**UNITED STATES DISTRICT COURT FOR THE DISTRICT OF RHODE ISLAND**

THOMAS WALDEN, et als

VS. C. A. NO. 04-304S

CITY OF PROVIDENCE, et als

consolidated with

JOHN C. CHMURA, et als

VS. C. A. NO. 04-553S

CITY OF PROVIDENCE, by and through STEVEN T. NAPOLITANO, its Treasurer, et als

**MOTION FOR SUMMARY JUDGMENT OF DEFENDANT, MANUEL VIEIRA**

Defendant, Manuel Vieira, hereby moves for Summary Judgment pursuant to Fed. R. Civ. P. 56. In support of his Motion for Summary Judgment, Defendant, Manuel Vieira, relies upon the accompanying Memorandum of Law.

Defendant, Manuel Vieira
By His Attorney,

George L. Santopietro, Esq.--#2056
Coia & Lepore, Ltd.
226 South Main Street
Providence, RI 02903
751-5522

## CERTIFICATION

I hereby certify that I mailed a true copy of the within Motion for Summary Judgment and Memorandum of Defendant, Manuel Vieira, by regular mail, postage prepaid on this 6 day of April, 2006 to:

Mark Fay, Esq.
127 Dorrance Street, 2nd floor
Providence, RI 02903

Carolyn Mannis, Esq.
170 Westminster Street, Suite 800
Providence, RI 02903

Kevin McHugh, Esq.
Michael Calise, Esq.
Assistant City Solicitor
City of Providence
275 Westminster Street, 2nd floor
Providence, RI 02903

Susan Marcotte Carlin, Esq.
The Lincoln Center, Suite 205
132 Old River Road
Lincoln, RI 02865

Dean Robinson, Esq.
670 Willett Avenue
East Providence, RI 02915

George J. West, Esq.
One Turks Head Place, Suite 312
Providence, RI 02903

Annette C. Scalzi
Annette C. Scalzi

# UNITED STATES DISTRICT COURT FOR THE DISTRICT OF RHODE ISLAND

THOMAS WALDEN, et als

VS. C. A. NO. 04-304S

CITY OF PROVIDENCE, et als

consolidated with

JOHN C. CHMURA, et als

VS. C. A. NO. 04-553S

CITY OF PROVIDENCE, by and
through STEVEN T. NAPOLITANO,
its Treasurer, et als

# MEMORANDUM IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT OF DEFENDANT, MANUEL VIEIRA

Defendant, Manuel Vieira

By His Attorney,
George L. Santopietro, Esq.-#2056
Coia & Lepore, Ltd.
226 South Main Street
Providence, RI 02903
(401) 751-5522

# TABLE OF CONTENTS


Table of Authorities .................................................. i

Issues Presented .................................................. 1

Statement of Facts .................................................. 2

Argument .................................................. 6

I. DEFENDANT, MANUEL VIEIRA, DID NOT DEPRIVE PLAINTIFFS OF THEIR CIVIL RIGHTS OR CONDUCT AN ILLEGAL SEIZURE .................. 7

(a) qualified and supervisory immunity ............ 12

II. DEFENDANT, MANUEL VIEIRA, DID NOT ENGAGE IN THE INTERCEPTION OF WIRE, ELECTRONIC AND ORAL COMMUNICATIONS IN VIOLATION OF 18 U.S.C. §2511............................ 19

(a) the interception occurred within the ordinary course of business .................... 21

(b) the plaintiffs consented to the interception ... 25

III. DEFENDANT, MANUEL VIEIRA, DID NOT ENGAGE IN THE UNAUTHORIZED INTERCEPTION, DISCLOSURE, OR USE OF WIRE, ELECTRONIC, OR ORAL COMMUNICATIONS IN VIOLATION OF R.I. GEN. LAWS §11-35-21 .................................................. 27

IV. DEFENDANT, MANUEL VIEIRA, DID NOT VIOLATE PLAINTIFFS' RIGHT TO PRIVACY .............. 28

V. DEFENDANT, MANUEL VIEIRA, DID NOT ENGAGE IN THE INTERCEPTION AND DISCLOSURE OF WIRE, ORAL, OR ELECTRONIC COMMUNICATIONS IN VIOLATION OF R.I. GEN. LAWS §12-5.1-1 et seq. .............................................. 31

Conclusion .................................................. 33

# TABLE OF AUTHORITIES

## 1. United States Supreme Court Decisions

*Anderson v. Creighton*,
483 U.S. 635, 107 S.Ct. 3034, 97 L.Ed.2d 523 (1987)……………10, 11

*Anderson v. Liberty Lobby Inc.*,
477 U.S. 242, 106 S.Ct. 2505, 91 L.Ed.2d 206 (1986)…………………1

*Brandon v. Holt*,
469 U.S. 464, 105 S.Ct. 873, 83 L.Ed.2d 878 (1985)…………………..2

*Brosseau v. Haugen*,
125 S. Ct. 596, 543 S.Ct. 194, 160 L.Ed.2d 583 (2004)………………..8

*Canton v. Harris*,
489 U.S. 378, 109 S.Ct. 1197, 103 L.Ed.2d 412 (1989)………………..6

*County Comm'rs of Bryan County v. Brown*,
520 U.S. 397, 117 S.Ct. 3034, 137 L.Ed.2d (1997)………………..13,14

*First National Bank of Arizona v. Cities Service Co.*,
391 U.S. 253, 88 S.Ct. 1575, 20 L.Ed.2d 569 (1968)…………………1

*Malley v. Briggs*,
475, U.S. 335, 106 S.Ct. 1092, 89 L.Ed.2d 271 (1986)……………….13

*Mitchell v. Forsyth*,
472 U.S. 511, 105 S.Ct. 2806, 86 L.Ed.2d 411 (1985)…………….... 7,10

*Monell v. Department of Social Servs.*,
436 U.S. 658, 98 S. Ct. 2018, 56 L.Ed.2d 611 (1978)………….………3

*O'Connor v. Ortega*,
480 U.S. 709, 107 S.Ct. 1492, 94 L.Ed.2d 601 (1987)………………..24

*Saucier v. Katz*,
533 U.S. 194, 121 S.Ct. 2151, 150 L.Ed.2d 272 (2001)…………....7,8,12

*Wilder v. VA Hospital Ass'n*,
496 U.S. 498, 110 S.Ct. 2510, 110 L.Ed.2d 455 (1990)....................4

*Will v. Michigan Dept. of State Police*,
491 U.S. 58, 109 S.Ct. 2304, 105 L.Ed.2d 45 (1989)......................2

2. Federal Court Decisions

*Amati v. City of Woodstock*,
176 F.3d 952 (7th Cir. 1999), cert. denied, 528 U.S. 985,
120 S.Ct.445, L.Ed.2d 362 (1999)..........................................17

*Anderson v. City of Columbus*,
374 F. Supp. 2d 1240 (2005) ..........................................4,22

*Arias v. Mutual Cent. Alarm Serv.*,
202 F.3d 553 (2nd Cir 2000)..........................................15-17,21

*Barreto-Rivera v. Medina-Vargas*,
168 F.3d 42 (1st Cir. 1999)..........................................13

*Blake v. Wright*,
179 F. 3d 1003 (6th Cir 1999)..........................................14,24

*Camilo-Robles v. Hoyos*,
151 F.3d 1 (1st Cir. 1998), cert. denied,
525 U.S. 1105 (1999)..........................................7-11,13

*Doe v. Taylor Indep. Sch. Dist.*,
15 F. 3d 443 (5th Cir. 1994)..........................................9

*Greenfield v. Kootenai County*,
752 F.2d 1387 (9th Cir. 1985)..........................................15

*Jandak v. Village of Brookfield*,
520 F. Supp. 815 (D.C. Ill. 1981)..........................................15,19,20

*Kabir v. F.W. Green*,
2003 WL 2405700 (2003)..........................................3

*Napier v. Windham*,
187 F.3d 177 (1st Cir. 1999)........................................1,11

*Savard v. Rhode Island*,
338 F.3d 23 (1st Cir. 2003)........................................7,8,10,12

*Schwier v. Cox*,
340 F.3d 1284 (11th Cir. 2003)........................................4

*Shaw v. Stroud*,
13 F.3d 791 (4th Cir. 1994), cert. denied,
513 U.S. 813 and 513 U.S. 814 (1994)........................................9,14

*United States v. Anderson*,
154 F.3d 1225 (10th Cir. 1998)........................................25

*United States v. Angevine*,
281 F.3d 1130 (10th Cir. 2002)........................................25

*United States v. Lanoue*,
71 F.3d 966 (1st Cir. 1995)........................................21

*United States v. Leary*,
846 F.2d 592 (10th Cir. 1988)........................................25

*United States v. Workman*,
80 F.3d 688 (2d Cir. 1996)........................................21

*Vinnedge v. Gibbs*,
550 F.2d 926 (4th Cir. 1977)........................................3

*Walker v. Darby*,
911 F.2d 1573 (11th Cir. 1990)........................................22

*Young v. City of Providence*,
396 F. Supp. 2nd 125 (2005)........................................1,7-13

### 3. State Court Decisions

*Clancy v. McCabe.*,
441 Mass. 311 (2004)......................................................6

### 4. Federal Statutes

42 U.S.C. §1983 ........................................................2-4,11,14

18U.S.C.§2510........................................................15,16,18,20,21

18U.S.C.§2511........................................................14-16,18,20

### 5. Federal Civil Procedure

Fed. R. Civ. P. 56 ........................................................1

### 6. Rhode Island Statutes

R.I. Gen. Laws §11-35-21........................................................22

R.I. Gen. Laws § 9-1-28.1........................................................23

R.I. Gen. Laws §12-5.1-1 ........................................................26,27

### 7. State Constitution

Article I, Section 6 of the Rhode Island Constitution..............................2,3

8. Secondary Authorities

Senate Rep. No. 1097, 90th Cong. 2d Sess. (1968), reprinted in 1968 U.S. Code Cong. Admin. News.......................................................21

## ISSUES PRESENTED

I. Whether defendant, Manuel Vieira, violated 42 U.S.C. §1983 or Article I, Section 6 of the R.I. Constitution as alleged in Counts I and II of plaintiffs' Complaint.

II. Whether defendant, Manuel Vieira, violated 19 U.S.C. §2511 as alleged in Count III of plaintiffs' complaint?

III. Whether defendant, Manuel Vieira, violated R.I. Gen. Laws §11-35-21 as alleged in Count IV of the plaintiffs' complaint?

IV. Whether defendant, Manuel Vieira, deprived plaintiffs of their right to privacy in violation of R.I. Gen. Laws §9-1-28.1 as alleged in Count V of their complaint.

V. Whether defendant, Manuel Vieira, violated R.I. Gen. Laws §12-5.1-1 et seq. as alleged in Count VI of the plaintiffs' complaint.

## STATEMENT OF UNDISPUTED FACTS

1. Manuel Vieira became Director of Communications for the City of Providence in 1993 and held that position until he left employment in February 2003. (Vieira Depo. 26/17-25; 27/1-2)

2. Meetings were held to establish the needs for the new Public Safety Complex. (Vieira Depo. 34/1-3.)

3. Communications Department employees and representatives from the fire and police departments and internal affairs were present to discuss the Public Safety Complex in December, 2001. (Vieira Depo. 35/11-25; 36/1-11 and 37/16-20.)

4. Total Recall was put out to bid through a request for proposal. (Vieira Depo. 30/12-17)

5. The request for a proposal for the computer system was drafted and presented to the Board of Contracts and Supplies. (Vieira Depo. 39/6-12)

6. From the time that the city received bids until the bid for the system was accepted, it took about 5-6 months. (Vieira Depo. 54/16-22.)

7. Expanets or Avaya was awarded the contract for the Total Recall system. (Vieira Depo. 44/21-23.)

8. The Board of Contracts and Supplies and, not Manuel Vieira, awarded the contract. (Vieria Depo. 44/24-25; 45/1-5.)

9. Manuel Vieira first became aware of the name Total Recall system after the bid was recommended and accepted. (Vieira Depo. 46/10-14.)

10. Total Recall had two functions-record lines at central station at the Public Safety Complex, where clerks received service calls, and for a record management system to account for phones in the Public

Safety Complex and Communications department. (Vieira Depo.47/13-25)

11. Phone lines in the police control center were being recorded. (Lennon Depo. 78/13-15)

12. The purposes of Total Recall were to record emergency lines and for a records management system which would identify phone abuse. (Vieira Depo. 30/12-15.)

13. The record management system was to identify "900" or sex number calls and other phone abuses. (Vieira Depo. 48/1-6)

14. The office of communications was located at the West Exchange Street address. (Vieira Depo. 58/17-25)

15. The Public Safety Complex opened at the end of July/beginning of August, 2002. (Vieira Depo. 58/10-12)

16. In July/August 2002, Total Recall system was operational. (Vieira Depo. 59/1-7)

17. Manuel Vieira was never given a password to access the Total Recall system. (Vieira Depo. 90/16-17)

18. Manuel Vieira did not know how to access a recorded phone conversation that was stored in Total Recall. (Vieira Depo. 90/6-9)

19. Manuel Vieira never saw the Total Recall system. (Vieira Depo. 138/14-17)

20. Manuel Vieira told one of his technicians Tony Desmaris that he wanted every line to be accounted for record management. (Vieira Depo. 104/5-8)

21. In early to mid January, 2003, Manuel Vieira realized, after a conversation with Fire Chief Dutra, that a line other than the central station or emergency lines may have been recorded. (Vieira Depo. 63/24-25; 64/1-13)

22. After a conversation with Chief Dutra, Manuel Vieira contacted City Solicitor John D'Amico and requested a meeting with representatives from the fire, police and communications department.
(Vieira Depo. 74/13-19) and (75/14-17)

23. The meeting was scheduled, but cancelled.
(Vieira Depo.75/24-25)

24. Manuel Vieira never spoke to Tony Desmaris about recording the lines except for central station and the management system. (Vieira Depo. 63/14-23)

25. Tony Desmaris did not indicate to Manuel Vieira that other lines were being recorded. (Vieira Depo. 66/14-17)

26. Manuel Vieira did not realize that more lines were being recorded until February 2003. (Vieira Depo. 66/18-25)

27. Manuel Vieira refused to resign because he believed he didn't do anything wrong. (Vieira Depo. 68/14-16)

28. Stephen Moise was the fire alarm inspector. (Moise Depo. 26/9) and he was trained on the system with other colleagues. (Moise Depo.31/2-7)

29. Joseph Richardson was the Deputy Director of Communications. (Richardson Depo. 11/18-20)

30. He attended meetings during which the communications system for Public Safety Complex was discussed. (Richardson Depo. 22/10-13)

31. He understood that all emergency calls for service, channel 4 (police calls), and NCIC calls were being recorded. (Richardson Depo. 27/1-8 see page 32)

32. Based upon his conversations with Manuel Vieira, he did not have an understanding that Manuel Vieiria knew the lines for Fire Chiefs Lanzi and Rattigan were being recorded. (Richardson Depo. 42/1-6)

33. Manuel Vieira never told him that all the calls were being recorded. (Richardson Depo. 49/9-12)

34. Mary Lennon was the Chief of Operations in the Communications Department. (Lennon 13/8-10)

35. She received some training in the Total Recall system in November 2002. (Lennon Depo. 41/9-11)

36. She had no first hand knowledge as to who made the decision to install the Total Recall system. (Lennon Depo. 79/4-6)

37. She was instructed by Deputy Director Joseph Richardson that a form had to be used in order to access Total Recall recorded conversations. (Lennon Depo. 46/12-21)

38. She believes that there were two requests from the police department to access recorded phone conversations. (Lennon Depo.53/1-4)

39. One would have to use a terminal in the computer room and a password in order to retrieve phone recordings on the Total Recall system. (Lennon Depo. 54/21-24)

## ARGUMENT

In deciding a Motion for Summary Judgment, a court must consider whether the "pleadings, depositions, answers to interrogatories and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). The burden of demonstrating the absence of a genuine issue of material facts rests with the moving party. Young v. City of Providence, 396 F. Supp. 2nd 125,130-131 (2005). Once the moving party has pointed to the absence of adequate evidence supporting the non-moving party's case, the onus is on the non-moving party to present facts that show a genuine issue for trial. Napier v. Windham, 187 F.3s 177,182 (1st Cir. 1999) "[A] party opposing a properly supported motion for summary judgment may not rest upon mere allegation or denials of his pleading, but must set forth specific facts showing that there is a genuine issue for trial." Anderson v. Liberty Lobby Inc., 477 U.S. 242, 256, 106 S. Ct. 2505, 91 L. Ed.2d 206 (1986) (citing Fed.R.Civ.P. 56 (e)). "Plaintiff... [must] offer [ ] ...' significant probative evidence tending to support the complaint." *Id.* at 256, 106 S. Ct. 2505 (quoting from First National Bank of Arizona v. Cities Service Co., 391 U.S. 253, 290, 88 S. Ct. 1575, 20 L.Ed. 2d 569 (1968).

## I. Defendant, Manuel Vieira, did not deprive the Plaintiffs of their civil rights or conduct an illegal seizure.

The central issues in the instant case are embodied in Counts I and II of the plaintiffs' complaint. In essence, plaintiffs allege that defendants, including Manuel Vieira, (hereinafter referred to as "Vieira") violated their rights under 42 U.S.C.§1983 or Article I, Section 6 of the Rhode Island Constitution by using, installing and maintaining the "Total Recall" system. Additionally, the plaintiffs have filed this action against the defendants individually and in their official capacities. For the purposes of this analysis, both counts will be addressed at this time.

In the present case, there is absolutely no evidence whatsoever that Vieira acted outside of the scope of his position as Director of Communications for the City of Providence at the time the alleged violations occurred. It is clear that a suit against an official in his official capacity is not an action against the official, but rather is a suit against the official's office. Will v. Michigan Dept. of State Police, 491 U.S.58, 71, 109 S. Ct. 2304, 105 L.Ed.2d 45 (1989) citing Brandon v. Holt, 469 U.S. 464, 471, 105 S. Ct. 873, 83 L.Ed.2d 878 (1985). As such, an official acting in his official capacity is not a "person" under §1983. *Id.* at 71. Moreover, in order for the plaintiffs to pursue the case at bar against Vieira in his individual capacity, they must

affirmatively show that defendant "acted personally in the deprivation of the plaintiffs' rights." Kabir v. F. W. Green, 2003 WL 24054700, p. 7(E.D. Va. 2003) citing Vinnedge v. Gibbs, 550 F.2d 926, 928 (4th Cir. 1977). It is not enough to show that subordinates of a sued official deprived plaintiffs of their constitutional rights; the doctrine of *respondeat superior* has no application in Section 1983 cases. *Id.* at 7. See, Monell v. Department of Social Servs., 436 U.S. 658, 694, 98 S. Ct. 2018, 56 L.Ed. 2d 611 (1978). If plaintiffs have not shown a personal connection between this defendant and a denial of their constitutional rights, that claim must fail. Similarly, that reasoning should apply to plaintiffs' contentions in Count II of their complaint. Accordingly, since the City of Providence is a named defendant, Vieira's inclusion individually is inappropriate and unjustified.

