**UNITED STATES DISTRICT COURT**
**DISTRICT OF RHODE ISLAND**

**THOMAS WALDEN, et als.**

**VS.** **C.A. NO.: 2004-304 S**

**CITY OF PROVIDENCE, et. als.**

***CONSOLIDATED WITH***

**JOHN C. CHMURA, et als.**

**VS.** **C.A. NO.: 04-553S**

**CITY OF PROVIDENCE ,et als.**

**STATEMENT OF UNDISPUTED FACTS IN SUPPORT OF THE MOTION FOR SUMMARY JUDGMENT OF DEFENDANT, URBANO PRIGNANO, JR.**

Now comes Defendant, URBANO PRIGNANO, JR., ("hereinafter Col. Prignano) and, in support of his motion for summary judgment, sets forth the following facts that are undisputed and which entitle Col. Prignano to judgment as a matter of law.

1. Plaintiffs in these consolidated cases have named Col. Prignano as a Defendant both in his capacity as former Chief of Police and in his individual capacity. (See Complaint in C.A. No. 04-304, Paragraph 93 and Second Amended Complaint in C.A. No. 04-553S, Paragraph 35.)

2. On January 31, 2001, Col. Prignano retired from his position as Chief of the Police Department of the City of Providence. [Prignano Affidavit at Paragraph 1 (Attachment A).]

3. Col. Prignano's last date of employment with the City of Providence was January 31, 2001. [Prignano Affidavit at Paragraph 1 (Attachment A); Prignano Deposition at 8 (Attachment B).]

4. The allegations advanced by Plaintiffs in these consolidated lawsuits relate to a telephone system within the Department of Public Safety for the City of Providence which has been referred to as "The Total Recall System". (See Complaint in C.A. No.: 04-304 and Second Amended Complaint in C.A. No.: 04-533S.)

5. "The Total Recall System" was not used in the City of Providence until it was used in the "new" Public Safety Complex. [Viera Deposition at 29-30 (Attachment C).]

6. The construction of the "new" Public Safety Building did not begin until sometime after Col. Prignano had retired from the Providence Police Department. [Prignano Affidavit at Paragraph 3 (Attachment A); Prignano Deposition at 11 (Attachment B).]

7. Col. Prignano never stepped foot in the new Public Safety Building as an employee of the City of Providence either during the time the building was under construction or when it was completed. (Affidavit of Prignano at Paragraph 4.)

8. Initial meetings relating to the needs of the telephone system to be installed in the "new" Public Safety Complex did not occur until sometime in December of 2001. [Viera Deposition at 34--38 (Attachment C).]

7. The Request for Proposal was drafted and the bidding process begun sometime after the initial meetings. [Viera Deposition at 39--40 (Attachment C).]

8. Col. Prignano had no part in either the initial meetings, drafting of the

proposals or the bidding process for the telephone system to be installed in the "new" Public Safety Complex". [Prignano Affidavit at 5 (Exhibit A).]

9. "The Total Recall System" was activated in July or August of 2002. [Viera Deposition at 58 (Attachment C).]

10. Prior to January 31, 2001, the date he retired, Col. Prignano had no knowledge of a telephone system referred to as the "Total Recall System". [Prignano Affidavit at Paragraph 6 (Attachment A); Prignano Deposition at 13 (Attachment B).]

11. Prior to January 31, 2001, Col. Prignano had never heard of the "Total Recall System". [Prignano Affidavit at Paragraph 7 (Attachment A); Prignano Deposition at 16 (Attachment B).]

12. The first Col. Prignano ever heard of the "Total Recall System" was in February 2003 while watching the 6:00 PM news on television. [Prignano Affidavit at Paragraph 8 (Attachment A); Prignano Deposition at 17–18 (Attachment B).]

