UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF RHODE ISLAND

| | | |
|---|---|---|
| THOMAS WALDEN, et al.<br>Plaintiffs<br><br>v.<br><br>CITY OF PROVIDENCE, et al.<br>Defendants | : | Case No. 04-304S |
| JOHN C. CHMURA, et al.<br>Plaintiffs<br><br>v.<br><br>CITY OF PROVIDENCE, et al.<br>Defendants | : | Case No. 04-553S |

## PLAINTIFFS' OBJECTION TO DEFENDANT MARY LENNON'S MOTION FOR RULE 11 SANCTIONS

Plaintiffs hereby object to Defendant Mary Lennon's motion for sanctions under Rule 11. The bases for this objection are detailed in the attached memorandum.

By their attorneys,

**Murphy & Fay, LLP**
127 Dorrance Street, 2nd Floor
Providence RI 02903
Tel: (401) 490-3200
Fax: (401) 490-3207

Mark A. Fay # 4208

## CERTIFICATION

On May 31, 2006 a true copy of the foregoing was served on all counsel of record, listed below, by mail.

Kendra Lima

**Dean G. Robinson, Esq.**
670 Willett Avenue
Riverside RI 02915

**Carolyn A. Mannis, Esq.**
170 Westminster Street, Suite 800
Providence RI 02903

Susan Marcotte Carlin, Esq.
**Famiglietti & Carlin, Ltd.**
205 The Lincoln Center
132 Old River Road
Lincoln RI 02865

**George J. West, Esq.**
1500 One Financial Plaza
Providence RI 02903

Kevin F. McHugh, Esq.
Assistant City Solicitor
**City of Providence**
275 Westminster Street
Providence RI 02903

George L. Santopietro, Esq.
**Coia & Lepore, Ltd.**
226 South Main Street
Providence RI 02903

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF RHODE ISLAND

| | | |
|---|---|---|
| THOMAS WALDEN, et al.<br>Plaintiffs<br><br>v.<br><br>CITY OF PROVIDENCE, et al.<br>Defendants | : | Case No. 04-304S |
| JOHN C. CHMURA, et al.<br>Plaintiffs<br><br>v.<br><br>CITY OF PROVIDENCE, et al.<br>Defendants | : | Case No. 04-553S |

PLAINTIFFS' MEMORANDUM IN SUPPORT OF
THEIR OBJECTION TO LENNON'S MOTION FOR RULE 11 SANCTIONS

## INTRODUCTION

Mary Lennon has moved this Court for the imposition of sanctions against plaintiffs and/or their attorneys under Rule 11. However, prior to filing their two complaints, plaintiffs' attorneys conducted reasonable inquiry by investigating and reviewing the relevant records that were available at the time. Under the standards set out by Rule 11, neither plaintiffs nor their attorneys are subject to Rule 11 sanctions because their actions were reasonable under the circumstances.

## FACTS

Prior to filing this suit, plaintiffs' co-counsel, Carolyn Mannis, traveled to the City of Providence's Law Department to review the files produced by the City in response to an Access to Public Records Act [APRA] request. After reviewing this material, Carolyn Mannis determined the following:

1. Mary Lennon was Chief of Operations in the Communications Department for the City of Providence. Affidavit of Carolyn Mannis at ¶ 11(a); Appendix [A.] 2.[1]
2. The Communications Department was in charge of procuring, installing, and maintaining the Total Recall system. *Id.* at ¶ 11(b); A. 2.
3. Mary Lennon was fired or otherwise asked to resign by Mayor Cicilline after the Total Recall system was discovered by his administration and subsequently removed. *Id.* at ¶ 11(c); A. 2.
4. Mary Lennon had access codes to the Total Recall system. *Id.* at ¶ 11(g); A. 3.
5. Mary Lennon retrieved some calls by using the Total Recall system access codes. *Id.* at 11(h); A. 3.

At the very minimum, the above facts provided plaintiffs a good-faith basis to include Lennon as a defendant in this matter.

After discovery was conducted, the following facts were confirmed or revealed:

1. From November of 1999 to February of 2003, Lennon was Chief of Operations of City's Communications Department. Lennon depo. at 13; A. 7.
2. Lennon learned in July 2002 that the Total Recall system was being installed and that some lines in the Communications Department's facility on West Exchange Street were also being recorded. Lennon depo. at 66-67; A. 20-21.
3. In July 2002, Lennon received an email informing her that certain phone stations at the Communications Department facility had been purged from the recording system and that those stations were no longer recording inbound or outbound calls. Lennon depo. exh. 3; Lennon depo. at 58-61; A. 15-18, 27.

---

1. The pages to the appendix have been consecutively numbered in the lower right corner for ease of reference.

4. Lennon directed Greg Haroian, a technician in the Communications Department, to add additional telephone lines to the Total Recall system. Haroian State Police statement Q. 43-53; A. 28-29.

