UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF RHODE ISLAND

| | | |
|---|---|---|
| THOMAS WALDEN, et al.<br>Plaintiffs<br><br>v.<br><br>CITY OF PROVIDENCE, et al.<br>Defendants | : | Case No. 04-304S |
| JOHN C. CHMURA, et al.<br>Plaintiffs<br><br>v.<br><br>CITY OF PROVIDENCE, et al.<br>Defendants | : | Case No. 04-553S |

# STATEMENT OF MATERIAL FACTS IN DISPUTE IN SUPPORT OF PLAINTIFFS' OBJECTION TO MARY LENNON'S SUMMARY-JUDGMENT MOTION

For the purposes of Defendant Mary Lennon's motion for summary judgment only, plaintiffs accept as undisputed facts the following numbered paragraphs of Lennon's Statement of Undisputed Facts: 1, 2, 3, 4, 7, 8, and 9.

Plaintiffs dispute the following facts that Lennon asserts are undisputed in her Statement of Undisputed Facts:

5. Lennon asserts that it is undisputed that "[t]he City of Providence (the "City") decided to procure an additional system to record these [emergency and certain other calls coming into the Providence Police and Fire Departments] and accepted bids for the same."

There is evidence that the Total Recall system was procured not just to record the calls that had been recorded on the "Dictaphone" system, but also to record all incoming and outgoing calls at the Providence Public Safety Complex [PPSC]. *See* State Police Forensics Report (providing list of telephone stations recorded and indicating that the Total Recall

system had created and archived 754,564 audio files); Deposition of Greg Desmarais [Desmarais depo.] at 37, 39, 43-44; Appendix [A.] 2, 3, 4-5[1].

6. Lennon asserts that it is undisputed that "[i]n 2002 the City acquired a new recording system known as the Total Recall system. The purpose of the Total Recall system was to record emergency lines and to have a records management system in place."

There is evidence that an additional purpose of the Total Recall system was to record all incoming and outgoing calls at the PPSC. *Id.*

In addition, for purposes of this summary judgment motion only, plaintiffs assert that the following additional facts are either undisputed or disputed facts:

10. From November of 1999 to February of 2003, Lennon was Chief of Operations at the Communications Department for the City of Providence. Deposition of Mary Lennon [Lennon depo.] at 13; A. 7.

11. Lennon learned in July 2002 that the Total Recall system was being installed and that some of the lines in the Communications Department facility (which was not located in the PPSC) were also being recorded. Lennon depo. at 66-67; A. 20-21.

12. In July 2002, Lennon received an email that included a list of phone stations that had been "purged from the recording system" and stating that the listed stations "are no longer recording inbound or outbound calls." Lennon depo. exh. 3; Lennon depo. at 58-61; A. 15-

1. Attached to this Statement is an appendix of the documents relied upon by plaintiffs in opposing Lennon's summary-judgment motion, consisting of excerpts of deposition transcripts, an exhibit used during one of the depositions, and reports and witness statements subpoenaed from the State Police. The pages of the appendix have been consecutively numbered in the lower right corner for ease of reference.

18, 27.

13. Lennon directed Greg Haroian to add telephone lines to the Total Recall system. Haroian State Police statement Q. 43-53; A. 28-29.

14. Lennon was trained for the Total Recall system in November 2002, during which she learned that the Total Recall system recorded more than just emergency lines, that it also recorded other calls at the PPSC. Lennon depo. at 43, 45, 63; A. 8, 9, 19.

15. Shortly after her training in November 2002, Lennon became aware that most phone lines at the PPSC were being recorded. Lennon depo. at 68-69; A. 22-23.

16. After becoming aware that most of the lines at the PPSC were being recorded, Lennon never discussed with the city's law department or with anyone else whether it was appropriate or legal. Lennon depo. 74-76; A. 24-26.

17. Lennon knew that essentially all telephone lines were recorded. Moise State Police statement Q. 28-32; A. 30-31.

18. Lennon personally filled out two or three forms requesting the retrieval of recordings from the Total Recall system. Lennon depo. at 46-47; A. 10-12. Moreover, Lennon used an administrative password to personally retrieve a recorded conversation from the Total Recall system at the request of Councilman Patrick Butler. *Id.* at 53, 56-57; A. 12, 13-14.

