UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF RHODE ISLAND

| | | |
|---|---|---|
| THOMAS WALDEN, et al.<br>Plaintiffs<br><br>v.<br><br>CITY OF PROVIDENCE, et al.<br>Defendants | : | Case No. 04-304S |
| JOHN C. CHMURA, et al.<br>Plaintiffs<br><br>v.<br><br>CITY OF PROVIDENCE, et al.<br>Defendants | : | Case No. 04-553S |

## STATEMENT OF MATERIAL FACTS IN DISPUTE IN SUPPORT OF PLAINTIFFS' OBJECTION TO URBANO PRIGNANO'S SUMMARY-JUDGMENT MOTION

For the purposes of Defendant Urbano Prignano, Jr's. motion for summary judgment only, plaintiffs accept as undisputed facts the following numbered paragraphs of Prignano's Statement of Undisputed Facts: 1, 2, 3, 4, 5, 6, both paragraph 7s,[1] and 9.

Plaintiffs dispute the following facts that Prignano asserts are undisputed in his Statement of Undisputed Facts:

8. In his first paragraph that is numbered "8"[2] Prignano asserts that it is undisputed that "Initial meetings relating to the needs of the telephone system to be installed in the 'new' Public Safety Complex did not occur until sometime in December of 2001." In his second

1. Prignano has accidently numbered two separate paragraphs with the number "7." For the purposes of this motion only, plaintiffs do not dispute either one.

2. Prignano has accidently numbered two separate paragraphs with the number "8." The plaintiffs dispute both paragraphs number 8.

paragraph that is separately numbered "8" Prignano asserts that it is undisputed that "Col. Prignano had no part in either the initial meetings, drafting of the proposals or the bidding process for the telephone system to be installed in the 'new' Public Safety Complex."

There is evidence that Prignano and the director of Providence's department of communications, Manuel Vieira, "met" (or at least conversed with each other) while Prignano was still Chief of Police, during which time Prignano directed Vieira to install a recording system that would record almost all of the incoming and outgoing calls in the soon-to-be-built Public Safety Complex. Deposition of Andrew Rosenzweig [Rosenzweig depo.], at 40, 44, 46, 47; Depo. exhibit 2 at 1 and 3; Appendix [A.] 4-8, 10.[3]

10. Prignano asserts that it is undisputed that "[p]rior to January 31, 2001, the date he retired, Col. Prignano had no knowledge of a telephone system referred to as the 'Total Recall System.'"

There is evidence that, whether or not Prignano was aware of the particular system called the Total Recall system, he had directed Vieira to install a recording system with the attributes of the Total Recall system. *Id.*

11. Prignano asserts that it is undisputed that ""[p]rior to January 31, 2001, Col. Prignano had never heard of the 'Total Recall System.'"

There is evidence that, whether or not Prignano was aware of the particular system called the Total Recall system, he had directed Vieira to install a recording system with the attributes of the Total Recall system. *Id.*

---

3. Attached to this Statement is an appendix of the documents relied upon by plaintiffs in opposing Prignano's summary-judgment motion, consisting of excerpts of deposition transcripts and an exhibit used during one of the depositions. The pages of the appendix have been consecutively numbered in the lower right corner for ease of reference.

12. Prignano asserts that it is undisputed that "[t]he first Col. Prignano ever heard of the 'Total Recall System' was in February 2003 while watching the 6:00 PM news on television."

There is evidence that, whether or not Prignano was aware of the particular system called the Total Recall system, he had directed Vieira to install a recording system with the attributes of the Total Recall system. *Id.*

Accordingly, to the extent that Prignano's undisputed facts 8 (both), 10, 11, and 12, conflict with the deposition testimony of Assistant Chief Rosenzweig and the deposition exhibit cited above, the plaintiffs dispute those facts.

In addition, for purposes of this summary-judgment motion only, plaintiffs assert that the following additional facts are either undisputed or disputed facts:

13. Vieira instructed Greg Desmarais, a technician in the communications department, to prepare a request for proposals [RFP] for a system that would record all calls. Desmarais depo. at 31, 35, 37 ("Vieira * * * told me he wanted everything recorded on the system"), 39 (agreeing that "Vieira instructed you that he wanted in the RFP that all stations were be recorded at the Public Safety Complex"); A. 15-18.

