**UNITED STATES DISTRICT COURT**
**DISTRICT OF RHODE ISLAND**

THOMAS WALDEN, ET AL

VS. C.A. NO. 04-304S

CITY OF PROVIDENCE, ET AL

Consolidated with:

JOHN C. CHMURA, ET AL

VS. C.A. NO. 04-553S

CITY OF PROVIDENCE, ET AL

**DEFENDANTS', DEAN ESSERMAN, DAVID CICILLINE AND THE CITY OF PROVIDENCE'S MOTION FOR SUMMARY JUDGMENT OR, IN THE ALTERNATIVE, MOTION TO DISMISS**

Now come the Defendants in the above-entitled matter, pursuant to Rule 56(c) of the Federal Rules of Civil Procedure, and move for Summary Judgment on the grounds that there are no genuine issues of material fact and the Defendants are entitled to judgment as a matter of law. In the alternative, Defendants, pursuant to Rule 12(B)(6) of the Federal Rules of Civil Procedure, move to dismiss the Complaints on the grounds they fail to state a claim upon which relief can be granted.

The Defendants rely on their accompanying memorandum in support thereof.

Defendants,
By their Attorneys:

Joseph M. Fernandez, City Solicitor

/s/ Kevin F. McHugh
Kevin F. McHugh (#3927)
Senior Assistant City Solicitor
City of Providence Department of Law
275 Westminster Street
Providence, Rhode Island 02903
(401) 421-7740 Ext. 333
(401) 351-7596 (fax)
kevin_mc1950@hotmail.com

Certificate of Service

I hereby certify that on this 14th day of September, 2006, I filed this document electronically and that it is available for viewing and downloading from the ECF system. This document was served by electronic mail upon:

Susan M. Carlin, Esq.
Stephen R. Famiglietti, Esq.
Famiglietti & Carlin, Ltd.
The Lincoln Center
132 Old River Road, Suite 205
Lincoln, RI 02865
Famcarltd@aol.com

Mark A. Fay, Esq.
Murphy & Fay, LLP
127 Dorrance Street, 2nd floor
Providence, RI 02903
mark@murphyandfay.com

Dean G. Robinson, Esq.
670 Willett Avenue
East Providence, RI 02915
drobinson@dgrlaw.necoxmail.com

George L. Santopietro, Esq.
Coia & Lepore, Ltd.
226 South Main Street
Providence, RI 02903
gsantopi@coilepore.com

I further certify that on said date, a copy of the foregoing was caused to be served on the following attorney(s) by regular mail, postage prepaid.

Carolyn Mannis, Esq.
170 Westminster Street, Suite 800
Providence, RI 02903

/s/ Kevin F. McHugh
Kevin F. McHugh

**UNITED STATES DISTRICT COURT**
**DISTRICT OF RHODE ISLAND**

THOMAS WALDEN, ET AL

VS. C.A. NO. 04-304S

CITY OF PROVIDENCE, ET AL

Consolidated with:

JOHN C. CHMURA, ET AL

VS. C.A. NO. 04-553S

CITY OF PROVIDENCE, ET AL

**DEFENDANTS', DEAN ESSERMAN, DAVID CICILLINE AND THE CITY OF PROVIDENCE'S MEMORANDUM IN SUPPORT OF THEIR MOTION FOR SUMMARY JUDGMENT OR, IN THE ALTERNATIVE, MOTION TO DISMISS**

## I. Statement of Facts

These consolidated cases involve 154 Plaintiffs and six Defendants. The Defendants are: City of Providence, by and through Steven T. Napolitano, its Treasurer; David N. Cicilline, its Mayor and Acting Public Safety Commissioner; Dean Esserman, in his Capacity as Chief of Police; Urbano Prignano, Jr., individually and in his capacity as former Chief of Police; Manuel Vieira, individually and in his former capacity as Communications Director; Mary Lennon, individually and in her former capacity as Chief of Operations of the Communications Department; and John Does 1-25.

Since Defendants Esserman and Cicilline are sued in their official duties only and this is a 42 U.S.C. § 1983 case, the suit is really one against the municipality itself. See

Oklahoma City v. Tuttle, 471 U.S. 808 (1985). Thus, for the purposes of this memorandum, Defendants Cicilline, Esserman and the City of Providence shall be referred to as the Municipal Defendants.

The Complaints contain 6 Counts.

The cases arise from the initial telephone system that was installed in the new public safety complex sometime in 2002.

As part of the new public safety complex, a new telephone system was to be installed. That system was put out to bid pursuant to Section 1007 (c) (1) of the Providence Home Rule Charter. (Exhibit A).

The Request for Proposal was for "furnish and install telephone and data equipment and cable for new Fire and Police Complex" and was dated July 30, 2001. (Exhibit B).

On January 14, 2002**,** the Board of Contract and Supply awarded Expanets the contract for what was known as the Total Recall System (Exhibit C).

That system was to record all lines coming into and out of the public safety complex as well as the communications center. It did not record station-to-station calls; nor did it record the private numbers in the various fire stations. (Deposition of Stephen Moise, pp. 72, 73; deposition of Anthony Desmarais, pp. 86, 87).

Only three of the calls were ever downloaded and listened to. (Deposition of Moise, p. 79). One was from a request by Chief Dutra of the Fire Department regarding a man in the water and the Fire Department's response. (Vieira deposition, pp. 142,143). A second request was made by Major Dennis Simoneau of the Police Department regarding

the towing of a car. (Lennon deposition, p. 153). A third request was from a City Councilman. (Deposition of Stephen Moise, p. 79).

On July 22, 2002, Major Simoneau sent an e-mail to the entire police department and its staff, indicating that the telephone lines in the complex may be taped. (A copy of the e-mail and a list of those receiving it are attached as Exhibit D).

On February 14, 2003, Defendant Dean Esserman learned of the existence of the Total Recall System and ordered it disconnected. It remains disconnected at the Providence Public Safety Complex. (Deposition of Anthony Desmarais, p. 63).

Defendants complained about the Total Recall System to the Rhode Island State Police on February 14, 2003. The Rhode Island State Police responded to the public safety complex and launched an investigation of the Total Recall System. (A narrative of the investigation is attached hereto as Exhibit E).

The State Police investigation was forwarded to the Attorney General's office for review and determination as to whether the action of certain individuals was warranted for criminal liability. (Exhibit E, p. 42).

The Attorney General's office determined that there was no criminal liability. (See p. 18 of Memorandum of Special Assistant Attorney General Ronald R. Gendron relating to the "Total Recall" telephone recording system at the Providence Public Safety Complex attached hereto as Exhibit F).

These lawsuits followed.

**II. Statement of the Law**

Rule 56(c) of the Federal Rules of Civil Procedure provides in pertinent part:

> The judgment sought shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law. A summary judgment, interlocutory in character, may be rendered on the issue of liability alone although there is a genuine issue as to the amount of damages.

Summary judgment is appropriate when the record documents that possess evidentiary force "show that there is no genuine issue as to any material fact." Fed.R. Civ.P. 56(c). Once the moving party avers "an absence of evidence to support the non-moving party's case, the burden of production shifts to the non-movant." Corp. v. Catrett, 477 U .S. 317, 325 (1986). To defeat a motion for summary judgment, the non-movant must tender "significant probative evidence" which, when viewed in the light most flattering to the non-movant, illumines a genuine and a material factual dispute. See First Nat'l Bank v. Cities Serv. Co., 391 U.S. 253, 290 (1968); Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247-48 (1986); Medina-Monoz v. R.J. Reynolds Tobacco Co., 896 F.2d 5, 8 (1st Cir. 1990). While the required proof need not necessarily rise to the level of admissible trial evidence, see Celotex, 477 U.S. 317; 106 S.Ct. 2548 (June 25, 1986), it must consist of something more than "conclusory allegations, improbable inferences, and unsupported speculation."

In a Rule 12(b)(6) motion, the accepted rule [is] that a complaint should not be dismissed for failure to state a claim unless it appears beyond doubt that the plaintiff could prove no set of facts in support of his claim which would entitle him to relief. Conley v. Gibson, 355 U.S. 41, 45-46 (1957).

In determining whether the plaintiff can survive a 12(b)(6) motion, a court must accept as true all "well-pleaded" factual allegations in the complaint, e.g., Aulson v. Blanchard, 83 F.3d 1, 3 (1st Cir. 1996); Edwards v. John Hancock Mutual Life Insurance Co., 973 F.2d 1027, 1028 (1st Cir. 1992); see also United States v. Gaubert, 499 U.S. 315, 327 (1991). Similarly, the court must draw all reasonable inferences in the favor of the plaintiff. Aulson v. Blanchard, 83 F.3d at 3; Coyne v. City of Somerville, 972 F.2d 440, 443 (1st Cir. 1992). In drawing inferences from the complaint's allegations, the First Circuit has held that a court need not credit subjective characterizations, unsupported conclusions, bald assertions, and vituperative allegations. E.g., Id. at 444; Correa-Martinez v. Arrillaga-Belendez, 903 F.2d at 52-53; Aulson v. Blanchard, 83 F.3d at 3; The Dartmouth Review v. Dartmouth College, 889 F.2d at 16. Unless a conclusion is logically compelled, or generally supported, by the facts alleged, the court is not required to afford it any deference. The Dartmouth Review v. Dartmouth College, 889 F.2d at 16.

Even when providing the plaintiff's complaint with the required deferential review, the First Circuit has nonetheless held complaints to some minimal standard of pleading; see e.g., The Dartmouth Review v. Dartmouth College, 889 F.2d at 14, recognizing that the "threshold [for stating a claim] may be low, it is real." Gooley v. Mobil Oil Corp., 851 F.2d at 514. As the First Circuit has stated:

> Modern notions of 'notice pleading' notwithstanding, a plaintiff . . . is nonetheless required to set forth factual allegations, either direct or inferential, respecting each material element necessary to sustain recovery under some actionable legal theory.

Rumford Pharmacy, Inc. v. City of East Providence, 970 F.2d 996, 998 (1st Cir. 1992) (quoting Gooley v. Mobil Oil Corp., 851 F.2d at 515). Thus, "each general allegation

[must] be supported by a specific factual basis." Fleming v. Lind-Waldock & Co., 922 F.2d 20 (1st Circuit 1990).

## III. Argument

### A. The Complaints, as drafted, are insufficient to make out a Monell violation.

"It is well established that a municipality cannot be held liable under Section 1983 on a theory of respondeat superior; rather, a plaintiff must plead and prove an injury caused by an action taken pursuant to official municipal policy or custom." Baxter v. Conte, 190 F.Supp. 2d 123, 128 (D.Mass. 2001), citing Monell v. Dep't. of Social Services, 436 U.S. at 691; see also Fedor v. Kudrak, 421 F.Supp. 2d 473, 481, (D.Conn. 2006), quoting Zahra v. Town of Southold, 48 F.3d 674, 685 (2nd Cir. 1995) ("In order to state a claim under Monell . . . a plaintiff must plead and prove: '(1) an official policy or custom that (2) causes the plaintiff to be subjected to (3) a denial of a constitutional right.'"). These requirements square with the principle that "[m]unicipalities are answerable only for their own decisions and policies; they are not vicariously liable for the constitutional tort of their agents." Auriemma v. Rice, 957 F.2d 397, 399 (7th Cir. 1992), citing Monell v. Department of Social Services of City of New York, 436 U.S. 658. While municipal liability may exist "when execution of [a municipal] policy or custom, whether made by its lawmakers or by those whose edicts or acts may fairly be said to represent official policy, inflict[ ] the injury," it does not exist here.

Next, assuming *arguendo*, Plaintiffs could prove the elements listed above and their failure to plead them proves fatal to their claim, the standard articulated in Fedor

and Zahra, which makes clear that the elements must be *pled* and *proved.* See generally Fedor v. Kudrak, 421 F. Supp. 2d 473. (D. Conn. 2006)

Plaintiffs allege, in their complaints, that by "installing and maintaining the 'Total Recall' system," Defendants "violated Plaintiffs' constitutionally protected Fourth Amendment rights: specifically, the Fourth Amendment right to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures." Complaints, Count One. Nowhere in their complaints, however, do Plaintiffs "identify either an official municipal policy or a widespread custom or practice that caused their injuries, as is required to properly maintain a § 1983 action against a municipality. See generally, Monell v. Department of Social Services of City of New York, 436 U.S. 658 (1978). This omission forecloses Plaintiffs' right to validly assert a *Monell* claim, and therefore forecloses their ability to recover from the Municipal Defendants under § 1983. See Id.

In sum, "the touchstone of [a] § 1983 action against a government body is an allegation that official policy is responsible for a deprivation of rights protected by the Constitution. . . ." Monell v. Department of Social Services of City of New York, 436 U.S. at 690. Here, no such allegation has been properly made. There is a long line of cases that can be traced from Circuit to Circuit that demonstrates this necessity in pleading. See generally: Soto v. Brooklyn Correctional Facility, 80 F.3d 34, 36 (2nd Cir. 1996) (plaintiff's complaint might have survived a motion to dismiss had he alleged that Defendant had a custom or policy regarding the alleged constitutional deprivation of inadequately protecting detainees); Garrett v. Clarke, 147 F.3d 745. 747 (8th Cir. 1998) ("[a] city is not vicariously liable under Section 1983 for the acts of its employees . . . .

[Plaintiffs'] complaint fails to state a claim against [Defendant] because it merely names it as a defendant without identifying any such policy, custom, or practice"); Edwards v. City of Goldsboro, 178 F.3d 231, 245 (4th Cir. 1999) (complaint containing allegations that the City delegated authority to its agents and employees "to formulate, develop and administer employment and personnel policies and practices for the City, including those policies and practices" that caused the constitutional deprivation, was sufficient to avoid dismissal of Plaintiff's § 1983 claims against the City under Monell).

The allegations in the complaints don't even come close to meeting the requirements for a 42 U.S.C. § 1983 claim. Count One should be dismissed.

**B. The municipal defendants have not violated the plaintiffs' Fourth Amendment rights.**

Even if the Court finds that the complaints properly allege a Monell claim, the Plaintiffs have insufficient evidence to prove the same. Count One provides:

> COUNT ONE
> (Fourth Amendment/42 U.S.C. § 1983)
>
> 55. The actions of the Defendants as alleged, including, but not limited to, using, installing and maintaining the "Total Recall" system violated Plaintiff's constitutionally protected Fourth Amendment rights; specifically, the Fourth Amendment right to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures.
>
> 56. As a direct result of the violation of Plaintiffs' Fourth Amendment rights, they sustained personal injuries and other damages.
>
> WHEREFORE, Plaintiffs seek that the Court issue the following relief pursuant to 42 U.S.C. § 1983:
>
> 1. Enter a Declaration that the Defendants violated Plaintiffs' Fourth Amendment rights;

2. Award Plaintiffs their compensatory damages;

3. Award costs, including reasonable attorney's fees pursuant to 42 U.S.C. § 1988.

4. Award prejudgment interest and such further relief as this Court deems fair and just.

Count Two provides:

COUNT TWO
(Article I, Section 6 of the Rhode Island Constitution)

57. The actions of the Defendants as alleged, including, but not limited to, subjecting the Plaintiffs' telephone conversations to the "Total Recall" system violated their constitutionally protected rights as set forth in Article I, Section 6 of the Rhode Island Constitution, specifically the constitutionally protected right to be secure in their persons, papers and possessions, against unreasonable searches and seizures.

58. As a direct result of the violation of Plaintiffs' rights as set forth in Article I, Section 6 of the Rhode Island Constitution, they sustained personal injuries and other damages.

WHEREFORE, Plaintiffs seek that the Court issue the following relief:

1. Enter a Declaration that the Defendants violated Plaintiffs' rights as set forth in Article I, Section 6 of the Rhode Island Constitution;

2. Award Plaintiffs their compensatory damages;

3. Award Plaintiffs their costs, including reasonable attorney's fees;

4. Award prejudgment interest and such further relief as this Court deems fair and just.

Article I, Section 6 is essentially the same as the Fourth Amendment. In fact, the Rhode Island Supreme Court has said that this Section has the same effect as the Fourth Amendment. See State v. Davis, 105 R.I. 247, 231 A.2d 394 (R.I. 1969).

That Court has also stated that this section of the Rhode Island Constitution and the Fourth Amendment both protect an individual's reasonable expectations of privacy. See State v. Bennett, 430 A.2d 424 (R.I. 1981).

Thus, they should be analyzed the same way. That way should be under 42 U.S.C. § 1983 since that is the statute that has been pleaded and that is the vehicle for bringing Fourth Amendment claims.

To make out a case against a municipality under 42 U.S.C. § 1983 is no easy task. The municipal liability standard requires proof that the Plaintiff's injury was caused by an action taken pursuant to official municipal policy on custom. Monell v. Dept. of Social Services, 436 U.S. 658 (1978). As the municipal defendants have already articulated the elements necessary to prove municipal liability under 42 U.S.C. § 1983 in Section III (A), they will not repeat them here.

However, Defendants will point out that the Plaintiffs must demonstrate that it was the official policy of the City to violate citizens' privacy or that it was a widely accepted and known custom of the City to violate citizens' Fourth Amendment rights.

This, they cannot do. As to the underlying actions of intercepting the calls, the Defendants deal with this in Section C of their Argument and will not repeat their argument here.

As to whether or not the interception of the calls was an official policy of the City, the Plaintiffs need to identify an official with final policymaking authority who instituted violating the Plaintiffs' rights. This, they have not done.

The first inquiry in any case alleging municipal liability under § 1983 is the question whether there is a direct causal link between a municipal policy or custom and the alleged constitutional deprivation. See City of Canton v. Harris, 489 U.S. 378, 385-386 109 S.Ct. 1997, 1203 (1986). It is necessary to establish the existence of a municipal policy or custom before liability may attach, because it is only through the municipality's establishment of a policy or custom that the municipality *itself* - as opposed to its agents - may be said to have acted so as to have caused the constitutional violation. Pembaur v. City of Cincinnati, 475 U.S. 469, 479-480, 106 S.Ct. 1292, 1298 (1986).

Municipal liability attaches only where the decision maker possesses final authority to establish municipal policy with respect to the action ordered **. . . .** The fact that a particular official - even a policymaking official - has discretion in the exercise of particular functions does not, without more, give rise to municipal liability based on an exercise of that discretion . . . .The official must also be responsible for establishing final government policy respecting such activity before the municipality can be held liable**.** Pembaur v. City of Cincinnati, 475 U.S. 469, 479-480, 106 S.Ct. 1292, 1298 (1986). Consequently, a distinction must be drawn between those municipal officials who are "final**"** policymakers and those other officials who *merely exercise* discretion or are just policymakers without *final* policy making authority. The exercise of discretion by an official without *final* policymaking authority cannot establish municipal liability. Pembaur v. City of Cincinnati, 475 U.S. 469, 481, 106 S.Ct. 1292, 1299 (1986).

Moreover, even where a final policymaker delegates authority to another official, then the decisions made by that official cannot constitute municipal policy unless the policymaker not only approves that decision, but also approves the basis for it.

In the instant case, there has been no evidence uncovered of a final policymaker for the City of Providence making a conscious choice among alternatives to tape all the calls going into and out of the public safety complex.

Only two cases exist regarding who is a final policymaker for the City of Providence: Sean Patrick v. City of Providence, C.A. No. 96-689L (D.R.I. April 24, 1998) (Lagueux), (a copy of same attached hereto as Exhibit G); and Young v. City of Providence, 404 F.3d 4 (1st Circuit 2005).

Sean Patrick was a 42 U.S.C. § 1983 case in which an adult entertainment establishment owner sued the City for harassment. The Chief of Police had authorized a four-day period of stepped-up enforcement of the City's ordinances and state statutes at all adult entertainment establishments. The Court dismissed the case at the close of the Plaintiff's case on the grounds that the Plaintiff had not shown that a final policymaker for the City of Providence had authorized the action. The Court specifically found that the final policymakers for the City of Providence are the Mayor and the City Council.

Young v. City of Providence was a 42 U.S.C. § 1983 case involving allegations of failure to train. One of the individual defendants in that case was the Chief of Police, Urbano Prignano, Jr., who is also a defendant in this case.

In the Young case, in ruling on Prignano's motion for summary judgment, the Court ruled that Prignano was a final policymaker in the Police Department. (Decision, p. 41).

In this case it is undisputed that Urbano Prignano, Jr. retired from the City of Providence on January 31, 2001. (Depo. of Prignano, p. 8). It is also undisputed that the Total Recall System was not used until July or August of 2002. (Deposition of Manuel Vieira, p. 58).

Thus, there is no evidence that Prignano had anything to do with the Total Recall System.

The current police chief, Dean Esserman, is also a defendant in this case in his official capacity. When he learned of the Total Recall System's existence, he ordered it removed. (Deposition of Stephen Moise, p. 37, deposition of Anthony Desmarais, p. 63). Thus, if one accepted the Chief of Police for the City of Providence as a final policymaker for the police department, then a final policymaker for the police department rejected the Total Recall System and ordered it removed.

There is no evidence that the Mayor and the City Council were involved in the Total Recall System. Thus, the 1983 claim against the City must fail as a matter of law.

Since the Plaintiffs have no proof of an official municipal policy, they cannot show a direct causal link to the alleged constitutional tort. Without that link, there can be no municipal liability.

In fact, at least one court has held that in cases such as this, Plaintiffs must prove that the municipality had an official written policy to violate employees' privacy rights. See Abbott v. Village of Winthrop Harbor, 205 F.3d 976 (7th Cir. 2000), at 981.

Even if the Court were to find there was an official municipal policy, there is no Fourth Amendment violation, anyway. The Defendants deal with this in the Total Recall System not being a violation of 18 U.S.C. § 2511 in Section C of their Memorandum.

The Complaints smack of respondeat superior. "Their employees did it, so the City is liable." That is simply not the law. That's why, as drafted, the Complaint fails to state a claim upon which relief may be granted against the municipal employees.

The instant complaints come nowhere near the evidence or type of pleading necessary to make out a *Monell* claim against the City. Thus, the Complaints should be dismissed.

**C. The Total Recall System was not a violation of 18 U.S.C. § 2511**

Count Three provides:

**Count Three**
(18 U.S.C. § 2511)

119. The actions of the Defendants as alleged, including, but not limited to, installing, using, and maintaining the "Total Recall" system violates 18 U.S.C. § 2511.

120. As a direct result of the Defendants violation of 18 U.S.C. § 2511 Plaintiffs suffered personal injuries and other damages.

**WHEREFORE**, Plaintiffs seek that the Court issue the following relief in accordance with 18 U.S.C. § 2520:

a. Enter a Declaration that the Defendants violated Plaintiffs' rights as set forth in 18 U.S.C. § 2520:

b. Award Plaintiffs their compensatory damages or statutory damages of which ever is the greater of $100 a day for each day of violation or $10,000.00;

c. Award Plaintiffs punitive damages;

d. Award Plaintiffs their costs, including reasonable attorney's fees;

e. Award prejudgment interest and such further relief as this Court deems fair and just.

The plaintiffs allege that the installation and use of the system violated 18 U.S.C. § 2511. This section is part of Title III of the Omnibus Crime Control and Safe Streets

Act of 1968, which authorizes the use of electronic surveillance for specified classes of crimes. United States v. United States Dist. Court for Eastern Dist., 407 U.S. 297, 302 (1972). It represents a comprehensive attempt by Congress to promote more effective control of crime while protecting the privacy of individual thought and expression. Id.

There has been no violation of the statute because the Total Recall System falls under the exemption listed under 18 U.S.C. § 2510 (5) (a) (ii) which provides:

> **(5)** "electronic, mechanical, or other device" means any device or apparatus which can be used to intercept a wire, oral, or electronic communication other than—
> **(a)** any telephone or telegraph instrument, equipment or facility, or any component thereof,
>
> * * *
>
> ; or
> **(ii)** being used by a provider of wire or electronic communication service in the ordinary course of its business, or by an investigative or law enforcement officer in the ordinary course of his duties;

In Amati v. City of Woodstock, 176 F.3d 952 (6th Cir. 1999), which is factually similar to the instant matter, the plaintiffs argued that they were entitled to judgment as a matter of law on the Title III claim because the evidence, even when construed as favorable to the defendants, nevertheless established a violation. See Amati, 176 F.3d at 954. In that case, the plaintiffs, employees and former employees of the police department, and their friends and family members, used a particular telephone line for personal calls. Id. The plaintiffs were allegedly unaware that the calls were being recorded. Id. Although the Court found that the taping was a *prima facie* violation of § 2511 (1), it held that the taping came within the statutory exclusion of eavesdropping "by an investigative or law enforcement officer in the ordinary course of his duties." See Id., citing 18 U.S.C. § 2510 (5) (a) (ii). For all calls to and from a police station to be

recorded, the Amati Court ruled, is routine and therefore "ordinary," as exempted by the statute. Id. at 952.

Here, Major Simoneau made an attempt to inform the Providence Police and the Communications Department of the recording calls. (See Exhibit D, Simoneau e-mail). However, the success of this announcement is rendered irrelevant by the decision in Amati, as the "ordinary" exception of § 2510 applies. The system was installed in the Providence Public Safety Complex for the same reasons described by the Amati Court in its analysis of § 2510, i.e., evidence and evaluation of the speed and adequacy of the response of the police to any complaint and call for emergency assistance. Id at 95. (Deposition of Richardson pp. 31, 32).

The Amati Court rejected the notion that wiretapping cannot be in the ordinary course of law enforcement unless there is express notice to the people who are being listened to. Id at 955.

According to the Amati Court, if ordinary course of law enforcement includes anything, it includes the recording of all calls to and from a police department. Id at 956 citing Jandak v. Village of Brookfield, 520 F.Supp. 815, 821-25 (D.C. Ill., 1981).

In fact, the Amati Court went out of its way to give an example of what would not be routine: tricking people into making damaging admissions over the phone by announcing that calls to and from the police department were not being recorded and then recording them anyway. Id at 956.

It should also be noted that unlike the instant case, the calls in Amati were listened to and there still was no violation.

The Amati Court found irrelevant the fact that personal calls were being recorded there because all employees make personal calls on company phones and if all the calls are recorded, then recording personal as well as official calls is within the ordinary course. Id at 976.

Such is the case here. In Adams v. City of Battle Creek, 250 F.3d 980 (6th Cir. 2001), the Court did not analyze the business use and law enforcement exceptions separately. However, they did opine that the Congress probably created the law enforcement exemption to make clear that the routine and almost universal recording of phone lines by police departments and prisons, as well as other law enforcement institutions, is exempt from the statute. See First v. Stark County Board of Commissioners, No. 99-3547; 234 F.3d 1268 (2000).

### D. Plaintiffs are unable to simultaneously pursue their § 1983 claims and claims under 18 U.S.C. § 2511, R.I. Gen. Laws §§ 11-35-21, 9-1-28.1 (a)(1) and 12-5.1-1.

Plaintiffs' complaint, as drafted, is insufficient to allege that Plaintiffs' civil rights were violated pursuant to Monell. Therefore, Plaintiffs cannot recover under § 1983, as discussed *supra*. Even if § 1983 were properly pled, this Court nevertheless should refuse to allow Plaintiffs to pursue the § 1983 claim, as this case must be analyzed under the rubric of the statutory claims asserted, rather than under the constitutional claim. The U.S. Supreme Court has made clear that courts should avoid the unnecessary adjudication of constitutional issues. Adams v. City of Battle Creek, 250 F.3d 980, 986 (6th Cir. 2001), citing Ashwander v. Tennessee Valley Authority, 297 U.S. 288, 347 (1936) (Brandeis, J., concurring) ("The Court will not pass on a constitutional question, although

properly presented by the record, if there is also present some other ground upon which the case may be disposed of."). With regard to the federal wiretapping statute specifically, the Adams Court went on to explain:

> One application of this doctrine is the principle of statutory construction that states that a comprehensive statute, like the federal wiretapping statute, designed to protect specific constitutional values may be read to provide the exclusive remedies in the field so long as the statute itself suffers no constitutional infirmity. Sutherland Statutory Construction § 499-500 (1984 ed.). . . . No claim is made that the statute is unconstitutional or that it is less protective of privacy rights than the Fourth Amendment. The plaintiff makes no claim that Fourth Amendment rights, as they relate to wiretapping, are broader or more comprehensive than the federal statute. There is no difference between the conduct relevant to plaintiff's statutory claim and the conduct relevant to his constitutional claim.

Adams v. City of Battle Creek, 250 F.3d at 986.

The factors listed by the Adams Court apply here. First, Plaintiffs have not asserted that the statutes referenced in their complaint are unconstitutional or are less protective of privacy rights than the Fourth Amendment. Second, Plaintiffs make no claim "that Fourth Amendment rights, as they relate to wiretapping, are broader or more comprehensive than the federal statute." In fact, courts have held that the statutory procedures of Title III comport with the Fourth Amendment. See United States v. Cafero, 473 F.2d 489, 499 (3rd Cir.1973). Finally, here, "there is no difference between the conduct relevant to [Plaintiffs'] statutory claim and the conduct relevant to [their] constitutional claim[s]." Adams v. City of Battle Creek, 250 F.3d at 986.

The Plaintiffs cannot simultaneously pursue relief under the federal and state wiretapping statutes. See generally Whitaker v. Garcetti, 291 F.Supp.2d 1132

(C.D.Cal.,2003). In Whitaker, Plaintiffs filed claims under §1983 as well as state and federal wiretapping statutes. The Court held that where "the Defendants are local rather than federal officials and municipalities and . . . the two wiretapping statutes regulate the same sphere of conduct, the operative directive…is" the state, not federal, wiretapping statute. Id. at 1141, citing Pac. Gas & Elec. Co. v. State Energy Res. Conserv. and Dev. Comm'n, 461 U.S. 190, 212-213 (1983); Florida Lime & Avocado Growers, Inc. v. Paul, 373 U.S. 132, 142-143 (1963). The Whitaker Court went on to describe the exception to the rule, where there is explicit preemption by Congress:

> It is accepted that Congress has the authority, in exercising its Article I powers, to preempt state law…In the absence of an express statement by Congress that state law is preempted, there are two other bases for finding preemption. First, when Congress intends that federal law occupy a given field, state law in that field is preempted. Pac. Gas at 212-13. Second, even if Congress has not occupied the field, state law is nevertheless preempted to the extent it actually conflicts with federal law; that is, when compliance with both state and federal law is impossible, Florida Lime and Avocado Growers at 142-43, or when the state law "stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress." Silkwood v. Kerr-McGee Corp., 464 U.S. 238, 248 (1984); Hines v. Davidowitz, 312 U.S. 52, 67 (1941).

See generally Whitaker v. Garcetti, 291 F.Supp.2d at 1141.

The First Circuit, too, utilizes this framework. See Bessette v. Avco Financial Services, Inc., 230 F.3d 439, 447 (1st Cir. 2000).

> [W]here there is no explicit statutory language preempting state law, this Court will find implied preemption under one of two circumstances: (1) where the federal statutory scheme is so pervasive that Congress clearly intended to "occupy the field" to the exclusion of state law, or (2) where

> a particular state law is in direct conflict with the federal law to an extent that the statutes cannot coexist.

Id., citing Summit Inv. & Dev. Corp., v. Leroux, 69 F.3d 608, 610 (1st Cir.1995); MSR Exploration Ltd. v. Meridian Oil, Inc., 74 F.3d 910, 913 (9th Cir.1996) (quoting Fidelity Fed. Sav. & Loan Ass'n v. de la Cuesta, 458 U.S. 141, 152-53 (1982)).

These exceptions do not apply here, as "[i]t is well accepted that Congress' wiretapping statute was not an attempt to occupy the field, but merely an attempt to establish minimum standards." See generally Whitaker v. Garcetti, 291 F.Supp.2d at 1141. Therefore, Plaintiffs are entitled to pursue relief solely under the Rhode Island wiretapping statute, since where the Municipal Defendants "are local rather than federal officials and municipalities and . . . the two wiretapping statutes regulate the same sphere of conduct, the operative directive . . . is" the state, not federal, wiretapping statute. Id. Moreover, the state statute at issue here is almost identical to the federal statute.

**E. The city cannot be liable for violations of the statutory claims asserted in this case.**

As explained *supra*, Plaintiffs are entitled to pursue relief solely under the Rhode Island wiretapping statute. This principle does not prohibit analysis of the claim under the jurisprudence of the federal statute, however. This is especially true where the state statute mirrors the federal statute with regard to the provision at issue, and where there is a lack of case law interpreting the state statute. See 2B Sutherland Statutory Construction § 52:2 (6th ed.); see also In re O'Connor, 44 A. 591 (R.I. 1899) ("When a statute is adopted which has already received judicial construction, it is to be presumed that it was adopted in view of such construction."), citing Miller v. Coffin, 19 R.I.164; End. Interp. St. § 371, notes 80, 81; Sayles v. Bates, 15 R. I. 342. Where a statute is almost a literal

copy of a statute of another jurisdiction, it is proper, in construing the statutory language, to resort to the interpretations of the court of the jurisdiction which first enacted the statute. 2B Sutherland Statutory Construction § 52:2. Therefore, it is proper and instructive to look to how federal courts have construed the federal wiretapping statute, insofar as it is mirrored by the Rhode Island statute.

Municipalities are immune from suit under the federal wiretapping statute. See generally Abbott v. Village of Winthrop Harbor, 205 F.3d 976 (7th Cir. 2000).

> . . . [M]unicipalities are immune from suit, not only because of the corroborating testimony in the legislative history, but simply because Congress has never amended the definition of "person" in § 2510(6). That definition unequivocally excludes local governmental entities from its definition of person and continues to apply to the entire chapter.

Id. at 980.

Under this rubric, it becomes even more apparent that there can be no recovery from a municipality under the Rhode Island statutes. The Circuit courts which have taken a different view from the Seventh Circuit regarding whether a municipality can be held liable under the federal wiretapping statute have done so based on an analysis that does not apply to the instant matter. Williams v. City of Tulsa, OK, 393 F.Supp.2d 1124, 1132 (N.D.Okla.,2005) ("[C]ourts are divided in their conclusions. Compare Adams v. City of Battle Creek, 250 F.3d 980, 985 (6th Cir.2001) (holding that the Act creates civil liability for municipalities); Conner v. Tate, 130 F.Supp.2d 1370, 1373-75 (N.D.GA.2001) (holding that the Act creates civil liability for municipalities) with Abbott v. Village of Winthrop Harbor, 205 F.3d 976, 980 (7th Cir.2000) (holding that the Act

does not create civil liability for municipalities); Anderson v. City of Columbus, 374 F.Supp.2d 1240, 1244-46 (M.D.GA. 2005) (following Abbott)").

Assuming, *arguendo*, that this circuit split will ultimately resolve contrary to the rulings of the Seventh Circuit, an application of the decisions of these other jurisdictions to Rhode Island's wiretapping statutes still indicates that there can be no recovery from the Municipal Defendants under the Rhode Island statutes. That is, the circuits which have ruled that there can be recovery from municipalities have done so based on an amendment to the federal statutes, an amendment never made to the state statute:

> The Act's eavesdropping prohibition applies to any "person." § 2511 . . .[P]rior to 1986, the section creating civil liability referred only to a cause of action against a "person;" that year, the Congress amended the civil liability section to read "any person whose . . . communication is intercepted ... may in a civil action recover from the person **or entity** . . . " § 2520 (emphasis added)….The Sixth Circuit, interpreting the . . . statutory text, but looking to the Senate Committee Report on the parallel prohibition of intercepting stored communications, concluded that the Congress did intend to create municipal liability with the 1986 amendment. Adams v. City of Battle Creek, 250 F.3d 980, 985 (2001) (citing S. Rep. 99-541, at 43 (1978), as reprinted in 1986 U.S.C.C.A.N. 3555, 3597).

Williams v. City of Tulsa, OK, 393 F.Supp.2d at 1131-1132.

The Rhode Island statutes contain no language synonymous to the 1986 amendment, i.e., the "or entity" language. Even if this Court declines to adopt the views of the Seventh Circuit, that municipalities cannot be liable under the federal statute, and does adopt the rationale of the circuits which have split from the Seventh Circuit, *the omission of the word "entity" from the Rhode Island statutes would nevertheless preclude recovery from a municipality under the Rhode Island statutes*.

No matter which analysis is employed, the same set of facts applies here.

In the Anderson case, supra, a city employee sued the city and others alleging violations of federal and Georgia wiretapping statutes as well as a 42 U.S.C. § 1983 claim and state tort claims. Anderson worked at the city's call center where all calls were taped and could be and were at times listened to. Those included private conversations between the operators, which included Anderson.

The Court held that a municipality is not a person under the federal wiretapping statute. It reasoned that a municipality was not included under the definition of a person. The Court found that the addition of the word *entity* was intended to refer to the entities mentioned in the definition of *person* and not to expand the statute to include other defendants. Based on that, the Court granted summary judgment.

**F. The Plaintiffs cannot prove a violation of R.I.G.L. § 11-35-21.**

Count Four of the Complaint states:

**Count Four**

**(R.I. Gen. Laws § 11-35-21)**

> 121. The actions of the Defendants as alleged, including but not limited to installing, using, and maintaining the "Total Recall" system violates R.I. Gen. Laws § 11-35-21.
>
> 122. As a direct result of the Defendants violation of R.I. Gen. Laws § 11-35-21, Plaintiffs suffered personal injuries and other damages.
>
> **WHEREFORE,** Plaintiffs seek that the Court issue the following relief in accordance with R.I. Gen. Laws § 9-1-2:
>
> a. Award Plaintiffs their compensatory damages;

b. Award Plaintiffs their costs, including reasonable attorney's fees;

c. Award prejudgment interest and such further relief as this Court deems fair and just.

R.I.G.L. § 11-35-21 provides:

> **§ 11-35-21 Unauthorized interception, disclosure or use of wire, electronic, or oral communication. –** (a) Except as otherwise specifically provided in chapter 5.1 of title 12, any person: (1) who willfully intercepts, attempts to intercept, or procures any other person to intercept or attempt to intercept, any wire, electronic, or oral communication; (2) who willfully discloses or attempts to disclose to any person the contents of any wire, electronic, or oral communication, knowing, or having reason to know that the information was obtained through interception of a wire, electronic, or oral communication in violation of this section; or (3) who willfully uses or attempts to use the contents of any wire, electronic, or oral communication, knowing, or having reason to know, that the information was obtained through interception of a wire, electronic, or oral communication in violation of this section; shall be imprisoned for not more than five (5) years.
>
> (b) The provisions of subdivisions (a)(2) and (3) of this section shall not apply to the contents of any wire, electronic, or oral communication, or evidence derived from those contents, which has become common knowledge or public information.
>
> (c) It shall not be unlawful under this chapter for:
>
> (1) An operator of a switchboard, or an officer, agent, or employee of a communication common carrier, whose facilities are used in the transmission of a wire, electronic, or oral communication, to intercept, disclose, or use that communication in the normal course of his or her employment while engaged in any activity which is a necessary incident to the rendition of his or her service or to the protection of the rights or property of the carrier of the communication. No communication common carrier shall utilize service observing or random monitoring except for mechanical or service quality control checks;
>
> (2) A person acting under color of law to intercept a wire, electronic, or oral communication, where that person is a party to the

> communication, or where one of the parties to the communication has given prior consent to the interception; or
>
> (3) A person not acting under color of law to intercept a wire, electronic, or oral communication, where the person is a party to the communication, or one of the parties to the communication has given prior consent to the interception unless the communication is intercepted for the purpose of committing any criminal or tortious act in the violation of the constitution or laws of the United States or of any state or for the purpose of committing any other injurious act.

This is a criminal statute. The instant case is a civil case for damages. A criminal statute has no place in the Complaint or in this case. Moreover, as to the City of Providence, a municipality cannot have the requisite intent to commit a crime. Count Four can easily be disposed of.

Moreover, even if there were a civil remedy for the statute, the same arguments would apply as in Section C of the Memorandum.

**G. The plaintiffs cannot prove a violation of R.I.G.L. § 12-5-.1-1, et seq.**

Count Six of the Complaints states:

> **Count Six**
> **(R.I. Gen. Laws § 12-5.1-1 *et seq.)***
>
> 125. The actions of the Defendants as alleged, including, but not limited to installing, using, and maintaining the 'Total Recall' system violates R.I. Gen. Laws § 12-5.1-1 *et seq.*
>
> 126. As a direct result of the Defendants violation of R.I. Gen Laws § 12-5.1-1 *et seq.* Plaintiffs suffered personal injuries and other damages.
>
> WHEREFORE, Plaintiffs seek that the Court issue the following relief in accordance with R.I. Gen. Laws § 12-5.1-13:
>
> a. Award Plaintiffs their compensatory damages but not less than liquidated damages, computed at a rate of one hundred dollars ($100) per day for each day of

violation, or one thousand dollars ($1,000), whichever is higher.

b. Award Plaintiffs punitive damages;

c. Award Plaintiffs their costs, including reasonable attorney's fees;

d. Award prejudgment interest and such further relief as this Court deems fair and just

That is the only citation to the statute in the Complaints. The Municipal Defendants will assume that the Plaintiffs are alleging a violation of R.I.G.L. § 12-5.1-10 which provides.

> **§ 12-5.1-10 Disclosure and use of intercepted wire or oral communications. –** (a) Any investigative or law enforcement officer who, by any means authorized by this chapter, has obtained knowledge of the contents of any wire, electronic, or oral communication, or evidence derived from them, may disclose the contents to another investigative or law enforcement officer to the extent that disclosure is appropriate to the proper performance of the official duties of the officer making or receiving the disclosure.
>
> (b) Any investigative or law enforcement officer who, by any means authorized by this chapter, has obtained knowledge of the contents of any wire, electronic, or oral communication or evidence derived from them may use the contents to the extent that their use is appropriate to the proper performance of his or her official duties.
>
> (c) Any person who has received, by any means authorized by this chapter, any information concerning a wire, electronic, or oral communication, or evidence derived from them intercepted in accordance with the provisions of this chapter may disclose the contents of that communication or the derivative evidence while giving testimony under oath or affirmation in any criminal proceeding in any court of the United States or of this or any other state or in any federal or state grand jury proceeding.

A civil remedy is provided for in R.I.G.L. § 12-5.1-13 which provides in pertinent part:

> **§ 12-5.1-13 Civil remedy. -** (a) Any person whose wire, electronic, or oral communication is intercepted, disclosed, or used in violation of this chapter shall have a civil cause of action against any person who intercepts, discloses, or uses the communications, and shall be entitled to recover from that person.

R.I.G.L. § 12-5.1-10 deals with the disclosure of intercepted communications not interception of those calls. There is no evidence in this case that any of the Plaintiffs' calls were disclosed.

Assuming the Plaintiffs called the Public Safety Complex during the period of time the Total Recall System was in use and assuming they called a line which was part of the Total Recall System, there are no allegations in the Complaint that the contents of their calls were disclosed. Thus, there can be no violation of this statute.

R.I.G.L. § 12.5.1-13 does speak of interceptions in violation of the Chapter. However, it is not clear how an interception would be a violation in the civil context as the statute contemplates criminal investigations.

This statute appears to deal with applications for wiretaps in criminal investigations. That would involve listening to conversations. That is not what this case is about. This is not a case where conversations were being listened to, just recorded.

**H. The plaintiffs cannot prove a violation of R.I.G.L. § 9-1-28.1**

Count Five of the Complaint states:

> Count Five
> (R.I. Gen. Laws § 9-1-28.1 Right to Privacy)
>
> 63. The actions of the Defendants as alleged, including, but not limited to, installing, using, and maintaining

the "Total Recall" system is a deprivation of Plaintiffs' right to privacy in violation of R.I. Gen. Laws § 9-1-28.1

64. As a direct result of the violation of Plaintiffs' privacy rights as set forth in R.I. Gen. Laws § 9-1-28.1. Plaintiffs suffered personal injuries and other damages.

WHEREFORE, Plaintiffs seek that the Court issue the following relief pursuant to R.I. Gen. Laws § 9-1-28.1(b):

1. Enter a Declaration that the Defendants violated Plaintiffs' privacy rights as set forth in R.I. Gen. Laws § 9-1-28.1

2. Award Plaintiffs their compensatory damages;

3. Award Plaintiffs their costs, including reasonable attorney's fees pursuant to R.I. Gen. Laws § 9-1-28.1 (b) as prevailing party;

4. Award prejudgment interest and such further relief as this Court deems fair and just.

R.I. G. L. § 9-1-28.1 provides:

**§ 9-1-28.1 Right to privacy – Action for deprivation of right. –** *(a) Right to privacy created.* It is the policy of this state that every person in this state shall have a right to privacy which shall be defined to include any of the following rights individually:

(1) The right to be secure from unreasonable intrusion upon one's physical solitude or seclusion;

(i) In order to recover for violation of this right, it must be established that:

(A) It was an invasion of something that is entitled to be private or would be expected to be private;

(B) The invasion was or is offensive or objectionable to a reasonable man; although,

(ii) The person who discloses the information need not benefit from the disclosure.

(2) The right to be secure from an appropriation of one's name or likeness;

(i) In order to recover for violation of this right, it must be established that:

(A) The act was done without permission of the claimant;

(B) The act is of a benefit to someone other than the claimant;

(ii) It need not be established that there was any publication.

(3) The right to be secure from unreasonable publicity given to one's private life;

(i) In order to recover for violation of this right, it must be established that:

(A) There has been some publication of a private fact;

(B) The fact which has been made public must be one which would be offensive or objectionable to a reasonable man of ordinary sensibilities;

(ii) The fact which has been disclosed need not be of any benefit to the discloser of the fact.

(4) The right to be secure from publicity that reasonably places another in a false light before the public;

(i) In order to recover for violation of this right, it must be established that:

(A) There has been some publication of a false or fictitious fact which implies an association which does not exist;

(B) The association which has been published or implied would be objectionable to the ordinary reasonable man under the circumstances;

(ii) The fact which was disclosed need not be of any benefit to the discloser.

> *(b) Right of action.* Every person who subjects or causes to be subjected any citizen of this state or other person within the jurisdiction thereof to a deprivation and/or violation of his or her right to privacy shall be liable to the party injured in an action at law, suit in equity, or any other appropriate proceedings for redress in either the superior court or district court of this state. The court having jurisdiction of an action brought pursuant to this section may award reasonable attorneys' fees and court costs to the prevailing party.

In order to state a claim for unreasonable intrusion, there must be an invasion of something that is entitled to be private or would be expected to be private. See Pontbriand v. Sundlun, 699 A.2d 856 (R.I. 1997), at 864.

There is no expectation of privacy of people who call in to the police and fire stations. Thus, there can be no intrusion.

The invasion must be offensive or objectionable to a reasonable man. Id.

Calling into police or fire stations and having the calls recorded would certainly not be offensive or objectionable to a reasonable man. These calls should and would be business calls for police and fire. Moreover, without the Defendants having acquired the information through any wrongful or improper means, there can be no liability. Id.

The Defendants' consistent position has been that the recording was legal. Thus, the recordings were not done through improper means.

Obviously, the right to be secure from an appropriation of one's name or likeness is inapplicable as there is no evidence any of the Plaintiffs' calls were ever listened to, never mind used for anything. Moreover, it should be noted that the Plaintiffs have not produced any evidence that they ever called the public safety complex.

Nor is the right to be secure from unreasonable publicity given to one's private life applicable here. The only people who have publicized the fact that the calls were

recorded are the Plaintiffs' themselves. The Municipal Defendants never publicized this fact until the day they ordered the system removed. Moreover, no one has ever publicized the names of the Plaintiffs.

Finally, Sec. 9-1-28.1 (4) does not apply to the instant case either. That is to say, the Municipal Defendants have not publicized the names of the Plaintiffs. The Court does not even have to get to whether or not the Plaintiffs have been placed in a false light since there has been no publication of who they are. Thus, this cause of action must fail, also.

**Conclusion**

The Complaints can be dismissed under Rule 12(b)(6) for the aforementioned reasons. The Court need not delve into the constitutional claims or the merits of the underlying statutory claims. The case can be dismissed short of a summary judgment analysis.

If the Court denies the motion to dismiss and undertakes the summary judgment analysis, then the result should be the same: judgment for the Defendants.

When the Court considers the undisputed facts, the statutes and caselaw, it should find that there are no genuine issues of material fact in this case and that the Defendants' are entitled to judgment as a matter of law.

Defendants,
By their Attorneys:

Joseph M. Fernandez,
City Solicitor

/s/ Kevin F. McHugh
Kevin F. McHugh (#3927)
Senior Assistant City Solicitor
City of Providence Department of Law
275 Westminster Street
Providence, Rhode Island 02903
(401) 421-7740 Ext. 333
(401) 351-7596 (fax)
kevin_mc1950@hotmail.com

Certificate of Service

I hereby certify that on this 14th day of September, 2006, I filed this document electronically and that it is available for viewing and downloading from the ECF system. This document was served by electronic mail upon:

Susan M. Carlin, Esq.
Stephen R. Famiglietti, Esq.
Famiglietti & Carlin, Ltd.
The Lincoln Center
132 Old River Road, Suite 205
Lincoln, RI 02865
Famcarltd@aol.com

Mark A. Fay, Esq.
Murphy & Fay, LLP
127 Dorrance Street, 2nd floor
Providence, RI 02903
mark@murphyandfay.com

Dean G. Robinson, Esq.
670 Willett Avenue
East Providence, RI 02915
drobinson@dgrlaw.necoxmail.com

George L. Santopietro, Esq.
Coia & Lepore, Ltd.

226 South Main Street
Providence, RI 02903
gsantopi@coilepore.com

and by regular mail, postage prepaid, to the following:

Carolyn Mannis, Esq.
170 Westminster Street, Suite 800
Providence, RI 02903

/s/ Kevin F. McHugh
Kevin F. McHugh

UNITED STATES DISTRICT COURT
IN THE DISTRICT OF RHODE ISLAND

| | | |
|---|---|---|
| THOMAS WALDEN, ET AL., Plaintiffs, | ) | |
| VS. | ) | C.A. NO. 04-304S |
| CITY OF PROVIDENCE, ET AL., Defendants. | ) | |
| JOHN C. CHMURA, ET AL., Plaintiffs, | ) | |
| VS. | ) | C.A. NO. 04-553S |
| CITY OF PROVIDENCE, ET AL., Defendant. | ) | |

DEPOSITION OF MARY FRANCES LENNON, taken on behalf of the Plaintiffs, in the above-entitled causes, pursuant to notice, before Nancy L. Simoes, R.P.R., a Notary Public in and for the State of Rhode Island, at the Law Offices of City of Providence Law Department, 275 Westminster Street, Providence, Rhode Island, on February 24, 2006, scheduled at 2:30 P.M.

ALLIED COURT REPORTERS, INC.
115 PHENIX AVENUE
CRANSTON, RHODE ISLAND 02920

Q. Were you aware of any requests that were made in written form?

A. I believe there were two from the Police Department.

Q. Did you fill those forms out?

A. Request forms?

Q. Correct.

A. No, I did not.

Q. Do you know who filled those out?

A. I believe one might have been Major Simoneau, and I don't remember the other person.

Q. Do you know what happened to those request forms?

A. They would have been filed in my file cabinet.

Q. In regard to the Total Recall system, do you know if that was a web-based access system?

MR. WEST: Objection.

MR. ROBINSON: Objection.

MR. MCHUGH: Objection as to form.

A. I do not know for sure.

Q. Were you given some kind of password to access the Total Recall phone conversations?

A. Yes.

Q. As part of your training, were you instructed how to use that password?

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF RHODE ISLAND

THOMAS WALDEN, et als.
vs. C.A. No. 2004-304S
URBANO PRIGNANO, JR., et als.

---

THOMAS C. CHMURA, et als.
vs. C.A. No. 2004-553S
URBANO PRIGNANO, JR., et als.

DEPOSITION OF ANTHONY DESMARAIS, a Witness in the above-entitled case, taken on behalf of the Plaintiffs, before Linda L. Guglielmo, RPR-RMR, a Notary Public in and for the State of Rhode Island, at the offices of the Murphy & Fay, LLP, 127 Dorrance Street, Providence, Rhode Island on May 24, 2006 at 2:00 P.M.

ALSO PRESENT: Manuel Vieira

ALLIED COURT REPORTERS, INC.
115 PHENIX AVENUE
CRANSTON, RHODE ISLAND 02920
(401) 946-5500

MR. SANTOPIETRO: Objection.
A. Yes.
Q. At some point did you receive some direction to remove the Total Recall system?
A. Yes.
Q. Who instructed you to remove the Total Recall system?
A. The Colonel.
Q. Colonel Esserman?
A. Yes.
Q. Did you speak with him directly or in the form of a memo; how did it come about?
A. It was in a meeting.
Q. Who was present at that meeting?
A. Manny Vieira, Joe Richardson, the Colonel, the deputy, a couple of majors were there, Major Loerenza, I think it was. There were another couple of majors there, I don't know what their names were. I don't know if it was Sullivan or who was there.
Q. What exactly did Colonel Esserman tell you to do?
A. Take the Total Recall out right now.
Q. Did he tell you why he wanted the Total Recall system out?
A. Just take it out.

Q. And there is no reference in this memo that calls generated out of the Public Safety Complex would in fact be recorded, correct?
A. Yes.
Q. I'm going to also ask you to look at Number 2, Plaintiffs' Exhibit Number 2, which refers to a meeting among Bob Nelson, Mr. Reposa and yourself; is that correct?
A. Yes.
Q. And there's a memo that apparently summarizes what was discussed at that meeting; is that correct?
A. Yes.
Q. And this memo was prepared by Mr. Reposa, right?
A. Yes.
Q. In this memo it indicates that station-to-station recording is unavailable to the Total Recall server; is that correct?
A. I don't know.
Q. Looking at that first bullet point, does it, in fact, indicate that station-to-station recording was, in fact, unavailable?
A. I don't see that on here.
Q. The first bullet point right under your name, it says, "Station-to-station recording is unavailable"?

A. Okay. Okay.
Q. So, the Total Recall server was incapable of recording station-to-station; is that correct?
MR. FAY: Objection.
A. Yes.
Q. In this memo it does not indicate that Mr. Vieira wanted any and all conversations into and out of the Public Safety Complex to be recorded, does it?
A. It says Total Recall records trunk lines, not individual stations.
Q. Right. It does not say it in this memo?
MR. FAY: Did you finish your answer?
THE WITNESS: No.
A. That means all the lines coming and going out of the building are recorded, not station-to-station.
Q. Right. Does it say in this memo that Mr. Vieira ordered those trunk lines to be recorded?
A. Yes.
Q. Where does it say that?
A. He's the one who brought this meeting together.
Q. I asked you, Mr. Desmarais, does it say in this memorandum, anywhere in this memorandum that Manuel Vieira directed that all of the lines into

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF RHODE ISLAND

THOMAS WALDEN, ET AL.

vs. C.A. No. 04-304S

CITY OF PROVIDENCE, ET AL.

DEPOSITION OF STEPHEN MOISE, a Witness in the above-entitled case, taken on behalf of the Plaintiffs, before Linda L. Guglielmo, RPR-RMR, a Notary Public in and for the State of Rhode Island, at the offices of Murphy & Fay, LLP, 127 Dorrance Street, Providence, Rhode Island on January 31, 2005 at 10:00 A.M.

ALLIED COURT REPORTERS, INC.
115 PHENIX AVENUE
CRANSTON, RHODE ISLAND 02910
(401) 946-5500

Q. How do you know that he knew about it?
A. I was in -- I was called to a meeting by Colonel Dean Esserman and it was the week of the Station Fire, so that's how I remember that particular time frame. He was present at that meeting.
Q. He, being Chief Sullivan?
A. Chief Sullivan.
Q. And what happened at this meeting?
A. Colonel Esserman questioned the people that were there regarding the system that was installed. He asked questions about it, who knew about it, asked if Chief Prignano knew about it, asked us to yank the thing out of the wall, nobody was leaving the building until it was done. He got up and left.
Q. This was after it was yanked out of the wall?
A. That meeting was prior to it being yanked out of the wall. We had gone and dismantled it at his request after that meeting broke up.
Q. And when he asked who knew about it, who was listed?
MR. McHUGH: Objection as to form. You can answer if you understand.
THE WITNESS: Could you repeat it?

Q. I understand that. But I'm talking about the Total Recall system?

THE WITNESS: Are you talking a phone to the recording system?

MS. MANNIS: No, I'm talking about the Total Recall system.

A. Let's back up then. I'm sorry.

Q. Under the Total Recall system, if you wanted to add an extension, who would do that?

A. That would be Tony Demaris, Greg Harnoian or Greg Parfume.

Q. But it's not something that you would do?

A. No, I would not do that.

Q. And is that something that you would do with those user guide passwords?

A. I would believe so.

Q. Okay. Earlier you indicated that under the Total Recall system private lines, such as the one in the fire living quarters, were not included in the Total Recall system, correct?

A. That is correct.

Q. How do you know that?

A. From my years as a dispatcher, my years -- I've been in the stations on numerous occasions. I mean, we have a roster, we have a list of all

the outside extensions, outside seven digit numbers for each station listed in the fire dispatch center. That's how -- in the event of a problem, that's how the dispatch center would get ahold of them, that would be another way of -- if the voc. alarm radio system broke down, there is a protocol as to how to get in touch with these companies.

Q. I understand that. How do you know they weren't subject to the Total Recall?

A. Because they have nothing to do with Total Recall, they're their own -- they got their own vendors, whoever they are, whatever phone company it is.

Q. So, the Total Recall system only operated on the phone numbers within?

A. The system.

Q. Within the system?

A. Correct.

Q. However, if you placed a call to that private number, that call would be subject to Total Recall, correct?

MR. McHUGH: Objection as to form. You can answer.

A. I'm not sure on that. That I'm not sure of.

that had been recorded under the Total Recall system?

A. To my knowledge, the only recordings that were done off that system were the police control center lines, and there were, I want -- it was an involved -- there was an incident involving a councilman, I remember, I recall Councilman Butler, he requested a tape which came out of the Total -- the police side of it and there might have been one or two others, but they were pretty much all police involved, where I didn't have access to it.

Q. So that -- I make sure I understand what you're saying, when you say the only recordings involved, those are recordings that someone asked to be retrieved and that potentially somebody researched or listened to?

A. That's correct.

Q. Pretty much, to your knowledge, the only kind of recordings that were retrieved and listened to or researched under the Total Recall system were the same kind of recordings that were researched when the dictaphone system was in place?

A. That is correct.

Q. You know of nothing else that was done?

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF RHODE ISLAND

THOMAS WALDEN, et als.

vs. C.A. No. 2004-304S

URBANO PRIGNANO, JR., et als.

---

THOMAS C. CHMURA, et als.

vs. C.A. No. 2004-553S

URBANO PRIGNANO, JR., et als.

DEPOSITION OF JOSEPH P. RICHARDSON, JR., a Defendant in the above-entitled case, taken on behalf of the Plaintiffs, before Linda L. Guglielmo, RPR-RMR, a Notary Public in and for the State of Rhode Island, at the offices of the Providence City Solicitor, 275 Westminster Street, Providence, Rhode Island on February 27, 2006 at 2:00 P.M.

ALLIED COURT REPORTERS, INC.
115 PHENIX AVENUE
CRANSTON, RHODE ISLAND 02920
(401) 946-5500

Page 30

MR. McALLISTER: Please indicate the date.
MS. MANNIS: The date is January 22, 2003. It's a letter addressed to Guy Lanzi, Chief, and it's signed John T. D'Amico, Jr., senior assistant city solicitor. I don't have copies of it.
(LAST ANSWER READ)
Q. Was there any other part of that conversation that related to the recording of phone calls?
A. That was the general nature of the inquiries we made of Mr. John D'Amico, that's what I remember.
Q. At the time that you had that conversation with Mr. D'Amico, did you know about the Total Recall system?
MR. McALLISTER: Objection to form. Go ahead.
A. I'm not sure I understand the question. Did I know about the Total Recall? What specifically about the Total Recall system?
Q. Did you even know the name?
MR. WEST: The question is did he know the name of the Total Recall?
MR. SANTOPIETRO: Yes, that's it.

Page 31

MR. WEST: Okay.
A. I think so. I don't know for sure.
Q. When did you first hear about a system called the Total Recall system?
A. I don't know specific to a Total Recall. I don't know when it was -- any bids when it was accepted, when it wasn't. I just don't know. I know that the city was looking for a system. I know what the general discussion was even prior, long prior to that because of the nature of the complaints that we had about not being able to answer citizen complaints and that the business lines, the complaint lines from the citizens that were not emergency calls for service needed to be better monitored as part of the community policing effort and attending community meetings where neighbors and citizens would complain about the response basically on the police side from the police department.
Q. Was it your understanding that all calls into the new Public Safety Complex and going out of the Public Safety Complex would be recorded?
A. No.
Q. Why was that?
MR. McALLISTER: Objection to form.

Page 32

A. I understood that all emergency calls for service, all the calls for service, for example, checking warrants and tows, those things, would be recorded. And I also understood that the complaint, the business calls when you called the police department would be recorded. So when someone called to complain of calls that were not emergency calls for service, you know, citizen complaints such as maybe loud music, dogs barking, whatever, any calls that went to the new Public Safety Complex in fact that they would be recorded, that was my understanding.
Q. Was it your understanding that your phone would be recorded?
A. No.
Q. Do you know if your phone was recorded?
A. No.
Q. Did you ever request that it not be recorded?
A. I think that I did. I think I inquired that if it was, that it shouldn't be.
Q. Do you know when that was?
A. It would have been around that same time, the discussion with Chief Lanzi and Chief Rattigan and Chief Dutra.
Q. When you say you inquired, to whom did you

Page 33

inquire?
A. I believe I asked the telephone technician, Tony Desmaris, and I believe I also asked the director.
Q. What were you told by Tony Desmaris?
MR. CRONIN: Objection.
MR. WEST: Objection.
MR. SANTOPIETRO: Objection.
A. I don't remember if he said no or if he said he would look into it, or he would make sure he didn't, but I remember having a discussion with him because I told him for obvious reasons that Major Haimes and Chief Giannini and myself were concerned our lines at the task force shouldn't be recorded because we were discussing some matters that were sensitive matters. We spoke with the FBI and the INS, Immigration Naturalization Service and the Coast Guard about port security matters and all those matters every day and those lines shouldn't be recorded.
Q. Were there any other lines other than yours that you inquired about to Tony Desmaris?
A. The fire department lines, the line that I mentioned earlier. If it involved a complaint, I don't recall the nature of the complaint, but

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF RHODE ISLAND

THOMAS WALDEN, et als.
vs. C.A. No. 2004-304S
URBANO PRIGNANO, JR., et als.

---

THOMAS C. CHMURA, et als.
vs. C.A. No. 2004-553S
URBANO PRIGNANO, JR., et als.

DEPOSITION OF MANUEL VIEIRA, a Defendant in the above-entitled case, taken on behalf of the Plaintiffs, before Linda L. Guglielmo, RPR-RMR, a Notary Public in and for the State of Rhode Island, at the offices of the Providence City Solicitor, 275 Westminster Street, Providence, Rhode Island on March 23, 2006 at 2:00 P.M.

ALLIED COURT REPORTERS, INC.
115 PHENIX AVENUE
CRANSTON, RHODE ISLAND 02920
(401) 946-5500

installation period?
A. Yes.
Q. All right. My follow-up question was other than Tony Desmaris, did anyone else give you any information in regard to the Total Recall system as to what it was actually going to do once it was up and running and what its capabilities were during the installation process?
A. No.
Q. Do you remember the date that the public safety building actually opened up?
A. August -- end of July, August --
Q. Of?
A. -- seems to stick in my mind.
Q. Of what year?
A. Of '02.
Q. Before the public safety building opened, where was your office located, where was director of communications -- where was your office located?
A. West Exchange Street.
Q. Did it stay there or did you move to the now building?
A. Stayed there.
Q. West Exchange?
A. Yes.

Dutra, I guess, he was able to -- Chief Rattigan and Dutra were able to get this copy of a recording." First of all, are you aware Chief Rattigan and Dutra got copies of a recorded phone conversation?

A. Chief Dutra, all I know, he asked for a request of the call. If I remember correctly, Tony had told me, yes, it was recorded. I never got to know or never got to ask the question -- I don't know if he ever physically got the tape, I'm not sure of that.

Q. All right. Then it goes on, Question, "What did you do with the request of Chief Lanzi?" Answer, "He asked me to find out if in fact they're recorded." I said, "You know, to the best of my knowledge, they wouldn't be recorded. I don't know why they would be recorded. They weren't recorded before, but I'll ask. I'll ask Manny, I'll ask the director." "Okay. And you asked Manny Vieira?" Answer, "Yes." So your testimony is Joe Richardson never came to you and asked you those questions?

A. I remember Dutra asking, I remember having a conversation with Tony. I remember Richardson asking about the, as I said earlier, the Dutra

situation and the recording. What specifically Richardson said, I don't remember what he said.

Q. But again, your testimony clearly before this was you had no knowledge any lines were being recorded, correct?

MR. SANTOPIETRO: Objection.

MR. McHUGH: Objection.

MR. ROBINSON: Objection.

MR. WEST: Objection.

MS. CARLIN: Objection.

A. No, I didn't.

Q. Other than the central lines?

A. Yes.

Q. Next question, "Okay, you asked Manny Vieira?" "Yes." Question, "About when was this? It was during the time I was doing the critique investigation of the body in the water, a guy drowned in the water." Question, "Off 195?" Answer, "Yes." "Okay. And what did Mr. Vieira say to you?" "He said that all the lines were recorded." Did you -- your testimony is you never said that to Joseph Richardson, correct?

MR. SANTOPIETRO: Objection to form.

A. If I said that, I was referring to all the emergency lines were being recorded. I certainly

1007. Board of contract and supply.

There shall be a board of contract and supply whose members shall consist of the mayor, the president of the city council, the finance director, the city controller, the chairperson of the committee of the city council with jurisdiction over city property, the chairperson of the committee of the city council with jurisdiction over budgetary and financial matters, the director of public works, the commissioner of public safety, the city treasurer, the director of public property, the chairperson of the watersupply board and the president of the school committee, all ex officio. In the absence of any of the above-named members, a deputy shall serve in the place of said member. On the first Monday of January, 1983, or as soon thereafter as may be practical, the members of the city council who are members of a political party or parties other than that of the mayor, or are independents, shall elect from their total number one member to serve on said board for a term of four (4) years. Any vacancy that may occurin the office of an elective member shall be filled for the unexpired term by those members of the city council eligible to vote for that elective member under the terms of this subsection. Failure to elect such elective member shall in no case prevent said board from acting. The city assessor shall likewise be, ex officio, a member of the board for such purposes as may be declared by ordinance.

(a) The mayor, or in the absence of the mayor, the president of the city council, shall be the chairperson of said board. The city clerk, or in the absence of the city clerk, one of his or her deputies, shall act as clerk of said board.

(b) In addition to the membership established herein, the city council, by ordinance, may appoint the heads of other city departments or agencies to the membership of the board of contract and supply, but may not deny membership to any member so named in this subsection unless the department or agency of which said member is the head shall have been abolished.

(c) It shall be the responsibility of the board of contract and supply:

(1) To make all contracts for purchase of materials, supplies, services, equipment and property on behalf of the city, the price or consideration of which shall exceed five thousand dollars ($5,000.00), on the basis of sealed bids solicited through public advertisement in a newspaper of general circulation in Providence, such bids to be submitted, opened and considered in accordance with rules and regulations approved by the board. The city council may increase the figure of five thousand dollars ($5,000.00) bya two-thirds vote following a public hearing, but no more often than once every five (5) years;

(2) To insure before a contract is entered into that there exists sufficient appropriation to pay the cost thereof;

(3) To reject any or all bids submitted to it for a specific purpose if it considers that the public interest will be best served thereby.

(d) The board of contract and supply shall have the authority to enter into agreements with the state, or the United States, or any public body having authority to condemn property of the city, with respect to the value of any such property so taken; and shall have the authority to employ such experts as it shall deem necessary to assist it in the purchase of real estate, or in connection with the condemnation thereof, under such terms and conditions as the city council may set.

(Ord. No. 107, § 2, 3-13-97)

Exhibit A

ALAN R. SEPE
Director

VINCENT A. CIANCI, JR.
Mayor

# DEPARTMENT OF PUBLIC PROPERTY

July 30, 2001

The Honorable Vincent A. Cianci, Jr.
Chairman
Board of Contract & Supply
C/o City Clerk's Office
City Hall
Providence, Rhode Island 02903

Dear Mayor Cianci:

Please advertise for Furnish and Install Telephone and Data Equipment and Cable for the new Fire and Police Complex at the Board meeting of July 30, 2001.

Enclosed are specifications and a suggested vendor list.

| | |
|---|---|
| Advertise Date: | August 2, 2001 |
| Bid Opening Date: | August 27, 2001 |
| Bid Award Date: | September 10, 2001 |

Funds will be made available through

Respectfully submitted,

Alan R. Sepe
Acting Director
Department of Public Property

Exhibit B

DEPARTMENT OF PUBLIC PROPERTY
FURNISH AND INSTALL TELEPHONE AND DATA EQUIPMENT AND CABLE
FOR THE NEW FIRE AND POLICE COMPLEX

ADDENDUM NO. ONE

AUGUST 17, 2001

THE OPENING DATE FOR THE BID WILL BE EXTENDED TO SEPTEMBER 10, 2001 AT 2:15PM.

City of Providence

Rhode Island

# Department of City Clerk

## MEMORANDUM

**DATE:** August 27, 2001

**TO:** Acting Purchasing Director

**SUBJECT:** FURNISH AND INSTALL TELEPHONE AND DATA EQUIPMENT AND CABLE FOR THE NEW FIRE AND POLICE COMPLEX – DEPARTMENT OF PUBLIC PROPERTY.

**CONSIDERED BY:** Board of Contract and Supply

**DISPOSITION:** VOTED: that all bids be referred to the Acting Purchasing Director for tabulation.

Bids from:

EXTENDED UNTIL SEPTEMBER 10, 2001

cc:Pur.Dir.
File

No Bid
9/12/01

Michael R. Clement

DEPARTMENT OF PUBLIC PROPERTY
FURNISH & INSTALL TELEPHONE AND DATA EQUIPMENT AND CABLE
FOR THE NEW POLICE & FIRE SAFETY COMPLEX

ADDENDUM NO. 2

SEPTEMBER 5, 2001

The opening date for the bid is extended to Monday, September 24, 2001 at 2:15PM.

City of Providence

Rhode Island

# Department of City Clerk

## MEMORANDUM

**DATE:** September 10, 2001

**TO:** Acting Purchasing Director

**SUBJECT:** FURNISH AND INSTALL TELEPHONE AND DATA EQUIPMENT AND CABLE FOR THE NEW FIRE AND POLICE COMPLEX - DEPARTMENT OF PUBLIC PROPERTY

**CONSIDERED BY:** Board of Contract and Supply

**DISPOSITION:** VOTED: that all bids be referred to the Acting Purchasing Director for tabulation.

Bids from:

Bid Opening Extended to September 24, 2001

cc:Pur.Dir.
File

NO Bids
9/12/01

Michael R. Clement

DEPARTMENT OF PUBLIC PROPERTY
FURNISH & INSTALL TELEPHONE AND DATA EQUIPMENT & CABLE
FOR THE NEW POLICE & FIRE SAFETY COMPLEX

ADDENDUM NO 3.

September 19, 2001

The opening date for the bid is extended to Tuesday, October 9, 2001 at 2:15 pm.

There will be a pre-bid meeting on Wednesday, September 26, 2001 at 9:00AM. The pre-bid will be held in the Department of Public Property, Providence City Hall, Room 407, Providence, RI.

City of Providence

Rhode Island

# Department of City Clerk

## MEMORANDUM

**DATE:** September 24, 2001

**TO:** Acting Purchasing Director

**SUBJECT:** FURNISH AND INSTALL TELEPHONE AND DATA EQUIPMENT AND CABLE FOR THE NEW FIRE AND POLICE COMPLEX – DEPARTMENT OF PUBLIC PROPERTY.

**CONSIDERED BY:** Board of Contract and Supply

**DISPOSITION:** VOTED: that all bids be referred to the Acting Purchasing Director for tabulation.

Bids from:

EXTEND UNTIL OCTOBER 9, 2001

cc:Pur.Dir.
File

No Bids
9/25/01

Michael R. Clement

DEPARTMENT OF PUBLIC PROPERTY
FURNISH & INSTALL TELEPHONE AND DATA AEQUIPMENT & CABLE
FOR THE NEW POLICE & FIRE SAFETY COMPLEX

ADDENDUM NO. 4

October 2, 2001

The opening date for the bid is extended to Monday, October 22, 2001 at 2:15 PM.

There will be an addendum issued prior to that date answering all questions that have been submitted by bidders. A set of floor plans for the Safety Complex will also be distributed with the addendum.

DEPARTMENT OF PUBLIC PROPERTY
FURNISH & INSTALL TELEPHONE AND DATA EQUIPMENT & CABLE
FOR THE NEW POLICE & FIRE SAFETY COMPLEX

ADDENDUM NO. 5

October 18, 2001

The opening date for the bid is extended to Monday, November 5, 2001 at 2:15PM

DEPARTMENT OF PUBLIC PROPERTY
FURNISH & INSTALL TELEPHONE AND DATA EQUIPMENT & CABLE
FOR THE NEW POLICE & FIRE SAFETY COMPLEX

ADDENDUM NO. 6

October 29, 2001

This addendum contains the answers to all questions that have been received by potential bidders.

Attached, you will also find floor plans for the complex supplied by the Architect.

At this time, we are enclosing a Request for Proposal for a Digital Voice Recording System. This is a separate item is to be bid on the separate bid form attached.

IMPORTANT INFORMATION FOR THE DATA CABLING:

CABLE GOING FROM COMMUNICATION TO NEW COMPLEX IS 3,000 FT. IT WAS PREVIOUSLY STATED TO BE 5,000 FT.

1. Is it possible to have a set of floor plans for the new Building? Can those floor plans be marked with how many voice/data drops per location? The location of the closets and possible distance between the closets?

   **Floor plans are attached. Please note the scale of 1/16".**

2. Is the City looking for data switches to the desktop in this bid?

   **No the City is not looking for data switches to the desktop.**

3. Is the City looking for Routers to handle the data traffic between Communications, Fire and Police?

   **No the City is not looking for Routers to handle the data traffic between locations.**

4. Is the City looking for a centralize voice / e-mail / fax server system that can support all locations that can light up the needed lights and where is the best place to house this system?

   **Yes the City is looking for a centralized voice/fax server system.**

5. Is the vendor going to train all the personnel of Police, Fire and Communications or the City looking to train specified personnel to do the training?

   **The vendor will train all the personnel of Police, Fire and Communications.**

6. What is the e-mail system of all these departments and is there a Common e-mail server?

   **E-mail servers will not be part of this bid.**

7. Can a diagram be submitted to Ronco Communications & Electronics that shows the infrastructure of all the off premise extensions.

   **We do not have a diagram of SOP locations.**

8. Is Communications going to use existing single line phones or new?

   **New single line phones will be required.**

9. Is the 5000 feet of fiber going to be single or multi mode fiber and if single mode who is going to provide the converter?

   **Multi-Mode, Superior Lissex PSE89 24 strand.**

10. Can a walk through be available at Communications to see and help Providence design the skills set that can be utilize here?

    **No walk through will be available.**

11. Is Communications re-using the cable plant or looking for new?

    **All new cable plant is required.**

12. Is Verizon the vendor of your voice network or do you use another and who is that contact?

    **Verizon is the vendor of our voice network.**

13. On page 7, can you please explain to what level is the City of Providence and which location looking to pass data through the proposed PBX?

    **Data will not be switched through the PBX.**

14. Is the data network connected by the proposed 5000 ft. of fiber between Police Fire and Communication?

    **The data network is connected through the multi-mode fiber.**

15. Is the City looking for 2 unified messaging systems or one? If one where is to reside?

    **One unified message system. Residing in the new Police Fire Complex.**

16. Is the manufacturer of the unified messaging system preferred to be also the manufacturer of the PBX?

    **The PBX and messaging system must be the same manufacturer.**

17. Are the two PBX's needed the same configurations?

    **The configurations must duplicate each other for the reasons that have been stated in the RFP.**

18. Where will the management of the system be resided? Will this management software be a web access and what software etc..

    **The management system will reside at Communication Place and the software will be decided by the vendor.**

19. Is this bid being extended?

**The bid has already been extended twice, it will not be extended again.**

20. Does this system need to be redundant?

    **Yes.**

21. What style/type of phones are required?

    **----**

22. What type of connectivity/networking (i.e. complete transparency and etc.) is required between the two locations?

    **Connect 2 buildings with fiber.**

23. Will Voice Mail, Call Accounting and System Administration be centralized?

    **Yes.**

24. Is any cabling required at this location?

    **Yes.**

25. Could you explain how you would like this "mirrored system" to operate in an emergency situation.

    **One goes down, the other system picks it up.**

26. Is Unified Messaging required?

    **No.**

27. Do you want both sites equipped with Site Event Buffers that will notify the vendor and the Police and Fire Departments of system errors?

    **Yes.**

28. Under Telephone Equipment (no page number given) item 4 is noted as "Elevated Phone" – Could you please specify what these are and the quantity?

    **There are 4 elevator phones.**

29. We are requesting an extension from the October 9, 2001. This is requested to ensure that we can get the proper Bid Bond in place based on the answers to our questions.

**Extension of Bid is to November 5, 2001.**

30. There seems to be a conflict between the system overview and System Redundancy and Reliability, please clarify.

1.0 System Overview

Statement: "The switch will have Duplicate Common Control for total redundancy within the complex. Also, there will be a Duplicate Switch that mirrors a portion of the new Fire and Police Complex. This switch will be located at One Communications Place which will house two attendant consoles, the 15 emergency answering positions. These positions will be mirrored at the Fire and Police Complex."

**Both switches will have duplicate common control and each switch will be able to act as a back up in the event either one of these switches go down. In other words if either switch goes down the other switch will handle the trunks and stations associated with that location. Each switch will come with a 2 hour UPS system.**

2.3 System Redundancy and Reliability

Statement: "Design the proposed system with no Duplication, but provided pricing options for all levels of redundancy."

**Statement 2.3 System Redundancy and Reliability is incorrectly stated in the RFP. The correct statement should state "The system must be configured with duplication at all levels, both common control and the ability to back-up the other switch in the event of a failure."**

31. Item 2.1.2.3

Statement: State the maximum number of ports on each of the following types of circuit packs." There are no packs listed.

**See attached pack listings.**

32. Item 2.2.5

Statement: "The system must be configured to provide a grade of service of P.002 for the "Wired For" requirements." Is this figure correct, the standard is a P.01 Grade of Service?

**The system must be configured with a grade of service of P.01.**

33. Item 2.4 System Power:

Are you requesting AC or DC power for the system? Are you requesting Uniform Power Supply (UPS) or Battery Back-up, with this system?

**The systems are to be configured with AC power and a 2 hour UPS at each location.**

34. Item 2.7 System Features – Data:

Statement: "Complete Table 2 in Attachment A that includes Mandatory and Desired System Data Features." No attachment A or Table 2 has been provided to potential bidders.

**See attached Attachment A Table 2 Data Features.**

35. Item 2.10.6 Physical Security

Statement: "As an option, it must be possible to provide additional physical security by adding a digital encryption "Lock and Key" device to the dial-up system management ports. Describe what devices are available form the vendor, and include any additional costs in the Optional Pricing section of the proposal." Is this section referring to password protection of the Maintenance and Administration access to the PBX?

**This question is referring to providing an additional layer of physical security to protect maintenance/administration ports that are used for dial-up remote access from computer criminals.**

36. Item 2.13 Station Equipment and Features

Statement: "Complete Table 1 in Attachment C that includes mandatory and desired Station features." No Attachment C or Table 1 has been provided.

**See attached Attachment C Table 1 Station Features.**

37. Item 3.3 Station Requirements

Statement: "The following table represents the station requirements of the system, including analog and digital stations. These quantities must be included in the price of the proposed system."

A. Could these station requirements be broken out based on how many of each type of the set requested will be at each location?
B. It stated Speakerphones and the quantity is ALL, do all Digital sets require speakerphones?

**New Fire and Police Complex 270 Digital Stations and 170 Analog Stations**
**Communications Building at One Communications Place 30 Digital Stations and 30 Analog Stations.**
**All digital sets must have speakerphones.**

Question #3



*be achieved by the addition of only port circuit packs. These quantities represent expected growth.*

### 3.1.3 Capacity

*The system capacity represents the ultimate capacity of the system, achieved by adding hardware and software beyond that included in the wired-for configuration.*

## 3.2 Port Requirements

*The following table represents the port requirements of the system, including analog and digital stations, trunks, and other access ports. The system must be configured to support the wired-for capacity. The vendor is required to fill in the capacity column.*

| Port Type | Equipped | Wired-For | Capacity |
|---|---|---|---|
| Station Ports | | | |
| *Analog* | 200 | 300 | 400 |
| ~~*Digital – Voice-only*~~ | [illegible] | [illegible] | [illegible] |
| *Digital – Voice/Data* | 300 | 400 | 500 |
| *Digital – Data-only* | | | |
| *Attendant Console* | 4 | 8 | 10 |
| Trunk Ports | | | |
| *Central Office (CO)* | 50 | 85 | 110 |
| *Direct Inward Dial (DID)* | 50 | 75 | 100 |
| *Tie* | 9 | 15 | 25 |
| *DS1/E1* | 4 | 6 | 8 |
| *ISDN-BRI* | 4 | 6 | 8 |
| *ISDN-PRI* | 4 | 6 | 8 |
| Adjunct Access Ports | | | |
| *Dial Dictation Access* | | | |
| *Modem Pool Access* | | | |
| *Paging Access* | 2 | 2 | 2 |
| *Power Failure Transfer* | 30 | 50 | 60 |
| *Recorded Announcements* | 4 | 6 | 7 |

| Port Type | Equipped | Wired-For | Capacity |
|---|---|---|---|
| *Voice Mail Access* | 24 | 30 | 40 |
| *Wideband Switching* | | | |

## 3.3 Station Requirements

*The following table represents the station requirements of the system, including analog and digital stations. These quantities must be included in the price of the proposed system.*

| Station Type | Quantity |
|---|---|
| *Analog Stations* | |
| *Single-Line* | 200 |
| *Digital Stations* | |
| *Single-Line* | |
| *5-Line with Display* | |
| *8-Line with Display* | [illegible] |
| *10-Line with Display* | 270 |
| *16-Line with Display* | [illegible] |
| *24-Line with Display* | 10 |
| *+30-Line with Display* | 20 |
| *Adjunct Equipment* | |
| *Expansion Modules* | |
| *Headsets* | 75 |
| *Speakerphones* | ALL |
| *Data Modules* | |
| | |

## 3.4 Traffic Requirements

*The following table represents the traffic requirements of the system, including stations and trunks. The system must be configured to meet these traffic requirements at the wired-for numbers of ports.*

| Feature | | | S/O /NA | Cost |
|---|---|---|---|---|
| 20 | *Conference – Single-Line Station* | | | |
| 21 | *Directed Call Pickup* | | | |
| 22 | *Distinctive Ringing* | | | |
| 23 | *Do Not Disturb* | | | |
| 24 | *Extension Preselection and Preference* | | | |
| 25 | *Group Call Pickup* | | | |
| 26 | *Group Paging* | | | |
| 27 | *Hold* | | | |
| 28 | *Hold – Automatic* | | | |
| 29 | *Long Hold Recall Warning* | | | |
| Intercom | | | | |
| 30 | *Automatic* | | | |
| 31 | *Dial* | | | |
| 32 | *Internal Automatic Answer* | | | |
| 33 | *Last Number Dialed* | | | |
| 34 | *Leave Word Calling* | | | |
| 35 | *Personalized Ringing* | | | |
| 36 | *Priority Calling* | | | |
| 37 | *Privacy – Attendant Lockout* | | | |
| 38 | *Privacy – Manual Exclusion* | | | |
| 39 | *Recall Signaling* | | | |
| 40 | *Reset Shift Call* | | | |
| 41 | *Ringback Queuing* | | | |
| 42 | *Ringer Cutoff* | | | |
| 43 | *Speed Dialing – Station* | | | |
| 44 | *Station Display* | | | |

| Feature | | | S/O /NA | Cost |
|---|---|---|---|---|
| *45* | ***Station Alerting Options*** | | | |
| *46* | ***Station Self Display*** | | | |
| *47* | ***Temporary Bridged Appearance*** | | | |
| *48* | ***Transfer*** | | | |

| Circuit Pack | Number of Ports |
|---|---|
| Analog | |
| Analog Caller ID | |
| **Proprietary Digital** | |
| Voice Only | |
| Data Only | |
| Voice/Data | |
| **ISDN-BRI** | |
| Voice Only | |
| Data Only | |
| Voice/Data | |
| **Combination Analog Trunk and Line** | |
| Central Office (CO), Direct Inward Dial (DID), CAMA E911 or Analog Line (on-or off-premises with message-waiting) | |
| **Trunks** | |
| Central Office (CO) | |
| Direct Inward Dial (DID) | |
| Tie Trunk | |
| DS1 | |
| E1 | |
| ISDN-BRI | |
| ISDN-PRI | |
| ATM | |

# Attachment A

## Table 2 – Data Features

***Please indicate whether all required features are Standard (S), Optional (O), or Not Available (NA), and provide a price for all optional items.***

| Feature | | | S/O /NA | Cost |
|---|---|---|---|---|
| 1 | Administered Connections | | | |
| 2 | Alphanumeric Dialing | | | |
| 3 | Data Call Setup | | | |
| 4 | Data Hot Line | | | |
| 5 | Data-Only Off-Premises Extensions | | | |
| 6 | Data Privacy | | | |
| 7 | Data Restriction | | | |
| 8 | Default Dialing | | | |
| 9 | Digital Multiplexed Interface | | | |
| 10 | DS1 and E1 Service | | | |
| 11 | EIA Interface | | | |
| 12 | Keyboard Dialing | | | |
| 13 | Modem Pooling | | | |
| 14 | Simultaneous Voice and Data | | | |
| WideBand Switching (ITU-U and ANSI Standards) | | | | |
| 15 | H0 | | | |
| 16 | H11 | | | |
| 17 | H12 | | | |
| 18 | Nx64 | | | |

# Attachment C Question #76

## Table 1 – Station Features

***Please indicate whether all required features are Standard (S), Optional (O), or Not Available (NA), and provide a price for all optional items.***

| Feature | | | S/O/NA | Cost |
|---|---|---|---|---|
| 1 | *Abort Transfer* | | | |
| 2 | *Automatic Callback* | | | |
| 3 | *Automatic Exclusion* | | | |
| 4 | *Automatic Incoming Call Display* | | | |
| 5 | *Bridged Call Appearance – Multi-Line Station* | | | |
| 6 | *Bridged Call Appearance – Single-Line Station* | | | |
| Call Coverage | | | | |
| 7 | *Consult* | | | |
| 8 | *Coverage Callback* | | | |
| 9 | *Coverage Incoming Call Identification* | | | |
| 10 | *Go To Cover* | | | |
| 11 | *Send All Calls* | | | |
| 12 | *Time of Day* | | | |
| 13 | *Call Forwarding All Calls* | | | |
| 14 | *Call Forwarding – Busy* | | | |
| 15 | *Call Forwarding – No Answer* | | | |
| 16 | *Call Park* | | | |
| 17 | *Call Pickup* | | | |
| 18 | *Call Waiting – Termination* | | | |
| 19 | *Conference – Multi-Line Station* | | | |

# REQUEST FOR PROPOSAL

FOR

DIGITAL VOICE
RECORDING SYSTEM

FOR THE
NEW PUBLIC SAFETY COMPLEX

# DIGITAL LOGGING RECORDER PROCUREMENT SPECIFICATION

This procurement specification defines the minimum desired features for a multichannel voice-logging recorder. The equipment furnished under this specification shall be designed for continuous duty operation 24 hours per day, 365 days per year. The voice logger shall record 500 channels initially and be expandable.

## 1.0 VENDOR

1.1 All recording equipment supplied under this specification shall be completely operational when installed.

1.2 After the equipment has been accepted, the vendor must provide parts for a period of one year and must replace any parts which become broken or defective, except by reason of accident, misuse, or any casualty, during such period.

1.3 The vendor must make all necessary adjustments to this system, not required by reason of accident, misuse, or casualty, at the vendor's expense for a period of one year from the date of installation for equipment returned to the vendor's factory.

1.4 The vendor shall provide a toll-free telephone help desk available for the period of one year from the date of instruction manual.

1.5 The vendor must provide factory authorized personnel for on-site training and instruction for all operators covering all equipment supplied under this specification. Additional training at the vendor's offices shall be available at no additional cost to the purchaser for installation.

1.6 Factory authorized service engineers must be optionally available to respond for on-site service within four hours of dispatch request (24 hours per day, seven days per week).

1.7 The vendor must provide an easy-to-read comprehensive operation a period of one year from installation.

1.8 The vendor must be responsible for installation of all equipment covered by these specifications.

1.9 All equipment in this specification must be delivered and installed within 30 days after receipt of order.

1.10 The vendor must engineer, manufacture and quality test the equipment in the United States.

1.11 The vendor must provide a one-year guarantee to the purchaser.

1.12 The vendor must provide a description of its local service organization including name, address, telephone number, number of years in operation, number of year's experience working with digital recorders and number of field service personnel in the organization.

## 2.0 SYSTEM DESIGN

2.1 The system must be available with single or dual DVD (9.4 GB) in addition to one, two or more hard drives for instantaneous playback and two levels of fault tolerance.

2.2 The system must be capable of directly recording proprietary digital PBX/ACD protocols without use of any external "couplers" or any "digital to analog converters".

2.3 Each digital recording module must include its own instant playback module (hard disk) Individual workstation instant recall per seat licenses shall also be available. The instant recall playback capability can be configured to allow playback of any installed channel on the recorder. In addition the amount of time that can be playback can be configured on a per position basis.

2.4 The system must be capable of supporting multiple archive devices including multiple hard drives (volume set and RAID levels 1 & 5) and dual Magneto-Optical or DVD drives in either serial or parallel operation. Dual power supplies shall be standard.

2.5 The system must be capable of supporting twisted pair, Ethernet (thin net, 10BaseT, 100BaseT) or token ring network configurations along with protocol support for: IPX/SPX, RAS, TCP/IP, NetBEUI and Windows sockets.

2.6 The system's integral clock will keep track of the system time and date. It will also be capable of synchronizing other LAN connected recording systems' integral clocks without the need of an external time source.

2.7 The recorder operating system must be Windows NT. Existing Windows NT/95/98/2000 client workstations may be used for remote playback.

2.8 The recorder system shall provide the capability to "drag and drop" any recorded call in standard .WAV file format onto a standard floppy disk for playback on any multimedia Windows PC without the need of proprietary software. These WAV files may also be transmitted as email attachments or act as embedded documents.

2.9 The vendor shall guarantee that all parts, assemblies and components contained in the recorder are commercial-off-the-shelf (COTS) non-proprietary items manufactured by, and available from, major computer manufacturers. No vendor proprietary assemblies such as voice processing cards shall be used. To be responsive to this request the vendor must submit the manufacturer and part number of any voice processing and playback assemblies used.

## 3.0 CONTROL AND OPERATIONS

3.1 The system shall be composed of a single chassis PC recorder along with a monitor, mouse and keyboard. A separate PC workstation shall not be required. Any number of remote LAN workstations (Windows NT/95/98/2000) may be used for playback.

3.2 The single chassis PC recorder must use Windows NT version 4.0 as the native operating system.

3.3 The Windows NT recorder operating system will enable the user to view multiple deck controls at the same time.

3.4 The system must provide local recording module control through a GUI SVGA display.

3.5 The system must provide on-line help screens on the single chassis PC recorder.

3.6 The single chassis PC recorder must optionally be able to display, and search by, call records information for each call including: media type, library location, channel number, name of channel, name of users, time, date, telephone number, duration of recorded message, start and end time, key words annotation reference, ANI, Caller ID, DNIS and user specific data base fields.

3.7 The system must provide the following functions and indications by point-and-click and drop down menu actions on the SVGA monitor GUI: logon, logoff, shutdown, system configuration, help, record, playback, live monitor, eject & format tape, Magneto-Optical or DVD disk, four color channel activity monitor, channel name, free-seating agent on channel, play/monitor volume, media retention period, catalog of all recordings, search-find, restore, copy conversation to floppy disk, playback, stop, play, pause, begin, rewind, fast forward (10% incremental speed selection), end, loop, and alarms.

3.8 Systems with multiple drives must be capable of providing simultaneous or individual control of drives such that a function can be performed on one drive (e.g. formatting) without affecting the operation of the other drives.

## 4.0 SYSTEM NETWORKING CAPABILITIES

4.1 The system will be capable of supporting up to 144 analog (or 128 digital) audio channels in a single PC recorder chassis and up to 256 workstations on a single network.

4.2 If multiple digital recording modules/servers are employed in the installation, the system must be optionally capable of viewing, and retrieving from, all such recording modules in a unified manner from a single PC.

4.3 The system must optionally be capable of real time live monitoring over the LAN from any Windows NT/2000 workstation.

4.4 The system will provide the capability of centrally capturing and storing important system information for easier system-wide management. This information will include alerts, user passwords and profiles, deck status information, user access audit trail information, media library records, etc.

## 5.0 SYSTEM EXPANDABILITY

5.1 The system must be Windows NT software-based, using only non-proprietary hardware to allow for future enhancements.

5.2 The system will allow for future expandability by adding up to a total of 144 analog or 128 digital channels per chassis, multiple hard disk drives, DVD and/or Magneto-Optical disk drives, digital recording modules, workstations and other Windows NT compatible devices.

## 6.0 MEDIA STORAGE

6.1 The system will be capable of recording to removable and/or on-line storage devices including DVD, Magneto-Optical disks and hard disk arrays.

6.2 The system will be capable of providing more than 1,800 channel hours of recording on two 9.4 GB DVD-RAM removable media.

6.3 The system will be capable of recording approximately 6,000 channel hours of the most recent recordings on-line for instant access with a standard 70 GB hard drive.

6.4 The archive media must be user formatable.

6.5 The system and media will provide for overrecord and write protection such that data will not be accidentally overwritten. The user may program a protected media retention period of from 0 to 32,000 days. When such a retention period is chosen, a previously recorded media that has not yet expired cannot be formatted and reused until the expiration of the retention period.

6.6 The expected shelf life of the archivable media will be greater than or equal to 10 years under normal ambient conditions.

## 7.0 SYSTEM RECORDING CAPABILITIES

7.1 Each digital recording module must be capable of on-site expansion for recording up to 144 analog or 128 digital audio inputs

7.2 The system must be a completely integrated, stand-alone PC recorder and shall not require a separate PC workstation interface for operation.

7.3 The system must be self-protecting and not require use of a ready state to prevent accidental erasure of recorded information.

7.4 The system must display which channels are recording, which are not recording and which channels have been idle for a user settable period of time as protection against line failure.

7.5 The system must be able to simultaneously record and play back or live monitor.

7.6 The system must provide the capability to support multiple sequential deck operations to extend unattended record time.

7.7 The system must provide buffering of all audio, as it is recorded, onto a hard disk drive and then stream the buffered digitized audio onto the archive media at a user selectable period so as to maximize the useful life of the archive media drives.

7.8 The system must provide simultaneous record and playback capability from two drives.

7.9 The system must be capable of configuring one drive backup or record in parallel with another drive within the same digital recording module.

7.10 The system must be capable of recognizing record activation by VOX, remote activation, ring voltage, continuous, or as scheduled start (all on a per channel basis).

7.11 As a standard feature, the system will be capable of providing non-volatile audio buffering to protect against data loss when an archive drive is taken out of record for any reason.

7.12 The system will be capable of buffering audio for multiple decks simultaneously.

7.13 The system will be capable of automatically downloading buffered information to an archive drive(s) if such drive has been interrupted for replacement, service or off-line searching.

7.14 The system must be capable of performing automatic data transfer from the hard drive to the archive drive(s).

7.15 The system must be capable of switching back to a second drive, when capacity is reached on the first drive, or if a drive failure is detected.

7.16 An internal backup battery shall not be required to prevent recording loss in the event of a power outage.

7.17 The system must be capable of an orderly shutdown. If there is a power outage, all audio will be buffered to a non-volatile hard disk drive. Buffering audio into RAM shall not be used due to the adverse effects on archive drive.

7.18 The system must provide an automatic restart capability to return the system to its previous operating state.

7.19 The system must provide an indication of the recording space remaining on the hard disk and each archive drive.

7.20 The system must provide for an alphanumeric "Remarks" field in which the user may enter up to twenty characters as a search parameter.

7.21 The system must be capable of recognizing the write protect tab on the media. Computer program protection to prevent over-record or erasure for a user set period must be available.

7.22 The system will provide the capability to establish schedules for media protection and spoken alarms for "Disk is full" and related alarms.

7.23 The system shall allow remote monitoring and configuration from a Windows NT/2000 workstation through a LAN connection.

7.24 The system shall allow the user to configure recording specific channels to certain archive media. (e.g. channels 1, 3, 5, 7 to DVD A and channels 2, 4, 6, 8 to DVD B)

## 8.0 SYSTEM SECURITY FEATURES

8.1 The security system must provide multiple levels of security down to the channel level.

8.2 Only those functions accessible to the user, as defined by the security level, will be available to the user.

8.3 As an option, DTMF Code access may be made available to provide remote workstation playback and "record on demand" start/stop.

8.4 The system must allow authorized access of selected-recorded audio either at the recorder or by use of an optional remote client workstation.

8.5 Media recorded on any system can be replayed on any other system with proper channel playback access.

8.6 The system must record a system identifier on the media for identification and catalog searching.

8.7 The system must provide an automatic logout at a user set time (i.e. number of minutes of inactivity). The automatic logout may be overridden by a single mouse-click.

8.8 A system-wide audit trail must be provided to show all activity.

8.9 Any number of authorized remote workstations may access and play the same or different conversations simultaneously by use of an optional remote playback client.

8.10 The system must provide the capability of remote playback and file copy to floppy disk (Drag and Drop) in Microsoft standard WAV format.

8.11 Dedicated reproducer (play only) will be available as either a standalone unit or as a network workstation.

8.12 Audio files must be written to media in a secure manner.

## 9.0 DVD & MO MANAGEMENT CAPABILITIES

9.1 The system will provide for a centralized media management capability for tracking archived media.

9.2 The system's optical media management function will be capable of assigning a unique, sequential ID to each media for tracking.

9.3 The system's media management function will allow appending of alphanumeric comments to each recording as desired by the user.

9.4 The system's archive media management function shall allow the user to select from several optional media such as: Magneto-Optical disk or DVD; RAID level 5 up to 200+ GB of storage along with other Windows NT supported archive and backup systems.

9.5 The system's media management function shall enable the user to define a threshold age such that the media older than the threshold date can be flagged to facilitate recycling of media.

9.6 The system's media management function will enable media library records to be stored on-line or off-line.

9.7 The system will allow the user to search for a specific media in a catalog using any one, or more, of the following criteria: channel, date, time, duration, ANI, Caller ID, alphanumeric comments or reference and user specific database fields. Optionally available search criteria include SMDR applicable data and switching domain events with full CTI enablement.

9.8 The media library will be password protected.

## 10.0 SYSTEM SEARCH CAPABILITIES

10.1 The system must be capable of searching for audio recorded to an archive or on-line media. (I.e. Magneto-Optical, DVD; RAID or HDD.)

10.2 Search may be made by multiple, user-selectable "views" or "keys" in standard database format. Such database shall be ODBC.

10.3 The audio playback of the object of a search shall be in industry standard WAV file format. WAV audio playback can be delivered to a multimedia equipped compatible workstation over the LAN or optionally, the audio can be ported to any telephone number over PSTN. Playback audio will also be available by DTMF remote access as an option.

10.4 The system must provide for the customized naming of channels without the need of a PC workstation. Channel names will be recorded to the media to facilitate searching.

10.5 The system must be capable of searching to and playing back from the time input by the user.

10.6 The system must be capable of searching for messages by dialed digits outbound (DTMF).

10.7 The system must be capable of incremental fast forward and rewind in 10% increments.

10.8 The system must provide the capability of skipping to the next or the previous chronological message for precision search and playback.

10.9 The system must provide the capability of searching by time/date or call and call duration. Duration searches must allow the user to search for calls "less than" or "greater than" a specified length of time.

10.10 The system will provide the capability for a user to tag a call and later use the tag as search criteria.

10.11 The system will provide the capability for the user to enter additional alphanumeric information or notes using a built-in utility, without the need for a separate word processing application.

10.12 The system will provide the capability for the user to locate and display calls on the media based on recorded DTMF codes within calls.

10.13 Search capabilities must be password protected.

## 11.0 SYSTEM DIAGNOSTIC/ALERT CAPABILITIES

11.1 The system must provide bootup system test and ongoing self-checking tests.

11.2 The system must provide an error log to keep track of alerts, error messages and conditions.

11.3 The system must be capable of on-line remote diagnostics.

11.4 The system must provide for channel inactivity alert that will notify the user if a particular channel is inactive (not reporting audio) for a certain period of time.

11.5 A remote response alert from the voice recording system is mandatory. The system must have the capability of alerting a user of a total system failure i.e. if the recording systems NT software locks-up the voice recorder software or if the hard drive fails or the power supply fails, this would initiate an alarm to a remote PC, with the appropriate software loaded on it, that there is no response from the voice recorder.

## 12.0 PHYSICAL CHARACTERISTICS

12.1 The digital recording module will be suitable for desktop, tower or rack mount configuration.

12.2 The digital recording module shall be self-contained and shall not require a PC Workstation for operation or monitoring.

12.3 Remote playback can be enabled on any Windows NT/95/98/2000 workstation on a network or with a null modem cable.

## 13.0 ELECTRONICS

13.1 The channel capacity within a single chassis shall be from 4 to 144 channels for analog inputs and from 24 to 144 for T1/ISDN.

13.2 The frequency shall be 300 to 3400 Hz +/- 0.5 dB.

13.3 The signal to noise ratio shall be greater than 40 dB at 64 Kbps.

13.4 The AGC must be fast attack and slow release.

13.5 The digital recording module operating system must be Windows NT (OS2 Warp based systems are not allowed, as it is no longer supported by IBM, DOS is also not acceptable).

13.6 The system shall support the following network protocols: TCP/IP, IPS/SPX, NetBEUI, RAS and Windows Sockets.

13.7 The digital recording module processor shall be Pentium III 800Mhz or better.

## 14.0 DIMENSIONS, POWER AND ENVIRONMENT

14.1 Dimensions shall be those for a standard PC package, typically 19"W x 20"D x 7"H.

14.2 Weight of the recorder module shall not exceed 50 pounds.

14.3 Power requirements shall be 250/350W, 90-132/180-250 VAC

14.4 Operating temperature shall be 0 to 35 degrees C.

14.5 Humidity shall be 10% to 85%, non-condensing @ 40 degree C.

## 15.0 OPTIONS AND ACCESSORIES

15.1 Dual hard disk drives for storage shall be 70 GB.

15.2 Fault tolerance methods available shall include RAID Level 1 (disk mirroring and duplexing) and RAID Level 5 (data striping with parity).

15.3 Remote Playback and Instant Recall software modules shall be available on a per seat license basis.

15.4 CTI connectivity and SMDR integration for standard PBX and ACD systems shall be available.

15.5 External time synchronization shall be available.

15.6 Remote live monitoring shall be available.

15.7 Channel upgrade kits shall be available for on site expansion up to a maximum of 144 analog channels per chassis.

15.8 Multi-channel (4, 8 or 16) simultaneous playback with silence insertion and talking clock shall be available remotely on a LAN workstation.

15.9 ANI/ALI capture and collection from PSAP controller to be inserted into data fields for search criteria.

# Digital Recording Technical Specifications

This specification covers an advanced digital recording system designed to provide recording of (xx) channels. The equipment furnished under this specification must be designed for continuous duty operation (e.g., 24 hours per day, 365 days per year).

## 1 BASIC PURPOSE

1.1 This specification covers an 8 to 128 channel digital recording module that records all in-coming messages onto Digital Audio Tapes or (DAT) or DVD. This shall be the primary role of the recording module.

1.2 The recorder shall be a message-based system, recording only when there are valid messages to be recorded.

1.3 The recorder shall allow instant access from the hard drive to recently recorded messages. Recorders that do not provide instant recall as a standard configuration will not be considered.

1.4 Search and replay shall be available at the front panel of the recording module. In addition, the recorder module must support multiple search and replay users via remote workstations. It shall be possible to connect multiple remote workstations to each recorder module.

1.5 The recording module shall not require any external monitor, keyboard or mouse. It shall be possible to connect a PC for remote control as an option, or connect the module to any workstation on the local area network (LAN).

1.6 Each recording module shall support a minimum of 2 archive drives.

1.7 It shall be possible to connect together multiple recording modules into a single networked recording system.

1.8 Recorder must interface to incoming 911 telephone traffic and radio channels.

## 2 SYSTEM LAYOUT

2.1 The recording module shall be completely self-contained, requiring no external equipment.

2.2 The recording module shall support a minimum of 2 archive drives and a hard disc for instant recall.

2.3 The recording module shall support a minimum of 2 autoloaders within the chassis to provide on-line access of up to 19,800 channel hours of messages.

2.4 The system will be designed to allow future advances in archive technology to be incorporated without chassis modification.

2.5 The recording module shall contain a display and controls to provide system configuration, search and replay functions. There will be dedicated replay control buttons to allow control of the message during replay.

2.6 The recording module shall contain all line interfacing whether the source to be recorded is analog or digital. Line cards to support either analog or digital line interfaces must be capable of being housed in the same physical module. Recorders that require externally mounted interfacing will not be considered.

2.7 The recording module shall contain a built-in loudspeaker, headphone socket and dubbing output socket as standard.

2.8 The recording module shall contain a security device such as a programmable key that does not require additional PIN number or password entry.

2.9 The recording module shall contain independent record status indicators for each of the archive drives.

2.10 Access to the archive drives shall be simple, not requiring any doors or flaps to be opened.

2.11 Outputs to external loudspeakers shall be available at the rear of the recorder module. At least four line outputs will be available as standard.

## 3 RECORDING INPUTS

### 3.1 General

3.1.1 Each recorder module shall contain approved interfaces for connection to telephone networks. These interfaces must cover all analog and digital telephony standards.

3.1.2 Each recorder module shall be configurable to record between 8 and 128 channels.

3.1.3 It shall be possible to add channels to recorder modules with less than 96 channels. Upgrades shall be available in 8 or 16 channel increments.

3.1.4 It shall be possible to tag each channel with a user-defined name as well as its number.

### 3.2 Automatic Gain Control

3.2.1 Messages shall be recorded at their true input levels. AGC shall not be applied during the record process.

3.2.2 AGC shall be available for replay only. It shall be possible to enable or disable AGC on replay.

3.2.3 The replay AGC shall have an attack time of 20 milliseconds and a release time of 1 second.

### 3.3 Analog Inputs

3.3.1 The analog signal cards shall have the following specification:-

3.3.2 The input impedance of the recorder inputs shall be greater than 50kohm as standard (over the range 300 to 3400 Hz).

3.3.3 Each recording channel shall be capable of operating with audio signals in the range -35 dBV to +15 dBV.

3.3.4 Audio files must be encrypted.

3.3.5 Each recording channel shall be capable of recording signals in the range 300Hz to 3400Hz.

3.3.6 The signal-to-noise ratio of each recording channel shall be better than 50dB.

3.3.7 The crosstalk between channels shall not be more than 50dB.

3.3.8 The distortion of each recording channel shall be less than 3% for a 1 kHz sine wave at 0 dBm.

3.3.9 The input isolation of each recording channel shall be > 3.5 kV rms 50Hz Common Mode, 250 V rms 50 – 60 Hz Differential.

3.3.10 It shall be possible to set the hook detect voltage per channel in the range 1 to 72 volts. Systems that have a single setting for multiple numbers of channels will not be accepted.

3.3.11 It shall be possible to configure the recording inputs with optional warning tone. The System Manager must be able to enable or disable the warn tone per channel.

**3.4 Digital Inputs**

3.4.1 The recorder module must be capable of supporting interfaces to digital telephone systems. The vendor shall detail the available interfaces that must include as a minimum:- T1, ISDN Primary Rate, ISDN Basic Rate and PCM30. Details of interfaces to proprietary signaling shall also be provided.

**3.4.2 Record Triggers**

3.4.3 When recording analog telephone lines, the following record triggers shall be available: off-hook, voice activation, DTMF detection, CLI detection, ring tone detection, contact closure, continuous, fax detection.

3.4.4 When recording ISDN inputs, the recorder shall trigger either from voice activation or call detection as determined by the ISDN signaling.

3.4.5 It shall be possible to configure the record trigger for each channel separately.

**3.4.6 Voice Activation**

3.4.7 Inputs shall be buffered such that no activity is lost due to voice activity delay time.

3.4.8 The activity hold time shall be adjustable over the range 1 to 14 seconds.

3.4.9 The activity threshold shall be configurable over the range –67 to –23 dBm (configurable per channel).

### 3.5 Analog Signaling

3.5.1 Dialed Digits – the recorder module shall decode all dialed digits (DTMF or LD) during a message. The digits will be stored with the audio message.

3.5.2 Calling Number – the recorder shall decode CLI information that meets the following specifications BT SIN227 or Bellcore Technical Reference TR-TSY-000031.

## 4 VOICE PROCESSING

4.1 Messages in the form of analog audio input signals shall be converted to digital data, compressed and stored on disc. Speech shall be digitized to 64kbit/sec and then compressed.

4.2 Digital input signals, such as ISDN Primary Rate, ISDN Basic Rate, PCM30, etc., shall be converted to discrete 64kbit/sec audio signals and then compressed.

4.3 The type of compression used shall be selectable from:

GSM at 13.2kbit/sec

Or ADPCM at 16kbit/sec

Or ADPCM at 32kbit/sec

4.4 It shall be possible for the System Manager to select which compression algorithm is to be used per recording module.

## 5 OPERATION

### 5.1 System Software Updates

5.1.1 It shall be possible to update the system software via the archive media; i.e., DAT DDS-3 or DVD.

### 5.2 Timer Control

5.2.1 It shall be possible to configure the recorder with an operation timer ensuring that recording takes place only between specified times. It shall be possible to define two start times and two stop times for each day of the week.

5.2.2 It shall be possible to program the recorder to inhibit recording on specified holidays. It shall be possible to program up to 25 dates on which recording will not take place.

### 5.3 Timecode

5.3.1 The recorder shall contain an internal timecode generator accurate to within +/-25 seconds per week.

5.3.2 The system will provide an automatic daylight saving adjustment that can be configured by the operator in 1-minute increments from –30 to +150 minutes.

5.3.3 It shall be possible to synchronize the internal timecode to an external source which may be IRIG B, IRIG E 100Hz, IRIG E 1kHz, or alternatively from an off-air timecode receiver tuned in to MSF (UK), or DCF77 (Germany). It shall also be possible to synchronize to timecode presented on the network connection or on the RS232 serial connection. The NENA time standard shall be supported on the serial connection.

5.3.4 It shall be possible to output timecode in IRIG B or IRIG E format. During replay this shall be the timecode read from the current replay message.

5.3.5 The recorder shall include a spoken time option as standard, which provides a simulated voice reading the off-tape time during replay.

### 5.4 Languages

5.4.1 The operator's manual and screen displays shall be available in English/German/French/ Italian/Spanish/Norwegian/Dutch.

### 5.5 Diagnostics

5.5.1 The recorder module shall include built-in tests that automatically monitor the status of the equipment, initiating audible and visual alarms in the event of a failure. When the audible alarm is silenced a visual indication shall remain.

5.5.2 All alarms and warning messages will be recorded in the audit log that may be viewed by operators with adequate security rights. The audit log shall contain the time and date of the alarm, and a message describing the cause of the alarm.

5.5.3 The recorder module shall provide external contacts to drive an optional remote alarm unit. Two levels of alarm shall be supported: Level 1 – Warning, Level 2 – Alarm.

## 6 INSTANT RECALL BUFFER

6.1 Each recording module shall be able to store a minimum of 1200 or up to 2400 channel hours of communications available for instant access.

6.2 Messages stored on the instant recall buffer (hard disc) shall automatically be copied to the archive media unless the archiving is disabled.

6.3 The archive media will not be continuously written to, thereby reducing drive wear.

6.4 In the event that the instant recall buffer is approaching 100% full of unarchived data and there is no archive available, the recording module shall initiate an alarm warning that data will be lost if a new archive is not enabled.

6.5 It shall be possible to set the level at which a tape low waming is generated.

6.6 It shall not be possible to delete messages from the instant recall buffer, other than by trained service staff.

6.7 An area of the hard disc shall be reserved as a semi-permanent area (Clipboard) where messages will not be over-written.

6.8 The operator shall be able to select a message either on the instant recall buffer or one of the archive media and copy it to this reserved area of disc.

6.9 Once in the reserved area, messages will only be deleted if selected for deletion by the operator.

6.10 Messages in the reserved area may be replayed or dubbed onto compact cassette by operators with suitable security access.

6.11 It shall be possible to copy messages from the reserved area to an archive media.

**7 ARCHIVE**

7.1 The recorder module shall be able to support single or dual archive decks. In dual deck mode it shall be possible to operate the decks in independent, sequential or parallel mode. It shall also be possible to put the decks into autocycle mode.

7.2 In sequential mode, one deck will be in record while the other is in standby. The second deck starts recording only if the first deck fails or if the tape becomes full on the first deck.

7.3 In parallel mode, both decks will be recording at the same time.

7.4 User must have the option of central or local archiving. Systems that do not provide local archive function will not be considered.

**7.5 Archive Type**

7.5.1 It shall be possible to configure the recording module to use one of the following archive types:

DAT DDS-3
DVD RAM

7.5.2 For either DDS-3 or DVD RAM archive, the recording module shall support up to 128 recording channels in the same physical module.

**7.6 Archive Capacity**

7.6.1 Each DDS-3 (125m) tape shall be capable of recording at least 240,000 messages and a total of 1980 channel hours, while maintaining a replay quality at least equivalent to that available with ADPCM compression at 24kbit/sec.

7.6.2 Each DVD RAM disk shall be capable of recording at least 94,000 messages and a total of 775 channel hours per side while maintaining a replay quality at least equivalent to that available with ADPCM compression at 24kbit/sec.

**7.7 Archive Database**

7.7.1 The database of messages shall be written both at the beginning of each archive tape and interleaved throughout the length of the tape. Tapes must not be forced to re-format upon each recorded message.

7.7.2 The recorder module shall be capable of recreating the database should any part of the tape become damaged.

**7.8 Archive Control**

7.8.1 It shall be possible to configure the recording module to allow an operator to insert a new tape, which is automatically used for archive without any further operator intervention.

7.8.2 The operator will not have to format the DAT tapes or DVD RAM disks before use.

**7.9 Archive Protection**

7.9.1 It shall be possible to configure the recording module to prevent recording over pre-recorded tapes.

7.9.2 It shall be possible to configure the recording module to record over pre-recorded tapes after first warning the operator that existing data will be lost and upon receipt of an acknowledgement from the operator.

7.9.3 It shall be possible to configure the recording module to record over pre-recorded tapes only when the information on the tapes has reached a predetermined age. The System Manager shall be able to configure the predetermined age in steps of one week.

7.9.4 When removing a newly recorded archive, it shall be possible to print a label on an optional label printer. The label shall contain the start and stop date for that archive.

**7.10 Archive Operation**

7.10.1 All messages will be buffered before being archived onto removable media. Recorders that cannot buffer for 20 channel minutes before writing to the archive decks will not be considered.

**7.11 Extended Archive**

7.11.1 The recorder shall provide an optional extended archive facility capable of archiving to 19,800 channel hours onto removable media.

7.11.2 The extended archive unit shall be capable of operating in auto-cycle mode to facilitate maximum on-line archive with minimal operator intervention.

**7.12 Selective Archive**

7.12.1 It shall be possible to configure the recorder to archive selected channels to specified archive decks.

## 8 LOCAL CONTROL

8.1 Each recording module shall be capable of being operated as a standalone device using front panel controls.

### 8.2 Full Graphical Display

8.2.1 The front panel controls shall utilize a display that is a full graphical Electroluminescent display.

8.2.2 The full graphical display shall provide all record, replay and configuration alarms, messages and instructions.

8.2.3 The full graphical display shall provide complete control of the recording module in conjunction with soft keys, a rotary selector, cursor keys, accept/reject keys and tape motion keys. Recorders that require a full QWERTY keyboard will not be considered.

8.2.4 The default screen on the full graphical display shall indicate the real time and date, the status of the archive drives, the percentage used on each archive tape and the instant recall buffer.

8.2.5 When a used archive tape or disk is pushed into an archive deck, the display shall automatically indicate the status of the inserted tape, indicating the first and last messages it contains. The operator shall be offered the actions available for that tape.

## 9 SEARCH AND REPLAY

9.1 It shall be possible to replay the last message on the selected channel without first requiring a message search.

9.2 The user shall describe the available search parameters for the available control options

9.3 It shall be possible to record on all channels during replay. The replay operation shall not effect the record performance.

9.4 The vendor shall describe the replay controls using the recorder module controls, and the replay controls using the remote workstation controls.

9.5 It shall be possible to search and replay messages via a telephone using DTMF tones (commonly known as Dial In or Dial Up Replay).

9.6 It shall be possible to replay up to four synchronized channels.

9.7 The vendor will offer the capability of tagging both the ANI and ALI information directly to the recorded message via automatic annotation.

## 10 REMOTE CONTROL

10.1 It shall be possible to remotely control each recording module.

10.2 Each recorder module shall support at least 4 remote control positions simultaneously.

10.3 The remote control devices shall connect to the recording system either via an Ethernet TCP/IP connection or Token Ring connection. There will also be an optional remote control package for connection via RS232.

10.4 A remote control software package shall be available to run on an IBM PC under Windows 98, Windows 95 or Windows NT.

10.5 Access to the recorder system via the remote control software shall be account name and password protected.

## 11 SECURITY

11.1 It shall be possible to set up unique security accounts allowing operators to access only specified channels with only specified functionality.

11.2 It shall be possible for users to log in at the recorder module using a programmable key.

11.3 It shall be possible to prevent unauthorized users from ejecting tapes from the recorder module.

11.4 It shall be possible to prevent unauthorized users from replaying tapes.

11.5 Each recorder module shall support up to 50 user accounts.

11.6 It shall be possible for users to log in using password entry at remote PC positions.

## 12 ELECTRICAL REQUIREMENTS

12.1 Each recorder module shall require a single ac supply of either 90 to 132V or 180 to 264V at 47 to 63Hz, switchable.

12.2 The power consumption of each recorder module shall not exceed 150 W.

12.3 The recorder module must support a power supply that allows a failed unit to be exchanged without compromising the recorder performance. The recorder must continue to operate fully with one failed power supply module within the unit.

## 13 ENVIRONMENT

13.1 The operating temperature of the recorder will be in the range 41 to 104 degrees F

13.2 The storage temperature of the recorder will be in the range -4 to 140 degrees F.

13.3 The operating humidity of the recorder shall be in the range 20% to 80% relative humidity, non-condensing.

13.4 The storage humidity of the recorder shall be in the range 5% to 80% relative humidity, non-condensing.

## 14 APPROVALS

14.1 The recorder shall meet electrical safety approval EN60950.

14.2 The recorder shall meet EN55022 Class A/FCC 15 Class A for EMC emissions.

14.3 The recorder shall be approved for connection to the local telephone network and approvals shall include the following: FCC15, FCC68, UL, DOC, and BABT.

14.4 The designer and manufacturer of the recorder must be ISO9001 certified. Copy of certificate to be included with bid.

## 15 PHYSICAL

15.1 Each recorder module shall be suitable for desktop operation, or for installation into an equipment cabinet.

15.2 Each recorder module shall not occupy more than 6U of rack height.

## 16 REDUNDANCY

16.1 The vendor shall detail the available options to provide redundancy for each recorder module.

16.2 It shall be possible to back-up a number of recorder modules with a single hot-standby recorder module, which automatically takes over recording in the event of a failure.

16.3 It shall be possible to provide 100% redundancy with no loss of messages.

## 17 OPTIONAL SOFTWARE SOLUTIONS

### 17.1 Last Message Replay

17.1.1 The system must allow a user to be able to replay a message from a remote PC Workstation via the network with a single click of a mouse button.

17.1.2 For maximum replay efficiency, the message shall automatically play without any additional action from the operator. All normal play controls (skip forward, skip backward, pause, stop) shall be available to allow the operator to have control of the replayed message.

17.1.3 No additional hardware shall be required within the recorder mainframe.

17.1.4 During replay of the last message, it must be possible to select a passage within the message using markers and to have that passage automatically loop back and repeat the passage. This aids the operator in their ability to check specific details within the message.

17.1.5 It must be possible to change the rate of replay from half speed to double speed to assist in clarification of the message. Looped sections must also be able to have the replay rate changed. The pitch shall be corrected for any time that the rate is changed.

17.1.6 Up to 3 channels can be configured for the replay of last messages for each dispatcher application.

17.1.7 It shall be possible to configure the application so that configuration can not be changed thereby fixing the channels upon which the last message search can be performed.

17.1.8 It shall be possible to determine the time frame over which the search will be performed in number of minutes, hours or days.

17.1.9 A list of messages will be displayed. It must be possible to pick any message within the list and have the application automatically start playing that message. In this way it will be possible for the operator to quickly select a message that may be older than the most recent (last) message on the particular channel.

17.1.10 The system must be able to replay up to 3 different channels over the last x amount of minutes.

**17.2 PC Reproducer**

17.2.1 The proposed solution must allow for playback of archived messages from a replay station that does not interact with the main recording system. It shall allow multiple users to access the replay station over a LAN/WAN connection running TCP/IP.

17.2.2 The replay application must give the user full replay controls (play, pause, stop, skip forward, skip backwards, jump to next/previous message and replay rate control). The skip forwards/backwards period must be configurable between 1 and 60 seconds.

17.2.3 The replay position must be shown indication the current position within the message. It must be possible to select a passage for loop playback.

17.2.4 A call list must be available allowing a user to pick any message from the list. The list will be compiled from the messages that have met the search criteria that were entered into the search fields.

17.2.5 The replay application will be account name and password protected. It must be possible to set up accounts so that user only has access to specific channels.

17.2.6 The replay workstation will replay messages from the archived media (DDS-3 tape or DVD).

17.2.7 The replay application must automatically log out after a pre-determined period of inactivity.

17.2.8 The application will allow a user to save frequently used search criteria as a favorite search so that frequently used searches can be quickly and easily carried out.

17.2.9 It must be possible to save messages to the local workstation as wav files.

**17.3 ANI/ALI**

17.3.1 The recorder system must be able to attach ANI and ALI information from the serial port of the CAD system to the call record.

17.3.2 As a minimum, the number of characters it is possible to tag a call with must be 50.

17.3.3 The tagged ANI/ALI data must not be part of the channel name, i.e. the ANI/ALI information must be available in addition to the channel name.

17.3.4 It must be possible to search for messages within the recorder system using the tagged ANI/ALI data as the search criteria.

17.3.5 The system must support wild card searches so that a message can be quickly found even if only part of the information is known.

**17.4 Annotator**

17.4.1 Agent must have the ability to annotate messages.

17.4.2 Agent must be able to type up to 30 characters in the annotation field.

17.4.3 Agent must have ability to verify annotation.

17.4.4 Agent must have the ability to build and select from a list of pre-programmed phrases.

17.4.5 The annotation must be performed within four minutes.

Honorable Vincent A. Cianci, Jr., Chairman
Board of Contract and Supply
City Hall, Room 311
Providence, R. I. 02903

CITY OF PROVIDENCE
STATE OF RHODE ISLAND

# BIDDER'S BLANK

| | |
|---|---|
| Name of Company: | |
| agrees to bid on:<br>Item(s) to be bid | |
| Date of Award: | |
| Total Amount in Writing: | |
| Total Amount in Figures: | |

Additional Bidding Details
Use Additional Pages if Necessary

| | |
|---|---|
| Federal ID# or Social Security #: | |
| Signature: | |
| Title of Person Signing: | |
| Firm Name: | |
| Address: | |
| Phone #: | |
| Delivery Date: | |
| Name of Surety Company: | |

verizon

**Verizon**
Large Business Sales North
234 Washington St. Floor 8
Providence, RI

**From : Gloria Maione** **401 455-4597** **Fax 401-455-4548**

E-mail: gloria.f.maione@verizon.com

DATE:

**Please deliver to:** Lori
Dept. of Public Properties
FAX: 273-2114

**Message:** Lori, I am requesting an extension on the RFP to "Furnish and Install Telephone and Data Equipment and Cable for the New Police + Fire Complex". I just received addendum six and due to the answers, new pricing must be calculated based on some of the answers. It would be helpful to extend one last time to be able to respond accurately.

Thanks,
Gloria Maione

# CITY OF PROVIDENCE

## STATE OF RHODE ISLAND

## Board of Contract and Supply

## Terms and Requirements for Bidding

| | |
|---|---|
| **Item Description:** | Furnish and Install Telephone and Data Equipment and Cable for the New Police & Fire ~~Complex~~ |
| **Date and Time to be Opened:** | August 27, 2001 @ 2:15PM |

Bids may be submitted up to **2:15 P.M**. on the above meeting date at the **DEPARTMENT OF THE CITY CLERK, Room 311, City Hall.** At 2:15 P.M., all bids will be publicly opened and read at the Board of Contract Meeting, City Council Chambers, third floor, City Hall.

## INSTRUCTIONS

1. Vendors must submit sealed bids in the bid envelope provided (or in an envelope clearly labeled with the above captioned item or work). The bid envelope and information relative to the bid must be addressed to the Board of Contract and Supply, Department of the City Clerk, City Hall, Providence, RI 02903. Communications to the Board of Contract and Supply that are not competitive sealed bids (i.e. product information/samples) should have **"NOT A BID"** written on the envelope or wrapper.

2. Bids must meet the attached specifications. Any exceptions or modifications must be noted and fully explained.

3. Bidder's responses must be in ink or typewritten, and all blanks on the bid form should be completed.

4. The price or prices proposed should be stated both in **WRITING** and in **FIGURES,** and any proposal not so stated may be rejected.

5. Bids **SHOULD BE TOTALED.** Do not group items: price each item individually. Awards may be made on the basis of ***total bid*** or by ***individual items***

6. Each bidder is required to state in his proposal his full name and place of residence; and must state the names of all persons or firms with whom he is submitting a joint bid. All bids **SHOULD BE SIGNED IN INK.**

# RFP

## TELEPHONE & DATA EQUIPMENT

## AND CABLE PROPOSAL

## FOR THE NEW

## FIRE AND POLICE COMPLEX

# CITY OF PROVIDENCE

**STATE OF RHODE ISLAND**

**Board of Contract and Supply**

## CONSTRUCTION AND SERVICE BID TERMS

1. The Board of Contract and Supply will not consider any bid unless it is accompanied by a CERTIFIED CHECK for $ n/a to be deposited with the City Clerk as a guarantee that the Contract will be signed and delivered by the bidder; OR

2. The Board of Contract and Supply will not consider any bid not accompanied by a bid bond in the amount of 5% per centum (%) of the proposed total price, to be deposited with the City Clerk as a guarantee that the contract will be signed and delivered by the bidder; and in default thereof, the amount of such check or bid bond shall be retained for the use of the City as liquidated damages on account of such default.

3. A performance and payment bond with a satisfactory surety company will be posted by the successful bidder in a sum equal to one hundred per centum (100%) of the amount of the awarded contract. **Required ☒ Not Required ☐**

4. It is hereby mutually understood and agreed that no payment for extra work shall or will be claimed or made unless ordered in writing by the Board of Contract and Supply.

5. Awards will be made within sixty (60) days of bid opening. All bid prices will be considered firm, unless qualified otherwise. Requests for price increases will not be honored.

6. Failure to deliver within the time quoted or failure to meet specifications may result in default action in accordance with the general specifications. It is agreed that deliveries and/or completion are subject to strikes, lockouts, accidents and Acts of God.

7. Only one shipping charge will be applied in the event of partial deliveries for blanket or term contacts.

8. The successful bidder shall, prior to commencing performance under the contract, attach and submit evidence that they have complied with the provisions of the Rhode Island Worker's Compensation Act Title 28, Chapter 29, Section 1, et seq. (R. I. G. L.). If the successful bidder is exempt from compliance under the Worker's Compensation Act, an officer of the successful bidder shall so state by way of sworn Affidavit which shall accompany the signed contract.

9. The successful bidder shall prior to commencing performance under the contract attach and submit a certificate of insurance, in a form and in the amount satisfactory to the City by which the successful bidder will indemnify and hold harmless the City during the term of the contract from and against all loss or damages arising from the performance under the contract including all claims for personal injury or damages to property sustained by third persons, or their agents, servants and/or those claimed under them.

# CITY OF PROVIDENCE

STATE OF RHODE ISLAND

## Board of Contract and Supply

## NOTICE TO VENDORS

1. The Board of Contract and Supply will make the award to the lowest responsible bidder who submits bid.
2. No proposal will be accepted if made in collusion with any other bidder.
3. A bidder who is an out-of-state corporation shall qualify or register to transact business in this State, in accordance with R.I. General Laws (as amended), Sections 7-1.1-99, 7-1.1-105, 7-1.1-106.
4. The Board of Contract and Supply reserves the right to reject any and all bid(s).
5. In determining the lowest responsible bidder, cash discounts for payment less than thirty (30) days will not be considered.
6. Where prices are the same, the Board of Contract and Supply reserves the right to award to one bidder, or to split the award.
7. Competitive prices may be obtained by all bidders attending formal bid opening. After a reasonable lapse of time, tabulation bids may be seen by applying in person at the Department of the City Clerk, City Hall, Providence. Telephone or written requests for the above will not be honored.
8. As the City of Providence is exempt from the payment of Federal Excise Taxes and Rhode Island Sales Tax, prices quoted are not to include these taxes.
9. In case of error in the extension of prices quoted, the unit price will govern.
10. The contractor will not be permitted to either assign or underlet the contract, nor assign either legally or equitably any moneys hereunder, or its claim thereto without the previous written consent of the City Purchasing Director.
11. Delivery dates must be shown in your bid. If no delivery date is specified, it will be assumed that an immediate delivery from stock will be made.
12. A certificate of insurance may be required of a successful vendor.
13. Bids may be submitted on an "equal" in quality basis. We reserve the right to decide equality. Bidders must indicate brand or the make being offered and submit detailed specifications if other than brand requested.
14. For contracts involving construction, alteration and/or repair work, the provisions of State Labor Laws concerning payment of prevailing wage rates apply. (See R.I. General Laws Sec. 37-13-1 et seq., as amended).
15. No goods should be delivered or work started without a Purchase Order.
16. Please submit one original and three copies of your bid to the City Clerk.

# A. Vendor Qualifications

## 1.0 Company History

*The vendor must provide a brief description of its company.*

**1.2** *The vendor must provide a description of its experience in providing communications systems.*

**1.3** *The vendor must provide evidence of financial stability with either an annual report, 10K, or audited financial statement.*

**1.4** *Who is the manufacturer of the proposed system?*

**1.5** *Describe your service options.*

**1.6** *The vendor must have a service center within 50 miles of City of Providence Police and Fire Departments.*

**1.7** *The vendor must have a technical support center that provides remote maintenance.*

**1.8** *Describe the types of maintenance performed by this service center.*

**1.9** *What other types of customer support is available from the technical support center?*

**1.10** *The vendor must have provisions to provide emergency service.*

**1.11** *The vendor must submit at least five reference customers with systems similar to the one proposed to City of Providence Police and Fire Departments. Reference information must include company name, contact, telephone number, and the system name with model number.*

**1.12** *Describe the migration of the proposed product for the next 10 years.*

**1.13** *Who will be responsible for implementing the proposed system?*

**1.14** *Describe the qualifications of your service technicians to install and maintain the proposed system.*

# B. Communications System Requirements

*This section specifies those requirements the proposed communications system must provide.*

## 1.0 System Overview

The Providence Fire and Police Complex will install a communication system that will encompass the three floors of the building. This switch will have duplicate common control for total redundancy within the complex. Also, there will be a duplicate switch that mirrors a portion of the new Fire and Police Complex. This duplicate switch will be located at one communication place which will house the two attendant consoles, the 15 emergency answering positions. These positions will be mirrored at the new Fire and Police Complex.

*Provide a brief description of your proposed solution to meet the current and future requirements of City of Providence Police and Fire Departments.*

## 2.0 Technical Requirements

### 2.1 System Architecture

*The proposed communications system must be a digital switching system capable of integrated voice and data communications. It must have stored program control, self-diagnostic routines, modular design, and optional duplication of critical subsystems. It must be registered for compliance with FCC Part 68 Rules for Registration and must be in compliance with Part 15, Subpart J of the FCC rules relating to electromagnetic interference (EMI).*

2.1.1 *Provide the following information on the proposed switching system:*

2.1.2 *Briefly describe the system architecture.*

2.1.2.1 *The system must use 8-bit Pulse Code Modulation (PCM).*

2.1.2.2 *Port carriers must be "Universal" and support any type of port circuit packs.*

2.1.2.3 *State the maximum number of ports on each of the following types of circuit packs.*

2.1.3 *Briefly describe the system's central processor.*

2.1.4 *Briefly describe the system's switching bus.*

2.1.4.1 *Is redundancy of the switching bus available?*

2.1.4.2 *Describe the traffic handling capacity and any limitations of the system's switching bus.*

2.1.5 *Do all ports within a cabinet have access to all time slots within the cabinet?*

2.1.6 *How many time slots are required for a two-party intra-node/module call?*

2.1.7 *How many time slots are required for a two-party inter-node/module call?*

2.1.8 *What is the standard blocking ratio of the proposed system?*

2.1.9 *Can the system be configured for non-blocking operation? If yes, provide the vendor's definition of "non-blocking."*

2.1.9.1 *What is the maximum number of ports per node/module that can be supported in a non-blocking configuration?*

2.1.9.2 *What is the maximum number of ports per system that can be supported in a non-blocking configuration?*

2.1.10 *Explain how the system grows and expansion is accomplished, and whether additions are disruptive to the ongoing system operation.*

2.1.10.1 *Does the system support remote modules? If yes, describe.*

2.1.10.2 *Is load balancing required with growth and expansion? If yes, describe.*

2.1.11 *Describe the main memory; identify type and size.*

2.1.11.1 *Is system memory redundancy available? If yes, describe.*

2.1.11.2 *What type of error detection/correction is utilized by the system memory?*

## 2.2 System and Traffic Capacities

2.2.1 *State the maximum number of trunks and stations that the system will support without requiring main processor upgrade or change out.*

2.2.2 *State the Busy Hour Call Completion and Busy Hour Call Attempts capacity of the proposed system. Define "Call Completion" and "Call Attempt."*

*2.2.3 Does a data call require more processor overhead than a voice call? If yes, explain.*

*2.2.4 Does a data call require more system resources than a voice call requires?*

*2.2.5 The system must be configured to provide a grade of service of P.002 for the "Wired-For" requirements.*

## 2.3 System Redundancy and Reliability

*Design the proposed system with no duplication, but provide pricing options for all levels of redundancy.*

*2.3.1 The system should provide a minimum availability of 99.9%, with the capability of increasing the availability to 99.99% and 99.999% as an option. Describe how this is achieved and any assumptions made.*

*2.3.2 Describe all duplication options available with the system.*

*2.3.3 When the main processor is duplicated, each one must be capable of individually handling the total system traffic load without degradation in service.*

*2.3.4 When the main processor is duplicated, it must operate in a hot standby mode. All memory and databases must be resident in both units.*

*2.3.4.1 How is the memory of the off-line processor kept up to date with the memory of the on-line processor?*

*2.3.5 When the main processor is duplicated, the system must be able to switch from one to the other on a scheduled or emergency basis without adversely affecting any switch operations, including established calls. The switchover must be automatic, without human intervention, and without the need to reload memory. Describe.*

*2.3.6 Is there a single point of failure in the proposed system? If yes, describe.*

*2.3.6.1 Does duplication eliminate this single point of failure in the system? If yes, describe.*

*2.3.7 If a node/module fails, what is the impact on the system?*

*2.3.7.1 How many users would be affected?*

*2.3.8 State the maximum number of ports (lines and/or trunks) impacted if a circuit card, other than a port card, fails.*

2.3.9 *How does the system's technology handle survivability of remote port networks?*

## 2.4 System Power

2.4.1 *State power requirements for the proposed system.*

2.4.2 *The systems must be equipped with a minimum of 10 minutes battery backup for the main memory and central processor in the event of power loss. This capability must facilitate rapid resumption of operation following a power failure, eliminating the need to reload memory from the storage medium. Describe.*

2.4.3 *Describe the standby power/battery backup options available with the system.*

2.4.4 *The system should provide standby power capable of supporting normal system operation for 2 hours.*

*Do not include the price of standby power in the cost of the proposed configuration. Provide the price as an option.*

## 2.5 Equipment Room and Environmental Requirements

2.5.1 *Specify the grounding requirements for the system and other ancillary equipment.*

2.5.2 *Specify the recommended temperature and humidity ranges for system operation, both long term and short term.*

2.5.3 *Specify the heat dissipation of the proposed system in BTUs per hour.*

2.5.4 *Provide a proposed floor plan showing the equipment room layout, including floor space, electrical requirements, Main Distribution Frame locations; and the placement, dimensions, and configuration of all system components.*

## 2.6 System Features – Voice

### 2.6.1 Call Coverage & Telecommuting

*The system must include a call coverage feature that allows calls to be redirected to a coverage path consisting of up to six answering positions accessed in sequence if coverage criteria are met. Describe.*

2.6.1.1 *Call Coverage must be assignable by time of day and day of week. Describe.*

2.6.1.2 *Redirection criteria must include the following:*

- *Active/Busy*
- *No Answer*
- *All Calls*
- *Time of Day*
- *Day of Week*

*and must be programmable by the system administrator. The no answer period before redirecting the call from the called party to the first coverage point must be able to be different from the no answer period between coverage points. How many rings can both of the no answer periods be?*

2.6.1.3 *Redirection criteria must be assignable separately for internal and external calls.*

2.6.1.4 *The system must support overriding criteria which are checked before the redirection* criteria, and the call redirected accordingly. The following capabilities must exist:

- *An internal caller must be able to send the call directly to coverage without ringing the called party's phone.*
- *The called party must be able to temporarily direct incoming calls to coverage regardless of the assigned redirection criteria.*
- *The called party must be able to forward his/her calls to another extension and have calls complete to this extension before redirecting to coverage.*

*Explain how each of these overriding features works.*

2.6.1.5 *The system must provide the following options to the covering user:*

- *For display-equipped sets, the incoming call must be identified to the covering user as a call coverage call, and the principal must be identified on the display.*
- *The covering user must be able to call the covered principal for a consultation, then conference or transfer the calling party.*
- *The covering user must be able to leave a message for the principal to call an internal caller back simply by pressing a designated button.*

*Explain how each of these covering user options work.*

2.6.1.6 *The Call Coverage feature must allow any of the coverage answering positions in the coverage path to be on a different system. Describe.*

2.6.1.7 *Is the Call Coverage feature to an off-network coverage answering position monitored? Describe.*

2.6.1.8 *Telecommute: Does the switch maintain control of the call until it is answered or receives a busy and is returned to the switch for possible further routing?*

2.6.1.9 *Telecommute: Can the user change primary and secondary coverage paths locally? Describe.*

2.6.1.10 *Telecommute: Can the user change primary and secondary coverage paths remotely? Describe.*

## 2.6.2 Integrated Directory

*The system must include an integrated directory feature which allows internal system users with display equipped sets to access the system database, use the touch-tone pad to key in a name, and retrieve an extension number. Describe how this feature works.*

2.6.2.1 *Once a name and number is displayed, the user must be able to place a call to that person by pressing one button. Describe.*

### 2.6.3 ISDN-BRI

*The system must support the ITU-T (CCITT) defined Integrated Services Digital Network (ISDN) Basic Rate Interface (BRI). ISDN-BRI must support two 64 Kbps Bearer (B) channels and one 16 Kbps signaling (D) channel, 2B+D. Provide an overview of your implementation of BRI.*

## 2.7 System Features – Data

*Complete Table 2 in Attachment A that includes Mandatory and Desired System Data features.*

### 2.7.1 Data Switching

*The system must support data switching, including data-only and voice/data applications, without the use of modems. Simultaneous voice and data transmission must be supported from a single port. Describe how this is accomplished.*

### 2.7.1 Data Switching

*The system must support data switching, including data-only and voice/data applications, without the use of modems. Simultaneous voice and data transmission must be supported from a single port. Describe how this is accomplished.*

2.7.1.1 *The system must support asynchronous data transmission at speeds up to 56 Kbps and synchronous data transmission speeds up to 64 Kbps.*

2.7.1.2 *Describe how data capability is added to a voice terminal. Are any changes required on the circuit pack?*

2.7.1.3 *Briefly describe the data devices/modules available for use with the system for data switching.*

2.7.1.4 *Describe the cabling requirements and distance limitations for the data devices/modules.*

2.7.1.5 *Describe how data privacy is provided on switched data connections.*

2.7.1.6 *The establishment of permanent data switching connections between data endpoints must be permitted. Describe.*

2.7.1.7 *Describe how the system interfaces with Local Area Networks (LANs).*

### 2.7.2 Data Call Setup

*Keyboard dialing must be supported, with call progress messages being displayed on the terminal. Briefly describe.*

2.7.2.1 *The Hayes AT command set must be supported.*

### 2.7.3 Modem Pooling

*The system must support modem pooling, with a modem being automatically inserted into a connection, if required. Describe.*

2.7.3.1 *How many modem pools are supported? How many modems are supported per modem pool?*

### 2.7.4 Wideband Switching

*The system must be able to support data and network applications that require greater than 64 Kbps. ITU-T and ANSI standards for H0, H11, H12, and Nx64 must be supported. Describe.*

## 2.8 System Features – Networking

### 2.8.1 North American Dial Plan

*The system must support the new North American Dial Plan at cutover.*

### 2.8.2 Call Routing

*The system must provide software to route long distance calls over the appropriate, usually least costly, trunk group via public or private networks. Describe how this is accomplished.*

2.8.2.1 *The system must be able to screen up to 28 digits in order to determine how the call is routed.*

2.8.2.2 *The system should route a call to a Routing Pattern consisting of trunk groups accessed in a pre-determined order. How many Routing Patterns are supported by the system, and what is the maximum number of trunk groups that can be accessed from a routing pattern?*

2.8.2.3 *The system must support Time-of-Day (TOD) routing, which allows the routing patterns accessed to be changed based on the time of day. How many TOD tables are supported?*

2.8.2.4 *The system must be able to automatically change the routing plan based on the time-of-day. How many times can this occur per day?*

2.8.2.5 *The system administrator must have the capability to establish an override schedule to take advantage of special situations such as low holiday toll rates. Describe.*

2.8.2.6 *International call routing must be supported. Describe.*

2.8.2.7 *Certain routes for call completion must be permitted only when a valid Authorization Code is entered by the station user. Describe.*

### 2.8.3 ISDN-PRI

*The system must support the ITU-T defined Integrated Services Digital Network (ISDN) Primary Rate Interface (PRI) and the European Telecommunications Standards Institute (ETSI) ISDN-PRI.*

2.8.3.1 *The ISDN-PRI interface must support the following features:*

- *Call-by-Call Service Selection*
- *Channel Negotiation*
- *Calling Party Number (CPN)*
- *Billing Number (BN)*
- *Non-Facility Associated Signaling (NFAS)*
- *D-Channel Backup*
- *Administration Connections with Automatic Restoration Temporary Signaling Connections*

*Describe how the proposed system provides each of these features.*

### 2.8.4 Private Networks

*It must be possible to connect multiple remote sites in a private network.*

2.8.4.1 *Describe how remote site functions and feature transparency are supported. Indicate all trunking requirements if applicable.*

2.8.4.2 *A four- or five-digit extension numbering plan must be supported across multiple systems.*

2.8.4.3 *Within a private network, consistent displays must be provided across the network (for example, connected party name and number and calling party name and number).*

## 2.9 System Features – Management

### 2.9.1 Switch Administration (Adds, Moves, and Changes)

*Describe, in detail, the system management features provided by the proposed system, being sure to cover each of the following points:*

2.9.1.1 *Does the proposed system require an external database for the purpose of administration? If yes, how is this external database kept synchronized with that of the system itself?*

2.9.1.2 *Does the actual administration of the system use a simple, English language-based, full screen interface?*

2.9.1.3 *What method is used to secure system administrative/maintenance access?*

2.9.1.4 *Can administrative/maintenance capabilities be tailored for individual users? If so, to what degree?*

2.9.1.5 *Is the system's on-line data readily available for viewing by the system administrator? How is this data made available?*

2.9.1.6 *What is the maximum number of administrators and/or maintenance personnel who can simultaneously access the management capabilities of the system?*

2.9.1.7 *Can the administration terminals be located both locally and remotely? Can both local and remote sessions occur simultaneously?*

2.9.1.8 *Can the system administration terminal also be used to administer the voice messaging system?*

2.9.1.9 *The system must allow stations to be administered (features, set type, Class of Service) without assigning the station to a specific switch port.*

*2.9.1.9.1 Can a new station user plug their telephone into an unused jack and dial an access code to identify themselves to the switch as one of these stations without hardware, thereby completing the database entry and establishing their own service?*

2.9.1.10 *Does the system support station display information to be presented in languages other than English?*

### 2.9.2 Reports

*Can the system provide traffic and status reports, or is an external system required to compile and print such reports?*

2.9.2.1 *If an external system is required, provide a complete list of the components and their prices.*

2.9.2.2 *Can reports be generated on demand and on a customer-defined schedule?*

2.9.2.3 *Provide samples of standard traffic and status reports available from the system.*

### 2.9.3 Maintenance Features

2.9.3.1 *Does the system allow maintenance access for City of Providence Police Department's personnel?*

2.9.3.2 *Is this maintenance access available through the same interface and terminal (platform) used for administrating the system, or is another terminal (platform) required?*

### 2.9.4 System Diagnostics

2.9.4.1 *Describe methods and procedures used to detect, diagnose, and report potential and actual troubles and component failures in the proposed system. How is alarm notification provided?*

2.9.4.2 *Describe the diagnostic tools provided by the proposed system. Describe how the system routinely self-administers diagnostic programs. Describe how system problems are automatically logged and reported, and how the vendor monitors such problems.*

2.9.4.3 *Alarms must be reported to the attendant console, at the switch, any active management terminals, and to the vendor's remote maintenance facility. Describe how this is accomplished.*

2.9.4.4 *Is the system able to provide Alarm notification to a remote customer location? Please describe all options available.*

### 2.9.5 Call Detail Recording

2.9.5.1 *The system must be able to generate and output of Call Detail Records (CDRs). CDRs must be generated for both incoming and outgoing calls on trunk facilities, and for station-to-station calls to and from specific stations. Describe.*

2.9.5.2 *What information is provided in a CDR?*

2.9.5.3 *CDRs must be output via an EIA RS-232 port. Buffering must be provided in the event that the external call accounting system, or storage device is unable to accept the CDRs for any period of time. How many CDRs can be buffered?*

2.9.5.4 *Can the system provide both a printed listing of CDRs as they are output, and an EIA RS-232 interface to an external call accounting system or storage device?*

### 2.9.6 Call Accounting System (Optional)

*As an option, provide pricing for a call accounting system to collect the CDRs from the system and provide call costing. The system should be Personal Computer (PC) based and operate in a Windows environment.*

2.9.6.1 *Describe this optional call accounting system, including the following:*

- *Can the call accounting system connect directly to the system?*
- *Can the call accounting system also poll storage devices and process CDRs from multiple systems? How many?*
- *What is the maximum number of CDRs the call accounting system can store and process?*

2.9.6.2 *City of Providence Police Department desires a LAN-based call accounting system. Describe.*

2.9.6.3 *Does the call accounting system provide inventory, directory, trouble ticketing, and work order management modules?*

2.9.6.4 *Does the optional call accounting system offer a toll fraud detection and alerting module? If yes, describe, including the following:*

- *Administration of toll fraud detection parameters*
- *Actual method of detection of possible toll fraud*
- *Alerting mechanisms and options*

2.9.6.5 *Provide samples of reports available from the optional call accounting system.*

## 2.10 System Features – Security

*The system must provide security features that help reduce the possibility of access by unauthorized users. The following features center around system security in regards to call routing, remote access, and system management access.*

### 2.10.1 Call Routing Security

*To prevent unauthorized use of facilities after hours, the system must support Alternate Facilities Restriction Levels (AFRLs). Facilities Restriction Levels (FRLs) are used to determine a user's calling privileges when initiating public or private network calls. The AFRL feature, when activated, must automatically change the FRL to the appropriate AFRL. Describe how the system implements AFRLs.*

2.10.1.1 *How is the AFRL feature activated/deactivated?*

2.10.1.2 *Can the system restrict call transfers to an outgoing trunk?*

2.10.1.3 *As an option, the system must provide Authorization Codes. These codes, when dialed, will provide a user with additional call routing capabilities than would*

*otherwise be available. Authorization Codes must be validated by the switch and must be included in the CDR generated for the call. Describe.*

2.10.1.4 *What length Authorization Codes are supported? How many Authorization Codes will the system support?*

### 2.10.2 Remote Access Security

*The Remote Access feature must be password protected to prevent unauthorized use.*

2.10.2.1 *How many passwords will the system support? What length passwords are supported?*

2.10.2.2 *As added security, the system must be able to also require the remote access user to enter a valid Authorization Code in order to use the feature.*

### 2.10.3 System Management Security

*Access to the system for management purposes must be login-password protected. Describe, including the number of available login IDs and the ability to restrict the capabilities of the users based on the login IDs.*

2.10.3.1 *The system must have the capability to automatically age passwords, thereby forcing users to change their passwords. The cycle length must be adminstrable by City of Providence Police Department, and the user must be given advance notice of the upcoming expiration. Describe.*

2.10.3.2 *The system must support the setting of an attempts threshold (number of attempts within a specific time period) for access to system management ports. If this threshold is exceeded, the system must automatically disable the login. Describe.*

### 2.10.4 Security Violation Notification

*The system must provide notification to a designated display-equipped station of possible abuse attempts on either the System Management or Remote Access ports. The call must have a distinctive ring and a message must be provided over the display. In addition, the login ID or the remote access password in violation must be disabled. Describe.*

2.10.4.1 *It must also be possible to have an announcement associated with the notification so that a display-equipped terminal is not required. This will also allow violation notification calls to be made to points on or off the system.*

2.10.4.2 *The system must also monitor Authorization Codes for invalid usage attempts and provide notification if an attempts threshold (number of attempts within a specific time period) is exceeded.*

### 2.10.5 Reports

*The system must provide useful reports to help identify potential "hacker" attempts at infiltration. These reports must address the security violations described above. Describe the reports available with the system.*

2.10.5.1 *In addition, the system must support a Recent Change History Report so that any changes made by an unauthorized user can be traced. Describe.*

2.10.5.2 *In order to assist the system administrator verify the security of the system it must provide a report that lists all stations with Call Forwarding activated and the forwarded-to number.*

### 2.10.6 Physical Security

*As an option, it must be possible to provide additional physical security by adding a digital encryption "Lock and Key" device to the dial-up system management ports. Describe what devices are available from the vendor, and include any additional costs in the Optional Pricing section of the proposal.*

## 2.11 System Features – Call Center

*What are the various call-center options available with your system? Please list prices on a separate section of your proposal.*

## 2.12 Attendant Console and Features

2.12.1 *The system shall provide an attendant console for servicing incoming calls to the system The console should provide dual jacks to accommodate both handsets and headsets. The console should feature a simple, uncluttered layout of call appearance keys, numeric keypad, attendant function keys, an easy-to-read display, system time indication, and major and minor alarm indication. Describe the attendant console available with the system.*

2.12.2 *The console should include the ability to determine the status of an extension number (busy/not busy) and to call an extension without having to key in the number.*

2.12.3 *The console display should provide information on the calling party (name, extension, and Class of Service/Class of Restriction); called party (name and extension); and call purpose (direct call, forwarded call, returned call, and so forth). Describe the information available on the console display.*

2.12.4 *Calls must be distributed to active attendant consoles on a most-idle-attendant basis. When all consoles are busy, calls must be queued to an attendant queue and*

2.12.3 *The console display should provide information on the calling party (name, extension, and Class of Service/Class of Restriction); called party (name and extension); and call purpose (direct call, forwarded call, returned call, and so forth). Describe the information available on the console display.*

2.12.4 *Calls must be distributed to active attendant consoles on a most-idle-attendant basis. When all consoles are busy, calls must be queued to an attendant queue and served on a First-In-First-Out (FIFO) basis. The console should provide an indication of the state of the attendant queue. Describe.*

2.12.5 *The system should provide priority queuing to the attendant queue. Describe.*

2.12.6 *The attendant should have the ability to restrict calls to or from individual extensions or groups of extensions. In addition, it must be possible to activate or deactivate call forwarding all calls for individual extensions. Describe.*

2.12.7 *The attendant must be able to establish a five-party conference, and hold the conference on the console. The conference must be able to include both internal and external parties. Describe, including the numbers types of parties that can be included.*

2.12.8 *Describe the cabling requirements and distance limitations for the console.*

2.12.9 *The attendant must be able to use an automated directory of switch extension numbers from the console. Describe.*

## 2.13 Station Equipment and Features

*Complete Table 1 in Attachment C that includes mandatory and desired station features.*

### 2.13.1 Analog Stations

*All analog sets provided by the vendor must be 2500-type compatible, and must include a flash button and a message waiting lamp. Describe the analog sets being proposed.*

2.13.1.1 *Describe the cabling requirements and distance limitations for analog sets.*

### 2.13.2 Digital Stations

*All digital sets provided will be instruments with the ability to support simultaneous voice and data transmission via a data module.*

2.13.2.1 *All digital sets must provide one button access to the most commonly used features such as Hold, Transfer, Conference, and Disconnect.*

2.13.2.2 *All digital sets must provide feature buttons that can be individually programmed for the user's specific applications. Describe.*

2.13.2.3 *All digital sets must provide a message waiting lamp to indicate the presence of messages to be retrieved from the voice messaging system.*

2.13.2.4 *Multi-line digital sets must provide a visual indication of line and feature (activated/deactivated) status for line/feature buttons. Describe.*

2.13.2.5 *All digital sets must provide ringer modification so that users in a common area can customize the ringer on their sets.*

2.13.2.6 *All digital sets must be able to be equipped with a speakerphone, integrated or adjunct, that can provide hands-free dialing; that is, able to monitor call progress without lifting the hand set. Describe.*

2.13.2.7 *Multi-line digital sets must support an Abbreviated and Delayed Ringing scheme which allows a bridged extension number to ring briefly on the first station and transition to ringing on the bridged station. Describe.*

2.13.2.8 *Single-line digital sets must provide dual line capability and programmable feature buttons. Describe.*

2.13.2.9 *Multi-line digital instruments must provide 1 to 10 line appearances and still provide additional buttons for single button feature access. Describe.*

2.13.2.10 *Multi-line digital instruments must provide integrated intercom capability, including Dial and Automatic intercom. Describe.*

2.13.2.11 *Display-equipped digital sets must include a built-in alphanumeric display for visual indication of calling party information, called party information, and call purpose. Describe what information is available on the display.*

2.13.2.12 *Describe the cabling requirements and distance limitations for digital sets.*

2.13.2.13 *Describe the proposed sets and any available options. Include the type of wire required, how many pairs, and from where the sets are powered.*

# 3.0 Configuration Details

## 3.1 Definitions

### 3.1.1 Equipped

*The equipped quantities are the at-cutover requirements. The port circuit packs, stations and trunks must be configured to support the equipped numbers.*

### 3.1.2 Wired-For

*The wired-for quantities are the quantities that the system can support without the addition of software and/or the re-engineering of existing hardware. Sufficient cabinets, carriers, memory, processor capability, power (including backup power), and other equipment must be included so that the wired-for configuration and traffic capacity can*

*be achieved by the addition of only port circuit packs. These quantities represent expected growth.*

### 3.1.3 Capacity

*The system capacity represents the ultimate capacity of the system, achieved by adding hardware and software beyond that included in the wired-for configuration.*

## 3.2 Port Requirements

*The following table represents the port requirements of the system, including analog and digital stations, trunks, and other access ports. The system must be configured to support the wired-for capacity. The vendor is required to fill in the capacity column.*

| Port Type | Equipped | Wired-For | Capacity |
|---|---|---|---|
| **Station Ports** | | | |
| *Analog* | 200 | 300 | 400 |
| *Digital – Voice-only* | 300 | 400 | 500 |
| *Digital – Voice/Data* | 300 | 400 | 500 |
| *Digital – Data-only* | | | |
| *Attendant Console* | 4 | 8 | 10 |
| **Trunk Ports** | | | |
| *Central Office (CO)* | 50 | 85 | 110 |
| *Direct Inward Dial (DID)* | 50 | 75 | 100 |
| *Tie* | 9 | 15 | 25 |
| *DS1/E1* | 4 | 6 | 8 |
| *ISDN-BRI* | 4 | 6 | 8 |
| *ISDN-PRI* | 4 | 6 | 8 |
| **Adjunct Access Ports** | | | |
| *Dial Dictation Access* | | | |
| *Modem Pool Access* | | | |
| *Paging Access* | 2 | 2 | 2 |
| *Power Failure Transfer* | 30 | 50 | 60 |
| *Recorded Announcements* | 4 | 6 | 7 |

| Port Type | Equipped | Wired-For | Capacity |
|---|---|---|---|
| *Voice Mail Access* | 24 | 30 | 40 |
| *Wideband Switching* | | | |

## 3.3 Station Requirements

*The following table represents the station requirements of the system, including analog and digital stations. These quantities must be included in the price of the proposed system.*

| Station Type | Quantity |
|---|---|
| *Analog Stations* | |
| *Single-Line* | 200 |
| *Digital Stations* | |
| *Single-Line* | |
| *5-Line with Display* | |
| *8-Line with Display* | 250 |
| *10-Line with Display* | |
| *16-Line with Display* | 10 |
| *24-Line with Display* | |
| *+30-Line with Display* | 20 |
| *Adjunct Equipment* | |
| *Expansion Modules* | |
| *Headsets* | 75 |
| *Speakerphones* | ALL |
| *Data Modules* | |
| | |

## 3.4 Traffic Requirements

*The following table represents the traffic requirements of the system, including stations and trunks. The system must be configured to meet these traffic requirements at the wired-for numbers of ports.*

| Port Type | CCS Per Port |
|---|---|
| ***Voice-Only Station*** | ***6*** |
| ***Voice/Data Station*** | ***18*** |
| ***Data-Only Station*** | ***24*** |
| ***Modem Pool*** | ***36*** |
| ***Trunk*** | ***30*** |

# C.0 Messaging Requirements

*A multi-media messaging solution is required that meets today's needs and yet allows for future growth. Provide an overview of the system's universal messaging capabilities. Voice, fax and visual desktop access to messaging functionality and e-mail access must be included as standard features. Initially Police Fire Complex will have 350 voice mail boxes with 16 ports and unlimited storage. What growth strategy is available?*

## C.1 Call Answering

*Note: Caller refers to any non-user.*

### C.1.1 Automated Attendant

C.1.1.1 *The voice messaging system is required to have Automated Attendant as part of its integrated platform. This feature must provide single digit menu choices to callers for automatic transfer, as well as provide the opportunity to reach assistance.*

C.1.1.2 *Multiple menu layers must be accessed by single digit selections. How many menu layers are supported?*

C.1.1.3 *The Automated Attendant must transfer callers who do not select a choice within a given timeframe to an answering position.*

C.1.1.4 *Automated Attendants menus can differ based on time of day and holiday schedules.*

C.1.1.5 *Users can access their mailboxes from an offsite location after reaching the Automated Attendant menu.*

### C.1.2 Caller Options

C.1.2.1 *Each mailbox must be able to have a unique destination if the caller presses "0" to reach an attendant before or after leaving a message.*

C.1.2.2 *Call coverage must be able to be customized for each user. For example, some users may need to have their calls routed to live assistance first, others may need external calls to be routed differently than internal calls, and some may need after-hours call routing.*

C.1.2.3 *Callers must be able to transfer out of voice mail by specifying a user's name or extension either before or after leaving a message.*

C.1.2.4 *The system must provide a names directory for callers to access.*

C.1.2.5 *Callers must be given context-sensitive help prompts automatically and upon caller request.*

C.1.2.6 *Callers must be able to skip the greeting and immediately record a message.*

C.1.2.7 *The system must provide a warning when message recording is approaching the maximum length. What is the maximum message recording time?*

C.1.2.8 *Callers must be able to re-record a message.*

C.1.2.9 *Callers must be able to mark a message private.*

C.1.2.10 *Callers must be able to mark a message priority.*

C.1.2.11 *Callers must be able to attach a fax if fax messaging is configured.*

C.1.2.12 *If the called party's mailbox is full, the system must inform callers of other available options.*

### C.1.3 Multilingual Prompts

C.1.3.1 *Multiple foreign language prompts are available for which the system can offer users and callers a choice of languages.*

C.1.3.2 *What foreign language prompts are available?*

## C.2 Call Processing

### C.2.1 Broadcast Messages

C.2.1.1 *The System Administrator and designated users must be able to broadcast system-wide messages without the use of a mailing list.*

### C.2.2 Login Announcement

C.2.2.1 *An announcement can be created that will automatically play to users when they log on to their mailboxes.*

### C.2.3 Bulletin Board Mailboxes

C.2.3.1 *Mailboxes can be designed to dispense information to callers.*

# C.3 Messaging

## C.3.1 User Interface

C.3.1.1 *Users are provided context-sensitive help prompts and can also access additional detailed prompts at any time.*

C.3.1.2 *Text-to-speech capabilities provide voice, fax and e-mail messages via digital voice.*

C.3.1.3 *Multiple telephone user interfaces are supported on the same system. Describe in detail.*

## C.3.2 User Mailbox Parameters

C.3.2.1 *State the maximum messaging size of a user's mailbox.*

C.3.2.2 *The proposed system must alert users when their mailbox space gets low.*

C.3.2.3 *State the maximum message length.*

C.3.2.4 *Messages must be automatically deleted after a prescribed number of days. Different schedules must be available for new, old and unopened messages. In addition, the System Administrator must be able to initiate message deletion at any time. Describe in detail.*

C.3.2.5 *Users with desktop messaging privileges must be able to save a message indefinitely. Describe in detail.*

C.3.2.6 *Users can share a single telephone extension yet have a private mailbox. Callers can choose to be routed to a specific user when calling this extension.*

## C.3.3 Greetings

C.3.3.1 *Users must be able to record multiple personal greetings. The system must recognize and play different personal greetings (if recorded) for internal vs. external, busy vs. no answer, and out of business hours calls.*

C.3.3.2 *Users can choose to use a generic system greeting rather than a personalized greeting.*

## C.3.4 Creating Messages

*The system must provide the following capabilities to users during message creation.*

C.3.4.1 *Re-record message from the beginning.*

C.3.4.2 *Re-record from any place within the message.*

C.3.4.3 *Pause during message creation.*

C.3.4.4 *Go forward and backward within the message in incremental steps.*

C.3.4.5 *Review before sending.*

C.3.4.6 *Users can press a single button or enter an access code to leave a prerecorded "return call" message in another user's mailbox.*

## C.3.5 Addressing Messages

C.3.5.1 *The system must provide the following capabilities to users during addressing messages for delivery. In addition, the user must be able to cancel an incorrect address without affecting the message.*

- *Address by extension*
- *Address by name*
- *Address to a list*
- *Address to a mixture of the above*

C.3.5.2 *When addressing by extension number, the system voices back the name for confirmation.*

C.3.5.3 *Describe the dial-by-name feature.*

C.3.5.4 *Users can set up aliases for a short-cut way to address by name.*

C.3.5.5 *Users can address a message or dial an extension simply by speaking a person's name.*

C.3.5.6 *The user can verify receipt of a message at any time.*

## C.3.6 Mailing Lists

C.3.6.1 *Mailing lists can be created and maintained by users that include both local and remote addresses. How many lists can each user have? How many entries in a list?*

C.3.6.2 *Mailing lists can be owned by one person but used by others without allowing access to the list owner's mailbox.*

C.3.6.3 *The System Administrator can create system lists that can be accessed by any user. How many lists can the system support? How many entries in a list?*

C.3.6.4 *A recipient can be removed prior to sending the message, even if the recipient was part of a pre-defined mailing list.*

## C.3.7 Message Delivery Markings

*After addressing, the system must provide the following options.*

C.3.7.1 *The user can mark the message as private (cannot be forwarded).*

C.3.7.2 *The user can mark the message as priority, causing it to be queued before non-urgent messages in the recipient's mailbox.*

C.3.7.3 *The user can schedule the message for delivery up to one year in the future. A future delivery message can be changed or canceled any time before delivery.*

C.3.7.4 *The user can file a copy of the message within his/her mailbox.*

C.3.7.5 *The user can mark the same message with more than one of the above options for the same recipient.*

## C.3.8 Message Notification

C.3.8.1 *How does the system notify users of new messages?*

C.3.8.2 *The system must make outcalls to offsite users at user-set telephone and pager numbers, based upon a user-set schedule and parameters such as notification of priority messages only. Describe.*

C.3.8.3 *The system provides instructions in the outcall message for the benefit of a non-user who answers the telephone. Outcall notification can be cancelled.*

C.3.8.4 *The System Administrator can limit the ability of users to request outcall message notification.*

## C.3.9 Message Retrieval

C.3.9.1 *The system must give the number of new messages at login time, including specifying the number of priority and broadcast messages.*

C.3.9.2 *New messages are stored in a different category than saved messages and the categories can be presented in any order.*

C.3.9.3 *Messages can be played back first-in, first-out (FIFO) and last-in, first-out (LIFO).*

C.3.9.4 *The user can skip to the next message, choosing to have the message automatically saved or held in its current category.*

C.3.9.5 *The system can play one message after another without intervention.*

C.3.9.6 *What information is included in the message header?*

C.3.9.7 *Header information is automatically presented before each message and can be replayed at any time during message review.*

C.3.9.8 *The user can skip the message header and immediately hear the message.*

C.3.9.9 *The user can pause during message review.*

C.3.9.10 *The user can move backward and forward while listening to a message.*

C.3.9.11 *Speed controls (faster/slower) are available, without distortion of the message.*

C.3.9.12 *Volume controls (louder/softer) are available.*

C.3.9.13 *The message can be replayed.*

C.3.9.14 *A message can be deleted at any time before, during or after listening to it.*

C.3.9.15 *A message accidentally marked for deletion can be undeleted.*

C.3.9.16 *Message review can be canceled without affecting the remaining new messages.*

C.3.9.17 *The user can immediately reply by having the system call the message sender without entering any address information.*

C.3.9.18 *The user can record a reply to the message sender without re-addressing the message. The user is then returned back to getting messages at the point of exit.*

C.3.9.19 *The user can add a comment to the beginning or the end of a message not marked private and forward it to one or multiple recipients, including lists.*

C.3.9.20 *Forwarded messages not marked private can be re-forwarded with additional comments. All forwarded comments remain with the message.*

# C.4 Fax Messaging

## C.4.1 Functionality

C.4.1.1 *Fax messaging must be included as an integral part of the user's multi-media mailbox. Describe the fax feature in detail.*

C.4.1.2 *Header information must indicate a fax message and the number of pages.*

C.4.1.3 *Describe the printing options available for fax messages.*

# C.5 Visual Desktop User Interface to Voice, Fax and E-Mail Messages

## C.5.1 User Options

C.5.1.1 *A visual desktop user interface must be included that can be installed on the user's PC.*

C.5.1.2 *A visual desktop user interface must be included that uses an Internet web-browser application, thereby not requiring the interface software to be installed on the*

C.5.1.3 *What desktop platforms (Windows, Macintosh and SUN UNIX) does the visual desktop user interface support?*

C.5.1.4 *Describe the on-screen options available to users.*

C.5.1.5 *Messages must be able to be audibly played on the PC.*

C.5.1.6 *The visual desktop user interface must provide a means to save a voice and fax message on the user's PC, providing unlimited storage time.*

## C.5.2 Message Addressing

C.5.2.1 *The user must be able to use the visual desktop interface to address messages to multiple destinations.*

C.5.2.2 *The user must be able to use the visual desktop interface to create distribution mailing lists.*

C.5.2.3 *The visual desktop interface must have directory capabilities. Describe.*

## C.5.3 Fax Capabilities

C.5.3.1 *Fax messages must be able to be viewed, manipulated and printed from the visual desktop user interface.*

C.5.3.2 *Fax cover sheet options are available from the visual desktop user interface.*

C.5.3.3 *The visual desktop user interface must allow users to turn any document into a fax, including those from another Windows program (for example, Microsoft Word) and send it.*

## C.5.4 Security

C.5.4.1 *Describe the security measures that apply to the visual desktop user interface.*

### C.5.5 Architecture and Specifications

C.5.5.1 *Describe the architecture and specifications required for the visual desktop user interface.*

C.5.5.2 *The visual desktop user interface application must use TCP/IP protocol to communicate between the users' PCs and the application.*

C.5.5.3 *The visual desktop user interface can be installed on a network file server for shared access.*

C.5.5.4 *Remote users not directly connected to the corporate LAN can must still be able to access the visual desktop user interface.*

C.5.5.5 *The visual desktop user interface must support multiple message servers.*

C.5.5.6 *The visual desktop user interface must only require the use of server ports when the user is using the telephone or while a fax is being transmitted to a fax machine.*

## C.6 Internet Messaging

### C.6.1 E-Mail Integration

C.6.1.1 *An application is included that provides e-mail integration with any SMTP/MIME and POP3 Protocols.*

## C.7 Security

### C.7.1 User Mailbox Security

*The following capabilities must be available.*

C.7.1.1 *Variable length user passwords must be supported with the ability for the System Administrator to set a minimum length. State the maximum length. What frivolous password restrictions can be imposed?*

C.7.1.2 *New users are required to change the System Administrator-assigned password to a personal password upon initial login to the system.*

C.7.1.3 *Users must be required to periodically change their passwords.*

C.7.1.4 *The system prevents the System Administrator from obtaining personal passwords; however, if the password is forgotten, a new password can be issued.*

C.7.1.5 *The system disconnects after three incorrect attempts to log in.*

C.7.1.6 *The mailbox is locked after a fixed number of incorrect login attempts. These break-in attempts are recorded in a log to alert the System Administrator of potential hacker activity.*

### C.7.2 System Security

*The following capabilities must be available.*

C.7.2.1 *Describe in detail the system security measures in place.*

C.7.2.2 *The system can prevent unauthorized system access or transfers from the system.*

C.7.2.3 *The system must encode messages to ensure storage security.*

## C.8 Administration

### C.8.1 Mailbox Administration

*The following capabilities must be available to the System Administrator.*

C.8.1.1 *Mailboxes can be added, deleted, or changed without service interruption.*

C.8.1.2 *Extension numbers can be changed without deleting messages or affecting the mailbox.*

C.8.1.3 *Describe how your system defines class of service. Mailboxes must be able to be given varying classes of service.*

C.8.1.4 *The system must allow customizable system prompts as an alternative to pre-recorded prompts from the manufacturer.*

### C.8.2 System Diagnostics and Alarms

C.8.2.1 *Diagnostics must run 24 hours per day without system disruption.*

C.8.2.2 *Describe how alarms are logged and monitored.*

C.8.2.3 *The system must provide a history log that records system problems. Please describe.*

### C.8.3 Administration Terminal

C.8.3.1 *Describe the system's administrative interface.*

C.8.3.2 *The system supports remote administration.*

### C.8.4 Desktop Mailbox Management Tool

C.8.4.1 *The system must include a desktop mailbox management application utilizing a Windows-based GUI interface.*

C.8.4.2 *The desktop mailbox management application database records can be modified to include customer-defined fields.*

C.8.4.3 *Simultaneous administration by multiple administrators is supported by the desktop mailbox management application.*

C.8.4.4 *Multiple mailboxes can be created at the same time using the desktop mailbox management application. In addition, data from an external database can be imported to add multiple users.*

C.8.4.5 *The System Administrator can use the desktop mailbox management application to batch mailbox additions and deletions for sending at a later time.*

C.8.4.6 *Audit trail and error detection capabilities must be provided by the desktop mailbox management application.*

### C.8.5 System Management Reports

C.8.5.1 *Describe the available standard reports, as well as viewing and printing options.*

## C.9 Networking

### C.9.1 Capabilities

C.9.1.1 *The system must include the AMIS Analog Networking protocol.*

C.9.1.2 *The system must include a digital networking protocol. Describe.*

C.9.1.3 *When addressing a message by name or mailbox number to a remote user, the name is played back for verification.*

C.9.1.4 *The system can deliver and retrieve messages from a networked system on the same call.*

# C.10 PBX Integration

## C.10.1 Integration

C.10.1.1 *Describe the integration between the PBX and the messaging system.*

## C.10.2 PBX/Messaging Port Integration

C.10.2.1 *Ports must be universal, allowing the system to support all features without requiring dedicated ports.*

C.10.2.2 *Describe how port contention problems between the messaging system and the PBX are eliminated.*

C.10.2.3 *Ports must not be required for activities such as lighting message-waiting lamps.*

C.10.2.4 *The system receives call disconnect information from the PBX and immediately terminates the session.*

C.10.2.5 *If a port has trouble, the system takes it out of service and automatically notifies the PBX to stop sending calls to that port, without requiring manual intervention.*

C.10.2.6 *The message waiting lamp will remain lit until all new messages are accessed.*

# C.11 Technical Specifications

## C.11.1 Capacities

C.11.1.1 *Mailboxes must be equipped with voice, fax, visual desktop and e-mail access capabilities as standard. State the maximum number for the proposed system.*

C.11.1.2 *Mailboxes should be available to be purchased in small increments in order to meet current needs and yet be expandable to meet future needs.*

C.11.1.3 *Ports must be universal. State the minimum and maximum number for the proposed system.*

C.11.1.4 *If available, additional port capacity can be purchased as needed.*

C.11.1.5 *Disks must be enabled for the full amount of message storage available on that disk. State the number of disks and storage for the proposed system.*

## C.11.2 Back-up Measures and Redundancy

C.11.2.1 *The capability to have the system backed up both automatically and on demand to removable media must be available.*

C.11.2.2 *Describe all industry-standard RAID levels of redundancy offered.*

## C.11.3 Storage Utilization

C.11.3.1 *The system must compress long pauses in recorded messages to efficiently utilize space on the hard drive. State the speech algorithm used.*

## C.11.4 Environmental, Physical and Electric Requirements

C.11.4.1 *Provide the environmental requirements for the proposed system.*

C.11.4.2 *Provide the physical dimensions and weight of the proposed system.*

C.11.4.3 *Provide the power requirements for the proposed system.*

# D. Implementation and Training

*The implementation criteria are detailed in this section.*

## 1.0 Implementation and Testing

*Describe how your company manages the implementation and testing process, including the roles of key project personnel.*

### 1.1 Implementation Plan

*The successful bidder shall be required to present a detailed implementation plan upon bid award.*

*Describe what responsibilities City of Providence Police and Fire Departments must provide in order to house the proposed system.*

### 1.2 Facility Coordination

*The vendor must be responsible for coordinating facility installations with the local telephone company.*

### 1.3 Acceptance Testing

*Vendor shall describe and list a detailed acceptance test plan. Describe the criteria for assuring full system performance and outline how tests will be conducted to demonstrate proper installation.*

### 1.4 Subcontractors

*Vendor must be fully responsible for the acts and omissions of its subcontractors.*

### 1.5 Code Compliance

*Vendor must guarantee that installation of the system will be in full compliance with all federal, state, and local government building and fire statutes, codes, regulations, and industry standards.*

### 1.6 Facility Restoration

*Vendor must be responsible for full restoration to original condition of all City of Providence Police and Fire Departments surfaces, buildings, and grounds.*

### 1.7 Software Station Review Process

*Describe the Software Review Process*

### 1.8 Final Change Date

*When is the last date vendor can accept changes to the products for installation?*

# 2.0 Training Requirements

*City of Providence Police and Fire Departments views training as a critical element of the communication system. Explain the training curriculum available to support the products recommended by the vendor's company in the technical solution.*

## 2.1 Station User and Console Attendant Training

*Describe the vendor's plan for station user and console attendant training.*

## 2.2 System Administrator Training

*Describe the vendor's plan for system administrator training.*

## 2.3 Training Details

*Provide details regarding course cost, length, class size, and any other relevant details about the system administration training.*

## 2.4 Customer Technician Training

*If required, will the vendor provide training for customer technicians?*

## 2.5 Ongoing Training Support

*Describe the vendor's plan to provide ongoing training support.*

## 2.6 Audio, Video, and Self-Paced Training

*Describe the availability of audiotape, videotape, and self-paced training support.*

# E. Warranty, Maintenance and Support

*This section asks the vendor to delineate warranty, maintenance and support offerings.*

## 1.0 Warranties

### 1.1 Description

1.1.1 *Provide a detailed overview of all applicable warranties, including any exclusions.*

1.1.2 *Describe the responsibilities City of Providence Police and Fire Departments will assume during the warranty or maintenance contract period.*

### 1.2 Service

1.2.1 *Describe service provided during warranty.*

## 2.0 Maintenance

### 2.1 Service Organization

*Describe your service organization.*

### 2.2 Expert Systems/ Artificial Intelligence

*Describe the use of state of the art computer and artificial intelligence systems to support the vendor's maintenance effort.*

### 2.3 Maintenance Staff

*Identify the makeup of the maintenance staff that will be assigned to the proposed system, citing their training experience on the system.*

### 2.4 Post Warranty Maintenance Options

*Describe your maintenance options available after the warranty period.*

### 2.5 Response Time

*What are the vendor's response times to major and minor system failures?*

### 2.6 Inventory

*What inventories do you maintain in order to assure prompt response to repair requests?*

## 2.7 Preventive Maintenance

*Does the maintenance contract include provisions for preventative maintenance? Does the system have to be taken out of service?*

## 2.8 Disaster Recovery

*Vendor shall provide a plan for repair or replacement of the system in the event of a catastrophe (for example, fire or flood).*

## 2.9 Dedicated Technician

*Discuss an optional program of a dedicated technician reporting to and working full time at City of Providence Police and Fire Departments.*

## 2.10 Remote Maintenance

*Discuss your remote monitoring, diagnostic and repair capabilities, focusing on your ability to quickly and accurately identify and resolve reported troubles.*

## 2.11 Trouble Reporting

*Explain your established trouble reporting procedures including:*

- *A trouble report telephone number to be answered 24 hours a day, seven days a week.*
- *Whether or not the telephone is answered at all times by members of your support organization.*
- *Whether or not that person has direct access to specific information about our system.*

## 2.12 Trouble Tracking via the Internet

*Do you provide a means to problem status tracking via the Internet?*

## 2.13 System Maintenance Billing

*Explain the standard billing period for system maintenance (monthly, quarterly, or annually).*

## 2.14 Upgrades and Additions Procedures

*Describe your procedures for software updates and upgrades.*

## 2.15 Escalation Procedures

*Describe your escalation procedures.*

## 2.16 Alarms

*Discuss the capability of the proposed system to automatically call for help when alarm conditions occur.*

## 2.17 Customer Participation

***Discuss what options are available should City of Providence Police and Fire Departments participate in part of the maintenance process.***

# 3.0 Support

## 3.1 Professional Services

***What professional services does your company offer to assist with the ongoing management of the system?***

## 3.2 Toll Fraud Protection

***What security measures and/or programs does your company offer to assist in preventing toll fraud?***

# F.0 Pricing and Financing Options

## 1.0 Pricing

**1.1** ***Vendors are asked to guarantee their prices for a period not to exceed 60 days from the date of submission of this RFP to the date of contract award.***

**1.2** ***Vendors are cautioned to write all prices and descriptions in a legible manner so there will be no doubt as to the intent and scope of the proposal.***

***The base proposal price shall include all labor and materials required to install the items in accordance with specifications as approved by City of Providence Police Department.***

**1.3** ***Vendors shall complete the following table to include all proposed system components. Price is defined as purchase price; install is the cost of installation; maintenance is the price of maintenance per month for that item.***

### Proposed System Components

| Qty | Itemized Description | Price | Install | Maint |
|---|---|---|---|---|
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | *Sub-total* | | | |
| | *Shipping* | | | |
| | *GRAND TOTAL* | | | |

**1.4** *Vendors shall complete the following table to include all optional system components. Price is defined as purchase price; install is the cost of installation; maintenance is the price of maintenance per month for that item.*

**Optional System Components**

| Qty | Itemized Description | Price | Install | Maint |
|---|---|---|---|---|
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | *Sub-total* | | | |
| | *Shipping* | | | |
| | *GRAND TOTAL* | | | |

## 2.0 Financing

**2.1** *City of Providence Police Department wants to finance the system covered in this RFP. Please provide background and general information on the financial institution the vendor will recommend as part of the proposal.*

**2.2** *List the items from the vendor's proposal that can be financed and those that must be billed separately.*

**2.3** *Vendor should complete the following table outlining the terms of the lease.*

| Lease Term | Lease Factor | Implicit % | Monthly Payment |
|---|---|---|---|
| *48 Months* | | | |
| *60 Months* | | | |

**2.4** *Outline the financing options available.*

**2.5** *Explain the credit approval process required by the vendor's financial institution.*

# Telephone and Computer System wiring

Scope:

A. Provide the following structured cabling system solution for physical layer support of category 5e voice and c category 5e for data communications requirements.

B. Work shall include but not be limited to the following: Work area outlets, modular jacks, horizontal station cabling, high density terminal blocks, category 5e patch panels, fiber optic data backbone cabling, equipment racks, all other incidental ancillary installation hardware including wire management and devices required to provide a completely functional voice data cabling infrastructure.

C. Material and installation shall comply with NEC 800, TIA/EIA 568A, category 5e draft 11a, 569A, 606, 607, TSB 3-6, TSB 67, BICSI, (TDMM) and all other applicable city and state and federal codes and regulations.

Qualifications, Experience and Warranty:

A. Bidder shall be licensed in Rhode Island as an Electrical/Tele-Data contractor.

B. Bidder shall have been actively engaged in the installation of network wiring for a period not less than 5 years.

C. Bidder shall provide 5 customer references for projects of similar size and scope completed within the last 2 years, including company name, contact person, telephone number and approximate size of project.

D. Bidder shall include a copy of their manufacturer certification with their bid submission.

E. Bidder shall be a certified installer with the capability of providing 25-year applications assurance warranty supported by the manufacturer. Said warranty shall include the connectivity product and cable media covering both parts and labor, additionally, the installer shall provide a one-year guarantee on material and workmanship.

Equipment:

A. Work Area Outlets – wiring configuration (568B) Hubble speed gain series communication outlets.

B. Voice Cable – Horizontal – Voice horizontal cable shall be category 3, 4 pair, 24 AWG unshielded twisted pair and be plenum rated. MOHAWK.

C. Data Cable – Horizontal – Data horizontal cable shall be Category 5e, UTP 4 pair, 24 awg, unshielded twisted pair and be plenum rated. MOHAWK Mega Lan 400.

D. Voice Backbone (Feeder) Cable – Voice backbone feeder cable shall be 100 pair 24 gauge solid conductor rated armm and cmp. Provide as many 100 pair cables as required to serve administrative and office phones from each data closet.

E. Data Backbone – Cable shall be fiber optic, 12 strand multi-mode, 62.5/125 um strands OFNP. All fiber optic cable runs shall be enclosed in 1 inch interduct as manufactured by Carlon, Pyramid or Amco.

F. Voice Terminations – Voice terminations in the telephone equipment rack and the main telephone backboard shall be via high density 110 terminal blocks wall mounted on plywood backboards. Cable

management, jumper troughs shall be installed as required for the effective routing of crosswiring. High-density blocks shall be as manufactured by Hubble.

G. Data Terminations (Copper) – Horizontal data cabling shall be terminated on category 5e, RJ45, (568B) high density IDC, 48 port patch panels. Patch Panels shall be as manufacture by Hubble.

H. Data Terminations (Fiber Optic) – Fiber optic cable shall be terminated with Siecor, ST type, ceramic connectors, i.e., multimode, Siecor 95-000-50 and single mode, Siecor 95-200-51. Provide a rack mounted LIU, in each wiring closed and at the MC such as manufactured by Hubble. Size according to strand count.

I. Provide (2) category 5e, 2 meter patch cord and 2 category 5e, 3 meter attachment cord per installed WAO.

J. Relay Racks – Provide 7 foot by 19 foot floor mounted open relay rack in the MDF and in each IDF wiring closet to house fiber optic LIU's, data patch panels, cable management as well as additional equipment to be provided and installed by others. Racks to be Ortronics Mighty Mo Cable Management type, #OR604-00-159. Provide at each rack two 6 outlet power strips.

K. Grounding – Equipment racks shall be bonded to an approved building ground with a #6 awg stranded, green jacketed single THHN type conductor.

L. Labeling – Installer will coordinate with the building official and formulate and alphanumeric identification scheme for WAO and copper and fiber patch panels. Identification shall be generated on adhesive backed pre-printed labels such as accomplished with a brother P-touch labelmaker.

M. Conformance Testing – All horizontal cabling shall be tested to insure 100% compliance with Cat 5e 100 mmbps standards and conform to Draft II/ Cat 5e Amendment. Testing shall include wire map, attenuation to crosstalk ratio, length, next at a minimum.

N. Documentation – Upon completion of the project, installer shall provide a complete documentation package including cable records, conformance test results, closet layouts and as built drawings. Additionally, the installer will provide the manufacturer's 25 year, applications assurance warranty within 30 days after acceptance by owner.

Installation:

A. Provide all voice and data cabling to work area and outlets and terminate at modular jacks, patch panels and terminal blocks per manufacturer's specifications.

B. Dual data outlets and Single data outlets and voice outlets shall consist at the various locations.

C. Cable colors shall consist of the following: single data outlets – Blue, Dual data Outlets – Blue and Yellow, Voice Outlets – Gray.

D. All cable runs above accessible suspended ceilings shall be routed parallel and perpendicular to the building walls and run in J hooks or cable tray above the corridor ceilings at the three floors in the various wings. All cable support materials shall be provided by this contractor.

E. Provide three 4 inch conduits from the data closets to above the corridor accessible ceiling and provide plastic bushings on each end.

F. At no time shall the cabling be permitted to rest on any suspended ceiling. A minimum of 6 inch clearance be maintained above any ceiling.

G. The cables shall be attached to the building along the entire cable route in such a way as to offer support and next appearance. Between supports the cable is to be neatly ty-wrapped. The maximum distance between ties is not to exceed 5 feet and care is to be taken so as not to wrap the cables to tightly so as to compromise the integrity of the Cat 5e cabling.

H. The contractor is responsible for providing all required c conduit sleeves through walls, floors, etc. Fire seal once cables are installed.

# Outside Cable

Fiber Optic Cable:

A. The fiber optic cables shall be a composite cable containing multimode optic fibers, with fiber counts as indicated. These cables shall be NEC OFNR, UL 1666 for riser installation, as well as indoor/outdoor, tray or underground duct. The fiber cable shall be heavy-duty dual jacketed, loose tube type. UL listed, gel-filled. The outer jacket will be UV, sunlight, flame-resistant, high density PVC shall be in accordance with a tube construction, creating a uniform and non-pressurized was of material over the cable core. The cable shall be Chromatic Technologies RLTC series.

B. Each fiber which has a 245 mm mechanically strippable acrylate coating. The fiber strength shall be a minimum of 100 kpsi. The fiber count shall be as indicated. The fibers will be contained in sub-unit tubes. Color-coding of fibers shall be per eia/tia-598.

C. The cabling manufacturer must guarantee the supplied cable will meet the specifications covering latest following standards and network applications. IEEE 802.3 FOIRL – 10 Mbps, IEEE 802.3 10 BaseF – 10 Mbps, IEEE 802.3u – 100Mbps, FDDI – 100Mbps, ATM – 155 Mbps, Fiber Channel FC-PH – 266 Mbps.

D. The multi-mode fiber shall have a core diameter of 62.5 clad diameter of 125 mm. Coating diameter of 15 mm, core non-circulating of 5%, cladding non circulating of <2% and core clad offset of 3 mm. The maximum cabled fiber attenuation shall be 3.5 dB/km@ 850nm and 1.0 dB/km @ 1300nm. The minimum optical fiber bandwidth shall be 160 MHZ-km @ 850 nm and 500 MHZ-km @ 1300 nm.

E. The loose buffer shall have a diameter of 0.101 inches nominal. The tube shall be filled with water blocking based optical gel. The tube shall be manufactured of single layer 100% polybutylene terephthalate. Loose buffer tubes shall be cabled around a fiberglass central strength member. A non-hygroscopic tape must be applied over the cable core. A red aramid rip cord must be applied under the cable jacket to facilitate jacket removal.

F. Cable shall withstand operating temperatures of –40 degrees C to +75 degrees C.

G. Strength members shall be provided in the center of the cable and between two jackets.

Outside Telephone Cable:

A. The telephone cable shall be multi-pair, 24AWG, REA Spec. PE89, rated direct burial, gel filled, jacketed cable. The cable shall be installed within a duck bank system. The cable shall be Essex sealpic-FSE or approved equal

B. Conductors shall be solid, drawn, annealed bare copper.

C. Insulation shall have an inner layer for foamed natural polyolefin with an outer layer of solid polyolefin with telephone industry color-coding.

D. Cable core assembly shall be insulated conductors and twisted into pairs with varying lays to minimize crosstalk and meet strict capacitance unbalance limits. Cables shall be assembled in sub-units.

E. Shielding shall be gopher resistant.

F. The outer jacket shall be black, low density, high molecular weight virgin polyethylene with a thickness of 0.100 inch.

Building Service Termination Equipment:

A. Building service entrance terminations shall be a wall or frame mountable enclosed terminal with 25 feet, 26 AWG cable, and either 110 connectors terminates the number of terminals and RJ21X female connectors as required. The building service entrance terminations shall be circa telecom 1880 series or approved equal.

Fiber Optic Cable Termination Equipment:

A. Fiber management racks shall be 19-inch wide, 7 foot high standard fiber distribution frame, B-line SB-556-084-XU; ADC interbay module part #E-501-L139 ADC, cable troughs, part # FL2-ACC011, ADC grounding kit FL2-ACC006 and other components listed or necessary for a complete rack assembly.

B. Multimode connectors shall have 0.5 dB or less insert loss and 40dB or more return loss. Multimode connectors shall be the hot melt type manufactured by 3M, series 6300, or approved equal.

C. Provide equipment required to terminate telecommunications wiring at the hub location and patch panels. At each hub and patch panel location, provide at a minimum the following: rack or cabinet, as specified and mounted as required. Provide 3 feet access front and back for racks. Anchor racks to the floor in and approved method. Power supply as indicated. Grounding to building grounding point, as indicated.

EQUIPMENT & CABLE PROPOSAL FOR THE NEW FIRE & POLICE COMPLEX

CABLE

1. TELEPHONE CABLE
2. COMMUNICATIONS CABLE - TWO 100 PAIRS 22 GAUGE 5,000 FT.
3. FIBER CABLE - 24 STRAND/ 5,000 FEET
4. FIRE ALARM CABLE - 25 PAIRS/ 16 GAUGE/ 5,000 FEET 25P161119-2

* ALL CABLE WILL HAVE LIGHTENING PROTECTION AND WILL BE FUSED, WITH APPROPRIATE HARDWARE

WIRING

1. CATEGORY 5 ENHANCED FOR DATA AND VOICE
2. COAX CABLE FOR VIDEO AND TV
3. TELEPHONE JACKS
4. COMPUTER JACKS
5. CABLE TV JACKS
6. ALL JACKS AND CABLE WILL BE MARKED AND TESTED

TELEPHONE SYSTEMS

1. TWO PBX SWITCHES WITH DATA OVER VOICE
2. CENTREX SWITCH WITH DATA OVER VOICE
3. VOICE MAIL
4. CALL ACCOUNTING
5. CALL MANAGEMENT

6. SERVICE WARRANTY CONTRACT

7. TRAINING

8. RECORDING TELEPHONE LINES ON VOICE TERMINALS

9. 500 STATIONS

10. 75 STATIONS OFF PREMISES (SOP'S)

11. 75 TRUNKS

12. 25 PRIVATE NUMBERS AND FAX LINES

13. DIRECT INCOMING DIALING ( DID)

TELEPHONE EQUIPMENT

1. 200 ANALOG VOICE TERMINALS

2. 300 DIGITAL VOICE TERMINALS

3. 75 HEAD SETS

4. ELEVATED TELEPHONES

SUMMARY

, THE FIRE ALARM CABLE AND THE FIBER CABLE WILL CONNECT THE COMM. DEPT. AT 1 COMM. PLACE TO THE NEW FIRE AND POLICE COMPLEX.

THE TELEPHONE SWITCH WILL BE REDUNDANT ( IF THE SWITCH GOES DOWN THE SYSTEM WILL STILL OPERATE.)

ALL CABLES, VOICE TERMINALS, WIRING AND JACKS WILL BE TESTED AND LABELED. ALL EQUIPMENT WILL HAVE A SERVICE CONTRACT AND TRAINING WILL BE PROVIDED.

THE OLD TELEPHONE SYSTEM AND NEW TELEPHONE SYSTEM WILL

BE WORKING AT THE SAME TIME.

EMERGENCY LINES FOR THE POLICE AND FIRE WILL SHOW UP AND BE ANSWERED IN BOTH BUILDINGS.

**TELEPHONE CLOSET**

| | |
|---|---|
| F-302 | Fire 3rd Floor |
| P-334 | Police 3rd Floor |
| F-203 | Fire 2nd Floor |
| P-234 | Police 2nd Floor |
| F-104 | Fire 1st Floor |
| P-144 | Police 2nd Floor |

All of the above need two (2) 4" conduit, two (2) telephone switches and 6 gauge ground bar.

| | | |
|---|---|---|
| P-291 | Building Telephone Switch | 16' x 20' |
| B-4 | Main Telephone Room 3.4" plywood on four walls, latter rack on all four walls, suspended. | |

| ROOM | DESCRIPTION | DATA | PHONE | CABLE |
|---|---|---|---|---|
| BASEMENT | | | | |
| B20 | Vehicle Port | 1 | 1 | 0 |
| B25 | Armor | 2 | 2 | 1 |
| B26 | Office | 3 | 3 | 0 |
| B24 | Copy Center | 3 | 3 | 1 |
| B37 | Building Storage | 1 | 1 | 0 |
| B36 | Main Electric | 0 | 1w | 0 |
| B31 | Building Super | 1 | 1 | 0 |
| B10 | Crime Scene Evidence | 1 | 1 | 0 |
| B12 | Firing Tank | 1 | 1 | 0 |
| B11 | Ballistics | 1 | 1 | 0 |
| B8 | CB Storage | 3 | 3 | 0 |
| B3 | Storage | 1 | 1w | 0 |
| B4 | Telephone | 1 | 1 | 0 |
| FIRST FLOOR | | | | |
| P-151 | Exercise Center (Police) | 0 | 1w | 2 |
| P-126 | Lab | 5 | 5 | 1 |
| P-120 | BCI | 8 | 8 | 1 |
| P-123 | Office | 1 | 1 | 1 |
| P-124 | Office | 1 | 1 | 1 |
| P-127 | Evidence Drying | 2 | 2 | 1 |
| P-110 | Traffic Bureau | 10 | 10 | 1 |
| P-111 | Front Desk (Traffic) | 4 | 4 | 0 |
| P-115 | Office (Traffic) | 1 | 1 | 1 |
| P-114 | Office (Traffic) | 1 | 1 | 1 |
| P-104 | Office (Patrol Bureau) | 2 | 2 | 1 |
| P-101 | Waiting Room (Patrol) | 0 | 1 | 0 |
| P-102 | Open Office (Patrol) | 1 | 1 | 1 |
| F-121 | Waiting Room | 1 | 1 | 0 |
| F-109 | Pump Room | 1 | 1 | 0 |
| P-103 | Office (Patrol) | 1 | 1 | 1 |
| P-105 | Office (Patrol) | 3 | 3 | 1 |
| P-100 | Patrol Bureau | 6 | 6 | 1 |
| P-106 | Front Desk (Patrol) | 3 | 3 | 0 |
| C-111 | Prosecution | 2 | 2 | 1 |
| C-112 | Court Office | 12 | 12 | 1 |
| 103 | News Stand | 0 | 1 | 0 |
| F-105 | Storage | 1 | 1 | 0 |
| P-110 | Tow Squad | 2 | 2 | 1 |
| P-111 | Auditorium | 5 | 5 | 1 |
| P-113 | Projection Room | 2 | 2 | 0 |
| P-170 | Record Bureau | 5 | 5 | 1 |

| ROOM | DESCRIPTION | DATA | PHONE | CABLE |
|---|---|---|---|---|
| P-171 | Front Desk (Records) | 2 | 2 | 0 |
| P-173 | Office (Records) | 1 | 1 | 1 |
| P-172 | Office (Records) | 1 | 1 | 1 |
| P-180 | AFIS | 1 | 1 | 0 |
| P-182 | Office (AFIS) | 2 | 2 | 1 |
| P-157 | Detail office | 3 | 3 | 1 |
| P-158 | Roll Call | 1 | 1 | 1 |
| C-115 | Judge's Chambers | 2 | 2 | 1 |
| C-100 | Municipal Court | 1 | 1 | 1 |
| C-102 | Conference Room | 1 | 1 | 1 |
| F-100 | Fire Garage | 0 | 5w | 0 |
| F-117 | Fitness Center (Fire) | 0 | 1 | 0 |
| F-105 | Storage | 1 | 1 | 0 |
| F-112 | Equipment | 1 | 1 | 0 |
| 103 | New Stand | 0 | 1w | 0 |
| P-113 | Storage | 1 | 1 | 0 |

SECOND FLOOR

| | | | | |
|---|---|---|---|---|
| P-241 | Male Booking | 1 | 1 | 0 |
| P-242 | Men's Waiting | 1 | 1 | 0 |
| P-244 | Men's Detention | 0 | 1w | 0 |
| P-243 | Office (men's detention) | 1 | 1 | 0 |
| P-252 | Matron | 1 | 1 | 1 |
| P-253 | Women's Detention | 0 | 1w | 0 |
| P-251 | Female Booking | 1 | 1 | 0 |
| P-263 | Evidence | 1 | 1 | 0 |
| P-260 | Evidence Department | 3 | 3 | 1 |
| P-262 | Evidence Department | 1 | 1 | 0 |
| P-261 | Clerk | 2 | 2 | 1 |
| P-233 | Electric Closet | 1 | 1 | 0 |
| P-272 | Domestic Violence (Conf) | 1 | 1 | 0 |
| P-271 | Domestic Violence (Waiting) | 1 | 1 | 0 |
| P-270 | Domest. Violence (Main Off) | 7 | 7 | 1 |
| P-273 | Domestic Violence (Office) | 1 | 1 | 1 |
| P-285 | Storage | 0 | 1w | 0 |
| P-283 | Office (Community Police) | 1 | 1 | 1 |
| P-282 | Office (Comm Police) | 3 | 3 | 1 |
| P-280 | Office (Comm Police) | 6 | 6 | 1 |
| P-281 | Waiting | 1 | 1 | 0 |
| P-292 | Equipment | 1 | 1 | 0 |
| P-291 | Phone Switch | 0 | 0 | 1 |
| P-284 | Office | 1 | 1 | 0 |

| ROOM | DESCRIPTION | DATA | PHONE | CABLE |
|---|---|---|---|---|
| 2ND FLOOR (CONT) | | | | |
| P-234 | Telephone Closet | 0 | 1w | 0 |
| P-295 | Training | 10 | 10 | 1 |
| P-294 | Office | 1 | 1 | 0 |
| P-293 | Office | 2 | 2 | 1 |
| P-296 | Equipment Room | 1 | 1 | 1 |
| P-220 | Special Services Bureau | 1 | 1 | 1 |
| P-222 | Special Services office | 1 | 1 | 1 |
| P-210 | Special Services office | 36 | 36 | 1 |
| P-219 | Special Services office | 1 | 1 | 1 |
| P-218 | Special Services office | 1 | 1 | 1 |
| P-217 | Special Services office | 1 | 1 | 1 |
| P-216 | Wiretap Special Services | 3 | 3 | 1 |
| P-214 | Special Services | 1 | 1 | 0 |
| P-215 | Special Services | 1 | 1 | 0 |
| P-200 | Prosecution Bureau | 5 | 5 | 1 |
| P-201 | Waiting Prosecution Bureau | 1 | 1 | 0 |
| P-203 | Files Prosecution Bureau | 1 | 1 | 0 |
| P-204 | Office Prosecution Bureau | 1 | 1 | 1 |
| C-212 | Storage | 0 | 1w | 0 |
| C-211 | Counter Waiting | 1 | 1 | 0 |
| C-210 | Court offices | 4 | 4 | 1 |
| C-213 | Court offices | 1 | 1 | 1 |
| C-215 | Judge's Chambers | 1 | 1 | 1 |
| C-217 | Judge's Chambers | 2 | 2 | 1 |
| C-218 | Housing Court Chambers | 3 | 3 | 1 |
| C-200 | Housing Court | 1 | 1w | 1 |
| C-201 | Housing Court | 0 | 1w | 0 |
| C-231 | Court Storage | 2 | 2 | 0 |
| C-230 | Break Room | 2 | 2 | 1 |
| C-209 | Radio Equip Room | 1 | 1w | 1 |
| F-203 | Telephone Room | 0 | 1w | 0 |
| 205 | Janitors Room | 0 | 1w | 0 |
| F-261 | Fire Dept Bedroom | 2 | 2 | 1 |
| F-262 | CB Storage | 2 | 2 | 0 |
| F-260 | Bedroom (Fire) | 1 | 1 | 1 |
| F-259 | Bedroom (Fire) | 1 | 1 | 1 |
| F-258 | Bedroom (Fire) | 1 | 1 | 1 |
| F-257 | Bedroom (Fire) | 1 | 1 | 1 |
| F-256 | Bedroom (Fire) | 1 | 1 | 1 |
| F-255 | Bedroom (Fire) | 1 | 1 | 1 |
| F-254 | Bedroom (Fire) | 1 | 1 | 1 |

| ROOM | DESCRIPTION | DATA | PHONE | CABLE |
|---|---|---|---|---|
| SECOND FLOOR (CONT) | | | | |
| F-253 | Bedroom (Fire) | 1 | 1 | 1 |
| F-252 | Bedroom (Fire) | 1 | 1 | 1 |
| F-251 | Bedroom (Fire) | 1 | 1 | 1 |
| F-220 | Dayroom (Fire) | 3 | 3 | 1 |
| F-230 | Kitchen | 0 | 1w | 0 |
| F-236 | Pantry | 0 | 1w | 0 |
| F-225 | Study (Fire) | 3 | 3 | 1 |
| F-237 | Laundry | 0 | 1w | 0 |
| F-245 | Electric Room | 0 | 1w | 0 |
| F-212 | Commander | 3 | 3 | 1 |
| F-211 | Commander | 2 | 2 | 1 |
| F-215 | Officer's Office | 2 | 2 | 1 |
| F-216 | Officer's Office | 2 | 2 | 1 |
| F-217 | Officer's Office | 2 | 2 | 1 |
| F-218 | Officer's Office | 2 | 2 | 1 |
| THIRD FLOOR | | | | |
| P-359 | Conference | 4 | 4 | 1 |
| P-360 | Office-Detectives | 1 | 1 | 1 |
| P-361 | Office-Detectives | 1 | 1 | 1 |
| P-362 | Office-Detectives | 1 | 1 | 1 |
| P-363 | Office-Detectives | 1 | 1 | 1 |
| P-364 | Inspector's office | 2 | 2 | 1 |
| P-365 | Sex office | 2 | 2 | 1 |
| P-337 | Office Human Resources | 1 | 1 | 1 |
| P-335 | Office Human Resources | 6 | 6 | 1 |
| P-336 | Human Resources-Waiting | 1 | 1 | 0 |
| P-330 | Internal Affairs | 4 | 4 | 1 |
| P-331 | Waiting | 1 | 1 | 1 |
| P-334 | Office | 1 | 1 | 0 |
| P-314 | Office | 1 | 1 | 0 |
| P-333 | Office | 1 | 1 | 0 |
| P-315 | Office | 1 | 1 | 0 |
| P-310 | Special Projects | 2 | 2 | 1 |
| P-313 | Break Room | 1 | 1 | 1 |
| P-307 | Conference Room | 2 | 2 | 1 |
| P-304 | Office | 1 | 1 | 1 |
| P-300 | Chief's Office | 2 | 2 | 1 |
| P-301 | Chief's Waiting Room | 1 | 1 | 0 |
| P-312 | Office open | 2 | 2,1w | 1 |
| P-306 | Chief's Bathroom | 0 | 1w | 0 |

| ROOM | DESCRIPTION | DATA | PHONE | CABLE |
|---|---|---|---|---|
| THIRD ROOM (CONT) | | | | |
| P-366 | Files | 1 | 1 | 0 |
| P-311 | Waiting Room | 1 | 1 | 0 |
| P-320 | Telephone Reporting | 3 | 3 | 1 |
| P-321 | Probation & Payroll | 4 | 4 | 1 |
| P-322 | Probation & Payroll office | 1 | 1 | 1 |
| P-372 | Interview Room | 1 | 1 | 1 |
| P-373 | Interview Room | 1 | 1 | 1 |
| P-375 | Line up | 1 | 1 | 1 |
| P-367 | Break room | 2 | 2 | 1 |
| P-358 | office | 1 | 1 | 1 |
| P-357 | office | 1 | 1 | 1 |
| P-356 | office | 1 | 1 | 1 |
| P-355 | office | 1 | 1 | 1 |
| P-354 | office | 1 | 1 | 1 |
| P-353 | office | 1 | 1 | 1 |
| P-352 | office | 1 | 1 | 1 |
| P-351 | Squad Room | 30 | 30 | 2 |
| P-369 | Clerks | 3 | 3 | 1 |
| P-380 | Detention Waiting | 1 | 1 | 0 |
| P-344 | Telephone Room | 0 | 1w | 0 |
| P-391 | Youth Area | 1 | 1 | 0 |
| P-393 | Matron | 1 | 1 | 0 |
| P-392 | Booking Room | 1 | 1 | 0 |
| P-390 | Open Office | 11 | 11 | 1 |
| P-389 | Storage | 1 | 1 | 0 |
| P-380 | Youth Services | 22 | 22 | 1 |
| P-388 | Interview | 1 | 1 | 0 |
| P-387 | Interview | 1 | 1 | 1 |
| P-398 | Office | 1 | 1 | 0 |
| P-397 | Office | 1 | 1 | 0 |
| P-386 | Office | 2 | 2 | 1 |
| P-385 | Office | 1 | 1 | 1 |
| P-382 | Clerk's | 3 | 3 | 1 |
| P-381 | Waiting | 2 | 2 | 0 |
| P-383 | Break room | 0 | 1w | 0 |
| C-303 | office | 2 | 2 | 1 |
| C-300 | Commissioner's suite | 5 | 5 | 1 |
| C-304 | Office | 1 | 1 | 0 |
| C-307 | Office | 1 | 1 | 0 |
| C-308 | Office | 2 | 2 | 1 |
| C-309 | Conference Room | 1 | 1 | 0 |
| C-310 | Emergency Management | 2 | 2 | 1 |

| ROOM | DESCRIPTION | DATA | PHONE | CABLE |
|---|---|---|---|---|
| THIRD FLOOR (CONT) | | | | |
| C-313 | Office | 1 | 1 | 0 |
| C-300 | Reception | 2 | 2 | 1 |
| F-304 | Open office | 2 | 2 | 1 |
| F-340 | Open Office | 9 | 9 | 2 |
| F-341 | Plan Review Room | 2 | 2 | 1 |
| F-343 | Break Room | 1 | 1 | 1 |
| F-344 | Office | 1 | 1 | 1 |
| F-345A | Plan Review Room | 1 | 1 | 1 |
| F-345 | Plan Review Room | 1 | 1 | 1 |
| F-346 | Plan Review Office | 2 | 2 | 1 |
| F-347 | Office | 1 | 1 | 1 |
| F-348 | Office Fire Prevention | 1 | 1 | 1 |
| F-349 | Office Fire Prevention | 1 | 1 | 0 |
| F-350 | Office Fire Prevention | 1 | 1 | 1 |
| F-354 | Open Office | 2 | 2 | 1 |
| F-351 | Office | 1 | 1 | 1 |
| F-318 | Office | 2 | 2 | 1 |
| F-317 | Office | 2 | 2 | 1 |
| F-316 | Office | 2 | 2 | 1 |
| F-315 | Office | 1 | 1 | 1 |
| F-314 | Office | 1 | 1 | 1 |
| F-313 | Office | 1 | 1 | 1 |
| F-312 | EMS | 1 | 1 | 1 |
| F-311 | Break Room | 2 | 2 | 1 |
| F-357 | File Room | 1 | 1 | 0 |
| F-358 | Computer Room | 1 | 1 | 0 |
| F-355 | Arson Evidence Room | 2 | 2 | 1 |
| F-330 | Conference Room | 1 | 1 | 1 |
| C-311 | Fire Control Room | 19 | 19 | 1 |
| | **APPROX. TOTALS** | **500** | **600** | **150** |

P-291

# Telephone Room 2nd FL




12 CKT sub panel

Any Questions or Comments on the specifications, please contact:

Anthony Desmarais
Department of Communications
1 Communications Place
Providence, Rhode Island 02903
401-274-1150

Honorable Vincent A. Cianci, Jr., Chairman
Board of Contract and Supply
City Hall, Room 311
Providence, R. I. 02903

**CITY OF PROVIDENCE**
**STATE OF RHODE ISLAND**

# BIDDER'S BLANK

| | |
|---|---|
| Name of Company: | |
| agrees to bid on: Item(s) to be bid | |
| Date of Award: | |
| Total Amount in Writing: | |
| Total Amount in Figures: | |

Additional Bidding Details
Use Additional Pages If Necessary

| | |
|---|---|
| Federal ID# or Social Security #: | |
| Signature: | |
| Title of Person Signing: | |
| Firm Name: | |
| Address: | |
| Phone #: | |
| Delivery Date: | |
| Name of Surety Company: | |

# MEMO

To: Alan Sepe

From: Joseph A. Abbate, Director

Date: July 23, 2001

Subject: New Public Safety Facility/Equipment.

---

It is my understanding that the Communications Department has provided the necessary specifications for all data, telephone and communication equipment. Patricia McLaughlin has advised that this equipment should be put out to bid, as soon as possible. It is also my understanding that you will be requesting authorization through the Board of Contract and Supply at its next meeting scheduled for the last week of July, to solicit bids for this equipment.

If you should need any clarification regarding this matter, please do not hesitate to contact me.

cc: John F. Palmieri, Director
Patricia McLaughlin

RECEIVED
JUL 26 2001
By

http://webstore/trweb/TR.ASP?WCI=wciRules&WCU - Microsoft Internet Explorer

http://webstore/trweb/TR.ASP?WCI=wciRules&WCU

Browse Calls | Reports | Grading | Rules | Maintenance | Configuration | Logout |

User List — View Users list and their properties here

- Users
- Stations
- Department
- Queues
- Trunks
- DNIS
- Caller/ Called ID
- Account Codes
- Schedule
- Processing Order
- Groups
- Misc Param

First | Previous | Next | Last | Refresh | Search | New

| User Name | Agent Id | Department | Access Level | Inbound Rule | Outbound Rule | Sampling % |
|---|---|---|---|---|---|---|
| administrator | 9000 | admin | Administrative | No Rule Applies | No Rule Applies | 0% |
| [illegible] | [illegible] | | [illegible] | No Rule Applies | No Rule Applies | [illegible] |
| frankp | 39 | | Administrative | No Rule Applies | No Rule Applies | 100% |
| [illegible] | [illegible] | | Administrative | No Rule Applies | No Rule Applies | [illegible] |
| mary | | | Administrative | No Rule Applies | No Rule Applies | 100% |
| [illegible] | [illegible] | | Administrative | No Rule Applies | No Rule Applies | [illegible] |
| ron | 38 | | Administrative | No Rule Applies | No Rule Applies | 100% |
| [illegible] | [illegible] | | Administrative | No Rule Applies | No Rule Applies | [illegible] |

Total Users Found: 8; Listed : 1 - 8

User Details -(No user selected!) — Shows details about a selected user

Select a User from above list!

CITY OF PROVIDENCE, RHODE ISLAND • MAYOR VINCENT A. CIANCI, JR.

Michael R. Clement
City Clerk

Clerk of Council

Barbara A. Poirie
First Deputy

Claire E. Bestwick
Second Deputy

## DEPARTMENT OF CITY CLERK
## CITY HALL

January 14, 2002

Expanets
One Thurber Blvd.
Smithfield, RI 02917

RE: AWARD OF CONTRACT – FURNISH AND INSTALL TELEPHONE AND DATA EQUIPMENT AND CABLE FOR THE NEW POLICE AND FIRE SAFETY COMPLEX – DEPARTMENT OF PUBLIC PROPERTY.

Dear Sir:

The Board of Contract and Supply has this day awarded to Expanets, fourth lowest bidder (low bidders did not meet specifications), the contract to Furnish and Install Telephone and Data Equipment and Cable for the new Police and Fire Safety Complex.

Said award is in accordance with the offer of said firm submitted November 19, 2001, in a total amount not to exceed Nine Hundred Seventy One Thousand Six Hundred Sixty Four ($971,664.00) Dollars.

You are, accordingly hereby notified of the said action of the Board. The contract will be prepared by the City Law Department, and in due course, the City Solicitor Charles R. Mansolillo, will contact you relative to its execution. After the contract has been signed, necessary purchase orders will be issued by the Acting Purchasing Director.

Very truly yours,

Michael R. Clement

Michael R. Clement
City Clerk

Pur.Dir.
Fin.Dir.
Contr.
Law
Public Property ✓
File

MRC/sap

DEPARTMENT OF PUBLIC PROPERTY
FURNISH & INSTALL TELEPHONE AND DATE EQUIPMENT & CABLE
FOR THE NEW POLICE & FIRE SAFETY COMPLEX

ADDENDUM NO. 7

The bid opening will be extended to Monday, November 19,2001 at 2:15 PM.

DEPARTMENT OF PUBLIC PROPERTY
FURNISH & INSTALL TELEPHONE AND DATA EQUIPMENT & CABLE
FOR THE NEW POLICE & FIRE SAFETY COMPLEX

ADDENDUM NO. 8

NOVEMBER 1, 2001

THERE WILL BE A PRE-BID CONFERENCE ON TUESDAY, NOVEMBER 6,2001 AT 11:00 AM AT THE DEPARTMENT OF PUBLIC PROPERTY, PROVIDENCE CITY HALL, ROOM 407, PROVIDENCE, RI.

City of Providence

Rhode Island

# Department of City Clerk

## MEMORANDUM

**DATE:** November 19, 2001

**TO:** Acting Purchasing Director

**SUBJECT:** FURNISH AND INSTALL TELEPHONE AND DATA EQUIPMENT FOR THE NEW FIRE AND POLICE COMPLEX – DEPARTMENT OF PUBLIC PROPERTY.

**CONSIDERED BY:** Board of Contract and Supply

**DISPOSITION:** VOTED: that all bids be referred to the Acting Purchasing Director for tabulation.

Bids from:
Dictronics
Verizon
Synet Inc.
Exp@nets
Cox Business Services
Mitel Networks Solutions
Panasonic Telecommunications Systems Co.

cc:Pur.Dir.
File

Bids to department
11/20/01

Michael R. Clement

City Clerk

CITY OF PROVIDENCE, RHODE ISLAND • MAYOR VINCENT A. CIANCI, JR.

Michael R. Clement
City Clerk

Clerk of Council

Barbara A. Poirier
First Deputy

Claire E. Bestwick
Second Deputy

## DEPARTMENT OF CITY CLERK
## CITY HALL

January 14, 2002

Expanets
One Thurber Blvd.
Smithfield, RI 02917

RE: AWARD OF CONTRACT – FURNISH AND INSTALL TELEPHONE AND DATA EQUIPMENT AND CABLE FOR THE NEW POLICE AND FIRE SAFETY COMPLEX – DEPARTMENT OF PUBLIC PROPERTY.

Dear Sir:

The Board of Contract and Supply has this day awarded to Expanets, fourth lowest bidder (low bidders did not meet specifications), the contract to Furnish and Install Telephone and Data Equipment and Cable for the new Police and Fire Safety Complex.

Said award is in accordance with the offer of said firm submitted November 19, 2001, in a total amount not to exceed Nine Hundred Seventy One Thousand Six Hundred Sixty Four ($971,664.00) Dollars.

You are, accordingly hereby notified of the said action of the Board. The contract will be prepared by the City Law Department, and in due course, the City Solicitor Charles R. Mansolillo, will contact you relative to its execution. After the contract has been signed, necessary purchase orders will be issued by the Acting Purchasing Director.

Very truly yours,

Michael R. Clement
City Clerk

Pur.Dir.
Fin.Dir.
Contr.
Law
Public Property ✓
File

MRC/sap

[redacted]

Exhibit C

| Recipients | Sent | | Received | | Read | |
|---|---|---|---|---|---|---|
| Simoneau, Dennis W | 7/22/02 | 14:26 | 7/22/02 | 14:26 | 7/22/02 | 14:25 |

Inquiry: 85829 sent on 7/22/02 at 14:48
Sent By: Simoneau, Dennis W Providence Police Department

U[illegible]ID: PRVD24 10.4.2.22
S[illegible]ct: F.Y.I.

To List: D=PPD
Message: Just a couple points for everyone's benefit:

1) Recently, a few officers went to Fargnoli Park on Smith Street during the "Meet the Candidate" day and asked people to sign the Residency Petition Forms. Good Idea.
However, several citizens later voiced their fears about being intimidated by these officers who were in plain clothes, wearing firearms, with their badges exposed.
In the future, please conceal your off-duty weapons when doing this petition drive so that no one can complain.

2) Know that all telephone lines in the new station are recorded and thus speak professionally at all times. D/Sgt..s please alert all of your clerks of this fact.

3) Any and all furniture left behind in the old station is property of the City and should not be taken or given away.

NOTE: As we try to work out all of the kinks in the new station, I will be sending these mass e-mails as updates.
Thanks

| Recipients | Sent | | Received | | Read | |
|---|---|---|---|---|---|---|
| Lambert, Dennis L | 7/27/02 | 14:48 | 7/27/02 | 17:27 | 7/27/02 | 17:39 |
| Thomas, Joseph | 7/23/02 | 14:48 | 7/23/02 | 16:57 | 7/23/02 | 17:11 |
| Valdivia, Nelson | 8/10/02 | 14:48 | 8/10/02 | 08:53 | | 00:00 |
| Melaragno, Steven | 7/24/02 | 14:48 | 7/24/02 | 22:35 | 7/24/02 | 22:39 |
| F[illegible], Joseph | | 14:48 | | 00:00 | | 00:00 |
| Angelino, Antonio | 9/26/02 | 14:48 | 9/26/02 | 15:36 | | 00:00 |
| Araujo, Rhonda | 7/24/02 | 14:48 | 7/24/02 | 07:09 | 7/24/02 | 07:34 |
| Calise, Christopher | 7/22/02 | 14:48 | 7/22/02 | 14:58 | 7/22/02 | 14:59 |
| Depalma, Donald | 7/23/02 | 14:48 | 7/23/02 | 13:22 | 7/23/02 | 13:25 |
| Furtado, Francisco | 7/23/02 | 14:48 | 7/23/02 | 08:11 | 7/23/02 | 08:12 |
| Gallucci, Joseph | 7/27/02 | 14:48 | 7/27/02 | 14:57 | 7/27/02 | 15:44 |
| Girard, David | 7/23/02 | 14:48 | 7/23/02 | 18:31 | 7/23/02 | 18:36 |
| Goldsboro, Glendon | 7/23/02 | 14:48 | 7/23/02 | 08:59 | 7/23/02 | 09:01 |
| Grennan, James | 7/22/02 | 14:48 | 7/22/02 | 16:51 | 7/22/02 | 16:56 |
| Maxwell, Shawn | 7/23/02 | 14:48 | 7/23/02 | 07:01 | 7/23/02 | 07:04 |
| McGrath, Brendan | 7/22/02 | 14:48 | 7/22/02 | 16:06 | 7/22/02 | 16:06 |
| Panzarella, Mark | 7/22/02 | 14:48 | 7/22/02 | 14:48 | 7/22/02 | 14:53 |
| Penza, Kenneth | 7/24/02 | 14:48 | 7/24/02 | 07:47 | 7/24/02 | 07:56 |
| Ryan, John K | 7/22/02 | 14:48 | 7/22/02 | 21:36 | 7/22/02 | 21:38 |
| Salzillo, Daniel | | 14:48 | | 00:00 | | 00:00 |
| Sarkisian, Simon | 8/19/02 | 14:48 | 8/19/02 | 08:32 | | 00:00 |
| Venditto, Gary | 7/23/02 | 14:48 | 7/23/02 | 17:02 | 7/23/02 | 17:45 |
| Woodruff, Steven | 7/26/02 | 14:48 | 7/26/02 | 10:22 | 7/26/02 | 11:37 |
| Martinous, Michael | 7/24/02 | 14:48 | 7/24/02 | 19:27 | 7/24/02 | 19:41 |
| | | 14:48 | | 00:00 | | 00:00 |
| Matracia, Charles | 7/24/02 | 14:48 | 7/24/02 | 20:26 | 7/24/02 | 20:32 |
| Cooley, Catherine | | 14:48 | | 00:00 | | 00:00 |
| Glancy, John | 7/30/02 | 14:48 | 7/30/02 | 14:06 | 7/30/02 | 14:12 |
| DeCastro, Gregory | 7/23/02 | 14:48 | 7/23/02 | 08:08 | 7/23/02 | 08:11 |
| Lopez, Earl | 7/24/02 | 14:48 | 7/24/02 | 07:10 | 7/24/02 | 07:11 |
| McGowan, Roy | 7/23/02 | 14:48 | 7/23/02 | 07:17 | 7/23/02 | 07:19 |
| S[illegible]ulli, David | 7/26/02 | 14:48 | 7/26/02 | 15:52 | 7/26/02 | 16:22 |
| H[illegible], Raymond | 8/1/02 | 14:48 | 8/1/02 | 17:35 | | 00:00 |
| Carchia, John | 7/23/02 | 14:48 | 7/23/02 | 07:19 | 7/23/02 | 07:20 |
| Sullivan, Richard | 7/24/02 | 14:48 | 7/24/02 | 16:27 | 7/24/02 | 16:34 |
| Sigillo, John A | 7/22/02 | 14:48 | 7/22/02 | 14:49 | 7/22/02 | 14:52 |
| Prybyla, Edmund | 7/22/02 | 14:48 | 7/22/02 | 22:51 | 7/22/02 | 22:58 |
| Gonzalez, Edward | 7/22/02 | 14:48 | 7/22/02 | 14:48 | 7/22/02 | 15:05 |
| Luke, William | 8/1/02 | 14:48 | 8/1/02 | 10:35 | | 00:00 |

PLAINTIFF'S EXHIBIT

| | | | | | | |
|---|---|---|---|---|---|---|
| Fitzpatrick, Robert | 9/12/02 | 14:48 | 9/12/02 | 09:17 | | [illegible] |
| [illegible] | 7/23/02 | 14:48 | 7/23/02 | 08:10 | 7/23/02 | 08:24 |
| Cohen, Kenneth | 7/23/02 | 14:48 | 7/23/02 | 16:09 | 7/23/02 | 16:11 |
| Cabral, Mark | 9/13/02 | 14:48 | 9/13/02 | 16:52 | | 00:00 |
| Allen, James L | 11/19/02 | 14:48 | 11/19/02 | 15:41 | | 00:00 |
| Cl-ments, Hugh Jr T. | 8/22/02 | 14:48 | 8/22/02 | 01:16 | | 00:00 |
| ( an, Robert O. | 12/10/02 | 14:48 | 12/10/02 | 08:35 | | 00:00 |
| Corley, John J. | 7/30/02 | 14:48 | 7/30/02 | 11:57 | 7/30/02 | 11:58 |
| Crawley, Terrence M. | | 14:48 | | 00:00 | | 00:00 |
| Esten, Edmund J. | | 14:48 | | 00:00 | | 00:00 |
| Finegan, John E. | 2/13/03 | 14:48 | 2/13/03 | 09:37 | | 00:00 |
| Lopardo, Stephen T. | 8/1/02 | 14:48 | 8/1/02 | 05:11 | | 00:00 |
| Mancone, John M | 7/24/02 | 14:48 | 7/24/02 | 08:48 | 7/24/02 | 08:50 |
| Mansolillo, Vincent B. | 8/5/02 | 14:48 | 8/5/02 | 14:56 | | 00:00 |
| Marsland, James J | 2/13/03 | 14:48 | 2/13/03 | 09:31 | | 00:00 |
| Murray, John J. | 11/12/02 | 14:48 | 11/12/02 | 09:31 | | 00:00 |
| Oates, Thomas F | 7/23/02 | 14:48 | 7/23/02 | 08:03 | 7/23/02 | 08:07 |
| Phillips, David J. | 7/25/02 | 14:48 | 7/25/02 | 11:14 | 7/25/02 | 11:26 |
| Schavone, Robert F. | 7/26/02 | 14:48 | 7/26/02 | 09:03 | 7/26/02 | 09:18 |
| Washburn, Robert L. | 8/2/02 | 14:48 | 8/2/02 | 09:18 | | 00:00 |
| Zienowicz, Gail M. | 8/20/02 | 14:48 | 8/20/02 | 13:30 | | 00:00 |
| | 7/24/02 | 14:48 | 7/24/02 | 15:38 | 7/24/02 | 15:39 |
| Kittell, Sandra L. | 11/12/02 | 14:48 | 11/12/02 | 15:23 | | 00:00 |
| Paolino-Reall, Jo-Ann M | 1/13/03 | 14:48 | 1/13/03 | 10:51 | | 00:00 |
| Abatiello, John S | 7/25/02 | 14:48 | 7/25/02 | 23:37 | 7/25/02 | 23:44 |
| Abenante, Ralph | 7/26/02 | 14:48 | 7/26/02 | 11:54 | 7/26/02 | 12:03 |
| Adoptante, Danilo S | 8/2/02 | 14:48 | 8/2/02 | 02:09 | | 00:00 |
| Almeida, John W | 7/22/02 | 14:48 | 7/22/02 | 15:05 | 7/22/02 | 15:06 |
| Andreozzi, Lucio | 8/15/02 | 14:48 | 8/15/02 | 23:04 | | 00:00 |
| Andreozzi, Michael E | 7/22/02 | 14:48 | 7/22/02 | 15:03 | 7/22/02 | 15:03 |
| Arsenault, Norman J | 9/6/02 | 14:48 | 9/6/02 | 11:54 | | 00:00 |
| Aspinall, Roger A | 9/20/02 | 14:48 | 9/20/02 | 16:09 | | 00:00 |
| Autieri, Robert P | 7/24/02 | 14:48 | 7/24/02 | 23:11 | 7/24/02 | 23:45 |
| P , Andrea J | 8/29/02 | 14:48 | 8/29/02 | 08:40 | | 00:00 |
| Ba..assare, William j | | 14:48 | | 00:00 | | 00:00 |
| Balkun, Joseph R | 7/31/02 | 14:48 | 7/31/02 | 11:28 | 7/31/02 | 11:32 |
| Bennett, Richard F | 7/22/02 | 14:48 | 7/22/02 | 14:57 | 7/22/02 | 15:00 |
| Bibeault, Jason R | 7/24/02 | 14:48 | 7/24/02 | 23:19 | 7/24/02 | 23:23 |
| Boehm, Robert K | 7/22/02 | 14:48 | 7/22/02 | 14:49 | 7/22/02 | 14:56 |
| Bolden, Gregory W | 7/29/02 | 14:48 | 7/29/02 | 09:03 | 7/29/02 | 09:48 |
| Braga, Michelle L | 7/23/02 | 14:48 | 7/23/02 | 19:00 | 7/23/02 | 19:00 |
| Brien, David W | 8/14/02 | 14:48 | 8/14/02 | 08:48 | | 00:00 |
| Brien, Donald C | 7/22/02 | 14:48 | 7/22/02 | 15:00 | 7/22/02 | 15:00 |
| Brousseau, Paul H | 7/28/02 | 14:48 | 7/28/02 | 10:10 | 7/28/02 | 12:23 |
| Bruno, James E | 7/22/02 | 14:48 | 7/22/02 | 15:11 | 7/22/02 | 15:18 |
| Buehne, David A | 7/24/02 | 14:48 | 7/24/02 | 07:03 | 7/24/02 | 07:09 |
| Campbell, William T | 7/24/02 | 14:48 | 7/24/02 | 07:32 | 7/24/02 | 07:38 |
| Carlson, Clifford S | 8/16/02 | 14:48 | 8/16/02 | 09:11 | | 00:00 |
| Carnevale, John M | 7/28/02 | 14:48 | 7/29/02 | 00:19 | | 00:00 |
| Chaffee, George E | 7/23/02 | 14:48 | 7/23/02 | 07:02 | 7/23/02 | 07:04 |
| Chin, Walter k | 7/22/02 | 14:48 | 7/22/02 | 23:28 | 7/23/02 | 00:29 |
| Chmura, John C | 7/25/02 | 14:48 | 7/25/02 | 07:40 | 7/25/02 | 08:17 |
| Cileli, Michael D | 7/22/02 | 14:48 | 7/22/02 | 23:03 | 7/22/02 | 23:11 |
| Cileli, Steven E | 7/23/02 | 14:48 | 7/23/02 | 07:10 | 7/23/02 | 07:11 |
| Connetta, Thomas R | 7/28/02 | 14:48 | 7/28/02 | 15:28 | 7/28/02 | 15:37 |
| Cook, Merrick A | 7/22/02 | 14:48 | 7/22/02 | 23:02 | 7/22/02 | 23:08 |
| Corcoran, Brian P | 7/23/02 | 14:48 | 7/23/02 | 07:16 | 7/23/02 | 07:23 |
| Corrigan, William J | 7/22/02 | 14:48 | 7/22/02 | 14:56 | 7/22/02 | 14:57 |
| Corsetti, Anthony A | 7/24/02 | 14:48 | 7/24/02 | 15:41 | 7/24/02 | 15:49 |
| Costantino, Ralph W | 8/19/02 | 14:48 | 8/19/02 | 14:52 | | 00:00 |
| C `, Kenneth M | 7/22/02 | 14:48 | 7/22/02 | 23:09 | 7/22/02 | 23:10 |
| C. ner, Patrick R | 7/23/02 | 14:48 | 7/23/02 | 07:49 | 7/23/02 | 07:49 |
| Springer, Stephen J. | 1/13/03 | 14:48 | 1/13/03 | 13:32 | | 00:00 |
| Davis, Ronald T | 8/28/02 | 14:48 | 8/28/02 | 15:26 | | 00:00 |
| Deandrade, Alyssa B | 7/24/02 | 14:48 | 7/24/02 | 23:23 | 7/24/02 | 23:36 |
| DeAngelis, Guy S | 7/23/02 | 14:48 | 7/23/02 | 07:14 | 7/23/02 | 07:15 |
| DeCesare, Jason F | 7/22/02 | 14:48 | 7/22/02 | 19:11 | 7/22/02 | 19:36 |
| DeLomba, Gerald E | 7/23/02 | 14:48 | 7/23/02 | 22:57 | 7/23/02 | 23:06 |

| | | | | | | |
|---|---|---|---|---|---|---|
| DePina, David J | 7/22/02 | 14:48 | 7/22/02 | 16:25 | 7/22/02 | 16:30 |
| DeSauteis, Curt D | 7/22/02 | 14:48 | 7/22/02 | 16:15 | 7/22/02 | 16:22 |
| Deschamps, Jose I | 7/22/02 | 14:48 | 7/22/02 | 17:35 | 7/22/02 | 17:36 |
| Desmarais, James F | 8/13/02 | 14:48 | 8/13/02 | 11:10 | | 00:00 |
| DosReis, Joseph R | 7/22/02 | 14:48 | 7/22/02 | 14:53 | 7/22/02 | 14:54 |
| F[illegible]monds, Derrek J | 7/23/02 | 14:48 | 7/23/02 | 07:12 | 7/23/02 | 07:13 |
| [illegible], John E | 8/4/02 | 14:48 | 8/4/02 | 06:54 | | 00:00 |
| Enright, Edward R | 7/23/02 | 14:48 | 7/23/02 | 07:18 | 7/23/02 | 07:19 |
| Farrell, Mark V | 7/24/02 | 14:48 | 7/24/02 | 07:03 | 7/24/02 | 07:54 |
| Figueiredo, Michael J | 9/13/02 | 14:48 | 9/13/02 | 23:46 | | 00:00 |
| Firth, Robert A | 12/11/02 | 14:48 | 12/11/02 | 16:15 | | 00:00 |
| Flynn, Peter E | 10/22/02 | 14:48 | 10/22/02 | 08:26 | | 00:00 |
| Frolich, Andrew J | 7/24/02 | 14:48 | 7/24/02 | 11:43 | 7/24/02 | 11:45 |
| Galvin, James M | | 14:48 | | 00:00 | | 00:00 |
| Gannon, Bernard E | 8/3/02 | 14:48 | 8/3/02 | 15:57 | | 00:00 |
| Gaspar, James S | | 14:48 | | 00:00 | | 00:00 |
| Gencarella, Stephen J | 7/25/02 | 14:48 | 7/25/02 | 14:55 | 7/25/02 | 15:00 |
| Giusti, Patrizia | 7/22/02 | 14:48 | 7/22/02 | 21:04 | 7/22/02 | 21:50 |
| Glancy, Bruce J | 7/29/02 | 14:48 | 7/29/02 | 13:22 | 7/29/02 | 13:25 |
| Glavin, Tabatha L | 7/25/02 | 14:48 | 7/25/02 | 15:05 | 7/25/02 | 16:20 |
| Gonsalves, William J | 7/30/02 | 14:48 | 7/30/02 | 12:05 | 7/30/02 | 13:13 |
| Gough, Clarence W | 8/5/02 | 14:48 | 8/5/02 | 23:03 | | 00:00 |
| Green, Maurice | 1/6/03 | 14:48 | 1/6/03 | 19:54 | | 00:00 |
| Gregory, Thomas J | 8/5/02 | 14:48 | 8/5/02 | 10:35 | | 00:00 |
| Grover, Stephen T | | 14:48 | | 00:00 | | 00:00 |
| Guarniero, Ralph M | 7/24/02 | 14:48 | 7/24/02 | 11:13 | 7/24/02 | 11:15 |
| Guerette, Michelle D | 7/31/02 | 14:48 | 7/31/02 | 08:38 | 8/1/02 | 10:34 |
| | | 14:48 | | 00:00 | | 00:00 |
| Huffman, Marcus | 12/4/02 | 14:48 | 12/4/02 | 23:51 | | 00:00 |
| Iacobucci, Louis F | 7/22/02 | 14:48 | 7/22/02 | 18:54 | 7/22/02 | 19:15 |
| Iannucci, Joseph C | 7/25/02 | 14:48 | 7/25/02 | 23:25 | 7/25/02 | 23:36 |
| Imondi, Michael D | 7/22/02 | 14:48 | 7/22/02 | 23:33 | 7/23/02 | 00:03 |
| Isabella, Dean R | 7/22/02 | 14:48 | 7/22/02 | 23:15 | 7/22/02 | 23:55 |
| J[illegible]ony, Michael V | 7/30/02 | 14:48 | 7/30/02 | 07:07 | 7/30/02 | 07:10 |
| Ja[illegible]y, Kenneth C | 7/23/02 | 14:48 | 7/23/02 | 01:34 | 7/23/02 | 01:34 |
| Kaya, John C | 7/22/02 | 14:48 | 7/22/02 | 22:34 | 7/22/02 | 22:37 |
| Kazandjian, Khatchig M | 7/22/02 | 14:48 | 7/22/02 | 23:06 | 7/22/02 | 23:16 |
| Kells, Robert T Jr. | 7/22/02 | 14:48 | 7/22/02 | 18:35 | 7/22/02 | 18:35 |
| Kemble, Edwin J | 7/24/02 | 14:48 | 7/24/02 | 19:29 | 7/24/02 | 19:42 |
| Kennedy, John J | 7/23/02 | 14:48 | 7/23/02 | 19:03 | 7/23/02 | 19:06 |
| Kessler, Rhonda B | 10/16/02 | 14:48 | 10/16/02 | 15:31 | | 00:00 |
| Khamsyvoravong, Bounheauan | 7/25/02 | 14:48 | 7/25/02 | 15:15 | 7/25/02 | 15:51 |
| King, Raymond | 7/24/02 | 14:48 | 7/24/02 | 22:58 | 7/24/02 | 23:29 |
| Lafazia, Keith A | 7/24/02 | 14:48 | 7/24/02 | 18:11 | 7/24/02 | 18:15 |
| Lagasse, John W | 7/30/02 | 14:48 | 7/30/02 | 07:31 | 7/30/02 | 07:36 |
| Lapatin, David A | 9/9/02 | 14:48 | 9/9/02 | 09:02 | | 00:00 |
| | | 14:48 | | 00:00 | | 00:00 |
| Laranjo, Antonio D | 8/6/02 | 14:48 | 8/6/02 | 14:54 | | 00:00 |
| Larkin, Robert M | 7/23/02 | 14:48 | 7/23/02 | 07:06 | 7/23/02 | 07:06 |
| LeBlanc, Dennis A | | 14:48 | | 00:00 | | 00:00 |
| Lee, Arthur J | 11/18/02 | 14:48 | 11/18/02 | 17:59 | | 00:00 |
| Lee, Timothy M | 7/26/02 | 14:48 | 7/26/02 | 09:18 | 7/26/02 | 09:25 |
| Lennon, Joseph L | 7/22/02 | 14:48 | 7/22/02 | 15:59 | 7/22/02 | 16:00 |
| Lepre, Robert T | 7/24/02 | 14:48 | 7/24/02 | 11:42 | 7/24/02 | 11:45 |
| Logan, Scott D | 7/24/02 | 14:48 | 7/24/02 | 15:30 | 7/24/02 | 15:33 |
| Lonergan, Richard | 9/17/02 | 14:48 | 9/17/02 | 08:27 | | 00:00 |
| Lopardo, Kenneth J | 8/2/02 | 14:48 | 8/2/02 | 23:40 | | 00:00 |
| Malloy, Edmond F | 7/24/02 | 14:48 | 7/24/02 | 15:03 | 7/24/02 | 15:08 |
| Mancini, Mark A | 7/22/02 | 14:48 | 7/22/02 | 15:02 | 7/22/02 | 15:02 |
| Mann, Wayne M | 7/23/02 | 14:48 | 7/23/02 | 07:03 | 7/23/02 | 07:06 |
| Ma[illegible]tti, John D | 7/23/02 | 14:48 | 7/23/02 | 10:49 | 7/23/02 | 10:50 |
| M[illegible]tti, Taft A | 7/23/02 | 14:48 | 7/23/02 | 07:05 | 7/23/02 | 09:49 |
| Marcoccio, Michael M | 12/4/02 | 14:48 | 12/4/02 | 10:36 | | 00:00 |
| Mastracchio, Tara A | 7/22/02 | 14:48 | 7/22/02 | 23:02 | 7/22/02 | 23:58 |
| McCarthy, Daniel J | 7/24/02 | 14:48 | 7/24/02 | 15:07 | 7/24/02 | 15:12 |
| McCusker, William F | 8/3/02 | 14:48 | 8/3/02 | 07:06 | | 00:00 |
| McGregor, Scott P | 7/23/02 | 14:48 | 7/23/02 | 16:21 | 7/23/02 | 16:40 |
| McKenna, John R | 7/29/02 | 14:48 | 7/29/02 | 15:15 | 7/29/02 | 15:24 |

| | | | | | | |
|---|---|---|---|---|---|---|
| Bibeault, Amy L | 7/24/02 | 14:48 | 7/24/02 | 07:03 | 7/24/02 | 07:07 |
| Merandi, William | 1/8/03 | 14:48 | 1/8/03 | 15:24 | | 00:00 |
| Mills, Richard A | 7/22/02 | 14:48 | 7/22/02 | 22:56 | 7/22/02 | 23:01 |
| Moffett, Shawn M | | 14:48 | | 00:00 | | 00:00 |
| Moran, Ellen C | 8/8/02 | 14:48 | 8/8/02 | 07:25 | | 00:00 |
| M~~rissey, Kurt E | 7/23/02 | 14:48 | 7/23/02 | 06:58 | 7/23/02 | 07:00 |
| I .etta, Mario A | | 14:48 | | 00:00 | | 00:00 |
| Muriel, John M | 7/22/02 | 14:48 | 7/22/02 | 14:56 | 7/22/02 | 14:59 |
| Nadeau, Tami L | 8/4/02 | 14:48 | 8/4/02 | 19:02 | | 00:00 |
| Nadrowski, Stanley J | 7/24/02 | 14:48 | 7/24/02 | 07:02 | 7/24/02 | 07:07 |
| Nolette, James T | 7/24/02 | 14:48 | 7/24/02 | 11:31 | 7/24/02 | 12:02 |
| O'Brien, Dennis P | 7/25/02 | 14:48 | 7/25/02 | 20:14 | 7/25/02 | 20:17 |
| O'Hara, Timothy E | 7/25/02 | 14:48 | 7/25/02 | 18:35 | 7/25/02 | 19:08 |
| Osgood, Franklin | 9/20/02 | 14:48 | 9/20/02 | 13:32 | | 00:00 |
| ~~Paniccia, Robert J~~ | ~~7/24/02~~ | ~~14:48~~ | ~~7/24/02~~ | ~~07:07~~ | ~~7/24/02~~ | ~~07:14~~ |
| Paolo, Gregory D | 7/24/02 | 14:48 | 7/24/02 | 18:13 | 7/24/02 | 18:17 |
| Partridge, Scott A | 9/12/02 | 14:48 | 9/12/02 | 08:55 | | 00:00 |
| Pazzetta, Vincent A | 7/23/02 | 14:48 | 7/23/02 | 14:55 | 7/23/02 | 15:17 |
| Pease, Donald L | | 14:48 | | 00:00 | | 00:00 |
| Pedchenko, William J | 8/2/02 | 14:48 | 8/2/02 | 10:00 | | 00:00 |
| Pelagio, Scott E | 7/23/02 | 14:48 | 7/23/02 | 06:59 | 7/23/02 | 07:02 |
| Perrotti, Lewis A | 7/23/02 | 14:48 | 7/23/02 | 06:09 | 7/23/02 | 06:09 |
| ~~Petrella, Steven~~ | ~~9/19/02~~ | ~~14:48~~ | ~~9/19/02~~ | ~~15:09~~ | | ~~00:00~~ |
| Pickering, Timothy E | 7/22/02 | 14:48 | 7/22/02 | 16:33 | 7/22/02 | 16:33 |
| Pike, Kenneth E | 8/2/02 | 14:48 | 8/2/02 | 01:27 | | 00:00 |
| Purro, Michael S | 7/29/02 | 14:48 | 7/29/02 | 00:44 | 7/29/02 | 01:00 |
| ~~Quinn, Robert P~~ | 7/23/02 | 14:48 | 7/23/02 | 09:50 | 7/23/02 | 09:58 |
| Rawnsley, Martin A | 7/22/02 | 14:48 | 7/22/02 | 15:03 | 7/22/02 | 15:03 |
| Reddy, Patrick G | 7/24/02 | 14:48 | 7/24/02 | 07:30 | 7/24/02 | 08:42 |
| Blessing, Stephen T | 10/18/02 | 14:48 | 10/18/02 | 11:27 | | 00:00 |
| Remolina, Henry | | 14:48 | | 00:00 | | 00:00 |
| Riccio, Kenneth V | 7/24/02 | 14:48 | 7/24/02 | 07:11 | 7/24/02 | 07:16 |
| Rilev, Ronald T | 7/24/02 | 14:48 | 7/24/02 | 15:19 | 7/24/02 | 16:34 |
| R no, Elizabeth M | 7/24/02 | 14:48 | 7/24/02 | 15:07 | 7/24/02 | 15:16 |
| Romano, Paul W | 7/24/02 | 14:48 | 7/24/02 | 16:19 | 7/24/02 | 16:26 |
| Romano, Shane M | 7/23/02 | 14:48 | 7/23/02 | 00:04 | 7/23/02 | 00:06 |
| Rose, Thomas A | 7/23/02 | 14:48 | 7/23/02 | 07:59 | 7/23/02 | 08:11 |
| Rotella, Christopher J | 10/16/02 | 14:48 | 10/16/02 | 15:42 | | 00:00 |
| Ryan, Edward R Jr | 8/18/02 | 14:48 | 8/18/02 | 23:16 | | 00:00 |
| Ryan, James F | 7/23/02 | 14:48 | 7/23/02 | 07:11 | 7/23/02 | 07:16 |
| Salisbury, William H | 8/5/02 | 14:48 | 8/5/02 | 15:43 | | 00:00 |
| Santos, David R | 7/22/02 | 14:48 | 7/22/02 | 23:53 | 7/23/02 | 01:49 |
| Saraiva, Carlos A | | 14:48 | | 00:00 | | 00:00 |
| Sauro, Anthony V | 8/4/02 | 14:48 | 8/4/02 | 14:59 | | 00:00 |
| Scanlon, Andrew P | 7/22/02 | 14:48 | 7/22/02 | 15:04 | 7/22/02 | 15:05 |
| Schlageter, Margaret M | 10/15/02 | 14:48 | 10/15/02 | 11:10 | | 00:00 |
| Simoneau, Dennis W | 7/22/02 | 14:48 | 7/22/02 | 14:48 | 7/22/02 | 14:48 |
| Sisson, Lincoln P | 1/20/03 | 14:48 | 1/20/03 | 12:32 | | 00:00 |
| Slater, Gary M | 7/29/02 | 14:48 | 7/29/02 | 08:29 | 7/29/02 | 08:34 |
| Smith, George P | 7/25/02 | 14:48 | 7/25/02 | 23:09 | 7/26/02 | 01:58 |
| Soares, Manuel J | 7/22/02 | 14:48 | 7/22/02 | 20:16 | 7/22/02 | 20:23 |
| Sobanski, Wladyslaw | | 14:48 | | 00:00 | | 00:00 |
| Sousa, Scott A | 7/24/02 | 14:48 | 7/24/02 | 10:16 | 7/24/02 | 10:17 |
| Teixeira, Anthony | 7/24/02 | 14:48 | 7/24/02 | 08:02 | 7/24/02 | 09:02 |
| Tella, Michele A | 7/23/02 | 14:48 | 7/23/02 | 15:16 | 7/23/02 | 15:23 |
| Valente, Jeffrey T | 7/22/02 | 14:48 | 7/22/02 | 14:54 | 7/22/02 | 14:56 |
| Villella, Joseph C | 7/22/02 | 14:48 | 7/22/02 | 19:23 | 7/22/02 | 19:44 |
| Wajda, Elizabeth A | 8/7/02 | 14:48 | 8/7/02 | 23:52 | | 00:00 |
| Walker, Michael | 8/2/02 | 14:48 | 8/2/02 | 15:46 | | 00:00 |
| Washburn, James E | 7/24/02 | 14:48 | 7/24/02 | 23:07 | 7/24/02 | 23:35 |
| Y hik, Robert | 7/31/02 | 14:48 | 7/31/02 | 17:41 | 7/31/02 | 18:25 |
| Za...gna, Arthur R | 8/1/02 | 14:48 | 8/1/02 | 07:03 | | 00:00 |
| Zeitountzian, Sarkis | 8/8/02 | 14:48 | 8/8/02 | 09:30 | | 00:00 |
| Ziegelmayer, Alan S | 7/29/02 | 14:48 | 7/29/02 | 09:49 | 7/29/02 | 09:59 |
| Zienowicz, Paul F | 7/28/02 | 14:48 | 7/28/02 | 07:03 | 7/28/02 | 07:38 |
| Zonfrilli, Alfred P | 7/24/02 | 14:48 | 7/24/02 | 09:07 | 7/24/02 | 09:12 |
| Hartnett, Philip R. | 7/22/02 | 14:48 | 7/22/02 | 14:48 | 7/22/02 | 14:58 |
| O'Mara, Kerion M. | 8/29/02 | 14:48 | 8/29/02 | 09:42 | | 00:00 |

| | | | | | | |
|---|---|---|---|---|---|---|
| Pearson, George A. | 2/6/03 | 14:48 | 2/6/03 | 10:06 | | 00:00 |
| Clements, Robert S. | | 14:48 | | 00:00 | | 00:00 |
| Carroll, William J. | | 14:48 | | 00:00 | | 00:00 |
| Cornell, Patricia L. | 11/15/02 | 14:48 | 11/15/02 | 01:17 | | 00:00 |
| Colon, Francisco, Jr. | 7/23/02 | 14:48 | 7/23/02 | 20:05 | 7/23/02 | 20:05 |
| Fanning, Daniel T. | 7/22/02 | 14:48 | 7/22/02 | 16:03 | 7/22/02 | 16:04 |
| on, Carl, Jr. W | 7/22/02 | 14:48 | 7/22/02 | 15:25 | 7/22/02 | 15:25 |
| Verdi, Thomas A. | 7/22/02 | 14:48 | 7/22/02 | 17:20 | 7/22/02 | 17:25 |
| San Lucas, Luis F | 7/22/02 | 14:48 | 7/22/02 | 15:14 | 7/22/02 | 15:14 |
| Badessa, Robert A. | | 14:48 | | 00:00 | | 00:00 |
| Renzi, Paul A. | 10/23/02 | 14:48 | 10/23/02 | 18:23 | | 00:00 |
| Miele, Robert T. | | 14:48 | | 00:00 | | 00:00 |
| Matos, Emililo | | 14:48 | | 00:00 | | 00:00 |
| Sarandrea, Joseph | 7/23/02 | 14:48 | 7/23/02 | 07:04 | 7/23/02 | 07:13 |
| Coughlin, John Jr. | 8/28/02 | 14:48 | 8/28/02 | 18:57 | | 00:00 |
| Sweeney, Michael J. | 8/6/02 | 14:48 | 8/6/02 | 12:34 | | 00:00 |
| Donnelly, F. Joseph | 2/7/03 | 14:48 | 2/7/03 | 13:26 | | 00:00 |
| Persson, Roy Jr. F. | | 14:48 | | 00:00 | | 00:00 |
| Drohan. Robert J. | 7/24/02 | 14:48 | 7/24/02 | 08:20 | 7/24/02 | 08:21 |
| O'Connell, Daniel J. | 7/22/02 | 14:48 | 7/22/02 | 14:59 | 7/22/02 | 14:59 |
| Dorley, Maxwell | 7/23/02 | 14:48 | 7/23/02 | 23:05 | 7/23/02 | 23:20 |
| Baez, Anibal | 7/22/02 | 14:48 | 7/22/02 | 15:58 | 7/22/02 | 16:07 |
| Marchant, David | 7/30/02 | 14:48 | 7/30/02 | 14:58 | 7/30/02 | 15:13 |
| Caraccia, Michael A | 7/23/02 | 14:48 | 7/23/02 | 13:50 | 7/23/02 | 14:10 |
| Della Ventura, Frank | 8/23/02 | 14:48 | 8/23/02 | 09:05 | | 00:00 |
| Morrison, George | 7/24/02 | 14:48 | 7/24/02 | 06:24 | 7/24/02 | 06:32 |
| Salinaro, Louis | 7/25/02 | 14:48 | 7/25/02 | 06:24 | 7/25/02 | 06:27 |
| Brown, Robert Jr | 7/22/02 | 14:48 | 7/22/02 | 23:03 | 7/22/02 | 23:04 |
| Cameron, Mark | 9/13/02 | 14:48 | 9/13/02 | 13:12 | | 00:00 |
| Day, Mary | 8/8/02 | 14:48 | 8/8/02 | 09:40 | | 00:00 |
| Edes,David, II | 7/23/02 | 14:48 | 7/23/02 | 08:22 | 7/23/02 | 08:27 |
| Ferrell, Jesse L | 8/1/02 | 14:48 | 8/1/02 | 12:42 | | 00:00 |
| Garcia, Fausto G | 7/23/02 | 14:48 | 7/23/02 | 08:11 | 7/23/02 | 08:34 |
| G lves,Stephen G | 1/16/03 | 14:48 | 1/16/03 | 17:35 | | 00:00 |
| Ke...edy, Paul J | 7/23/02 | 14:48 | 7/23/02 | 14:26 | 7/23/02 | 14:37 |
| Harris Tonya | 8/7/02 | 14:48 | 8/7/02 | 10:06 | | 00:00 |
| Laorenza, Guido | 7/23/02 | 14:48 | 7/23/02 | 07:52 | 7/23/02 | 07:54 |
| Latimer, Donals | 11/18/02 | 14:48 | 11/18/02 | 22:32 | | 00:00 |
| Lynch, Jerome | 8/13/02 | 14:48 | 8/13/02 | 23:48 | | 00:00 |
| | 7/22/02 | 14:48 | 7/22/02 | 17:03 | 7/22/02 | 17:13 |
| Melaragno, Robert | 11/14/02 | 14:48 | 11/14/02 | 19:20 | | 00:00 |
| Mellor, John | 8/3/02 | 14:48 | 8/3/02 | 04:22 | | 00:00 |
| Patino, Maribel | 10/9/02 | 14:48 | 10/9/02 | 13:58 | | 00:00 |
| Rawnsley, Thomas | 7/25/02 | 14:48 | 7/25/02 | 12:26 | 7/25/02 | 12:35 |
| Reall, Lawrence Jr | 7/22/02 | 14:48 | 7/22/02 | 14:48 | 7/22/02 | 14:49 |
| Sacco, Mark | 1/6/03 | 14:48 | 1/6/03 | 17:40 | | 00:00 |
| Santopadre, Nancy | 2/6/03 | 14:48 | 2/6/03 | 16:02 | | 00:00 |
| Silva-Rocha, Debra | | 14:48 | | 00:00 | | 00:00 |
| Small, Gregorio v | | 14:48 | | 00:00 | | 00:00 |
| Soto, John | 7/23/02 | 14:48 | 7/23/02 | 07:11 | 7/23/02 | 07:17 |
| Wells, Roy | 9/26/02 | 14:48 | 9/26/02 | 08:41 | | 00:00 |
| Wheeler, Micheal | 9/5/02 | 14:48 | 9/5/02 | 22:29 | | 00:00 |
| Ziegelmayer, Kevin | 7/25/02 | 14:48 | 7/25/02 | 16:26 | 7/25/02 | 17:36 |
| Rocchio, Peter | 7/23/02 | 14:48 | 7/23/02 | 20:51 | 7/23/02 | 21:06 |
| Coogan, Chris | | 14:48 | | 00:00 | | 00:00 |
| Allin, Douglas R | 7/25/02 | 14:48 | 7/25/02 | 15:08 | 7/25/02 | 16:24 |
| Campbell, Paul R | 7/23/02 | 14:48 | 7/23/02 | 07:06 | 7/23/02 | 07:26 |
| Campbell, Stephen M | 10/2/02 | 14:48 | 10/2/02 | 10:02 | | 00:00 |
| Clift, James E | 10/22/02 | 14:48 | 10/22/02 | 16:15 | | 00:00 |
| DeCarlo, Robert R | 7/22/02 | 14:48 | 7/22/02 | 20:36 | 7/22/02 | 20:36 |
| Du 'ski, Robert S | 7/22/02 | 14:48 | 7/22/02 | 15:19 | 7/22/02 | 15:28 |
| Fe des, Richard II | 7/22/02 | 14:48 | 7/22/02 | 14:48 | 7/22/02 | 14:53 |
| Ferreira, Jeffrey S | | 14:48 | | 00:00 | | 00:00 |
| Fitzgerald, Paul C | 7/23/02 | 14:48 | 7/23/02 | 10:01 | 7/23/02 | 10:16 |
| Green, Terrence L | 8/7/02 | 14:48 | 8/7/02 | 19:21 | | 00:00 |
| Harris, Michael M | 7/23/02 | 14:48 | 7/23/02 | 11:42 | 7/23/02 | 11:53 |
| Kerr, Tara A | 11/26/02 | 14:48 | 11/26/02 | 07:58 | | 00:00 |
| Lanni, Kevin M | | 14:48 | | 00:00 | | 00:00 |

| | | | | | | |
|---|---|---|---|---|---|---|
| Lawton, Andrew P | 9/6/02 | 14:48 | 9/6/02 | 16:20 | | 00:00 |
| Ludovici, Nicholas A | | 14:48 | | 00:00 | | 00:00 |
| Marsella, Richard D | 7/22/02 | 14:48 | 7/22/02 | 15:03 | 7/22/02 | 15:08 |
| Mattera, William C | 7/24/02 | 14:48 | 7/24/02 | 15:07 | 7/24/02 | 15:12 |
| McGann, Timothy C | 7/24/02 | 14:48 | 7/24/02 | 03:23 | 7/24/02 | 03:23 |
| I' 'lally, Brian T | 7/22/02 | 14:48 | 7/22/02 | 19:07 | 7/22/02 | 19:08 |
| or, James F | 7/22/02 | 14:48 | 7/22/02 | 15:02 | 7/22/02 | 15:02 |
| Moffett, Casey W | 8/19/02 | 14:48 | 8/19/02 | 17:23 | | 00:00 |
| O'Connor, John J III | 7/23/02 | 14:48 | 7/23/02 | 07:09 | 7/23/02 | 08:00 |
| Pereira, George C | 7/22/02 | 14:48 | 7/22/02 | 17:11 | 7/22/02 | 17:15 |
| Pino, Ronald | 7/23/02 | 14:48 | 7/23/02 | 16:38 | 7/23/02 | 16:41 |
| Reposa, John M Jr | 7/24/02 | 14:48 | 7/24/02 | 15:15 | 7/24/02 | 15:21 |
| Ruggiero, Richard F | 10/31/02 | 14:48 | 10/31/02 | 08:22 | | 00:00 |
| Silvestri, David N | 8/7/02 | 14:48 | 8/7/02 | 07:19 | | 00:00 |
| Simoneau, Jason | 7/23/02 | 14:48 | 7/23/02 | 07:20 | 7/23/02 | 07:21 |
| Sollitto, Vincent J | 7/31/02 | 14:48 | 7/31/02 | 23:12 | 7/31/02 | 23:37 |
| Sullivan, Stephen E | 7/24/02 | 14:48 | 7/24/02 | 15:06 | 7/24/02 | 15:09 |
| Tarlaian, Richard D | 7/22/02 | 14:48 | 7/22/02 | 19:34 | 7/22/02 | 19:35 |
| Tejada, David | 7/28/02 | 14:48 | 7/28/02 | 22:57 | 7/28/02 | 23:08 |
| Thornton, Brian G | 7/29/02 | 14:48 | 7/29/02 | 08:35 | 7/29/02 | 08:58 |
| Young, Cornel | 7/25/02 | 14:48 | 7/25/02 | 08:28 | | 00:00 |
| Zabinski, Robert A | 7/29/02 | 14:48 | 7/29/02 | 08:12 | 7/29/02 | 08:19 |
| Zincone, Thomas J | 8/2/02 | 14:48 | 8/2/02 | 16:34 | | 00:00 |
| Amoroso, Joseph M | 7/23/02 | 14:48 | 7/23/02 | 09:26 | 7/23/02 | 09:28 |
| Berarducci, Stephen P | | 14:48 | | 00:00 | | 00:00 |
| Bianco, Maria | 7/23/02 | 14:48 | 7/23/02 | 07:29 | 7/23/02 | 07:29 |
| Conti, James E | 7/26/02 | 14:48 | 7/26/02 | 22:07 | 7/26/02 | 22:45 |
| Dasilva, Antonio | 8/7/02 | 14:48 | 8/7/02 | 17:55 | | 00:00 |
| Leste, Edward M | 7/29/02 | 14:48 | 7/29/02 | 10:57 | 7/29/02 | 11:04 |
| Long, Michael J | 7/23/02 | 14:48 | 7/23/02 | 07:02 | 7/23/02 | 07:06 |
| Masse, Thomas F | 7/22/02 | 14:48 | 7/22/02 | 14:48 | 7/22/02 | 14:48 |
| Perez, Oscar L | 9/5/02 | 14:48 | 9/5/02 | 22:26 | 9/17/02 | 19:08 |
| V''lla, Frank C | 7/22/02 | 14:48 | 7/22/02 | 20:22 | 7/22/02 | 20:22 |
| en, John R | 8/30/02 | 14:48 | 8/30/02 | 15:05 | | 00:00 |
| Avant, Angelo | 7/24/02 | 14:48 | 7/24/02 | 15:05 | 7/24/02 | 15:09 |
| Colanduono, Joseph A | | 14:48 | | 00:00 | | 00:00 |
| Conley, Peter F | 7/22/02 | 14:48 | 7/22/02 | 15:33 | 7/22/02 | 15:33 |
| Connetta, John E | 7/28/02 | 14:48 | 7/28/02 | 09:02 | 7/28/02 | 09:17 |
| Correia, Michael E | 7/24/02 | 14:48 | 7/24/02 | 08:49 | 7/24/02 | 08:53 |
| Costello, Peter J | 7/22/02 | 14:48 | 7/22/02 | 14:49 | 7/22/02 | 14:49 |
| Dwyer, William M | 7/26/02 | 14:48 | 7/26/02 | 15:05 | 7/26/02 | 15:37 |
| Enright, Robert M | 7/23/02 | 14:48 | 7/23/02 | 08:07 | 7/23/02 | 08:19 |
| Ferland, Wayne H | 7/23/02 | 14:48 | 7/23/02 | 08:01 | 7/23/02 | 08:06 |
| Gannon, Daniel E | 7/25/02 | 14:48 | 7/25/02 | 11:17 | 7/25/02 | 11:43 |
| Hampton, Anthony R | | 14:48 | | 00:00 | | 00:00 |
| Hassett, James K | 8/27/02 | 14:48 | 8/27/02 | 07:38 | | 00:00 |
| Iadevaia, Patricia M | 10/15/02 | 14:48 | 10/15/02 | 09:31 | | 00:00 |
| Lussier, David | 7/22/02 | 14:48 | 7/22/02 | 15:12 | 7/22/02 | 15:15 |
| Moody, Frank | | 14:48 | | 00:00 | | 00:00 |
| Rocha, Freddy E | 8/26/02 | 14:48 | 8/26/02 | 09:39 | | 00:00 |
| Spiver, Allen E | 7/23/02 | 14:48 | 7/23/02 | 11:56 | 7/23/02 | 11:59 |
| St. Lawrence, John E | 7/22/02 | 14:48 | 7/22/02 | 16:02 | 7/22/02 | 16:02 |
| Stravato, Louis D | | 14:48 | | 00:00 | | 00:00 |
| Zammarelli, Frank L | | 14:48 | | 00:00 | | 00:00 |
| Zuena, Fabio | 7/24/02 | 14:48 | 7/24/02 | 15:09 | 7/24/02 | 15:14 |
| San Antonio, George | 7/30/02 | 14:48 | 7/30/02 | 16:53 | 7/30/02 | 16:59 |
| RICHARDSON, Joseph COMM | 7/22/02 | 14:48 | 7/22/02 | 14:48 | 7/22/02 | 16:20 |
| Bogda, Edward | 7/26/02 | 14:48 | 7/26/02 | 16:44 | 7/26/02 | 16:49 |
| Brito, Napoleon | 8/8/02 | 14:48 | 8/8/02 | 07:23 | | 00:00 |
| Br^thers, Michael | 7/22/02 | 14:48 | 7/22/02 | 14:59 | 7/22/02 | 15:00 |
| ian, Daniel | 7/24/02 | 14:48 | 7/24/02 | 15:06 | 7/24/02 | 15:27 |
| Carr, James | 7/24/02 | 14:48 | 7/24/02 | 08:12 | 7/24/02 | 08:14 |
| Carvalho, John | 7/31/02 | 14:48 | 7/31/02 | 22:09 | 7/31/02 | 23:39 |
| Casbarro, Steven | 7/23/02 | 14:48 | 7/23/02 | 09:03 | 7/23/02 | 09:04 |
| Cassidy, Glenn | 7/22/02 | 14:48 | 7/22/02 | 15:36 | | 00:00 |
| Castillo, Jose | 7/22/02 | 14:48 | 7/22/02 | 15:51 | 7/22/02 | 16:03 |
| Clark, Thomas | 10/16/02 | 14:48 | 10/16/02 | 09:07 | | 00:00 |
| Costa, John | 7/24/02 | 14:48 | 7/24/02 | 13:27 | 7/24/02 | 13:30 |

| | | | | | | |
|---|---|---|---|---|---|---|
| Dean, George | | 14:48 | | 00:00 | | 00:00 |
| DeCristofano, Albert | 7/22/02 | 14:48 | 7/22/02 | 18:40 | 7/22/02 | 18:43 |
| DeFrances, Louis | 7/26/02 | 14:48 | 7/26/02 | 08:08 | 7/26/02 | 08:11 |
| Del Rio, Louis Jr. | 8/6/02 | 14:48 | 8/6/02 | 14:58 | | 00:00 |
| Etchells, Alfred | 7/22/02 | 14:48 | 7/22/02 | 14:48 | 7/22/02 | 14:49 |
| Famiglietti, Daniel | 8/1/02 | 14:48 | 8/1/02 | 21:14 | | 00:00 |
| ( ta, Pasquale | 7/22/02 | 14:48 | 7/22/02 | 14:48 | 7/22/02 | 15:54 |
| Hames, Martin | | 14:48 | | 00:00 | | 00:00 |
| Hull, Darren | 7/24/02 | 14:48 | 7/24/02 | 07:35 | 7/24/02 | 07:36 |
| Hutchinson, William | 7/29/02 | 14:48 | 7/29/02 | 12:50 | 7/29/02 | 13:19 |
| Katsetos, Niko | 1/10/03 | 14:48 | 1/10/03 | 08:49 | | 00:00 |
| Keegan, John | 7/23/02 | 14:48 | 7/23/02 | 08:32 | 7/23/02 | 08:34 |
| | | 14:48 | | 00:00 | | 00:00 |
| Lima, Alfred | 7/24/02 | 14:48 | 7/24/02 | 10:06 | 7/24/02 | 10:10 |
| Luna, Ernesto | | 14:48 | | 00:00 | | 00:00 |
| Mackin, John | 7/22/02 | 14:48 | 7/22/02 | 14:48 | 7/22/02 | 16:06 |
| Mangan, Michael | 8/29/02 | 14:48 | 8/29/02 | 10:03 | | 00:00 |
| Matracia, Micheal | 7/22/02 | 14:48 | 7/22/02 | 14:48 | 7/22/02 | 14:49 |
| McCarthy, Michael | 7/23/02 | 14:48 | 7/23/02 | 10:45 | 7/23/02 | 10:47 |
| McNulty, Patrick | 7/27/02 | 14:48 | 7/27/02 | 15:33 | 7/27/02 | 17:04 |
| Morgan, David | 1/6/03 | 14:48 | 1/6/03 | 14:25 | | 00:00 |
| Murphy, Daniel | 7/22/02 | 14:48 | 7/22/02 | 16:21 | 7/22/02 | 16:21 |
| Nichols, Patricia | 11/6/02 | 14:48 | 11/6/02 | 14:45 | | 00:00 |
| O'Rourke, Paul | 7/23/02 | 14:48 | 7/23/02 | 14:18 | 7/23/02 | 14:19 |
| Panzarella, Michael | 7/22/02 | 14:48 | 7/22/02 | 23:58 | 7/23/02 | 00:01 |
| Ricci, John | | 14:48 | | 00:00 | | 00:00 |
| Rodriguez, Cynthia | 8/27/02 | 14:48 | 8/27/02 | 08:30 | | 00:00 |
| Searles, Edwin | | 14:48 | | 00:00 | | 00:00 |
| Sarrasin, Joseph | 7/24/02 | 14:48 | 7/24/02 | 10:49 | 7/24/02 | 10:52 |
| Shea, Stephen | 7/28/02 | 14:48 | 7/28/02 | 07:05 | 7/28/02 | 07:21 |
| Simoneau, Kenneth | 7/23/02 | 14:48 | 7/23/02 | 09:50 | 7/23/02 | 09:51 |
| Sion, Gregory | 7/23/02 | 14:48 | 7/23/02 | 10:25 | 7/23/02 | 10:26 |
| Soares, Roderick | 7/24/02 | 14:48 | 7/24/02 | 16:38 | 7/24/02 | 16:43 |
| S' 'akos, George | 7/22/02 | 14:48 | 7/22/02 | 16:11 | 7/22/02 | 16:11 |
| | | 14:48 | | 00:00 | | 00:00 |
| Tucker, Keith | 7/24/02 | 14:48 | 7/24/02 | 12:12 | 7/24/02 | 12:21 |
| Vanderhorst, Gregorio | 8/7/02 | 14:48 | 8/7/02 | 18:04 | | 00:00 |
| Vieira, Michael | 8/28/02 | 14:48 | 8/28/02 | 10:53 | | 00:00 |
| Vinacco, Kenneth | 1/6/03 | 14:48 | 1/6/03 | 13:16 | | 00:00 |
| Williamson, Hugh | | 14:48 | | 00:00 | | 00:00 |
| Yang, Pao | 12/11/02 | 14:48 | 12/11/02 | 08:11 | | 00:00 |
| Zacks, Harold | 7/25/02 | 14:48 | 7/24/02 | 16:11 | 8/7/02 | 08:39 |
| Cooley,Nurys | 10/15/02 | 14:48 | 10/15/02 | 12:33 | | 00:00 |
| Bennet, R (INACTIVE) | 8/6/02 | 14:48 | 8/6/02 | 07:43 | | 00:00 |
| VIN Station | 7/22/02 | 14:48 | 7/22/02 | 14:48 | 7/22/02 | 15:15 |
| Yee, Peter | 7/24/02 | 14:48 | 7/24/02 | 23:21 | 7/24/02 | 23:37 |
| Acampora, Joseph | 7/24/02 | 14:48 | 7/24/02 | 22:59 | 7/24/02 | 23:36 |
| Carroll, Sean M | 7/28/02 | 14:48 | 7/28/02 | 19:47 | 7/28/02 | 20:40 |
| Courville, Steven E | 8/8/02 | 14:48 | 8/8/02 | 18:10 | | 00:00 |
| Fallon, Michael J | 7/28/02 | 14:48 | 7/28/02 | 23:50 | 7/29/02 | 00:31 |
| Ramage,David | 7/23/02 | 14:48 | 7/23/02 | 19:05 | 7/23/02 | 19:08 |
| Henderson, John | 8/21/02 | 14:48 | 8/21/02 | 18:13 | | 00:00 |
| Difillippo Jeanna A. | 7/22/02 | 14:48 | 7/22/02 | 23:44 | 7/23/02 | 00:12 |
| Petrocchi, Scott T | 7/22/02 | 14:48 | 7/22/02 | 22:58 | 7/22/02 | 23:01 |
| O, Jin | 7/25/02 | 14:48 | 7/25/02 | 23:23 | 7/26/02 | 01:40 |
| O'Donnell, William | 7/23/02 | 14:48 | 7/23/02 | 22:56 | 7/23/02 | 22:59 |
| Solitro, Michael | | 14:48 | | 00:00 | | 00:00 |
| Lough, John J | 7/22/02 | 14:48 | 7/22/02 | 23:02 | 7/22/02 | 23:04 |
| Marshall, Wayne D | 7/22/02 | 14:48 | 7/22/02 | 14:48 | 7/22/02 | 14:49 |
| Pitrone, Marsha | 7/24/02 | 14:48 | 7/24/02 | 23:04 | 7/24/02 | 23:24 |
| Lo· Fernando | 7/22/02 | 14:48 | 7/22/02 | 22:58 | 7/22/02 | 23:00 |
| To· Kevin | 7/24/02 | 14:48 | 7/24/02 | 23:53 | 7/25/02 | 00:29 |
| Regine, Edward A | 7/22/02 | 14:48 | 7/22/02 | 23:29 | 7/22/02 | 23:31 |
| DeAngelis,Frank | 7/22/02 | 14:48 | 7/22/02 | 23:08 | 7/23/02 | 00:22 |
| Sousa, Richard | 8/26/02 | 14:48 | 8/26/02 | 13:34 | | 00:00 |
| Boranian, Charles | 7/23/02 | 14:48 | 7/23/02 | 13:08 | 7/23/02 | 13:22 |
| ANTONSON, Lori COMM | 7/24/02 | 14:48 | 7/24/02 | 14:59 | 7/24/02 | 15:31 |
| ARIAS, Carolyn | 7/22/02 | 14:48 | 7/22/02 | 14:49 | 7/22/02 | 14:49 |

| | | | | | | |
|---|---|---|---|---|---|---|
| BUCCI, Agostino COMM | 7/23/02 | 14:48 | 7/23/02 | 12:41 | | [illegible] |
| BUONANNO, Douglas COMM | 7/26/02 | 14:48 | 7/26/02 | 05:53 | 7/26/02 | 07:58 |
| LONG, Patricia COMM | 7/23/02 | 14:48 | 7/23/02 | 23:10 | 7/23/02 | 23:12 |
| LENNON, Mary COMM | 7/22/02 | 14:48 | 7/22/02 | 15:29 | 7/22/02 | 15:29 |
| LAMOTHE, Alfred COMM | 11/7/02 | 14:48 | 11/7/02 | 15:05 | | 00:00 |
| SNEAD, Walter COMM | 7/22/02 | 14:48 | 7/22/02 | 22:54 | 7/23/02 | 03:39 |
| [illegible]EY, Joseph COMM | 8/27/02 | 14:48 | 8/27/02 | 23:00 | | 00:00 |
| SEARS, David COMM | 7/26/02 | 14:48 | 7/26/02 | 00:23 | 7/26/02 | 00:27 |
| Comerford, Michael | 7/22/02 | 14:48 | 7/22/02 | 23:10 | 7/23/02 | 00:32 |
| Wigginton, Kenneth | 7/25/02 | 14:48 | 7/25/02 | 08:18 | 7/25/02 | 08:26 |
| Otrando, Michael | 7/22/02 | 14:48 | 7/22/02 | 22:58 | 7/22/02 | 23:05 |
| Lepore, Brian | 7/22/02 | 14:48 | 7/22/02 | 23:52 | 7/23/02 | 00:11 |
| Calcagni, Eileen | | 14:48 | | 00:00 | | 00:00 |
| Buote, Sondra | | 14:48 | | 00:00 | | 00:00 |
| AUTIELLO, Robert COMM | 11/18/02 | 14:48 | 11/18/02 | 14:13 | | 00:00 |
| BIANCA, David COMM | 2/16/03 | 14:48 | 2/16/03 | 12:57 | | 00:00 |
| CALCAGNI, Edmund COMM | 1/10/03 | 14:48 | 1/10/03 | 18:26 | | 00:00 |
| COSENZA, Frank COMM | 8/2/02 | 14:48 | 8/2/02 | 09:46 | | 00:00 |
| CUNHA, Michael COMM | | 14:48 | | 00:00 | | 00:00 |
| GOMES, Russell COMM | | 14:48 | | 00:00 | | 00:00 |
| GRIMALDI, Michael COMM | 7/26/02 | 14:48 | 7/26/02 | 09:00 | 7/26/02 | 09:11 |
| KAZARIAN, Lori COMM | 7/24/02 | 14:48 | 7/24/02 | 01:12 | 7/24/02 | 01:14 |
| KEARNEY, Maurice COMM | | 14:48 | | 00:00 | | 00:00 |
| LACAS, George COMM | 8/21/02 | 14:48 | 8/21/02 | 12:10 | | 00:00 |
| NEVES, Paul COMM | | 14:48 | | 00:00 | | 00:00 |
| NEWELL, William COMM | 9/7/02 | 14:48 | 9/7/02 | 09:36 | | 00:00 |
| OATES, Emily COMM | 8/16/02 | 14:48 | 8/16/02 | 05:03 | | 00:00 |
| PERIQUITO, Sue COMM | 8/3/02 | 14:48 | 8/3/02 | 16:58 | | 00:00 |
| PINNEY, Ramonita COMM | | 14:48 | | 00:00 | | 00:00 |
| PITOCCO, Anthony COMM | | 14:48 | | 00:00 | | 00:00 |
| REIS, David COMM | 9/17/02 | 14:48 | 9/17/02 | 23:41 | | 00:00 |
| SAMBAIN, Lisa COMM | 1/9/03 | 14:48 | 1/9/03 | 08:05 | | 00:00 |
| SPARDELLO, Gary COMM | 12/25/02 | 14:48 | 12/25/02 | 01:25 | | 00:00 |
| V[illegible]NZUELA, Candida COMM | | 14:48 | | 00:00 | | 00:00 |
| W[illegible]DMAN, Howard COMM | 7/23/02 | 14:48 | 7/23/02 | 21:27 | 7/23/02 | 21:50 |
| XIONG, Ger COMM | | 14:48 | | 00:00 | | 00:00 |
| YA, Ive Khun COMM | | 14:48 | | 00:00 | | 00:00 |
| CONTI, John COMM | | 14:48 | | 00:00 | | 00:00 |
| MILLARD, Ann-Marie COMM | 7/25/02 | 14:48 | 7/25/02 | 06:50 | 7/25/02 | 06:52 |
| LEITE, Paul COMM | 12/21/02 | 14:48 | 12/21/02 | 17:04 | | 00:00 |
| GIARDILLO, Anthony COMM | 7/24/02 | 14:48 | 7/24/02 | 15:07 | 7/24/02 | 15:09 |
| | | 14:48 | | 00:00 | | 00:00 |
| MAINE, Keith COMM | 7/24/02 | 14:48 | 7/24/02 | 19:02 | 7/24/02 | 19:31 |
| TORRES, Yuberkis COMM | | 14:48 | | 00:00 | | 00:00 |
| VILLANOVA, Rafael COMM | 8/30/02 | 14:48 | 8/30/02 | 11:06 | | 00:00 |
| Ferreira, Jason M | 7/27/02 | 14:48 | 7/27/02 | 15:39 | 7/27/02 | 16:16 |
| Cardarelli,Kris | 8/23/02 | 14:48 | 8/23/02 | 14:51 | | 00:00 |
| Marble, Roseann | 9/11/02 | 14:48 | 9/11/02 | 15:14 | | 00:00 |
| dlambert | | 14:48 | | 00:00 | | 00:00 |
| PEIXINHO, Michael VIDEO | 7/23/02 | 14:48 | 7/23/02 | 07:09 | 7/23/02 | 07:09 |
| tes1 | | 14:48 | | 00:00 | | 00:00 |
| PANZARELLA, Michael G VIDEO | 7/25/02 | 14:48 | 7/25/02 | 08:01 | 7/25/02 | 08:02 |
| SIMONEAU, Steven VIDEO | 7/22/02 | 14:48 | 7/22/02 | 15:45 | 7/22/02 | 15:46 |
| JEREJIAN, Gary VIDEO | 7/23/02 | 14:48 | 7/23/02 | 10:35 | 7/23/02 | 10:36 |
| Manning, Sandra | 7/23/02 | 14:48 | 7/23/02 | 09:55 | 7/23/02 | 10:06 |
| Homerston, T | 7/23/02 | 14:48 | 7/23/02 | 16:03 | 7/23/02 | 17:42 |
| Alarie, Michele | 8/8/02 | 14:48 | 8/8/02 | 23:11 | | 00:00 |
| Riccio, Gene | 7/23/02 | 14:48 | 7/23/02 | 09:12 | 7/23/02 | 09:12 |
| Eddy, Dwight | 8/7/02 | 14:48 | 8/7/02 | 06:59 | | 00:00 |
| Haroian, Greg | | 14:48 | | 00:00 | | 00:00 |
| FC[illegible]odge 3 | 7/23/02 | 14:48 | 7/23/02 | 10:04 | 7/23/02 | 10:05 |
| K[illegible]dy, Gloria | 7/25/02 | 14:48 | 7/25/02 | 10:03 | 7/25/02 | 10:38 |
| McCaffery, Kristen | 7/23/02 | 14:48 | 7/23/02 | 23:23 | 7/23/02 | 23:26 |
| Kennedy, Shawn | 8/5/02 | 14:48 | 8/5/02 | 04:55 | | 00:00 |
| Waleryszak, Joseph | 10/23/02 | 14:48 | 10/23/02 | 09:22 | | 00:00 |
| Paolino, Ann | 11/1/02 | 14:48 | 11/1/02 | 08:35 | | 00:00 |
| Migliaccio, Joe | 7/23/02 | 14:48 | 7/23/02 | 08:09 | 7/23/02 | 08:11 |
| Heroux, Raymond | 7/27/02 | 14:48 | 7/27/02 | 15:22 | 7/27/02 | 15:25 |

| | | | | | | |
|---|---|---|---|---|---|---|
| Gordon, Bob | 7/22/03 | 14:48 | [illegible] | [illegible] | [illegible] | [illegible] |
| McKenna, Robert | 9/3/02 | 14:48 | 9/3/02 | 08:54 | | 00:00 |
| Crepeau, Rodney | | 14:48 | | 00:00 | | 00:00 |
| Massaregli, Nick | | 14:48 | | 00:00 | | 00:00 |

May 8, 2003

On February 14, 2003, members of the Rhode Island State Police Detective Bureau were requested to respond to the Providence Police Department/Providence Public Safety Complex in reference to a complaint of a digital recording system which was installed in the second-floor utility room, Room No. P284, which maintained computers and telephone interface equipment. At approximately 6:30 P.M., the following detectives were present: Lieutenant David Neill, Corporal Douglas Newberg, and Detectives John Killian and John Lemont. Present from the Providence Police Department was Consultant to the Chief, Andy Rosenzweig, Lieutenant Keith Tucker, and Detective John O'Hara. At this time, detectives were debriefed by Andy Rosenzweig and Lieutenant Keith Tucker as to the discovery and removal of a digital recording device which was recording incoming and outgoing telephone calls at the Providence Public Safety Complex.

At approximately 7:30 P.M., Inspector Bennett of the Providence Police Department Internal Affairs Unit provided access to the utility/telephone room. Detectives were able to view the location of the recording device. The system was already removed by Lieutenant Tucker and Communications Technicians Greg Haroian and Tony Desmarais on February 10, 2003. At this time, detectives only observed telephone lines, equipment brackets, and some power requirements from the removed recording system. Photographs were taken of this area by Detective John Killian.

Detectives seized from the office area of Lieutenant Tucker a digital recording system identified as Expanets Total Recall System which included a Dell 1650 Server, Serial No. 4SC5F11; a Dell 2500 Server, Serial No. 6J84C11; some documentation on the Total Recall System; an AT&T computer tower and associated peripheral devices.

Exhibit E

During the debriefing by Andy Rosenzweig, detectives were informed that the Director of the Communications Center, Manuel Vieira, and personnel from his office assisted with defining the system specifications, installation, access, and technical settings of the Total Recall System. Detectives further learned at that time the Total Recall System was digitally archiving all incoming and outgoing telephone calls except for a selected few from the Communications Center, Providence Public Safety Complex, to include the Providence Police Department and the Providence Fire Department; as well as some outlying buildings such as the Animal Control Center and the Fraternal Order of Police hall. Detectives also received from Andy Rosenzweig a list containing telephone extensions and the respective personnel assigned to that extension which were allegedly not being recorded.

At approximately 8:30 P.M., detectives responded to the Communications Center located at One Communication Place, West Exchange Street, Providence. Director Vieira's office was locked. At approximately 9:05 P.M., Director Vieira met detectives at the Communications Center but refused to discuss the recording system or any other questions regarding the recording of telephone calls at the Providence Public Safety Complex. At this time detectives seized the computer from Director Vieira's office, identified as a Dell PC Tower, Service Tag No. 1UDU9, and associated peripheral devices.

Detectives secured for the evening. Corporal Newberg and Detective Killian returned all seized evidence to State Police Headquarters and secured for the evening.

On February 15, 2003, at approximately 11:30 A.M., the following detectives returned to the Providence Public Safety Complex: Lieutenant David Neill; Corporals David Palmer and Douglas Newberg; and Detectives John Killian, John Lemont, and James Dougherty. Also present were: Andy Rosenzweig and Lieutenant Keith Tucker.

At this time detectives were further debriefed by Andy Rosenzweig and Lieutenant Keith Tucker as to the week's events leading up to Colonel Esserman's discovery and request to remove the digital recording device from the second-floor computer/telephone room.

At this time detectives start to interview the following Communications Center employees:

On February 15, 2003, Detective Corporal Newberg interviewed Mary Lennon at the Providence Public Safety Complex. Ms. Lennon provided the following information:

Ms. Lennon was the Chief of Operations, Police Control Center, at the Communications Center. She oversees approximately 44 personnel answering calls for service and dispatching calls for service for the police department. Ms. Lennon identified her immediate supervisor as Joseph Richardson, Deputy Director of the Communications Center. Ms. Lennon indicated she had some knowledge of the Total Recall System based on some training received and discussions with other personnel of the Communications Center, that most of the telephone lines were being recorded in the Providence Public Safety Complex. Ms. Lennon also indicated that Director Manuel Vieira and Deputy Director Joseph Richardson had knowledge that the telephone lines were being recorded at the Providence Public Safety building. Ms. Lennon indicated she had received remote training (via telephone) on the Total Recall System which included an overview of the system; its capabilities; and how to research, locate, and download pre-recorded telephone conversations. Ms. Lennon stated she recalls downloading one pre-recorded telephone conversation from the Total Recall System. This call involved a conversation between Councilman Patrick Butler and acting Director of the Emergency Management System, Thomas Scorpio in early November of 2002, at the request of Deputy Director Joseph Richardson. Ms. Lennon indicated that after locating the above-mentioned telephone conversation file, she briefly played the audio file and then downloaded a file to a CD-ROM. Ms. Lennon stated she then placed the CD-ROM in Director Vieira's office. Ms. Lennon

also stated that a short time later, Director Vieira indicated to her there was no audio file on the CD. She subsequently requested Greg Haroian, Communications Specialist Technician, to re-retrieve the file and write it to a CD-ROM.

Ms. Lennon indicated that to her knowledge the following personnel from the Communications Center had access to the Total Recall System: Ron Reposa, Steve Moise, Greg Haroian, Tony Desmarais, and Frank Parfume.

Ms. Lennon did indicate prior to the Providence Public Safety Building being constructed and operational, the only telephone lines at the Communications Center recorded were the police control lines, emergency lines, Channel 4, the back room lines (referring to some secondary lines), and all other telephone lines were not recorded.

Ms. Lennon stated she was provided a list of telephone numbers by Greg Haroian that were being recorded, but she was never trained or had knowledge on how to add or remove telephone numbers from the recording parameters.

Ms. Lennon was shown three request sheets for "logging tape playbacks" which she initialed and dated. Ms. Lennon indicated she completed the request forms but did not download to a CD-ROM, the requested pre-recorded telephone conversations which were requested by Major Simoneau and Investigator Thomas Clark. (Ms. Lennon did state she attempted to download the telephone conversation between Butler and Scorpio.) Ms. Lennon indicated that Ron Reposa and Greg Haroian executed the download request and that she only completed the request forms.

Ms. Lennon stated she did copy police calls for service and radio transmissions from the dictaphone system to cassette when requested through the requests sheets for "logging tape playback" forms. The dictaphone system records all police center emergency telephone lines, two telephone lines at the front dispatch, three telephone lines on Channel 4 (in back room), and

dispatch/cruiser radio Channels 1 through 6.

Ms. Lennon indicated her only reaction to the publicity of the recording device was that she assumed that most (all) of the people had knowledge that the telephone lines were being recorded.

On February 15, 2003, Detective Corporal Douglas Newberg and Detective John Killian interviewed Greg Haroian. Greg Haroian is employed at the Communications Center as a computer technician.

Mr. Haroian stated that in July or August of 2002, he became aware that all telephone lines were being recorded when he was asked to do maintenance from a server of the recording device. Mr. Haroian was asked by Deputy Director Joseph Richardson and Frank Parfume to install a sound card in the server which was located in the second-floor telephone room of the Providence Public Safety Complex. Mr. Haroian further stated he did not install a sound card because he could not locate a 64-pin audio card. A sound card, along with audio speakers, allows a system to have audio capability.

Mr. Haroian stated that he learned through online training to do some basic functions of the Total Recall System; more specifically to add and remove telephone extensions for the recording device. Mr. Haroian stated he was directed by either Director Vieira, Deputy Director Richardson, Mary Lennon, or Tony Desmarais to perform this function with the Total Recall System.

Greg Haroian mentioned that there were some issues with other personnel at the Communications Center about the recording of the recreational/break area telephone; and after numerous complaints, the recording of that extension was removed.

Mr. Haroian stated he had administrative privileges to the Total Recall System (which were provided by Deputy Director Richardson), along with Mary Lennon, Ron Reposa, Tony Desmarais, Frank Parfume, and Steve Moise. Mr. Haroian stated that it was approximately three to five times

that he was requested to retrieve audio files from recorded telephone conversations from the Total Recall System.

Mr. Haroian stated he specifically recalls removing the recording of telephone extensions from the director's area, deputy director's area, their receptionist, the task force area, the conference room telephone number, the director's home number, and the chief's home number (acting Chief Sullivan). Mr. Haroian further stated that Tony Desmarais had removed additional telephone numbers from being recorded but he had no specific information.

Mr. Haroian stated he searched for and downloaded a telephone call file for Chief Dutra of the Providence Fire Department at the direction of Tony Desmarais. Mr. Haroian further stated Chief Dutra brought his own CD-ROM and the request was made, and he then left with the file recorded to the CD-ROM.

Detective Killian seized from Mr. Haroian a Dell PC Tower computer, Serial No. 1U026, which was used by Deputy Director Richardson at his home. According to Mr. Haroian, the computer was returned to the Communications Department approximately two weeks prior to February 15, 2003.

On February 15, 2003, Detective Corporal David Palmer interviewed Stephen Moise. Mr. Moise is an inspector in the Department of Communications.

Mr. Moise stated he was trained on the Total Recall System sometime in June or July of 2002, and was assigned administrative privileges. Mr. Moise recalls an individual from Texas coming to the Providence Public Safety Complex for a brief training session. Mr. Moise indicated that other personnel of the Communications Center who had administrative privileges were: Mary Lennon, Anthony Desmarais, Greg Haroian, Ron Repose, and Frank Parfume.

Mr. Moise had knowledge that all of the telephone lines within the Providence Public Safety Complex and the Communications Department were recorded. Mr. Moise further indicated that

Director Vieira, Deputy Director Richardson, Mary Lennon, Frank Parfume, and Ron Reposa had knowledge that the telephone lines were being recorded.

Mr. Moise also stated former Chief Urbano Prignano, Majors Sullivan and Simoneau, and the "brass" of the Fire Department were aware that all the telephone lines were recorded. He based this knowledge of the Fire Department on their request to remove specific telephone numbers from being recorded.

Mr. Moise further indicated he observed a list of telephone numbers (approximately 16 to his recollection) presented to Tony Desmarais to be removed from the Total Recall System at the direction of Director Vieira.

Mr. Moise stated he specifically recalls two individuals complaining about their telephone lines being recorded. The two individuals were Cindy Parente, Administrative Assistant; and Fire Marshal David Costa.

Mr. Moise stated he never downloaded a telephone-recorded file from the Total Recall System; and if he needed anything from that system, he would contact Mary Lennon.

Mr. Moise recalls overhearing a conversation concerning Councilman Butler looking for information about a telephone conversation, but he had no further information.

Mr. Moise had knowledge of the location of the Total Recall System based on receiving training at that location as well as knowledge that information can be retrieved from the Total Recall System from Mary Lennon's computer.

On February 15, 2003, Detectives John Killian and James Dougherty interviewed Sergeant Dennis Lambert of the Providence Police Department. Sergeant Lambert is the Management Information System Director responsible for all computer equipment within the Providence Public Safety Complex. Sergeant Lambert stated he knew of the Total Recall System and the fact that this

system was recording all incoming and outgoing telephone calls from the Providence Public Safety Complex and Communications Center. Sergeant Lambert further stated he was not involved in the installation or setup of the Total Recall System, that this system was installed and set up by a representative from Expanets who also installed all the telephone installation and switching equipment. Sergeant Lambert stated this system was discussed at several meetings which pertained to telephone and computer equipment installation and the recording of the trunk lines at the Providence Public Safety Complex.

Sergeant Lambert stated that Tony Desmarais, Frank Parfume, and Ron Reposa from the Communications Center, as well as a representative from Expanets were always present at these meetings.

Sergeant Lambert stated to his knowledge no written notices or banners were placed on the system notifying users that the telephone system was being recorded.

Sergeant Lambert stated he contacted Andy Garza of Expanets to determine if the Total Recall System maintained a system log of users accessing it. This was requested by Chief Esserman after the chief was notified in early February of 2003, of a digital recording system recording all telephone lines at the Providence Public Safety Complex. Sergeant Lambert determined through Garza that the system did not have that capability. Also at the request of Chief Esserman, and with Greg Haroian present, Sgt. Lambert stated he accessed the Total Recall System and printed a list of users and their access privileges.

On February 15, 2003, Detective James Dougherty interviewed Frank Parfume, telephone technician with the Communications Center. Mr. Parfume has been employed with the City of Providence for the past sixteen (16) years. Mr. Parfume stated his primary responsibilities include changing telephones, adding extensions, and installing wiring for computer systems and telephones

in all City buildings. Mr. Parfume stated he learned from Anthony Desmarais and Bob Nelson that all the telephone trunk lines were to be recorded. Mr. Parfume further stated the information surrounding the recording of all telephone lines was discussed during the bidding process for the new Providence Public Safety Complex. Mr. Parfume also stated that Anthony Desmarais and Robert Nelson met occasionally to prepare the request for proposal for the telephone system but was uncertain if their discussion also included the recording device.

Mr. Parfume stated that Robert Nelson, presently a contractor for Expanets, had a long history of telephone service work for the City of Providence and that Robert Nelson would be handling all the installation and upgrading for the new telephone system throughout the Providence Public Safety Complex.

Mr. Parfume believed everything Robert Nelson and Anthony Desmarais undertook was at the direction of Director Vieira.

Mr. Parfume stated that at the direction of Manuel Vieira, every telephone extension in the Providence Public Safety Complex was to be recorded or have the ability to be recorded.

Mr. Parfume further stated that Deputy Director Joseph Richardson was also knowledgeable of the requirement directed by Manuel Vieira to record all telephone lines or have the capability to record all telephone lines, and that Deputy Director Richardson also wanted "station-to-station" recording capability; but it was cost prohibitive at the onset of the project.

Mr. Parfume stated that after Robert Nelson and Expanets won the contract, two individuals, identified only as Al and Larry, set up the Total Recall System.

Mr. Parfume stated that it was "no secret" that the telephone lines were recorded. Mr. Parfume stated that Steve Moise and himself received approximately twenty (20) minutes of training and then were issued passwords from an Expanets employee in Texas.

Mr. Parfume stated his user name was "FRANKP" and his password was "PHONE."

Mr. Parfume stated that Steve Moise, Anthony Desmarais, Ron Reposa, and Mary Lennon also had log-on credentials with the Total Recall System.

Mr. Parfume stated on one occasion Manuel Vieira requested him to inquire into a long-distance telephone call due to an outrageous telephone charge. Mr. Parfume recalls accessing the Total Recall System at the site of the server and determined that the telephone line in question was a computer line.

Mr. Parfume stated there was no sound card in the Total Recall System server and that one could not be purchased; therefore, no telephone calls could be replayed from the Total Recall System itself. A sound card, along with audio speakers, allows a system to have audio capability.

Mr. Parfume stated Greg Haroian took responsibility for the Total Recall System, and they attempted to purchase a sound card at which time they learned a sound card was not available.

Mr. Parfume recalled a conversation with Lieutenant David Lapatin of the Providence Police Department concerning the recording of telephone lines. Lieutenant Lapatin had requested two (2) additional telephone lines installed within an office of the Providence Police Department and indicated that the two telephone lines not be recorded. Mr. Parfume stated that the two lines were eventually recorded.

Mr. Parfume further stated Director Vieira instructed him to remove certain telephone extensions from being recorded. Mr. Parfume recalls removing the director's extension and the director's home extension, as well as additional telephone extensions being removed. Mr. Parfume also stated within the last month, a number of telephone extensions were removed consisting entirely of Fire Department extensions.

Corporal Newberg reviewed a memo drafted by Frank Parfume to Colonel Esserman in which

Parfume states he was issued a password for the Total Recall System but never accessed the system other than to verify his password. This memo was drafted on February 10, 2003, and notarized by Veronica D'Antuono.

On February 15, 2003, Lieutenant David Neill and Detective John Lemont interviewed Anthony Desmarais. Mr. Desmarais is a radio engineer for the City of Providence and has been employed by the City of Providence for the past thirty-two (32) years, and has been in his present position as radio engineer for six (6) years.

Mr. Desmarais stated he has had a longstanding relationship with Robert Nelson, a private contractor who has done extensive work for the City of Providence.

Mr. Desmarais stated he was directed by Director Manuel Vieira to prepare a 'Request for Proposal' on everything to do with the telephone system and recording system for the Providence Public Safety Complex.

Mr. Desmarais further stated he had no familiarity with the bidding process so he sought the assistance of Robert Nelson to assist in writing a draft for the 'Request for Proposal.' Mr. Desmarais stated he met Robert Nelson on several occasions to explain and eventually turn over the final version of the 'Request for Proposal.' Mr. Desmarais stated the final version of the 'Request for Proposal' was provided to Director Manuel Vieira.

Mr. Desmarais further stated that Director Vieira specified that every telephone line was to be recorded and predicted approximately five hundred (500) telephone-line capability would be sufficient. Mr. Desmarais stated that initially there were two (2) specifications submitted to him: One specification written by Robert Nelson and the second specification outlining the recording device. Mr. Desmarais could not recall who drafted the recording device specification. Mr. Desmarais then stated the two (2) specifications were combined into one (1) 'Request for Proposal.'

Mr. Desmarais stated that Director Vieira favored Robert Nelson to win the bid because of a longstanding relationship with the City and the director's trust in his abilities. Mr. Desmarais stated four (4) individuals were hired through Robert Nelson to do the telephone and recording device installation. Mr. Desmarais recalls two (2) of the names being Larry and Al who installed the hardware, and a Susan who installed the software. Mr. Desmarais also stated that a Tom Ngo from Texas worked on the Total Recall System.

Mr. Desmarais stated he was to receive training on the Total Recall System but missed the training; therefore, Greg Haroian provided him some introductory training on access to the computer and assigned him a user name and password. Mr. Desmarais stated that his user name was "TONY" and his password was "TONY00."

Mr. Desmarais admitted to logging into the system on several occasions to verify that the switch was working properly. Mr. Desmarais stated he used a computer located in the computer room in the Telecommunications Center. Mr. Desmarais stated he was taught by Greg Haroian on how to access the system. He has also observed Greg Haroian access the recording system, then access a pre-recorded ".WAV" file, and play the audio on several occasions. Mr. Desmarais recalled two (2) occasions where requests were made to access recorded telephone calls. The first request was to look into a bomb threat being called in, and the second request was from Chief Dutra of the Fire Department. Mr. Desmarais first checked with Director Vieira prior to requesting Greg Haroian to record the files to a CD-ROM to provide to Chief Dutra. Mr. Desmarais stated he never listened to the requested recorded telephone conversations.

Mr. Desmarais stated he was provided a list of telephone extensions to be removed from recording. To Mr. Desmarais's recollection, the telephone numbers were listed to Director Vieira's two telephones, Deputy Director Richardson's two telephones, the Task Force telephones located at

the Dunkin' Donuts Center, the Telecommunications Center conference room and lunch room, Director Vieira's secretary Cindy Parente's telephone, acting Chief Sullivan's office and home extension, as well as extensions belonging to the Fire Department.

Mr. Desmarais recalls a conversation with technician Frank Mills who had concerns over the legality of recording telephone conversations without consent. Mr. Desmarais indicated he never mentioned this conversation with Frank Mills to Director Vieira.

Mr. Desmarais also stated he had some conversations with Chief Rattigan and Chief Lanzi about removing the recording of telephone extensions within the Fire Department. Mr. Desmarais had complied with their request as mentioned above.

Mr. Desmarais stated he had recent conversations with Director Vieira and Deputy Director Richardson concerning the recording of station-to-station telephone extensions. After some discussion, Mr. Desmarais stated Director Vieira agreed to upgrading the equipment to record twenty-five (25) to thirty (30) station-to-station extensions and that Robert Nelson would order the appropriate equipment to complete this request. Mr. Desmarais stated he had no knowledge of what telephone extensions would have station-to-station recording capability. That would be determined by Director Vieira.

Corporal Newberg reviewed a memo drafted by Anthony Desmarais to Colonel Esserman in which Desmarais states he was issued a password for the Total Recall System and used this access ten (10) times to verify the system was operational. This memo was drafted on February 10, 2003, and notarized by Veronica D'Antuono.

Anthony Desmarais provided several documents to detectives that pertained to the Total Recall System. The first is a document authored by Robert Nelson to Director Vieira, Ron Reposa, and Anthony Desmarais dated December 9, 2002, and contained the following:

- Discussion of upgrading Total Recall to include station-to-station recording
- The installation of a sound card
- Discussion of activating call accounting as soon as a computer is designated for use by the City of Providence and that Anthony Desmarais has been provided the system specifications
- Additional training on the Total Recall System
- Discussion of an up-to-date listing of the data base for the Total Recall System for the Police, Fire, and Communications Bureau

The second document authored by Ronald Reposa to Director Vieira dated November 21, 2002, contained the following:

- Status of the Total Recall and Dictaphone projects--to include, station-to-station recording capability
- Status of sound cards for Total Recall
- Unavailability of call accounting due to lack of computer
- Discussion of recording and monitoring activities in the EOC
- Additional issues discussed in memo

The third document consists of three pages of order summaries for Expanets station-to-station recording hardware requirements.

On June 17, 2003 Corporal Newberg re-interviewed Anthony Desmarais. Mr. Desmarais emphasized throughout the interview that Manny Vieira directed everything he did relative to the Total Recall System and the recording of telephone extensions. Mr. Desmarais further stated he did not do anything relative to the recording device without Director Vieira's permission and/or knowledge.

On February 18, 2003, Detective Sergeant Brian Casilli and Detective John Killian, along with Lieutenant Keith Tucker of the Providence Police Department, interviewed Joseph Richardson, Deputy Director of the Department of Communications. Mr. Richardson stated the following:

Mr. Richardson indicated that since September 28, 2001, he was assigned to the Public Security Task Force located at the Dunkin' Donuts Center along with Major Martin Hames of the Providence Police Department and Chief Giannini of the Providence Fire Department. Mr. Richardson continued to maintain the Deputy Director of the Department of Communications position as well. Mr. Richardson indicated that as the deputy director, he was responsible for the operations of the Communications Center, to include police and fire responsibilities, as well as fire alarm inspections.

Mr. Richardson stated he never specifically attended any meeting or discussion on the recording of any or all telephone lines. He did, however, recall discussions with Director Vieira, Major Sullivan, and Major Simoneau about numerous complaints concerning the police not responding to calls for service and the necessity to record certain telephone lines.

Mr. Richardson further indicated he had general conversations about the recording device with Director Vieira asking if the Department obtained a recording device, is it operable, and does it have the capabilities to record the switchboard. Mr. Richardson indicated he only observed the Total Recall System twice. One time, in approximately September or October of 2002, he observed the Total Recall System and he stated he wasn't sure if the system was working. The second time was when the system was removed by Colonel Esserman. Mr. Richardson further indicated that he only thought the switchboard and the central station lines (clerks) were being recorded until inquiries were made by the Fire Department around December of 2002. It was at this time that he learned from Director Vieira that all telephone lines were recorded. He also learned from Director Vieira that this was at the direction of the Police Department and more specifically referred to the names of Colonel Prignano, Major Simoneau, and Major Sullivan.

Mr. Richardson stated that once he learned of the telephone lines being recorded, he initiated,

through Tony Desmarais, to have certain telephone lines removed from the recording list; and further, he may have initiated Channel 4 lines (tow lines) to be recorded. But prior to initiating any changes, he would first check with Director Vieira.

Mr. Richardson indicated he had knowledge of three (3) telephone conversations which were requested to be downloaded from the recording system. Mr. Richardson indicates the three (3) were: A request by Major Simoneau concerning a tow; the incident involving a man in the water and the response by the Fire Department; and the request by Councilman Butler.

Mr. Richardson stated that he had a meeting which included John D'Amico, Senior City Solicitor, Chiefs Lanzi and Giannini, and himself to discuss the recordings of all telephone lines. Based on this meeting, another meeting was to be scheduled with Chief Lanzi, Major Sullivan, Colonel Esserman, and others.

Mr. Richardson did state that during a conversation with Director Vieira, that he (Vieira) mentioned responsibility for the Total Recall System and that he wanted an accounting of the telephone lines and their use.

Detective Killian seized from Deputy Richardson a Dell Desktop Computer, Serial No. 1UOY4, from Mr. Richardson's office at the Dunkin' Donuts Center Terrorism Task Force office.

On February 18, 2003, Lieutenant David Neill and Corporal Douglas Newberg interviewed Lieutenant David Lapatin of the Providence Police Department. Lieutenant Lapatin stated that on February 14, 2003, he authored a memo to Andrew Rosenzweig outlining concerns/suspicions he had since he had heard that the telephone lines were being recorded in the Providence Public Safety Complex. Lieutenant Lapatin stated he approached acting Colonel Sullivan sometime in late July or early August 2002, with those concerns. Lieutenant Lapatin further stated acting Colonel Sullivan acknowledged that he knew the telephone lines were being recorded and basically disregarded any

further comment/concern of Lieutenant Lapatin. Lieutenant Lapatin indicated he terminated any further conversation with acting Colonel Sullivan and never discussed the subject again. Lieutenant Lapatin stated that he was attempting to discuss the legalities of this action with Colonel Sullivan.

Lieutenant Lapatin recalled a situation where he was tasked to set up an area in the Providence Public Safety Complex where a sensitive investigation was to be organized, and he needed two (2) telephone lines installed. At the time, two telephone technicians of the Communications Center did install these telephone lines; and he relayed information not to have these two lines recorded. Based on Lt. Lapatin's concern, he received a call from Director Vieira a short time later. Lieutenant Lapatin stated Director Vieira gave the impression that only central station telephone lines were recorded and that other telephone lines were not recorded.

Lieutenant Lapatin further stated the two telephone technicians confirmed his suspicion and indicated to him the telephone lines were recorded. Lieutenant Lapatin stated he was never notified through any method that the telephone lines were recorded.

On February 18, 2003, Corporal Steven Lefebvre and Detective David Doucet interviewed Joseph Migliaccio. Mr. Migliaccio is a video technician working at the Communications Center.

Mr. Migliaccio stated he first learned of a system being installed that had the capabilities of recording telephone lines but did not recall the system being identified as Total Recall. Mr. Migliaccio stated it was in April or May 2002, that he first heard of the new system from Tony Desmarais. Mr. Migliaccio stated Tony Desmarais discussed the system that they will eventually need to learn about. Mr. Migliaccio stated he eventually would need to learn how to add stations and delete stations from the Total Recall System. Mr. Migliaccio stated on several occasions, after being taught by Tony Desmarais, he would log into the system with either Tony Desmarais's log-in identification and password or Frank Parfume's log-in identification and password.

Mr. Migliaccio stated he logged into the system approximately ten to twelve times and always with the log-in identification and password of either Tony Desmarais or Frank Parfume, and this was always done at the Providence Public Safety Complex.

On February 18, 2003, Lieutenant David Neill and Corporal Douglas Newberg interviewed Sergeant Michael Vieira of the Providence Police Department. Sergeant Vieira stated he has been employed as a police officer for the past 15 years and presently works in the office of the Chief, primarily as a grant writer. He also has other administrative duties. Sergeant Vieira is the brother of Manuel Vieira, Director of Communications.

Sergeant Vieira stated he was involved in organizing the transition from the old Providence police station to the new public safety complex along with Inspector Robert Bennett. Sergeant Vieira further stated his responsibilities included the placement of personnel, the assignment of telephone extensions, and the actual move.

Sergeant Vieira further stated he attended meetings with representatives of Expanets, Robert Nelson, Susan Rennie, and members of the Communications Department, and other individuals he could not specifically recall. Sergeant Vieira stated that based on attending these meetings, he became aware that all telephone lines were to be recorded and had knowledge of the location of the system.

On February 19, 2003, Detective Corporal Steven Lefebvre and Detective David Doucet interviewed Patrick Butler. Patrick Butler is a councilman in Ward 5 in the City of Providence. Mr. Butler, on or about November 8, 2002, had a telephone conversation with Thomas Scorpio of the Emergency Management Office where he felt he was threatened by Scorpio. Mr. Butler stated he dialed the main telephone number to the Providence Police Department, 272-3121, and was forwarded to the Emergency Management Office. During this conversation Mr. Butler felt threatened

by Thomas Scorpio so he looked into whether or not the telephone call was recorded. Mr. Butler eventually spoke with Deputy Director Richardson who, at the time of their conversation, stated he wasn't sure if the telephone call was recorded. Mr. Butler stated a short time later Deputy Director Richardson re-contacted him and advised him the telephone call was recorded and he could come to the Communications Center and listen to it. Mr. Butler stated he met with Mary Lennon, completed a request for logging tape playback form, and then listened to his conversation with Thomas Scorpio which was already downloaded and ready to open from the computer. Mr. Butler determined, based on the telephone conversation, that he was not threatened. Mr. Butler stated that no copy of the file was made and the matter was dropped at that time.

Corporal Newberg received a signed consent form from Patrick Butler allowing investigators to listen to the recorded telephone conversation between himself and Thomas Scorpio.

Detective Killian located the recorded audio file, filename "11082002161413003.WAV" on the imaged copy of the Dell Computer. Corporal Newberg then briefly listened to the audio file and verified a conversation between Patrick Butler and Thomas Scorpio.

On February 19, 2003, Detective Corporal Steven Lefebvre and Detective David Doucet interviewed Sandra Manning, a clerk in the Vehicle Recovery Office of the Providence Police Department.

Ms. Manning stated she has been a clerk in the Vehicle Recovery Unit for approximately nine years. Ms. Manning further indicated she had an argument over the telephone with Anthony Vescera, Fiscal Administrator, concerning overtime money not received and that Vescera later went to Colonel Guido Laorenza with a complaint. Ms. Manning indicated this argument occurred in early November 2002. Ms. Manning then stated she was summoned into Colonel Laorenza's office concerning the telephone confrontation with Vescera. Ms. Manning stated that at this time then

Colonel Laorenza indicated a tape of the conversation was made. Ms. Manning indicated that she challenged the taping of telephone conversations with then Colonel Laorenza and indicated that it cannot be done. Ms. Manning stated shortly thereafter, then Colonel Laorenza called her back and indicated that Vescera was not pursuing a complaint and nothing further was done. Ms. Manning stated there was never a tape shown or played back for her to hear.

Ms. Manning stated that on February 14, 2003, after it was publicly revealed that a recording device was capturing telephone conversations within the Providence Public Safety Complex, Major Laorenza asked her (about her lawsuit over the recording of telephone conversations referring to the alleged tape Vescera had). Major Laorenza further stated the disks are erased every 30 days and then their conversation ended.

The only significance of this conversation between Sandra Manning and then Colonel Laorenza was the alleged comment made that a tape of the conversation existed. In speaking with Major Laorenza and Anthony Vescera, they both denied possessing a tape; however, Major Laorenza did indicate he may have made a comment that a tape existed without ever basing this comment on any knowledge.

On February 19, 2003, Corporal Steven Lefebvre and Detective David Doucet seized the following computers from the Communications Center with the assistance of Greg Haroian: 1) Dell Optiplex Computer, Serial No. 290NE; 2) Dell Optiplex Computer, Serial No. 7N4LD11. Both computers were taken to State Police Headquarters and turned over to Detective Killian.

On February 20, 2003, Lieutenant David Neill and Corporal Douglas Newberg interviewed Inspector Robert Bennett of the Providence Police Department Internal Affairs Unit. Inspector Bennett stated he was involved in the transition between the old Providence police station and the new Providence Public Safety Complex. His involvement included sharing the responsibilities of the

Providence Police Department during the construction phase and the moving phase which included occasionally attending meetings.

Inspector Bennett stated he had heard rumors that the telephone system was being recorded both in the old station and at the Providence Public Safety Complex. He further heard that the system had the capability of recording all telephone lines, but he had no direct knowledge that a system was designed and installed to record all telephone lines.

Inspector Bennett stated he attended at least one meeting concerning the telephone system which was attended by Susan Rennie of Expanets and possibly other Expanets employees, Gary Masono from Gilbane, Sergeant Michael Vieira, and possibly Tony Desmarais from the Communications Center. Inspector Bennett stated that no mention was ever made at any meeting he was present for, that the telephone system was to be recorded.

On February 20, 2003, Corporal Douglas Newberg seized from Lt. Tucker a laptop computer which was City of Providence property and used by Deputy Director Richardson in his City-issued vehicle. The computer is identified as a Panasonic CF-25 laptop computer, Serial No. CF25LGC4EAM8AKSA01366.

On February 20, 2003, Corporal Steven Lefebvre and Detective David Doucet interviewed Ronald Reposa, Fire Alarm Technician and Inspector at the Communications Department. Mr. Reposa stated he's been employed by the Communications Department for approximately 15 years and has had some responsibilities with the computer system in the Communications Center.

Mr. Reposa stated that several weeks prior to the Providence Public Safety Complex opening, he became aware the telephone lines were to be recorded. He observed Total Recall personnel configuring the system within the telephone room. Mr. Reposa was also aware of the capability to access and download files to CD-ROM's from a computer located at the Communications Center.

Mr. Reposa further stated he was instructed by either Tony Desmarais or Director Manuel Vieira to become familiar with the Total Recall System; and based on that request, he did some remote training with Andy Garza. Mr. Reposa stated the training consisted of learning basic functionality of the system, such as logging in, adding and deleting telephone lines, and sampling rate information.

Mr. Reposa identified his user name and password as "RON" and "CARE" respectively. Mr. Reposa also stated he may have accessed the system 30 to 40 times using his access name and password to verify the system was functioning or to add/delete telephone extensions. Mr. Reposa stated he probably added or deleted telephone extensions on two occasions at the direction of Director Vieira or Tony Desmarais and probably only accessed and recorded one telephone conversation to a CD-ROM.

On February 20, 2003, Corporal Steven Lefebvre and Detective David Doucet seized one (1) Dell laptop computer, Service Tag No. J549201, from Inspector Trinque, acting Director of the Communications Bureau. The seized laptop computer was previously used by Director Vieira.

On February 20, 2003, Lieutenant David Neill and Corporal Douglas Newberg interviewed Major Dennis Simoneau of the Providence Police Department. Major Simoneau stated he is the Commander of the Uniform Division and has been employed as a Providence police officer for the past 27 years.

Major Simoneau stated he was involved in planning the transition from the old Providence police station to the new Providence Public Safety Complex and that he attended hundreds of meetings leading up to the move. Major Simoneau further stated that during several of these meetings, of which he was in attendance, there were discussions of the telephone system and its capabilities including recording telephone conversations. Major Simoneau stated he clearly

understood the recording capability but was never directly told that the system had been installed and was recording all telephone lines. Major Simoneau further stated that based on the above knowledge, he sent a department-wide (global) e-mail to all sworn Police personnel and Communication personnel listing three to four items of concern with the transition to the new complex. Major Simoneau produced a copy of his original e-mail, sent July 22, 2002, which stated the following: "Know that all telephone lines in the new station are recorded and thus speak professionally at all times. Desk sergeants please alert all of your clerks of this fact."

Major Simoneau stated he had not recalled this specific e-mail until he was reminded of it by a sergeant, the name of whom he cannot recall. Major Simoneau spent several days sorting through all the 2002 e-mails he authored until he located this specific one.

Major Simoneau stated it was at one of many meetings he attended where discussion of the recording capability occurred and that discussion, according to Major Simoneau, could have been initiated by Director Vieira.

Major Simoneau further stated he had no access to the Total Recall System and when necessary, used the same protocol used to access Dictaphone records. Major Simoneau stated that protocol would be to contact Mary Lennon in Communications; Mary Lennon would then research the request and provide a copy, via tape or CD-ROM, if it existed.

Major Simoneau discussed a specific request made to Mary Lennon concerning a citizen complaint of a patrolman who had treated a caller rudely and unprofessionaly. Major Simoneau stated he advised Sergeant Gregory to look into the complaint and then requested from Mary Lennon the specific telephone call. Major Simoneau stated that several days later, a copy of the telephone conversation was downloaded to a CD-ROM and provided to him. Major Simoneau stated he listened to the CD-ROM to verify the complainant's allegations. Major Simoneau stated he then

provided the CD-ROM to Sergeant Gregory.

Major Simoneau also stated that when he was questioned by Colonel Esserman, he retrieved the CD-ROM from Sergeant Gregory and turned it over to Andy Rosenzweig.

Corporal Newberg seized the CD-ROM from Lt. Tucker on February 26, 2003.

On February 20, 2003, Lieutenant David Neill and Corporal Douglas Newberg interviewed Major Guido Laorenza. Major Laorenza stated he was promoted to acting Chief in October of 2002, for approximately three months and one week before returning to the rank of Major. Major Laorenza stated he had no knowledge of the telephone lines being recorded prior to a Command Staff meeting hosted by Colonel Esserman. Major Laorenza did state he had heard rumors within the Providence Police Department that telephone lines were recorded but refused to elaborate. Major Laorenza had no further information.

On February 20, 2002, Corporal Steven Lefebvre and Detective David Doucet interviewed Cynthia Parente, Administrative Assistant to the Director of Communications, Manuel Vieira.

Ms. Parente stated she had knowledge from Director Vieira that the telephone lines at the Communications Center were going to be recorded; and more specifically, Director Vieira made the comment that everything was going to be on a recording system. Ms. Parente stated Director Vieira made this comment a few months prior to the opening of the Providence Public Safety Complex.

Ms. Parente stated eventually, due to complaints, Director Vieira was to remove the recording of some telephone extensions at the Communications Center.

Ms. Parente further stated she had no knowledge of the system's location, she never had any training with the system, nor did she ever have any access privileges to the system.

On February 24, 2003, Detectives John Lemont and Gerald McKinney, along with Detective Al Lima of the Providence Police Department, interviewed Providence Fire Chiefs Rattigan and Lanzi.

Chief Rattigan stated he became knowledgeable of the telephone lines being recorded after a Providence Journal article appeared about an automobile accident in December of 2002. The Providence Journal article about the accident concerned a male operator driving into the Providence River and drowning. Chief Rattigan stated he recalls reporter Amanda Milkovits requesting telephone tapes regarding this particular accident.

Chief Rattigan stated he assigned Chief Giannini and Deputy Joseph Richardson of the Communications Center to investigate the recorded telephone lines.

Chief Rattigan stated he received a correspondence dated January 22, 2003, from City Solicitor D'Amico concerning all telephone lines being recorded.

Chief Rattigan stated he had no knowledge prior to D'Amico's correspondence that all the telephone lines were recorded and assumed that only emergency telephone lines were being recorded in the Providence Public Safety Complex.

Chief Rattigan further stated shortly thereafter, Anthony Desmarais contacted him regarding the recording of telephone lines. Chief Rattigan stated that after conversing with Anthony Desmarais, he assigned Chief Lanzi to look into the recording of all the telephone lines. Chief Rattigan stated that Chief Lanzi requested, through Anthony Desmarais, to remove all the Command Staff telephone extensions from being recorded.

Chief Lanzi stated that after learning of the recording of all the telephone lines, he requested to have all the Command Staff telephone extensions removed from recording and provided all the necessary extension numbers to Anthony Desmarais. Chief Lanzi further stated that a meeting was to be convened with the City Solicitor regarding the recording of telephone lines, but the meeting never took place due to the fact the recording system became public knowledge and an investigation was initiated.

On February 24, 2003, Corporal Douglas Newberg interviewed Monica D'Antuono, Administrative Assistant for retired Commissioner of Public Safety, John Partington. Ms. D'Antuono stated she attended approximately twelve (12) meetings on the planning/construction of the Providence Public Safety Complex. Ms. D'Antuono further stated she does not recall any mention of telephone lines being recorded at any of these meetings. Ms. D'Antuono stated that she did become aware, but does not recall how or when, that all the telephone lines were being recorded at the Providence Public Safety Complex. Ms. D'Antuono indicated she was never formally notified of the recordings of telephone lines through either a memo, general order, or e-mail. Ms. D'Antuono stated she discussed the recordings with Commissioner Partington who had no reaction at all, neither a denial or a confirmation that the telephone lines were being recorded.

Ms. D'Antuono stated she kept informal minutes and attendance records of the meetings she attended. Ms. D'Antuono, along with Lieutenant Keith Tucker, Lieutenant David Neill, Corporal Douglas Newberg, and Anthony Vescera, could not locate the records within the storage areas of the Providence Public Safety Complex.

Ms. D'Antuono stated that Mayor Cianci was never present at any of the earlier meetings, but that then-Chief Prignano may have attended along with acting Chief Sullivan (after Chief Prignano retired), Director Vieira, Deputy Director Richardson, and others.

On February 25, 2003, Lieutenant David Neill interviewed Susan Rennie, System Consultant for Expanets. Ms. Rennie stated she is a system consultant for Expanets and works in conjunction with Robert Nelson. Ms. Rennie stated both Robert Nelson and herself work for Expanets, which is located at One Thurber Boulevard in Smithfield. Ms. Rennie stated that the Request for Proposal was approved and purchased by the City of Providence, and she acted as a company consultant dealing directly with Anthony Desmarais and Frank Parfume. Ms. Rennie stated that the phone

system's features included voicemail, call accounting, and the Total Recall System. Ms. Rennie stated she had numerous conversations with Anthony Desmarais and Frank Parfume regarding the capabilities of the Total Recall System. Ms. Rennie stated she also worked directly with Inspector Robert Bennett, Sergeant Michael Vieira of the Providence Police Department and Mr. Costa from the Fire Marshals Office, but their conversations pertained only to the phone extensions and locations and not with the Total Recall System.

Ms. Rennie stated that the Total Recall System was installed by Expanets employees Larry Taylor and Al Forand. Ms. Rennie further stated after the system was installed, Andrew Garza configured the system and provided training to Frank Parfume. To Ms. Rennie's recollection the training occurred in early July 2002. Ms. Rennie stated that Andrew Garza later trained Greg Haroian via the telephone.

Ms. Rennie stated that Anthony Desmarais would contact Robert Nelson, who would then contact herself whenever the Total Recall System crashed. Ms. Rennie further stated she would then contact Andrew Garza who would correct the problem by dialing into the system remotely from Texas or by contacting Greg Haroian.

Ms. Rennie stated that all telephone extensions from 243-6000 to 243-6399 were believed to be recorded by the Total Recall System, and she further believed that there were also several two-thousand (2000) numbers on the system being recorded.

Ms. Rennie stated that the following locations had extensions believed to be recorded by the Total Recall System: The Providence Public Safety Complex, to include the Police and Fire Departments, all fire stations, the Police Academy, the Communications Center, Roger Williams Park, the Animal Control Center, 100 Dupont Street, and 300 Washington Street.

Ms. Rennie provided documentation showing the list of extensions to be recorded by the Total

Recall System. Ms. Rennie further stated she recalls sending an e-mail to Greg Haroian with an attachment of telephone extensions. Ms. Rennie also stated that she requested Greg Haroian to advise her which extensions would not be recorded. Ms. Rennie stated she recalled Anthony Desmarais contacting her later on, stating that they would remove or add extensions from the Total Recall System.

Ms. Rennie stated she recalled a situation on or about September 6, 2002, where a threat was made via the telephone towards acting Mayor Lombardi. It was learned at this time that this particular telephone extension was not recorded; and according to Anthony Desmarais, Director Vieira was upset and wanted this problem corrected. Ms. Rennie could not recall the extension number.

Ms. Rennie added that she has never accessed the Total Recall System and does not have an access code. Ms. Rennie further stated that she does not correct any technical problems with the Total Recall System and that Andrew Garza is responsible for maintaining the system and handling all technical problems.

On February 26, 2003, Lieutenant David Neill and Corporal Douglas Newberg interviewed Patrolman Richard Lonergan of the Providence Police Department. Patrolman Lonergan stated he has been with the Providence Police for approximately 22 years and presently works in the Vehicle Recovery Unit.

Patrolman Lonergan stated he was aware that all the telephone lines were recorded. He also stated in the summer of 2002, he had a conversation with Tony Desmarais from Communications who stated that all the telephone lines in the Providence Public Safety Complex will be recorded. Patrolman Lonergan stated he does not recall telling others about the telephones. Patrolman Lonergan further stated he doesn't recall receiving an e-mail from Major Simoneau regarding the

recording of telephone lines.

Patrolman Lonergan stated in December of 2002, he had a telephone conversation with a citizen of the Olneyville area of Providence and based on that telephone conversation, a complaint was filed against him. Patrolman Lonergan stated the complaint escalated to the point where Major Simoneau obtained a copy of the telephone conversation between him and the citizen from Olneyville. This copy of the telephone conversation was played for Sergeant Gregory, Patrolman Lonergan's immediate supervisor. Patrolman Lonergan never listened to the recorded telephone conversation.

Corporal Newberg received a signed consent form from Patrolman Lonergan allowing investigators to listen to the recorded telephone conversation between himself and the civilian complainant. Corporal Newberg then briefly listened to the audio file located on the CD-ROM and verifed a conversation between Patrolman Lonergan and another male.

On February 26, 2003, Lieutenant David Neill and Corporal Douglas Newberg interviewed Investigator Thomas Clark of the Providence Police Department Internal Affairs Unit. Investigator Clark had requested on November 5, 2002, a telephone conversation left on his voicemail to be recalled from the Total Recall System and written to a CD-ROM for playback. The requested message was left on Investigator Clark's voicemail and subsequently lost before Investigator Clark's request to retrieve it was received. Investigator Clark stated at the time of the request he did not know for sure if the telephone messages could be retrieved, and he did not have knowledge that all telephone conversations were being recorded through the Total Recall System at the Providence Public Safety Complex. Investigator Clark stated he contacted Mary Lennon for the request from his extension, 6153, and further provided a date and approximate time. Investigator Clark stated shortly

thereafter he received a CD-ROM with the telephone message.

Corporal Newberg seized the CD-ROM from Lieutenant Tucker on February 26, 2003.

Corporal Newberg received a signed consent form from Detective Clark allowing investigators to listen to the recorded telephone message. Corporal Newberg then briefly listened to the audio file located on the CD-ROM and verifed a telephone message was recorded.

On February 26, 2003, Lieutenant David Neill and Corporal Douglas Newberg, along with Lieutenant Keith Tucker of the Providence Police Department, interviewed Sergeant Thomas Gregory of the Providence Police. Sergeant Gregory indicated the following:

Sergeant Gregory is a supervisor with the Vehicle Recovery Unit with 24 1/2 years of service. Sergeant Gregory stated in early December 2002, Major Simoneau instructed him to contact Mary Lennon of the Communications Center and retrieve a telephone conversation between Patrolman Richard Lonergan of the Providence Police and Abe Hernandez, a private citizen. Major Simoneau indicated to Sergeant Gregory this was in reference to a complaint filed against Patrolman Lonergan for discourteous behavior during a telephone conversation. Sergeant Gregory stated he had no knowledge prior to the complaint that all telephone conversations were recorded. Sergeant Gregory further stated he contacted Mary Lennon with the request and eventually, in the presence of Major Simoneau, listened to the telephone conversation between Patrolman Lonergan and Abe Hernandez. Major Simoneau then gave the CD-ROM to Sergeant Gregory. Sergeant Gregory indicated he filed the CD-ROM until several weeks ago when Major Simoneau requested the CD-ROM be returned to him. Sergeant Gregory also stated he never received any training, e-mails, or inter-office notification prior to the relocation to the Providence Public Safety Complex that the telephone lines were being recorded.

On February 26, 2003, Lieutenant David Neill and Corporal Douglas Newberg interviewed Rosemary Hefner, Administrative Assistant to the Chief of the Fire Department. Ms. Hefner stated she received some basic functional training on the new telephone system to be installed at the Providence Public Safety Complex. Ms. Hefner stated prior to the training session (taught by Susan Rennie, a consultant for Expanets) in a conversation with Ms. Rennie, she learned from Ms. Rennie the telephones in the Providence Public Safety Complex were going to be monitored/recorded. Ms. Hefner did not recall the specific choice of words but understood the meaning of Ms. Rennie. Ms. Hefner could not recall specifically the training date, but it was prior to moving into the new complex in late July 2002.

On March 3, 2003, Corporal Douglas Newberg interviewed Lisa DiFolco, secretary to Colonel Esserman. Ms. DiFolco stated she has been in this position since Chief Gannon through to the present chief, Colonel Esserman. Ms. DiFolco stated she did not attend any training on the telephone system but had heard, through hearsay and rumor, that the telephones were recorded. Ms. DiFolco stated she never received any formal notification that the telephone lines were recorded.

Ms. DiFolco further stated she had never requested a recorded telephone call for any chief. Ms. DiFolco did state she has contacted Mary Lennon in the past to verify that "calls for service" information did come into the Communications Center but did not request the actual recording of the call.

On March 4, 2003, Lieutenant David Neill and Corporal Douglas Newberg, along with Lieutenant Keith Tucker interviewed retired Chief Urbano Prignano in the presence of his attorney, Stephen Famiglietti. Mr. Prignano stated he left as chief on January 31, 2001 and had nothing to do with the concept or design of installing a device to record telephone lines in the Providence Public Safety Complex. Mr. Prignano did recall requesting input from various units for design considerations

in the summer of 2000. Mr. Prignano further stated that Sandra Ruggero, a friend and employee at the Animal Control Center, made a comment sometime after his retirement that the telephone lines were recorded, but never gave the comment any further thought. Mr. Prignano throughout the interview adamantly denied any involvement and offered no additional comment.

On March 5, 2003, Corporal Douglas Newberg and Detective John A'Vant interviewed retired Commissioner of Public Safety for the City of Providence John Partington. Commissioner Partington stated he was the Commissioner of Public Safety for the City of Providence from 1990 through October of 2002. Commissioner Partington stated he was responsible for the Police Department, the Fire Department, and the Communications Center.

Commissioner Partington stated he never had any knowledge that the telephones in the Providence Public Safety Complex were being recorded.

Commissioner Partington stated he attended occasional meetings during the planning and construction phases of the complex and never once heard discussion of recording the telephone lines.

Commissioner Partington stated shortly after Director Vieira had a meeting with Colonel Esserman, that he (Commissioner Partington) received a call from Vieira and he made reference to being in some serious trouble. Commissioner Partington further stated Director Vieira made reference to not knowing that all the telephone lines were being recorded and that he was surprised when he found out the percentage of telephone lines being recorded at the Providence Public Safety Complex. Commissioner Partington doubted Director Vieira's credibility during the conversation based on the information he was volunteering.

Commissioner Partington stated shortly after his conversation with Director Vieira, Major Sullivan contacted him. Commissioner Partington stated Major Sullivan's initial conversation

Case 1:04-cv-00304-LDA Document 179-11 Filed 09/14/2006 Page 33 of 43

concerned another topic but it eventually led to the recording controversy. Commissioner Partington stated that Major Sullivan indicated Director Vieira came to him (Sullivan) and informed him that a majority of the telephone lines were being recorded and acted somewhat surprised. According to Commissioner Partington, Major Sullivan then stated he discussed the issue with legal and drafted a memo to Chief Esserman.

Commissioner Partington stated he contacted Anthony Vescera, Fiscal Manager, and learned the request for proposal on the telephone system and recording system bid process did not go through Vescera's office. Commissioner Partington found this to be unusual and not the correct protocol.

On March 5, 2003, Lieutenant David Neill contacted Ellie Doyle, Expanets New England contractor who provided training to some employees working in the Providence Public Safety Complex. Ms. Doyle stated only a few people attended the training, which included employees of the Providence Police Department, Providence Fire Department, and civilian personnel. Ms. Doyle did not have any attendance sign-in forms. Ms. Doyle further stated she did recall being questioned regarding if the telephone lines were going to be recorded, and she acknowledged that they were. Ms. Doyle could not provide any further specific information.

On March 10, 2003, Corporal Douglas Newberg interviewed David Costa, Deputy Fire Marshal. Mr. Costa stated he was involved with the design aspects of the fire station within the Providence Public Safety Complex and attended meetings where discussion of the capability of recording all telephone calls was discussed, but he did not know the recordings were actually occurring.

Mr. Costa stated it was in a meeting on July 1, 2002, with Sue Rennie, Deputy Chief Mulcahey, and Frank Parfume that Sue Rennie stated that the intentions of the Communications Center are to record all telephone lines. Mr. Costa stated he then spoke with Chief Rattigan with his concerns of

recording all telephone lines with the Fire Department at the Providence Public Safety Complex. Mr. Costa further stated he left the meeting with the understanding that no telephone lines were to be recorded without further discussions.

On April 30, 2003, Corporal Douglas Newberg met with Lieutenant Keith Tucker of the Providence Police Department to review the telephone system located in the cellblock area. The male, female, and juvenile cellblock areas are supervised by civilian detention officers. There are telephones located in each cell that are outgoing, collect-call only telephones, installed and maintained by TIP Inmate Phone, Inc. of Texas. These telephones are not part of the telephone system of the Providence Public Safety Complex. In addition to the collect call, outgoing only capability, they are also controlled by the civilian detention officer through a switch which controls the operational/non-operational status of the telephone.

The telephones located in the juvenile cellblock area are not used. It is the policy of the Providence Police Department not to allow juveniles to make telephone calls.

There is also a telephone located in the male and female cellblock areas that detainees have access to at the discretion of the detention officer. The telephone extension in the male cellblock area is Extension 2023. The telephone extension in the female cellblock area is Extension 2024. If for some reason the detainee cannot make an outgoing telephone call from the cell, they may be permitted to use the above identified telephone at the discretion of the detention officer.

Corporal Newberg spoke with Louis Navarro of TIP Inmate Phones, Inc. and verified the system requirements.

Corporal Newberg also checked with the municipal court within the Providence Public Safety Complex which revealed that there are no holding cell areas or telephones to which a detainee would have access.

On May 1, 2003, Corporal Douglas Newberg interviewed Gary Mesagno, Project Manager for Hodess Building Company, Inc., of North Attleboro, Massachusetts. Mr. Mesagno was the Program Manager for Gilbane Construction for the Providence Public Safety Complex from March 2001, through September 2002. Mr. Mesagno stated he was not aware of any recording device until articles started appearing in The Providence Journal. Mr. Mesagno stated he attended numerous meetings involving the construction of the Public Safety Complex but only attended approximately six meetings that directly involved the telephone systems, including telephone installation, wire drops, wire requirements, power requirements, and square footage requirements. Mr. Mesagno further stated he was aware Expanets had won the bid to install the telephone systems. Mr. Mesagno stated he recalled Anthony Desmarais mentioning a recording device once while on site during a walk through, but never heard any further discussion.

Mr. Mesagno stated Anthony Desmarais was the lead person for the telephone systems.

Mr. Mesagno further stated his only concerns involved the wiring and installation schedules for the installation of the telephone system.

On May 5, 2003, Corporal Newberg interviewed Robert Nelson of Expanets. Mr. Nelson stated he has been employed by various telephone companies for the past 31 years starting with New England Telephone through his present employment with Expanets. Mr. Nelson stated he has had numerous exposure working on local and State telephone installation contracts, to include the Providence Public Safety Complex.

Mr. Nelson further stated he has known Anthony Desmarais for the past 12 to 13 years on a professional basis and assisted Desmarais with drafting a request for proposal for the telephone system for the Providence Public Safety Complex.

Mr. Nelson indicated the RFP (request for proposal) for the recording device was released

shortly after the initial request for proposal for the telephone system installation, and he provided no assistance with any request for proposal for a recording device.

Mr. Nelson stated that Expanets had a working relationship with Total Recall, and that the two responses to the RFP be merged as part of the Expanets bid.

Mr. Nelson stated he recalled assisting Anthony Desmarais sometime in the spring of 2001, and being awarded the contract in January or February of 2002. Mr. Nelson stated he attended several meetings involving the Providence Public Safety Complex where members of the Police and Fire Departments were present along with Anthony Desmarais, Susan Rennie, Alan Sepe of Purchasing, and others he did not recall. Mr. Nelson recalls having conversations concerning the recording device and the requirement of trunk lines being routed through particular areas for recording purposes. Mr. Nelson further stated he had numerous open conversations with Anthony Desmarais concerning the recording device and its installation, as well as additional conversations with Manny Vieira discussing station-to-station recording which was not present on the initial installation.

Mr. Nelson also recalled a conversation he had with Manny Vieira just prior to the release of information to the news groups concerning the recording device. Mr. Nelson characterized Vieira as being concerned and acting in disbelief that all telephone lines were being recorded, and he further recalls Vieira mentioning call accounting technology. Mr. Nelson recalls his disbelief with Vieira's reaction and indicated that Vieira had knowledge of the Total Recall System and its function and capabilities.

On May 8, 2003, Corporal Douglas Newberg and Detective John Killian interviewed Andrew Garza, Support Engineer for Expanets in Houston, Texas. Mr. Garza was in Rhode Island assisting Detective Killian correlating dates, times, and modem accesses to the access of audio files on the

Total Recall System. Mr. Garza is a Support Engineer for the Total Recall System, to include software development, installation, training, and system configuring both on site and remote. Mr. Garza stated that in March or April of 2002, he did the on-site installation of the Total Recall System at the Providence Public Safety Complex.

Mr. Garza further explained that Expanets would design a database of telephone extensions (stations) to be recorded. This would be determined by working with the customer. The database would then be uploaded with the defined attributes into the Total Recall System.

Mr. Garza further stated the system was web-based, meaning it also can be accessed through an IP address over the internet.

Mr. Garza identified the following Communications personnel who had administrative privileges: Frank Parfume, Greg Haroian, Mary Lennon, Ronald Reposa, Steve Moise, and Anthony Desmarais. Administrative privileges means that the person has the capability of adding, deleting, and modifying the system attributes.

Mr. Garza stated the Total Recall System had dial-up modem access that he would use regularly to perform system maintenance and troubleshooting. Mr. Garza further stated he would access audio files for testing and maintenance purposes only and at times, he listened to only portions of recorded telephone conversations for quality control. Mr. Garza further explained that accessing audio files remotely was also to verify that the system compressor was functioning, all the servers were online, and to further verify audio files were being generated. (Detective Killian's technical summary accounts for file accesses and modem dial-in times by Garza during troubleshooting and maintenance.) Mr. Garza further stated that the modem access number was 401-243-6496.

Mr. Garza further stated that the purpose of the Dell 1650 server is to compress files from a

Case 1:04-cv-00304-LDA Document 179-11 Filed 09/14/2006 Page 38 of 43

TRR to an audio file, and the Dell 2500 stores all the WAV files. Mr. Garza determined, by examining the Dell 2500 server, that the first file created was done so on May 23, 2002, at 4:12 P.M.; and the last file created was February 10, 2003, at 4:47 P.M. Mr. Garza further explained the May 23, 2002, file was generated during testing phase just after the initial installation and troubleshooting.

Mr. Garza stated the system did not have the logging capability due to system problems. If the logging capability was available, it could have easily identified accesses to the system.

Mr. Garza recalled training Tony Desmarais, Frank Parfume, and another person he could not recall, in late May 2002, just after the system installation. Mr. Garza's training consisted of web applications, browsing calls, searching calls, listening to calls, deleting calls, establishing the database, and how to add and delete stations to record. Mr. Garza's opinion was that the three individuals were not grasping the concept of the Total Recall System. Mr. Garza recalled a second training session conducted remotely in early August 2002, which included Greg Haroian and Ron Reposa. The training consisted of the same content as the original on-site training session.

Mr. Garza stated that Anthony Desmarais was his contact person. He recalled a time Desmarais asked if the Total Recall System had the capability of an audio noise alerting that a recording is occurring. Mr. Garza explained that it did not have that capability.

Mr. Garza stated he has worked with other police agencies, but he indicated that an announcement message was stated indicating the call might be monitored for quality assurance purposes. Mr. Garza stated he did inform Anthony Desmarais during training of what other departments have done and what could be done to post notification of recording.

On May 15, 2003, Corporal Douglas Newberg interviewed Alan Sepe, acting Director of Public Property Purchasing for the City of Providence. Mr. Sepe stated he has been the acting director for the past 12 1/2 years and was involved in the bid process for the telephone installation for the

Providence Public Safety Complex.

Mr. Sepe stated he communicated with Manny Vieira and Anthony Desmarais of the Communications Center and recalled several meetings where Manny Vieira and Anthony Desmarais were present.

Mr. Sepe recalled after the initial request for proposal authored by the Communications Department, a subsequent request for a recording device was added as a requirement by the Communications Department. Mr. Sepe stated after some discussion with either Manny Vieira and/or Anthony Desmarais and the potential bidders, a decision was made to add the recording device requirement as Addendum No. 6 to the original request for proposal and to make the telephone installation and recording device as one project.

Mr. Sepe did indicate that there was nothing unusual or secretive during the bidding process concerning the recording device.

On June 3, 2003, Corporal Douglas Newberg interviewed Michael J. Dutra, Deputy Assistant Chief of the Providence Fire Department.

On or about January 21, 2003, Chief Dutra had a lengthy conversation with a complainant over the telephone concerning possible inappropriate medical treatment during a Rescue call. Chief Dutra stated that after the telephone conversation, and to ensure the accuracy of the complaint, he contacted and questioned Director Vieira if this particular telephone call was recorded. Chief Dutra further stated Director Vieira had him contact Tony in Communications (Anthony Desmarais). Chief Dutra provided Tony with his telephone extension and the date and time of the telephone conversation, along with a CD-ROM, and received a file containing the complete telephone conversation between himself and the complainant.

Chief Dutra stated prior to his conversation with Director Vieira, he did not have any knowledge

that all the telephone lines were being recorded and that he only investigated this particular call because of the assumption that it had been transferred through the Bureau of Operation Control.

Chief Dutra stated that when he went to the Communications Center, a third party downloaded the audio file and allowed him to briefly listen to it to confirm it was the requested conversation prior to the file being written to a CD-ROM. Chief Dutra could not identify the third party involved, but investigators believed it to be Greg Haroian. Chief Dutra stated he then returned to his office, replayed the entire conversation, and filed the CD-ROM.

On June 3, 2003 Corporal Newberg seized the CD-ROM from Chief Dutra who signed a Release Form.

Corporal Newberg received a signed consent form from Wennzdehl Powell allowing investigators to listen to the recorded telephone conversation between Chief Dutra and Wennzdehl Powell. Corporal Newberg then briefly listened to the audio file located on the CD-ROM and verifed a conversation between Chief Dutra and Wennzdehl Powell.

Corporal Newberg received from the Consultant to the Chief, Andy Rosenzweig, a memo outlining a meeting of February 10, 2003, which included Colonel Esserman, Andy Rosenzweig, Manuel Vieira, Joseph Richardson, Greg Haroian, Anthony Desmarais, Majors Sullivan and Laorenza, and Lieutenant Tucker. The focus of this meeting was the ongoing practice of recording incoming and outgoing telephone calls in the Public Safety Complex. The following are the salient points learned from this meeting which were documented by Andy Rosenzweig:

- Vieira stated he was directed by former Colonel Prignano to create this practice but has no written directive
- Vieira stated the two former acting chiefs, Sullivan and Laorenza, knew of the practice but never questioned it
- There was no sign-off obtained from the City Solicitor prior to the installation and use of the recording device

- No formal notifications were made to employees or the public that the telephone lines were being recorded (Major Simoneau's e-mail was an informal notification)
- Cianci, Corrente, and Coloian had no knowledge of the system

There are additional points documented in Andy Rosenzweig's memo dated February 10, 2003.

Summary

After conducting numerous interviews with members of the Providence Police Department, Providence Fire Department, and Communications Center, to include sworn and civilian personnel, as well as other individuals who had some level of relationship with the City of Providence during the planning and construction phase of the Providence Public Safety Complex, it does appear that the Total Recall System's purchase, installation and use was not performed in a surreptitious manner. Based on the interviews of certain individuals, the recording device was discussed openly and the general consensus of the personnel within the Providence Public Safety Complex and Communications Center was that the telephones were being recorded.

Major Simoneau's e-mail of July 22, 2002, at 1:26 P.M., sent globally to all members of the Providence Police Department and Communications Center, displays an intent by the Major to disseminate this important information. This e-mail was sent to and received by over 500 employees. In addition, the recording device was not secreted in a locked, concealed area but installed on the second-floor utility room. This room was a limited access area due to the technical sensitivity of all the equipment, but the room was accessed frequently by a number of individuals. Cpl. Newberg obtained a printout of the door history report for this utility room and observed over 150 accesses between January 28, 2003 through February 10, 2003.

Testimonial evidence indicates that Command-level officers of the Providence Police

Department, besides Major Simoneau, had knowledge that the telephone lines were being recorded and took no action to limit or prohibit these actions until Attorney John D'Amico, Senior City Solicitor, made statements of the inappropriateness and possible illegalities surrounding the practice of recording all telephone conversations.

Anthony Desmarais was considered the point-of-contact for the design considerations and installation of the telephone system, to include the recording device. Based on numerous interviews and memos obtained during this investigation, including statements made by Anthony Desmarais, he was directed by Manual Vieira, prior to making any decisions on the Total Recall System.

There has been no evidence to support that the installation and use of the recording device went beyond the Director of Communications, Manuel Vieira. In statements made by Manuel Vieira to others, he attempted to distance himself from knowledge and understanding of the recording of telephone lines. In conversations with Robert Nelson, retired Commissioner Partington, Colonel Esserman, and Andy Rosenzweig, Manuel Vieira avoided any direct responsibility; however, memos and statements that were reviewed indicated Manuel Vieira was directly responsible for the purchase and installation of the recording device.

Based upon the above facts and statements, this investigation will be forwarded to the Attorney Generals Office for review and determination if the actions of certain individuals are warranted for criminal liability, to include those individuals who listened to recorded audio conversations under Rhode Island General Law (RIGL) 12-5-1, *Interception of Wire and Oral Communications.*

Respectfully Submitted,

Douglas C. Newberg
Detective Corporal
RI State Police

# MEMORANDUM RELATING TO THE "TOTAL RECALL" TELEPHONE RECORDING SYSTEM AT THE PROVIDENCE PUBLIC SAFETY COMPLEX

**FROM:** RONALD R. GENDRON, SP. ASSISTANT ATTORNEY GENERAL

**TO:** PATRICK LYNCH, ATTORNEY GENERAL

**CC:** GERALD COYNE, DEPUTY ATTORNEY GENERAL
PAUL DALY, CHIEF, CRIMINAL DIVISION

**DATE:** JANUARY 2, 2004

---

## I. Introduction.

This memorandum contains findings and conclusions regarding whether a willful violation of the General Laws of Rhode Island occurred with respect to the installation and use of a telephone recording system, known as Total Recall, at the Providence Public Safety Complex. The telephone and recording systems were furnished and installed by Expanets, Inc., based in Houston, Texas. The findings and conclusions contained herein were reached after reviewing several hundred pages of documents submitted to me by the Rhode Island State Police following their investigation into this matter. The materials reviewed included the following: a Rhode Island State Police Forensic Report relating to the Public Safety Complex telephone system, Total Recall, and recorded calls accessed through Total Recall; police reports by members of the Rhode Island State Police; witness statements taken by the Rhode Island State Police from personnel at Expanets, the Providence Telecommunications Department, the office of the Commissioner of Public



DRAFT

Exhibit F

Safety, and the Providence Police and Fire Departments; literature pertaining to the Total Recall telephone recording system; internal memoranda and e-mails generated by personnel at the Providence Police and Fire Departments and Department of Communications; technical logs relating to the Total Recall system; and relevant statutes and case law.

II. Procurement and Installation of Total Recall

Before and during the time that the Public Safety Complex was being constructed, hundreds of planning meetings occurred – attended by various high-ranking officials from the Fire, Police, and Telecommunications Departments – relating to all aspects of the new complex, including its telephone system and the ability to record telephone calls coming into the complex. It appears that it was generally understood that certain telephone lines in the new complex, including emergency response lines, would be recorded, as is common practice generally in virtually all police and fire stations. However, from a review of the witness statements and documentary evidence provided, it is unclear exactly who, if anyone, from the Providence Police and Fire Departments and Commissioner of Public Safety's Office actually requested that an all-extension telephone recording system be installed, and activated, in the new complex. When interviewed, Colonel Urbano Prignano and Chief James Rattigan, then-chiefs of the Police and Fire Departments, respectively, and then-Commissioner of the Office of Public Safety, John Partington, all denied any knowledge of or involvement in requesting such a recording system, drafting bid specifications for the recording system, its purchase, installation, or its activation, even though each individual understood certain lines within the Public Safety Complex would be recorded, as they were in the Fountain Street facility. Although this fact, if true, is indicative of a disturbing lack of communication and exchange of information between the then-Director of the Telecommunications Department, Manuel Vieira, and Colonel Urbano Prignano, Chief James Rattigan, and Public Safety Commissioner John Partington – whose agencies were to be housed in the new Public Safety Complex and, thus, their telephone conversations monitored by Total Recall – there is no credible



DRAFT

evidence in existence that refutes their assertion of lack of involvement in the requisitioning or installation of the all-extension recording system.

The totality of the evidence submitted appears to clearly indicate that the Director of the Telecommunications Department, Manuel Rivera, was responsible for requisitioning a telephone recording system, like Total Recall, that had the ability to record every line in the new Public Safety Complex, ordering its installation, and allowing the system to become operational without giving formal notification to the Chiefs of the Police and Fire Departments, or the Commissioner of Public Safety, that the system was operating and recording virtually every incoming or outgoing telephone call in the complex. Despite this rather incontrovertible evidence, it also appears that, immediately after the controversy surrounding the telephone recording system garnered media attention, Director Vieira, in conversations with several individuals, attempted to distance himself from the acquisition, installation, and activation of the recording system while minimizing his knowledge of the system's recording capability and the extent to which it was being used. Furthermore, it does not appear that Director Vieira consulted with the Providence City Solicitor's office to obtain an opinion with respect to the legality of such a system before its purchase or activation, or to develop an official policy with respect to the system's usage. Mr. Vieira declined to give a statement to the Rhode Island State Police or otherwise assist them in their investigation into this matter.

Conversely, however, it also does not appear that the acquisition of the Total Recall system occurred in a fashion inconsistent with normal city purchasing procedures or in an otherwise clandestine manner. Indeed, during the construction of the Public Safety Complex, a formal Request for Proposal was drafted that included the specifications for the desired telephone system. Because the initial Request for Proposal relating to the complex's telephone system did not include the requirement of a telephone recording system, a Telecommunications Department employee – at Director Vieira's request – prepared a second set of specifications relating to the additional requirement of a telephone recording system, which was attached to the initial Request for Proposal as an addendum. In accord with normal procedure, this Request for Proposal and recording-



DRAFT

system addendum was forwarded to Mr. Alan Sepe, then-Acting Director of the Providence Department of Public Property. Thereafter, Mr. Sepe conducted pre-bid meetings that were attended by several telecommunications vendors. At these meetings, the telephone system's requirements – including the need for a telephone recording system – were discussed openly. Of the approximately 7 vendors that expressed interest in the proposal, 6 submitted bids on the project. Although not the lowest bidder overall, Expanets won the bid because its product met all bid specifications, including the telephone recording system. Although lower, the bids of other vendors were rejected for failure to meet the general Request for Proposal specifications or failing to bid on the recording system.

Ultimately, the Telecommunications Department was responsible for choosing the vendor that satisfied its Request for Proposal requirements. A January 8, 2002 letter from Director Vieira to Acting Director Sepe indicated that the Telecommunications Department was selecting Expanets based on the fact that they were the lowest bidder that met all bid specifications for a total phone system solution, which included a 500-channel telephone voice recording system. Expanets was awarded the telephone system contract, which included Total Recall, by the Board of Contract & Supply on January 14, 2002. (See attached correspondence). Expanets installed total recall in May of 2002 and it became operational shortly thereafter.

Additionally, although there was no formal notification from the Telecommunications Department to all personnel in the Public Safety Complex that the majority of lines in the complex were being recorded, there is also no evidence that shows affirmative steps were taken to intentionally conceal this information or prevent its dissemination. As previously mentioned, numerous planning meetings occurred prior to the opening of the Public Safety Complex at which various issues, including telecommunications, were discussed. Statements provided by several witnesses who were in attendance at some of those meetings indicate that the issue of telephone-line recording was often discussed openly. While it may not have been formally stated outright, it seems that it was fairly common knowledge that telephone lines in the new Public Safety Complex would be recorded, although the magnitude and extent of such



DRAFT

recording may not have been fully understood by all.

In his statement to the Rhode Island State Police, (Ret.) Major Dennis Simoneau recalled attending "at least two, if not three" meetings, attended by "dozens" of people, at which various design issues relating to the new Public Safety Complex were discussed, including the call-recording ability of the complex's telephone system. He recalls Director Vieira being present at at least one of the meetings during which telephone recording ability was discussed, and questioned Director Vieira about whether recorded lines would be equipped with an audible signal that alerted callers that the call was being recorded. (As an aside, it should be noted that the Total Recall system did not have the capability of alerting callers of active recording by means of an audible 'beep.' Although Telecommunications Department employees were aware, through Expanets trainings, that Total Recall could be configured to verbally announce to callers that their calls were being recorded, this feature was apparently never utilized). Based upon information gleaned from these meetings, prior to moving into the new Public Safety Complex, on July 22, 2002 at 2:48 p.m., Simoneau prudently sent out a department-wide email that contained, inter alia, the following notification, "Know that all telephone lines in the new station are recorded and thus speak professionally at all times. [Desk Sergeants] please alert all of your clerks of this fact." From the recipient list relating to this email, it appears that this email was delivered to and received by over 500 Police Department and Telecommunications Department personnel. (See attached copy of email and recipient list). According to Simoneau, at the time he composed this email at the former Providence Public Safety Complex on Fountain Street, he did not know whether all lines in the new Public Safety Complex would in fact be recorded (and did not in fact know they were being recorded prior to the commencement of the instant investigation) but, out of an abundance of caution, decided to affirmatively state that all calls were recorded so that all recipients of the email would conduct their telephone conversations accordingly.

III. Public Safety Complex Telephone System and Total Recall

As stated earlier, the telephone system contract at the Providence Safety Complex



DRAFT

was awarded to Expanets, based in Houston, Texas. The basic telephone system product provided by Expanets for the Public Safety Complex incorporates a PBX trunk line and, in addition to functioning as a conventional telephone system, also has the ability to count the number of calls made on the system, the calls made on each extension of the system, and the duration of those calls, although this so-called 'call accounting' feature was not initially operating when system was first activated. The basic telephone system, however, does not have the independent ability to monitor conversations during a telephone call or to record conversations.

Total Recall is described in company literature by Expanets as a "digital, Web-based, call logging software system[.]" Although Expanets does not manufacture the Total Recall system, they have a business affiliation with the company that does and, consequently, offers the Total Recall system to customers as part of their solution for a total telephone system product. Total Recall is a recording system that, when integrated with a telephone system, has the ability to record conversations occurring during all incoming or outgoing telephone calls on the main telephone 'trunk' line that services a building, including those conversations occurring on every telephone extension attached to the trunk line. Equipped with 70 gigabytes of memory, the Public Safety Complex's Total Recall server was capable of recording approximately 35,000 storage hours of telephone calls. Total Recall does not have the ability to real-time monitor a telephone conversation as it is transpiring, nor is it able to record 'station-to-station' calls that are made within the building itself. The purchaser of the Total Recall system designates those telephone lines or extensions that are to be recorded and Expanets installs this database into the Total Recall system. After the initial database is installed and the system is operational, the customer can then add or remove extensions for recording purposes, as the customer desires.

The Total Recall system is a network-based system that allows designated users to retrieve calls through a personal computer ("PC") by accessing a web-based application. Total Recall records telephonic conversations digitally and stores them on the Total Recall server as digital audio files, formatted as .WAV files. A designated user can then enter the Internet (or 'IP') address of the Total Recall server into an Internet browser, like



DRAFT

Microsoft Internet Explorer, and visit the web-application, or "login," page of Total Recall. Once a designated user enters a valid login name and password, the user can locate recorded calls stored on the Total Recall server by entering specific search parameters (e.g., time and date). The server will then generate a list of hyperlinks (each representing a recorded telephone call) corresponding to those calls that match the search parameters. A mouse click on a hyperlink activates the PC's media player and plays the audio file of the recorded call. These audio files can be accessed and listened to through the use of any internet-connected PC equipped with a sound card and speakers, downloaded onto a hard drive, or written on to a compact disc through the use of a compact disc writer and a recordable compact disc. Although it is possible to listen to .WAV files of recorded conversations directly from the Total Recall server, it was not possible to do this on the Public Safety Complex's Total Recall server because it was not equipped with a sound card or speakers. (It should be noted that there are 2 other means of accessing the Total Recall server: 1) TCP/IP access – Public Safety Complex Total Recall system was not equipped with this means of access, and 2) Telephone Modem Access – this was used exclusively by Expanets employees for routine troubleshooting, maintenance, and quality control. No Telecommunications Department employee or other City of Providence employee had access to the system through this method).

A very limited number of people had 'administrative rights' on the Total Recall system. Those with administrative rights are able to add, delete, or modify recorded telephone extensions on the server, and can also access or download recorded calls stored on the server. Of the 8 user logins identified on the system, 2 were assigned to Expanets employees, and the remaining 6 were assigned to Telecommunications Department employees. Director Vieira did not have administrative rights on the system.

The two servers that comprised the Total Recall system were located in a utility room on the second floor of the Public Safety Complex. Although access to the utility room was restricted due to the costly and technical equipment contained therein and a log was kept of those who accessed the room, the room was accessed frequently by a number of individuals for various purposes. There is no evidence that the Total Recall system



DRAFT

was covertly secreted in a little known and inaccessible room within the Public Safety Complex.

It appears that Total Recall was recording the vast majority of the telephone extensions within the Public Safety Complex. Following the initial installation and activation of Total Recall, designated Telecommunications Department employees with administrative rights removed certain extensions from the list of recorded extensions in the normal course of business.

It is significant to note that Total Recall did not record telephones located in the male, female, and juvenile detention areas of the Public Safety Complex and intended for use by detained persons. The telephones found in those detention cells are maintained by TIP Inmate Phone, Inc. of Texas, a distinct company that is unaffiliated with Expanets or Total Recall. Because those telephones are not a part of the PBX telephone system supplied by Expanets, they were not within the ambit of Total Recall's recording capability. There is no evidence whatsoever which indicates that any telephone call by any person detained within the Public Safety Complex was recorded or, more importantly, heard by anyone other than the intended recipient of the telephone call.

IV. Recorded Calls Accessed on Total Recall

Total Recall was activated on May 23, 2002 and archived its first call at 4:12:26 p.m. on that date. Substantial archiving activity on the Total Recall server. however. did not commence until months later when the Police and Fire Departments and other agencies moved into the building. The last call archived occurred on February 10, 2003 at 4:47:15 p.m., when the Total Recall system was disconnected. During its time in operation, Total Recall archived 754,564 calls.

In his Forensic Report prepared in relation to this investigation, Detective John Killian, of the Rhode Island State Police Computer Crimes Unit, first sought to determine which of the 754,564 archived calls were accessed after their creation. With the technical assistance of an Expanets employee, Detective Killian concluded that 83.552 archived calls had been accessed. It should be noted, however, that the mere fact that a call was



DRAFT

'accessed' does not necessarily mean that the audio file of that call was activated and played audibly. Call accesses can be attributable to a variety of reasons, such as troubleshooting, remote routine maintenance by Expanets employees, etc. With this in mind, Detective Killian then further refined his inquiry to determine which of those accessed calls were accessed and played audibly with "malicious [or] surreptitious intent." In doing so, Detective Killian employed what can only be described as an exhaustive methodology that included analysis of "service/trouble-shooting audio file type accesses" and cross-referencing with "testimonial evidence, knowledge of operating system characteristics and configuration, web browser history(s), Expanets telephone/modem connection logs, and Expanets service logs," in addition to "[t]ime synchronization between data" relating to "[t]ime stamped data from Expanets, the Total Recall server and other seized computers..." Detective Killian's Forensic Report is attached hereto and its findings and conclusions are incorporated herein.

Following his analysis, Detective Killian concluded, "[b]ased on the above methodology and analysis to date, this examination and review did not identify Total Recall audio files that appear to have been accessed with malicious/surreptitious intent." It is worthy of note that it was determined that a very small number of accessed calls were activated and played audibly or downloaded and written on to a compact disc. A review of the testimonial evidence indicates, however, that these instances are attributable to requests made to the Telecommunications Department for a copy of the recorded conversation by a participant to the conversation, or were ordered by officials within the Providence Police or Fire Departments for legitimate business purposes. There is no evidence to suggest that any accessed call was played audibly or downloaded and recorded either without the consent of a call participant or for a criminal, malicious, or non-business-related reason.

## V. Statutes and Relevant Case Law

The recording of the telephone calls at issue in this investigation falls within the purview of two inter-related statutes contained in the General Laws of Rhode Island. The



DRAFT

interception of wire, electronic, or oral communications in Rhode Island is governed by Rhode Island General Law sec. 11-35-21, entitled "Unauthorized interception, disclosure, or use of wire, electronic, or oral communication," which provides, in pertinent part, as follows:

> (a) Except as otherwise specifically provided in chapter 5.1 of title 12, any person: (1) who willfully intercepts, attempts to intercept, or procures any other person to intercept or attempt to intercept, any wire, electronic, or oral communication; (2) who willfully discloses or attempts to disclose to any person the contents of any wire, electronic, or oral communication, knowing, or having reason to know that the information was obtained through interception of a wire. electronic. or oral communication in violation of this section; or (3) who willfully uses or attempts to use the contents of any wire, electronic, or oral communication, knowing, or having reason to know, that the information was obtained through interception of a wire, electronic, or oral communication in violation of this section; shall be imprisoned for not more than five (5) years.
>
> [(b) Omitted]
>
> (c) It shall not be unlawful under this chapter for:
>
> (1) An operator of a switchboard, or an officer, agent, or employee of a communication common carrier, whose facilities are used in the transmission of a wire, electronic, or oral communication, to intercept, disclose, or use that communication in the normal course of his or her employment while engaged in any activity which is a necessary incident to the rendition of his or her service or to the protection of the rights or property of the carrier of the communication. No communication common carrier shall utilize service observing or random monitoring except for mechanical or service quality control checks:
>
> (2) A person acting under color of law to intercept a wire, electronic, or oral communication, where that person is a party to the communication, or where one of the parties to the communication has given prior consent to the interception; or
>
> (3) A person not acting under color of law to intercept a wire, electronic, or oral communication, where the person is a party to the communication, or one of the parties to the communication has given prior consent to the interception unless the communication is intercepted for the purpose of committing any criminal or tortious act in the violation of the constitution or laws of the United States or of any state or for the purpose of committing any other injurious act. (Emphasis added).

Additionally, Chapter 5.1 of Title 12 of the Rhode Island General Laws, entitled



DRAFT

"Interception of Wire and Oral Communications," defines terms used in sec. 11-35-21 and also establishes procedures that must be followed for the interception of wire or oral communications and the disclosure of intercepted communications obtained therefrom. Section 12-5.1-1, et seq., closely parallels the federal wiretap statute, Title III of the federal Omnibus Crime Control and Safe Streets Act, found at 18 U.S.C.A. 2510- 2521.

Thus, in analyzing whether utilization of the Total Recall system in a facility like the Public Safety Complex contravened Rhode Island's "wiretap" statutes, a determination must be made as to whether Total Recall – and its users – impermissibly "intercepted" protected "wire, electronic, or oral communications" as defined in Chapter 5.1 of Title 12. Resolution of this inquiry is dependent upon an analysis of the precise statutory definitions found in Chapter 5.1 of Title 12 and applicable case law.

At the outset, it should be noted that recording systems, like Total Recall, are frequently used in public facilities like the Providence Public Safety Complex for legitimate business purposes. Courts have noted that public safety agencies, like police and fire departments, commonly use such systems "due to the need to preserve and be capable of accurately recalling messages pertaining to emergencies or to official police business." Jandak v. Village of Brookfield, 520 F.Supp. 815, 822 (D.C. Ill. 1981). "[Recorded] calls may constitute vital evidence or leads to evidence, and monitoring them is also necessary for evaluating the speed and adequacy of the response of the police to tips, complaints, and calls for emergency assistance." Amati v. City of Woodstock, 176 F.3d 952, 954 (7th Cir. 1999). Consequently, a plethora of federal case law has evolved under Title III of the federal Omnibus Crime Control and Safe Streets Act, 18 U.S.C.A. 2510- 2521, relating to litigation concerning recordings made through the use of such telephone recording systems.

An initial consideration is whether the telephone calls recorded by Total Recall fit within the statutory definition of protected "wire, electronic, or oral communications." Sec. 12-5.1-1(10) defines "Oral communications" as "any oral communication uttered by a person exhibiting an expectation that the communication is not subject to interception under circumstances justifying that expectation, but the term does not include any electronic communication." (Emphasis added). Based upon this definition, a colorable



DRAFT

argument could be made that many of the conversations recorded by Total Recall do not constitute "oral communications" within the meaning of sec. 12-5.1-1(10) because many callers from within the Public Safety Complex were likely aware of the fact that their calls were being recorded. As stated earlier, prior to moving into the new Public Safety Complex, Major Simoneau of the Providence Police Department sent out a department-wide email on July 22, 2002 that contained, inter alia, the following notification, "Know that all telephone lines in the new station are recorded and thus speak professionally at all times. [Desk Sergeants] please alert all of your clerks of this fact." From the recipient list relating to this email, it appears that this email was delivered to and received by over 500 Police Department and Telecommunications Department personnel. Additionally, as stated earlier, it appears that it was generally acknowledged by personnel housed in the Public Safety Complex that telephone lines within the new facility were recorded, though the extent of the recordings may not have been fully understood. Because of this general awareness, it could be argued that the recorded calls were not "oral communications" within the meaning of the statute since Public Safety Complex personnel that were informed – or suspected – their calls were recorded would not be "[persons] exhibiting an expectation that the communication is not subject to interception under circumstances justifying that expectation."

Based upon the current state of the evidence, however, it is impossible to discern who within the Public Safety Complex had actual knowledge – as opposed to a "hunch" or a "generalized suspicion" – that their telephone conversations were being continually recorded. Although Major Simoneau's email was sent to – and apparently received by – numerous members of the Providence Police Department, it does not appear that comparable notice was given to personnel in the Fire Department and Office of the Commissioner of Public Safety by the respective leadership in those agencies, although they apparently attended planning meetings at which telephone recording was discussed.

Courts that have addressed this issue on the federal level have required a showing that a participant to a recorded conversation had "actual knowledge" that their call was being monitored, rather than a "generalized suspicion," to remove the monitored or



DRAFT

recorded conversation from the statutory ambit of an "oral communication" by negating a justifiable expectation of privacy. When individual privacy rights are implicated, courts that have considered the 'consent' issue have been reluctant to afford an expansive reading to the exception. See, e.g., Jandak v. Village of Brookfield, 520 F.Supp. 815, 820 (D.C. Ill. 1981); United States v. Duncan, 598 F.2d 839, 850 (4th Cir. 1979)[1]. In accord with this reasoning, for the purposes of this analysis all telephone conversations recorded by Total Recall shall be treated as "oral communications" within the meaning of the statute.

Another issue that must be addressed is whether Total Recall or its users "intercepted" the oral communications at issue. Sec. 12-5.1-1(8) defines "Intercept" as "aural or other acquisition of the contents of any wire, electronic, or oral communication through the use of any electronic, mechanical, or other device." The common dictionary definition of "aural" is "of or pertaining to the ear or the sense of hearing." See Webster's New International Dictionary, at 182 (2d ed. unabridged 1957).

Thus, "interception" is contingent upon whether an "aural or other acquisition of the contents" of an oral communication occurred. As noted earlier, Det. Killian's investigation revealed that only a minute percentage of all recorded calls were actually heard by human ears. This raises the question of whether the recording of calls that were never played audibly constitutes an "interception" within the meaning of the relevant statutes, since "interception" requires "aural or other acquisition of the contents of any... oral communication through the use of any electronic. mechanical, or other device." A difference of opinion exists among courts that have considered whether the mere recording of a telephone conversation constitutes an "interception" if the recording is never played audibly. Some jurisdictions have taken the position that only those recorded calls that have been listened to by human ears are "interceptions" within the meaning of

[1] The Duncan court noted. "Certainly the law does not contemplate that the expectation required here shall be one held with the perfect certitude that it is being respected at all times. At some point along the path of developing suspicion it must surely be possible for an originally justified expectation to become unjustified, but just as surely that point is not reached when a first glimmer of generalized suspicion that something Could or Might be amiss is aroused...If by merely creating a generalized suspicion that a victim's communications were possibly being intercepted, while at the same time avoiding detection, an electronic eavesdropper could bootstrap his activity from the proscribed to the permitted." Id.



DRAFT

the statutes because they have been "aurally" acquired. See, e.g., Greenfield v. Kootenai County, 752 F.2d 1387 (9th Cir. 1985). Other jurisdictions have interpreted "aural or other acquisition" to mean that the mere recording of a call, even if not listened to, constitutes an "interception." See, e.g., United States v. Rodriguez, 968 F.2d 130, 136 (2nd Cir. 1992); Sanders v. Robert Bosch Corp. 38 F.3d 736, 740 (4th Cir. 1994); United States v. Truglio, 731 F.2d 1123, 1131 (4th Cir. 1984), cert. denied, 469 U.S. 862, 105 S.Ct. 197, 83 L.Ed.2d 130 (1984); United States v. Seidlitz, 589 F.2d 152, 157 & n. 17 (4th Cir. 1978), cert. denied, 441 U.S. 922, 99 S.Ct. 2030, 60 L.Ed.2d 396 (1979). Although the Rhode Island Supreme Court – on facts identical to those at issue here – has not yet specifically ruled upon whether mere recording of a telephone call would constitute an "aural or other acquisition" for purposes of "interception" under Rhode Island's law, dictum in relevant Rhode Island cases indicates that recording alone would run afoul of state wiretap statutes.[2] Consequently, all calls recorded by Total Recall, whether or not played audibly, will be treated as having been "aurally" acquired under sec. 12-5.1-1(8) for purposes of this analysis.

A final, and determinative, issue that must be addressed in determining whether Total Recall unlawfully intercepted oral communications is whether the "aural acquisitions" were accomplished through the use of "any electronic, mechanical, or other device." Sec. 12-5.1-1(7) defines "any electronic, mechanical, or other device" as:

> "any device or apparatus which can be used to intercept wire, electronic, or communications, other than:
>
> (i) Any telephone or telegraph instrument, equipment, or facility or any component of telephone or telegraph instruments, equipment, or facilities, furnished to the subscriber or user by a provider of wire or electronic communication service in the ordinary course of its business, and being used by the subscriber or user in the ordinary course of business, or by an investigative or law enforcement officer in the ordinary course of his or her duties... (Emphasis

[2] In State v. O'Brien, 774 A.2d 89 (R.I. 2001), defendant was convicted of violating sec. 11-35-21 after consensually allowing fraternity brother to secretly videotape defendant's sexual encounter with victim. In holding that audio portion of videotape recorder was an 'intercepting device' under state wiretap statute, the Court adopted the position that "an 'acquisition' occurs at the time [a] recording is made" – but *not* at the time of "the replaying of a previously recorded conversation." Id. at 96, fn. 7 (emphasis in original) (quoting U.S. v. Turk, 526 F.2d 654, 658 (5th Cir. 1976)).



DRAFT

added).

Although it would seem that any telephone recording system is, per se, an "electronic, mechanical, or other device" because it is, by common usage, a "device or apparatus which can be used to intercept wire, electronic, or oral communications," sec. 12-5.1-1(7), and its federal counterpart,[3] exclude from their definition of "electronic, mechanical, or other device" recording systems that are employed to record all calls made by employees of a business or governmental law enforcement agency, like police departments, if the recordings are made routinely in the ordinary course of business, see, e.g., Arias v. Mutual Central Alarm Service, Inc., 202 F.3d 553, (2nd Cir. 2000); Jandak v. Village of Brookfield, 520 F.Supp. 815, 820 (D.C. Ill. 1981); Amati v. City of Woodstock, 176 F.3d 952 (7th Cir. 1999), cert. denied, 120 S.Ct. 445, 528 U.S. 985, 145 L.Ed.2d 362 (1999); United States v. Van Poyck, 77 F.3d 285 (9th Cir. 1996), cert. denied, 117 S.Ct. 276, 519 U.S. 912, 136 L.Ed.2d 199 (1996), and not selectively or for some criminal or malicious purpose. See, e.g., United States v. Townsend, 987 F.2d 927 (2nd Cir. 1993). When interpreting the so-called "ordinary course of business" or "law enforcement" exceptions delineated in the statute, courts have held that such recordings do not constitute an 'interception' if the recording is done through the use of a telephone instrument, equipment or facility, or any component thereof, and the equipment was being used by law enforcement officers in the ordinary course of their duties. Jandak, 520 F.Supp. at 821.

Courts have considered the nature of the recording equipment in question in determining whether such recordings were effectuated through the use of a "telephone instrument, equipment or facility, or any component thereof." Generally, privately purchased recording equipment that is covertly attached to a telephone system to

[3] The comparable federal definition is found at 18 U.S.C. sec. 2510(5) and provides as follows:

> Electronic, mechanical, or other device means any device or apparatus which can be used to intercept a wire or oral communication other than
> (a) any telephone or telegraph instrument, equipment or facility, or any component thereof,
> (i) furnished to the subscriber or user by a communications common carrier in the ordinary course of its business and being used by the subscriber or user in the ordinary course of its business; or (ii) being used by a communications common carrier in the ordinary course of its business, or by an investigative or law enforcement officer in the ordinary course of his duties; ...



DRAFT

selectively record calls made on particular telephone lines or by certain individuals is likely to run afoul of the wiretap statutes. See, e.g., United States v. Townsend, 987 F.2d 927 (2nd Cir. 1993). Conversely, integrated recording systems like Total Recall, that are purchased by a business or municipality from a telephone equipment company or telephone services provider, which "indiscriminately and routinely records all activities on established designated lines, and is not comparable to the selective use of recording equipment to eavesdrop on a normally unmonitored telephone system in order to record specifically selected communications," will generally be exempted from the wiretap statute under the "ordinary course of business" exception. See, e.g., Arias v. Mutual Central Alarm Service, Inc., 202 F.3d 553, (2nd Cir. 2000)(Dictaphone machine at alarm services company); Jandak v. Village of Brookfield, 520 F.Supp. 815, 820 (D.C. Ill. 1981)(police department)[4]; Amati v. City of Woodstock, 176 F.3d 952 (7th Cir. 1999), cert. denied, 120 S.Ct. 445, 528 U.S. 985, 145 L.Ed.2d 362 (1999)(police department); United States v. Van Poyck, 77 F.3d 285 (9th Cir. 1996), cert. denied, 117 S.Ct. 276, 519 U.S. 912, 136 L.Ed.2d 199 (1996)(inmate detention center)[5].

It should be noted that under the wiretap statutes, the 'ordinary course of business exception' is separate and distinct from the 'consent' exception. Even if the participants to the conversation in a recorded telephone call are unaware that their call is being recorded and have not consented to the recording, the statutory prohibition against interception of oral communications is not offended so long as the recording is done routinely in the ordinary course of business and not for some criminal or malicious purpose. See Amati, 176 F.3d at 955.

## VI. Conclusion

[4] Describing the integrated telephone recording system at issue in the case that was used in a police station, the court in Jandak observed, "Such a system indiscriminately and routinely records all activities on established designated lines, and is not comparable to the selective use of recording equipment to eavesdrop on a normally unmonitored telephone system in order to record specifically selected communications. There is little doubt that Congress did not intend the statute to apply to routine recording of emergency and investigative calls as an integral component of a police station telephone system..." Id. at 822.

[5] The VanPoyck court succinctly stated, "To record all calls to and from a police department is... a routine police practice. If "ordinary course" of law enforcement includes anything, it includes that." Id. at 955.



DRAFT

Total Recall is an integrated telephone recording system that was used at the Providence Public Safety Complex from May 23, 2002 to February 10, 2003. During this time period, Total Recall routinely and indiscriminately recorded the vast majority of incoming and outgoing calls at the Public Safety Complex.

The credible evidence submitted shows that Manuel Vieira, then-Director of the Telecommunications Department, was the individual who was responsible for the requisitioning, installation, and activation of the Total Recall system. Although it appears that – among many others – Chiefs Prignano and Rattigan and Commissioner Partington were aware that certain lines in the Public Safety Complex would be recorded, the evidence suggests that none of these individuals was fully aware of Total Recall's capabilities or the extent to which lines would be recorded in the Complex, nor did they have any involvement in the requisitioning, installation, or activation of the recording system. It also appears, however, that discussion of a telephone recording system for the Public Safety Complex occurred regularly and openly at planning meetings relating to Complex, that the system was requisitioned and purchased in accordance with normal municipal purchasing procedures, and the system was purchased from a legitimate vendor of telephone products and services as part of a complete telephone system solution for the Public Safety Complex. Lastly, although formal notification was not given to the Chiefs, Commissioner, or Public Safety Complex personnel by the Telecommunications Department regarding the activation of the recording system or the extent of its operation, it appears that many, if not all, Public Safety Complex personnel had some belief – if not actual notice – that calls in the Public Safety Complex were being recorded, and no evidence exists that affirmative steps were taken by personnel at the Telecommunications Department or elsewhere to either refute this belief or quell its propagation.

During its time in operation, Total Recall archived 754,564 calls and, of that total, Detective John Killian determined 83,552 calls had been 'accessed' after their creation, but noted that simply because a call was 'accessed' does not necessarily mean that the audio file of that call was activated and played audibly. Through an exhaustive methodology more fully explained in his Forensic Report, Detective Killian further refined his inquiry to determine which of those accessed calls were accessed and played



DRAFT

audibly with "malicious [or] surreptitious intent" and was unable to find any audio file accesses that fit this criteria. The very small number of accessed calls that were activated and played audibly or downloaded and written on to a compact disc were attributable to legitimate business purposes, and no evidence suggested that any accessed call was played audibly or downloaded and recorded either without the consent of a call participant or for a criminal, malicious, or non-business-related reason. To conclude otherwise in the absence of credible evidence to the contrary would amount to sheer speculation and conjecture.

The submitted evidence shows that Total Recall "indiscriminately and routinely record[ed] all activities on established designated lines, and [was] not comparable to the selective use of recording equipment to eavesdrop on a normally unmonitored telephone system in order to record specifically selected communications." As such, use of the Total Recall recording system in the Public Safety Complex falls within the 'ordinary course of business exception' to the state and federal wiretap statutes and, thus, was not an electronic or other device that unlawfully intercepted oral communications in contravention of those statutes.

Although the facts surrounding the requisitioning, installation, and operation of the Total Recall system may show rather unfathomable negligence on the part of certain Providence municipal employees and a disturbing lack of communication between their respective agencies, the facts do not show probable cause to believe that a prosecutable violation of the Rhode Island General Laws occurred. Accordingly, it is recommended that no charges be filed against anyone in relation to the requisitioning, installation, and operation of Total Recall. In the event that Total Recall is reactivated and further recording of telephone lines occurs at the Public Safety Complex, however, it is recommended that the leadership of the agencies housed therein and the Telecommunications Department consult with the Providence City Solicitor to develop an official written policy relating to the use of Total Recall within the Public Safety Complex and that the policy be disseminated to all personnel that will be effected by it.



DRAFT

Respectfully submitted,

RONALD R. GENDRON



DRAFT

UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF RHODE ISLAND

* * * * * * * * * *

SEAN PATRICK, INC. C.A NO. 96-689 L

VS. PROVIDENCE, R.I.
24 APRIL 98

CITY OF PROVIDENCE, et al

* * * * * * * * * *

BEFORE HONORABLE CHIEF JUDGE RONALD R. LAGUEUX

<u>APPEARANCES:</u>

FOR THE PLAINTIFF: NEAL J. MC NAMARA, ESQ.
101 Dyer Street
Providence, RI, 02903
831-7854

FOR THE DEFENDANT: KEVIN F. MC HUGH, ESQ
City of Providence
100 Fountain Street
Providence, RI, 02903
421-7740 x329

Court Reporter: JOSEPH A. FONTES
One Exchange Terrace
Providence, RI 02903
401-273-0344

Proceeding reported and produced by computer-aided stenography

Exhibit G

24 APRIL 98

THE COURT: The plaintiff has sued the City of Providence, Vincent A. Cianci as Mayor of the City of Providence, and Urbano Prignano Jr. as Chief of Police of the City of Providence, therefore, this is an action against the City of Providence. There is no claim here of individual action.

It is necessary for a plaintiff to recover under 1983 against a municipality and its agents, acting as officials of that municipality, that the City has a policy to violate the constitutional rights of the plaintiff. The claimed policy here is that the Chief of Police decided to have a group of police officers stationed prominently at this nightclub, which had an entertainment license but not an adult entertainment license, and liquor licenses. There is no showing that the highest authority of the City of Providence had this policy. From all that appears, that policy was framed by the Chief of Police in response to a particular circumstance. He could be sued personally, if that is a constitutional violation. But the City cannot be sued for the actions of one of its officials unless it is shown that that was the City policy promulgated by its highest authorities, and the highest authorities in

the City of Providence are the City Council and Mayor. There is no showing of such a policy.

It appears from the limited evidence in this case that it was a policy for a limited period of time, initiated by the Chief of Police, and that does not make the City liable. There is no way the City can be held liable in this case as a matter of law.

Judgment will be entered for the three defendants. The Clerk will enter judgment for the defendants. We'll take a recess.

THE CLERK: All rise.

(R E C E S S)

C E R T I F I C A T I O N

I hereby certify that the foregoing is a correct transcript from the record of proceedings in the above-entitled matter.

Joseph A. Fontes

JOSEPH A. FONTES

May 15, 1998

Date

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF RHODE ISLAND

THOMAS WALDEN, ET AL. :
PLAINTIFFS :
:
vs. : C.A. No. 04-304S
:
CITY OF PROVIDENCE, ET AL. :
DEFENDANTS :

DEPOSITION OF URBANO PRIGNANO, JR., a Witness in the above-entitled case, taken on behalf of the Plaintiffs, before April C. Costa, a Notary Public in and for the State of Rhode Island, at the offices of Providence City Solicitor's Office, 275 Westminster St., Ste 200, Providence, Rhode Island on February 16, 2006 at 2:00 P.M.

ALLIED COURT REPORTERS, INC.
115 PHENIX AVENUE
CRANSTON, RHODE ISLAND 02910
(401) 946-5500

A. I think it was 1986.

Q. After becoming sergeant in 1986, what was the next --

A. Narcotics inspector.

Q. You're going to have to let me finish so that the stenographer can take it down properly.

What was the next rank you obtained after becoming sergeant in 1986?

A. Narcotics inspector.

Q. What was year was that?

A. I think it was 1990.

Q. Following becoming a narcotics inspector in 1990, what rank did you hold?

A. In '94 I became major.

Q. Following becoming major in 1994, what rank did you become?

A. In '95 I became colonel.

Q. When did you leave the employment of the City?

A. January 31st, 2001.

Q. When you were chief what were your duties?

A. Discipline and administrative.

Q. What were your administrative duties?

A. Making sure that the police department operated daily.

Q. Did you have any responsibility among any other