UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF RHODE ISLAND

| | | |
|---|---|---|
| THOMAS WALDEN, et al.<br>Plaintiffs<br><br>v.<br><br>CITY OF PROVIDENCE, et al.<br>Defendants | :<br>:<br>:<br>:<br>:<br>:<br>: | Case No. 04-304S |
| JOHN C. CHMURA, et al.<br>Plaintiffs<br><br>v.<br><br>CITY OF PROVIDENCE, et al.<br>Defendants | :<br>:<br>:<br>:<br>:<br>:<br>: | Case No. 04-553S |

<u>STATEMENT OF MATERIAL FACTS IN DISPUTE IN SUPPORT OF PLAINTIFFS' OBJECTION TO DEFENDANTS DEAN ESSERMAN, DAVID CICILLINE, AND THE CITY OF PROVIDENCE'S MOTION FOR SUMMARY JUDGMENT OR, IN THE ALTERNATIVE, MOTION TO DISMISS</u>

Only for the purposes of the motion for summary judgment of Dean Esserman, David Cicilline, and the City of Providence [hereinafter, collectively, "the City"], plaintiffs accept as undisputed facts the following numbered paragraphs of the City's Statement of Undisputed Facts: 4, 5, 6, 7, 8, 9, 10, 12, 13, 14, 16, and 17.

Plaintiffs dispute the following facts that the City asserts are undisputed in its Statement of Undisputed Facts:

1. The City asserts that it is undisputed that "[t]here is no allegation in the Complaints that the City has an unconstitutional policy, custom or widespread practice of violating people's privacy."

There are allegations in the complaint from which it may be inferred that the City had an unconstitutional policy, custom, or practice of recording private phone conversations without the knowledge or consent of the participants. In particular, the unconstitutional policy, custom, or practice may be inferred from the allegations of the complaint that the City taped all telephone extensions (with the exception of 19 designated extensions) at the Providence Public Safety Complex [PPSC] by means of a telephone system (the Total Recall system) owned, installed,

operated, and maintained by the City for approximately 6 months (from September 2002 to on or about February 13, 2003), without the knowledge of consent of plaintiffs. Plaintiffs' Second Amended Complaint ¶¶ 45-54. Plaintiffs' complaint is sufficient to give the City notice of what their claims are and the grounds upon which they rest. *See* Plaintiffs' Memorandum in Support of Objection at 6-12.

2. The City asserts that it is undisputed that "[t]he Plaintiffs have not identified a Final Policy Maker for the City."

Individual defendants named in the complaint who might be found to be final policymakers for the City include the current and former mayors of the City, the current and former police chiefs of the City, and the former director of the communications department of the City. Plaintiffs' Second Amended Complaint ¶¶ 33-37. Plaintiffs' complaint is sufficient to give the City notice of what their claims are and the grounds upon which they rest. *See* Plaintiffs' Memorandum in Support of Objection at 6-12.

3. The City asserts that it is undisputed that "[t]here is no allegation that a policy of the City caused the Plaintiffs' damages."

As set forth above, there are allegations in the complaint from which it may be inferred that the City had an unconstitutional policy, custom, or practice of recording private phone conversations without the knowledge or consent of the participants. Further, paragraph 55 of Plaintiffs' Second Amended Complaint alleges that "[t]he actions of the Defendants as alleged, including, but not limited to, using, installing and maintaining the `Total Recall' system") the actions from which it may be inferred that the City had an unconstitutional policy, custom, or practice) "violated Plaintiffs' constitutionally protected Fourth Amendment rights." And, paragraph 56 of Plaintiffs' Second Amended Complaint alleges that "[a]s a direct result of the violation of Plaintiffs' Fourth Amendment rights, they sustained personal injuries and other damages." Hence, the allegations of the complaint permit the conclusion that a policy, custom, or practice of the City caused the Plaintiffs' damages. Plaintiffs' complaint is sufficient to give

the City notice of what their claims are and the grounds upon which they rest. *See* Plaintiffs' Memorandum in Support of Objection at 6-12.

11. The City asserts that it is undisputed that "[o]n July 22, 2002, Major Simoneau sent an e-mail to the entire police department and its staff indicating that the telephone lines in the complex may be taped."

Defendants' Exh. D shows that the email was not received by all of the staff. Moreover, to the extent the City implies that Major Simoneau knew that the telephone lines in the complex were being taped, that is contradicted by his statement to the State Police, wherein he claimed only to have notice of the capability of the Total Recall system, but not to have learned that the system was turned on and actually recording the telephone lines in the PPSC. *See* Simoneau State Police statement Q. 9; A. 49.

15. The City asserts that it is undisputed that "[t]he Attorney General's office determined that there was no criminal liability."

The Memo of Special Assistant Attorney General Ronald R. Gendron (Defendants' Exh. F), does not state that there was no criminal liability. It states that the "facts do not show probable cause to believe that a prosecutable violation of the Rhode Island General Laws occurred." Exh. F at p. 18. In any event, the legal opinions of the Attorney General's office are irrelevant and inadmissible.

18. The City asserts that it is undisputed that "[t]he System was installed because of the nature of the citizens' complaints made to the police regarding the Police response to their complaints."

Page 31 of the deposition testimony of Joseph P. Richardson, Jr., which is the only evidentiary support for this allegedly undisputed fact cited by the City, does not support the factual allegation. At page 31 of his deposition, Richardson is answering a question about when he first heard of the Total Recall system, not about why it was installed. Further, when he is next asked whether it was his understanding that all calls into and out of the PPSC would be recorded,

he replies "No," explaining that he understood that only emergency calls and complaint calls to the police department would be recorded. Deposition of Joseph Richardson at 31-32.

There is evidence that the city sought and procured a system with the capability of recording 500 stations. Defendants' Exh. B at 25. 500 stations is essentially all of the telephone stations in the PPSC. Deposition of Greg Desmarais [Desmarais depo.] at 37; Appendix [A.] 6.[1]

There is evidence that the Manuel Vieira, Director of the Communications Department, stated to department technician Greg Desmarais that he wanted the system to record essentially all incoming and outgoing calls at the PPSC, not just emergency calls. Desmarais depo. at 37, 39; A. 6, 7.

Because the City procured a system with the capability of recording essentially every phone in the PPSC, and because the system was actually installed and operated to record essentially all incoming and outgoing calls, not just emergency calls and complaint calls to the police department, it may be inferred that it was installed for reasons and purposes beyond "citizens' complaints made to the police regarding the Police response to their complaints."

In addition, for purposes of this summary judgment motion only, plaintiffs assert that the following additional facts are either undisputed or disputed facts:

19. The Total Recall system was a digital, web-based, call-logging system that recorded approximately 755,000 calls made on approximately 500 different telephone stations between May 23, 2002 and February 10, 2003. State Police Forensics Report; A. 50-64; City Ex. F at 8, 17.

20. The fire department occupied three floors of the PPSC, and lines serving areas occupied by the fire department were recorded by the Total Recall System. Deposition of Stephen Moise [Moise depo.] at 45-46; State Police Forensics Report; A. 28-29, 51-52.

---

1. Attached to this Statement is an appendix of the documents relied upon by plaintiffs in opposing the City's summary-judgment motion, consisting of excerpts of deposition transcripts, deposition exhibits, and witness statements and a forensics report prepared by and subpoenaed from the State Police. The pages of the appendix have been consecutively numbered in the lower right corner for ease of reference.

21. Manuel Vieira, Director of the City's communications department, instructed Anthony Desmarais, then a radio engineer in the department, to prepare an RFP [request for proposal] for the phone system for the PPSC. Desmarais depo. at 30-31; A. 2-3.

22. Vieira instructed Desmarais that he wanted everything recorded on the system, and thus the RFP required a recording system with the capability of recording 500 stations, which were essentially all the stations in the PPSC. Desmarais depo. at 31, 36-37, 39; A. 3, 5-6; *see also* City's Exh. B at 25.

23. Prior to the construction of the PPSC, while Prignano was the Providence Police Chief, Prignano directed Vieira to create the practice of recording almost all incoming and outgoing calls in the PPSC. Deposition of Andrew Rosenzweig [Rosenzweig depo.] Exh. 2 at 1; A. 38; *see also* Rosenzweig depo. at 40-41; A. 31-32.

24. According to Vieira, Prignano had knowledge of and responsibility for the installation of the recording system installed in the PPSC. Rosenzweig depo. at 44; Rosenzweig depo. Exh. 2 at 3; A. 33, 40.

25. Mary Lennon, the Chief of Operations of the communications department, learned in July 2002 that the Total Recall system was being installed and that non-emergency lines in the communications department's facility on West Exchange Street were being recorded. Deposition of Mary Lennon [Lennon depo.] at 13, 66-67; A. 12, 17-18.

26. Lennon was issued a password with which she could access calls that the system had recorded. Lennon depo. at 53; A. 15.

27. Lennon directed Greg Haroian, a technician in the communications department, to add additional telephone lines to the Total Recall system. Haroian State Police statement Q. 43-53; A. 44-45.

28. In November 2002, Lennon received training for the Total Recall system during which she was told that the system recorded calls on non-emergency lines within the PPSC. Lennon depo. at 43, 45, 63; A. 13, 14, 16.

29. Lennon acknowledges that sometime after that training and prior to her resignation in February 2003, she became aware that most phone lines at the PPSC were being recorded, and that she did not notify anyone of the recording and never discussed with the city's law department whether it was appropriate or legal. Lennon depo. at 68-69, 74-76; A. 19-20, 22-24.

30. While the Total Recall system was operating, there was no warning or beeping on the recorded stations to let individuals know their phone calls were being recorded. Lennon depo. at 84; A. 26.

31. At no time did anyone ever indicate to Lennon that they were aware that the phone lines were being recorded by the Total Recall system, and she denied any knowledge whether any employees working at the PPSC knew that phone calls were being recorded. Lennon depo. at 73, 83-84; A. 21, 25-26.

32. Vieira never obtained the verbal or written consent of any of the plaintiffs that their phone conversations be recorded. Deposition of Manuel Vieira [Vieira depo.] at 115-16; A. 36-37.

33. As soon as the Total Recall system's existence was made public in February 2002, it was immediately removed at the direction of Chief Esserman. Desmarais depo. at 63-65; A. 8-10.

34. Since its removal, the Total Recall system has not been replaced. Desmarais depo. at 64-65; A. 9-10.

30. According to Vieira, "[y]ou just don't record lines unless they're emergency lines." Vieira depo. at 85; A. 35.

Accordingly, to the extent that the City's undisputed facts conflict with the evidence cited above, the plaintiffs dispute those facts.

By their attorneys,

**MURPHY & FAY, LLP**
127 Dorrance Street, 2nd Floor
Providence RI 02903
Tel : (401) 490-3200
Fax: (401) 490-3207

/s/ *Mark A. Fay*
Mark A. Fay # 4208
*mark@murphyandfay.com*

## CERTIFICATIONS

On October 23, 2006, I caused a true copy of the foregoing document to be filed electronically; it is available for viewing and downloading from the ECF system. Counsel for all parties to the action, listed below, have been served electronically through the ECF system.

