**UNITED STATES DISTRICT COURT**
**DISTRICT OF RHODE ISLAND**

THOMAS WALDEN, ET AL

VS. C.A. NO. 04-304S

CITY OF PROVIDENCE, ET AL

Consolidated with:

JOHN C. CHMURA, ET AL

VS. C.A. NO. 04-553S

CITY OF PROVIDENCE, ET AL

# MUNICIPAL DEFENDANTS' REPLY MEMORANDUM TO PLAINTIFF'S OBJECTION TO THE MUNICIPAL DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

## I. The Plaintiffs' Complaint fails to adequately plead a 42 U.S.C. § 1983 claim against the city.

The Plaintiffs agree on page 1 of their Memorandum that their claims against Defendants Esserman and Cicilline are claims against the City. Therefore, the 42 U.S.C. § 1983 claim must be evaluated under the municipal liability standard both for pleading and proof.

While the thrust of Plaintiffs' argument, that their Complaints contain an adequately pled Monell claim, is based on misguided readings of case law, the relevant analysis is oft-quoted and crystalline: to hold a municipality liable under § 1983, plaintiffs must plead *and* prove an injury caused by an action taken pursuant to official municipal policy or custom. See Baxter v. Conte, 190 F.Supp. 2d 123, 128 (D.Mass.

2001); see also Fedor v. Kudrak, 421 F.Supp. 2d 473, 481, (D.Conn. 2006), quoting Zahra v. Town of Southold, 48 F.3d 674, 685 (2nd Cir. 1995).

Although Plaintiffs, in their memorandum, dispute the statement that "[t]here is no allegation in the Complaints that the City has an unconstitutional policy, custom or widespread practice of violating people's privacy," they admit that "the complaint does not use the words 'policy,' 'custom,' or 'practice.'" See *Memorandum in Support of Plaintiffs' Objection to Defendants Dean Esserman, David Cicilline, and the City of Providence's Motion for Summary Judgment or, in the Alternative, Motion to Dismiss*, page 8. This admission clearly warrants dismissal of the Monell claim under the relevant case law. Plaintiffs argue that the chronology of events, as alleged in their complaints, sufficiently identify a City policy and therefore make out a valid Monell claim under the case law they cite. Their exegesis is misguided and logically flawed, however.

In an effort to avert the death knell to their case, Plaintiffs parse the language of several cases beyond recognition. In Jackson v. Marion County, 66 F.3d 151 (7th Cir. 1995), relied upon by Plaintiffs, the Seventh Circuit declined to follow one of its own cases, which would have led to the dismissal of the civil rights action of the Plaintiff, a state prisoner. Note, however, that the Jackson decision was not a dispositive ruling, as the case was dismissed on other grounds not described in the opinion; nor is it easily applied to other factual scenarios, as the Court places a disclaimer at the end of the opinion, by noting that the Court was declining to rule as it normally would (i.e., to follow its own precedent) since the Plaintiff was both *pro se* and a prisoner. Id. at 153. What one Circuit has held in one case, where it temporarily ignored its own precedents since it was deciding a case involving a *pro se* prisoner litigant, is far from persuasive

here. Also of note, the Jackson Court referenced a First Circuit case that stood for the same proposition as the Seventh Circuit precedent which, on a one time only basis, was being ignored. Id., citing O'Brien v. DiGrazia, 544 F.2d 543, 546 (1st Cir. 1976) ("[W]hen a complaint omits facts that, if they existed, would clearly dominate the case, it seems fair to assume that those facts do not exist."). There is no reason to believe that the First Circuit would depart from its own precedent in the peculiar circumstance described in Jackson, much less here, where Plaintiffs are not prisoners and are represented by not one but a team of lawyers.

Plaintiffs also rely on Burton v. Sheahan, 68 F.Supp.2d 974 (N.D.Ill.,1999), a district court case never cited inside or outside the Seventh Circuit, and one which misapplies Jackson by failing to take note of the peculiarities articulated in that case. Further, the Burton Court itself recognized and stated (in a concession that explicitly admitted the Court was stretching to reach its ruling) that the case would not likely survive summary judgment, which it ultimately did not. Id. at 983.