As to his official capacity, Vieira is likewise not liable because plaintiffs have not alleged or shown that a municipal policy or custom existed that caused the violation. In the instant case, plaintiffs have not set forth a cognizable claim under §1983 or Article I Section 6 because they are seeking damages under Title III as reflected in Count III of their complaint. When plaintiffs attempt to enforce an existing federal right under §1983, "courts must look to whether Congress intended to foreclose [ ] a remedy under §1983 either 'expressly, by forbidding recourse to §1983 in the statute itself, or impliedly, by creating a comprehensive enforcement scheme that is

incompatible with individual enforcement under §1983." Schwier v. Cox, 340 F.3d 1284, 1292 (11th Cir. 2003). A civil enforcement mechanism for a Title III violation is already in place, and it allows for damages, just as a §1983 action would. There is no reason for plaintiffs to look to §1983 as "an alternative source of express congressional authorization of private suits." Wilder v. VA Hospital Ass'n, 496 U. S. 498, 509 n. 9, 110 S. Ct. 2510, 110 L.Ed. 2d 455 (1990). In effect, plaintiffs would be recovering, if at all, for the exact same claim/violation under two different statutes. see, Anderson v. City of Columbus, 374 F. Supp, 2d 1240, 1253 (2005). Here, plaintiffs have filed claims seeking relief pursuant to Title III which will be discussed hereafter.

A review of the plaintiffs' complaint reveals that it is replete with naked allegations which are unsupported by any evidence. So far, plaintiffs have deposed fire alarm inspector Stephen Moise and defendants Joseph Richardson, Urbano Prignano, Mary Lennon and Vieira. Not one witness has testified that they ever saw Vieira use or access the Total Recall system or that he knew the phone lines for inbound and outgoing calls, except for emergency or central desk lines, were being recorded. As such, there is no testimonial evidence supporting any of the contentions in plaintiffs' complaint. In his deposition, Vieira explained that the only lines which were recorded related to emergency or central desk calls. Also, at the request of high-ranking officials from the Police Department, he incorporated call cost accounting within the

telephone system which maintained records of every call into and out of the Public Safety Complex. The purpose of this record management system was to identify any misuse of the telephone system since it was common knowledge that long distance and "900" or sex line calls were generated from the former police station in Providence. However, Vieira adamantly denied that he ordered or knew that phone lines at the Public Safety Complex were recording private conversations. When he was initially informed in mid to late January, 2003 that a call involving Fire Chief Dutra may have been recorded, he was shocked. In response, he immediately questioned one of his technicians and contacted the City Solicitor's office for advice. Such conduct clearly indicates that he had no knowledge with respect to the extent of the recording of calls. That is not to say, of course, that even if he knew conversations were recorded, that his conduct is "clearly established" as unlawful.

Assuming plaintiffs establish a genuine issue of material fact that Vieira violated plaintiffs' constitutional and/or statutory rights, an assertion totally denied by Vieira, plaintiffs have failed to show that his action or omission was affirmatively linked to plaintiffs' damages. "[M]ere cause-in fact does not suffice to establish the required affirmative link. If that were the test, every degradation of this sort would give rise to [supervisory] liability, for every §1983 claimant harmed by such employer conduct could 'point to something the [supervisor] "could have done" to prevent the unfortunate incident."

Clancy v. McCabe, 441 Mass. 311, 321 (2004) (quoting Canton v.. Harris, 489 U.S. 378, 392, 109 S. Ct. 1197, 103 L.Ed.2d 412 (1989). Rather, the affirmative connection requires something more, such as "tacit approval of, acquiescence in, or purposeful disregard of, rights-violating conduct," Camilo-Robles v. Hoyos, 151 F. 3d 1, 7 (1st Cir. 1998), cert. denied, 525 U.S. 1105 (1999). Here, the complaint is replete with obtuse and unsupported allegations and the record, which consists of the depositions and plaintiffs' answers to interrogatories, is bereft of any evidence linking Vieira to any alleged injuries.

As to the issue of damages, in their complaint plaintiffs contend that they suffered personal injuries and other damages as a result of the defendants' conduct. However, in response to defendants' interrogatories numbered 21 and 22, they waived their claims for personal injuries. Also, their responses, which have not been supplemented, fail to enumerate or describe their "other damages."

> 21. Please describe in detail the nature of each component and/or symptom of personal injury you experienced as a result of defendants' actions and as alleged in the complaint. For each such component and/or symptom of personal injury, please identify by name, address and specialty each and every health care provider you consulted, treated with, otherwise visited as a result of the personal injury, and provide the dates of each such consultation or visit.
>
> Answer: I am waiving any personal injury claim as a result of this action but I am seeking nominal damages.
>
> 22. With regard to each component and/or symptom of personal injury described in your answer to interrogatory 21 above, please state

whether you had ever experienced any similar component and/or symptom of personal injury prior to your discovery of the matters described in your complaint related to the "Total Recall" system, and if your answer is in the affirmative, identify each previously experienced component and/or symptom of personal injury, its cause and origin, and provide the name, address and dates of treatment of each and every health care provider with whom you consulted, treated or visited as a result of said prior similar component and/or symptom of personal injury.

Answer: I am waiving any personal injury claim as a result of this action but am seeking nominal damages.

If this Court finds that the plaintiffs have demonstrated that they are entitled to relief in accordance with Counts I and/or II of their complaint, Vieira is exempt from liability based upon qualified and/or supervisory immunity.

(a) Qualified and Supervisory Immunity

"Qualified immunity is 'an entitlement not to stand trial or face the other burdens of litigation.' " Saucier v. Katz, 533 U.S. 194, 200, 121 S.Ct. 2151, 150 L.Ed.2d 272 (2001) (quoting Mitchell v. Forsyth, 472 U.S. 511, 526, 105 S.Ct. 2806, 86 L.Ed.2d 411 (1985). Courts considering qualified immunity claims follow a three pronged approach and must analyze the issues in a particular order. Young v. City of Providence, 396 F.3d 125, 131 (2005) citing Savard v. Rhode Island, 338 F.3d 23, 27 (1st Cir. 2003); Saucier, 533 U. S. at 200. First, the court inquires whether, "[t]aken in the light most favorable to the party asserting the injury, do the facts alleged show the defendant's conduct violated a

constitutional right?" *Id.* at 131. If the answer is affirmative, the court must then determine if the right allegedly violated was "clearly established" at the time. *Id.* at 131. (citing Brosseau v. Haugen, 125 S. Ct. 596, 599, 543 U.S.194, 160 L.Ed.2d 583 (2004). If the right was clearly established, then the court reaches the final query: "whether a reasonable official, situated similarly to the defendant(s), would have understood that the conduct at issue contravened the clearly established law." *Id.* at 131. citing Savard, 338 F.3d at 27. Even if an official is mistaken regarding whether his conduct violated clearly established law, qualified immunity protects the official when his "mistake as to what the law requires is reasonable." *Id.* at 132. citing Saucier, 533 U. S. at 205.

Qualified immunity protects "supervisory officials from suit when they could not reasonably anticipate liability." *Id.* at 132. citing Camilo-Robles v. Hoyos, 151 F.3d 1, 6 (1st Cir. 1998). In the present case, plaintiffs seek to hold Vieira accountable for his role as Director of the Communications Department. When defendants seek qualified immunity in the supervisory liability context, two prongs of the traditional three-pronged inquiry become more particularized. *Id.* at 132. First, within the "clearly established" prong, the court must answer two distinct questions. In order "for a supervisor to be liable there must be a bifurcated 'clearly established' inquiry – one branch probing the underlying violation, and the other probing the supervisor's potential liability." *Id.* at 132. (citing Camilo-Robles, 151 F.3d at 6.) More

specifically, "the 'clearly established' prong of the qualified immunity inquiry is satisfied when (1) the subordinate's actions violated a clearly established constitutional right, and (2) it was clearly established that a supervisor would be liable for constitutional violations perpetrated by his subordinates in that context." *Id.* at 132. (citing Doe v. Taylor Indep. Sch. Dist., 15 F.3d 443, 456 (5th Cir. 1994); Shaw v. Stroud, 13 F.3d 791, 801 (4th Cir. 1994) ).

The second change to the traditional qualified immunity inquiry occurs in the third prong, "objective legal reasonableness." *Id.* at 132. When the underlying claim involves supervisory liability, a court must ask whether the supervisor "should reasonably have understood that his conduct jeopardized [the plaintiff's clearly established constitutional] rights. *Id.* at 132. (citing Camilo-Robles, 151 F.3d at 7). Although courts generally keep the qualified immunity analysis distinct from the merits analysis, the supervisory liability "test of objective legal reasonableness to some extent collapses the separate 'qualified immunity' and 'merits' inquiries into a single analytic unit." *Id.* at 132.

In order to satisfy the first prong of the qualified immunity analysis, plaintiffs must demonstrate that "the facts alleged show Vieira's conduct violated a constitutional right[.]" see, *Id.* at 133. In this case, plaintiffs have not established that Vieira either personally or in his official capacity violated their rights.

The second prong of the qualified immunity analysis "deals with fair warning; it asks whether the law was clearly established at the time of the constitutional violation. *Id* . at 133. (citing Savard, 338 F.3d at 127). In the supervisory liability context, this prong divides into two distinct queries. This Court must determine "whether both the underlying constitutional violation of the plaintiffs' rights and the basis for liability of Vieira were clearly established [ ]". *Id.*, at 134. (citing Young, 404 F.3d at 32) (emphasis added). First, this Court must discern if the constitutional right in prong one is a clearly established constitutional right. see Camilo-Robles, 151 F.3d at 6. Only if that question is answered in the affirmative does the Court proceed to the second inquiry regarding whether it was clearly established that a supervisor could be liable for the recording of private conversations. *Id.* at 134. The Supreme Court's holding in Anderson v. Creighton, 483 U. S. 635, 640, 107 S. Ct. 3034, 97 L.Ed.2d 523(1987), suggests the need for a particularized statement of the right violated:

> It should not be surprising, therefore, that our cases establish that the right the official is alleged to have violated must have been "clearly established" in a more particularized, and hence more relevant, sense: The contours of the right must be sufficiently clear that a reasonable official would understand that what he is doing violates that right. This is not to say that an official action is protected by qualified immunity unless the very action in question has previously been held unlawful, see Mitchell v. Forsyth, 472 U. S. 511, 535, n.12 (1985); but it is to say that in the light of pre-existing

law the unlawfulness must be apparent.

Anderson attempted to preclude the use of overly generalized allegations to satisfy the clearly established prong and thereby defeat the defense of qualified immunity. *Id.* at 134. Some cases since Anderson have required plaintiffs to show that a more particularized right was in fact clearly established law. *Id.* at 134. See, e.g., Napier v. Town of Windham, 187 F.3d 177, 188-189 (1st Cir. 1999.

In the instant case, the plaintiffs have filed a complaint which consists solely of unsubstantiated allegations. Although in Count I they seek relief pursuant to 42 USC §1983, they do not adequately state the basis of their claim. Additionally, they fail to specifically identify the actual violation purportedly committed by Vieira and the resulting consequences. In this case, the law is not "clearly established" that callers were entitled to a reasonable expectation of privacy. The law regarding the monitoring of phone lines was sufficiently unclear at the time of the alleged violations that a "reasonable" person in Vieira's position would not have known he was violating "clearly established" rights.

The second inquiry within the "clearly established" prong asks whether "it was clearly established that a supervisor would be liable for constitutional violations perpetrated by his subordinates in [this] context." *Id.* at 134. (citing Camilo-Robles, 151 F.3d at 6). "[T]he relevant legal rights and obligations

must be particularized enough that a reasonable official can be expected to extrapolate from them and conclude that a certain course of conduct will violate the law." *Id.* at 135. (citing Savard, 338 F.3d at 28). The right violated must be defined at the appropriate level of specificity before a court can determine if it was clearly established. Saucer v. Katz, 533 U.S. 194, 121 S. Ct. 2151, 150 L.Ed. 272 (2001).

Without engaging in repetition, in every deposition which has been taken by the plaintiffs, no one has testified that Vieira knew or should have known that telephone conversations at the Public Safety Complex were being recorded. Moreover, each defendant affirmed that they had no personal knowledge that lines were recorded. Furthermore, plaintiffs have not established that the Total Recall system was programmed by Vieira or his subordinates to record conversations. Is there liability on the part of any defendant if the system was pre-programmed to record conversations by the entity which sold the system to the City without the knowledge of the defendants? Vieira did not receive any training on the system and did not have an access code. The undisputed evidence manifests that he never knew that lines other than emergency and central station were recorded. Once he was notified that a non-emergency or central desk line may have been subjected to recording, he contacted Attorney John D'Amico of the City Solicitor's office

and sought his advice. He only ordered the lines to be subjected to call costs accounting and not recording.

Plaintiffs' final obstacle in overcoming Vieira's claim of qualified immunity requires them to establish at least a material issue of disputed fact as to whether Vieira acted in an objectively unreasonable manner. *Id.* at 136. In order for conduct to be unprotected by qualified immunity, it must rise to the level of deliberate indifference. *Id.* at 136. (citing Camilo-Robles, 151 F.3d at 7). Proof of deliberate indifference requires that plaintiffs show "(1) a grave risk of harm, (2) the defendant's actual or constructive knowledge of that risk, and (3) his failure to take easily available measures to address the risk." *Id.* at 136. But, supervisors remain protected by qualified immunity when they make reasonable mistakes regarding the constitutionality of their conduct. *Id.* at 136-137 (citing Saucier, 533 U. S. at 206). Therefore, qualified immunity provides "protection to all but the plainly incompetent or those who knowingly violate the law." *Id* .at 137. (citing Malley v. Briggs, 475 U. S. 335, 341 (1986)). Thus, plaintiffs must prove that there are material factual disputes regarding whether Vieira was deliberately indifferent to a grave risk. That "conduct or inaction must amount to a reckless or callous indifference to the constitutional rights of others." Barreto-Rivera v. Medina-Vargas, 168 F.3d 42, 48 (1s Cir. 1999) Deliberate indifference is a stringent standard of fault, requiring proof that a [supervisor] disregarded a known or obvious consequence of his action." County Comm'rs

of Bryan County v. Brown, 520 U.S. 397, 410, 177 S.Ct. 1382, 137 L.Ed.626 (1997). Of course, mere negligence is insufficient and does not rise to the level of callous indifference. Although Vieira may have done more, such a rule is not the standard by which his conduct should be judged. see, Shaw v. Stroud, 13 F.3d 791, 801 (4th Cir.1994), cert. denied, 513 U.S. 813 and 513 U.S. 814 (1994). Here, Vieira did not exhibit the "deliberate indifference' to the alleged conditional injuries required to impose liability under §1983.

Although the foregoing analysis deals with the application of qualified and supervisory immunity in actions under §1983, those defenses are equally applicable to the plaintiffs' Title III claims which are addressed later in this memorandum. see, Blake v. Wright, 179 F.3d 1003, 1110-1111 (6th Cir. 1999)

**II. Defendant, Manuel Vieira, did not engage in the interception and disclosure of wire, oral or electronic communications.**

In Count III of their complaint, plaintiffs contend that Vieira violated Section 2511 of the Omnibus Crime Control and Safe Streets Act of 1968, which prohibits, in relevant part, any person from intentionally intercepting a wire, oral or electronic communication. In the instant case, the record, which presently consists of four depositions and plaintiffs' answers to interrogatories, is completely devoid of any evidence which establishes that Vieira acted

willfully or intentionally. Hence, summary judgment should be entered on his behalf relative to this count of the complaint.

If this Court disagrees, it is necessary to ascertain if Vieira has violated 18 U.S.C. §2511. With that in mind, 18 U.S. §2510 must be examined in order to define the apposite terms. An interesting question involves Section 2510 (5)(a)(ii) of the statute which has caused considerable controversy and confusion in the courts, and has yet to be considered in circumstances similar to those presented here. See, Jandak v. Village of Brookfield, 520 F.Supp. 815, (D.C.Ill. 1981). As previously noted, the statute inhibits, among other things, intentionally intercepting a wire or oral communication. However, the case law relative to Title III is somewhat unclear regarding the proper definition of an "interception" under the statute. Arias v. Mutual Cent. Alarm Serv. 202 F.3d 553, 557 (2nd Cir. 2000). Subsection 4 of Section 2510 defines "intercept" as "the aural or other acquisition of the contents of any wire, electronic or oral communication through the use of any electronic, mechanical or other device." 18 U.S.C. §2510(4). The Arias court cited with approval the Ninth Circuit's holding in Greenfield v. Kootenai County, 752 F.2d 1387 (9th Cit. 1985). In Greenfield, the court found that telephone calls which were automatically recorded but not listened to were not "aurally acquired" within the meaning of Title III. see, Greenfield, 752 F.2d at 1389. As the district court correctly noted, although the definition of "intercept" was subsequently amended to

encompass "aural or other acquisition," 18 U.S.C. §2510(4) (emphasis added), this amendment sheds no light on the definition of "intercept" with respect to the oral communication at issue here. Arias, 202 F.3d at 558. Based upon those holdings, there is no violation of 18 U.S.C. §2511. If, however, this Court finds that Vieira violated the aforesaid statute, plaintiffs still are not entitled to any relief pursuant to Section 2511 because, as discussed hereafter, either the interception occurred within the ordinary course of business of defendants or the plaintiffs consented to the interception.

(a) Ordinary course of business exception

18 U.S.C. §2510 (5)(a)(ii) excludes from its definition of "electronic, mechanical or other device"..."any telephone... instrument, equipment, or facility, or any component thereof,...being used by a provider of wire or electronic communication service in the ordinary course of its business, or by an investigative or law enforcement officer in the ordinary course of his duties." It is axiomatic that recording systems similar to Total Recall are regularly utilized in public facilities such as the Providence Public Safety Complex for legitimate business purposes. Police and fire departments commonly employ such recording systems in order to preserve and accurately recall messages pertaining to emergencies or official business, to monitor calls

for evaluating the speed and adequacy of the response to tips and complaints, and to oversee any abusive usage of the phone lines by employees.

In Arias v. Mutual Cent. Alarm Serv., 202 F.3d 553, 558 (2nd Cir. 2000), the court had to decide whether the blanket recording of plaintiffs' personal conversations was in the ordinary course of business of their employer. The plaintiffs argued that the surreptious, 24-hour recording of all telephone conversations did not fall within the purview of the aforesaid exception. Additionally, they contended that even if the recording of their private conversations was supported by a purportedly legitimate business purpose, defendant should have provided them with notice if such blanket recording was to fall within the ordinary course of business exception. That court disagreed with their arguments and found that legitimate business reasons supported the continual recording of all incoming and outgoing telephone calls at their employer's business, which was non-governmental. *Id.* at 558. Here, the equipment was installed and used for proper business or investigative purposes. As discussed, the Total Recall system was utilized for call cost accounting in order to eliminate, or at least minimize, any misuse of the lines for private purposes, long distance or "900" calls and to preserve and accurately recall messages relating to emergencies or official police business.