Respectfully submitted on behalf of
Defendant,
Urbano Prignano, Jr.
By his Attorneys,
**FAMIGLIETTI & CARLIN, LTD.**

Stephen R. Famiglietti, Esq.
RI Bar No. 1305
Susan M. Carlin, Esq.
RI Bar No. 2648
132Old River Road, Suite 205
Lincoln, Rhode Island 02865
(401) 335-4550
(401) 335-4515 Fax

Dated: April 6, 2006

**UNITED STATES DISTRICT COURT**
**DISTRICT OF RHODE ISLAND**

**THOMAS WALDEN, et als.**

**VS.** **C.A. NO.: 2004-304 S**

**CITY OF PROVIDENCE, et. als.**

***CONSOLIDATED WITH***

**JOHN C. CHMURA, et als.**

**VS.** **C.A. NO.: 04-553S**

**CITY OF PROVIDENCE ,et als.**

**AFFIDAVIT OF COL. URBANO PRIGNANO, JR. (Ret.)**
**IN SUPPORT OF HIS MOTION FOR SUMMARY JUDGMENT**

Now comes Defendant, URBANO PRIGNANO, JR., and under oath makes affidavit and states as follows:

1. On January 31, 2001, I retired from the position of Chief of Police of the City of Providence.

2. My last date of employment with the City of Providence was January 31, 2001.

3. The construction of the "new" Public Safety Building did not begin until sometime after I had retired from the Providence Police Department.

4. I never stepped foot in the "new" Public Safety Building as an employee of the City of Providence either during the time the building was under construction or after it had been completed.

5. I had no part in either the initial meetings discussing communication needs, drafting of the proposals or the bidding process for the telephone system to be installed in the "new" Public Safety Complex.

6. Prior to January 31, 2001, the date I retired, I had no knowledge of a telephone system referred to as the "Total Recall System".

7. Prior to January 31, 2001, I had never heard of the "Total Recall System".

8. The first I ever heard of the "Total Recall System" was in February 2003 while watching the 6:00 PM news on television.

COL. URBANO PRIGNANO, JR. (Ret.)

STATE OF RHODE ISLAND
PROVIDENCE COUNTY

Signed and Sworn to before me this 6 day of April, 2006.

Notary Public Lauren Gervais
My Commission Expires: 10/20/09

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF RHODE ISLAND

| | | |
|---|---|---|
| THOMAS WALDEN, ET AL. | : | |
| PLAINTIFFS | : | |
| | : | |
| vs. | : | C.A. No. 04-304S |
| | : | |
| CITY OF PROVIDENCE, ET AL. | : | |
| DEFENDANTS | : | |

DEPOSITION OF URBANO PRIGNANO, JR., a Witness in the above-entitled case, taken on behalf of the Plaintiffs, before April C. Costa, a Notary Public in and for the State of Rhode Island, at the offices of Providence City Solicitor's Office, 275 Westminster St., Ste 200, Providence, Rhode Island on February 16, 2006 at 2:00 P.M.

ALLIED COURT REPORTERS, INC.
115 PHENIX AVENUE
CRANSTON, RHODE ISLAND 02910
(401) 946-5500

A. I think it was 1986.

Q. After becoming sergeant in 1986, what was the next --

A. Narcotics inspector.

Q. You're going to have to let me finish so that the stenographer can take it down properly.

What was the next rank you obtained after becoming sergeant in 1986?

A. Narcotics inspector.

Q. What was year was that?

A. I think it was 1990.

Q. Following becoming a narcotics inspector in 1990, what rank did you hold?

A. In '94 I became major.

Q. Following becoming major in 1994, what rank did you become?

A. In '95 I became colonel.

Q. When did you leave the employment of the City?

A. January 31st, 2001.

Q. When you were chief what were your duties?

A. Discipline and administrative.

Q. What were your administrative duties?

A. Making sure that the police department operated daily.

Q. Did you have any responsibility among any other

MR. FAMIGLIETTI: Objection. The basic objection is that he's retired now, and I don't know if he would have any personal knowledge of that. You can answer.

A. All we did is suggest to the architects -- well, I didn't -- the commanding officers would be called up and sat with the architects to designate how much room they needed for their division, and that's about all the input we would have into it.

As far as the design, that was up to the architects, and whatever each commander, from patrol to narcotics to community police, would sit with them, and, you know, tell them the adequate space that they would need. That's about it.