5. Lennon received training for the Total Recall system in November 2002, during which she learned that the system recorded more than just emergency lines, that it also recorded calls on non-emergency lines within the Providence Public Safety Complex [PPSC]. Lennon depo. at 43, 45, 63; A. 8, 9, 19.

6. After her training in November 2002, and before her resignation in February 2003, Lennon became aware that most phone lines at the PPSC were being recorded. Lennon depo. at 68-69; A. 22-23.

7. After becoming aware that most of the lines at the PPSC were being recorded, Lennon never discussed with the City's Law Department or with anyone else whether it was appropriate or legal. Lennon depo. at 74-76; A. 24-26.

8. Lennon knew that essentially all telephone lines were recorded. Moise State Police statement Q.28-32; A. 30-31.

9. Lennon personally filled out two to three forms requesting the retrieval of recordings from the Total Recall system. Lennon depo. at 46-47; A. 10-11. Moreover, Lennon used an administrative password to personally retrieve a recorded conversation from the Total Recall system, at the request of Councilman Patrick Butler. *Id.* at 53, 56-57; A. 12, 13-14.

This evidence shows that, prior to the time of Lennon's resignation, she was aware of the function and the capabilities of the Total Recall system, she had directed that additional lines be recorded by the system, and that she had actively participated in the retrieval and disclosure of recorded messages from this system.

## ARGUMENT

I. Plaintiffs and their attorneys should not be subject to Rule 11 sanctions because the claims made against Lennon resulted from an inquiry that was reasonable under the circumstances, showing that the claims had evidentiary support or were likely to have evidentiary support after reasonable opportunity of discovery.

Federal Rules of Civil Procedure, Rule 11 expressly provides that sanctions will not be imposed if the plaintiff's allegations are reasonable under the circumstances because they have evidentiary support or are likely to have support after further investigation or discovery:

> (b) Representations to Court. By presenting to the court * * * a pleading * * * an attorney * * * is certifying that to the best of the person's knowledge, information, and belief, formed after an inquiry reasonable under the circumstances, —
>
> * * * * *
>
> (3) the allegations and other factual contentions have evidentiary support or, if specifically so identified, are likely to have evidentiary support after a reasonable opportunity for further investigation or discovery;

FED.R.CIV.P. 11(b).

One Court has explained this part of Rule 11 in detail that is highly relevant to these proceedings:

> When an attorney signs a complaint (or other pleadings) in a federal district court, he or she certifies that "to the best of the person's knowledge, information, and belief, formed after an inquiry reasonable under the circumstances, * * * (3) the allegations and other factual contentions have evidentiary support after a reasonable opportunity for further investigation or discovery." *Id.* Fed.R.Civ.P. 11(b). While the reasonable inquiry requirement is not to be taken lightly, Rule 11 does "allow pleadings based on evidence reasonably anticipated after further discovery or investigation." [Citation omitted.] Whether an inquiry is "reasonable under the circumstances" takes into account the lack of access to information within the defendant's exclusive control. *See Robinson v. Dean Witter Reynolds, Inc.*, 129 F.R.D. 15, 22 (D.Mass. 1989) ("If the lawyer has only limited * * * access to information prior to filing, it is reasonable for her to conduct a less extensive inquiry * * *" [citation omitted.]). Moreover, an attorney's reliance on public reports of

circumstances alleged in a complaint may be a reasonable inquiry for purposes of Rule 11(b). [Citation omitted.] n.9

n9 *See also Forbes v. Eagleson*, 19F.Supp.2 352, 375-76 (E.D.Pa. 1998) (holding that the plaintiffs' RICO claims were time-barred, and explaining that reliance on a report written by a lawyer and based on extensive investigations would have satisfied Rule 11(b); also explaining that "plaintiffs would have acted consistent with Rule 11" if, after having read news articles describing "self-enriching" schemes between RICO defendants, the plaintiff had "simply contacted sources cited by [the media reports]"); [citation omitted]; *In re Air Disaster at Lockerbie, Scotland*, 144 F.R.D. 618,n 621 (E.D.N.Y. 1992) ("Parties and their attorneys may base their complaints and requests for discovery on * * * hearsay reports and statements of others until such time, if ever, as they are satisfied that the statements * * * are not competent or are otherwise untrustworthy."); *Kamerman v. Steinberg*, 113 F.R.D. 511, 514-15 (S.D.N.Y. 1986) (news articles and public documents provide a reasonable factual basis for claims based on securities violations).

*Estate of Barrett v. U.S.*, 337 F.Supp.2d 370, 377 and n.9 (D.C.Mass. 2004) (emphasis added).

Under Rule 11, as explained in *Estate of Barrett*, the plaintiffs' actions and the actions of counsel when bringing the complaints were reasonable under the circumstances and, therefore, the plaintiffs are not subject to sanctions. After finding out (through the media) about the wiretapping of the phones in the PPSC, plaintiffs' co-counsel, Carolyn Mannis, traveled to the City of Providence's Law Department to review the files produced by the City in response to an APRA request. This was the primary evidence available to the plaintiffs at that time. Plaintiffs and their counsel therefore made reasonable inquiry under the circumstances.