Accordingly, to the extent that Lennon's undisputed facts conflict with the evidence cited above, the plaintiffs dispute those facts.

By their attorneys,

**Murphy & Fay, LLP**
127 Dorrance Street, 2nd Floor
Providence RI 02903
Tel: (401) 490-3200
Fax: (401) 490-3207

Mark A. Fay # 4208

CERTIFICATION

On May 31, 2006 a true copy of the foregoing was served on all counsel of record, listed below, by mail.

**Dean G. Robinson, Esq.**
670 Willett Avenue
Riverside RI 02915

**Carolyn A. Mannis, Esq.**
170 Westminster Street, Suite 800
Providence RI 02903

Susan Marcotte Carlin, Esq.
**Famiglietti & Carlin, Ltd.**
205 The Lincoln Center
132 Old River Road
Lincoln RI 02865

**George J. West, Esq.**
1500 One Financial Plaza
Providence RI 02903

Kevin F. McHugh, Esq.
Assistant City Solicitor
**City of Providence**
275 Westminster Street
Providence RI 02903

George L. Santopietro, Esq.
**Coia & Lepore, Ltd.**
226 South Main Street
Providence RI 02903

UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF RHODE ISLAND

THOMAS WALDEN, et als.

vs. C.A. No. 2004-304S

URBANO PRIGNANO, JR., et als.

---

THOMAS C. CHMURA, et als.

vs. C.A. No. 2004-553S

URBANO PRIGNANO, JR., et als.

DEPOSITION OF ANTHONY DESMARAIS, a Witness in the above-entitled case, taken on behalf of the Plaintiffs, before Linda L. Guglielmo, RPR-RMR, a Notary Public in and for the State of Rhode Island, at the offices of the Murphy & Fay, LLP, 127 Dorrance Street, Providence, Rhode Island on May 24, 2006 at 2:00 P.M.

ALSO PRESENT: Manuel Vieira

ALLIED COURT REPORTERS, INC.
115 PHENIX AVENUE
CRANSTON, RHODE ISLAND 02920
(401) 946-5500


2c9de357-1b7f-4f94-96fe-62866f66da49

stations. There was 500 stations that were going to be recorded.

Q. Was that basically all the stations in the Public Safety Complex?

A. All the phones.

Q. And how did you decide that you wanted all the phone stations recorded?

A. That came from Manny Vieira, director, he told me he wanted everything recorded on the system.

MR. SANTOPIETRO: Objection. Move to strike.

Q. And then you just gave that information to Bob Nelson for the RFP?

A. Yes.

Q. When did Manny Vieira tell you he wanted all the stations recorded at the Public Safety Complex?

MR. SANTOPIETRO: Objection.

MS. CARLIN: Objection.

MR. CALISE: Objection.

The first time.

A. When I was putting the RFP together.

If you refer to your police statement that's been marked as Plaintiffs' 1, if you look at Line 10 on Page 2, the question to you was, "Okay. Sir,

can find out." So, if I'm understanding your testimony and what you told the detectives for the State Police, even before the RFP was actually written Mr. Vieira instructed you that he wanted in the RFP that all stations were to be recorded at the Public Safety Complex, correct?

MR. SANTOPIETRO: Objection.

MR. CALISE: Objection.

MR. ROBINSON: Objection.

MS. CARLIN: Objection.

A. Yes.

Q. When you gave your statement to the detectives, I take it you told them the truth, correct?

MR. SANTOPIETRO: Objection.

MR. CALISE: Objection.

MR. ROBINSON: Objection.

MS. CARLIN: Objection.

A. Yes.

Q. You wouldn't lie to the State Police, correct?

MR. SANTOPIETRO: Objection.

MR. CALISE: Objection.

MR. ROBINSON: Objection.

MS. CARLIN: Objection.

A. No.

During Mr. Vieira's sworn testimony, I asked him

A. I didn't understand that. What did you say?

Q. What I'm saying is during Mr. Vieira's deposition I was asking him about the bid process, and basically what he was saying he wanted in the bid, and in his sworn testimony he said he only wanted the emergency lines or clerk lines recorded. My understanding from your testimony is he's telling you that he wants all the stations recorded incoming and outgoing, correct?