14. The RFP that resulted included the Total Recall System. Desmarais depo. at 43-44; A. 19-20.

15. Vieira was the person responsible for requisitioning the Total Recall system. Desmarais depo. at 80; A. 21.

By their attorneys,

**Murphy & Fay, LLP**
127 Dorrance Street, 2nd Floor
Providence RI 02903
Tel: (401) 490-3200
Fax: (401) 490-3207

Mark A. Fay # 4208

CERTIFICATION

On May 31, 2006 a true copy of the foregoing was served on all counsel of record, listed below, by mail.

Kendra Lima

**Dean G. Robinson, Esq.**
670 Willett Avenue
Riverside RI 02915

**Carolyn A. Mannis, Esq.**
170 Westminster Street, Suite 800
Providence RI 02903

Susan Marcotte Carlin, Esq.
**Famiglietti & Carlin, Ltd.**
205 The Lincoln Center
132 Old River Road
Lincoln RI 02865

**George J. West, Esq.**
1500 One Financial Plaza
Providence RI 02903

Kevin F. McHugh, Esq.
Assistant City Solicitor
**City of Providence**
275 Westminster Street
Providence RI 02903

George L. Santopietro, Esq.
**Coia & Lepore, Ltd.**
226 South Main Street
Providence RI 02903

# APPENDIX


| Item | Page |
|---|---|
| Deposition of Andrew Rosenzweig | 1-7 |
| Deposition of Andrew Rosenzweig, Exhibit 2 | 8-13 |
| Deposition of Anthony DesMarias | 14-21 |

UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF RHODE ISLAND

THOMAS WALDEN, et als.

vs. C.A. No. 2004-304S

URBANO PRIGNANO, JR., et als.

---

THOMAS C. CHMURA, et als.

vs. C.A. No. 2004-553S

URBANO PRIGNANO, JR., et als.

DEPOSITION OF ANDREW ROSENZWEIG, a Witness in the above-entitled case, taken on behalf of the Plaintiffs, before Linda L. Guglielmo, RPR-RMR, a Notary Public in and for the State of Rhode Island, at the offices of the Murphy & Fay, LLP, 127 Dorrance Street, Providence, Rhode Island on May 9, 2006 at 3:00 P.M.

ALSO PRESENT: Manuel Vieira, Urbano Prignano

ALLIED COURT REPORTERS, INC.
115 PHENIX AVENUE
CRANSTON, RHODE ISLAND 02920
(401) 946-5500

job?
A. I did.
Q. How did you know Colonel Esserman before you were offered that position?
A. Professionally, from New York City.
Q. How long did you know Colonel Esserman before you took the position as Assistant Chief?
A. Approximately 15 years.
Q. Okay. While you were chief investigator in Manhattan for the DA's office, did you receive any citations, commendations, anything like that?
A. No.
Q. Do you remember the year that you started as Assistant Chief, when that was?
A. 2003, January.
Q. Generally, what were your duties and responsibilities as Assistant Chief when you took that position?
A. Support the policies of the Chief and really oversee the functioning of different areas of the department.
Q. Now, at some point did you become involved in an investigation of the Total Recall system that had been installed at the Public Safety Building in Providence, Rhode Island?

A. I did.

Q. All right. How did you first become involved in that investigation?

A. To the best of my recollection, the Chief brought to my attention the existence of the system, and we discussed it briefly and he told me his intentions, and we needed to ask questions about it, investigate how it came to be and we did that.

Q. During that first meeting with Colonel Esserman, was anyone else present other than you and he?

A. I don't recall.

Q. Was anything, to your knowledge, memorialized in regard to that first meeting when you first spoke with Colonel Esserman about the Total Recall investigation?

A. Not to my knowledge, other than the memo to file that I have. I'm not aware of other documentation.

Q. What did Colonel Esserman tell you about the Total Recall system during that first meeting?

A. I don't remember exactly, but in sum and substance, he told me about its existence, it was a machine that had the capacity to intercept all communications, telephonic communications in the

I don't recall. From what I wrote, I think it's clear there was a concern over whether there was any illegal wiretapping going on.

Q. The next date, February 14th, 2003 on the next page of the memo do you see that, sir?

A. I do.

Q. The first sentence says, "The interview of Manny Vieira continued on this date, and he made the following comments." Now, under my count that would be the third meeting you had with Mr. Vieira?