/s/ *Mark A. Fay*

**Michael A. Calise, Esq.**

**Susan M. Carlin, Esq.**

**Thomas J. Cronin, Esq.**

**Stephen R. Famiglietti, Esq.**

**Kevin J. McAllister, Esq.**

**Kevin F. McHugh, Esq.**

**Dean G. Robinson, Esq.**

**George L. Santopietro, Esq.**

**George J. West, Esq.**

**Richard B. Woolley, Esq.**

# APPENDIX

| Item | Page |
|---|---|
| Deposition of Anthony Desmarais (excerpts) | 1-10 |
| Deposition of Mary Lennon (excerpts) | 11-26 |
| Deposition of Stephen Moise (excerpts) | 27-29 |
| Deposition of Andrew Rosenzweig (excerpts) | 30-33A |
| Deposition of Manuel Vieira (excerpts) | 34-37A |
| Exhibit 2 to Deposition of Andrew Rosenzweig (excerpt) | 38-40 |
| State Police Witness Statement of Inv. Thomas Clark (excerpt) | 41-42 |
| State Police Witness Statement of Greg Haroian (excerpt) | 43-45 |
| State Police Witness Statement of Maj. Guido Laorenza (excerpt) | 46-47 |
| State Police Witness Statement of Maj. Dennis Simoneau (excerpt) | 48-49 |
| State Police Forensics Report (excerpts) | 50-64 |

UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF RHODE ISLAND

THOMAS WALDEN, et als.

vs. C.A. No. 2004-304S

URBANO PRIGNANO, JR., et als.

---

THOMAS C. CHMURA, et als.

vs. C.A. No. 2004-553S

URBANO PRIGNANO, JR., et als.

DEPOSITION OF ANTHONY DESMARAIS, a Witness in the above-entitled case, taken on behalf of the Plaintiffs, before Linda L. Guglielmo, RPR-RMR, a Notary Public in and for the State of Rhode Island, at the offices of the Murphy & Fay, LLP, 127 Dorrance Street, Providence, Rhode Island on May 24, 2006 at 2:00 P.M.

ALSO PRESENT: Manuel Vieira

ALLIED COURT REPORTERS, INC.
115 PHENIX AVENUE
CRANSTON, RHODE ISLAND 02920
(401) 946-5500

language together that would describe what the building was going to need in regard to the telephone system and recording capabilities, correct?

A. Say that again.

MR. CALISE: Objection.

MR. FAY: Could you read it back.

(QUESTION READ)

A. No.

Q. Explain to me what your involvement is, then.

A. I didn't put the language together. Bob Nelson and Phil Nelson put the language together in like a book or something.

Q. What was your involvement in all this? What was your purpose to be with Bob Nelson and Phil Nelson and this RFP?

A. To get it done.

Q. Now, who instructed you to work on the RFP?

A. Manny Vieira, director of communications.

Q. The first time that you became aware that Mr. Vieira wanted you to work on this RFP, when was that?

A. It was about a year before the building was built.

Q. And did he call you to his office, did he call you

up on the phone, how did that --
A. He called me in his office.
Q. What was the conversation you had in his office at that time?
MR. SANTOPIETRO: Objection to form.
A. He wanted me to help him to put an RFP together for the new equipment going into the building, and he asked me if I would do it and I said yes.
Q. Did he tell you what equipment he wanted to be going into the new building?
MR. SANTOPIETRO: Objection.
MR. CALISE: Objection.
A. He said that he wanted the state of the art telephone system and he wanted a recording system.
Q. Did he give you any more details in regard to the recording system he wanted at that time?
A. Not at that time.
Q. All right. So, when you had that meeting with Mr. Vieira, was anyone else present?
A. No.
Q. And how is it that Bob Nelson got involved, is that something Mr. Vieira organized or something you organized or arranged?
A. Well, Manny told me to call Bob Nelson

system?

MR. CALISE: Objection.

A. From Bob Nelson.

(MR. MCHUGH ENTERED AT THIS POINT)

Q. So, I'm just trying to get a handle on this, how this RFP got together. Bob Nelson -- did you indicate to Bob Nelson that you were requiring some kind of recording system for the new Public Safety Complex?

A. Yes.

MR. CALISE: Objection.

Q. Was it Bob Nelson who recommended the Total Recall system?

A. Yes.

Q. Now, when you first -- you already testified it was Mr. Vieira who told you you wanted -- he wanted a recording system included with the RFP?

MR. CALISE: Objection.

MR. SANTOPIETRO: Objection.

A. Yes.

Q. Now, in regard to the Total Recall system, did Bob Nelson explain to you its capabilities?

A. Yes.

Q. What were the -- what did Mr. Nelson tell you that the Total Recall system was going to be able to do

in regard to the phone lines at the new Public Safety Complex?

MR. ROBINSON: Objection.

A. He said that they would be able to record the lines at the police station.

Q. All right. Did anyone ever indicate to Mr. Nelson how many lines should be recorded at the Public Safety Complex?

MR. CALISE: Objection.

A. Yes, that was in the RFP.

Q. Who put it in the RFP?

A. Bob Nelson.

Q. So who -- Bob Nelson didn't work for the City, correct?

A. That's right.

Q. So, who instructed Bob Nelson when he was preparing the RFP as to how many lines were going to be recorded by the Total Recall system?

MR. SANTOPIETRO: Objection.

A. That was me.

Q. That was you?

A. Yes.

Q. And what did you tell Bob Nelson in regard to how many lines you wanted recorded?

A. We don't call them lines, we call them

stations. There was 500 stations that were going to be recorded.

Q. Was that basically all the stations in the Public Safety Complex?

A. All the phones.

Q. And how did you decide that you wanted all the phone stations recorded?

A. That came from Manny Vieira, director, he told me he wanted everything recorded on the system.

MR. SANTOPIETRO: Objection. Move to strike.

Q. And then you just gave that information to Bob Nelson for the RFP?

A. Yes.

Q. When did Manny Vieira tell you he wanted all the stations recorded at the Public Safety Complex?

MR. SANTOPIETRO: Objection.

MS. CARLIN: Objection.

MR. CALISE: Objection.

The first time.

A. When I was putting the RFP together.

Q. If you refer to your police statement that's been marked as Plaintiffs' 1, if you look at Line 10 on Page 2, the question to you was, "Okay. Sir,

can find out." So, if I'm understanding your testimony and what you told the detectives for the State Police, even before the RFP was actually written Mr. Vieira instructed you that he wanted in the RFP that all stations were to be recorded at the Public Safety Complex, correct?

MR. SANTOPIETRO: Objection.

MR. CALISE: Objection.

MR. ROBINSON: Objection.

MS. CARLIN: Objection.

A. Yes.

Q. When you gave your statement to the detectives, I take it you told them the truth, correct?

MR. SANTOPIETRO: Objection.

MR. CALISE: Objection.

MR. ROBINSON: Objection.

MS. CARLIN: Objection.

A. Yes.

Q. You wouldn't lie to the State Police, correct?

MR. SANTOPIETRO: Objection.

MR. CALISE: Objection.

MR. ROBINSON: Objection.

MS. CARLIN: Objection.

A. No.

During Mr. Vieira's sworn testimony, I asked him

MR. SANTOPIETRO: Objection.

A. Yes.

Q. At some point did you receive some direction to remove the Total Recall system?

A. Yes.

Q. Who instructed you to remove the Total Recall system?

A. The Colonel.

Q. Colonel Esserman?

A. Yes.

Q. Did you speak with him directly or in the form of a memo; how did it come about?

A. It was in a meeting.

Q. Who was present at that meeting?

A. Manny Vieira, Joe Richardson, the Colonel, the deputy, a couple of majors were there, Major Loerenza, I think it was. There were another couple of majors there, I don't know what their names were. I don't know if it was Sullivan or who was there.

What exactly did Colonel Esserman tell you to do?

A. Take the Total Recall out right now.

Did he tell you why he wanted the Total Recall system out?

A. Just take it out.

Q. Do you remember when that was when you took it out?

THE WITNESS: The date?

MR. FAY: Yes.

A. I don't know. It's probably in my statement.

Q. All the records seem to indicate the meetings and conversations were happening in February 2003. Does that refresh your memory at all?

MR. SANTOPIETRO: Objection. Form.

MR. McHUGH: Objection. Form.

MS. CARLIN: Objection.

Q. You can answer, if you remember?

A. I don't remember.

Q. Now, were you reprimanded or disciplined as a result of any of your involvement with the Total Recall?

MR. SANTOPIETRO: Objection.

MR. ROBINSON: Objection.

MR. McHUGH: Objection.

A. No.

Since you removed the Total Recall system, to your knowledge, has another Total Recall system been installed to record all incoming and outgoing lines at the Public Safety Complex?

MR. SANTOPIETRO: Objection.

MR. CALISE: Objection.

MR. ROBINSON: Objection.

MS. CARLIN: Objection.

A. No.

Q. Would you know if one had been put in?

MR. McHUGH: Objection.

MR. SANTOPIETRO: Objection.

MR. ROBINSON: Objection.

MS. CARLIN: Objection.

A. I don't know.

Q. Do you remember meeting with Deputy Chief Rosenzweig?

A. Yes.

Q. Do you remember how many meetings you had with him -- strike that. Did you have any meetings with Assistant or Deputy Chief Rosenzweig when Mr. Vieira was present in regard to this Total Recall system?

A. Just one meeting when everybody was there.

All right. Some of the notes I have from Mr. Rosenzweig, he made some notations of some statements that Mr. Vieira made -- the memo -- the date is February 14, 2003. Do you remember any conversations or any statements that Mr. Vieira made to Mr. Rosenzweig or to any of the other

UNITED STATES DISTRICT COURT
IN THE DISTRICT OF RHODE ISLAND

THOMAS WALDEN, ET AL., )
Plaintiffs, )
)
VS. ) C.A. NO. 04-304S
)
CITY OF PROVIDENCE, ET AL., )
Defendants. )
------------------------------ )
JOHN C. CHMURA, ET AL., )
Plaintiffs, )
)
VS. ) C.A. NO. 04-553S
)
CITY OF PROVIDENCE, ET AL., )
Defendant. )

DEPOSITION OF MARY FRANCES LENNON, taken on behalf of the Plaintiffs, in the above-entitled causes, pursuant to notice, before Nancy L. Simoes, R.P.R., a Notary Public in and for the State of Rhode Island, at the Law Offices of City of Providence Law Department, 275 Westminster Street, Providence, Rhode Island, on February 24, 2006, scheduled at 2:30 P.M.