Similarly, Plaintiffs supply this Court with a misguided reading of Roma Construction Co. v. aRusso, 96 F.3d 566 (1st Cir. 1996). There, the First Circuit reversed the District Court's ruling, that evidence of a policy which caused the alleged constitutional violation was lacking. Id. at 575-576. Thus, the decision did not regard whether or not a Monell claim was sufficiently pled, but rather whether or not one could be proved.

Therefore, the Municipal Defendants pray that this Court rule based on the long line of cases, shared among the Circuits, which necessitate that Plaintiffs plead the

existence of constitutional violations based on municipal policies, customs, or practices. This necessity is lacking here.

## II. Plaintiffs May Not Pursue Both Their Federal and State Wiretap Claims

Plaintiffs, in an effort to dissuade this Court from ruling that they may not pursue both their federal and state wiretap claims, use a two-fold method. First, they argue against adherence to the ruling of Whitaker v. Garcetti, 291 F.Supp.2d 1132 (C.D.Cal., 2003), which squarely confronts the issue before this Court. In a second, desperate argument, Plaintiffs proffer that somehow, Williams v. Poulos, 11 F.3d 271 (1st Cir. 1993) is relevant to deciding this issue.

Under the rubric of Whitaker, Plaintiffs are entitled to pursue relief solely under the Rhode Island wiretapping statute, since where the Municipal Defendants "are local rather than federal officials and municipalities and . . . the two wiretapping statutes regulate the same sphere of conduct, the operative directive . . . is" the state, not federal, wiretapping statute. Whitaker, 291 F.Supp.2d at 1141.

Plaintiffs explain Williams v. Poulos, 11 F.3d 271 (1st Cir.1993) with the following: "the court affirmed a judgment that the defendants had violated both the federal and Maine anti-wiretap statutes. There was no suggestion in the district court or in the court of appeals that plaintiff was precluded from proceeding under both statutes." *Memorandum in Support of Plaintiffs' Objection to Defendants Dean Esserman, David Cicilline, and the City of Providence's Motion for Summary Judgment or, in the Alternative, Motion to Dismiss*, page 21. Assuming the accuracy of Plaintiffs' characterization, the Williams opinion contains nothing that substantiates Plaintiffs' position. That the issue was not raised at trial or on appeal, nor addressed by the First

Circuit, hardly constitutes a practice, though Plaintiffs argue as much. Plaintiffs would have this Court believe that the First Circuit's silence on an issue constitute a "practice" of the Circuit. Is it Plaintiffs' belief that lower courts should now take non-verbal cues from appellate courts? Should we call this new level of judicial decision-making "implied dicta"?

Therefore, Plaintiffs may not pursue both their federal and state wiretap claims.

**III. The ordinary course of business - investigative law enforcement officer's exemption applies.**

The City is not liable under either the Fourth Amendment or 18 U.S.C. § 2510 because the recording was not illegal under the ordinary course - investigative law enforcement officer's exemption to the wiretapping statute.

The Plaintiffs offer two weak reasons why these exemptions don't apply: (1) The Total Recall System was under the control of the communications department, not the police department; and (2) there is no evidence that the exemptions apply.

**A. The Communication – Police Department**

Section 1001 of the City Charter creates a Department of Public Safety. It provides:

> 1001. Department of public safety.
> There shall be a department of public safety. . . . The department of public safety shall include a police department, a fire department, and a department of communications. . . .

Thus, there are three departments which make up the public safety department: police, fire, and communications.

Section 100(a) provides in pertinent part:

> (a) *Police department.* The head of the police department shall be the commissioner, who shall appoint a chief of police, who shall serve as the chief executive officer of the police department subject to the direction of the commissioner. . . .

Section 1001 (b) of the Charter provides in pertinent part:

> (b) *Fire department.* The head of the fire department shall be the commissioner, who shall appoint a fire chief, who shall serve as the chief executive officer of the fire department subject to the direction of the commissioner. . . .

Section 1001 (c) of the Charter provides in pertinent part:

> (c) *Department of communications*. The head of the department of communications shall be the commissioner, who shall appoint a director of communications, who shall serve as the chief executive officer of the department of communications subject to the direction of the commissioner. . . .

Moreover, the ordinance which created the communications department also places it within the Department of Public Safety. Section 2-124 provides in pertinent part:

> **Sec. 2-124. Created; jurisdiction**
> Pursuant to the provisions of Chapter 2723 of the Public Laws of 1951, there is hereby created in the City of providence, a department of communications within the department of public safety.