Similarly, in Amati v. City of Woodstock, 176 F. 3d 952 (7th Cir. 1999), cert. denied, 120 S. Ct. 445, 528 U. S. 985, 145 L. Ed. 2d 362 (1999), sixty-three

plaintiffs, who were employees or former employees of the local police department, and their family members and friends filed an action pursuant to the federal electronic-eavesdropping statute, 18 U.S.C. §2510 et seq. in which they asserted that calls, which they made on a line designated for personal use, were recorded without their knowledge and consent. A jury found in favor of the police chief and former police officers. On appeal, the court upheld their verdict. The defendants relied upon the statutory exclusion of eavesdropping by an "investigative or law enforcement officer in the ordinary course of his duties." 18 U. S. C. §2510 (5)(a)(ii). The court reasoned that it was routine and standard, hence "ordinary", for all calls to and from the police station to the recorded. *Id.* at 954. However, the plaintiffs argued that wiretapping cannot be "in the ordinary course of law enforcement" unless there is notice to the people whose conversations are being recorded. *Id.* at 955. The court rejected the plaintiffs' interpretation of the statute and held that if the "ordinary course" exclusion required proof of notice, it would have no function in the statute because there is a separate statutory exclusion for cases in which one party to the communication has consented to the interception. *Id.* at 955, 18 U.S.C. §2511 (2)(c).

That court further interpreted "ordinary" to refer broadly to routine non-investigative recording of telephone conversations. As the court noted, this interpretation may have the same practical effect as the interpretation

mentioned earlier in which "ordinary course" included recording calls on one's own line; for ordinarily when police record calls as part of an investigation, they are recording calls on someone else's line. *Id.* at 955. The court explained that such recording is rarely an invasion of privacy, and for a reason that does after all bring the ordinary-course exclusion close to the consent exclusion: what is ordinary is apt to be known; it imports implicit notice. *Id.* at 955. Furthermore, the court reasoned that to record all calls to and from a police department is a routine police practice. *Id.* at 955. Jandak v. Village of Brookfield, 520 F.Supp. 815, 821-25 (D.C. Ill. 1981). Of interest, the court stated that the sparsity of case law on the question suggests not that the principle is dubious but that it is too obvious to have invited many challenges. Amati at 956.

In the case at bar, the plaintiffs ostensibly allege, since their complaint is so laconic and obscure, that the mere recording of their phone conversations violates their statutory and constitutional rights. In essence, they contend that because their personal conversations were intercepted, the defendants are obligated to remunerate them for their spurious damages. That personal calls as well as official calls were made on the police lines is irrelevant since all employees make personal calls on company lines. If all the lines are taped, as in the ordinary practice of fire and police departments, then the recording of personal as well as official calls is within the ordinary course of business. *Id.* at

956. In this case, the record is devoid of any evidence which establishes that calls were recorded for surreptitious or unlawful purposes. Additionally, the plaintiffs do not aver that their conversations were recorded to intimidate or humiliate them. The Total Recall system indiscriminately and routinely recorded activities on established and designated lines, and is not comparable to the selective use of recording equipment to eavesdrop on a normally unmonitored telephone system in order to record specifically selected communications. See, Jandak v. Village of Brookfield, 520 F.Supp. 815 (D.C. Ill. 1981). As that court and others have concluded, Congress did not enact the section as mere surplusage and the exception should not be so narrowly read. *Id.* at 823. Here, the call cost accounting recording was not conducted for illicit purposes but to insure that the phones were not misused for private purposes. As such, the course of business exception is clearly applicable to Vieira and any recordings are exempted from the statute by Section 2510 (5)(a)(ii).

(b) Consent exception

The "ordinary course of business" exception is separate and distinct from the "consent" exception. According to U.S.C. §2511 (2)(c ), a person is permitted to intercept communications "where such person is a party to the communication or where one of the parties to the communication has given

prior consent to such interception." Arias v. Mutual Cent. Alarm Serv., Inc., 202 F.3d 553, 558 (2nd Cir. 2000); see e.g. United States v. Workman, 80 F.3d 688, 692-693 (2d Cir. 1996) (recognizing consent exception and stating that the consent may be express or implied). The consent may be implied in fact from surrounding circumstances indicating that the party knowingly agreed to the surveillance. Senate Rep. No. 1097, 90th Cong. 2d Sess. (1968), reprinted in 1968 U.S. Code Cong. Admin. News, pp. 2112. The United States Court of Appeals for the First Circuit has recognized that the implied consent of one party to a communication may provide a defense to a claim that a person has intercepted a communication in violation of the Act. See United States v. Lanoue, 71 F.3d 966, 981 (1st Cir. 1995). The appeals court noted that implied consent is not constructive consent but rather "consent in fact." *Id.* at 981. Moreover, while consent should not be casually inferred, it may be implied in some circumstances notwithstanding insufficient notice. See *id.* Here, the phone recording system was submitted to and purchased after public bidding. During and subsequent to that process, many representatives from various departments within the Public Safety Complex attended meetings and training sessions during which the recording system and, more particularly, its use and capabilities were openly discussed.

A related issue is whether plaintiffs had an expectation that their conversations were free from interception. See 18 U.S.C. §2510(2) (defining

oral communication as "any oral communication uttered by a person exhibiting an expectation that such communication is not subject to interception under circumstances justifying such expectation"). Anderson v. City of Columbis, 374 F.Supp. 2nd 1240, 1251 (2005). The Eleventh Circuit has held that this is a two-step inquiry: (1) whether plaintiff "had a subjective expectation that his conversations were free from interception"; and (2) whether that expectation was objectively reasonable." Walker v. Darby, 911 F.2d 1573, 1577(11th Cit. 1990). Here, plaintiffs have not even alleged any expectation that their calls to the Public Safety Complex were free from interception. Accordingly, it is clear that the plaintiffs expressly or, at the very least, impliedly consented to the interceptions because they knew or should have known from the totality of the circumstances that their conversations would be recorded.

**III. Defendant, Manuel Vieria did not engage in the unauthorized interception, disclosure or use of wire, electronic or oral communications.**

In Count 4 of their complaint, plaintiffs assert that the defendants, including Vieria, violated R.I. Gen. Laws Section 11-35-21. In their pre-trial conference statement, plaintiffs admit that in order for them to recover under the aforementioned statute, they must demonstrate that Vieria "willfully intercepted …… any wire, electronic or oral communication." Obviously, the operative term is "willful" which connotes intentional or

deliberate conduct. As this Court is aware, the State Police concluded that there was no evidence to support the filing of criminal charges against the defendants. Additionally, although the plaintiffs have deposed four defendants and Stephen Moise, they have not produced any evidence which establishes that defendants, including Vieria, engaged in the willful or intentional interception of their phone conversations. In fact, Vieira confirmed at his deposition that he did not have a password or administrative access to the system.

## IV. Defendant, Manuel Vieira, did not violate Plaintiffs' right to privacy.

In Count V of their complaint, plaintiffs maintain that the actions of defendants, including Vieira, in installing, using and maintaining the Total Recall system deprived them of their right to privacy in violation of R.I. Gen. Laws §9-1-28.1. In their complaint, the plaintiffs fail to identify the sub-section(s) of said statute which support their allegations. For the purposes of this analysis, it will be assumed that plaintiffs rely upon (a)(1) which prescribes that every person in this state shall have "the right to be secure from unreasonable intrusion upon their physical solitude or seclusion." According to that section, in order to recover for violation of this right, it must be established that:

(a) it was an invasion of something that is entitled to be private or would be expected to be private;
(b) the invasion was or is offensive or objectionable to a reasonable man.

Initially, it is incumbent to ascertain if the installation and use of the recording system on the phones in a workplace setting such as a police or fire department necessarily constitutes an invasion of privacy. In the instant case, plaintiffs have failed to show that they had a reasonable expectation of privacy in their phone conversations. Stated broadly, workplaces or commercial settings often are subject to less protection than dwellings. Blake v. Wright, 179 F.3d 1003, 1009 (6th cir. 1999); see, O'Connor v. Ortega, 480 U.S. 709, 718, 107 S. Ct. 1492, 1501, 94 L.Ed. 2d 601 (1987). In O'Connor, the Supreme Court stated that "operational realities of the workplace, however, may make some employees' expectations of privacy unreasonable when an intrusion is by a supervisor rather than law enforcement agent." 480 U.S. at 717. A plurality of the justices held that the "privacy interests of government employees in their place of work" … "are far less than those found at home or in some other contexts." *Id.* at 725. The Supreme Court further concluded that although employees have an expectation of privacy in their workplace, that expectation is not without limits. *Id.* at 718.

In this case, numerous meetings and training seminars were held during which the computer recording system was openly discussed. Employees and

their supervisors in the fire and police departments shared information about the system and its capabilities. Additionally, the Communications Department had a policy which required the execution of a form and written consent by the parties before a telephone conversation could be accessed and downloaded for playback purposes. According to testimonial evidence, two telephone conversations were retrieved and listened to by police and fire personnel. Thus, the plaintiffs knew or should have known that their conversations may be recorded. In view of the nature of the work environment at the Public Safety Complex, any recordings were tenable and justified.

Next, it is necessary to examine whether the plaintiffs' subjective expectations that their conversations were free from interception were objectively reasonable. As previously noted, the expectation of privacy in a place of business is less than a similar expectation in a person's home. United States v. Leary, 846 F.2d 592, 597 n.6 (10th Cir. 1988). Whether an employee has an objectively reasonable expectation of privacy in the workplace is determined on a case-by-case basis. United States v. Angevine, 281 F.3d 1130, 1134 (10th Cir. 2002). Therefore, it is necessary "to examine all of the circumstances of the working environment and the relevant search." United States v. Anderson, 154 F. 3d 1225 (10th cir. 1998). Contrary to the contentions in their complaint, plaintiffs have not adduced any evidence which shows that Vieria violated §9-1-28.1. In fact, in their answers to defendants'

interrogatories numbered 18 and 19, all of the plaintiffs concede that they lack any personal knowledge or information supporting their allegation.

> 18. Please describe by date and by identity of the participants involved, each and every occasion on which you and/or any of the Plaintiffs had a telephone conversation, or a portion thereof, that was actually listened to by any individual Defendant, or by anyone acting on his/her behalf, either contemporaneously or subsequently, and that is related in any way to the allegations in Plaintiff's Complaint.
>
> Answer No. 18: I have no personal knowledge that any of the named individual defendants actually listened to any of my conversations.
>
> 19. Please describe by date and by identity of the participants involved, each and every occasion on which you and/or any of the Plaintiffs had a telephone conversation, or a portion thereof, that was actually listened to by anyone who was not a party to the telephone conversation, either contemporaneously or subsequently, and that is related in any way to the allegations in Plaintiffs' Complaint.
>
> Answer No. 19: I have no information that anyone who is not a party to this matter listed to any conversations involved in this action.

## V. Defendant, Manuel Vieira, did not engage in the interception of wire, electronic and oral communications.

In the sixth and final count of the complaint, plaintiffs contend that defendants, including Vieira, violated R.I. Gen. Laws §12-5.1-1 et seq. which is the state version of the Federal Wiretap Act. In order to recover, the plaintiffs must establish that they are "aggrieved persons" under the statute. That term is

defined as "an individual who was a party to any intercepted wire, electronic or oral communication or against whom the interception was directed." §12-5.1-1(1) Additionally, "oral communication" includes "any oral communication uttered by a person exhibiting an expectation that the communication is not subject to interception under circumstances justifying that expectation, but the term does not include any electronic communication." §12-5.1-1(10) Here, any conversations which may have been recorded do not constitute "oral communications" since the callers within the Public Safety Complex were probably aware that their calls were being recorded. As previously mentioned, prior and subsequent to the purchase of the Total Recall system, numerous meetings, which were attended by representatives from the Communications Center, and police and fire departments, were conducted in open forums and the system was requisitioned and purchased in accordance with standard municipal procedures. Hence, many, if not all, Public Safety Complex personnel had some belief --if not actual notice -- that conversations in the building may be recorded. Moreover, there is no evidence to even suggest that any steps were initiated to conceal or misrepresent the capabilities of the system. As a result, the plaintiffs should not be considered "aggrieved persons" and their telephone conversations do not qualify as "oral communications" as defined by the Statute.

## CONCLUSION

In the present case, plaintiffs allege that defendants, including Vieira, individually and in their official capacity, violated their constitutional and statutory rights by using, installing and maintaining the Total Recall System. However, their complaint is replete with obtuse and unsupported assertions. Moreover, the record in this case, which consists of the deposition testimony and answers to interrogatories, leads to only one reasonable conclusion – that there are no material issues of fact to be decided by a trier of fact. Even if plaintiffs demonstrated sufficient evidence to create genuine issues of material facts, which defendant Vieira vigorously denies, he is still exempt from liability because of the affirmative defenses including, but not limited to, qualified and supervisory immunity, consent and ordinary course of business exception, which he raised in his amended answer and which were discussed above. Accordingly, defendant Vieira respectfully requests that his motion for summary judgment be granted and that this case be dismissed against him both personally and in his official capacity.

Respectfully submitted,
Manuel Vieira,
By His Attorney,

George L. Santopietro, Esq.--#2056
Coia & Lepore, Ltd.
226 South Main Street
Providence, RI 02903
751-5522/331-3758

MR. ROBINSON: Objection.
MR. CRONIN: Objection.
MR. CALISE: Objection.
MR. WEST: Objection.
MS. CARLIN: Objection.
A. Yes.
MR. SANTOPIETRO: Everybody objected.
Q. Getting back to your initial position as the deputy director of communications department, you might have told me this, how long did you hold that position, 14 months, I think?
MR. SANTOPIETRO: Objection. Asked and answered.
A. It might have been a year or a little better. 13, 14 months.
Q. What was the next position you held after that?
A. Director of communications.
Q. You think you obtained that position in 1993?
A. I think so.
Q. All right. And was that the same position you held up until the time that you left your employment with the City of Providence?
A. Yes.
Q. I think you told me that was some time in February



'03?
A. Yes.
Q. You held the position for approximately ten years?
A. Yes.
Q. All right. And the director of the communications department, is that the highest administrative position within the communications department?
A. Below the Commissioner of Public Safety, yes.
Q. Right. And just take me above the director of the communications department, who was your direct supervisor, and then who is above that?
A. Commissioner Partington was my direct supervisor.
Q. Who would be above Commissioner Partington?
A. It would have been the Mayor.
Q. Whoever the Mayor was during those ten years?
A. Yes.
Q. Now, when you became the director of the communications department, I'm saying 1993, what were your job duties and responsibilities when you took that position?
A. Pretty much the same, with the exception, you know, I was to overlook all the operations, day-to-day operations. Once again, radio division, all the other divisions within the



department.
Q. Now, as the head of the department, director of communications, you would be responsible for any policies or procedures, rules or regulations in regard to the recording of phone conversations within the fire station and police station?
MR. SANTOPIETRO: Objection.
A. Maybe the policies and procedures or rules that pertain strictly to the emergency operation centers, yes.
Q. All right. For example, in regard to the Dictaphone system that was in place, at some point the idea must have been floated out there when we go to the new public safety building that this Total Recall system was going to be used. Now, the change from one system to another, is that something that would have come before you?
MR. SANTOPIETRO: Objection.
MR. McHUGH: Objection.
MR. ROBINSON: Objection.
MR. CRONIN: Objection.
MR. CALISE: Objection.
MR. WEST: Objection.
MS. CARLIN: Objection.
A. No, it did not. There really was no change.



Q. Did you have a Total Recall -- the Total Recall system is the system that was in the public safety building; you're aware of that, correct?
A. Yes.
Q. It's the same one that was removed about the same time you left your employment by Chief Esserman?
MR. SANTOPIETRO: Objection.
A. I believe it was.
Q. Did you have a system like that in place at any time prior to the ten years you were director of communications?
A. We had the Dictaphone system in place at the communications bureau and when the new Public Safety Complex was built, the new telephone equipment which was the telephone switch itself, and the recording equipment was placed in the Public Safety Complex. And it was an additional back-up phone switch that was placed at the communications department.
Q. All right. And part of that was the Total Recall system, correct, that was put in place?
A. The name -- I believe the name of the recording system was still Total Recall.
Q. Before that time, that system, Total Recall, hadn't been used anywhere within the City of

Q. When did those meetings take place when you were trying to establish what the needs were going to be?
A. Oh, God, there were so many of them. I probably went to the first two or three. I didn't go to the -- I didn't go to any more because it got to the point where everybody was fighting about parking spaces, who had a bigger bathroom, who had a bigger room. I didn't bother going.
I would say the first two or three meetings, oh, it had to be -- when this all first broke out, you know, a new station was going to be built, '01, December of '01. I mean, I'm just guessing.
Q. Well, no one wants you to guess, I just want your best recollection. Is that your best recollection?
A. My best recollection it was maybe the December of '01.
Q. Were there any records generated as a result of those meetings that memorialized what was talked about or established what the needs were going to be?
A. I don't know.
Q. Have you ever seen any records generated from those meetings?



A. No, I have not.
Q. At any time during those initial meetings, did anyone ever raise the issue that all of the lines should be recorded in the new public safety building?
MR. WEST: Objection.
MR. McHUGH: Objection.
MS. CARLIN: Objection.
MR. SANTOPIETRO: Objection to form.
A. No.
Q. All right. If you can just run through for me the names of the individuals that you remember were present during those meetings and who they were representing, fire, police, whatever department it was. Again, I'm talking about these initial meetings when you're trying to establish what new needs were going to be needed in regard to the recording for the new Public Safety Complex.
A. My department, I had my radio techs, radio engineer, telephone tech.
Q. If you can list the names for me.
A. Anthony Desmaris, Eugene Gianfracco. Police department, there were -- the majors were there, might have been -- I don't know if Sullivan was a major. He might have been a captain. He was



there. There was some other captains there. Simoneau, whether he was a lieutenant or captain at the time, I'm not sure of that, either. The fire department -- the whole fire department staff was there, usually Chief Rattigan came down, Chief Lanzi, Chief. There were a lot of people there. It was a full room.
Q. Do you remember anyone else?
A. Might have been people there from internal affairs. I know the Colonel had every -- his whole agency there.
Q. When you say the Colonel, is that Colonel Prignano?
A. Yes.
Q. Was he present at some of these initial meetings with you?
A. He might have been present at one or two, you know, but he usually sent his people. His staff usually came to those meetings.
Q. Who were some of the people of his staff that was present at these meetings, Colonel Prignano's people?
A. The names that I just mentioned, Simoneau, Sullivan. There were captains. Might have been Captain Glancy, Captain Ryan. I really don't



remember. I know there was a lot of white shirts there, so to speak.
Q. In regard to Colonel Prignano, if he wasn't present, was it your understanding that if it was Captain Sullivan at the time I don't know, but his people, they were to report to him about what was going on at these meetings?
MR. WEST: Objection.
A. I can't answer that. I would imagine so. I don't know.
Q. Did you ever discuss these meeting with Colonel Prignano himself, if he wasn't at one of the meetings?
A. No. No. I never called him or the fire Chief, not about that, no.
Q. Again, we're talking about initial meetings now. You're trying to establish what the needs are for the new public safety building in regard to the recordings?
A. Yes.
Q. How long you -- you think it was some time in December of '01. What was the name --
A. That's when they started. They started --
Q. How long did these meetings go before you took the next step, which I would imagine would be

Q. When did those meetings take place when you were trying to establish what the needs were going to be?
A. Oh, God, there were so many of them. I probably went to the first two or three. I didn't go to the -- I didn't go to any more because it got to the point where everybody was fighting about parking spaces, who had a bigger bathroom, who had a bigger room. I didn't bother going.
I would say the first two or three meetings, oh, it had to be -- when this all first broke out, you know, a new station was going to be built, '01, December of '01. I mean, I'm just guessing.
Q. Well, no one wants you to guess, I just want your best recollection. Is that your best recollection?
A. My best recollection it was maybe the December of '01.
Q. Were there any records generated as a result of those meetings that memorialized what was talked about or established what the needs were going to be?
A. I don't know.
Q. Have you ever seen any records generated from those meetings?