Q. Have you had any conversations with any of the defendants in this case regarding this case?

A. Oh, yes.

Q. With who?

A. I don't remember. Plenty of them I talked to.

Q. Did you talk to Manuel Vieira?

A. Yes, I did.

Q. What did you talk to him about?

A. How stupid this is, because I was retired January 31st, '01. And the foundation of the police department wasn't even put in, and how could I be

advertised it.
Q. Did you know about the Total Recall System before you retired?
A. Absolutely not.
Q. Did you have any conversations with Richardson about the Total Recall System?
MR. FAMIGLIETTI: At what point in time, please?
Q. At any point in time.
A. Not that I remember.
Q. Did you attend any meetings with regard to the new public safety complex that was proposed?
A. Let's clarify that now. Whatever year that I worked for Mayor Cianci, Mayor Cianci started to -- decided to have a new police department -- I mean, a new building. First it was two separate ones, a fire and police. Then it got combined.
We had meetings of moving the police department and keeping that building so that -- we would move the police department first. They wanted to move it to the Armory, so that the developers could knock down the police department and developed that area. So there was a lot of meetings on moving the police department to the Armory. Then for some reason or somehow -- you'll have to talk to the administrators

A. Many people, you know. I just don't remember all the time. You're talking 10 years ago.
Q. Were they city people or outside vendors?
A. No, it wasn't outside vendors, because it wasn't determined yet. It would be city people.
Q. Did you tell Richardson?
A. I just explained to you. I don't remember who it was, but whoever the city workers that were putting in anything, I just says put the best.
Q. Have you ever heard -- had you ever heard of the Total Recall System prior to your retirement?
A. I had never heard of the Total Recall System. I have never designed the system, because I don't know how to design a telephone system. All right? I don't know how. That's up to the engineers in communications to design it. I don't know anybody from the people that put it in. All you have to do is ask them. It's a very simple question, which after I read all the stuff here from the State Police, no one said, Do you know Colonel Prignano or how about the purchasing department? My name is never down there to intercede or interject anything about the system.
Q. When you were earlier describing your conversations with Manuel Vieira, when was that conversation that

you described?

A. When I talked to Manny?

Q. Uh-huh.

A. Manny's a personal friend of mine. I talk to him a lot.

Q. But the conversation that you translated for us, when did that occur?

A. You're talking about what?

Q. The conversation that you testified to earlier.

A. About the stupidity, them blaming me?

Q. Um-hum.

A. Every time I talk to him I keep reminding him that it's retarded.

Q. Approximately how many times have you had this conversation with him?

A. I don't know.

Q. When was the last time you spoke with him?

A. Oh, I would say yesterday.

Q. How did you first learn about the Total Recall System?

A. I was watching television when the mayor and Esserman came on and said, quote, There's a secret device in the police station, and Colonel Urbano Prignano was responsible for it. And this was the 6:00 news. I went on the 11:00 news and told them,

it's -- let me refrain. It was totally assanine. I had absolutely, unequivocally, nothing to do with it. Then the stupidity in the paper that it was a top-secret recording device.

What I want to understand is how do you go out to bid for a top-secret recording device when it goes in the paper?

Q. You didn't know about it, did you?

A. Huh?

Q. You didn't know about it, did you?

A. I didn't know about it? No, I didn't know about it, so how could I get blamed for it? All right.

MR. FAMIGLIETTI: You've answered the question.

THE WITNESS: Well, I'll answer the question. I'm just tired of the shit, all right. Not for issue. Here's the draft of the daily operation of how the system was purchased, all right? Someone hiding something there? Not for issue? Huh? Is there somebody hiding something here or trying to frame me?

MR. FAMIGLIETTI: Monty, enough. You've answered the question.

THE WITNESS: No, it's not enough.

MR. FAMIGLIETTI: It's enough for now.

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF RHODE ISLAND

THOMAS WALDEN, et als.
vs. C.A. No. 2004-304S
URBANO PRIGNANO, JR., et als.

---

THOMAS C. CHMURA, et als.
vs. C.A. No. 2004-553S
URBANO PRIGNANO, JR., et als.