The plaintiffs' inquiry showed that Lennon was in a position of authority in the Communications Department — the department that was in charge of procuring, installing, and maintaining the Total Recall system. Moreover, this pre-complaint inquiry tended to show that Lennon had access to the codes for the Total Recall system, and had retrieved calls

by using that system. Finally, it was known that Lennon had been fired or otherwise asked to resign by Mayor Cicilline after the Total Recall system was discovered by his administration and subsequently removed. All of these facts, and more, were supported by the subsequent discovery. Given the standard for inquiry when lawyers have only limited access to information prior to filing, as outlined in the *Estate of Barrett* decision, there was sufficient basis for the plaintiffs' complaint so as to defeat Lennon's Rule 11 motion for sanctions.

## Conclusion

Under the circumstances, the plaintiffs and their counsel plainly made a reasonable inquiry as to the facts prior to filing their complaints. This inquiry revealed enough information on which to make a valid claim against Mary Lennon for her part in the wiretapping of the phones used by the plaintiffs in the PPSC. Accordingly, Lennon's motion for Rule 11 sanctions should be denied.

By their attorneys,

**Murphy & Fay, LLP**
127 Dorrance Street, 2nd Floor
Providence RI 02903
Tel : (401) 490-3200
Fax: (401) 490-3207

Mark A. Fay # 4208

CERTIFICATION

On May 31, 2006 a true copy of the foregoing was served on all counsel of record, listed below, by mail.

Kumara Lima

**Dean G. Robinson, Esq.**
670 Willett Avenue
Riverside RI 02915

**Carolyn A. Mannis, Esq.**
170 Westminster Street, Suite 800
Providence RI 02903

Susan Marcotte Carlin, Esq.
**Famiglietti & Carlin, Ltd.**
205 The Lincoln Center
132 Old River Road
Lincoln RI 02865

**George J. West, Esq.**
1500 One Financial Plaza
Providence RI 02903

Kevin F. McHugh, Esq.
Assistant City Solicitor
**City of Providence**
275 Westminster Street
Providence RI 02903

George L. Santopietro, Esq.
**Coia & Lepore, Ltd.**
226 South Main Street
Providence RI 02903

# APPENDIX


| Item | Page |
| --- | --- |
| Affidavit of Carolyn A. Mannis | 1-3 |
| No pages 4 and 5 | |
| Deposition of Mary Lennon | 6-26 |
| Deposition of Mary Lennon, Exhibit 3 | 27 |
| Witness Statement of Greg Haroian (excerpt) | 28-29 |
| Witness Statement of Stephen Moise (excerpt) | 30-31 |

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF RHODE ISLAND

| | | |
|---|---|---|
| THOMAS WALDEN, et al., | : | |
| | : | |
| vs. | : | C.A. No. 04-304-S |
| | : | |
| CITY OF PROVIDENCE, et al. | : | |
| JOHN C. CHMURA, et al. | : | |
| | : | |
| vs. | : | C.A. No. 04-553S |
| | : | |
| CITY OF PROVIDENCE, et al. | : | |

AFFIDAVIT

I, Carolyn A. Mannis, being duly sworn, do depose and state as follows:

1. I am an attorney at law duly licensed to practice before all the courts of the State of Rhode Island. I am a member of the Rhode Island Bar and this federal court and am in good standing and have been since 1990 and 1991 respectively, and have the bar registration number 4275.

2. I am co-counsel with Mark Fay in the above captioned consolidated cases involving the recording of telephone calls at the Providence Public Safety Complex.

3. I became involved in the case through Mark Fay at his request.

4. Prior to filing the lawsuit in question, I assisted Steven Crawford, an attorney located with Mark Fay in drafting an Access to Public Records Act request to see documents relative to the recording of telephone calls at the Providence Public Safety Complex.

5. In response, Steven Crawford was invited to review a file box full of

thousands of pages of documents relative to the recording of telephone calls at the Providence Public Safety Complex.

6. I accompanied Attorney Crawford and personally reviewed the documents in the file box with him. We reviewed the documents with the assistance of Adrienne Southgate an attorney for the City of Providence at the Law Dept. on Westminster Street in Providence.

7. In particular I recall viewing a manila envelope of documents labeled "liability."

8. During my review I took some notes. Included among the notes was a listing of the telephone extensions that were not recorded.

9. In addition, I also recall reading media accounts regarding the recording of telephone calls at the Providence Public Safety Complex.

10. It is difficult to reconstruct the knowledge I had prior to filing the lawsuit(s) and subsequent information I have learned through discovery.