MR. SANTOPIETRO: Objection.

MR. CALISE: Objection.

MR. ROBINSON: Objection.

MS. CARLIN: Objection.

A. Yes.

Q. So based upon the conversations you had with Mr. Vieira you spoke to Mr. Nelson and he put an RFP together, correct?

A. Yes.

Q. Now, who approved that RFP, do you know?

MR. SANTOPIETRO: Objection.

A. I don't know.

Did you ever meet with Mr. Vieira in regard to that RFP after it was completed?

A. No.

Did that RFP include the Total Recall system?

A. Yes.
Q. To your knowledge, was Mr. Vieira aware that the RFP included the Total Recall system.
MR. ROBINSON: Objection.
MS. CARLIN: Objection.
MR. SANTOPIETRO: Objection.
A. Yes.
Q. He requested it?
MR. SANTOPIETRO: Objection. Form.
MR. CALISE: Objection.
MR. ROBINSON: Objection.
MS. CARLIN: Objection.
A. Yes.
Q. Later on in your sworn testimony -- strike that. Later in your statement to the police on Page 4, if you want to take a look at that, you were asked, "When you initially contacted Robert Nelson, did you indicate that you wanted a recording device?" And your answer was "Yes." Question, "So that recording device was designed and planned for at the inception of this whole telephone system?" Did I read that correctly?
A. Yes.
That's consistent with your testimony today, correct?

UNITED STATES DISTRICT COURT
IN THE DISTRICT OF RHODE ISLAND

| | | |
|---|---|---|
| THOMAS WALDEN, ET AL., Plaintiffs, | ) | |
| VS. | ) | C.A. NO. 04-304S |
| CITY OF PROVIDENCE, ET AL., Defendants. | ) | |
| JOHN C. CHMURA, ET AL., Plaintiffs, | ) | |
| VS. | ) | C.A. NO. 04-553S |
| CITY OF PROVIDENCE, ET AL., Defendant. | ) | |

DEPOSITION OF MARY FRANCES LENNON, taken on behalf of the Plaintiffs, in the above-entitled causes, pursuant to notice, before Nancy L. Simoes, R.P.R., a Notary Public in and for the State of Rhode Island, at the Law Offices of City of Providence Law Department, 275 Westminster Street, Providence, Rhode Island, on February 24, 2006, scheduled at 2:30 P.M.

ALLIED COURT REPORTERS, INC.
115 PHENIX AVENUE
CRANSTON, RHODE ISLAND 02920

Q. Did you hold a position with the Communications Department, was that the last job with the City until you went to Providence College?
A. Correct.
Q. So what was the year you started with the Communications Department?
A. 1999, of November.
Q. What was your first job in the Communications Department?
A. Chief of Operations.
Q. Did you hold that position right up until -- well, when was the last time you held that position?
A. Until February of 2003.
Q. Again, how did you obtain that position with the Communications Department?
A. From Director Viera.
Q. How did you learn about the position?
A. From the Commissioner of Public Safety Office.
Q. Did someone in that office tell you about the position?
A. Uh-huh.
Q. Do you remember who that person was?
A. I don't recall.
Q. When you found out about the new position as Chief



7

A. Yes, it did.
Q. What was the difference between the two systems, the Dictaphone system and Total Recall system?
MR. MCHUGH: Object, form.
MR. SANTOPIETRO: Object.
MR. MCALLISTER: Object.
MR. WEST: Objection to form.
A. The Total Recall system recorded on a CD, and it was a little bit more advanced than the Dictaphone system.
Q. During your initial phone training, were you made aware at that time that the Total Recall system would be recording phone conversations on lines other than just emergency calls?
MR. ROBINSON: Objection.
A. Yes.
Q. So what were you told in regard to what the Total Recall system would be recording, other than just the emergency call lines?
MR. MCHUGH: Object, form.
MR. SANTOPIETRO: Object, form.
MR. MCALLISTER: Object, form.
MR. WEST: Objection to form
A. That it was going to be recording calls at the new Public Safety Complex.