A. I think so, yes.

Q. All right. Now, during this third meeting with Mr. Vieira, was that just you and Mr. Vieira, or was Colonel Esserman also present?

A. I'm not positive, but I think the Colonel was present as well.

Q. Do you remember if anyone else was present?

A. I don't remember.

Q. Now you already met with Mr. Vieira on two occasions before this, why did you have him back for another round of questioning?

A. We had more questions to ask.

Second bullet point says, "The police wanted it - Colonel Prignano and Major Simoneau." Where did

MS. CARLIN: Objection.

A. I don't know if I'd characterize it as blaming, but he certainly was attributing knowledge and responsibility for it to the Colonel.

Q. Let me ask you this, just going ahead a little bit, after you completed your inquiry, when you spoke to all these individuals, did you, based upon the conversations with all the individuals, who did you conclude was the person that ultimately made the decision to purchase and install this Total Recall system?

MR. SANTOPIETRO: Objection. Form.

MR. McHUGH: Objection. Form.

MR. ROBINSON: Objection.

MS. CARLIN: Objection.

A. I didn't draw a conclusion on that because I continued with the inquiry.

Q. Based upon what's contained in your memo, can you draw that conclusion for me now?

MR. SANTOPIETRO: Objection. Form.

MR. McHUGH: Objection. Form.

MR. ROBINSON: Objection.

MS. CARLIN: Objection.

A. I won't do that. I can't do that.

his line deleted in November or December." First of all, whose line are we talking about there?

A. I'm not sure. I don't know if he's referring to his own or the Fire Chief's in the previous bullet. I don't recall.

Q. The next bullet point says, "Prignano, Sullivan and Simoneau all knew about the system. On occasion, Prignano asked," and you have this in quotes, "Are we going to have a recording system? Make sure we have it. What are you doing about the phone system?" That information was provided to you and that quote was provided to you by Mr. Vieira?

A. That's right.

Q. Do you remember any other conversations you had with Mr. Vieira about Colonel Prignano was -- strike that. Did you have any follow-up conversation with Mr. Vieira in regard to what he meant by -- he attributed those quotes to Colonel Prignano?

A. Other than what's in this memo, no.

The next bullet point says, "Tony or Frank would tell Manny lines that were recorded that should be taken off." First of all, do you remember who Tony and Frank are, or who are you referring to by

Tony and Frank there?

A. I believe that's Tony Desmaris and Frank Parfume.

Q. So Manny was saying that Tony and Frank would tell him lines that were recorded that should be taken off?

A. Yeah. I'm not quite clear what that means, counselor, but yes.

Q. The next statement, we'll skip down one to the second to the bottom, it says, "Prignano asked for," quote, "all the trinkets, all the bells and whistles. Vieira said the conversation about the system went on for years. He was sure Prignano knew." Again, that bullet point, is that information Manny Vieira gave you?

A. That's right.

Q. Again, so, that seems clear that Mr. Vieira was telling you that Colonel Prignano knew about the system, correct?

MR. SANTOPIETRO: Objection. Form.

MR. McHUGH: Objection. Form. You can answer.

MR. ROBINSON: Objection.

MS. CARLIN: Objection.

MR. FAY: You can answer.

7

February 10, 2003

RE: COMMUNICATIONS DIVISION REVIEW

Memo to File

(by Andy Rosenzweig)

As part of the review of the Communications Division directed by Mayor Cicilline, Col. Dean Esserman ordered a meeting with Manny Viera, Director of the Comm. Div, at 11:20am on this date. Also present were Dep. Dir. Joe Richardson, and two technicians of that Div., Majors Sullivan and Loerenza, Lt. Keith Tucker, IA, and the writer. The focus of the meeting was the ongoing practice of recording of almost all incoming and outgoing calls in the Public Safety Complex. The following are the salient points learned:

- Viera was directed by former Col. Prignano to create this practice
- He doesn't believe he has anything in writing about this
- The two former acting Chief's new of the practice but never questioned it
- All claimed never to have listened to a call or directed same
- Viera doesn't know if the FD Chief knows of the practice
- No sign off was obtained from the city solicitor
- No formal notifications were made to employees or the public that they were being taped

At about 4:30pm the same group reconvened in the Colonel's office and the following occurred:

- Viera provided notarized statements from all individuals who had access to the system attesting to the fact that they didn't eavesdrop on conversations
- Viera stated he could find no written requests from Urbano Prignano or anyone else with respect to the intercept system

DEPOSITION EXHIBIT 2 5/9/06 PENGAD 800-631-6989

- He verified that the former Commissioner of Public Safety and the Fire Chief were unaware of the system

- Technicians Greg Haroian and Tony DesMarais were directed to accompany Lt. Tucker of Internal Affairs and immediately remove the eavesdropping system

- Mr. Haroian provided the name of his contact at Total Recall Co. in Texas, an Andy Garza, 1-877- 230-0227. He said that Mr. Garza claimed there was no way to query the system to ascertain who had utilized it to intercept conversations.