ALLIED COURT REPORTERS, INC.
115 PHENIX AVENUE
CRANSTON, RHODE ISLAND 02920

Q. Did you hold a position with the Communications Department, was that the last job with the City until you went to Providence College?
A. Correct.
Q. So what was the year you started with the Communications Department?
A. 1999, of November.
Q. What was your first job in the Communications Department?
A. Chief of Operations.
Q. Did you hold that position right up until -- well, when was the last time you held that position?
A. Until February of 2003.
Q. Again, how did you obtain that position with the Communications Department?
A. From Director Viera.
Q. How did you learn about the position?
A. From the Commissioner of Public Safety Office.
Q. Did someone in that office tell you about the position?
A. Uh-huh.
Q. Do you remember who that person was?
A. I don't recall.
Q. When you found out about the new position as Chief

A. Yes, it did.
Q. What was the difference between the two systems, the Dictaphone system and Total Recall system?
MR. MCHUGH: Object, form.
MR. SANTOPIETRO: Object.
MR. MCALLISTER: Object.
MR. WEST: Objection to form.
A. The Total Recall system recorded on a CD, and it was a little bit more advanced than the Dictaphone system.
Q. During your initial phone training, were you made aware at that time that the Total Recall system would be recording phone conversations on lines other than just emergency calls?
MR. ROBINSON: Objection.
A. Yes.
Q. So what were you told in regard to what the Total Recall system would be recording, other than just the emergency call lines?
MR. MCHUGH: Object, form.
MR. SANTOPIETRO: Object, form.
MR. MCALLISTER: Object, form.
MR. WEST: Objection to form
A. That it was going to be recording calls at the new Public Safety Complex.

A. Yes.
Q. During that training, you learned that the Public Safety Complex, the lines were going to be recorded; correct?
MR. MCHUGH: Object as to form.
MR. SANTOPIETRO: Object.
MR. MCALLISTER: Object.
MR. WEST: Objection.
A. He reviewed lines that were being recorded.
Q. Okay. After that phone training, did you have an understanding of how many phone lines were going to be recorded at the Public Safety building?
A. I was under the assumption that most lines would be recorded at the Public Safety, but that was just what I thought.
Q. That's what you took away from the training?
MR. SANTOPIETRO: Objection.
MR. MCALLISTER: Objection.
MR. MCHUGH: Objection.
MR. ROBINSON: Objection.
MR. WEST: Objection.
Q. All right. Now, at some point, just like with the Dictaphone system, procedures were put in place in order to access recorded phone calls on the Total Recall system; correct?

Q. Were you aware of any requests that were made in written form?

A. I believe there were two from the Police Department.

Q. Did you fill those forms out?

A. Request forms?

Q. Correct.

A. No, I did not.

Q. Do you know who filled those out?

A. I believe one might have been Major Simoneau, and I don't remember the other person.

Q. Do you know what happened to those request forms?

A. They would have been filed in my file cabinet.

Q. In regard to the Total Recall system, do you know if that was a web-based access system?

MR. WEST: Objection.

MR. ROBINSON: Objection.

MR. MCHUGH: Objection as to form.

A. I do not know for sure.

Q. Were you given some kind of password to access the Total Recall phone conversations?

A. Yes.

Q. As part of your training, were you instructed how to use that password?

A. No.
Q. What was your understanding at that time?
A. I didn't really understand the whole system because we hadn't had any training on it, so I didn't have any firsthand knowledge of. As I said, I didn't receive training until November, obviously, of 2002.
Q. How did you come by the knowledge, as you testified earlier, that the lines were being recorded prior to July 30, 2002?
MR. SANTOPIETRO: Objection.
MR. MCALLISTER: Objection.
MR. MCHUGH: Objection.
MR. ROBINSON: Objection.
MR. WEST: Objection to form.
Q. I went through that time line with you.
MR. SANTOPIETRO: Objection.
MR. MCALLISTER: Objection.
MR. MCHUGH: Objection.
MR. ROBINSON: Objection.
MR. WEST: Objection to form.
A. That they were being recorded prior to July 30, all of the phones?
Q. All of the lines, all of the lines other than emergency lines.

in with the Total Recall system.
Q. All right. Are you talking about the Westminster building now?
A. Yes.
Q. Well, let me ask you this way: Before July 30, 2002, was it your understanding at least some of the phone lines at your old building were being recorded?
MR. SANTOPIETRO: Objection.
MR. MCALLISTER: Objection.
MR. MCHUGH: Objection.
MR. ROBINSON: Objection.
MR. WEST: Objection to form.
Q. In connection with the Total Recall system?
MR. ROBINSON: Asked and answered.
MR. FAY: You can answer again, go ahead.
A. Can you repeat that?
Q. Sure. A second ago you just testified about you had some understanding that the Total Recall system was being installed before July 30, 2002; correct?
A. I don't have an exact time frame. Based on this memo, yes.
Q. Okay. I thought you testified that your understanding was it was being installed at your building; correct?

A. They were starting to record some of the lines at our building, yes.
Q. Which would be the building on Westminster Street?
A. Correct.
Q. Not the Public Safety building?
A. Correct.
Q. These phone lines in the memo, do you know if these lines were located at the Westminster Street location or the Public Safety Complex? .
MR. SANTOPIETRO: Objection.
MR. MCALLISTER: Objection.
MR. MCHUGH: Objection.
MR. ROBINSON: Objection.
MR. WEST: Objection to form.
MR. MCALLISTER: Mark, I think you mean West Exchange. You are saying Westminster, which is very confusing.
A. West Exchange.
Q. West Exchange.
A. Yes.
MR. MCHUGH: Could you read that question back, please.
A. Yes.
(PENDING QUESTION READ BACK)
Q. If looking at the memo again in Plaintiff's 3, do

you know who the Director is referring to at extension 6000?

A. Director Viera.

Q. Back in July 30, 2002, was he at West Exchange Street?

A. Yes.

Q. How about the Deputy, do you know who that refers to?

A. Joseph Richardson.

Q. Was he also at West Exchange Street at that time?

A. I don't believe so.

Q. Do you know where his office was at that time?

A. At the Civic Center.

Q. Let me ask you this: At any time before you resigned -- let's do it this way: Any time before you resigned, did you become aware that phone conversations were being recorded at the Public Safety building?

(MR. FAMIGLIETTI RE-ENTERS DEPOSITION)

A. Yes.

MR. ROBINSON: Objection as to form.

MR. MCHUGH: I am sorry; what was the answer.

THE WITNESS: Yes.

Q. When was that; when did you gain that knowledge?

A. I would say it was some time after my training in November.

Q. November of 2002?

A. Correct.

Q. All right. We will do it that way. After you received your training in November of 2002, up until the time you resigned, okay, what was your understanding as to how many phone lines at the Public Safety Complex were being recorded?

MR. SANTOPIETRO: Objection.

MR. MCALLISTER: Objection.

MR. MCHUGH: Objection.

MR. ROBINSON: Objection.

MR. WEST: Objection to form.

A. They said most lines at the new Public Safety building were recorded.

Q. Okay. When you say they, who is they that say most lines were being recorded?

A. The phone technicians.

Q. Okay. Which phone technicians told you that?

A. Probably Tony Desmarais.

Q. Did you ever speak with Mr. Richardson about that, whether or not or how many phone lines were being recorded at the Public Safety building at any time after November, until your resignation in February

MR. FAY: You can answer.
A. Yes.
Q. Had you ever sent out an e-mail similar to this, a mass e-mailing like this in your job?
A. No.
MR. WEST: Object.
Q. Well, in regard to the Total Recall system, I am not going to have you look at all of the named Plaintiffs, I am not going to run through them all, about 135 of them, but at any time did anyone approach you and indicate that they were aware that the phone lines, whatever phone lines they were, were being recorded by the Total Recall system, and they were notifying you, personally, that the City had permission to do so?
MR. SANTOPIETRO: Objection.
MR. MCALLISTER: Objection.
MR. MCHUGH: Objection.
MR. ROBINSON: Objection.
MR. WEST: Objection to form.
A. Not that I recall.
Q. Okay. Do you understand the question I asked? You answered; I want to make sure you understand.
A. Yes.
Q. Did you ever receive any written documentation from

anyone that they were consenting to or giving the City or anyone in the Department of Communications permission to record their phone conversations through the Total Recall system?

MR. SANTOPIETRO: Objection.

MR. MCALLISTER: Objection.

MR. MCHUGH: Objection.

MR. ROBINSON: Objection.

MR. WEST: Objection to form.

A. No.

Q. Did you ever discuss with Major Simoneau this e-mail that's been marked as Plaintiff's 4, and specifically the section two about the notification?

A. No.

MR. ROBINSON: Objection. Asked and answered.

Q. Ms. Lennon, I am going to use the date, after November, 2002, that seems to be the date you think you received your training over the phone about the Total Recall. It was some time after that that you gained knowledge that most of the lines at the Public Safety building were being recorded; when you gained that knowledge, did you ever discuss with anyone whether or not that was appropriate?

MR. SANTOPIETRO: Objection.
MR. MCALLISTER: Objection.
MR. MCHUGH: Objection.
MR. ROBINSON: Objection.
MR. WEST: Objection to form.
A. Not that I recall, no.
Q. In your position as Chief of Operations of the Department of Communications, the whole time you held that position, did you ever face an issue that you required counsel from the City's Law Department involving the Communications Department?
MR. MCHUGH: Object.
MR. ROBINSON: Objection.
A. That I, personally --
Q. In your position as Chief of Operations?
A. No, I don't believe so.
Q. Were you aware at the time when you held that position as Chief of Operations, that the City of Providence did have a Law Department, and that if you did have any questions in regard to the legality of something, you could go to them with a question?
A. Yes.
MR. MCHUGH: Objection to form.
MR. ROBINSON: Objection.

MR. FAMIGLIETTI: A very excellent law department, too, that should go on the record.

MR. MCHUGH: Thank you, Mr. Famiglietti. Particularly coming from you.

Q. Again, in regard to the Total Recall system, again, once you gained this knowledge, you never sought counsel from any of the Law Department as to its appropriateness or legality?

MR. ROBINSON: Object.

MR. MCHUGH: Objection.

A. No, I did not.

MR. WEST: Objection.

MR. MCALLISTER: Objection.

MR. ROBINSON: Can we take a break?

MR. FAY: I'm almost done.

MR. ROBINSON: I was going to say take a break, but if you're almost done.

MR. FAY: I have a few more things. You want to push it through.

MR. ROBINSON: You want to take a break?

THE WITNESS: I am fine.

Q. Do you know who ordered the removal of the Total Recall system? Let preface that -- strike that. Are you aware that at some point the Total Recall system was removed?

A. Based on the fact that the training took place over the phone, and I was dialing in to the system, I would have to say yes.

Q. Ms. Lennon, you remember you gave two statements to the police when they investigated this incident; correct?

A. Uh-huh.

Q. Without me go going through all of this, the information that you gave the investigating officer, I take it that was truthful; correct?

A. Yes.

Q. For whatever questions he asked you, you gave a truthful response; correct?

A. Yes.

Q. Do you know who Andy Rosenzweig is?

A. I believe he was the Deputy chief, Deputy Chief of Police.

Q. Do you have any knowledge as to whether any of the employees or individuals working at the Public Safety Complex were given knowledge that the recording system, the Total Recall system, had been put in and phone calls were being recorded?