Thus, both the police and communications departments are branches of the public safety department. Are the Plaintiffs saying that the law enforcement investigative exemption does not apply to the Public Safety Department? If so, their argument is even weaker than is stated in their memorandum.

Moreover, the emergency calls for service for the fire department were being dispatched over the department phones. (Exhibit A, Deposition of J. Richardson, p. 25).

The same would hold true of the police department phones. Public Safety is public safety. Both the police and fire departments come under the auspices of public safety under the Charter.

Moreover, just because the communications department maintains the communications system of the City does not mean their phones were not part of the public safety. The Plaintiffs want to hold Defendant Prignano liable as Chief of Police yet want the Court to believe it was the Communications Department and, therefore, not a law enforcement agency. They can't have it both ways.

**B. The evidence that the exemption applies**

It is undisputed that the phone lines at issue were coming into the public safety complex as well as the communications center. (Municipal Defendants' Statement of Undisputed Facts, No. 6; Exhibit B, Deposition of Stephen Moise, pp. 72-73; Exhibit C, Deposition of Anthony Desmarais, pp. 86-87). The Plaintiffs have accepted this fact as undisputed (Plaintiffs' Statement of Material Facts in Dispute, Introductory Paragraph).

It is also undisputed that the police and fire headquarters are located there.

The Plaintiffs' argument made on page 13 of their memorandum that there is a genuine issue of material fact whether it was investigative and law enforcement officers who were using the Total Recall System is nothing short of ludicrous. It is undisputed that they recorded conversations in the police and fire departments.

18 U.S.C. § 2510(7) states in pertinent part:

> (7) 'Investigative or law enforcement officer' means any officer of the United States or of a State of political subdivision thereof, who is empowered by law to conduct investigations of or to make arrests for offenses enumerated in this chapter.

The Plaintiffs cannot be saying that the police department doesn't come under that definition. Even as to the fire department, the fire department could certainly investigate arson and arson is a federal crime under 11. U.S.C. § 81 which provides:

> § **Arson** within special maritime and territorial jurisdiction
> Whoever, within the special maritime and territorial jurisdiction of the United States, willfully and maliciously sets fire to or burns any building, structure or vessel, any machinery or building materials or supplies, military or naval stores, munitions of war, or any structural aids or appliances for navigation or shipping, or attempts or conspires to do such an act, shall be imprisoned for not more than 25 years, fined the greater of the fine under this title or the cost of repairing or replacing any property that is damaged or destroyed, or both.
> If the building be a dwelling or if the life of any person be placed in jeopardy, he shall be fined under this title or imprisoned for any term of years or for life, or both.

The Plaintiffs' argument on page 15 of their memorandum that the recording was not in the ordinary course of an investigation or law enforcement officer's duty is equally flawed.

In Amati v. City of Woodstock, 176 F.3d 952 (7th Cir. 1999), in an opinion by the pre-eminent Chief Judge Posner, the Seventh Circuit states that screening all calls to and from a police department is a routine practice and that investigation is within the ordinary course of law enforcement.

They go on to cite Jandak v. Village of Brookfield, 520 F.Supp 815, 821-25 (N.D. Ill. 1981) for the proposition that if ordinary course of law enforcement includes anything, it includes the recording of all calls to and from a police department. They even go so far as to state that the lack of case law on the question suggests that that principle is too obvious to have incited many challenges.

## IV. The Plaintiffs had no expectation of privacy in their phone calls.

As a threshold matter, it should be noted that there is no proof, other than bold assertions in the Complaint, that any of the plaintiffs ever called the public safety complex during the period that the Total Recall System was employed. Not one single affidavit to that effect had been produced.

Assuming that at least one plaintiff called, they had no reasonable expectation of privacy in their call.

In order to make out a Fourth Amendment violation, the Plaintiffs must prove that the City invaded their reasonable expectation of privacy. Smith v. Maryland, 442 U.S. 735, 740, 99 S.Ct. 2577, 2580, 61 L.Ed. 2d. 222 (1979).

The Court must determine whether the individuals exhibited a subjective expectation of privacy and whether their expectation is one which society is prepared to recognize as reasonable. Id. at 740.