A. No, I have not.
Q. At any time during those initial meetings, did anyone ever raise the issue that all of the lines should be recorded in the new public safety building?
MR. WEST: Objection.
MR. McHUGH: Objection.
MS. CARLIN: Objection.
MR. SANTOPIETRO: Objection to form.
A. No.
Q. All right. If you can just run through for me the names of the individuals that you remember were present during those meetings and who they were representing, fire, police, whatever department it was. Again, I'm talking about these initial meetings when you're trying to establish what new needs were going to be needed in regard to the recording for the new Public Safety Complex.
A. My department, I had my radio techs, radio engineer, telephone tech.
Q. If you can list the names for me.
A. Anthony Desmaris, Eugene Gianfracco. Police department, there were -- the majors were there, might have been -- I don't know if Sullivan was a major. He might have been a captain. He was



there. There was some other captains there. Simoneau, whether he was a lieutenant or captain at the time, I'm not sure of that, either. The fire department -- the whole fire department staff was there, usually Chief Rattigan came down, Chief Lanzi, Chief. There were a lot of people there. It was a full room.
Q. Do you remember anyone else?
A. Might have been people there from internal affairs. I know the Colonel had every -- his whole agency there.
Q. When you say the Colonel, is that Colonel Prignano?
A. Yes.
Q. Was he present at some of these initial meetings with you?
A. He might have been present at one or two, you know, but he usually sent his people. His staff usually came to those meetings.
Q. Who were some of the people of his staff that was present at these meetings, Colonel Prignano's people?
A. The names that I just mentioned, Simoneau, Sullivan. There were captains. Might have been Captain Glancy, Captain Ryan. I really don't



remember. I know there was a lot of white shirts there, so to speak.
Q. In regard to Colonel Prignano, if he wasn't present, was it your understanding that if it was Captain Sullivan at the time I don't know, but his people, they were to report to him about what was going on at these meetings?
MR. WEST: Objection.
A. I can't answer that. I would imagine so. I don't know.
Q. Did you ever discuss these meeting with Colonel Prignano himself, if he wasn't at one of the meetings?
A. No. No. I never called him or the fire Chief, not about that, no.
Q. Again, we're talking about initial meetings now. You're trying to establish what the needs are for the new public safety building in regard to the recordings?
A. Yes.
Q. How long you -- you think it was some time in December of '01. What was the name --
A. That's when they started. They started --
Q. How long did these meetings go before you took the next step, which I would imagine would be

Page 30

Providence, correct?
MR. WEST: Objection.
A. Not that particular system.
Q. That's all I'm talking about. You already explained the Dictaphone system that was in place. But the Total Recall system was something new that had never been used before, correct?
A. It was new.
Q. Okay. What was the purpose of the Total Recall system?
MR. McHUGH: Objection as to form.
A. The purpose of the Total Recall system, there were two purposes, to record emergency lines and to have a records management system that would identify any kind of phone abuse. In other words, each and every station in the Public Safety Complex as well as communications would be on a records management system, where we could identify long distance calls or any kind of telephone abuse.
Q. All right. Do you know how many phone recordings were actually made by this system while it was in place?
A. No, I don't.
Q. According to the State Police file, there was over

Page 31

750,000 recordings. Is this the first time you're hearing that?
MR. SANTOPIETRO: Objection.
MR. McHUGH: Objection to form.
MR. ROBINSON: Objection.
MR. CRONIN: Objection.
MR. CALISE: Objection.
MR. WEST: Objection.
MS. CARLIN: Objection.
A. I might have read it. I might have seen it in the report.
Q. Let's just go back to the Total Recall system. In regard to the Total Recall system, in order to purchase a system, I mean was the system bid out? How was the system actually purchased?
A. There was a request for proposal that went out of what our needs were.
Q. Let me stop you there. Who made the request for proposal in regards to what your needs were?
A. My technicians.
Q. Who were?
A. Telephone technician and my radio engineer.
Q. Their names?
A. And Chief radio engineer. Anthony Desmaris and Eugene Gianfracco.

Page 32

Q. You said that the bid would go out for the needs that you had. What were the needs that you had?
A. We had many meetings at the Commissioner's office and --
Q. That's with Mr. Partington?
A. Yes. At his office. There were people there from the administrative staff of the police department, the fire department, my department as well, my people, and there were discussions of what the needs were for this new Public Safety Complex, and when the phone system came up, the Commissioner had expressed his concern that he wanted the best equipment, state-of-the-art equipment. He wanted the best recording system, the best phone system. He got into the issues of the Twin Towers in New York and how terrorism was becoming this big thing. And so he expressed just how much he wanted to make sure that we got this ultimate phone system.
At that time there were also administrators from the police department, I don't remember if it was captains or major. I think it was the majors. They wanted to make sure that their calls for service coming into central station where the clerk sat, that those lines would also be

Page 33

recorded.
Q. When were --
MR. SANTOPIETRO: Have you finished?
THE WITNESS: No.
MR. FAY: Go ahead.
A. And at the same meeting, if I remember correctly, the Chief of Police wanted -- brought up the issue of a records management system for the phone system. He said, you know, this is a good time for us to get a system where we can identify where this abuse is coming from, because we had some history there with problems as far as 900 sex numbers being dialed out of that station. Some of the bills were astronomical. So he, on more than one occasion, he requested that type of a system, a records management system would be purchased to identify that abuse.
I also brought up the fact that the new emergency operation center at the Public Safety Complex, that that room there, we were going to need to have a recording system for the emergency lines as well as the radio lines and that we were going to need a radio tower, which is there in place, that's the only thing that got in place, but -- so all of those things.

procurement?
A. The meetings I attended might have been within those first three months, but they continued. I didn't -- I wasn't present at them. I didn't go to any of them.
Q. So, three or five months, meetings were going on. I know you didn't attend all of them. At some point were some final decisions made in regard to what the new building, the public safety building was going to need in regard to a recording system?
A. The discussions that we had, just that, you know, that we wanted to have -- discussions I had with my people, my technicians, we wanted to have a duplex-type of switching phone equipment. There were two going to be two switches, one switch was going to be located in the Public Safety Complex, one at communications. If there was a failure at the Public Safety Complex, the phone switch, back-up phone switch, it was a redundant system is what we requested. The backup switch would take over until such time as the main switch would be repaired. We talked about that.
We talked about the new emergency operations center that we were going to put on the third floor of the Public Safety Complex that we needed



lines for the recording system there.
We needed to record the lines in central station, calls for service. Just in general that, you know, that the city itself needed to have a recording system for this new complex.
Q. Right. And I take it at some point after all these meetings, a decision was made as to what type of recording system was needed, correct?
A. Well, all these facts were compiled by my technicians, telephone technician, and an RFP, request for proposal was drafted and that was presented to the Board of Contract and Supply.
Q. The RFP, did you see that before it went out?
A. Yeah, I looked at it, from what I can remember.
Q. Was that part of your job duties and responsibilities as director of communications, that you should take a look at that before it goes out?
A. Oh, yeah. Absolutely.
Q. Did you approve that when it went out?
MR. McHUGH: Objection as to form.
THE WITNESS: Approve it? How do you mean approve it?
Q. You reviewed it before it went out?



A. I reviewed it. I went over all the requests that we had made. As I just got through telling you, the duplex switches and the recording system for the operations center. Yes, that was part of the spec.
Q. If the recording system in the RFP wasn't what you thought the communications -- wasn't what was required, I take it you would have said something or tried to make a change to the RFP, correct?
MR. SANTOPIETRO: Objection.
MR. McHUGH: Objection.
MR. ROBINSON: Objection.
MR. CRONIN: Objection.
MR. CALISE: Objection.
MR. WEST: Objection.
MS. CARLIN: Objection.
A. The only thing the RFP said, from what I can remember, it explained the switching system, the way we wanted it to work, and that there would be a recording system, and that as part of that recording system there would be a records management system that would account for all the phones.
Q. The RFP that went out specifically in regard to the recording system you were seeking, that was



what you approved, correct?
MR. WEST: Objection.
MS. CARLIN: Objection.
MR. SANTOPIETRO: Objection.
MR. McHUGH: Objection.
MR. ROBINSON: Objection.
MR. CRONIN: Objection.
MR. CALISE: Objection.
A. I don't know what you mean by approve.
Q. As director of communications, you said there had been nothing in the RFP in regard to recording?
A. Yes.
Q. I take it you would have said something to somebody that we need some kind of recording device, correct?
MR. SANTOPIETRO: Objection.
MR. WEST: Objection.
MS. CARLIN: Objection.
MR. McHUGH: Objection.
Q. Fair enough?
A. Yes.
Q. The RFP, as you're saying, contained some language in regard to the type of recording device or recording needs that were needed, correct?
A. There was information in there that pertained

did this happen?
MR. McHUGH: Objection to form.
MS. CARLIN: Objection.
MR. SANTOPIETRO: Objection.
A. I don't want to guess.
Q. We know the initial meetings in regard to the general needs of the new public safety building, you think that was three or four months into 2002. You think it was from December to -- December '01, three or four months into early '02; does that sound about right? That's what you testified to.
MR. SANTOPIETRO: If you recall.
A. I don't recall but -- I don't recall. I hate to give you an answer and guess at it. I don't really -- you know --
Q. Let me put it this way, from the time you started to receive bids or the city started to receive bids, until the bid that was actually chosen, had the Total Recall system contained in it, how long was that period, was it a month, two months, weeks?
A. I'll say it was close to five, six months.
Q. That was -- your best recollection it was five- to six-month process?
A. To the best of my recollection, yes.



Q. After the bids are approved, now we're up to the point of installation, that would be the next step in the process?
A. Once the bids were approved, yes.
Q. Now, who would be involved in, you know, overseeing the installation of this project for the communications department?
MR. McHUGH: Objection to form.
Q. It wasn't you, you weren't hands-on?
MR. WEST: Objection.
MR. SANTOPIETRO: Objection.
MR. McHUGH: Objection.
A. I wasn't hands-on.
Q. So, was there an individual from your department that was overseeing the installation?
A. There were several.
Q. Okay. Who were those individuals?
A. Anthony Desmaris, Frank Parfume, Gino Gianfracco. Sometimes I think -- I don't want to think. That's it.
Q. Those are the only ones you can remember?
A. Yes.
Q. Could there have been more individuals from your department that were overseeing, you just can't remember?



A. I was just going to say perhaps Steven Moise, but no. No.
Q. All right. Now, during the installation period, okay, were these gentlemen you just went through, Tony Desmaris, Frank Parfume, maybe Steven Moise, and who is the other guy?
A. Not Steven Moise. Gino Gianfracco.
Q. Were they reporting to you as the installation was going on?
A. Tony would come in from time to time and give me an update, they're wiring the building, they're cabling the building, they're pulling the lines in from the street to the building.
Q. All right. And during the installation period, did Tony ever discuss with you any more specifics in regard to the Total Recall system that was being installed?
A. Nothing specific, no. no.
Q. Did you gain any other knowledge about the Total Recall system from anyone else during the installation period that gave you new information in regard to its capabilities and what it was going to do?
THE WITNESS: We're going back to your previous question?



MR. FAY: Sure.
A. I believe the question was, you asked -- what was the question you asked?
(LAST QUESTION READ)
A. He would come in, we would discuss the system, that the lines in central station, I would ask him, are you sure to get those, make sure you get those lines in, and make sure that when you put up the call cost accounting, make sure you get all the stations online. That was the extent of the conversation.
Q. In regard to the Total Recall system, did he give you any more information in regard to the Total Recall system as to what its capabilities were or what it was going to do once it was installed?
A. No.
Q. So, just so I'm clear, during the installation period now, it's your testimony that, to your knowledge, there were still only going to be a few lines that were actually going to be recorded, clerks' lines, maybe four, and then this recording management system was going to be put in for the other stations?
A. Yes.
Q. That's still your understanding during the

Page 42

to a recording, just to a recording system, yes.
Q. Did you make any changes to that?
MR. SANTOPIETRO: Objection.
MR. McHUGH: Objection.
A. Not that I can remember.
Q. Did you speak with Commissioner Partington in any way saying that what was requested in the RFP in regard to the recording capabilities needed to be expanded or lessened or changed in any way?
MR. SANTOPIETRO: Objection.
MR. McHUGH: Objection.
MR. CRONIN: Objection.
MR. ROBINSON: Objection.
MR. CALISE: Objection.
MR. WEST: Objection.
Ms. CARLIN: Objection.
A. No, not about the sizing of the system, no.
Q. At this point, just when the RFP is going out, I take it the Total Recall system hadn't been specifically mentioned at that time, correct?
THE WITNESS: Can you repeat the question?
Q. When you were putting together the criteria for the RFP, okay, there was nothing in the RFP about the Total Recall system specifically, correct?

Page 43

A. No.
Q. At this time you're just looking for a product?
A. A system.
Q. A system, okay. So the RFP goes out, what's the next step?
A. The next step, it goes out to bid, and the bids would come back, and then the bids would be reviewed to see if in fact, you know, if it's going to serve our needs.
Q. Was Expanets involved in putting the RFP together?
A. There were several firms that my technicians had -- they spoke -- I believe it was Expanets, they spoke to them about their type of equipment, what type of equipment they had when the RFP was being drafted by the technicians, I believe they did go to these individuals and talk about their systems.
Q. Again, who were the technicians you're talking about? I just ask in the future if you can give me names.
A. Tony Desmaris, he was the most knowledgeable in the phone system, phone systems within the city.
Q. To your knowledge, was Tony Desmaris working for you in the communications department at the time?

Page 44

A. Yes, he was.
Q. Okay. And from what you're telling me, it's your understanding Tony Desmaris sought out Expanets to help put the RFP together?
MR. SANTOPIETRO: Objection.
MR. McHUGH: Objection.
MR. ROBINSON: Objection.
MR. CRONIN: Objection.
MR. CALISE: Objection.
MR. WEST: Objection.
MS. CARLIN: Objection.
A. I believe he may have had discussions with them, but there were other vendors, I don't know who. I'm not trying to be a wiseguy, you'd have to ask him. I know he spoke to some of the other vendors in the business when he was working the RFP.
Q. All right. Do you remember who you received bids from?
A. No, I don't.
Q. All right. Do you know who eventually was awarded the contract?
A. I believe it was Expanets or Avaya.
Q. And can you just explain -- were you involved in the decision-making as to who would win the bid?

Page 45

A. No.
Q. Who made that decision?
A. That was made by the Board of Contract and Supply. We recommended -- we recommended the bidder.
Q. Who did you -- go ahead.
A. That bid process would go back to the Board of Contract Supply. They had the final say.
Q. Who did your -- as director of communications of the department, who did you recommend?
MR. SANTOPIETRO: Objection. Form.
A. It was recommended to me by my technician, Tony Desmaris, along with my radio engineer, that it should be, I believe it was Avaya, that they were the only ones that could provide the two switching mechanisms to work in conjunction with one another. Nobody else could provide that type of switching.
Q. Who is the radio technician, I don't know if you named him?
A. Eugene Gianfracco.
Q. They made the recommendation to you?
A. They recommended that this -- he came into the office, he, being, Anthony Desmaris, told me that it looks like the only one that can do the

Word Index

Page 46

system the way, we want it done is Avaya -- not Avaya -- one or the other.
Q. The records have it. Now, when the bid came in that was ultimately selected, was the Total Recall system part of that bid?
A. I believe it was.
Q. All right. Now, when the bid came in, you reviewed the bid, correct, with Tony Desmaris?
A. We went over the bid. We spoke about it.
Q. Was that the first time you became aware of the name Total Recall, the Total Recall system, when it was contained in the bid?
A. After the bids were recommended and accepted, some time after that, yeah, right during that time I remember --
Q. Seeing the name?
A. The name, title, however you want to look at it.
Q. All right. Now, in regard to the Total Recall system in the bid, who would be doing the work on the Total Recall system installing it?
A. Whoever the contractor was.
Q. The same contractor, you just can't remember the name?
A. I don't -- I can't tell you the name. Not

Page 47

that I can't, I don't know.
Q. What was your understanding at that time, the first time you saw the Total Recall system, it was going to be part of this bid and installed, okay, of what the Total Recall system was going to do?
MR. McHUGH: Objection to form.
MR. WEST: Objection.
MR. SANTOPIETRO: Objection.
A. It was going to record emergency lines.
Q. And what are the emergency lines, again, that your understanding was that the Total Recall was going to record?
A. Well, the Dictaphone was already recording emergency lines at the operations center on West Exchange Street. This system here was going to have two functions, what I understood, it was going to have two functions, one being it was going to record lines, at that time it was determined a few lines into the central station at the Public Safety Complex, central station where the clerks took calls for service. And this system was also going to have a records management system that would account for every phone in the Public Safety Complex as well as the communications department. This records

Page 48

management system, as I said earlier, would identify any telephone abuse. I think I mentioned that we had some history where we had a lot of problems over the years going back as far as when Ted Gannon was the Chief, where they would be dialing these 1-900 sex numbers and that type of thing, and phone bills would come in at the end of the month, 5, $6,000 for those type of calls. So that being the problem, that was a big issue.
Q. I'm going to kind of split this between the few lines that you understood were actually going to be recorded and this record management system you've been talking about, the problem with the 900 numbers.
The record management system, okay, your understanding from going through the bid and speaking to your technical people, was that going to be recording all the lines in the public safety building?
A. Not recording for voice, but there would be like a -- there was supposed to be like a spreadsheet that would identify which station, what phone station that came from, whose office that phone was in, okay. Because each one of those phone stations in that complex, from what I