DEPOSITION OF MANUEL VIEIRA, a Defendant in the above-entitled case, taken on behalf of the Plaintiffs, before Linda L. Guglielmo, RPR-RMR, a Notary Public in and for the State of Rhode Island, at the offices of the Providence City Solicitor, 275 Westminster Street, Providence, Rhode Island on March 23, 2006 at 2:00 P.M.

ALLIED COURT REPORTERS, INC.
115 PHENIX AVENUE
CRANSTON, RHODE ISLAND 02920
(401) 946-5500

MR. ROBINSON: Objection.
MR. CRONIN: Objection.
MR. CALISE: Objection.
MR. WEST: Objection.
MS. CARLIN: Objection.
A. Yes.
MR. SANTOPIETRO: Everybody objected.
Q. Getting back to your initial position as the deputy director of communications department, you might have told me this, how long did you hold that position, 14 months, I think?
MR. SANTOPIETRO: Objection. Asked and answered.
A. It might have been a year or a little better. 13, 14 months.
Q. What was the next position you held after that?
A. Director of communications.
Q. You think you obtained that position in 1993?
A. I think so.
Q. All right. And was that the same position you held up until the time that you left your employment with the City of Providence?
A. Yes.
Q. I think you told me that was some time in February



'03?
A. Yes.
Q. You held the position for approximately ten years?
A. Yes.
Q. All right. And the director of the communications department, is that the highest administrative position within the communications department?
A. Below the Commissioner of Public Safety, yes.
Q. Right. And just take me above the director of the communications department, who was your direct supervisor, and then who is above that?
A. Commissioner Partington was my direct supervisor.
Q. Who would be above Commissioner Partington?
A. It would have been the Mayor.
Q. Whoever the Mayor was during those ten years?
A. Yes.
Q. Now, when you became the director of the communications department, I'm saying 1993, what were your job duties and responsibilities when you took that position?
A. Pretty much the same, with the exception, you know, I was to overlook all the operations, day-to-day operations. Once again, radio division, all the other divisions within the



department.
Q. Now, as the head of the department, director of communications, you would be responsible for any policies or procedures, rules or regulations in regard to the recording of phone conversations within the fire station and police station?
MR. SANTOPIETRO: Objection.
A. Maybe the policies and procedures or rules that pertain strictly to the emergency operation centers, yes.
Q. All right. For example, in regard to the Dictaphone system that was in place, at some point the idea must have been floated out there when we go to the new public safety building that this Total Recall system was going to be used. Now, the change from one system to another, is that something that would have come before you?
MR. SANTOPIETRO: Objection.
MR. McHUGH: Objection.
MR. ROBINSON: Objection.
MR. CRONIN: Objection.
MR. CALISE: Objection.
MR. WEST: Objection.
MS. CARLIN: Objection.
A. No, it did not. There really was no change.



Q. Did you have a Total Recall -- the Total Recall system is the system that was in the public safety building; you're aware of that, correct?
A. Yes.
Q. It's the same one that was removed about the same time you left your employment by Chief Esserman?
MR. SANTOPIETRO: Objection.
A. I believe it was.
Q. Did you have a system like that in place at any time prior to the ten years you were director of communications?
A. We had the Dictaphone system in place at the communications bureau and when the new Public Safety Complex was built, the new telephone equipment which was the telephone switch itself, and the recording equipment was placed in the Public Safety Complex. And it was an additional back-up phone switch that was placed at the communications department.
Q. All right. And part of that was the Total Recall system, correct, that was put in place?
A. The name -- I believe the name of the recording system was still Total Recall.
Q. Before that time, that system, Total Recall, hadn't been used anywhere within the City of

Page 30

Providence, correct?
MR. WEST: Objection.
A. Not that particular system.
Q. That's all I'm talking about. You already explained the Dictaphone system that was in place. But the Total Recall system was something new that had never been used before, correct?
A. It was new.
Q. Okay. What was the purpose of the Total Recall system?
MR. McHUGH: Objection as to form.
A. The purpose of the Total Recall system, there were two purposes, to record emergency lines and to have a records management system that would identify any kind of phone abuse. In other words, each and every station in the Public Safety Complex as well as communications would be on a records management system, where we could identify long distance calls or any kind of telephone abuse.
Q. All right. Do you know how many phone recordings were actually made by this system while it was in place?
A. No, I don't.
Q. According to the State Police file, there was over