11. What I believe I understood at the time of the filing of the lawsuit(s) is as follows:

a. Mary Lennon was Chief of Operations in the Communications Department for the City of Providence.
b. The Communications Department was in charge of procuring, installing and maintaining the Total Recall system.
c. Mary Lennon was fired or otherwise asked to resign by the City of Providence as a direct result of the Total Recall system's being discovered by Colonel Dean Esserman.
d. Colonel Esserman immediately upon discovery of the Total Recall system had it removed.
e. Colonel Esserman ordered an internal investigation into the recording of telephone calls at the Providence Safety Complex.
f. As a result of his investigation or simultaneously the matter was referred to the Attorney General's office for potential criminal charges

as a result of the taping of the telephone calls at the Providence Public Safety Complex.

g. Mary Lennon had access codes to the Total Recall system.

h. Mary Lennon retrieved some calls by using the Total Recall system access codes.

12. I have spoken with Dean Robinson about this case on several occasions. Since the beginning of the case he has maintained, despite the evidence to the contrary that his client Mary Lennon was not involved in the recording of the telephone calls at issue.

13. I requested that he provide some type of documentation or sworn testimony in this regard and he never provided anything until he filed a motion for summary judgment and the instant motion for Rule 11 sanctions.

14. The above is based upon personal knowledge and if sworn as a witness I could and would so testify.

[signature]
Carolyn A. Mannis

Signed and sworn to before me this 31st day of May, 2006 in Providence, Rhode Island.

[signature]
Notary Public
My commission expires:

RICHARD M. BIANCULLI JR. # 58013
Notary Public-State of Rhode Island
My Commission Expires
April 17, 2010

UNITED STATES DISTRICT COURT
IN THE DISTRICT OF RHODE ISLAND

| | | |
|---|---|---|
| THOMAS WALDEN, ET AL., Plaintiffs, | ) | |
| VS. | ) | C.A. NO. 04-304S |
| CITY OF PROVIDENCE, ET AL., Defendants. | ) | |
| JOHN C. CHMURA, ET AL., Plaintiffs, | ) | |
| VS. | ) | C.A. NO. 04-553S |
| CITY OF PROVIDENCE, ET AL., Defendant. | ) | |

DEPOSITION OF MARY FRANCES LENNON, taken on behalf of the Plaintiffs, in the above-entitled causes, pursuant to notice, before Nancy L. Simoes, R.P.R., a Notary Public in and for the State of Rhode Island, at the Law Offices of City of Providence Law Department, 275 Westminster Street, Providence, Rhode Island, on February 24, 2006, scheduled at 2:30 P.M.

ALLIED COURT REPORTERS, INC.
115 PHENIX AVENUE
CRANSTON, RHODE ISLAND 02920

Q. Did you hold a position with the Communications Department, was that the last job with the City until you went to Providence College?

A. Correct.

Q. So what was the year you started with the Communications Department?

A. 1999, of November.

Q. What was your first job in the Communications Department?

A. Chief of Operations.

Q. Did you hold that position right up until -- well, when was the last time you held that position?

A. Until February of 2003.

Q. Again, how did you obtain that position with the Communications Department?

A. From Director Viera.

Q. How did you learn about the position?

A. From the Commissioner of Public Safety Office.

Q. Did someone in that office tell you about the position?

A. Uh-huh.

Q. Do you remember who that person was?

A. I don't recall.

Q. When you found out about the new position as Chief

A. Yes, it did.
Q. What was the difference between the two systems, the Dictaphone system and Total Recall system?
MR. MCHUGH: Object, form.
MR. SANTOPIETRO: Object.
MR. MCALLISTER: Object.
MR. WEST: Objection to form.
A. The Total Recall system recorded on a CD, and it was a little bit more advanced than the Dictaphone system.
Q. During your initial phone training, were you made aware at that time that the Total Recall system would be recording phone conversations on lines other than just emergency calls?
MR. ROBINSON: Objection.
A. Yes.
Q. So what were you told in regard to what the Total Recall system would be recording, other than just the emergency call lines?
MR. MCHUGH: Object, form.
MR. SANTOPIETRO: Object, form.
MR. MCALLISTER: Object, form.
MR. WEST: Objection to form
A. That it was going to be recording calls at the new Public Safety Complex.

8

A. Yes.
Q. During that training, you learned that the Public Safety Complex, the lines were going to be recorded; correct?
MR. MCHUGH: Object as to form.
MR. SANTOPIETRO: Object.
MR. MCALLISTER: Object.
MR. WEST: Objection.
A. He reviewed lines that were being recorded.
Q. Okay. After that phone training, did you have an understanding of how many phone lines were going to be recorded at the Public Safety building?
A. I was under the assumption that most lines would be recorded at the Public Safety, but that was just what I thought.
Q. That's what you took away from the training?
MR. SANTOPIETRO: Objection.
MR. MCALLISTER: Objection.
MR. MCHUGH: Objection.
MR. ROBINSON: Objection.
MR. WEST: Objection.
Q. All right. Now, at some point, just like with the Dictaphone system, procedures were put in place in order to access recorded phone calls on the Total Recall system; correct?

MR. SANTOPIETRO: Objection.

MR. MCALLISTER: Objection.