A. Yes.

Q. During that training, you learned that the Public Safety Complex, the lines were going to be recorded; correct?

MR. MCHUGH: Object as to form.

MR. SANTOPIETRO: Object.

MR. MCALLISTER: Object.

MR. WEST: Objection.

A. He reviewed lines that were being recorded.

Q. Okay. After that phone training, did you have an understanding of how many phone lines were going to be recorded at the Public Safety building?

A. I was under the assumption that most lines would be recorded at the Public Safety, but that was just what I thought.

Q. That's what you took away from the training?

MR. SANTOPIETRO: Objection.

MR. MCALLISTER: Objection.

MR. MCHUGH: Objection.

MR. ROBINSON: Objection.

MR. WEST: Objection.

Q. All right. Now, at some point, just like with the Dictaphone system, procedures were put in place in order to access recorded phone calls on the Total Recall system; correct?

MR. SANTOPIETRO: Objection.
MR. MCALLISTER: Objection.
MR. MCHUGH: Objection.
MR. ROBINSON: Objection.
MR. WEST: Objection.
A. I can't say for sure.
Q. All right. Well, reviewing some of your statements, I will get into all of that later, there was a form that was filled out; correct, in order to access a recording on the Total Recall system?
A. There was a form filled out, yes.
Q. As a matter of fact, at the request of others, you actually filled out two or three of those forms; correct?
A. Correct.
Q. That's what I am talking about, a procedure.
A. Okay.
Q. So in order to get a Total Recall recorded phone conversation, to access it, a form had to be filled out; correct?
A. Yes.
Q. What I am asking you now is if you can tell me what the whole procedure was, just like with the Dictaphone system, what was the whole procedure

with the Total Recall system?

MR. FAMILGIETTI: Objection. Asked and answered.

MR. SANTOPIETRO: Objection.

MR. MCALLISTER: Objection.

MR. MCHUGH: Objection.

MR. ROBINSON: Objection.

MR. WEST: Objection.

A. I don't recall.

Q. The forms that had to be filled out, okay, where did you get those forms?

A. I can't say for sure that they were Total Recall forms, or we used the same forms that we used for Dictaphone. So I am not sure.

Q. Who instructed you that that form had to be used to access the Total Recall recorded conversation?

A. Deputy Richardson.

Q. Did he do that during a formal meeting; do you remember when that came about?

A. I believe it was an informal conversation.

Q. At that time, did he bring up the topic as to how someone would actually access one of those recorded phone calls?

MR. MCALLISTER: Objection to form.

A. No.

Q. Were you aware of any requests that were made in written form?
A. I believe there were two from the Police Department.
Q. Did you fill those forms out?
A. Request forms?
Q. Correct.
A. No, I did not.
Q. Do you know who filled those out?
A. I believe one might have been Major Simoneau, and I don't remember the other person.
Q. Do you know what happened to those request forms?
A. They would have been filed in my file cabinet.
Q. In regard to the Total Recall system, do you know if that was a web-based access system?
MR. WEST: Objection.
MR. ROBINSON: Objection.
MR. MCHUGH: Objection as to form.
A. I do not know for sure.
Q. Were you given some kind of password to access the Total Recall phone conversations?
A. Yes.
Q. As part of your training, were you instructed how to use that password?

memory of Greg Haroian?
A. No, I don't.
Q. Again, your testimony is you never used your password to access into the system after that one terminal; correct?
A. Correct. I used an admin password at one time.
Q. What was that?
A. I used an admin password because my password wouldn't go through.
Q. What was that admin password?
A. From Greg Haroian.
Q. Using that password, did you access the Total Recall?
A. Yes.
Q. I am going to call it your second password; okay?
A. Uh-huh.
Q. Was that at someone's instruction, or did you just do it yourself?
A. At someone's instruction.
Q. Who told you to use your password to access?
A. Deputy Richardson.
Q. How many times did Deputy Richardson tell you to use your password to access the Total Recall system?