In a private conversation with Colonel Esserman and the writer Mr. Viera said the following:

- He had no knowledge of any illegal wiretapping

- Nobody had ever asked him to engage in conducting any wiretapping

- He denied any knowledge of any illegal activity when asked by the Colonel if there was anything he wanted to get off his chest

- He did divulge that of the five Ford Explorers in the possession of the Communications Division (*which may have been donated to the city by a vendor)*, two were used by him and his brother, Sergeant Mike Viera; two were used by brothers Joe and Ray Richardson (*Ray Richardson is in charge of the PD fleet*); and one is at the Mayor's Office.

Feb.11, 2003

On this date Col. E. had a meeting with Verizon representatives John Kent, VP of Government Relations and Joseph Osediecz, Sr. Staff Consultant, Security. The process for subpoenas for unpublished #s and pair and cable information was discussed. Mr. Osediecz said that it has been years since that type of information has been handled locally and it all goes through their NY Office and under the direction of Security Director Jim Trainor. He said further that no one from the PD has asked him for anything illegal or unethical, however, Manny Viera occasionally has asked for non-published #s.

Ann Travers, a former Verizon employee who is now with the Boston office of the FBI, is very knowledgeable about the Providence PD, the Communications Division; and their relationships with Verizon.

---

Feb. 14, 2003

The interview of Manny Viera continued on this date and he made the following comments:

- Others who were in the process on the purchase of the Total Recall System included: Alan Sepe, Patricia McGlouglin (Solicitor's Office) and Joe Abate. Also, Bob Nelson of Avaya, who worked with Tony DesMaris on preparing the specs on the purchase order.
- The police wanted it – Col Prignano and Major Simoneau
- An addendum was added to include the station-to-station lines
- About three weeks ago the Fire Chief spoke to Manny and asked that his line not be the recorded
- Manny decided to have his line deleted in Nov or Dec
- Prignano, Sullivan and Simoneau all knew about the system. On occasion Prignano asked: "are we going to have a recording system?, make sure we have it!"; "what are you doing about the phone system?";
- Tony or Frank would tell Manny lines that were recorded that should be taken off.
- Manny stated Cianci, Corrente and Coloian had no knowledge of the system
- Prignano asked for "all the trinkets"; "all the bells and whistles". Viera said the conversation about the system went on for years. He was sure Prignano knew
- He said the technicians installed the system in

- July or mid- August

Tony DesMaris was interviewed and said:

- Manny requested he do the specs for the system. He wanted all the lines recorded
- Espernet's original bid was $500,000 but it was changed to 125,000
- Bob Nelson put the switch in
- After the switch went in Manny wanted station to station
- Bob Nelson said he might be able to do 35 stations and Manny said to do it
- A guy from Texas put in extra equipment
- Those trained on the switch included: Steve Moise, Frank Parfume and Greg Haroian
- They showed Tony and Mary Lennon how to use it
- Tony went into the system five times to see if it was working
- He thought two companies bid on the original RFP
- He doesn't think anyone told Manny to do this
- Greg and Ronnie Reposa are most knowledgeable on the system
- Manny was off the list (system) from the beginning (Tony told Greg to remove him)
- Manny said to take the Chief and Commissioner off
- Fire was taken off a week ago

- Two weeks ago Fire Chief Dutra asked for a conversation with a problem employee

- One week later Tony went to see Chief Rattigan who said "I want these lines off

- Manny called Tony at home last night and said "why are you telling people I want lines recorded

- They talked amongst themselves that the recording wasn't right; it wasn't legal

Greg Haroian and Frank Parfume were interviewed:

- Greg said it wasn't true that Manny only recently asked fro his number to be deleted or removed from the recorded lines