MR. SANTOPIETRO: Objection.

MR. MCALLISTER: Objection.

MR. MCHUGH: Objection.

MR. ROBINSON: Objection.
MR. WEST: Objection to form.
A. I don't know. I don't know.
Q. Did you ever talk to Colonel Prignano about any of this?
MR. FAMIGLIETTI: Objection.
A. No.
MR. FAMILGIETTI: Thanks, Mark. I waited all day just to ask that question. I can go now.
Q. To your knowledge, the Total Recall system that was installed, when it was recording the lines, say outside of the emergency lines, okay, do you know if it was giving any kind of warning or beeping to let individuals know their phone calls were being recorded?
MR. SANTOPIETRO: Objection.
MR. MCALLISTER: Objection.
MR. MCHUGH: Objection.
MR. ROBINSON: Objection.
MR. WEST: Objection to form.
A. Not that I am aware of.
Q. Okay. Were you told about that during your training or instruction, phone instruction you got, whether or not there would be any beeping or warning given on the lines?

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF RHODE ISLAND

THOMAS WALDEN, ET AL.

vs. C.A. No. 04-304S

CITY OF PROVIDENCE, ET AL.

DEPOSITION OF STEPHEN MOISE, a Witness in the above-entitled case, taken on behalf of the Plaintiffs, before Linda L. Guglielmo, RPR-RMR, a Notary Public in and for the State of Rhode Island, at the offices of Murphy & Fay, LLP, 127 Dorrance Street, Providence, Rhode Island on January 31, 2005 at 10:00 A.M.

ALLIED COURT REPORTERS, INC.
115 PHENIX AVENUE
CRANSTON, RHODE ISLAND 02910
(401) 946-5500

Page 42

extensions that were not subject to the Total Recall system?
A. Repeat that.
Q. Are you aware of a memorandum that lists the extensions that were not subject to the Total Recall system?
A. I did see a list and it was somewhere around 15, 16, 17 something names on it. That was a list to be asked to be removed from the system that was given to Anthony Demaris.
Q. And do you know who gave that list to Anthony Demaris?
A. Director Viera.
Q. Do you recall any of the names on that list?
A. I believe they were administrators from the police and fire departments and I know of one other person, Cindy Parente, who requested that her line not be recorded. She was taken out of the system.
Q. What was her job. At that time?
A. At that time she was the secretary for the department or administrative assistant, whatever title she had.
Q. For the fire department?
A. For the communications department.

Page 43

Q. Who did she work for?
A. The director, Viera.
Q. Was anyone else -- was everyone given the option of being taken out of the Total Recall system?
A. Not to my knowledge.
(RECESS)
Q. Were you also given a copy of this list of 16 or 17 names?
A. No, I was not.
Q. Did you see the list?
A. Yes, I did.
Q. How is it that you saw the list?
A. I was in the office when it was handed to Anthony Demaris from the director, Viera.
Q. Under your understanding of how the Total Recall system works, did this work for all city offices?
MR. McHUGH: Objection to form. You can answer if you understand.
A. The system worked for the public safety sector in the City of Providence.
Q. Only public safety sector, and where are these buildings physically located?
A. West Exchange Street, 325 Washington Street, I don't know if there's a phone in the parking garage, but if there is, that would be part of it,

Page 44

too, it's part of the complex.
Q. Parking garage?
A. Yes. I want to say 344 Washington Street.
Q. What about the fire stations?
A. Well, that's part of the Public Safety Complex.
Q. Are all the fire departments located in the public safety building?
A. That is correct, not all but the ones for that district.
Q. What about the ones not in that district, were they subject to Total Recall?
MR. McHUGH: Objection to form. You can answer if you know.
A. The whole fire department and police department system was upgraded, so the extensions that they had in their buildings were possibly changed out and part of the new phone system, that would be correct.
Q. So, even if they were located outside of those three locations, if they had changed over to the new extension system, they would be subject to Total Recall?
MR. McHUGH: Objection as to form. You can answer.

Page 45

A. I have no knowledge of that.
Q. You have no knowledge of that?
A. I have no knowledge of that.
Q. So to your knowledge only phone calls that were -- phones that were physically located at West Exchange Street, 325 Washington Street or at the parking garage were subject to the Total Recall?
A. Any phones that were part of that system would be subject to the Total Recall. If that meant that the stations had those phones in them, then, yes, that would be correct.
Q. Well, that's what I'm trying to ask you. If you know, maybe the answer is you don't know.
A. When the system was installed, it was installed for the public safety building. What they did is they came over to communication and upgraded our phones. So our phone system was all compatible with that. Then if they went to each fire station, each of the 14 stations and changed their phone out, then that would be correct.
Q. But you don't have knowledge?
A. I have no knowledge of that.
Q. Are you familiar with the fire department operations at the public safety building?
A. Very familiar.

Page 46

Q. From my understanding there's three different levels?

A. That is correct.

Q. One is the fire level, one is the living level and one is administrative offices?

A. Yes, the apparatus level, the living level and office for the chief, whoever, and administrative office and fire prevention are on the third level. That's where I'm working right now.

Q. That's where you work now?

A. That's correct.

Q. In February of 2003 where did you work?

A. At the communications department.

Q. On West Exchange Street?

A. That is correct.

Q. When did you switch to Washington Street?

A. April of 2004.

Q. So when they gave us that One Communications Way, it's actually not where you're located?

A. I'm not located there anymore. We merged divisions, so...

MS. MANNIS: And they spelled your name wrong, too.

THE WITNESS: That's okay.

Page 47

MS. MANNIS: But it did get to you?

THE WITNESS: Yes, it did.

Q. Did your job responsibilities change when you switched to your location?

A. To the location I'm at now, I am -- my job is still the same, as assistant deputy State Fire Marshal, enforcing the code, that's exclusively what I do. I don't have any collateral duties that I had before.

Q. Is that why your location changed, because you weren't going to be doing those collateral duties?

A. My location changed because the new administration came in and they wanted to streamline the permit process for the contractors, architects and residents of the City of Providence to make it one stop shop as opposed to going to communications, going to fire prevention and going to the building department. It was just trying to streamline the service.

Q. Are you aware at the living headquarters of the fire at the present time there's a private line that firefighters can use?

A. Of the 14 stations, every station has their own private line. It's their own designated line that they pay for, they maintain with their

Page 48

provider, whoever it is. Has nothing to do with the city -- the public safety system phone system.

Q. So, would that line not have been subject to the Total Recall?

A. It would not be.

Q. If firefighters were calling from the Public Safety Complex to a different station, would those calls have been subject to Total Recall?

MR. McHUGH: Objection as to form. You can answer.

A. To a different station? Possibly, but not to my knowledge.

Q. When you say possibly, but not to your knowledge, what do you mean?

A. Well, the system from the dispatch center, okay, in the public safety building on the third floor, they were building a backup police fire E-911 control center, P-SAP (phonetic), if you will, and this system was expected out because of that, because the control center, that's what we do, we record systems in control centers. That control center when the new administration came, cut it, it never happened, but everything was in place to have that system there and that never happened. But the phone calls, all the phone

Page 49

lines in the public safety, whether they're going to police control center or fire control center were recorded. If I picked up the phone and called fire alarm from the station, the bureau of operational control or I called the police control center, it would be recorded. If phone to phone was recorded, I have no knowledge of that.

Q. Earlier you were describing the two different levels of passwords?

A. Yes.

Q. What does a user password entitle the user to do under the Total Recall system?

A. I'm not sure if it's for general maintenance to make changes such as take a phone off, put a phone on, put a new extension on, office moves, relocating an office, if you will, relocating a phone for record management, I'm not sure if that's -- that would be my understanding of what it would be.

Q. That's your understanding, but you didn't actually have a user password?

A. No, I didn't. I had an administrative password.

Q. What did the administrative password allow you to do?

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF RHODE ISLAND

THOMAS WALDEN, et als.
vs. C.A. No. 2004-304S
URBANO PRIGNANO, JR., et als.

THOMAS C. CHMURA, et als.
vs. C.A. No. 2004-553S
URBANO PRIGNANO, JR., et als.

DEPOSITION OF ANDREW ROSENZWEIG, a Witness in the above-entitled case, taken on behalf of the Plaintiffs, before Linda L. Guglielmo, RPR-RMR, a Notary Public in and for the State of Rhode Island, at the offices of the Murphy & Fay, LLP, 127 Dorrance Street, Providence, Rhode Island on May 9, 2006 at 3:00 P.M.

ALSO PRESENT: Manuel Vieira, Urbano Prignano

ALLIED COURT REPORTERS, INC.
115 PHENIX AVENUE
CRANSTON, RHODE ISLAND 02920
(401) 946-5500

I don't recall. From what I wrote, I think it's clear there was a concern over whether there was any illegal wiretapping going on.

Q. The next date, February 14th, 2003 on the next page of the memo do you see that, sir?

A. I do.

Q. The first sentence says, "The interview of Manny Vieira continued on this date, and he made the following comments." Now, under my count that would be the third meeting you had with Mr. Vieira?

A. I think so, yes.

Q. All right. Now, during this third meeting with Mr. Vieira, was that just you and Mr. Vieira, or was Colonel Esserman also present?

A. I'm not positive, but I think the Colonel was present as well.

Q. Do you remember if anyone else was present?

A. I don't remember.

Q. Now you already met with Mr. Vieira on two occasions before this, why did you have him back for another round of questioning?

A. We had more questions to ask.

Q. Second bullet point says, "The police wanted it - Colonel Prignano and Major Simoneau." Where did

you obtain that information?
A. From Mr. Vieira.
Q. And what are you referring to when it says the police wanted it, what is it?
A. I'm referring to the Total Recall system.
Q. Okay. The same system that you refer on the first page that recorded all incoming and outgoing calls?
MS. CARLIN: Objection.
MR. SANTOPIETRO: Objection.
MR. McHUGH: Objection to form.
Q. Correct?
A. Correct.
Q. So, this was at least on the second occasion during this meeting when Mr. Vieira is saying Colonel Prignano wanted this system installed at the Public Safety Complex?
THE WITNESS: Please, again?
(QUESTION READ)
THE WITNESS: The second time during this meeting?
Q. During your inquiry?
A. During the inquiry, yes.
Q. Again, you have a specific memory of that, correct, as evidenced in your memo here?

MS. CARLIN: Objection.
A. I don't know if I'd characterize it as blaming, but he certainly was attributing knowledge and responsibility for it to the Colonel.
Q. Let me ask you this, just going ahead a little bit, after you completed your inquiry, when you spoke to all these individuals, did you, based upon the conversations with all the individuals, who did you conclude was the person that ultimately made the decision to purchase and install this Total Recall system?
MR. SANTOPIETRO: Objection. Form.
MR. McHUGH: Objection. Form.
MR. ROBINSON: Objection.
MS. CARLIN: Objection.
A. I didn't draw a conclusion on that because I continued with the inquiry.
Q. Based upon what's contained in your memo, can you draw that conclusion for me now?
MR. SANTOPIETRO: Objection. Form.
MR. McHUGH: Objection. Form.
MR. ROBINSON: Objection.
MS. CARLIN: Objection.
A. I won't do that. I can't do that.