In the instant case, how could the Plaintiffs ever have an expectation of privacy in calling the police or fire station? These are not private homes, individuals, or medical facilities; they are government businesses, if you will. It is unreasonable to expect that such calls would not be monitored. Moreover, those very phones are for business and not for personal uses. Particularly in this day and age, numerous businesses tape phone calls. People who want privacy don't call others on business phones. They call them on their personal cell phones.

In short, it is unrealistic to think that any individual who calls a police or fire department expects privacy in so doing. This is particularly true post 9-11.

**V. The Attorney General found no probable cause to believe a violation of state law occurred.**

In number 15 of their alleged Statement of Disputed Facts, the Plaintiffs claim that the Attorney General's memorandum does not state that there was no criminal liability. However, the Plaintiffs do admit that it stated there was no probable cause to believe that a prosecutable violation of the Rhode Island General Law occurred. Isn't that the same thing? Don't you need probable cause as the first step in proving a crime has occurred? There can't be a crime committed if there is no probable cause to believe it.

Therefore, the Attorney General's finding is tantamount to a finding of no criminal liability.

**VI. The City is not liable for any actions the individual defendants took outside the scope of their employment**

The Plaintiffs argue that the City has not argued that it is not liable under Respondeat Superior. It goes without saying that the City is not liable if the individual defendant committed torts outside the scope of their employment.

A municipality can be held liable for an employee's intentional tort committed against a third-party only if the misconduct falls within the scope of employment. Cruz v. Town of North Providence, 833 A.2d 1237 (R.I. 2003).

Certainly, if the individual defendants intentionally violated the Plaintiffs' Fourth Amendment rights, that would not be within the scope of their employment, and the City would not be liable.

**Conclusion**

The Court need not analyze the summary judgment portion of the Municipal Defendants' motion as the Defendants have given the Court a sufficient basis to outright dismiss the case.

However, should the Court find it necessary to analyze the motion under the summary judgment standard, it is crystal clear from the Plaintiffs' alleged Statement of Disputed Facts that the Plaintiffs have failed to put forth any genuine issue of material fact as to the summary judgment motion and that their case is ripe for a summary judgment determination.

That being said, once the Court goes through the summary judgment analysis, it should find that the Municipal Defendants are entitled to judgment as a matter of law given the high standard for holding a municipality liable and the facts of this case.

Defendants,

By their Attorneys:

Joseph M. Fernandez,
City Solicitor

/s/ Kevin F. McHugh
Kevin F. McHugh (#3927)
Senior Assistant City Solicitor
City of Providence Department of Law
275 Westminster Street
Providence, Rhode Island 02903
(401) 421-7740 Ext. 333
(401) 351-7596 (fax)
kevin_mc1950@hotmail.com

Certificate of Service

I hereby certify that on this 1st day of November, 2006, I filed this document electronically and that it is available for viewing and downloading from the ECF system. This document was served by electronic mail upon:

Susan M. Carlin, Esq.
Stephen R. Famiglietti, Esq.
Famiglietti & Carlin, Ltd.
The Lincoln Center
132 Old River Road, Suite 205
Lincoln, RI 02865
Famcarltd@aol.com

Mark A. Fay, Esq.
Murphy & Fay, LLP
127 Dorrance Street, 2nd floor
Providence, RI 02903
mark@murphyandfay.com

Dean G. Robinson, Esq.
670 Willett Avenue
East Providence, RI 02915
drobinson@dgrlaw.necoxmail.com

George L. Santopietro, Esq.
Coia & Lepore, Ltd.
226 South Main Street
Providence, RI 02903
gsantopi@coialepore.com

and by regular mail, postage prepaid, to the following:

Carolyn Mannis, Esq.
170 Westminster Street, Suite 800
Providence, RI 02903

/s/ Kevin F. McHugh
Kevin F. McHugh

UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF RHODE ISLAND

THOMAS WALDEN, et als.

vs. C.A. No. 2004-304S

URBANO PRIGNANO, JR., et als.

---

THOMAS C. CHMURA, et als.

vs. C.A. No. 2004-553S

URBANO PRIGNANO, JR., et als.

DEPOSITION OF JOSEPH P. RICHARDSON, JR., a Defendant in the above-entitled case, taken on behalf of the Plaintiffs, before Linda L. Guglielmo, RPR-RMR, a Notary Public in and for the State of Rhode Island, at the offices of the Providence City Solicitor, 275 Westminster Street, Providence, Rhode Island on February 27, 2006 at 2:00 P.M.