Page 49

understand, they were all assigned -- an individual was assigned to that phone station. So if someone was to make a long-distance call, where, how long, and it even give you a call estimate of what the call cost.
Q. Again, just so I'm clear with your understanding of this record management system, basically it was a system to keep track of the numbers that were coming out of each station so if there was --
A. Phone station.
Q. Phone station. So if it was a 900 number, you can track it back to the phone station?
A. Yes.
Q. But to your knowledge, there wasn't going to be any recording of the actual outgoing or incoming call to that station?
A. Oh, absolutely not.
Q. All right. Again, the only lines, to your knowledge, we're just talking about the bidding process, we're going through the bid now. The only lines that your understanding in the public safety building that were actually going to be recorded, were these clerks' lines you've been talking about, correct?
A. Yes.

system the way, we want it done is Avaya -- not Avaya -- one or the other.
Q. The records have it. Now, when the bid came in that was ultimately selected, was the Total Recall system part of that bid?
A. I believe it was.
Q. All right. Now, when the bid came in, you reviewed the bid, correct, with Tony Desmaris?
A. We went over the bid. We spoke about it.
Q. Was that the first time you became aware of the name Total Recall, the Total Recall system, when it was contained in the bid?
A. After the bids were recommended and accepted, some time after that, yeah, right during that time I remember --
Q. Seeing the name?
A. The name, title, however you want to look at it.
Q. All right. Now, in regard to the Total Recall system in the bid, who would be doing the work on the Total Recall system installing it?
A. Whoever the contractor was.
Q. The same contractor, you just can't remember the name?
A. I don't -- I can't tell you the name. Not



that I can't, I don't know.
Q. What was your understanding at that time, the first time you saw the Total Recall system, it was going to be part of this bid and installed, okay, of what the Total Recall system was going to do?
MR. McHUGH: Objection to form.
MR. WEST: Objection.
MR. SANTOPIETRO: Objection.
A. It was going to record emergency lines.
Q. And what are the emergency lines, again, that your understanding was that the Total Recall was going to record?
A. Well, the Dictaphone was already recording emergency lines at the operations center on West Exchange Street. This system here was going to have two functions, what I understood, it was going to have two functions, one being it was going to record lines, at that time it was determined a few lines into the central station at the Public Safety Complex, central station where the clerks took calls for service. And this system was also going to have a records management system that would account for every phone in the Public Safety Complex as well as the communications department. This records



management system, as I said earlier, would identify any telephone abuse. I think I mentioned that we had some history where we had a lot of problems over the years going back as far as when Ted Gannon was the Chief, where they would be dialing these 1-900 sex numbers and that type of thing, and phone bills would come in at the end of the month, 5, $6,000 for those type of calls. So that being the problem, that was a big issue.
Q. I'm going to kind of split this between the few lines that you understood were actually going to be recorded and this record management system you've been talking about, the problem with the 900 numbers.
The record management system, okay, your understanding from going through the bid and speaking to your technical people, was that going to be recording all the lines in the public safety building?
A. Not recording for voice, but there would be like a -- there was supposed to be like a spreadsheet that would identify which station, what phone station that came from, whose office that phone was in, okay. Because each one of those phone stations in that complex, from what I



understand, they were all assigned -- an individual was assigned to that phone station. So if someone was to make a long-distance call, where, how long, and it even give you a call estimate of what the call cost.
Q. Again, just so I'm clear with your understanding of this record management system, basically it was a system to keep track of the numbers that were coming out of each station so if there was --
A. Phone station.
Q. Phone station. So if it was a 900 number, you can track it back to the phone station?
A. Yes.
Q. But to your knowledge, there wasn't going to be any recording of the actual outgoing or incoming call to that station?
A. Oh, absolutely not.
Q. All right. Again, the only lines, to your knowledge, we're just talking about the bidding process, we're going through the bid now. The only lines that your understanding in the public safety building that were actually going to be recorded, were these clerks' lines you've been talking about, correct?
A. Yes.

Page 78

right before my resignation.
Q. How long before was the meeting with Chief Esserman?
A. Probably maybe three or four months prior.
Q. Did the Total Recall system come up during that meeting?
A. He did not specifically ask about Total Recall. He asked about a recording system.
Q. What did you tell him about the recording system when he asked?
A. I, basically, told him what I was dealing with as far as the Police Control Center.
Q. Okay. What did you tell him?
A. That the phone lines in the Police Control Center were recorded.
Q. How many of the lines?
A. There is six, maybe a total of 10 or 12 lines.
Q. How many lines are at the Center?
A. I don't know exactly the number.
Q. Is it more than 20 lines?
A. I don't believe so, no.
Q. All right. I will be brief with these. In regard to Manuel Viera, did you ever have any discussion about the Total Recall system?

Page 79

MR. SANTOPIETRO: Object.
MR. ROBINSON: Objection.
A. Not that I recall, specifically.
Q. Do you have any knowledge who actually made the decision to put the Total Recall system in?
A. No firsthand knowledge, no.
Q. Any secondhand knowledge, other than your attorney?
MR. SANTOPIETRO: Objection.
MR. MCALLISTER: Objection.
MR. MCHUGH: Objection.
MR. ROBINSON: Objection.
MR. WEST: Objection.
A. No, no.
Q. When you say, no firsthand knowledge --
A. I mean, you know, I mean, I don't know, no. I don't know who signed anything or anything like that; I don't have any of that information.
Q. You already indicated Mr. Richardson was your direct supervisor; correct?
A. Correct.
Q. Was he your direct supervisor the whole time you held that position as Chief of Operations?
A. Yes.
Q. Did you continue -- would you report to him; how would that work?

Page 80

A. I mean, I would report to work every day. If I had, you know, needed his assistance, you know, I would speak with him regarding the matter that needed to be addressed, but he was working for the task force for approximately six or nine months prior to February of '03. I don't know the exact time line.
Q. Did you still speak with him in his capacity as your supervisor at the Department of Communications?
A. Yes.
Q. Did you ever have any conversations with him about what he was doing at the task force?
A. No.
Q. Just so I am clear, so he was your direct supervisor the whole time you were there in Communications?
A. Correct.
Q. Okay. The only reason I ask, I am trying to figure out when he went to do the task force thing, he left his position of Communications, was only working on the task force, or maybe doing both?
A. More or less doing both.
MR. MCALLISTER: Objection.
Q. Did you have conversations with Mr. Richardson

Page 81

about the Total Recall system?
A. Not that I recall.
Q. Is there anything that would refresh your recollection, any documents?
MR. SANTOPIETRO: Objection.
MR. MCALLISTER: Objection.
MR. MCHUGH: Objection.
MR. ROBINSON: Objection.
MR. WEST: Objection.
A. I mean, the only conversation I had with him on Total Recall was the request that he asked that I retrieve the phone call from Patrick Butler.
Q. How about Tony Desmarais, any conversation with him about the Total Recall system?
A. Yes.
Q. How many times did you speak with Mr. Desmarais about the Total Recall system?
A. Numerous times, I would say.
Q. Were they specific issues you covered; what were you talking about?
MR. ROBINSON: Objection.
A. They weren't specific issues. He was just trying to get an idea of how the Dictaphone worked, you know, he would ask me questions regarding that.
Q. Was there ever any written documentation between

Page 30

Providence, correct?
MR. WEST: Objection.
A. Not that particular system.
Q. That's all I'm talking about. You already explained the Dictaphone system that was in place. But the Total Recall system was something new that had never been used before, correct?
A. It was new.
Q. Okay. What was the purpose of the Total Recall system?
MR. McHUGH: Objection as to form.
A. The purpose of the Total Recall system, there were two purposes, to record emergency lines and to have a records management system that would identify any kind of phone abuse. In other words, each and every station in the Public Safety Complex as well as communications would be on a records management system, where we could identify long distance calls or any kind of telephone abuse.
Q. All right. Do you know how many phone recordings were actually made by this system while it was in place?
A. No, I don't.
Q. According to the State Police file, there was over

Page 31

750,000 recordings. Is this the first time you're hearing that?
MR. SANTOPIETRO: Objection.
MR. McHUGH: Objection to form.
MR. ROBINSON: Objection.
MR. CRONIN: Objection.
MR. CALISE: Objection.
MR. WEST: Objection.
MS. CARLIN: Objection.
A. I might have read it. I might have seen it in the report.
Q. Let's just go back to the Total Recall system. In regard to the Total Recall system, in order to purchase a system, I mean was the system bid out? How was the system actually purchased?
A. There was a request for proposal that went out of what our needs were.
Q. Let me stop you there. Who made the request for proposal in regards to what your needs were?
A. My technicians.
Q. Who were?
A. Telephone technician and my radio engineer.
Q. Their names?
A. And Chief radio engineer. Anthony Desmaris and Eugene Gianfracco.

Page 32

Q. You said that the bid would go out for the needs that you had. What were the needs that you had?
A. We had many meetings at the Commissioner's office and --
Q. That's with Mr. Partington?
A. Yes. At his office. There were people there from the administrative staff of the police department, the fire department, my department as well, my people, and there were discussions of what the needs were for this new Public Safety Complex, and when the phone system came up, the Commissioner had expressed his concern that he wanted the best equipment, state-of-the-art equipment. He wanted the best recording system, the best phone system. He got into the issues of the Twin Towers in New York and how terrorism was becoming this big thing. And so he expressed just how much he wanted to make sure that we got this ultimate phone system.
At that time there were also administrators from the police department, I don't remember if it was captains or major. I think it was the majors. They wanted to make sure that their calls for service coming into central station where the clerk sat, that those lines would also be

Page 33

recorded.
Q. When were --
MR. SANTOPIETRO: Have you finished?
THE WITNESS: No.
MR. FAY: Go ahead.
A. And at the same meeting, if I remember correctly, the Chief of Police wanted -- brought up the issue of a records management system for the phone system. He said, you know, this is a good time for us to get a system where we can identify where this abuse is coming from, because we had some history there with problems as far as 900 sex numbers being dialed out of that station. Some of the bills were astronomical. So he, on more than one occasion, he requested that type of a system, a records management system would be purchased to identify that abuse.
I also brought up the fact that the new emergency operation center at the Public Safety Complex, that that room there, we were going to need to have a recording system for the emergency lines as well as the radio lines and that we were going to need a radio tower, which is there in place, that's the only thing that got in place, but -- so all of those things.

system the way, we want it done is Avaya -- not Avaya -- one or the other.
Q. The records have it. Now, when the bid came in that was ultimately selected, was the Total Recall system part of that bid?
A. I believe it was.
Q. All right. Now, when the bid came in, you reviewed the bid, correct, with Tony Desmaris?
A. We went over the bid. We spoke about it.
Q. Was that the first time you became aware of the name Total Recall, the Total Recall system, when it was contained in the bid?
A. After the bids were recommended and accepted, some time after that, yeah, right during that time I remember --
Q. Seeing the name?
A. The name, title, however you want to look at it.
Q. All right. Now, in regard to the Total Recall system in the bid, who would be doing the work on the Total Recall system installing it?
A. Whoever the contractor was.
Q. The same contractor, you just can't remember the name?
A. I don't -- I can't tell you the name. Not



that I can't, I don't know.
Q. What was your understanding at that time, the first time you saw the Total Recall system, it was going to be part of this bid and installed, okay, of what the Total Recall system was going to do?
MR. McHUGH: Objection to form.
MR. WEST: Objection.
MR. SANTOPIETRO: Objection.
A. It was going to record emergency lines.
Q. And what are the emergency lines, again, that your understanding was that the Total Recall was going to record?
A. Well, the Dictaphone was already recording emergency lines at the operations center on West Exchange Street. This system here was going to have two functions, what I understood, it was going to have two functions, one being it was going to record lines, at that time it was determined a few lines into the central station at the Public Safety Complex, central station where the clerks took calls for service. And this system was also going to have a records management system that would account for every phone in the Public Safety Complex as well as the communications department. This records



management system, as I said earlier, would identify any telephone abuse. I think I mentioned that we had some history where we had a lot of problems over the years going back as far as when Ted Gannon was the Chief, where they would be dialing these 1-900 sex numbers and that type of thing, and phone bills would come in at the end of the month, 5, $6,000 for those type of calls. So that being the problem, that was a big issue.
Q. I'm going to kind of split this between the few lines that you understood were actually going to be recorded and this record management system you've been talking about, the problem with the 900 numbers.
The record management system, okay, your understanding from going through the bid and speaking to your technical people, was that going to be recording all the lines in the public safety building?
A. Not recording for voice, but there would be like a -- there was supposed to be like a spreadsheet that would identify which station, what phone station that came from, whose office that phone was in, okay. Because each one of those phone stations in that complex, from what I



understand, they were all assigned -- an individual was assigned to that phone station. So if someone was to make a long-distance call, where, how long, and it even give you a call estimate of what the call cost.
Q. Again, just so I'm clear with your understanding of this record management system, basically it was a system to keep track of the numbers that were coming out of each station so if there was --
A. Phone station.
Q. Phone station. So if it was a 900 number, you can track it back to the phone station?
A. Yes.
Q. But to your knowledge, there wasn't going to be any recording of the actual outgoing or incoming call to that station?
A. Oh, absolutely not.
Q. All right. Again, the only lines, to your knowledge, we're just talking about the bidding process, we're going through the bid now. The only lines that your understanding in the public safety building that were actually going to be recorded, were these clerks' lines you've been talking about, correct?
A. Yes.

Page 58

installation period?
A. Yes.
Q. All right. My follow-up question was other than Tony Desmaris, did anyone else give you any information in regard to the Total Recall system as to what it was actually going to do once it was up and running and what its capabilities were during the installation process?
A. No.
Q. Do you remember the date that the public safety building actually opened up?
A. August -- end of July, August --
Q. Of?
A. -- seems to stick in my mind.
Q. Of what year?
A. Of '02.
Q. Before the public safety building opened, where was your office located, where was director of communications -- where was your office located?
A. West Exchange Street.
Q. Did it stay there or did you move to the now building?
A. Stayed there.
Q. West Exchange?
A. Yes.

Page 59

Q. After the installation was complete, did you come to learn when the Total Recall system became activated?
A. I -- it was activated, up and running in July or August, as I said earlier. That's when they moved in, and I thought that's when it was operational.
Q. All right. Now that the Total Recall system is installed, now we're during the operational phase, we're dealing with the time period July '02 until the system was taken out some time in February of '03, okay. Now it's running. You earlier testified that even sitting here today, you had no knowledge that that Total Recall system was recording phone conversations on a majority of the lines in the public safety building, correct?
MR. SANTOPIETRO: Objection. Form.
MR. McHUGH: Objection.
MR. ROBINSON: Objection.
MR. CRONIN: Objection.
MR. CALISE: Objection.
MR. WEST: Objection.
MS. CARLIN: Objection.
A. I don't know what you mean by majority. Could you be more specific?

Page 60

Q. What I'll do is I'll have --
A. Those lines there --
Q. The ones I showed you earlier?
A. No.
Q. The lines that were contained in the --
MR. WEST: Move to strike.
Q. The lines that were contained in the State Police investigation file, were they identified as all the lines that were being recorded, and I went through them with you just to show you how many there were?
A. Yes, you did.
Q. Until today, that's the first time, today, was when you became aware to the extent that the Total Recall system was recording phone conversations, correct?
MR. SANTOPIETRO: Objection.
MS. CARLIN: Objection.
MR. McHUGH: Objection.
MR. WEST: Objection.
A. I was aware that it was recording the phone conversations, as I said earlier, in the central station, yes.
Q. Your own testimony is you only thought that was only about four, five lines, correct?

Page 61

A. Yes.
Q. I showed you hundreds of lines, correct?
A. Yes.
MR. SANTOPIETRO: Objection to form.
MR. McHUGH: Objection.
MR. ROBINSON: Objection.
MR. CRONIN: Objection.
MR. CALISE: Objection.
MR. WEST: Objection.
MS. CARLIN: Objection.
Q. Let me ask you this, when did you first become aware that the Total Recall system was recording phone conversations on more than the four or five lines that you thought it was going to be recording when it was bid, procured and installed?
MR. SANTOPIETRO: Objection.
MR. McHUGH: Objection.
MR. ROBINSON: Objection.
MR. CRONIN: Objection.
MR. CALISE: Objection.
MR. WEST: Objection.
MS. CARLIN: Objection.
A. There was a situation that was brought to my attention by a chief in the fire department, Chief Dutra. Chief had called me, I don't know when he

Word Index

Word Index

Page 90

Q. To your knowledge, did anyone request access to a phone recording on a line other than the four or five that you were aware of that were being recorded?
A. No, not to my knowledge.
Q. Do you know how an individual would actually access a recorded phone conversation that was stored in the Total Recall system?
A. No, I do not.
Q. That was never explained to you?
A. No.
Q. Did anyone -- did Tony Desmaris ever discuss with you how to access the phone calls by using a password?
A. No.
Q. Were you ever given a password?
A. No.
Q. Is this the first time you're hearing about this?
THE WITNESS: Hearing about what?
Q. About how to access phone calls from the Total Recall system a password ward?
A. No, I know you could access it with a password, but I did not have a password. I knew nothing about it.
Q. Who told you you could access the phone recordings

Page 91

with a password?
A. Some time during my time when I was working there. Who? I don't remember who. I just know that it was common knowledge that in order to get into that system you needed to have a password.
Q. Why was that common knowledge?
A. Because with the Dictaphone you didn't, but with that Total Recall system you needed to have some type of a code or an access to get into the system.
Q. Who told you that?
A. Who told me that? Might have been during --
MR. SANTOPIETRO: If you don't remember, Manny --
A. I don't remember who the hell told me.
Q. Who had passwords to access to the phone recordings?
A. Greg Haroian, Mary Lennon, Tony Desmaris, but there was a difference in the passwords, there was something about, one was administrative and the other was whatever it was. I can tell you Greg Haroian, Mary Lennon, maybe Ron Reposa and Tony Desmaris had -- I'm pretty sure it was those four that had passwords to get into that system.
Q. Did you have ever have any conversation with

Page 92

Joseph Richardson in regard to the capabilities of the Total Recall system that was being installed?
A. No.
Q. Did you ever have any conversations with Mary Lennon about that?
A. No.
Q. What about Mr. Prignano?
A. No.
Q. To your knowledge, was Mr. Prignano involved in either procuring bidding for or installing the Total Recall system?
A. No.
Q. To your knowledge did he have -- strike that. To your knowledge, did Mr. Prignano have any knowledge at all that a Total Recall system was going to be installed in the Public Safety Complex and record phone lines?
A. No, not Total Recall, no.
Q. Have you had an opportunity to review within the police report the memo that Andy Rosenzweig compiled in regard to his summary of these -- his investigation into the Total Recall system for Chief Esserman?
A. I don't -- I'd have to see it.
MR. FAY: Could I have this marked