Page 31

750,000 recordings. Is this the first time you're hearing that?
MR. SANTOPIETRO: Objection.
MR. McHUGH: Objection to form.
MR. ROBINSON: Objection.
MR. CRONIN: Objection.
MR. CALISE: Objection.
MR. WEST: Objection.
MS. CARLIN: Objection.
A. I might have read it. I might have seen it in the report.
Q. Let's just go back to the Total Recall system. In regard to the Total Recall system, in order to purchase a system, I mean was the system bid out? How was the system actually purchased?
A. There was a request for proposal that went out of what our needs were.
Q. Let me stop you there. Who made the request for proposal in regards to what your needs were?
A. My technicians.
Q. Who were?
A. Telephone technician and my radio engineer.
Q. Their names?
A. And Chief radio engineer. Anthony Desmaris and Eugene Gianfracco.

Page 32

Q. You said that the bid would go out for the needs that you had. What were the needs that you had?
A. We had many meetings at the Commissioner's office and --
Q. That's with Mr. Partington?
A. Yes. At his office. There were people there from the administrative staff of the police department, the fire department, my department as well, my people, and there were discussions of what the needs were for this new Public Safety Complex, and when the phone system came up, the Commissioner had expressed his concern that he wanted the best equipment, state-of-the-art equipment. He wanted the best recording system, the best phone system. He got into the issues of the Twin Towers in New York and how terrorism was becoming this big thing. And so he expressed just how much he wanted to make sure that we got this ultimate phone system.
At that time there were also administrators from the police department, I don't remember if it was captains or major. I think it was the majors. They wanted to make sure that their calls for service coming into central station where the clerk sat, that those lines would also be

Page 33

recorded.
Q. When were --
MR. SANTOPIETRO: Have you finished?
THE WITNESS: No.
MR. FAY: Go ahead.
A. And at the same meeting, if I remember correctly, the Chief of Police wanted -- brought up the issue of a records management system for the phone system. He said, you know, this is a good time for us to get a system where we can identify where this abuse is coming from, because we had some history there with problems as far as 900 sex numbers being dialed out of that station. Some of the bills were astronomical. So he, on more than one occasion, he requested that type of a system, a records management system would be purchased to identify that abuse.
I also brought up the fact that the new emergency operation center at the Public Safety Complex, that that room there, we were going to need to have a recording system for the emergency lines as well as the radio lines and that we were going to need a radio tower, which is there in place, that's the only thing that got in place, but -- so all of those things.

Page 34

Q. When did those meetings take place when you were trying to establish what the needs were going to be?
A. Oh, God, there were so many of them. I probably went to the first two or three. I didn't go to the -- I didn't go to any more because it got to the point where everybody was fighting about parking spaces, who had a bigger bathroom, who had a bigger room. I didn't bother going.
I would say the first two or three meetings, oh, it had to be -- when this all first broke out, you know, a new station was going to be built, '01, December of '01. I mean, I'm just guessing.
Q. Well, no one wants you to guess, I just want your best recollection. Is that your best recollection?
A. My best recollection it was maybe the December of '01.
Q. Were there any records generated as a result of those meetings that memorialized what was talked about or established what the needs were going to be?
A. I don't know.
Q. Have you ever seen any records generated from those meetings?

Page 35

A. No, I have not.
Q. At any time during those initial meetings, did anyone ever raise the issue that all of the lines should be recorded in the new public safety building?
MR. WEST: Objection.
MR. McHUGH: Objection.
MS. CARLIN: Objection.
MR. SANTOPIETRO: Objection to form.
A. No.
Q. All right. If you can just run through for me the names of the individuals that you remember were present during those meetings and who they were representing, fire, police, whatever department it was. Again, I'm talking about these initial meetings when you're trying to establish what new needs were going to be needed in regard to the recording for the new Public Safety Complex.
A. My department, I had my radio techs, radio engineer, telephone tech.
Q. If you can list the names for me.
A. Anthony Desmaris, Eugene Gianfracco. Police department, there were -- the majors were there, might have been -- I don't know if Sullivan was a major. He might have been a captain. He was