MR. MCHUGH: Objection.

MR. ROBINSON: Objection.

MR. WEST: Objection.

A. I can't say for sure.

Q. All right. Well, reviewing some of your statements, I will get into all of that later, there was a form that was filled out; correct, in order to access a recording on the Total Recall system?

A. There was a form filled out, yes.

Q. As a matter of fact, at the request of others, you actually filled out two or three of those forms; correct?

A. Correct.

Q. That's what I am talking about, a procedure.

A. Okay.

Q. So in order to get a Total Recall recorded phone conversation, to access it, a form had to be filled out; correct?

A. Yes.

Q. What I am asking you now is if you can tell me what the whole procedure was, just like with the Dictaphone system, what was the whole procedure

with the Total Recall system?

MR. FAMILGIETTI: Objection. Asked and answered.

MR. SANTOPIETRO: Objection.

MR. MCALLISTER: Objection.

MR. MCHUGH: Objection.

MR. ROBINSON: Objection.

MR. WEST: Objection.

A. I don't recall.

Q. The forms that had to be filled out, okay, where did you get those forms?

A. I can't say for sure that they were Total Recall forms, or we used the same forms that we used for Dictaphone. So I am not sure.

Q. Who instructed you that that form had to be used to access the Total Recall recorded conversation?

A. Deputy Richardson.

Q. Did he do that during a formal meeting; do you remember when that came about?

A. I believe it was an informal conversation.

Q. At that time, did he bring up the topic as to how someone would actually access one of those recorded phone calls?

MR. MCALLISTER: Objection to form.

A. No.

Q. Were you aware of any requests that were made in written form?

A. I believe there were two from the Police Department.

Q. Did you fill those forms out?

A. Request forms?

Q. Correct.

A. No, I did not.

Q. Do you know who filled those out?

A. I believe one might have been Major Simoneau, and I don't remember the other person.

Q. Do you know what happened to those request forms?

A. They would have been filed in my file cabinet.

Q. In regard to the Total Recall system, do you know if that was a web-based access system?

MR. WEST: Objection.

MR. ROBINSON: Objection.

MR. MCHUGH: Objection as to form.

A. I do not know for sure.

Q. Were you given some kind of password to access the Total Recall phone conversations?

A. Yes.

Q. As part of your training, were you instructed how to use that password?

memory of Greg Haroian?

A. No, I don't.

Q. Again, your testimony is you never used your password to access into the system after that one terminal; correct?

A. Correct. I used an admin password at one time.

Q. What was that?

A. I used an admin password because my password wouldn't go through.

Q. What was that admin password?

A. From Greg Haroian.

Q. Using that password, did you access the Total Recall?

A. Yes.

Q. I am going to call it your second password; okay?

A. Uh-huh.

Q. Was that at someone's instruction, or did you just do it yourself?

A. At someone's instruction.

Q. Who told you to use your password to access?

A. Deputy Richardson.

Q. How many times did Deputy Richardson tell you to use your password to access the Total Recall system?

A. Once.
Q. Do you remember when that was?
A. I don't. It was some time maybe early December.
Q. Again, prefacing this, we know it was taken out in February of '03, would that be December of '02, '01; do you remember?
A. '02, it was only in for about six months.
Q. If you remember, what phone recording was Mr. Richardson asking you to access?
A. It was a recording for Councilman Butler.
Q. Just so I am clear, to your knowledge, did Councilman Butler ask Mr. Richardson to obtain that; is that what you are saying, or Mr. Richardson wanted to get the phone conversation?
MR. MCALLISTER: Objection.
A. Councilman Butler asked Mr. Richardson.
Q. To obtain that?
A. Yes.
Q. Was that one done in a written form?
A. Not that I am aware of.
Q. What was Councilman Butler's first name?
A. Patrick.
Q. Do you have any personal knowledge -- I probably

already asked this -- all of the individuals that you were aware of that had passwords that could access the system, do you have any personal knowledge that they actually did?

A. No.

Q. You weren't physically present with someone when they were on the terminal?

A. Correct.

Q. To your knowledge, when did the Total Recall system first start recording phone conversations at the Public Safety Complex?

MR. SANTOPIETRO: Objection.

A. I don't know for sure.

Q. Can you give me a month and a date, as opposed to a specific day?

MR. WEST: Objection, asked and answered.

A. I really don't; I don't know.

Q. At some point some requests came across your desk to take some extensions off the list of extensions that could be recorded by the Total Recall system; do you remember that?

MR. WEST: Objection to form.

MR. SANTOPIETRO: Objection to form.

MR. MCALLISTER: Objection to form.

MR. MCHUGH: Objection to form.