A. Once.
Q. Do you remember when that was?
A. I don't. It was some time maybe early December.
Q. Again, prefacing this, we know it was taken out in February of '03, would that be December of '02, '01; do you remember?
A. '02, it was only in for about six months.
Q. If you remember, what phone recording was Mr. Richardson asking you to access?
A. It was a recording for Councilman Butler.
Q. Just so I am clear, to your knowledge, did Councilman Butler ask Mr. Richardson to obtain that; is that what you are saying, or Mr. Richardson wanted to get the phone conversation?
MR. MCALLISTER: Objection.
A. Councilman Butler asked Mr. Richardson.
Q. To obtain that?
A. Yes.
Q. Was that one done in a written form?
A. Not that I am aware of.
Q. What was Councilman Butler's first name?
A. Patrick.
Q. Do you have any personal knowledge -- I probably

already asked this -- all of the individuals that you were aware of that had passwords that could access the system, do you have any personal knowledge that they actually did?

A. No.

Q. You weren't physically present with someone when they were on the terminal?

A. Correct.

Q. To your knowledge, when did the Total Recall system first start recording phone conversations at the Public Safety Complex?

MR. SANTOPIETRO: Objection.

A. I don't know for sure.

Q. Can you give me a month and a date, as opposed to a specific day?

MR. WEST: Objection, asked and answered.

A. I really don't; I don't know.

Q. At some point some requests came across your desk to take some extensions off the list of extensions that could be recorded by the Total Recall system; do you remember that?

MR. WEST: Objection to form.

MR. SANTOPIETRO: Objection to form.

MR. MCALLISTER: Objection to form.

MR. MCHUGH: Objection to form.

15

MR. ROBINSON: Objection, form.

A. It came across my desk.

Q. Did you become aware at some point that certain extensions were being requested by individuals to be removed from the Total Recall?

A. Yes.

Q. All right. Now, do you remember when that occurred when individuals were asking that their lines be removed from the Total Recall system?

MR. MCHUGH: Objection to form.

MR. MCALLISTER: Objection.

MR. ROBINSON: Objection.

A. I don't remember. Obviously, after it was installed, but I don't have a time frame.

Q. All right. That was my only point. All right. I will show you what I am going to mark as Plaintiff's 3.

(PLAINTIFF'S EXHIBIT 3 MARKED FOR IDENTIFICATION)

MR. FAY: Take a look at that. If you can show it to your attorney also for me.

(EXAMINATION OF DOCUMENT)

MR. FAY: Once you have had a chance to look at it, I am just going ask to you if you recognize the documents that have been marked as

Plaintiff's 3. The second document, you can actually remove that, everybody can just take that off; it wasn't supposed to be stapled to that. Plaintiff's 3 is just going to be what you are holding in your hand.

Q. Do you recognize what has been marked as Plaintiff's 3?

A. Yes.

Q. What is Plaintiff's 3?

A. Stating that the following phone stations have been purged from the recording system and gives a list of extensions.

Q. Is this an e-mail or memo, or what is this?

A. It appears to be -- an e-mail.

Q. The bottom part of the e-mail, okay, it says, "From: C COMM," do you see that?

A. Uh-huh.

Q. Who would that be?

A. I don't know for sure.

Q. Do you see down the bottom, it says, "Greg"?

A. Uh-huh.

Q. Do you know who Greg was?

A. Greg Haroian.

Q. Now, this document, the send date is July 30, 2002; correct?

A. Correct.
Q. That's why I asked you earlier, I was trying to get a time frame for when you had knowledge that the Total Recall system was actually recording phone conversations. You testified it was some time before they or before lines were purged; correct?
A. I would assume so, but I can't say for sure because I don't know when they started.
Q. That's your best memory, though, it was some time before the lines were purged, at least when these lines were purged, which is July 30, 2002; correct?
A. Yes, yes.
Q. The State Police file, which I am, just for your own knowledge, indicates that the phone calls were recorded May 23, '02 to May 23, '03, that's just where I am coming from with the, obviously, May 23, '02 and prior to July 30, '02?
A. Correct.
Q. Do you know how this e-mail came about, how this request came about?
A. I don't.
Q. Do you know how these lines were purged from the system?
A. No.
Q. What was your involvement in getting these lines