- Frank knew about wiretaps in the old building at SIB
- but said they weren't on employees. He never found unusual or strange equipment

- Tony repeated what Manny said: "I don't care what it costs, I want every phone recorded"

- Tony was at the original meeting on the system. He put the specs together with Bob Nelson after Manny agreed to it

- The bids went to Alan Sepe's office

- Greg said there was a bomb threat the day of Lombardi's inauguration and Dep. Joe Richardson was upset they couldn't retrieve the call

- Frank said they got 20 minutes training on Total Recall, which included Steve Moise. He didn't know why Steve was included

- Greg aud Dutra asked for a call and Manny said give to him

- Greg said he did an inventory of computers and could account for only 36 of 50

- Greg and Frank said Viera's son used city cars
- Greg, Frank and Tony all told of Maj Simoneau asking for a conversation. Sgt Lambert worked on it

---

Fire Chief Rattigan was interviewed and said:

- John D'Amico of the Law Dept wrote to him on 1/22/03 and told him the recording of calls was inappropriate
- He didn't know the calls were taped when they moved into the new building
- He said when he heard he talked to Manny the end of Jan and voiced his opposition
- He told Chief Lanzie to handle it
- He never asked for calls to be taped
- EMS Chief Dutra asked for a recording. The Chief was going to look for the request

Sergeant Dennis Lambert was interviewed and said:

- He can't say if Prignano knew of system
- He's 100 % sure it was all from Viera
- Manny definitely knew. In fact moving into new building
- May have been held up by Total Recall System
- A meeting re: Total Recall included: Sepe, DesMaris, the contractor, Espernet, Mike Viera, and possibly Dave Costa

- Guy Lanzie provided the letter from John D'Amico of 1/22/03. Lanzie spoke to Tony and asked command staff lines be removed

UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF RHODE ISLAND

THOMAS WALDEN, et als.

vs. C.A. No. 2004-304S

URBANO PRIGNANO, JR., et als.

THOMAS C. CHMURA, et als.

vs. C.A. No. 2004-553S

URBANO PRIGNANO, JR., et als.

DEPOSITION OF ANTHONY DESMARAIS, a Witness in the above-entitled case, taken on behalf of the Plaintiffs, before Linda L. Guglielmo, RPR-RMR, a Notary Public in and for the State of Rhode Island, at the offices of the Murphy & Fay, LLP, 127 Dorrance Street, Providence, Rhode Island on May 24, 2006 at 2:00 P.M.

ALSO PRESENT: Manuel Vieira

ALLIED COURT REPORTERS, INC.
115 PHENIX AVENUE
CRANSTON, RHODE ISLAND 02920
(401) 946-5500

14

up on the phone, how did that --
A. He called me in his office.
Q. What was the conversation you had in his office at that time?
MR. SANTOPIETRO: Objection to form.
A. He wanted me to help him to put an RFP together for the new equipment going into the building, and he asked me if I would do it and I said yes.
Q. Did he tell you what equipment he wanted to be going into the new building?
MR. SANTOPIETRO: Objection.
MR. CALISE: Objection.
A. He said that he wanted the state of the art telephone system and he wanted a recording system.
Q. Did he give you any more details in regard to the recording system he wanted at that time?
A. Not at that time.
Q. All right. So, when you had that meeting with Mr. Vieira, was anyone else present?
A. No.
Q. And how is it that Bob Nelson got involved, is that something Mr. Vieira organized or something you organized or arranged?
A. Well, Manny told me to call Bob Nelson

system?

MR. CALISE: Objection.

A. From Bob Nelson.

(MR. MCHUGH ENTERED AT THIS POINT)

Q. So, I'm just trying to get a handle on this, how this RFP got together. Bob Nelson -- did you indicate to Bob Nelson that you were requiring some kind of recording system for the new Public Safety Complex?

A. Yes.

MR. CALISE: Objection.

Q. Was it Bob Nelson who recommended the Total Recall system?

A. Yes.

Q. Now, when you first -- you already testified it was Mr. Vieira who told you you wanted -- he wanted a recording system included with the RFP?

MR. CALISE: Objection.

MR. SANTOPIETRO: Objection.

A. Yes.

Q. Now, in regard to the Total Recall system, did Bob Nelson explain to you its capabilities?

A. Yes.

Q. What were the -- what did Mr. Nelson tell you that the Total Recall system was going to be able to do

stations. There was 500 stations that were going to be recorded.