Q. And the public -- head of the public safety department, so to speak, in Providence, who would that have been?

THE WITNESS: While I was employed?

MS. CARLIN: Yes.

A. Well, it was Mayor Cicilline, he acted as the public safety commissioner in the absence of a public safety commissioner.

Q. So the title would be the title of public safety commissioner?

A. Yes.

Q. Who were the people that were directly responsible to him or the next rung below him?

A. Colonel Esserman in the Providence PD and Chief Rattigan, fire department and emergency services.

Q. That was all part of the fire department?

A. No, I think they were separate.

Q. What about Communications, how did that fall into the line of command?

A. Communications was a separate entity. They also reported to public safety.

Q. All right. Did Communications report to the Chief of Police?

A. No.

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF RHODE ISLAND

THOMAS WALDEN, et als.
vs. C.A. No. 2004-304S
URBANO PRIGNANO, JR., et als.

THOMAS C. CHMURA, et als.
vs. C.A. No. 2004-553S
URBANO PRIGNANO, JR., et als.

DEPOSITION OF MANUEL VIEIRA, a Defendant in the above-entitled case, taken on behalf of the Plaintiffs, before Linda L. Guglielmo, RPR-RMR, a Notary Public in and for the State of Rhode Island, at the offices of the Providence City Solicitor, 275 Westminster Street, Providence, Rhode Island on March 23, 2006 at 2:00 P.M.

ALLIED COURT REPORTERS, INC.
115 PHENIX AVENUE
CRANSTON, RHODE ISLAND 02920
(401) 946-5500

A. Just what I read in the newspaper articles.
Q. What did you read in the newspaper articles?
A. They were all recorded in and out, something to that effect.
Q. You deny you had any knowledge about that?
A. I had no knowledge of that, no, sir.
Q. Let me ask you this, as director of the communications department, if you had known that the Total Recall system as installed was going to be recording all those lines, recording over 754,000 phone calls within the Public Safety Complex, would you have allowed it to be installed and operating?
MR. SANTOPIETRO: Objection.
MR. McHUGH: Objection.
MR. ROBINSON: Objection.
MR. CRONIN: Objection.
MR. CALISE: Objection.
MR. WEST: Objection.
MS. CARLIN: Objection. Calls for speculation.
A. Of course now.
Q. Why not?
A. You just don't record lines unless they're emergency lines. I've been in the business for

Q. Is the first time you became aware that lines were being taken off the recording system, Total Recall system in July 2002?

MR. SANTOPIETRO: Objection.

MR. McHUGH: Objection.

MR. ROBINSON: Objection.

MR. CRONIN: Objection.

MR. CALISE: Objection.

MR. WEST: Objection.

MS. CARLIN: Objection.

A. Yes -- well, yes.

MR. SANTOPIETRO: You don't even know what that is?

A. I don't know what this is for or what it really means. Okay.

MR. WEST: Is the witness referring to the E-mail, for clarity sake?

MR. FAY: What I've been referring to is Plaintiffs' 2.

MR. WEST: I'm asking with regard to his answer.

I understand your testimony, but I'm going to ask these questions anyways. In regard to all the named plaintiffs in these cases, did you ever obtain their verbal consent that their phone

conversations be recorded while at the Public Safety Complex?

MR. SANTOPIETRO: Objection.

MR. McHUGH: Objection. Lack of foundation.

MR. ROBINSON: Objection.

MR. CRONIN: Objection.

MR. CALISE: Objection.

MR. WEST: Objection.

MS. CARLIN: Objection.

A. No.

Q. Did you ever obtain any written consent from any of the named plaintiffs that their phone conversations be recorded at the Public Safety Complex?

MR. SANTOPIETRO: Objection.

MR. McHUGH: Objection.

MR. ROBINSON: Objection.

MR. CRONIN: Objection.

MR. CALISE: Objection.

MR. WEST: Objection.

MS. CARLIN: Objection.

A. No.

Do you have any knowledge of an E-mail going out at the Public Safety Complex in regard to that new

A. Yes.

Q. Isn't it also true that if the system had been installed and was recording all these lines, it would not be put in and used in the ordinary course of business of the communications department or the City of Providence?

MR. SANTOPIETRO: Objection.

MR. McHUGH: Objection.

MR. ROBINSON: Objection.

MR. WEST: Objection.

MS. CARLIN: Objection. Calls for a legal conclusion.

A. I would agree with that.

Q. If you had known the Total Recall system was recording all those lines and assessing those 750,000 phone conversations in the computer banks while you were director of communications, would you have shut the system down?

MR. SANTOPIETRO: Objection.

MR. McHUGH: Objection.

MR. ROBINSON: Objection.

MR. WEST: Objection.

MS. CARLIN: Objection. Speculation.

A. I would have seeked legal advice and I would have shut it down, yes.

February 10, 2003

RE: COMMUNICATIONS DIVISION REVIEW

Memo to File

(by Andy Rosenzweig)

As part of the review of the Communications Division directed by Mayor Cicilline, Col. Dean Esserman ordered a meeting with Manny Viera, Director of the Comm. Div, at 11:20am on this date. Also present were Dep. Dir. Joe Richardson, and two technicians of that Div., Majors Sullivan and Loerenza, Lt. Keith Tucker, IA, and the writer. The focus of the meeting was the ongoing practice of recording of almost all incoming and outgoing calls in the Public Safety Complex. The following are the salient points learned:

- Viera was directed by former Col. Prignano to create this practice
- He doesn't believe he has anything in writing about this
- The two former acting Chief's new of the practice but never questioned it
- All claimed never to have listened to a call or directed same
- Viera doesn't know if the FD Chief knows of the practice
- No sign off was obtained from the city solicitor
- No formal notifications were made to employees or the public that they were being taped

At about 4:30pm the same group reconvened in the Colonel's office and the following occurred:

- Viera provided notarized statements from all individuals who had access to the system attesting to the fact that they didn't eavesdrop on conversations
- Viera stated he could find no written requests from Urbano Prignano or anyone else with respect to the intercept system

DEPOSITION EXHIBIT 2 5/9/06

- He verified that the former Commissioner of Public Safety and the Fire Chief were unaware of the system
- Technicians Greg Haroian and Tony DesMarais were directed to accompany Lt. Tucker of Internal Affairs and immediately remove the eavesdropping system
- Mr. Haroian provided the name of his contact at Total Recall Co. in Texas, an Andy Garza, 1-877- 230-0227. He said that Mr. Garza claimed there was no way to query the system to ascertain who had utilized it to intercept conversations.

In a private conversation with Colonel Esserman and the writer Mr. Viera said the following:

- He had no knowledge of any illegal wiretapping
- Nobody had ever asked him to engage in conducting any wiretapping
- He denied any knowledge of any illegal activity when asked by the Colonel if there was anything he wanted to get off his chest
- He did divulge that of the five Ford Explorers in the possession of the Communications Division (*which may have been donated to the city by a vendor*), two were used by him and his brother, Sergeant Mike Viera; two were used by brothers Joe and Ray Richardson (*Ray Richardson is in charge of the PD fleet*); and one is at the Mayor's Office.

Feb.11, 2003

On this date Col. E. had a meeting with Verizon representatives John Kent, VP of Government Relations and Joseph Osediecz, Sr. Staff Consultant, Security. The process for subpoenas for unpublished #s and pair and cable information was discussed. Mr. Osediecz said that it has been years since that type of information has been handled locally and it all goes through their NY Office and under the direction of Security Director Jim Trainor. He said further that no one from the PD has asked him for anything illegal or unethical, however, Manny Viera occasionally has asked for non-published #s.

3

Ann Travers, a former Verizon employee who is now with the Boston office of the FBI, is very knowledgeable about the Providence PD, the Communications Division; and their relationships with Verizon.

---

Feb. 14, 2003

The interview of Manny Viera continued on this date and he made the following comments:

- Others who were in the process on the purchase of the Total Recall System included: Alan Sepe, Patricia McGlouglin (Solicitor's Office) and Joe Abate. Also, Bob Nelson of Avaya, who worked with Tony DesMaris on preparing the specs on the purchase order.
- The police wanted it – Col Prignano and Major Simoneau
- An addendum was added to include the station-to-station lines
- About three weeks ago the Fire Chief spoke to Manny and asked that his line not be the recorded
- Manny decided to have his line deleted in Nov or Dec
- Prignano, Sullivan and Simoneau all knew about the system. On occasion Prignano asked: "are we going to have a recording system?, make sure we have it!"; "what are you doing about the phone system?";
- Tony or Frank would tell Manny lines that were recorded that should be taken off.
- Manny stated Cianci, Corrente and Coloian had no knowledge of the system
- Prignano asked for "all the trinkets"; "all the bells and whistles". Viera said the conversation about the system went on for years. He was sure Prignano knew
- He said the technicians installed the system in

# WITNESS STATEMENT

DATE: February 26, 2003

TIME:

INTERVIEW OF: Investigator Thomas R. Clark
Providence Police Department/Internal Affairs Unit

INTERVIEW BY: Lieutenant David S. Neill
And
Detective Corporal Douglas C. Newberg
RI State Police

LOCATION: Providence Safety Complex

REFERENCE:

1. Q. Tom, could you spell your – state your full name and spell your last name?

A. Thomas R. Clark, C-l-a-r-k.

2. Q. And you're employed with the Providence Police?

A. Yes, I am.

3. Q. And what is your current position?

A. Internal Affairs Investigator.

4. Q. And how long have you been employed in that position?

A. Approximately, uh, four years.

5. Q. And how long have you been employed with the Providence Police?

A. Since 1985.

19. Q. Do you recall how this recorded conversation was provided to you?

A. In the form of a CD.

20. Q. And were you able to listen to that CD?

A. Yes.

21. Q. And was it in fact a conversation that you requested?

A. Yes, it was.

22. Q. And it was in fact the – your requested recording involved Mrs. Broomfield, and it was in fact a recording that was left on your voice mail –

A. Right.

23. Q. ...at extension 6153?

A. Right.

24. Q. Did you – were you aware that the phone system in the new Providence Police Fire and Police Complex were being recorded?