ALLIED COURT REPORTERS, INC.

115 PHENIX AVENUE

CRANSTON, RHODE ISLAND 02920

(401) 946-5500



"EXHIBIT A"

Page 22

Q. Do you know if there were any revisions made to this book that you referred to with regard to the use of the Total Recall systems?
A. No.
Q. You do not know or there were none?
A. I don't know.
Q. Were you involved in the bidding process for the new public safety building?
A. No.
Q. Did you attend any meetings where the new communication system for the new public safety building complex was discussed?
A. Yes.
Q. When did you attend these meetings?
A. I don't recall any specific dates. One of my primary responsibilities from John Partington who was Commissioner of Public Safety of the task force was to ensure or to make sure that we had a backup, redundant communication system. Given the failures of the 1993 (sic) World Trade Center tragedy in 2001, one of the primary goals was to make sure that we had an emergency operation center and that we had backup, redundant communication systems.
Q. Did you attend any meetings prior to the opening

Page 23

of the Public Safety Complex in which the number of lines that were going to be recorded was discussed?
A. Not that I recall.
Q. Did you have any conversations with John D'Amico regarding the Total Recall system?
A. I had conversations with John D'Amico. I don't recall specific to the Total Recall system, but I had conversations with John D'Amico about regarding -- about telephone recordings.
Q. And what was said?
MR. WEST: Objection.
MR. SANTOPIETRO: Objection.
MR. ROBINSON: Objection.
MR. McHUGH: Objection.
MR. McALLISTER: You can answer.
A. I was asked to investigate along with Chief Giannini an incident where an automobile or an accident where a car had gone into the water and a man had died and there was some questions as to the response and Chief Rattigan had asked Chief Giannini to look into the matter and asked me to look into the matter from the communications end, and I did, and it was at that time that I had discussions with John D'Amico about recordings of

Page 24

conversations.
Q. And what was said with respect to the recording of conversations?
MR. WEST: Objection.
MR. SANTOPIETRO: Objection.
MR. ROBINSON: Objection.
MR. McHUGH: Objection.
MR. McALLISTER: You can answer.
A. John D'Amico, the -- the Providence Journal, Amanda Milkovich was doing a story or was asking questions about the death of this man that died in the water. In the course of that investigation The Journal had requested any and all recordings, you know, transmissions, radio transmission, phone calls and stuff related to the incident and the department phones, the department phones, the fire department phones, the phones that are just between the fire stations, inside the fire department system, the internal system. I was not sure. We consulted with, as we did with the solicitor's office if those recordings could be or should be turned over to The Journal.
MS. MANNIS: Could you read back his answer, not this last one, the one before that.
(ANSWER BEGINNING ON PAGE 23, LINE 17 READ)

Page 25

Q. Was that the extent of your conversations with D'Amico regarding the recording of the conversations?
A. He asked what we were recording, how we did recordings, he asked about the process.
Q. And did you know at that time?
MR. WEST: Objection.
MR. CRONIN: Objection.
A. I'm not sure I understand your question.
Q. Were you able to answer his question about how recordings were being made at that time?
A. I told him calls were being made to my knowledge, yes.
Q. And what was your knowledge at that time?
A. That the department phones would in fact be recorded because in fact we did dispatch emergency calls for service via the department lines. He didn't understand the nature of what the difference was in the department line and some of the other lines. So I explained to him what that difference was or explained to him the nature of the department phone lines.
Q. What was your understanding with regard to other phones within the department at that time?
MR. WEST: Objection.

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF RHODE ISLAND

THOMAS WALDEN, ET AL.

vs. C.A. No. 04-304S

CITY OF PROVIDENCE, ET AL.

DEPOSITION OF STEPHEN MOISE, a Witness in the above-entitled case, taken on behalf of the Plaintiffs, before Linda L. Guglielmo, RPR-RMR, a Notary Public in and for the State of Rhode Island, at the offices of Murphy & Fay, LLP, 127 Dorrance Street, Providence, Rhode Island on January 31, 2005 at 10:00 A.M.