Page 93

as plaintiffs' first exhibit.
(PLAINTIFFS' EXHIBIT 1
MARKED FOR IDENTIFICATION)
Q. For the record, what's been marked as Plaintiffs' 1 is a communication division review dated February 10, 2003, and it says memo to the file, in parentheses it says (by Andy Rosenzweig)?
A. Yes.
Q. Is that the same Andy Rosenzweig you referred to earlier?
A. Yes.
Q. This memo dated February 10, 2003, he references that meeting, or one of those meetings I think that you referenced earlier; do you see that in the first paragraph there?
A. Okay.
Q. It says, "As part of the review of the communications division, directed by Mayor Cicciline, Colonel" --
THE WITNESS: Where do you see that?
Q. First paragraph. "Colonel Dean Esserman ordered a meeting with Manny Vieira, director of communications division at 11:20 A.M. on this date. Also present were Deputy Director Joe Richardson and two technicians of that division,

Page 138

The Total Recall system was at your direction?
MR. SANTOPIETRO: Objection.
MR. McHUGH: Objection. Lack of foundation.
MR. ROBINSON: Objection.
MR. CRONIN: Objection.
MR. CALISE: Objection.
MR. WEST: Objection.
MS. CARLIN: Objection.
A. Not from what you've said, no.
MR. McHUGH: Lack of foundation.
(RECESS)
(MS. VERNI AND MR. CALISE LEFT AT THIS POINT)
Back on the record. Mr. Vieira, just a couple of quick questions. Have you ever seen the Total Recall system itself?
A. No.
Did anyone ever take you to the computer room at the Public Safety Complex and show you how it was hooked into the servers or anything like that?
A. No.
I might have asked you this already, but did you ever have any questions with Joseph Richardson in regard to the Total Recall system recording phone lines other than the four or five that we

Page 139

discussed?
A. No.
When I say recording phone conversations, I'm not talking about your system that kept track of the 900 numbers and all that, I'm talking about actual phone – incoming outgoing phone conversation?
A. Just the Dutra situation, he made a comment.
That's the only one?
A. Yes, that's all.
Did you ever have any phone conversations with Joseph Richardson in regard to removing phone lines from being recorded?
A. No.
Did any of the police chiefs or anyone in the police department ever tell you that they wanted phone lines recorded other than the central station lines?
A. No.
Did you ever tell Joseph Richardson that, that someone in the police department had told you they want additional lines recorded other than the central station lines?
A. No.
Other than Chief Dutra, did any of the other chiefs ever come to you and indicate they had

Page 140

heard their phone lines were being recorded and they wanted them taken off?
A. I believe at the same time of the Chief Dutra situation, Chief Rattigan, I might have had a conversation with him, it was like how about that, you know, that line was recorded.
Q. Did Chief Rattigan ever indicate to you that he thought his line was being recorded and it needed to be removed?
A. No.
Q. In regard to the purging of a recorded line, the only one that you're aware of was Chief Dutra?
MR. McHUGH: Objection as to form.
A. I don't know that we purged that line.
Q. I understand that. But Chief Dutra came to you, he told you he thought his line was being recorded, correct?
MR. SANTOPIETRO: Objection.
Q. He didn't want it recorded anymore?
A. No.
Q. What happened again, just tell me again.
A. Chief Dutra called me. He had a very disturbing conversation with someone and he wanted to know if the line was recorded. I said to him, I don't think the line is recorded unless it came

Page 141

through the switchboard it was transferred to your line, or came through an emergency line, rather, and transferred to your line, but I think the recording would be dropped if that happened, but I'm not sure, ask Tony, see if Tony has a recording of it. That was the extent of the conversation.
Q. So it's your testimony that Joseph Richardson never had any conversations with you about other chiefs inquiring about whether or not their lines were being recorded?
A. Other than the Dutra situation, no.
Q. In Joseph Richardson's statement to the police, he refers to a conversation he had with Chief Lanzi. Who is Chief Lanzi?
A. He was the Chief on the fire department.
Q. The question was, "So you had a conversation with Chief Lanzi?" This is Richardson's answer to the police. His answer was, "Yes, sir." "Was that on the phone?" "I believe so, and I had subsequent conversations with him, yeah." "Okay. What did the Chief ask you?" "He asked me if those lines were being recorded." "Are the Chief's lines being recorded, and do you know why he asked that?" "Because I guess he had that line from

THE WITNESS: Would tell me?
MR. FAY: Would tell you. This is your interview.
Q. Again, Andy Rosenzweig --
MR. SANTOPIETRO: Objection.
MR. McHUGH: Objection.
MR. ROBINSON: Objection.
MR. CRONIN: Objection.
MR. CALISE: Objection.
MR. WEST: Objection.
MS. CARLIN: Objection.
MR. FAY: I haven't asked a question again.
MR. McHUGH: That's the objection.
Q. That's all right. Again, the note that is on the memo is that "Tony or Frank would tell Manny lines that were recorded that should be taken off." Okay. Now, did you ever tell Mr. Rosenzweig or Dean Esserman that Tony or Frank were telling you lines that should be taken off?
A. No.
Q. Again, a couple bullet points down from the bottom, this is referring to what you would have said.
MR. SANTOPIETRO: Objection.



MR. McHUGH: Objection.
MR. ROBINSON: Objection.
MR. CRONIN: Objection.
MR. CALISE: Objection.
MR. WEST: Objection.
MS. CARLIN: Objection.
Q. "Prignano asked for all the trinkets, all the bells and whistles. Vieira said the conversation about the system went on for years. He was sure Prignano knew." Did you ever attribute those statements to Mr. Prignano when you were being interviewed when this memo was recorded?
THE WITNESS: To Mr. Prignano?
Q. No. Did you ever say --
THE WITNESS: These comments to Rosenzweig?
MR. FAY: Yes.
A. No. I already said what I had said relating to Prignano.
Q. That's all I'm asking you. I'm reading what Rosenzweig wrote in regard to his memo. If you go on to the next page, the next section is the section when Tony Desmaris was interviewed by Andy Rosenzweig and created this memo for Dean Esserman. Again, this is all attributed to Tony



Desmaris, not you. It said, "Manny requested he do the specs for the system. He wanted all the lines recorded." Did you ever tell Tony Desmaris you wanted all the lines recorded?
A. No. I only told Tony Desmaris I wanted every line to be accounted for for records management. That's what I told Tony Desmaris many times, very specific to the point.
Q. All right. If you go down about four down there it says, "After the switch went in, Manny wanted station-to-station." Now, the switch went in right at the beginning of this process. So, right when the system was first put in, did you indicate to Tony Desmaris that you wanted station-to-station recordings?
MR. WEST: Objection to form. Foundation.
A. No. Station-to-station came up with the bomb scare that I spoke of earlier; that's it.
Q. I'm taking these one by one, you can disagree. I'm just asking what I have in front of me. Were you ever aware that your lines, I guess in the director's office were also originally going to be recorded?
A. No. No. The only question about my lines



and my secretary's line was when it was relative to the records management system.
Q. Not actual voice recordings?
A. No, absolutely not.
Q. So, I know it seems obvious, did you ever ask that your line specifically not be voice recorded with the Total Recall system?
A. No, I never had a reason to ask that.
Q. Did you ever tell Tony Desmaris to take the Chief's line and the Commissioner's line off from being recorded?
A. From being recorded, no. no.
Q. So again, if Tony Desmaris is making these statements to Mr. Rosenzweig and attributing them to you, he's either incorrect or he's lying?
MR. SANTOPIETRO: Objection.
MR. McHUGH: Objection.
MR. ROBINSON: Objection.
MR. CRONIN: Objection.
MR. CALISE: Objection.
MR. WEST: Objection.
MS. CARLIN: Objection.
A. Either/or, I can't answer that.
Q. Did you ever have any conversations with Tony Desmaris that the recording of the phone

Word Index

Page 62

called me, I can't give you any dates. He called and asked me, he said he just had a very disturbing conversation with someone regarding a call, an emergency call, and that his question was, is the phone -- do you think this conversation is recorded? And I said -- I asked him where he got it from and he told me. I said, from the Chief's office? No. I doubt like hell if that's recorded, unless -- the only way it might have been recorded is if it came through an emergency line and they transferred it to your phone, that's a possibility. But even at that that, I would doubt it. Usually the recording is dropped once it's transferred. I said, but if you want to ask the telephone tech, Tony, ask him, you know, see if he can recover that call or get that call for you, you know, I don't have a problem with that; but I don't think it's recorded.

I don't know if it was that following day or a couple of days later Tony had come upstairs to bring up some paperwork and I asked him, I said, Tony, did you talk to Chief Dutra about the --

Q. I don't mean to cut you off, we're talking Tony Desmaris?

A. Yes.

Page 63

MR. FAY: If you can just say the full name.

A. He's the only Tony. I said, Tony Desmaris, did you have a conversation with Chief Dutra about his phone being recorded? He goes oh, yeah. I said, how did you make out with that? He goes, oh, yeah, it was recorded. I said, how was it recorded? My question to you is how was it recorded? He said, well the Chief's office is recorded. Didn't you want them recorded? I said no, I didn't want the Chief's office recorded, Tony, the only thing we want recorded over there in that whole goddamn building is the central station. Never spoke about recording anything else. So he sat down and looked at me. His look was kind of puzzled. He said, oh, gee, I thought you want all those lines in the Chief's office recorded. I said no, absolutely not. You know what we talked about. We talked about we wanted everything online for the records management system. We didn't want anything to do with recording voices. I got a little explicit with him and that's it.

That's when I came to realize that other than the central station lines that were recorded, that

Page 64

this Chief's office, we had a problem.

Q. Just one line?

A. This Chief Dutra's line, yes.

Q. When did this conversation take place?

A. It was some time in early to mid-January of '03.

Q. Okay. So in January of '03, is the first time you became aware that any more lines other than the central station lines were being recorded, and at that time you became aware of this one line, Chief Dutra's line that Tony Desmaris told you was being recorded after the complaint, right?

A. Yes.

Q. At this time, in January '03, you're aware of one line that is being recorded that you weren't aware of before that date?

A. Yes.

Q. During your conversation when you talked to Tony Desmaris about this, did he indicate to you at that time whether any other lines were being recorded, other than the central station lines that you thought were only being recorded?

A. No. The only lines we spoke of was this Chief's line.

Q. So, I'm just trying to get my time line. Any time

Page 65

before January of '03, again, your understanding is no lines are being recorded, phone conversations other than central station?

MR. SANTOPIETRO: Objection. Asked and answered.

A. Yes.

Q. After January '03 -- strike that. Did you ever speak to Chief Dutra yourself about this, around this time, January '03?

A. Just the initial call -- have I talked to him since?

Q. No. Around this time when you found out about Chief Dutra's line being recorded, did you speak to him directly yourself?

A. Initially, I did. But after it was discovered, is that your question?

Q. No. Initially, did he call you?

A. Yeah, he called me. He asked me what I had said.

Q. Right. And that's when you went to Tony Desmaris to find out what was going on?

A. No. Tony came upstairs and I had asked Tony, I said, by the way, very nonchalantly --

MR. SANTOPIETRO: You don't have to repeat it, just answer the question.

terminated, if it was still your understanding at that time that the only lines that were being actually recorded were those central station lines, and you said, yes; do you remember that?
A. Yes.
Q. All right. So I take it when you had this first meeting with Chief Esserman, when you left that meeting, you were still under the impression that the only lines that were being recorded were the central station lines, correct?
A. Yes. However, at that time, I knew about the situation with Chief Dutra.
Q. Right. After that meeting, though, in January '03 with Chief Dutra, did you take any steps to see that his line wasn't recorded anymore?
MR. SANTOPIETRO: Objection.
A. No. I contacted the law office here to speak to John D'Amico. I told him, "Don't touch nothing, leave things alone."
Q. So, going back to the January '03 meeting or conversation about Chief Dutra's line --
THE WITNESS: We're going back to Dutra now?
MR. FAY: Yes.
Q. You spoke to Tony Desmaris about that and you



learned for the first time there's one additional line that's being recorded that you didn't know about?
A. Uh-huh.
Q. When you finished all those conversations with Chief Dutra and Tony Desmaris, that's when you called Attorney D'Amico?
A. Yes.
Q. The same day?
A. I believe so.
Q. Okay. What was the conversation you had with Attorney D'Amico at that time?
A. I had a tough time getting ahold of him. I finally got ahold of him, I said, "I need to meet. With you and I would like to have the staff from.
The fire department, Chief's office there and the police department there and my department also. There is a problem with a line, a line was being recorded that shouldn't have been recorded in the Chief's office, Chief Dutra." He said, "Okay, let me set up a meeting" -- "let me get back to you and I'll get a meeting set up."
Q. Did the meeting get set up?
A. The meeting did get set up and then it was cancelled.



Q. So the meeting didn't go forward, but did you ever speak with Attorney D'Amico again regarding your question of the recording of Chief Dutra's line?
A. Only to call him to tell him we need to sit down and discuss this.
Q. Did you ever sit down and discuss it?
A. No.
Q. You were terminated before you got a chance to speak with Attorney D'Amico or discuss this?
A. Yes.
Q. All right. That clears that up. To your knowledge, Chief Dutra's line was still being recorded at the time you were terminated, that line hadn't been removed?
A. I'm not sure. I'm not sure. I think -- I think I told him don't touch it.
Q. Who did you say don't touch it?
A. To Anthony Desmaris.
Q. You told Tony Desmaris not to take any action with regard to Chief Dutra's line, to leave it as it is because you wanted to talk to Attorney D'Amico first?
A. I believe so.
Q. At any time after the Total Recall system was put in place, until you were terminated in February of



'03, did anyone approach you other than Chief Dutra and inform you that their line or lines were being recorded that they didn't want recorded and they wanted that to stop?
A. No.
Q. Okay. To your knowledge, from the time the Total Recall system was put in place until you were terminated in February of '03, did anyone other than Chief Dutra approach Tony Desmaris or any other of your technicians and inform them that their lines were being recorded and they wanted it stopped?
A. Not to my knowledge.
Q. When I say that, so that means Tony Desmaris never reported that to you other than Chief Dutra?
A. Right.
Q. And none of the other technicians you identified, they never came to you and said, look, such and such has told me their line is being recorded, they don't want it recorded? None of those conversations ever happened with you or any of your techs, other than that one time with Chief Dutra?
THE WITNESS: With Chief Dutra or Tony Desmaris?

called me, I can't give you any dates. He called and asked me, he said he just had a very disturbing conversation with someone regarding a call, an emergency call, and that his question was, is the phone -- do you think this conversation is recorded? And I said -- I asked him where he got it from and he told me. I said, from the Chief's office? No. I doubt like hell if that's recorded, unless -- the only way it might have been recorded is if it came through an emergency line and they transferred it to your phone, that's a possibility. But even at that that, I would doubt it. Usually the recording is dropped once it's transferred. I said, but if you want to ask the telephone tech, Tony, ask him, you know, see if he can recover that call or get that call for you, you know, I don't have a problem with that; but I don't think it's recorded.

I don't know if it was that following day or a couple of days later Tony had come upstairs to bring up some paperwork and I asked him, I said, Tony, did you talk to Chief Dutra about the --

Q. I don't mean to cut you off, we're talking Tony Desmaris?

A. Yes.



MR. FAY: If you can just say the full name.

A. He's the only Tony. I said, Tony Desmaris, did you have a conversation with Chief Dutra about his phone being recorded? He goes oh, yeah. I said, how did you make out with that? He goes, oh, yeah, it was recorded. I said, how was it recorded? My question to you is how was it recorded? He said, well the Chief's office is recorded. Didn't you want them recorded? I said no, I didn't want the Chief's office recorded, Tony, the only thing we want recorded over there in that whole goddamn building is the central station. Never spoke about recording anything else. So he sat down and looked at me. His look was kind of puzzled. He said, oh, gee, I thought you want all those lines in the Chief's office recorded. I said no, absolutely not. You know what we talked about. We talked about we wanted everything online for the records management system. We didn't want anything to do with recording voices. I got a little explicit with him and that's it.

That's when I came to realize that other than the central station lines that were recorded, that



this Chief's office, we had a problem.

Q. Just one line?

A. This Chief Dutra's line, yes.

Q. When did this conversation take place?

A. It was some time in early to mid-January of '03.

Q. Okay. So in January of '03, is the first time you became aware that any more lines other than the central station lines were being recorded, and at that time you became aware of this one line, Chief Dutra's line that Tony Desmaris told you was being recorded after the complaint, right?

A. Yes.

Q. At this time, in January '03, you're aware of one line that is being recorded that you weren't aware of before that date?

A. Yes.

Q. During your conversation when you talked to Tony Desmaris about this, did he indicate to you at that time whether any other lines were being recorded, other than the central station lines that you thought were only being recorded?

A. No. The only lines we spoke of was this Chief's line.

Q. So, I'm just trying to get my time line. Any time



before January of '03, again, your understanding is no lines are being recorded, phone conversations other than central station?

MR. SANTOPIETRO: Objection. Asked and answered.

A. Yes.

Q. After January '03 -- strike that. Did you ever speak to Chief Dutra yourself about this, around this time, January '03?

A. Just the initial call -- have I talked to him since?

Q. No. Around this time when you found out about Chief Dutra's line being recorded, did you speak to him directly yourself?

A. Initially, I did. But after it was discovered, is that your question?

Q. No. Initially, did he call you?

A. Yeah, he called me. He asked me what I had said.

Q. Right. And that's when you went to Tony Desmaris to find out what was going on?

A. No. Tony came upstairs and I had asked Tony, I said, by the way, very nonchalantly --

MR. SANTOPIETRO: You don't have to repeat it, just answer the question.

Page 66

Q. So you didn't call Tony, Tony just happened to show up at that time after you got this inquiry from Chief Dutra, then you asked him what was going on?
A. Yes.
Q. Then you had that conversation you just testified to?
A. Yes.
Q. At that time you didn't ask Tony at that time whether any additional lines were being recorded?
MR. SANTOPIETRO: Objection. Asked and answered.
A. At that time, no, I did not.
Q. Did Tony Desmaris offer that information to you at that time that any other lines were being recorded?
A. At that time, no, he did not.
Q. Now, after this situation in January '03 with Chief Dutra, when was the next time you became aware that more lines were being recorded than you thought?
A. In the newspaper, after I had left the city.
Q. Okay. So that's after February -- some time late February or after February '03?
A. After February '03, yes.

Page 67

Q. So your testimony is other than that one additional line from Chief Dutra that you found out was being recorded, up until the time you left your position as director of communications with the City of Providence, you had no knowledge from any source of the extent of the recordings that were going on at the public safety building?
A. Yes.
Q. In regard to your position as director, how did you come to leave that position?
THE WITNESS: Leave the position?
Q. Were you terminated, did you resign?
A. Terminated.
Q. That's what I'm asking. Now, were you terminated in writing or in person, how were you terminated?
A. Both.
Q. Was it a letter, someone sent you a letter or handed you a letter?
A. I was asked to go to David Cicciline's office.
Q. When was that?
A. February, second week of February some time.
Q. Okay. Did you have a conversation with Mayor Cicciline at that time?
A. Yes.