Page 36

there. There was some other captains there. Simoneau, whether he was a lieutenant or captain at the time, I'm not sure of that, either. The fire department -- the whole fire department staff was there, usually Chief Rattigan came down, Chief Lanzi, Chief. There were a lot of people there. It was a full room.
Q. Do you remember anyone else?
A. Might have been people there from internal affairs. I know the Colonel had every -- his whole agency there.
Q. When you say the Colonel, is that Colonel Prignano?
A. Yes.
Q. Was he present at some of these initial meetings with you?
A. He might have been present at one or two, you know, but he usually sent his people. His staff usually came to those meetings.
Q. Who were some of the people of his staff that was present at these meetings, Colonel Prignano's people?
A. The names that I just mentioned, Simoneau, Sullivan. There were captains. Might have been Captain Glancy, Captain Ryan. I really don't

Page 37

remember. I know there was a lot of white shirts there, so to speak.
Q. In regard to Colonel Prignano, if he wasn't present, was it your understanding that if it was Captain Sullivan at the time I don't know, but his people, they were to report to him about what was going on at these meetings?
MR. WEST: Objection.
A. I can't answer that. I would imagine so. I don't know.
Q. Did you ever discuss these meeting with Colonel Prignano himself, if he wasn't at one of the meetings?
A. No. No. I never called him or the fire Chief, not about that, no.
Q. Again, we're talking about initial meetings now. You're trying to establish what the needs are for the new public safety building in regard to the recordings?
A. Yes.
Q. How long you -- you think it was some time in December of '01. What was the name --
A. That's when they started. They started --
Q. How long did these meetings go before you took the next step, which I would imagine would be

procurement?
A. The meetings I attended might have been within those first three months, but they continued. I didn't -- I wasn't present at them. I didn't go to any of them.
Q. So, three or five months, meetings were going on. I know you didn't attend all of them. At some point were some final decisions made in regard to what the new building, the public safety building was going to need in regard to a recording system?
A. The discussions that we had, just that, you know, that we wanted to have -- discussions I had with my people, my technicians, we wanted to have a duplex-type of switching phone equipment. There were two going to be two switches, one switch was going to be located in the Public Safety Complex, one at communications. If there was a failure at the Public Safety Complex, the phone switch, back-up phone switch, it was a redundant system is what we requested. The backup switch would take over until such time as the main switch would be repaired. We talked about that.
We talked about the new emergency operations center that we were going to put on the third floor of the Public Safety Complex that we needed



lines for the recording system there.
We needed to record the lines in central station, calls for service. Just in general that, you know, that the city itself needed to have a recording system for this new complex.
Q. Right. And I take it at some point after all these meetings, a decision was made as to what type of recording system was needed, correct?
A. Well, all these facts were compiled by my technicians, telephone technician, and an RFP, request for proposal was drafted and that was presented to the Board of Contract and Supply.
Q. The RFP, did you see that before it went out?
A. Yeah, I looked at it, from what I can remember.
Q. Was that part of your job duties and responsibilities as director of communications, that you should take a look at that before it goes out?
A. Oh, yeah. Absolutely.
Q. Did you approve that when it went out?
MR. McHUGH: Objection as to form.
THE WITNESS: Approve it? How do you mean approve it?
Q. You reviewed it before it went out?



A. I reviewed it. I went over all the requests that we had made. As I just got through telling you, the duplex switches and the recording system for the operations center. Yes, that was part of the spec.
Q. If the recording system in the RFP wasn't what you thought the communications -- wasn't what was required, I take it you would have said something or tried to make a change to the RFP, correct?
MR. SANTOPIETRO: Objection.
MR. McHUGH: Objection.
MR. ROBINSON: Objection.
MR. CRONIN: Objection.
MR. CALISE: Objection.
MR. WEST: Objection.
MS. CARLIN: Objection.
A. The only thing the RFP said, from what I can remember, it explained the switching system, the way we wanted it to work, and that there would be a recording system, and that as part of that recording system there would be a records management system that would account for all the phones.
Q. The RFP that went out specifically in regard to the recording system you were seeking, that was