15

MR. ROBINSON: Objection, form.
A. It came across my desk.
Q. Did you become aware at some point that certain extensions were being requested by individuals to be removed from the Total Recall?
A. Yes.
Q. All right. Now, do you remember when that occurred when individuals were asking that their lines be removed from the Total Recall system?
MR. MCHUGH: Objection to form.
MR. MCALLISTER: Objection.
MR. ROBINSON: Objection.
A. I don't remember. Obviously, after it was installed, but I don't have a time frame.
Q. All right. That was my only point. All right. I will show you what I am going to mark as Plaintiff's 3.
(PLAINTIFF'S EXHIBIT 3 MARKED FOR IDENTIFICATION)
MR. FAY: Take a look at that. If you can show it to your attorney also for me.
(EXAMINATION OF DOCUMENT)
MR. FAY: Once you have had a chance to look at it, I am just going ask to you if you recognize the documents that have been marked as

Plaintiff's 3. The second document, you can actually remove that, everybody can just take that off; it wasn't supposed to be stapled to that. Plaintiff's 3 is just going to be what you are holding in your hand.

Q. Do you recognize what has been marked as Plaintiff's 3?

A. Yes.

Q. What is Plaintiff's 3?

A. Stating that the following phone stations have been purged from the recording system and gives a list of extensions.

Q. Is this an e-mail or memo, or what is this?

A. It appears to be -- an e-mail.

Q. The bottom part of the e-mail, okay, it says, "From: C COMM," do you see that?

A. Uh-huh.

Q. Who would that be?

A. I don't know for sure.

Q. Do you see down the bottom, it says, "Greg"?

A. Uh-huh.

Q. Do you know who Greg was?

A. Greg Haroian.

Q. Now, this document, the send date is July 30, 2002; correct?

A. Correct.
Q. That's why I asked you earlier, I was trying to get a time frame for when you had knowledge that the Total Recall system was actually recording phone conversations. You testified it was some time before they or before lines were purged; correct?
A. I would assume so, but I can't say for sure because I don't know when they started.
Q. That's your best memory, though, it was some time before the lines were purged, at least when these lines were purged, which is July 30, 2002; correct?
A. Yes, yes.
Q. The State Police file, which I am, just for your own knowledge, indicates that the phone calls were recorded May 23, '02 to May 23, '03, that's just where I am coming from with the, obviously, May 23, '02 and prior to July 30, '02?
A. Correct.
Q. Do you know how this e-mail came about, how this request came about?
A. I don't.
Q. Do you know how these lines were purged from the system?
A. No.
Q. What was your involvement in getting these lines

A. No.

Q. What was your understanding at that time?

A. I didn't really understand the whole system because we hadn't had any training on it, so I didn't have any firsthand knowledge of. As I said, I didn't receive training until November, obviously, of 2002.

Q. How did you come by the knowledge, as you testified earlier, that the lines were being recorded prior to July 30, 2002?

MR. SANTOPIETRO: Objection.

MR. MCALLISTER: Objection.

MR. MCHUGH: Objection.

MR. ROBINSON: Objection.

MR. WEST: Objection to form.

Q. I went through that time line with you.

MR. SANTOPIETRO: Objection.

MR. MCALLISTER: Objection.

MR. MCHUGH: Objection.

MR. ROBINSON: Objection.

MR. WEST: Objection to form.

A. That they were being recorded prior to July 30, all of the phones?

Q. All of the lines, all of the lines other than emergency lines.

in with the Total Recall system.
Q. All right. Are you talking about the Westminster building now?
A. Yes.
Q. Well, let me ask you this way: Before July 30, 2002, was it your understanding at least some of the phone lines at your old building were being recorded?
MR. SANTOPIETRO: Objection.
MR. MCALLISTER: Objection.
MR. MCHUGH: Objection.
MR. ROBINSON: Objection.
MR. WEST: Objection to form.
Q. In connection with the Total Recall system?
MR. ROBINSON: Asked and answered.
MR. FAY: You can answer again, go ahead.
A. Can you repeat that?
Q. Sure. A second ago you just testified about you had some understanding that the Total Recall system was being installed before July 30, 2002; correct?
A. I don't have an exact time frame. Based on this memo, yes.
Q. Okay. I thought you testified that your understanding was it was being installed at your building; correct?

A. They were starting to record some of the lines at our building, yes.

Q. Which would be the building on Westminster Street?

A. Correct.

Q. Not the Public Safety building?

A. Correct.

Q. These phone lines in the memo, do you know if these lines were located at the Westminster Street location or the Public Safety Complex? .

MR. SANTOPIETRO: Objection.

MR. MCALLISTER: Objection.

MR. MCHUGH: Objection.

MR. ROBINSON: Objection.

MR. WEST: Objection to form.

MR. MCALLISTER: Mark, I think you mean West Exchange. You are saying Westminster, which is very confusing.

A. West Exchange.

Q. West Exchange.

A. Yes.

MR. MCHUGH: Could you read that question back, please.

A. Yes.

(PENDING QUESTION READ BACK)

Q. If looking at the memo again in Plaintiff's 3, do

you know who the Director is referring to at extension 6000?