A. No.
Q. What was your understanding at that time?
A. I didn't really understand the whole system because we hadn't had any training on it, so I didn't have any firsthand knowledge of. As I said, I didn't receive training until November, obviously, of 2002.
Q. How did you come by the knowledge, as you testified earlier, that the lines were being recorded prior to July 30, 2002?
MR. SANTOPIETRO: Objection.
MR. MCALLISTER: Objection.
MR. MCHUGH: Objection.
MR. ROBINSON: Objection.
MR. WEST: Objection to form.
Q. I went through that time line with you.
MR. SANTOPIETRO: Objection.
MR. MCALLISTER: Objection.
MR. MCHUGH: Objection.
MR. ROBINSON: Objection.
MR. WEST: Objection to form.
A. That they were being recorded prior to July 30, all of the phones?
Q. All of the lines, all of the lines other than emergency lines.

in with the Total Recall system.
Q. All right. Are you talking about the Westminster building now?
A. Yes.
Q. Well, let me ask you this way: Before July 30, 2002, was it your understanding at least some of the phone lines at your old building were being recorded?
MR. SANTOPIETRO: Objection.
MR. MCALLISTER: Objection.
MR. MCHUGH: Objection.
MR. ROBINSON: Objection.
MR. WEST: Objection to form.
Q. In connection with the Total Recall system?
MR. ROBINSON: Asked and answered.
MR. FAY: You can answer again, go ahead.
A. Can you repeat that?
Q. Sure. A second ago you just testified about you had some understanding that the Total Recall system was being installed before July 30, 2002; correct?
A. I don't have an exact time frame. Based on this memo, yes.
Q. Okay. I thought you testified that your understanding was it was being installed at your building; correct?

A. They were starting to record some of the lines at our building, yes.
Q. Which would be the building on Westminster Street?
A. Correct.
Q. Not the Public Safety building?
A. Correct.
Q. These phone lines in the memo, do you know if these lines were located at the Westminster Street location or the Public Safety Complex?
MR. SANTOPIETRO: Objection.
MR. MCALLISTER: Objection.
MR. MCHUGH: Objection.
MR. ROBINSON: Objection.
MR. WEST: Objection to form.
MR. MCALLISTER: Mark, I think you mean West Exchange. You are saying Westminster, which is very confusing.
A. West Exchange.
Q. West Exchange.
A. Yes.
MR. MCHUGH: Could you read that question back, please.
A. Yes.
(PENDING QUESTION READ BACK)
Q. If looking at the memo again in Plaintiff's 3, do

you know who the Director is referring to at
extension 6000?
A. Director Viera.
Q. Back in July 30, 2002, was he at West Exchange
Street?
A. Yes.
Q. How about the Deputy, do you know who that refers
to?
A. Joseph Richardson.
Q. Was he also at West Exchange Street at that time?
A. I don't believe so.
Q. Do you know where his office was at that time?
A. At the Civic Center.
Q. Let me ask you this: At any time before you
resigned -- let's do it this way: Any time before
you resigned, did you become aware that phone
conversations were being recorded at the Public
Safety building?
(MR. FAMIGLIETTI RE-ENTERS DEPOSITION)
A. Yes.
MR. ROBINSON: Objection as to form.
MR. MCHUGH: I am sorry; what was the
answer.
THE WITNESS: Yes.
Q. When was that; when did you gain that knowledge?

A. I would say it was some time after my training in November.

Q. November of 2002?

A. Correct.

Q. All right. We will do it that way. After you received your training in November of 2002, up until the time you resigned, okay, what was your understanding as to how many phone lines at the Public Safety Complex were being recorded?

MR. SANTOPIETRO: Objection.

MR. MCALLISTER: Objection.

MR. MCHUGH: Objection.

MR. ROBINSON: Objection.

MR. WEST: Objection to form.

A. They said most lines at the new Public Safety building were recorded.

Q. Okay. When you say they, who is they that say most lines were being recorded?

A. The phone technicians.

Q. Okay. Which phone technicians told you that?

A. Probably Tony Desmarais.

Q. Did you ever speak with Mr. Richardson about that, whether or not or how many phone lines were being recorded at the Public Safety building at any time after November, until your resignation in February

anyone that they were consenting to or giving the City or anyone in the Department of Communications permission to record their phone conversations through the Total Recall system?