Q. Was that basically all the stations in the Public Safety Complex?

A. All the phones.

Q. And how did you decide that you wanted all the phone stations recorded?

A. That came from Manny Vieira, director, he told me he wanted everything recorded on the system.

MR. SANTOPIETRO: Objection. Move to strike.

Q. And then you just gave that information to Bob Nelson for the RFP?

A. Yes.

Q. When did Manny Vieira tell you he wanted all the stations recorded at the Public Safety Complex?

MR. SANTOPIETRO: Objection.

MS. CARLIN: Objection.

MR. CALISE: Objection.

Q. The first time.

A. When I was putting the RFP together.

Q. If you refer to your police statement that's been marked as Plaintiffs' 1, if you look at Line 10 on Page 2, the question to you was, "Okay. Sir,

17

can find out." So, if I'm understanding your testimony and what you told the detectives for the State Police, even before the RFP was actually written Mr. Vieira instructed you that he wanted in the RFP that all stations were to be recorded at the Public Safety Complex, correct?

MR. SANTOPIETRO: Objection.

MR. CALISE: Objection.

MR. ROBINSON: Objection.

MS. CARLIN: Objection.

A. Yes.

Q. When you gave your statement to the detectives, I take it you told them the truth, correct?

MR. SANTOPIETRO: Objection.

MR. CALISE: Objection.

MR. ROBINSON: Objection.

MS. CARLIN: Objection.

A. Yes.

Q. You wouldn't lie to the State Police, correct?

MR. SANTOPIETRO: Objection.

MR. CALISE: Objection.

MR. ROBINSON: Objection.

MS. CARLIN: Objection.

A. No.

During Mr. Vieira's sworn testimony, I asked him

A. I didn't understand that. What did you say?
Q. What I'm saying is during Mr. Vieira's deposition I was asking him about the bid process, and basically what he was saying he wanted in the bid, and in his sworn testimony he said he only wanted the emergency lines or clerk lines recorded. My understanding from your testimony is he's telling you that he wants all the stations recorded incoming and outgoing, correct?
MR. SANTOPIETRO: Objection.
MR. CALISE: Objection.
MR. ROBINSON: Objection.
MS. CARLIN: Objection.
A. Yes.
Q. So based upon the conversations you had with Mr. Vieira you spoke to Mr. Nelson and he put an RFP together, correct?
A. Yes.
Q. Now, who approved that RFP, do you know?
MR. SANTOPIETRO: Objection.
A. I don't know.
Q. Did you ever meet with Mr. Vieira in regard to that RFP after it was completed?
A. No.
Q. Did that RFP include the Total Recall system?

A. Yes.
Q. To your knowledge, was Mr. Vieira aware that the RFP included the Total Recall system.
MR. ROBINSON: Objection.
MS. CARLIN: Objection.
MR. SANTOPIETRO: Objection.
A. Yes.
Q. He requested it?
MR. SANTOPIETRO: Objection. Form.
MR. CALISE: Objection.
MR. ROBINSON: Objection.
MS. CARLIN: Objection.
A. Yes.
Q. Later on in your sworn testimony -- strike that. Later in your statement to the police on Page 4, if you want to take a look at that, you were asked, "When you initially contacted Robert Nelson, did you indicate that you wanted a recording device?" And your answer was "Yes." Question, "So that recording device was designed and planned for at the inception of this whole telephone system?" Did I read that correctly?
A. Yes.
That's consistent with your testimony today, correct?

MS. CARLIN: Objection.
A. I don't know.
Q. I'll break it down. Do you agree Manny Vieira was the person responsible for requisitioning the Total Recall system?
MR. SANTOPIETRO: Objection.
MR. CALISE: Objection.
MR. ROBINSON: Objection.
MS. CARLIN: Objection.
A. Yes.
Q. Do you know where Bob Nelson is today?
A. No.
Q. Is he still in the state, do you know?
A. I don't know.
Q. Do you know if he still works for Expanets?
A. I think they're out of business.
Q. How about Ron Reposa, Mr. Reposa?
A. He's retired.
Q. Do you know where he's living today?
A. I think somewhere down in Charlestown.
Q. Have you ever discussed this Total Recall situation with Mr. Reposa?
A. No.
Q. How about Greg Harnoian, is he still working for the City?