A. No, I didn't. I did not.

25. Q. Did you have the ability to access the recording system which is known as Total Recall?

A. No.

26. Q. You were never provided with an access code for that system –

A. No.

27. Q. ...and never accessed that code?

A. No.

# WITNESS STATEMENT

DATE: February 15, 2003

TIME:

INTERVIEW OF: GREG HAROIAN

INTERVIEW BY: Corporal Douglas C. Newberg and
Detective John F. Killian of the
Rhode Island State Police Detective Bureau

LOCATION: Providence Police Department

SUBJECT:

**BY CORPORAL NEWBERG:**

1. Q. Greg, for the record, state your name, please, and spell your last name.

A. **Greg Haroian, H-a-r-o-i-a-n.**

2. Q. And Greg, by whom are you employed?

A. **The City of Providence.**

3. Q. In what capacity?

A. **Technician for the Telecommunications Department.**

4. Q. And when did you start with the Communications Department?

A. **August 1st.**

5. Q. Of which year?

A. **2001.**

6. Q. And at some point were you promoted to the position of technician?

A. **I wouldn't – I started out as a technician.**

A. Andy Gazza (phonetic).

36. Q. And who is Andy Gazza?

A. He's a tech support person for the total recall.

37. Q. Is he located in Texas?

A. Yes, he is. Oh, that's the number I would call, I don't know.

38. Q. Okay, it was remote training?

A. Yes, over the phone.

39. Q. At some point, Greg, you learned how to add and remove telephone extensions for recording purposes?

A. That's correct.

40. Q. How many additions to telephone extensions did you do?

A. Can I think about that for a second?

41. Q. Yeah, generally, I mean --

A. Oh, God, maybe 50. I mean, it could have been -- it could have been more.

42. Q. Sure.

A. You know, it's hard to remember exactly because it was, like, over a long period of time, you know.

43. Q. Okay. Who requested you to add telephone lines to be recorded?

A. Different people: Mary Lennon and the Deputy Director and Tony Desmarais.

44. Q. And again, Deputy Director --

A. Oh, excuse me, Deputy Director Richardson.

Q. And how would they inform you of which extensions to record?

A. They would come up to me and say these lines need to be -- you know, make sure

that these lines are recorded.

46. Q. Did they give you a formal piece of paper with a bunch of extensions written on it or did they just give you handwritten --

A. Nothing formal. I never received anything formal like that, like, with letterhead or anything like that, no.

47. Q. When you were requested by Mary Lennon, was she just directed by somebody else?

A. Yes.

48. Q. Okay, and you had better knowledge of the system than Mary?

A. That's right, yeah.

49. Q. That's why she asked you to do it?

A. That's my understanding, yes.

50. Q. Did the Director ever ask you to add telephone extensions?

A. The Director never specifically came to me for that, no. I mean, he never asked me. Any time I got an order to add, it came from Mary telling me that.

51. Q. Okay, just to clarify something. The Director, Mr. Vieira, never asked you to add a number to the total recall system for recording?

A. No.

52. Q. All your requests came from the Deputy Director?

A. Or Mary.

53. Q. Or Mary.

A. Or Tony.

Q. Tony Desmarais.

A. Yes.

# WITNESS STATEMENT

DATE: February 20, 2003

TIME: 3:10 P.M.

INTERVIEW OF: Major Guido Laorenza
Providence Police Department

INTERVIEW BY: Detective Corporal Douglas C. Newberg
and
Lieutenant David S. Neill
RI State Police

LOCATION: Providence Police Complex

SUBJECT:

1. Q. Sir, for the record, could you state your name, please, and spell your last name?

A. **First name Guido, G-u-i-d-o. Last name Laorenza, L-a-o-r-e-n-z-a.**

2. Q. And, sir, by whom are you employed?

A. **Providence Police Department.**

3. Q. In what capacity?

A. **I'm a Major.**

4. Q. Back in October were you appointed the Acting Colonel?

A. **Yes, I was.**

5. Q. Do you recall the time frame you were the Acting Colonel?

A. **Approximately three months and weeks, I guess.**

Q. Based on a command staff meeting you had recently with the Colonel, now Colonel Esserman of the Providence Police Department, did you learn of a taping system within this

complex?

A. Yes, I did.

7. Q. Did you have any prior knowledge of that taping system?

A. No.

8. Q. Did you have any recollection or knowledge of where the taping system was located?

A. No.

9. Q. And I refer to the system as the Total Recall System which taped all incoming/outgoing telephone calls in the Providence Police Complex, you had no knowledge of that?

A. No.

10. Q. Have you heard rumors of that in the past?

A. Yes.

11. Q. Can you elaborate on some of the rumors you had heard?

A. Just grapevine stuff, that's all, within the police department.

12. Q. That the phones were being --

A. Yeah, that they had the ability to tap phones --

13. Q. We were informed that there was a phone discussion between a Sandra Manning and an Anthony Vescera which contained, I guess, an argument between those two parties. Did you ever state to any one of those two parties that you would pull that telephone conversation and listen to it?

A. No.

14. Q. Did you ever pull a conversation between those two parties?

A. No.

Q. After the command staff meeting was -- well, when Colonel Esserman addressed the Total Recall System to his command staff and other members that were in meeting, did he then bring

# WITNESS STATEMENT

DATE: February 20, 2003

TIME: 2:15 P.M.

INTERVIEW OF: Major Dennis W. Simoneau
Providence Police Department

INTERVIEW BY: Detective Corporal Douglas C. Newberg
and
Lieutenant David S. Neill
RI State Police

LOCATION: Public Safety Complex
Providence, Rhode Island

SUBJECT:

1. Q. For the record, sir, could you state your name, spell your last name, please?

A. It's Dennis W. Simoneau, S-i-m-o-n-e-a-u.

2. Q. And by whom are you employed, sir?

A. City of Providence, Providence Police Department.

3. Q. In what capacity?

A. I'm the Major, the commander of the Uniform Division.

4. Q. And how many years have you been a Providence police officer?

A. Twenty-seven years.

5. Q. Back in July -- back in July of 2002, you had assisted in the move from the old police station to the new Providence Safety Complex, would that be safe to say?

A. Yes.

6. Q. Based on being involved in the movement, did you attend numerous meetings?

A. **Yes, within the previous two years of the movement I attended hundreds of meetings.**

7. Q. And specifically do you recall during any of those meetings discussion of the phone system, installation of any recording devices?

A. **Yes. At, at least two, if not three, of these very large meetings that were tended by dozens of people, um, conversation was brought forth about the capabilities of the phone systems that they were gonna put in the building, which included the capability of recording, uh, phone messages.**

8. Q. So, you were under the impression that the system had the capability to record all phone tems?

A. **That's correct. I even posed a question as to certain areas of my responsibility if I would at some point have the capability, and I followed that question up with: When that time came would there be a beep or some type of notice, message that they were being recorded.**

(TAPE INTERRUPTION)

9. Q. Just to clarify something, sir, you understood it had the capability of recording all phone system but you never learned that the system was turned on and actually recording the telephone lines in the Public Safety Complex?

A. **That's, that's correct.**

10. Q. Based on attendance at some of these meetings, did you send out an e-mail with some concern that the telephone lines may be recorded?

A. **Yes. On July 22nd, I believe, I sent a department wide e-mail which went to all officers, as well as people at the Communications Bureau. Um , basically it listed three or**

# STATE OF RHODE ISLAND

## DIVISION OF STATE POLICE

Detective Division

COMPUTER CRIMES UNIT

Tel. 401-444-1000 (x 1193)

Date : 06/20/2003

Submitting Agency : City of Providence
Agency Case # : 03RIX1-102-OF

**Summary:**

Beginning on February 14, 2003, the Computer Crimes Unit began to receive source media for forensic evaluation pursuant to an official request by the City of Providence, Providence Police Department. Representatives from the City of Providence indicated that the source media was City property. Based on written consent executed on February 18, 2003, Detective Killian--with certain technical assistance from Agent Daniel Dickerman of the Internal Revenue Service Electronic Crimes ...n; and Mr. Andrew Garza, Support Engineer, Expanets, Inc.—conducted a review of copies of the source media related to possible violations of Rhode Island General Law 11-35-21, titled "Unauthorized Interception, Disclosure or Use of Wire, Electronic, or Oral Communication."

This review related to a call-recording system that was located inside the City of Providence Public Safety Building, 325 Washington Street, Room P-284, Providence, Rhode Island, and known as the Total Recall System. The Total Recall System was a digital, web-based, call-logging system that recorded telephone conversations. The Total Recall computer server interfaced with the City of Providence Public Safety Building telephone network. The Total Recall computer system acquired and archived telephone conversations in a standard Microsoft Windows sound format known as a "WAV" format. The "WAV" file format is an audio/sound file format that has become the standard personal computer audio file format. The nature and scope of the forensic evaluation pertained to:

1. Identification of audio files created by the Total Recall Call-Recording System
2. Identification of Total Recall Call-Recording System audio files accessed
3. Identification of users who accessed the Total Recall Call-Recording System and/or Files
4. Identification of what telephone stations were recorded by the Total Recall Call-Recording System
5. Identification of other operating system files related to access to the Total Recall Call-Recording System

| Station Name | StationNo |
|---|---|
| Foyer | 2001 |
| Housing court break room | 2002 |
| Break Area | 2003 |
| 1st Floor break room | 2004 |
| Detective break room | 2005 |
| ~~Youth ser. break room~~ | 2006 |
| Comm. door | 2008 |
| Gas computer | 2009 |
| Hall wall 2nd floor | 2010 |
| 3rd Floor wall phone | 2011 |
| open | 2012 |
| Modem commissioners office | 2015 |
| Police computer training room | 2019 |
| Chief's break room | 2021 |
| Frame phone | 2022 |
| ~~male detention~~ | 2023 |
| Female detention | 2024 |
| Sally port 2nd floor | 2025 |
| Armorer work area | 2027 |
| Armorer | 2028 |
| Supply division | 2029 |
| Housing court | 2030 |
| Housing court | 2031 |
| Municipal court | 2032 |
| Municipal court | 2033 |
| Exercise area | 2034 |
| Auditorium | 2035 |
| Director bath room | 2036 |
| Fire truck bay area | 2037 |
| Fire truck bay area | 2038 |
| Fire truck bay area | 2039 |
| Chief's office | 2040 |
| Chief's office | 2041 |
| Fire prevention main area | 2050 |
| Fire headquarters main | 2060 |
| Console (for VDN 6090) | 2091 |
| test | 2200 |
| Engine 1 | 2201 |
| Engine 2 & Rescue 3 | 2202 |
| Engine 4 | 2204 |
| Engine 5 | 2205 |
| Engine 6 | 2206 |
| Engine 7 | 2207 |
| Engine 8 | 2208 |
| Engine 9 | 2209 |
| Engine 10 | 2210 |
| Engine 11 | 2211 |
| Engine 12 | 2212 |