ALLIED COURT REPORTERS, INC.
115 PHENIX AVENUE
CRANSTON, RHODE ISLAND 02910
(401) 946-5500



"EXHIBIT B"

Q. I understand that. But I'm talking about the Total Recall system?

THE WITNESS: Are you talking a phone to the recording system?

MS. MANNIS: No, I'm talking about the Total Recall system.

A. Let's back up then. I'm sorry.

Q. Under the Total Recall system, if you wanted to add an extension, who would do that?

A. That would be Tony Demaris, Greg Harnoian or Greg Parfume.

Q. But it's not something that you would do?

A. No, I would not do that.

Q. And is that something that you would do with those user guide passwords?

A. I would believe so.

Q. Okay. Earlier you indicated that under the Total Recall system private lines, such as the one in the fire living quarters, were not included in the Total Recall system, correct?

A. That is correct.

Q. How do you know that?

A. From my years as a dispatcher, my years -- I've been in the stations on numerous occasions. I mean, we have a roster, we have a list of all

the outside extensions, outside seven digit numbers for each station listed in the fire dispatch center. That's how -- in the event of a problem, that's how the dispatch center would get ahold of them, that would be another way of -- if the voc. alarm radio system broke down, there is a protocol as to how to get in touch with these companies.

Q. I understand that. How do you know they weren't subject to the Total Recall?

A. Because they have nothing to do with Total Recall, they're their own -- they got their own vendors, whoever they are, whatever phone company it is.

Q. So, the Total Recall system only operated on the phone numbers within?

A. The system.

Q. Within the system?

A. Correct.

Q. However, if you placed a call to that private number, that call would be subject to Total Recall, correct?

MR. McHUGH: Objection as to form. You can answer.

A. I'm not sure on that. That I'm not sure of.

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF RHODE ISLAND

THOMAS WALDEN, et als.
vs. C.A. No. 2004-304S
URBANO PRIGNANO, JR., et als.

THOMAS C. CHMURA, et als.
vs. C.A. No. 2004-553S
URBANO PRIGNANO, JR., et als.

DEPOSITION OF ANTHONY DESMARAIS, a Witness in the above-entitled case, taken on behalf of the Plaintiffs, before Linda L. Guglielmo, RPR-RMR, a Notary Public in and for the State of Rhode Island, at the offices of the Murphy & Fay, LLP, 127 Dorrance Street, Providence, Rhode Island on May 24, 2006 at 2:00 P.M.

ALSO PRESENT: Manuel Vieira

ALLIED COURT REPORTERS, INC.
115 PHENIX AVENUE
CRANSTON, RHODE ISLAND 02920
(401) 946-5500



"EXHIBIT C"

Q. And there is no reference in this memo that calls generated out of the Public Safety Complex would in fact be recorded, correct?

A. Yes.

Q. I'm going to also ask you to look at Number 2, Plaintiffs' Exhibit Number 2, which refers to a meeting among Bob Nelson, Mr. Reposa and yourself; is that correct?

A. Yes.

Q. And there's a memo that apparently summarizes what was discussed at that meeting; is that correct?

A. Yes.

Q. And this memo was prepared by Mr. Reposa, right?

A. Yes.

Q. In this memo it indicates that station-to-station recording is unavailable to the Total Recall server; is that correct?

A. I don't know.

Q. Looking at that first bullet point, does it, in fact, indicate that station-to-station recording was, in fact, unavailable?

A. I don't see that on here.

Q. The first bullet point right under your name, it says, "Station-to-station recording is unavailable"?

A. Okay. Okay.
Q. So, the Total Recall server was incapable of recording station-to-station; is that correct?
MR. FAY: Objection.
A. Yes.
Q. In this memo it does not indicate that Mr. Vieira wanted any and all conversations into and out of the Public Safety Complex to be recorded, does it?
A. It says Total Recall records trunk lines, not individual stations.
Q. Right. It does not say it in this memo?
MR. FAY: Did you finish your answer?
THE WITNESS: No.
A. That means all the lines coming and going out of the building are recorded, not station-to-station.
Q. Right. Does it say in this memo that Mr. Vieira ordered those trunk lines to be recorded?
A. Yes.
Q. Where does it say that?
A. He's the one who brought this meeting together.
Q. I asked you, Mr. Desmarais, does it say in this memorandum, anywhere in this memorandum that Manuel Vieira directed that all of the lines into