Page 68

Q. What was the conversation you had with Mayor Cicciline?
A. He said to me -- I went to his office, he said to me, "I don't approve of your management techniques," or I don't know if he used the word "style," I can't remember. I said, "What is it that you don't approve of, Mayor?" He said, "I just don't like your management style; I want you to resign." I said, "Well, I would resign if you would just only tell me why you want me to resign and what it is about my management style that you don't like." He said, "Well, if you don't resign, I'm going to fire you." He said, "I'm being nice to you." I said okay. I said, "Well, I'm not going to resign because I don't feel I did anything improper or anything wrong to resign." He stood up and he said, "Very well, you're fired." I said, "Fine."
Q. How long did that meeting -- how long was that meeting?
A. Two minutes.
Q. Was anyone else present other than you and Mayor Cicciline?
A. Yeah, his director of administration -- what's his name -- Mike Mello. Mike Mello. I try

Page 69

to forget his name.
Q. At that time did you receive a termination letter?
A. Well, actually he had the two letters on his desk, resignation and termination. I decided to take the termination.
Q. And do you still have a copy of that, do you still have that letter today?
A. I don't know if I still got it. No, I don't -- I may have. I have to look for it. It's not something I wanted to frame.
Q. Prior to the meeting you had with Mayor Cicciline that resulted in your termination, had you had any meetings with Chief Esserman in regard to your position as director of the communications department?
A. We had meetings with Dean Esserman, yes.
Q. How many meetings did you have with Dean Esserman before this determination?
A. Might have been two.
Q. During those two meetings -- let me ask you this, when was the first meeting, do you remember?
A. No. It was some time first week in February.
Q. Let's just talk about the first meeting initially. Who was present other than you and Chief Esserman during the first meeting?

Q. Is he currently in that position?
A. He's currently the captain -- chief dispatcher in the bureau of operational control, and myself, and for the police control center, it was Mary Lennon.
Q. Do you know who replaced her?
A. Cindy Parente, as I understand it.
Q. And do you have a title, captain or --
A. My title is fire alarm inspector/plan reviewer, although I had collateral duties.
Q. Is that because you're a civilian worker, you had said that earlier?
A. I don't know if that has any bearing on it or not, but they gave me these collateral duties and that was one of them, for whatever reason. Maybe my experience in the control centers, they trusted me, I don't know.
Q. That was to process the request forms?
A. That was to retrieve the information they were requesting on the tapes.
Q. Where would you retrieve them from?
A. From the bureau of operational control.
Q. Now did you have a written protocol as to how you were to retrieve the tapes?
A. The information I would receive would be the

for training?

A. I received his phone call, I went for training, it was located on the second floor at the public safety building. I was with my colleagues and that gentleman from Expanets, Carlos, whatever, whoever it was that did the training.

Q. What other colleagues were present?

A. It was myself, Tony Demaris -- Anthony Demaris, Frank Parfume, Greg Haroian and Ron Reposa.

Q. Was Tony Demaris and the another Demaris, what was his first name --

A. It's Anthony. Tony is Anthony, it's one person.

Q. Frank?

A. Parfume.

Q. Ron Reposa?

A. Yes.

Q. And there were a couple of others?

A. Greg Haroian, myself and a gentleman from Expanets and Carlos.

Q. Was Mary Lennon present?

A. No, she was not. She couldn't make it and I went. I went representing her, if you will.

Word Index

Page 10

position?
A. In, I think it was in the 1984, mayor Paolino, he created an arson task force, and at that time I had been working in the field of juvenile treatment, and I was working I believe doing some work at the Training School and when they created this task force, a lot of the focus was on education and treatment programs for juveniles and juvenile offenders. I was appointed on that task force.
Q. Did you have more than one job while you worked for the City of Providence with a different employer?
A. I'm not sure what you mean.
Q. Well, you had indicated earlier that you were a fire dispatcher until 1988, from '73 to '88 and you just indicated to me that in '84 you were part of this juvenile treatment program?
A. I did that in addition to my duties for the city. I did that in addition to my duties as a dispatcher.
Q. Were you compensated for that?
A. No.
Q. So, the question I had originally asked was how you learned about it, so you indicated you worked

Page 11

on this juvenile task force program that was created by then-Mayor Paolino in 1984?
A. I don't recall exactly who, but probably through fire department people, people in the fire department, that they were doing the task problem because of the arson problem in the City of Providence, and they knew that I had experience working with juvenile arson offenders at the Training School. Sex offenders was the program I had been working with.
Q. How long did you work with this juvenile program?
THE WITNESS: For the arson task force?
MS. MANNIS: For the city. You said you started in '88, you moved in '89?
A. I think it was '88, but some time around '88 until 1992.
Q. And where did you go to work --
A. In 1992 I became the deputy director of communications.
Q. How is it that you learned about this position?
A. I believe -- I'm trying to think of the first person, probably Director Viera was the person that approached me about it.
Q. Did you know Director Viera prior to 1982?

Page 12

A. Yes.
Q. How is it that you became to know Director Viera?
A. He was a fire department dispatcher when I started in 1973.
Q. Prior to becoming deputy director of communications in 1992, did you ever answer to Manuel Viera?
THE WITNESS: Prior to 1992?
MS. MANNIS: Yes.
A. No.
Q. Did he work with you any other location other than as dispatcher?
A. No.
Q. What was the next position you held for the city?
A. In September of 2001 I was assigned to the public security task force.
Q. You still remained deputy director of communications at the same time, correct?
A. No.
Q. You were no longer deputy director of communications as of September 2001?
A. I was assigned to the public security task force.
Q. I understand that. My question is were you still the deputy director of communications?

Page 13

A. My full-time job was working for the public security task force.
Q. I understand that. My question is were you still the deputy director of communications?
A. I can answer the question the best way I can. I was assigned full time to the public security task force, that was my full-time job.
Q. You were assigned to the juvenile task force in some time in the '80s, correct?
A. Correct.
Q. But you still held your position as dispatcher, correct?
A. Correct.
Q. And as you sit here today, you are unsure whether or not you were still the deputy director of communications after September of 201?
MR. CRONIN: Objection.
A. I was assigned to the public security task force and that was my primary responsibility and that was my job.
Q. I understand that. My question is whether or not you were still the deputy director of communications for the City of Providence after September 2001?
MR. WEST: Objection. Asked and

Q. Do you know if there were any revisions made to this book that you referred to with regard to the use of the Total Recall systems?
A. No.
Q. You do not know or there were none?
A. I don't know.
Q. Were you involved in the bidding process for the new public safety building?
A. No.
Q. Did you attend any meetings where the new communication system for the new public safety building complex was discussed?
A. Yes.
Q. When did you attend these meetings?
A. I don't recall any specific dates. One of my primary responsibilities from John Partington who was Commissioner of Public Safety of the task force was to ensure or to make sure that we had a backup, redundant communication system. Given the failures of the 1993 (sic) World Trade Center tragedy in 2001, one of the primary goals was to make sure that we had an emergency operation center and that we had backup, redundant communication systems.
Q. Did you attend any meetings prior to the opening



of the Public Safety Complex in which the number of lines that were going to be recorded was discussed?
A. Not that I recall.
Q. Did you have any conversations with John D'Amico regarding the Total Recall system?
A. I had conversations with John D'Amico. I don't recall specific to the Total Recall system, but I had conversations with John D'Amico about regarding -- about telephone recordings.
Q. And what was said?
MR. WEST: Objection.
MR. SANTOPIETRO: Objection.
MR. ROBINSON: Objection.
MR. McHUGH: Objection.
MR. McALLISTER: You can answer.
A. I was asked to investigate along with Chief Giannini an incident where an automobile or an accident where a car had gone into the water and a man had died and there was some questions as to the response and Chief Rattigan had asked Chief Giannini to look into the matter and asked me to look into the matter from the communications end, and I did, and it was at that time that I had discussions with John D'Amico about recordings of



conversations.
Q. And what was said with respect to the recording of conversations?
MR. WEST: Objection.
MR. SANTOPIETRO: Objection.
MR. ROBINSON: Objection.
MR. McHUGH: Objection.
MR. McALLISTER: You can answer.
A. John D'Amico, the -- the Providence Journal, Amanda Milkovich was doing a story or was asking questions about the death of this man that died in the water. In the course of that investigation The Journal had requested any and all recordings, you know, transmissions, radio transmission, phone calls and stuff related to the incident and the department phones, the department phones, the fire department phones, the phones that are just between the fire stations, inside the fire department system, the internal system. I was not sure. We consulted with, as we did with the solicitor's office if those recordings could be or should be turned over to The Journal.
MS. MANNIS: Could you read back his answer, not this last one, the one before that.
(ANSWER BEGINNING ON PAGE 23, LINE 17 READ)



Q. Was that the extent of your conversations with D'Amico regarding the recording of the conversations?
A. He asked what we were recording, how we did recordings, he asked about the process.
Q. And did you know at that time?
MR. WEST: Objection.
MR. CRONIN: Objection.
A. I'm not sure I understand your question.
Q. Were you able to answer his question about how recordings were being made at that time?
A. I told him calls were being made to my knowledge, yes.
Q. And what was your knowledge at that time?
A. That the department phones would in fact be recorded because in fact we did dispatch emergency calls for service via the department lines. He didn't understand the nature of what the difference was in the department line and some of the other lines. So I explained to him what that difference was or explained to him the nature of the department phone lines.
Q. What was your understanding with regard to other phones within the department at that time?
MR. WEST: Objection.

MR. SANTOPIETRO: Objection.
A. He was concerned about those particular calls. That was the reason that I was discussing that with him, about primarily the department phones, but then he asked us how long we kept them, what did we do with them. He wanted to know what that procedure was.
Q. Separate and apart from your conversation with Mr. D'Amico, when you were having this conversation with him, what was your understanding as to the extent of the phone calls that were being recorded at the Public Safety Complex?
A. That the department phones were being recorded.
Q. Was it your understanding that all phones were being recorded?
A. No.
Q. What phones did you understand not to be recorded at that time?
MR. McALLISTER: Objection to form.
THE WITNESS: Can you repeat the question again, please?
Q. At that time when you had the conversation with Mr. D'Amico you said you understood that department phones were being recorded but that not



all calls were being recorded. What calls, was it your understanding at that time, were not being recorded?
A. All emergency calls for service were recorded. The channel 4 calls, those are the calls I referred to earlier where people check for warrants on people, NCIC calls, those calls were recorded.
Q. Which ones were not being recorded, to your knowledge?
THE WITNESS: In the entire department, is that what you're asking?
MS. MANNIS: At the Public Safety Complex.
A. I don't know what calls were being recorded at the Public Safety Complex. I can tell you, to my knowledge, when the Dictaphone was in place and in service, the calls that were being recorded.
Q. I'm not asking you what was actually happening. I'm asking you what you understood was happening. So you have this conversation with Mr. D'Amico whereby you were telling him all the department calls were being recorded, correct?
A. Okay. Internal department -- three digit numbers, not seven digit phone numbers. It's an



internal system.
Q. Okay. And you said that emergency calls were being recorded, correct?
A. Correct.
Q. Channel 4 calls were being recorded?
A. Channel 4, police, correct.
Q. I'm not asking you what actually was happening, I'm asking you what your understanding was at that time as to what calls were not being recorded; do you have an understanding?
A. I don't -- no.
Q. Do you understand at some point there was a list that was generated of calls, of extensions that were not recorded? Do you have an understanding of that?
MR. McALLISTER: Objection to form.
A. No.
Q. So, to the best of your recollection, you don't recall seeing a list of extensions that were not recorded?
A. No. I had a discussion with Chief Lanzi who is the investigative officer for the fire department about his concern that a particular call had been recorded involving a complaint between Chief Dutra from emergency medical



services and Chief Rattigan, and whether or not I saw a list, and I don't recall what -- I do recall he wanted to know why or if those lines were being recorded. I told him that I didn't know.
Q. When was this?
A. Somewhere in that period of time, all around that same time when that incident happened with the body in the water. I'm not sure exactly. Somewhere in that December 2002.
Q. 2002?
A. It was before I retired, so, yes.
Q. I'm going to show you a copy of a correspondence to Chief Lanzi from John D'Amico and ask you if you've ever seen it before?
A. I understand the contents. I recall the conference. I'm not sure if I saw this, but I do understand the contents. I recall when this happened.
Q. Is that the conversations that you were referring to earlier?
MR. WEST: Objection as to form.
A. It's part of the conversations, yes.
MR. McALLISTER: Can we mark that?
MS. MANNIS: I just asked if it refreshed his recollection.

to Rattigan or Tony Desmaris, the telephone technician.
Q. Did you have an understanding as to whether or not they were being recorded at that time as a result of that conversation with Manuel Viera?
A. No, not from the conversation with Viera, no. I do know that Rattigan and Lanzi indicated that a conversation that they had was recorded. I don't know when it was recorded, how it was recorded or what line it was recorded on. I did not have any specific discussion with Viera as to if in fact it was recorded or what line it was recorded on.
Q. Was any part of the conversation that you had with Manuel Viera that we're talking about, that specific conversation, with regard to removing Chief Rattigan and/or Chief Lanzi from the recording system?
MR. SANTOPIETRO: Objection as to form.
MR. WEST: Objection.
A. I think I said if they are, they shouldn't be.
Q. You indicated that Manuel Viera said he was going to speak to Tony Desmaris?
A. I think I recall he said he would have Tony



look into it or he was going to look into it, I'm not sure, but I think he said he was going to have Tony look into it.
Q. But there was no part of that conversation about removing any names -- any extensions from the recording system in that conversation?
MR. SANTOPIETRO: Objection as to form and foundation.
A. I had a general conversation with him about the lines, the chief's line, Chief Rattigan, Chief Dutra, Chief Lanzi, all those lines that would not have been business lines or emergency call for service lines.
Q. I understand that. What I'm asking you is if you recall if any part of that conversation had to do with removing people's calls from the system lines from the system?
MR. SANTOPIETRO: Objection.
MR. WEST: Objection as to form.
A. The names of the people -- no. I don't have any specifics other than Rattigan, Lanzi, Dutra, that was the reason for the inquiry.
Q. I guess I'm not making myself clear. I'm trying to find out if any part of that conversation had to do with that in the future certain people's



calls would not be recorded?
MR. WEST: Objection as to form.
A. I did not -- I was in no position to request that, no.
Q. I'm not asking if you requested. I'm asking if that was discussed at all?
A. What was discussed, that I remember what I recall is that emergency calls for service and business lines were the ones that I understood to be recorded. There was no discussion about specific lines, to my knowledge, or removing certain lines.
Q. Okay. Do you know how the Public Safety Complex was wired for calls?
A. No.
Q. I don't mean wired in terms of recording, I mean physically wired, the trunk, do you have any knowledge of that?
A. No.
Q. Do you know who would?
A. Well, I would assume the phone company, the people who consulted with them to put it in, get the service from the street into the building.
Q. Do you know the names of any of the people that did that?



A. From the phone company, no.
Q. Did you ever meet with any of the people from the phone company?
MR. McALLISTER: About this building?
MS. MANNIS: About this building. In your capacity -- in your employment for the city.
MR. WEST: Objection to form.
MR. SANTOPIETRO: Objection.
THE WITNESS: Can you be more specific? Did I ever meet with people from the phone company when?
MS. MANNIS: When you were employed for the City of Providence.
THE WITNESS: Did I ever speak with anybody from the phone company when I was employed with the City of Providence?
MS. MANNIS: Did you ever meet with them?
THE WITNESS: Ever? I'm not quite sure I understand.
Q. From 2000 forward, did you ever meet with anyone from the phone company?
A. Yes.
Q. Who did you meet with?
A. I don't recall their names. One of the

primary responsibilities that we had, I had, from John Partington was to make sure we had a backup emergency communication center and what that meant so we could receive calls for service some place other than West Exchange Street. So we had done extensive negotiations with emergency 911, state of Rhode Island -- State of Rhode Island emergency 911 people and their staff with phone company people, their staff and whoever the private consultant the State of Rhode Island had so that we could have entered into an agreement so that the emergency -- the backup piece of that public safety answering point at the new public safety complex could be used to answer emergency calls for service and in the event something happened to the building on West Exchange Street.

Q. Did you ever meet with anyone from Expanets while you were employed at the city?

A. No.

Q. Do you have any knowledge of your line being removed from the system that was recording calls?

MR. WEST: Asked and answered. Objection.

A. No.

(MS. CARLIN ENTERED AT THIS POINT)



Q. I'm going to show you an E-mail and ask you if you've ever seen it before?

MR. McHUGH: Is that the Simmoneau E-mail?

MS. MANNIS: No.

MR. SANTOPIETRO: What's the date of that?

MS. MANNIS: July 30, 2002. It's from Mary Lennon to Greg.

A. I don't recall seeing it.

Q. You indicated you investigated whether there was a recording made of something that occurred with the chiefs of the fire department?

A. No, I didn't investigate it. They asked me to ask if in fact -- I mentioned it to the director and Tony Desmaris, that they should look into that.

Q. Inquired may be a better word. Did you also inquire with regard to another phone call that may have been recorded with regard to Councilman Butler?

A. Yes.

Q. And when was that?

A. I don't recall exact date. My recollection is somewhere in that time period, November,



December of 2002.

Q. And what happened?

MR. McHUGH: Objection as to form.

MR. WEST: Same objection.

A. Councilman Butler contacted me and said that he wanted to look at a complaint that he had a discussion with somebody from emergency management and initially I think he characterized it that it was threatening. He said there was a lot of swearing, a lot of yelling and he wanted to listen to the phone call.

Q. What did you do in response to that?

A. I told him if it was a threatening phone call, he should probably reach out, contact someone from the police department and there was a procedure and he would have to get approval and there was a form and they have to sign a form to be able to do that. I also told him I didn't know if the line was recorded in the first place.

Q. Was that the extent of your involvement with that inquiry?

A. I discussed that with him. I recall I spoke to Mary Lennon and I spoke to the director about that, I believe, as well, all in that same time when he asked that and described it to him he had



to get permission, and I described the nature of the complaint that the councilman had.

Q. When you made the inquiry with regard to the incident you referred to earlier about the car in the water, did Mr. Viera tell you all the calls were being recorded?

MR. SANTOPIETRO: Objection.

A. No.

Q. Did Mr. Viera ever tell you that all the calls were being recorded?

MR. WEST: Objection.

A. No.

Q. When you told the police that Mr. Viera said to you, quote, "He said all the lines were recorded," did you lie to the police?

A. No.

MR. WEST: Objection to form.

MR. SANTOPIETRO: Objection.

MR. CRONIN: Objection.

MR. ROBINSON: Objection.