what you approved, correct?
MR. WEST: Objection.
MS. CARLIN: Objection.
MR. SANTOPIETRO: Objection.
MR. McHUGH: Objection.
MR. ROBINSON: Objection.
MR. CRONIN: Objection.
MR. CALISE: Objection.
A. I don't know what you mean by approve.
Q. As director of communications, you said there had been nothing in the RFP in regard to recording?
A. Yes.
Q. I take it you would have said something to somebody that we need some kind of recording device, correct?
MR. SANTOPIETRO: Objection.
MR. WEST: Objection.
MS. CARLIN: Objection.
MR. McHUGH: Objection.
Q. Fair enough?
A. Yes.
Q. The RFP, as you're saying, contained some language in regard to the type of recording device or recording needs that were needed, correct?
A. There was information in there that pertained

Page 58

installation period?
A. Yes.
Q. All right. My follow-up question was other than Tony Desmaris, did anyone else give you any information in regard to the Total Recall system as to what it was actually going to do once it was up and running and what its capabilities were during the installation process?
A. No.
Q. Do you remember the date that the public safety building actually opened up?
A. August -- end of July, August --
Q. Of?
A. -- seems to stick in my mind.
Q. Of what year?
A. Of '02.
Q. Before the public safety building opened, where was your office located, where was director of communications -- where was your office located?
A. West Exchange Street.
Q. Did it stay there or did you move to the now building?
A. Stayed there.
Q. West Exchange?
A. Yes.

Page 59

Q. After the installation was complete, did you come to learn when the Total Recall system became activated?
A. I -- it was activated, up and running in July or August, as I said earlier. That's when they moved in, and I thought that's when it was operational.
Q. All right. Now that the Total Recall system is installed, now we're during the operational phase, we're dealing with the time period July '02 until the system was taken out some time in February of '03, okay. Now it's running. You earlier testified that even sitting here today, you had no knowledge that that Total Recall system was recording phone conversations on a majority of the lines in the public safety building, correct?
MR. SANTOPIETRO: Objection. Form.
MR. McHUGH: Objection.
MR. ROBINSON: Objection.
MR. CRONIN: Objection.
MR. CALISE: Objection.
MR. WEST: Objection.
MS. CARLIN: Objection.
A. I don't know what you mean by majority. Could you be more specific?

Page 60

Q. What I'll do is I'll have --
A. Those lines there --
Q. The ones I showed you earlier?
A. No.
Q. The lines that were contained in the --
MR. WEST: Move to strike.
Q. The lines that were contained in the State Police investigation file, were they identified as all the lines that were being recorded, and I went through them with you just to show you how many there were?
A. Yes, you did.
Q. Until today, that's the first time, today, was when you became aware to the extent that the Total Recall system was recording phone conversations, correct?
MR. SANTOPIETRO: Objection.
MS. CARLIN: Objection.
MR. McHUGH: Objection.
MR. WEST: Objection.
A. I was aware that it was recording the phone conversations, as I said earlier, in the central station, yes.
Q. Your own testimony is you only thought that was only about four, five lines, correct?

Page 61

A. Yes.
Q. I showed you hundreds of lines, correct?
A. Yes.
MR. SANTOPIETRO: Objection to form.
MR. McHUGH: Objection.
MR. ROBINSON: Objection.
MR. CRONIN: Objection.
MR. CALISE: Objection.
MR. WEST: Objection.
MS. CARLIN: Objection.
Q. Let me ask you this, when did you first become aware that the Total Recall system was recording phone conversations on more than the four or five lines that you thought it was going to be recording when it was bid, procured and installed?
MR. SANTOPIETRO: Objection.
MR. McHUGH: Objection.
MR. ROBINSON: Objection.
MR. CRONIN: Objection.
MR. CALISE: Objection.
MR. WEST: Objection.
MS. CARLIN: Objection.
A. There was a situation that was brought to my attention by a chief in the fire department, Chief Dutra. Chief had called me, I don't know when he