A. Director Viera.

Q. Back in July 30, 2002, was he at West Exchange Street?

A. Yes.

Q. How about the Deputy, do you know who that refers to?

A. Joseph Richardson.

Q. Was he also at West Exchange Street at that time?

A. I don't believe so.

Q. Do you know where his office was at that time?

A. At the Civic Center.

Q. Let me ask you this: At any time before you resigned -- let's do it this way: Any time before you resigned, did you become aware that phone conversations were being recorded at the Public Safety building?

(MR. FAMIGLIETTI RE-ENTERS DEPOSITION)

A. Yes.

MR. ROBINSON: Objection as to form.

MR. MCHUGH: I am sorry; what was the answer.

THE WITNESS: Yes.

Q. When was that; when did you gain that knowledge?

A. I would say it was some time after my training in November.
Q. November of 2002?
A. Correct.
Q. All right. We will do it that way. After you received your training in November of 2002, up until the time you resigned, okay, what was your understanding as to how many phone lines at the Public Safety Complex were being recorded?
MR. SANTOPIETRO: Objection.
MR. MCALLISTER: Objection.
MR. MCHUGH: Objection.
MR. ROBINSON: Objection.
MR. WEST: Objection to form.
A. They said most lines at the new Public Safety building were recorded.
Q. Okay. When you say they, who is they that say most lines were being recorded?
A. The phone technicians.
Q. Okay. Which phone technicians told you that?
A. Probably Tony Desmarais.
Q. Did you ever speak with Mr. Richardson about that, whether or not or how many phone lines were being recorded at the Public Safety building at any time after November, until your resignation in February

anyone that they were consenting to or giving the City or anyone in the Department of Communications permission to record their phone conversations through the Total Recall system?

MR. SANTOPIETRO: Objection.

MR. MCALLISTER: Objection.

MR. MCHUGH: Objection.

MR. ROBINSON: Objection.

MR. WEST: Objection to form.

A. No.

Q. Did you ever discuss with Major Simoneau this e-mail that's been marked as Plaintiff's 4, and specifically the section two about the notification?

A. No.

MR. ROBINSON: Objection. Asked and answered.

Q. Ms. Lennon, I am going to use the date, after November, 2002, that seems to be the date you think you received your training over the phone about the Total Recall. It was some time after that that you gained knowledge that most of the lines at the Public Safety building were being recorded; when you gained that knowledge, did you ever discuss with anyone whether or not that was appropriate?

MR. SANTOPIETRO: Objection.

MR. MCALLISTER: Objection.

MR. MCHUGH: Objection.

MR. ROBINSON: Objection.

MR. WEST: Objection to form.

A. Not that I recall, no.

Q. In your position as Chief of Operations of the Department of Communications, the whole time you held that position, did you ever face an issue that you required counsel from the City's Law Department involving the Communications Department?

MR. MCHUGH: Object.

MR. ROBINSON: Objection.

A. That I, personally --

Q. In your position as Chief of Operations?

A. No, I don't believe so.

Q. Were you aware at the time when you held that position as Chief of Operations, that the City of Providence did have a Law Department, and that if you did have any questions in regard to the legality of something, you could go to them with a question?

A. Yes.

MR. MCHUGH: Objection to form.

MR. ROBINSON: Objection.

MR. FAMIGLIETTI: A very excellent law department, too, that should go on the record.

MR. MCHUGH: Thank you, Mr. Famiglietti. Particularly coming from you.

Q. Again, in regard to the Total Recall system, again, once you gained this knowledge, you never sought counsel from any of the Law Department as to its appropriateness or legality?

MR. ROBINSON: Object.

MR. MCHUGH: Objection.

A. No, I did not.

MR. WEST: Objection.

MR. MCALLISTER: Objection.

MR. ROBINSON: Can we take a break?

MR. FAY: I'm almost done.

MR. ROBINSON: I was going to say take a break, but if you're almost done.

MR. FAY: I have a few more things. You want to push it through.

MR. ROBINSON: You want to take a break?

THE WITNESS: I am fine.

Q. Do you know who ordered the removal of the Total Recall system? Let preface that -- strike that. Are you aware that at some point the Total Recall system was removed?

## C Comm

| | |
|---|---|
| **From:** | Mary Lennon |
| **nt:** | Tuesday, July 30, 2002 3:13 PM |
| **o:** | C Comm |
| **Subject:** | RE: Total Recall |

Greg,

Thank You,

Mary

-----Original Message-----
**From:** C Comm
**Sent:** Tuesday, July 30, 2002 2:32 PM
**To:** Mary Lennon
**Subject:** Total Recall

Mary,

The Following phone stations have been purged from the recording system.

6000 - Director
6001 - Deputy
6002 - Director's Residence
6003 - Police Chief's Residence
6004 - Public Security Task Force
6005 - Administrative Assistant
6006 - Receptionist
6007 - Chief of Operations
6027 - Break Room
6046 - Conference Room

These phone stations are no longer recording inbound or outbound calls.

-Greg

PLAINTIFF'S EXHIBIT
3-7-2006
Lennon Dep.