MR. SANTOPIETRO: Objection.

MR. MCALLISTER: Objection.

MR. MCHUGH: Objection.

MR. ROBINSON: Objection.

MR. WEST: Objection to form.

A. No.

Q. Did you ever discuss with Major Simoneau this e-mail that's been marked as Plaintiff's 4, and specifically the section two about the notification?

A. No.

MR. ROBINSON: Objection. Asked and answered.

Q. Ms. Lennon, I am going to use the date, after November, 2002, that seems to be the date you think you received your training over the phone about the Total Recall. It was some time after that that you gained knowledge that most of the lines at the Public Safety building were being recorded; when you gained that knowledge, did you ever discuss with anyone whether or not that was appropriate?

MR. SANTOPIETRO: Objection.
MR. MCALLISTER: Objection.
MR. MCHUGH: Objection.
MR. ROBINSON: Objection.
MR. WEST: Objection to form.
A. Not that I recall, no.
Q. In your position as Chief of Operations of the Department of Communications, the whole time you held that position, did you ever face an issue that you required counsel from the City's Law Department involving the Communications Department?
MR. MCHUGH: Object.
MR. ROBINSON: Objection.
A. That I, personally --
Q. In your position as Chief of Operations?
A. No, I don't believe so.
Q. Were you aware at the time when you held that position as Chief of Operations, that the City of Providence did have a Law Department, and that if you did have any questions in regard to the legality of something, you could go to them with a question?
A. Yes.
MR. MCHUGH: Objection to form.
MR. ROBINSON: Objection.

MR. FAMIGLIETTI: A very excellent law department, too, that should go on the record.

MR. MCHUGH: Thank you, Mr. Famiglietti. Particularly coming from you.

Q. Again, in regard to the Total Recall system, again, once you gained this knowledge, you never sought counsel from any of the Law Department as to its appropriateness or legality?

MR. ROBINSON: Object.

MR. MCHUGH: Objection.

A. No, I did not.

MR. WEST: Objection.

MR. MCALLISTER: Objection.

MR. ROBINSON: Can we take a break?

MR. FAY: I'm almost done.

MR. ROBINSON: I was going to say take a break, but if you're almost done.

MR. FAY: I have a few more things. You want to push it through.

MR. ROBINSON: You want to take a break?

THE WITNESS: I am fine.

Q. Do you know who ordered the removal of the Total Recall system? Let preface that -- strike that. Are you aware that at some point the Total Recall system was removed?

**C Comm**

**From:** Mary Lennon
**Sent:** Tuesday, July 30, 2002 3:13 PM
**To:** C Comm
**Subject:** RE: Total Recall

---

Greg,

Thank You,

Mary

-----Original Message-----
**From:** C Comm
**Sent:** Tuesday, July 30, 2002 2:32 PM
**To:** Mary Lennon
**Subject:** Total Recall

Mary,

The Following phone stations have been purged from the recording system.

6000 - Director
6001 - Deputy
6002 - Director's Residence
6003 - Police Chief's Residence
6004 - Public Security Task Force
6005 - Administrative Assistant
6006 - Receptionist
6007 - Chief of Operations
6027 - Break Room
6046 - Conference Room

These phone stations are no longer recording inbound or outbound calls.

-Greg

27

A. **Andy Gazza (phonetic).**

36. Q. And who is Andy Gazza?

A. **He's a tech support person for the total recall.**

37. Q. Is he located in Texas?

A. **Yes, he is. Oh, that's the number I would call, I don't know.**

38. Q. Okay, it was remote training?

A. **Yes, over the phone.**

39. Q. At some point, Greg, you learned how to add and remove telephone extensions for recording purposes?

A. **That's correct.**

40. Q. How many additions to telephone extensions did you do?

A. **Can I think about that for a second?**

41. Q. Yeah, generally, I mean --

A. **Oh, God, maybe 50. I mean, it could have been -- it could have been more.**

42. Q. Sure.

A. **You know, it's hard to remember exactly because it was, like, over a long period of time, you know.**

43. Q. Okay. Who requested you to add telephone lines to be recorded?

A. **Different people: Mary Lennon and the Deputy Director and Tony Desmarais.**

44. Q. And again, Deputy Director --

A. **Oh, excuse me, Deputy Director Richardson.**

Q. And how would they inform you of which extensions to record?

A. **They would come up to me and say these lines need to be -- you know, make sure**

**that these lines are recorded.**

46. Q. Did they give you a formal piece of paper with a bunch of extensions written on it or did they just give you handwritten --