| | |
|---|---|
| Engine 13 | 2213 |
| Engine 14 | 2214 |
| Engine 15 | 2215 |
| Air supply | 2217 |
| Fire break room 3rd floor | 2218 |
| Spare | 2220 |
| Tony's modem | 2221 |
| Fire BOC | 2223 |
| Fire BOC | 2224 |
| Receptionist | 2225 |
| Hefner,R | 2226 |
| Headqurters | 2227 |
| Headquarters | 2228 |
| Murphy ,V | 2229 |
| Smoke detector | 2233 |
| Fire prevention | 2234 |
| Fire prevention | 2235 |
| Fire break room | 2236 |
| Fire prevention | 2237 |
| Spare fire | 2238 |
| Fire BOC | 2241 |
| Fire BOC | 2242 |
| Fire BOC | 2243 |
| Fire BOC | 2244 |
| Fire BOC | 2245 |
| Fire BOC | 2246 |
| Rescue 2 | 2252 |
| Fire union hall | 2253 |
| Rescue 4 | 2254 |
| Rescue 5 | 2255 |
| Rhode Island Hospital | 2261 |
| Hasbro Childrens Hospital | 2262 |
| Roger Williams Hospital | 2263 |
| Miriam Hospital | 2264 |
| Cranston Fire Dept. | 2267 |
| St. Joseph's Hospital No. Prov | 2269 |
| Radio and telephone repair | 2270 |
| Bradford House | 2271 |
| Brown Library | 2272 |
| Engine 3 | 2280 |
| Tower Ladder 1 | 2281 |
| Special Hazard 1 | 2282 |
| Rescue 1 | 2283 |
| Fire watch room | 2284 |
| Washington St. | 2285 |
| Washington St. | 2286 |
| Washington St. | 2287 |
| Washington St. | 2288 |
| Washington St. | 2289 |
| Washington St. | 2290 |
| Washington St. | 2291 |

| | |
|---|---|
| Washington St. | 2292 |
| Washington St. | 2293 |
| Washington St. | 2294 |
| Washington St. | 2295 |
| Washington St. | 2296 |
| Arson Hotline | 2298 |
| Fire Person | 2299 |
| Police Call Taker | 2500 |
| open | 2502 |
| Crime Stoppers | 2503 |
| Channel 1 | 2504 |
| Complaint Desk | 2505 |
| Complaint Desk | 2506 |
| Complaint Desk | 2507 |
| Complaint Desk | 2508 |
| Crew Chief | 2509 |
| Complaint Desk | 2510 |
| Channel 1 | 2512 |
| Channel 4 | 2513 |
| open | 2514 |
| open | 2515 |
| Radio Room | 2520 |
| Radio Room | 2521 |
| Radio Room | 2522 |
| Telephone Repair Room | 2523 |
| Garage | 2524 |
| Radio Repair Garage | 2525 |
| Garage Wall | 2527 |
| Recorder Room | 2529 |
| Gas Depot | 2530 |
| Audix 1 | 2801 |
| Audix 2 | 2802 |
| Audix 3 | 2803 |
| Audix 4 | 2804 |
| Audix 5 | 2805 |
| Audix 6 | 2806 |
| Audix 7 | 2807 |
| Audix 8 | 2808 |
| Audix 9 | 2809 |
| Audix 10 | 2810 |
| Audix 11 | 2811 |
| Audix 12 | 2812 |
| Audix 13 | 2813 |
| Audix 14 | 2814 |
| Audix 15 | 2815 |
| Audix 16 | 2816 |
| Audix 17 | 2817 |
| Audix 18 | 2818 |
| Audix 19 | 2819 |
| Audix 20 | 2820 |
| Audix 21 | 2821 |

| | |
|---|---|
| Audix 22 | 2822 |
| Audix 23 | 2823 |
| Audix 24 | 2824 |
| Fire Prevention Night | 2850 |
| Fire Headquarters | 2860 |
| ASAI | 2880 |
| Elevator Phone | 4001 |
| Elevator Phone | 4002 |
| Elevator Phone | 4003 |
| Elevator Phone | 4005 |
| Evidence Supply Room 2 | 4006 |
| Planning and Review | 6008 |
| Police Academy 1 | 6009 |
| Police Academy 2 | 6010 |
| Police Academy 3 | 6011 |
| Police Academy | 6012 |
| Chad Brown Sub 2 | 6013 |
| Range 2000 | 6014 |
| AFIS | 6015 |
| Explorer Program | 6016 |
| 6017 | 6017 |
| Chad Brown 3rd Floor | 6018 |
| Mayor | 6019 |
| 6020 | 6020 |
| 6021 | 6021 |
| 6022 | 6022 |
| 6023 | 6023 |
| Computer Room | 6024 |
| 6025 | 6025 |
| Video Repair Garage | 6026 |
| Spare | 6028 |
| Fire Repair Dept. | 6029 |
| FOP | 6030 |
| Community Police/516 Hartford | 6031 |
| Hartford Housing Unit | 6032 |
| Community Police/Silver Lake | 6033 |
| Prov. Place Mall SubStation | 6034 |
| Community Police /140 Cypress | 6035 |
| Vin Station | 6036 |
| 6th District Court | 6037 |
| 6TH District Court | 6038 |
| Animal Control | 6039 |
| Animal Control | 6040 |
| Animal Control | 6041 |
| Mounted Police | 6042 |
| Mounted Police | 6043 |
| Park Security | 6044 |
| Park Security | 6045 |
| Comm. Conf. Room | 6046 |
| Comfort Station/216 Weybosset | 6047 |
| Community Police/246 Magnolia | 6048 |

| | |
|---|---|
| City Gulf/Police Repair Garage | 6049 |
| 6050 | 6050 |
| Box | 6051 |
| Division 1 | 6052 |
| Division 1 | 6053 |
| Fire Dept. Computer Room | 6054 |
| Fire Dept. Computer Room | 6055 |
| Isles, D | 6056 |
| Donahue,E | 6057 |
| Division 1 Conference Table | 6058 |
| 6060 | 6060 |
| Hickey, J | 6061 |
| Battalion 2 | 6062 |
| Battalion 3 | 6063 |
| 6065 | 6065 |
| Carpenter Shop | 6067 |
| Auditorium 1st Floor | 6068 |
| Division of Training | 6069 |
| 6070 | 6070 |
| Krapf, R | 6071 |
| Dunlap, V | 6072 |
| Dorsey,J | 6073 |
| Doorley, M | 6074 |
| O'Rourke, J | 6080 - |
| O'Rourke, Coley | 6082 |
| Silva | 6083 |
| Estrella,A | 6084 |
| Lawrence,C | 6086 |
| Colardo, P | 6087 |
| Scott, D | 6089 |
| 6091 | 6091 |
| 6092 (for VDN 2090) | 6092 |
| Callse,G | 6093 |
| 6094 | 6094 |
| Computer Room | 6095 |
| 6096 | 6096 |
| 6097 | 6097 |
| 6098 | 6098 |
| Exponets Test | 6099 |
| 6100 | 6100 |
| Young | 6101 |
| Simoneau | 6102 |
| Major Sullivan | 6103 |
| Hames | 6104 |
| Matracia | 6105 |
| Campbell | 6106 |
| Oates | 6107 |
| Tarlaian | 6108 |
| Cardarelli | 6109 |
| DiFolco | 6110 |
| Bennett | 6111 |

| | |
|---|---|
| Chief's Conference Room | 6112 |
| Lapalin | 6113 |
| DeFrances | 6114 |
| Open | 6115 |
| Cohen | 6116 |
| Granata | 6117 |
| Harrington | 6118 |
| Open | 6119 |
| Delomba | 6120 |
| Lapatin | 6121 |
| Ferland | 6122 |
| Boot Squad | 6123 |
| Mackin | 6124 |
| Pavao | 6125 |
| Catonf | 6126 |
| Melise | 6127 |
| M. Court | 6128 |
| Drake | 6129 |
| 6130 | 6130 |
| 6131 | 6131 |
| Boehm | 6132 |
| Sisson | 6133 |
| Moody | 6134 |
| 6135 | 6135 |
| 6136 | 6136 |
| 6137 | 6137 |
| 6138 | 6138 |
| 6139 | 6139 |
| 6140 | 6140 |
| 6141 | 6141 |
| 6142 | 6142 |
| 6143 | 6143 |
| Richardson, Ray | 6144 |
| Goins | 6145 |
| Tibbets | 6146 |
| Diggins | 6147 |
| Isherwood | 6148 |
| Records Window | 6149 |
| Building Manager | 6150 |
| Tucker | 6151 |
| Lima | 6152 |
| Clark | 6153 |
| open | 6154 |
| open | 6155 |
| Locker Room | 6156 |
| RollCall Room | 6157 |
| Gorton, R | 6158 |
| Gonzalez | 6159 |
| Perrotti | 6160 |
| Riccio | 6161 |
| Manning | 6162 |

| | |
|---|---|
| Lonergan | 6163 |
| open | 6164 |
| Gregory | 6165 |
| Sgt. Shiavulli | 6166 |
| Brito | 6167 |
| George Pearson | 6168 |
| Pearson | 6169 |
| Baldassare | 6170 |
| Badessa | 6171 |
| Paolino | 6172 |
| Cornel | 6173 |
| Donnelly | 6174 |
| Renzi | 6175 |
| Firth | 6176 |
| Kittel | 6177 |
| Yang | 6178 |
| Yekelchik | 6179 |
| Clarke | 6180 |
| Cliff | 6181 |
| BCI Labratory | 6182 |
| BCI Labratory | 6183 |
| Evidence Drying Room | 6184 |
| Cugazzo-Grover | 6185 |
| BCI Processing | 6186 |
| BCI Processing | 6187 |
| Counter Station | 6188 |
| Counter Station | 6189 |
| Counter Station | 6190 |
| Desk Sgt. | 6191 |
| open | 6192 |
| Grant | 6193 |
| Patrol Office | 6194 |
| Patrol Office | 6195 |
| Briggs | 6196 |
| Giragosian | 6197 |
| Lt's. Central Station | 6198 |
| Lt's. Central Station | 6199 |
| Commissioner | 6200 |
| D'Antuono | 6201 |
| Nelson | 6202 |
| Leach | 6203 |
| DiBiaso | 6204 |
| open | 6205 |
| open | 6206 |
| open | 6207 |
| Marble | 6208 |
| Lazzareschi, Lori | 6209 |
| Commissioner Conf. Room | 6210 |
| Iozzi | 6211 |
| McCoy | 6212 |
| Spertini | 6213 |

| | |
|---|---|
| Gonzalez | 6214 |
| Calenda/Abbate | 6215 |
| Bianco | 6216 |
| Prosecution Officer | 6217 |
| Jennings | 6218 |
| McKenna, R | 6219 |
| Paolino,A | 6220 |
| DeSmarais | 6221 |
| Vascera | 6222 |
| Male Lock up | 6223 |
| Female Lock up | 6224 |
| Laprade | 6225 |
| Hassett | 6226 |
| Balkun | 6227 |
| McCarthy | 6228 |
| Evidence Supply1 | 6229 |
| Patino | 6230 |
| C. Gough | 6231 |
| DaSilva | 6232 |
| Goldsboro | 6233 |
| Baker | 6234 |
| Domestic Conf. Room | 6235 |
| Keegan | 6236 |
| Telephone Room | 6237 |
| Lambert | 6238 |
| Pino | 6239 |
| Computer Room | 6240 |
| Thomas | 6241 |
| Pryble | 6242 |
| Glancy | 6243 |
| SSD Telephone Room | 6244 |
| Lennon | 6245 |
| Correia | 6246 |
| Zammarelli | 6247 |
| St.Lawrence | 6248 |
| Costello | 6249 |
| Amoroso | 6250 |
| open | 6251 |
| DellaVentura | 6252 |
| Whelen | 6253 |
| Stravato | 6254 |
| Hutchinson | 6255 |
| Conley | 6256 |
| Colanduono | 6257 |
| Patridge | 6258 |
| Enright | 6259 |
| Ruggiero | 6260 |
| Zeitountzian | 6261 |
| Sion | 6262 |
| Creamer | 6263 |
| Lawton | 6264 |