Q. Do you recall saying that to the police?

A. I understood them to be asking about the calls that I understood, as I stated before, emergency calls for service, channel 4 calls, department phone calls, those are the calls that I

Page 10

A. No.
Q. Are you currently employed today?
A. Yes.
Q. Who are you employed by today?
A. Providence College.
Q. What your position with the school?
A. Senior Office Assistant.
Q. When you did you obtain that position?
A. Three years ago, April. April of 2003.
Q. What do you do as a Senior Office Assistant for Providence College?
A. Basically, I handle all registrations, contracts for graduate instructors, purchase orders, requisitions.
Q. Is there a department that you are in there?
A. Yes, Graduate Education.
Q. Who is your direct supervisor in that position today?
A. Thomas Flaherty.
Q. Have you been in the same department the three years?
A. Yes.
Q. Has Tom Flaherty been your supervisor for those three years?
A. Yes.

Page 11

Q. Prior to Providence College, whom were you employed by?
A. City of Providence.
Q. In any capacity, when were you first employed by the City of Providence?
A. I believe it was in 1997, 1996, as I started off as a crossing guard part time.
Q. What was your next position with the City after the crossing guard position?
A. Meter checker.
Q. What was the time frame for the meter checker job?
A. Approximately, six months.
Q. So we are still talking 1996, 1997, still early on?
A. Yes.
Q. What was the next position with the City after meter checker?
A. Retirement Office.
Q. What was your position in the Retirement Office?
A. An office assistant.
Q. What was the time frame that you held that position in the Retirement Office?
A. Approximately, nine months to a year.
Q. How did you obtain the position at the Retirement Office, is that something you had to apply for, was it a posted job; how did you get that job?

Page 12

A. I don't recall. It was temporary.
Q. What was your next position with the City after the office assistant position with the Retirement Office?
A. Commissioner of Public Safety Office.
Q. What was your job with the Commissioner of Public Safety?
A. Same as in Retirement, an office assistant.
Q. Do you remember when you held that position?
A. Approximately, a year.
Q. In regard to the -- I am sorry, was it Commission -- I am sorry; what was it?
A. Commissioner of Public Safety.
Q. What year are we talking about now?
A. I would say that was approximately 1998, 1999.
Q. How did you obtain that position; was it something posted you learned about from the other position at the Retirement Office?
A. I believe they were just looking for somebody. I had known somebody from city hall that had went to the Commissioner's Office, so it was internal.
Q. What was the next position after that?
A. Communications Department.

Page 13

Q. Did you hold a position with the Communications Department, was that the last job with the City until you went to Providence College?
A. Correct.
Q. So what was the year you started with the Communications Department?
A. 1999, of November.
Q. What was your first job in the Communications Department?
A. Chief of Operations.
Q. Did you hold that position right up until -- well, when was the last time you held that position?
A. Until February of 2003.
Q. Again, how did you obtain that position with the Communications Department?
A. From Director Viera.
Q. How did you learn about the position?
A. From the Commissioner of Public Safety Office.
Q. Did someone in that office tell you about the position?
A. Uh-huh.
Q. Do you remember who that person was?
A. I don't recall.
Q. When you found out about the new position as Chief

A. The Deputy.
Q. Which was who?
A. Joseph Richardson.
Q. Do you know if Mr. Richardson had a supervisor or anyone above him that he would have to go through above approving access to those tapes?
MR. MCHUGH: Object.
MR. SANTOPIETRO: Object.
MR. MCALLISTER: Objection.
MR. WEST: Objection.
Q. Or did the buck stop with him, so to speak?
MR. MCHUGH: Objection.
MR. SANTOPIETRO: Objection.
MR. MCALLISTER: Objection.
MR. WEST: Objection.
MR. SANTOPIETRO: Could we have a time frame, please.
Q. Do you understand what I am asking you?
A. You are asking me if he had to ask approval.
Q. Right.
A. I can't say for sure.
Q. Okay. Again, you indicated there were some policies procedures how to go through this; was it written?
MR. FAMILGIETTI: Are you referring to



the Dictaphone system?
MR. FAY: That is only the Dictaphone system.
A. Yes, I believe there were policies written on Dictaphone, yes.
MR. MCHUGH: Can you read back that last answer.
(PENDING ANSWER READ BACK)
Q. Do you know who had possession of those policies, the written policies?
A. The Communications Department.
Q. All right. In regard to the Dictaphone system, was there any warning beep while the phones were being recorded, anything like that?
MR. MCHUGH: Object.
MR. SANTOPIETRO: Object.
MR. MCALLISTER: Object.
MR. WEST: Objection, form.
MR. ROBINSON: Object.
A. No.
Q. Was there anything as part of the Dictaphone system that would inform people that their calls were being recorded in any manner?
MR. MCHUGH: Object.
MR. SANTOPIETRO: Object.



MR. MCALLISTER: Object.
MR. WEST: Objection.
MR. ROBINSON: Object.
Q. Whether it was a beep or anything else?
MR. MCHUGH: Object.
MR. SANTOPIETRO: Object.
MR. MCALLISTER: Object.
MR. WEST: Objection.
MR. ROBINSON: Object.
A. Not that I am aware of.
Q. As part of the State Police investigation, I am going to read part of a memo to you, but I am not going to have it marked at this time. You don't have to take this for God's truth here. I am going to ask you about this statement. Under the old system --
MR. MCHUGH: Can you identify what you are reading from?
Q. This is a memo dated February 6, '03, to Colonel Esserman, from Major Sullivan. The subject is Meeting on Tapped Lines. In the memo it's written, "Under the old system, very few lines were taped, and any request for a copy had to go through Internal Affairs or Department Inspector to the Director of Communications." Is that consistent



with your memory of how the old system would work?
MR. MCHUGH: Object.
MR. SANTOPIETRO: Object.
MR. MCALLISTER: Object.
MR. WEST: Objection to form.
A. Yes.
Q. Director of Communications, who was that?
A. Manuel Viera.
Q. Is it correct that at some point you received some training in the Total Recall system.
A. Yes.
Q. During the training, did you gain some knowledge as to how the system worked?
A. Yes.
Q. Other than the training you received on the Total Recall system, I can't remember the individuals off the top of my head who gave you the training, was that one meeting, two meetings, how many meetings did you have in regard to your training?
A. Actually, I wasn't there for the on-site training. I just had over-the-phone training.
Q. How many times did you have phone training, just once?
A. Once.
Q. Just once; okay. Other than that phone training

Page 78

right before my resignation.
Q. How long before was the meeting with Chief Esserman?
A. Probably maybe three or four months prior.
Q. Did the Total Recall system come up during that meeting?
A. He did not specifically ask about Total Recall. He asked about a recording system.
Q. What did you tell him about the recording system when he asked?
A. I, basically, told him what I was dealing with as far as the Police Control Center.
Q. Okay. What did you tell him?
A. That the phone lines in the Police Control Center were recorded.
Q. How many of the lines?
A. There is six, maybe a total of 10 or 12 lines.
Q. How many lines are at the Center?
A. I don't know exactly the number.
Q. Is it more than 20 lines?
A. I don't believe so, no.
Q. All right. I will be brief with these. In regard to Manuel Viera, did you ever have any discussion about the Total Recall system?

Page 79

MR. SANTOPIETRO: Object.
MR. ROBINSON: Objection.
A. Not that I recall, specifically.
Q. Do you have any knowledge who actually made the decision to put the Total Recall system in?
A. No firsthand knowledge, no.
Q. Any secondhand knowledge, other than your attorney?
MR. SANTOPIETRO: Objection.
MR. MCALLISTER: Objection.
MR. MCHUGH: Objection.
MR. ROBINSON: Objection.
MR. WEST: Objection.
A. No, no.
Q. When you say, no firsthand knowledge --
A. I mean, you know, I mean, I don't know, no. I don't know who signed anything or anything like that; I don't have any of that information.
Q. You already indicated Mr. Richardson was your direct supervisor; correct?
A. Correct.
Q. Was he your direct supervisor the whole time you held that position as Chief of Operations?
A. Yes.
Q. Did you continue -- would you report to him; how would that work?

Page 80

A. I mean, I would report to work every day. If I had, you know, needed his assistance, you know, I would speak with him regarding the matter that needed to be addressed, but he was working for the task force for approximately six or nine months prior to February of '03. I don't know the exact time line.
Q. Did you still speak with him in his capacity as your supervisor at the Department of Communications?
A. Yes.
Q. Did you ever have any conversations with him about what he was doing at the task force?
A. No.
Q. Just so I am clear, so he was your direct supervisor the whole time you were there in Communications?
A. Correct.
Q. Okay. The only reason I ask, I am trying to figure out when he went to do the task force thing, he left his position of Communications, was only working on the task force, or maybe doing both?
A. More or less doing both.
MR. MCALLISTER: Objection.
Q. Did you have conversations with Mr. Richardson

Page 81

about the Total Recall system?
A. Not that I recall.
Q. Is there anything that would refresh your recollection, any documents?
MR. SANTOPIETRO: Objection.
MR. MCALLISTER: Objection.
MR. MCHUGH: Objection.
MR. ROBINSON: Objection.
MR. WEST: Objection.
A. I mean, the only conversation I had with him on Total Recall was the request that he asked that I retrieve the phone call from Patrick Butler.
Q. How about Tony Desmarais, any conversation with him about the Total Recall system?
A. Yes.
Q. How many times did you speak with Mr. Desmarais about the Total Recall system?
A. Numerous times, I would say.
Q. Were they specific issues you covered; what were you talking about?
MR. ROBINSON: Objection.
A. They weren't specific issues. He was just trying to get an idea of how the Dictaphone worked, you know, he would ask me questions regarding that.
Q. Was there ever any written documentation between

MR. SANTOPIETRO: Objection.
MR. MCALLISTER: Objection.
MR. MCHUGH: Objection.
MR. ROBINSON: Objection.
MR. WEST: Objection.
A. I can't say for sure.
Q. All right. Well, reviewing some of your statements, I will get into all of that later, there was a form that was filled out; correct, in order to access a recording on the Total Recall system?
A. There was a form filled out, yes.
Q. As a matter of fact, at the request of others, you actually filled out two or three of those forms; correct?
A. Correct.
Q. That's what I am talking about, a procedure.
A. Okay.
Q. So in order to get a Total Recall recorded phone conversation, to access it, a form had to be filled out; correct?
A. Yes.
Q. What I am asking you now is if you can tell me what the whole procedure was, just like with the Dictaphone system, what was the whole procedure



with the Total Recall system?
MR. FAMILGIETTI: Objection. Asked and answered.
MR. SANTOPIETRO: Objection.
MR. MCALLISTER: Objection.
MR. MCHUGH: Objection.
MR. ROBINSON: Objection.
MR. WEST: Objection.
A. I don't recall.
Q. The forms that had to be filled out, okay, where did you get those forms?
A. I can't say for sure that they were Total Recall forms, or we used the same forms that we used for Dictaphone. So I am not sure.
Q. Who instructed you that that form had to be used to access the Total Recall recorded conversation?
A. Deputy Richardson.
Q. Did he do that during a formal meeting; do you remember when that came about?
A. I believe it was an informal conversation.
Q. At that time, did he bring up the topic as to how someone would actually access one of those recorded phone calls?
MR. MCALLISTER: Objection to form.
A. No.



Q. Did you ask him?
MR. MCALLISTER: Objection to form.
A. I don't recall.
Q. Were those policies and procedures to access recorded Total Recall conversations, were they ever memorialized in a written document or a written policy?
A. I know they were in the process; I don't know if they ever --
Q. Let me ask you this: Did you ever see a written policy and procedure in regard to accessing those Total Recall conversations that had been recorded?
A. I don't believe so.
Q. Can you tell me what your understanding was of the policy or procedure in order for a person to obtain a recorded Total Recall phone conversation?
A. A request would have to be made either to the Director, Manny Viera, or the Deputy Director, Joseph Richardson.
Q. Would that request have to be in writing?
A. I can't speak for them, I mean, I don't know for sure.
Q. Okay. I am going to show you --
MR. FAY: I will have this marked as Plaintiff's 1.



(PLAINTIFF'S EXHIBIT 1 MARKED FOR IDENTIFICATION)
MR. FAY: Hopefully, there is enough for everybody. I will show it to your attorney first. Plaintiff's 1, take a moment to look at it, and let me know when you have had an opportunity to finish reading it.
(WITNESS COMPLIES)
Q. All set; you read that?
A. Yes.
Q. First of all, on Plaintiff's 1 --
MR. FAMILGIETTI: I have to make a call, please continue.
(MR. FAMIGLIETTI LEAVES DEPOSITION)
Q. Is that your signature, Ms. Lennon?
A. Yes.
Q. That memo to Colonel Esserman, it references some forms that were attached to the memo; do you see that?
A. Uh-huh.
Q. I am going to show you what we can mark as Plaintiff's 2.
(PLAINTIFF'S EXHIBIT 2 MARKED FOR IDENTIFICATION)
Q. I will show it to your attorney, Plaintiff's 2

consists of one, two, three, four documents, and I am going to ask you, first, if you can identify what those documents are that have been marked as Plaintiff's 2, just generally, I can read them, but generally, what are they?

MR. ROBINSON: I am going to object on the ground that these documents were, apparently, if you can believe the dates, prepared after my client left employment of the City. So I don't see how she can be expected to discuss or respond to questions about documents that were prepared after she left.

MR. FAY: I don't know if these were prepared after she left or not. I can see the dates at the top, but that's why I am asking to take a look.

MR. ROBINSON: That's why I want the record to note that the dates all, apparently, are dates after she had left employment.

MR. FAY: The document has been marked so --

Q. My question to you, first, do you recognize any of these documents that have been marked as Plaintiff's 2?

A. That I have seen these previously?



Q. Yes.

A. No.

Q. To me, what has been marked as Plaintiff's 2, it looks like some kind of a form, it's entitled, Consent to Listen to Electronically Recorded Oral/ Wired Communication; do you agree with that?

A. Uh-huh.

Q. When you indicated earlier there was a form that you would use for the Dictaphone and also the Total Recall system --

A. Uh-huh.

Q. -- was it similar to this form, or was it this form?

A. It was not this form.

Q. Going back to Plaintiff's 1 for a second, ma'am. When it references in Plaintiff's 1, "Attached are the forms completed for the Total Recall recordings," are those the forms that you filled out or someone had to fill out to access those recordings?

A. Yes, yes.

Q. Do you remember how many forms were attached to what has been marked to Plaintiff's 1?

A. I do not.

Q. Do you remember if it was more or less than five?



A. I would assume less than five.

Q. Do you know normally who would be in possession of those forms, those request forms; would that be the Communications Department?

A. Yes.

Q. While you were employed there, would you maintain those forms somewhere?

A. Yes.

Q. When you were employed in the Communications Department, where would you maintain these request forms?

A. They were in a file.

Q. At the time of your resignation, some time in February, '03, all of the request forms that you were aware of and had been filed, were they still there?

A. Yes.

Q. Was there a specific file cabinet or somewhere where we could find those forms?

A. They would have been filed in the room where the Dictaphone recording was.

Q. Were you aware of any requests to access any Total Recall recorded phone conversations? We had talked about the forms you would use for the Total Recall.

A. Uh-huh.



Q. Were you aware of any requests that were made in written form?

A. I believe there were two from the Police Department.

Q. Did you fill those forms out?

A. Request forms?

Q. Correct.

A. No, I did not.

Q. Do you know who filled those out?

A. I believe one might have been Major Simoneau, and I don't remember the other person.

Q. Do you know what happened to those request forms?

A. They would have been filed in my file cabinet.

Q. In regard to the Total Recall system, do you know if that was a web-based access system?

MR. WEST: Objection.

MR. ROBINSON: Objection.

MR. MCHUGH: Objection as to form.

A. I do not know for sure.

Q. Were you given some kind of password to access the Total Recall phone conversations?

A. Yes.

Q. As part of your training, were you instructed how to use that password?

Page 54

A. Yes, I believe so.
Q. I am not saying you used it, but I am saying they trained you how to use it?
A. Yes, I believe they trained us how to log in.
Q. First of all, what was that password for?
A. To log in to the computer terminal.
Q. What would you be logging into?
A. Total Recall.
Q. Once you logged into the Total Recall system through your computer, would you be able to access the phone recording?
MR. WEST: Objection, form.
MR. SANTOPIETRO: Objection.
MR. MCHUGH: Objection.
A. I couldn't log in from my personal computer.
Q. The password that you had, would you have to use a specific terminal to access?
A. Yes, I did.
Q. Where was that terminal located?
A. In the computer room?
Q. Okay. When you used that computer and you typed in your password, would that enable you to access the phone recordings on the Total Recall system?
A. Yes.
Q. Okay. That's what I was talking about, a web-based

Page 55

system. Again, if you don't understand what I am saying, again, I will try to clarify for you. Now, other than yourself, do you have any knowledge of anyone else who had a password?
A. Steve Moise I believe, Tony Desmarais, Ron Raposa, and Greg Haroian. There would have been other people that I wasn't aware of.
Q. Let me ask you this: Did you ever access the Total Recall system using your password?
A. No.
Q. You have already indicated you remember some written requests to access the phone recordings; correct?
A. Uh-huh.
Q. After you received those written requests, to your knowledge, did someone access the phone recordings that were requested?
A. Yes.
Q. First of all, do you know who did that?
A. I believe on two occasions -- I know on one occasion it was Greg Haroian; I don't know if he was on both occasions or one occasion.
Q. Do you know of anyone else that accessed the Total Recall system to obtain a phone recording after a written request had been made other than your

Page 56

memory of Greg Haroian?
A. No, I don't.
Q. Again, your testimony is you never used your password to access into the system after that one terminal; correct?
A. Correct. I used an admin password at one time.
Q. What was that?
A. I used an admin password because my password wouldn't go through.
Q. What was that admin password?
A. From Greg Haroian.
Q. Using that password, did you access the Total Recall?
A. Yes.
Q. I am going to call it your second password; okay?
A. Uh-huh.
Q. Was that at someone's instruction, or did you just do it yourself?
A. At someone's instruction.
Q. Who told you to use your password to access?
A. Deputy Richardson.
Q. How many times did Deputy Richardson tell you to use your password to access the Total Recall system?

Page 57

A. Once.
Q. Do you remember when that was?
A. I don't. It was some time maybe early December.
Q. Again, prefacing this, we know it was taken out in February of '03, would that be December of '02, '01; do you remember?
A. '02, it was only in for about six months.
Q. If you remember, what phone recording was Mr. Richardson asking you to access?
A. It was a recording for Councilman Butler.
Q. Just so I am clear, to your knowledge, did Councilman Butler ask Mr. Richardson to obtain that; is that what you are saying, or Mr. Richardson wanted to get the phone conversation?
MR. MCALLISTER: Objection.
A. Councilman Butler asked Mr. Richardson.
Q. To obtain that?
A. Yes.
Q. Was that one done in a written form?
A. Not that I am aware of.
Q. What was Councilman Butler's first name?
A. Patrick.
Q. Do you have any personal knowledge -- I probably