A. **Andy Gazza (phonetic).**

36. Q. And who is Andy Gazza?

A. **He's a tech support person for the total recall.**

37. Q. Is he located in Texas?

A. **Yes, he is. Oh, that's the number I would call, I don't know.**

38. Q. Okay, it was remote training?

A. **Yes, over the phone.**

39. Q. At some point, Greg, you learned how to add and remove telephone extensions for recording purposes?

A. **That's correct.**

40. Q. How many additions to telephone extensions did you do?

A. **Can I think about that for a second?**

41. Q. Yeah, generally, I mean --

A. **Oh, God, maybe 50. I mean, it could have been -- it could have been more.**

42. Q. Sure.

A. **You know, it's hard to remember exactly because it was, like, over a long period of time, you know.**

43. Q. Okay. Who requested you to add telephone lines to be recorded?

A. **Different people: Mary Lennon and the Deputy Director and Tony Desmarais.**

44. Q. And again, Deputy Director --

A. **Oh, excuse me, Deputy Director Richardson.**

Q. And how would they inform you of which extensions to record?

A. **They would come up to me and say these lines need to be -- you know, make sure**

Case 1:04-cv-00304-LDA Document 157-2 Filed 05/31/2006 Page 28 of 30

**that these lines are recorded.**

46. Q. Did they give you a formal piece of paper with a bunch of extensions written on it or did they just give you handwritten --

A. **Nothing formal. I never received anything formal like that, like, with letterhead or anything like that, no.**

47. Q. When you were requested by Mary Lennon, was she just directed by somebody else?

A. **Yes.**

48. Q. Okay, and you had better knowledge of the system than Mary?

A. **That's right, yeah.**

49. Q. That's why she asked you to do it?

A. **That's my understanding, yes.**

50. Q. Did the Director ever ask you to add telephone extensions?

A. **The Director never specifically came to me for that, no. I mean, he never asked me. Any time I got an order to add, it came from Mary telling me that.**

51. Q. Okay, just to clarify something. The Director, Mr. Vieira, never asked you to add a number to the total recall system for recording?

A. **No.**

52. Q. All your requests came from the Deputy Director?

A. **Or Mary.**

53. Q. Or Mary.

A. **Or Tony.**

Q. Tony Desmarais.

A. **Yes.**

**this training -- to go to this training on this particular day. When we, when we -- when we were at the training he had to issue passwords out, and amongst us, Tony Desmarais, Greg Haroian, myself, Frank Parfume, we, uh, we decided what, what access we would have pertaining to our job. Uh, my job being in the Bureau, Bureau of Operation and Control, was retrieving information on recordings on the Dictaphone system, they gave me total access, the administrative access. Tony had to do repairs or, uh, upgrades or what have you, maintenance, he was given full access, and down the, down the line.**

26. Q. Basically, the gentleman from Texas listened to your responsibilities, and he determined what level of access you would get.

A. **He didn't determine that. We did. We determined that. We told him what access needed, and we agreed, 'Okay, you need administrative access.'**

27. Q. That access that he gave you, that allowed you to be able to listen into any type of conversations within the phone system, is that correct?

A. **As I understood it, that is correct.**

28. Q. At that time did you know that all the lines within the police department were being recorded?

A. **I knew 100-percent of the phone lines within the Public Safety Complex, as well as lines in the Communications Department, were re -- were recorded, that's correct.**

29. Q. Who else knew that?

A. **Uh, Anthony Desmarais, he's a telephone -- he's a radio engineer and telephone tech.; um, Frank Parfume, telephone technician from the Communications Department; Greg Haroian, telephone tech. from the Communications Department; Ron Raposa from the Communications Department; Mary Lennon, Chief of Operations from the Communications**

Department; um, Director Vieira from the Communications Department; Deputy Joseph Richardson from the Communications Department. All of these people knew that that -- what that system was designed to do, record, and that everything was recorded.

30. Q. How about anybody from the police department were you aware of?

A. Uh, from the police department, it's my understanding, uh, just from conversations that I've heard that, uh, Major Sullivan, Major Simoneau, former Chief Barney Prignano, um, they were all aware of this.

31. Q. Anybody else within the police department that you're aware of?

A. Um, let me think. Um, to my knowledge the -- the brass from the Providence Fire Department were aware of it.

Q. You're getting this not -- through word of mouth, correct?

A. This information I'm getting through their request to have their lines taken off it because there were concerns about information being retrieved. They wanted some privacy, they're doing investigations, what have you.

33. Q. At some point someone came to the communication system and asked that some of the lines be taken off of the recording system, is that correct?

A. That is correct.

34. Q. Were you present at that time?

A. I, I was -- I saw -- I was in a position to see a list of phones that were asked to be disconnected. Uh, the Director had instructed, uh, Tony Desmarais, the telephone tech. to disconnect a number of lines off that system.

Q. When was that?

A. That was -- I would say within days, if not weeks, of, uh, of the installation of this