A. **Nothing formal. I never received anything formal like that, like, with letterhead or anything like that, no.**

47. Q. When you were requested by Mary Lennon, was she just directed by somebody else?

A. **Yes.**

48. Q. Okay, and you had better knowledge of the system than Mary?

A. **That's right, yeah.**

49. Q. That's why she asked you to do it?

A. **That's my understanding, yes.**

50. Q. Did the Director ever ask you to add telephone extensions?

A. **The Director never specifically came to me for that, no. I mean, he never asked me. Any time I got an order to add, it came from Mary telling me that.**

51. Q. Okay, just to clarify something. The Director, Mr. Vieira, never asked you to add a number to the total recall system for recording?

A. **No.**

52. Q. All your requests came from the Deputy Director?

A. **Or Mary.**

53. Q. Or Mary.

A. **Or Tony.**

Q. Tony Desmarais.

A. **Yes.**

**this training -- to go to this training on this particular day. When we, when we -- when we were at the training he had to issue passwords out, and amongst us, Tony Desmarais, Greg Haroian, myself, Frank Parfume, we, uh, we decided what, what access we would have pertaining to our job. Uh, my job being in the Bureau, Bureau of Operation and Control, was retrieving information on recordings on the Dictaphone system, they gave me total access, the administrative access. Tony had to do repairs or, uh, upgrades or what have you, maintenance, he was given full access, and down the, down the line.**

26. Q. Basically, the gentleman from Texas listened to your responsibilities, and he determined what level of access you would get.

A. **He didn't determine that. We did. We determined that. We told him what access needed, and we agreed, 'Okay, you need administrative access.'**

27. Q. That access that he gave you, that allowed you to be able to listen into any type of conversations within the phone system, is that correct?

A. **As I understood it, that is correct.**

28. Q. At that time did you know that all the lines within the police department were being recorded?

A. **I knew 100-percent of the phone lines within the Public Safety Complex, as well as lines in the Communications Department, were re -- were recorded, that's correct.**

29. Q. Who else knew that?

A. **Uh, Anthony Desmarais, he's a telephone -- he's a radio engineer and telephone tech.; um, Frank Parfume, telephone technician from the Communications Department; Greg Haroian, telephone tech. from the Communications Department; Ron Raposa from the Communications Department; Mary Lennon, Chief of Operations from the Communications**

**Department; um, Director Vieira from the Communications Department; Deputy Joseph Richardson from the Communications Department. All of these people knew that that -- what that system was designed to do, record, and that everything was recorded.**

30. Q. How about anybody from the police department were you aware of?

A. **Uh, from the police department, it's my understanding, uh, just from conversations that I've heard that, uh, Major Sullivan, Major Simoneau, former Chief Barney Prignano, um, they were all aware of this.**

31. Q. Anybody else within the police department that you're aware of?

A. **Um, let me think. Um, to my knowledge the -- the brass from the Providence Fire Department were aware of it.**

Q. You're getting this not -- through word of mouth, correct?

A. **This information I'm getting through their request to have their lines taken off it because there were concerns about information being retrieved. They wanted some privacy, they're doing investigations, what have you.**

33. Q. At some point someone came to the communication system and asked that some of the lines be taken off of the recording system, is that correct?

A. **That is correct.**

34. Q. Were you present at that time?

A. **I, I was -- I saw -- I was in a position to see a list of phones that were asked to be disconnected. Uh, the Director had instructed, uh, Tony Desmarais, the telephone tech. to disconnect a number of lines off that system.**

Q. When was that?

A. **That was -- I would say within days, if not weeks, of, uh, of the installation of this**