| | |
|---|---|
| Hampton | 6265 |
| Ludavici | 6266 |
| Aspinal | 6267 |
| Lanni | 6268 |
| Ramolina | 6269 |
| DeSaulls | 6270 |
| DePina | 6271 |
| Lepre | 6272 |
| Kennedy | 6273 |
| Moffett | 6274 |
| Figuerido | 6275 |
| Casbarro | 6276 |
| Zonfrilli | 6277 |
| Burns | 6278 |
| Woodruff | 6279 |
| open | 6280 |
| open | 6281 |
| Depalma/Beze | 6282 |
| Teixeira | 6283 |
| Penza | 6284 |
| Calcagni | 6285 |
| Buote | 6286 |
| Traffic Work Station | 6287 |
| Traffic Work Station | 6288 |
| Traffic Work Station | 6289 |
| Traffic Work Station | 6290 |
| Traffic Work Station | 6291 |
| Jackvony | 6292 |
| Glavin | 6293 |
| Lee | 6294 |
| Modem Comm. Place | 6295 |
| Modem Comm.Place | 6296 |
| Modem Comm. Place | 6297 |
| Modem Comm. Place | 6298 |
| 6299 | 6299 |
| Mike Vieira | 6300 |
| Pietrunti | 6301 |
| McGrath | 6302 |
| Fanning | 6303 |
| Green | 6304 |
| O'Hara | 6305 |
| Mattos | 6306 |
| Open SSD | 6307 |
| McGrath | 6308 |
| Schabone | 6309 |
| Moffett | 6310 |
| Drohan | 6311 |
| O'Mara | 6312 |
| Moffett,C | 6313 |
| Javery | 6314 |
| Corley | 6315 |

| | |
|---|---|
| Coogan | 6316 |
| Clements,R | 6317 |
| Weston | 6318 |
| Zienowicz | 6319 |
| Washburn | 6320 |
| Coughlin | 6321 |
| Murray | 6322 |
| Harnett | 6323 |
| Allen | 6324 |
| Carroll | 6325 |
| Springer | 6326 |
| Open Det. | 6327 |
| Esten | 6328 |
| Marsland | 6329 |
| Finnegan | 6330 |
| Mansolillo | 6331 |
| Campbell, P | 6332 |
| Sweeney | 6333 |
| Colon | 6334 |
| Cancelliert | 6335 |
| Campbell, S | 6336 |
| Crawley | 6337 |
| Det. Conference Room | 6338 |
| Det. Captain | 6339 |
| Melle | 6340 |
| O'Connell | 6341 |
| Det. Open | 6342 |
| Phillips | 6343 |
| Luke | 6344 |
| Phillips | 6345 |
| Owens | 6346 |
| Youth LockUp | 6347 |
| LeBlanc | 6348 |
| Latimer | 6349 |
| Gonsalves | 6350 |
| Lee | 6351 |
| Grover | 6352 |
| Huffman | 6353 |
| Mac Andrew John, Det. | 6354 |
| Meleragno | 6355 |
| Dosreis | 6356 |
| Kastelos | 6357 |
| Sacco | 6358 |
| Wells | 6359 |
| Blessing | 6360 |
| Fitzpatrick | 6361 |
| Small | 6362 |
| Silva-Rocha | 6363 |
| Rawnsley | 6364 |
| Reall | 6365 |
| Garcia | 6366 |

| | |
|---|---|
| Sousa | 6367 |
| Rodriguez | 6368 |
| Ferrell | 6369 |
| Edes | 6370 |
| Carvalho | 6371 |
| McConnell | 6372 |
| Day | 6373 |
| King | 6374 |
| Lopardo | 6375 |
| Kennedy | 6376 |
| Gannon Laurie | 6377 |
| Rossi | 6378 |
| Fraille | 6379 |
| Gannon,D | 6380 |
| Wheeler | 6381 |
| Perez | 6382 |
| Zincone | 6383 |
| 6384 | 6384 |
| Modem | 6385 |
| Modem | 6386 |
| Modem | 6387 |
| Modem | 6388 |
| Lambert's Modem | 6389 |
| Venditto | 6390 |
| Roccio | 6391 |
| Xavier-Emergency Mgt. | 6392 |
| Delpico-Emergency Mgt. | 6393 |
| Scorpio-Emergency Mgt. | 6394 |
| Morales-Emergency Mgt. | 6395 |
| Lambert's Modem | 6396 |
| Lambert's Modem | 6397 |
| Emergency Management | 6398 |
| 6399 | 6399 |
| Central Station | 6400 |
| Chief's Office | 6401 |
| Commissioner's Office | 6402 |
| BCI | 6403 |
| Data | 6404 |
| Detail | 6405 |
| Detective | 6406 |
| Domestic | 6407 |
| Evidence | 6408 |
| Hit & Run | 6409 |
| Housing Court | 6410 |
| Human Resources | 6411 |
| Internal Affairs | 6412 |
| Lt. Office | 6413 |
| Municipal Court | 6414 |
| Prosecution | 6415 |
| Records | 6416 |
| Sgt. Office | 6417 |

| | |
|---|---|
| SSD | 6418 |
| Traffic | 6419 |
| Vehicle Recovery | 6420 |
| Armorer's Office | 6421 |
| Youth Services | 6422 |
| Greenlaw | 6423 |
| 6424 (Youth Service) | 6424 |
| Emergency Mgt. | 6425 |
| Municp. Court credit card pay. | 6426 |
| 6427 | 6427 |
| 6428 | 6428 |
| 6429 | 6429 |
| Auto Recovery | 6430 |
| Municipal Court | 6431 |
| Patrol Office | 6432 |
| 6433 | 6433 |
| 6434 | 6434 |
| Traffic | 6435 |
| 6436 | 6436 |
| Records | 6437 |
| Housing | 6438 |
| SSD | 6439 |
| Domestic | 6440 |
| Emergency Mgt. | 6441 |
| Human Resources | 6442 |
| Detective | 6443 |
| Fax Comm. Office | 6444 |
| Fax Communications | 6445 |
| Channel 4 Police Fax | 6446 |
| 6447 | 6447 |
| 6448 | 6448 |
| 6449 | 6449 |
| 6450 | 6450 |
| 6451 | 6451 |
| 6452 | 6452 |
| 6453 | 6453 |
| 6454 | 6454 |
| 6455 | 6455 |
| 6456 | 6456 |
| 6457 | 6457 |
| 6458 | 6458 |
| 6459 | 6459 |
| 6460 | 6460 |
| 6461 | 6461 |
| 6462 | 6462 |
| 6463 | 6463 |
| Police Chief-Office | 6464 |
| 6465 | 6465 |
| Modem Lambert | 6466 |
| 6467 | 6467 |
| 6468 | 6468 |

| | |
|---|---|
| SSD | 6418 |
| Traffic | 6419 |
| Vehicle Recovery | 6420 |
| Armorer's Office | 6421 |
| Youth Services | 6422 |
| Greenlaw | 6423 |
| 6424 (Youth Service) | 6424 |
| Emergency Mgt. | 6425 |
| Municp. Court credit card pay. | 6426 |
| 6427 | 6427 |
| 6428 | 6428 |
| 6429 | 6429 |
| Auto Recovery | 6430 |
| Municipal Court | 6431 |
| Patrol Office | 6432 |
| 6433 | 6433 |
| 6434 | 6434 |
| Traffic | 6435 |
| 6436 | 6436 |
| Records | 6437 |
| Housing | 6438 |
| SSD | 6439 |
| Domestic | 6440 |
| Emergency Mgt. | 6441 |
| Human Resources | 6442 |
| Detective | 6443 |
| Fax Comm. Office | 6444 |
| Fax Communications | 6445 |
| Channel 4 Police Fax | 6446 |
| 6447 | 6447 |
| 6448 | 6448 |
| 6449 | 6449 |
| 6450 | 6450 |
| 6451 | 6451 |
| 6452 | 6452 |
| 6453 | 6453 |
| 6454 | 6454 |
| 6455 | 6455 |
| 6456 | 6456 |
| 6457 | 6457 |
| 6458 | 6458 |
| 6459 | 6459 |
| 6460 | 6460 |
| 6461 | 6461 |
| 6462 | 6462 |
| 6463 | 6463 |
| Police Chief-Office | 6464 |
| 6465 | 6465 |
| Modem Lambert | 6466 |
| 6467 | 6467 |
| 6468 | 6468 |

| | |
|---|---|
| 6469 | 6469 |
| 6470 | 6470 |
| 6471 | 6471 |
| 6472 | 6472 |
| 6473 | 6473 |
| 6474 | 6474 |
| 6476 | 6476 |
| 6477 | 6477 |
| 6478 | 6478 |
| 6479 | 6479 |
| Open Office | 6480 |
| 6481 | 6481 |
| 6482 | 6482 |
| 6483 | 6483 |
| 6484 | 6484 |
| Arson Squad | 6485 |
| Fire Prevention | 6486 |
| Fire Admin. Headquarters | 6487 |
| Chief Lanzi | 6488 |
| Chief Mulcahy | 6489 |
| 6490 | 6490 |
| 6491 | 6491 |
| 6492 | 6492 |
| 6493 | 6493 |
| 6494 | 6494 |
| Temp. Dial-up Inads comm pl. | 6495 |
| Total Recall Dial-up | 6496 |
| Intuity Dial-up | 6497 |
| Mapp D Dial-up | 6498 |
| 6499 | 6499 |

## CERTIFICATIONS

On October 23, 2006, I caused a true copy of the foregoing document to be filed electronically; it is available for viewing and downloading from the ECF system. Counsel for all parties to the action, listed below, have been served electronically through the ECF system.

*/s/ Mark A. Fay*

**Michael A. Calise, Esq.**

**Susan M. Carlin, Esq.**

**Thomas J. Cronin, Esq.**

**Stephen R. Famiglietti, Esq.**

**Kevin J. McAllister, Esq.**

**Kevin F. McHugh, Esq.**

**Dean G. Robinson, Esq.**

**George L. Santopietro, Esq.**

**George J. West, Esq.**

**Richard B. Woolley, Esq.**

In addition, on October 23, 2006, a true copy of the foregoing was served on additional counsel of record, listed below, by mail.

*/s/ Mark A. Fay*

**Carolyn A. Mannis, Esq.**
170 Westminster Street, Suite 800
Providence RI 02903

Thomas J. Cronin, Esq.
**Gunning & LaFazia**
56 Pine Street
Providence RI 02903

David A. Ursillo, Esq.
**Coia & Lepore, Ltd.**
226 South Main Street
Providence RI 02903