UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF RHODE ISLAND

| | |
|---|---|
| THOMAS WALDEN, et al., Plaintiffs | |
| v. | C.A. No. 04-304 S |
| CITY OF PROVIDENCE, et al., Defendants | |

**OPINION AND ORDER**

I. Introduction

More than 100 Plaintiffs filed this action[1] under 42 U.S.C. § 1983 and 18 U.S.C. § 2511 alleging that the City of Providence, Mayor David N. Cicilline, Chief of Police Colonel Dean Esserman, former Chief of Police Urbano Prignano, Jr., Communications Director Manuel Vieira and former Chief of Operations of the Communications Department Mary Lennon[2] violated their statutory and constitutional rights when they installed a telephone call recording system at the Providence Public Safety Complex.[3]

---

[1] This action was originally two separate actions: Walden v. City of Providence, 04-304, and Chmura v. City of Providence, 04-553. On June 6, 2005, the cases were consolidated into Walden v. City of Providence, 04-304.

[2] The Complaint names Defendants Vieira, Prignano and Lennon in their individual and official capacities.

[3] Plaintiffs also named as defendants Joseph Richardson, the former Deputy Director for the Department of Communications for the City of Providence, and Vincent A. Cianci, Jr., the former Mayor of

Defendants all move to dismiss Plaintiffs' claims, or in the alternative for summary judgment. The court will construe all the motions as motions for summary judgment, and after careful review of the legal and factual bases for Defendants' motions, the Defendants' Motions for Summary Judgment will be DENIED.[4] Because of the complexity of the matter, the Court will set forth its reasoning in some detail; this will, as well, hopefully set the stage for trial.[5]

## II. Facts

The following facts are undisputed, or if disputed are taken in a light most favorable to the non-moving party, in this case the Plaintiffs. See DeNovellis v. Shalala, 124 F.3d 298, 306 (1st Cir. 1997).

This lawsuit arose out of events that transpired in the planning and use of a telephone recording system, the "Total Recall" system, in the new Providence Public Safety Complex ("PPSC" or "Complex"). While it was in place, the Total Recall system

---

Providence. By stipulation, on April 3, 2006 and April 19, 2006, respectively, Richardson and Cianci were dismissed with prejudice pursuant to Fed. R. Civ. P. 41(a)(1)(ii).

[4] Defendant Lennon also moves for sanctions against Plaintiffs. For the reasons embodied in this opinion, that motion will also be denied.

[5] This Opinion may also be helpful to the parties in settlement discussions.

recorded hundreds of thousands of incoming and outgoing telephone calls. The numerous Plaintiffs - employees or family members of employees of the City of Providence - allege that their statutory and civil rights were violated by the unauthorized recording of their telephone conversations.

In December 2001, representatives from the City's Communications, Fire, and Police Departments convened to discuss the proposed but not yet constructed Public Safety Complex. The representatives, including Vieira, decided that a recording system should be installed in the PPSC and, although the exact timing is unclear, at some point a request for proposals for what was termed the "Total Recall" computer system was presented to the Board of Contracts and Supplies, and the Total Recall system was put out to bid. After receiving bids, the Board of Contracts awarded the contract for the Total Recall system to Expanets, Inc., a Houston, Texas-based integrated communications company. The system Expanets proposed to install was described as a "digital, Web-based, call logging software system."

There was some discussion about whether the recorded lines would be equipped with an audible signal that alerted callers that the call was being recorded, but it was ultimately decided that no signal should be included. In addition, the system could have been configured to verbally announce to callers that their calls were being recorded, but this feature was also never utilized. These

decisions were made without consultation or advice from the Providence City Solicitor's office.[6] However, before the PPSC opened, Major Dennis Simoneau sent a department-wide e-mail on July 22, 2002, which was delivered to and received by over 500 Police Department and Telecommunications Department personnel that contained the following notification: "Know that all telephone lines in the new station are recorded and thus speak professionally at all times. [Desk Sargeants] please alert all of your clerks of this fact." At the time Major Simoneau sent this e-mail, he was unsure whether all lines in the PPSC would in fact be recorded (or, for that matter, that the system had already begun to record the PPSC's telephone lines). All the Plaintiffs in this case, however, claim that they never received any notice (including Major Simoneau's e-mail) that the telephone lines were being recorded.

The system was activated and began recording calls on May 23, 2002, even though the PPSC had yet to officially open. Nevertheless, when the PPSC opened at the end of July 2002, the Total Recall system was operational and recorded most of the building's incoming and outgoing phone calls. The system continued, for nearly ten months, to record almost all of the Complex's telephone lines, with some exceptions. Certain extensions were removed from the recording list, including,

---

[6] All of this is rather remarkable. Had these simple steps been taken, in all likelihood this entire dispute and this litigation could have been avoided.

allegedly, Vieira's own personal line. In addition, the system did not record "station-to-station" calls that were made within the building itself or, importantly, incoming and outgoing lines located in the male, female and juvenile detention areas, which are intended for detained individuals.

The last call was recorded and archived on February 10, 2003, when Police Chief Dean Esserman learned about Total Recall's existence and ordered it shut down; he also asked Assistant Chief Rosenzweig to inquire into its origins, and soon after the State Police took over the investigation and eventually issued a report.[7] The State Police Forensics Report indicates that in the approximately ten months Total Recall functioned, it created and archived 754,564 audio files of recorded phone conversations. The report was forwarded to the Attorney General's office, which reviewed it and determined that there was insufficient evidence to support a finding of criminal liability.

Of all the calls recorded, only three calls were ever downloaded and listened to. Fire chief Dutra listened to a call regarding a man in the water and the Fire Department's response;

---

[7] The Rhode Island State Police ("RISP") became involved in this matter on February 14, 2003 as a result of a complaint filed alleging the existence of a digital recording system in the PPSC. The RISP conducted a preliminary investigation which included a forensic evaluation, but concluded no criminal laws were broken.

Major Dennis Simoneau listened to a call about the towing of a car; and an unidentified City Councilman also listened to a call.[8]

Additional disputed and undisputed facts are summarized below in relation to each individual Defendant.

A. Defendant Prignano

Until January 31, 2001, Defendant Prignano was the Chief of the Providence Police Department. It is undisputed that Colonel Prignano retired before construction began on the PPSC. There is, however, some dispute as to when initial meetings about the Public Safety Complex's proposed telephone system were held, the time line of the request for proposals and bidding process for the telephone system, and the extent of Colonel Prignano's involvement in procuring the system. Prignano contends that he had no part in the initial meetings or the drafting of the request for proposals, and, for that matter, had "never even heard of 'The Total Recall System' before February 2003." Plaintiffs, on the other hand, contend that there is evidence that Defendant Prignano "met," or at least conversed, with the Director of the Department of Communications, Vieira, about the telephone system while Prignano was Chief of Police. Plaintiffs submit that during that conversation, Prignano procured Vieira to install a recording system that would record almost all of the incoming and outgoing calls in the new PPSC.

---

[8] This important fact does not affect the viability of this action for the reasons discussed below; however, it may well affect damages, if after trial, the Plaintiffs prevail.

Assistant Chief Rosenzweig stated that Vieira told him that Prignano asked for a system with "all the trinkets," and "all the bells and whistles." Plaintiffs also assert that Vieira carried out Prignano's directions by instructing Greg Desmarais, a technician in the Communications Department, to prepare a request for proposals for a system that could record all calls.

B. Defendant Vieira

Defendant Vieira served as the Director of Communications for the City of Providence from 1993 through February 2003. It is undisputed that Vieira did not himself award the bid for the Total Recall system. Plaintiffs allege that Vieira, at the instruction of Colonel Prignano, instructed Anthony Desmarais, a radio engineer in the Department, to prepare a request for proposals for a telephone system that could record everything in the Complex. Plaintiffs also assert that approximately two weeks after the system was installed, Vieira instructed Desmarais to cease recording of several telephone lines, including Vieira's line, Vieira's secretary's line, and the line in the communications conference room.

Vieira, on the other hand, asserts that he never spoke to Tony Desmarais about recording any lines except for the central station and the management system, and did not in fact know that lines other than the central station or emergency lines may have been recorded until January 2003. He moreover claims that Total Recall

functioned to record emergency lines used by clerks at the PPSC and for general record management of telephone calls in the PPSC, including identification of telephone abuse, such as telephone calls to "900" numbers.[9] Vieira contends that he first realized that a line other than the central station or emergency lines may have been recorded after a conversation with Fire Chief Dutra in early to mid-January 2003.

Whatever Vieira's knowledge prior to January 2003, it is undisputed that after his conversation with Fire Chief Dutra, Vieira contacted City Solicitor John D'Amico and requested a meeting with representatives from the Fire, Police, and Communications Departments. That meeting was scheduled, but later cancelled. It is also undisputed that Vieira was never given a password to access the Total Recall System and did not know how to access a recorded phone conversation stored therein.

C. Defendant Lennon

Defendant Lennon was employed as the Chief of Operations in the City of Providence Department of Communication from 1999 through her resignation in February 2003. Lennon denies that she played any role in procuring or installing the system. In July 2002, Lennon learned about the existence of the Total Recall system, including that some of the phone stations had been purged

---

[9] "900" numbers are typically phone numbers one may call for sexual content; a fee is charged for such calls to the number placing the call.

from the recording system. Sometime after November 2002, Lennon received training on the Total Recall system and learned that more than just emergency lines were recorded within the Public Safety Complex. Lennon personally filled out two or three forms requesting the retrieval of recordings from the Total Recall system, and personally retrieved one recorded conversation using an administrative password at the request of Councilman Patrick Butler. Nevertheless, Lennon disclaims any knowledge that the system was recording private phone calls. Plaintiffs assert, with corroboration from the State Police investigation report, that Lennon directed Greg Haroian, a technician in the Communications Department, to add additional telephone lines to the Total Recall system to be recorded.

III. Summary Judgment Standard

Under Federal Rule of Civil Procedure 56(c)), a party is entitled to summary judgment "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c)). When deciding a motion for summary judgment, the Court must review the evidence in the light most favorable to the nonmoving party and

draw all reasonable inferences in the nonmoving party's favor. Cadle Co. v. Hayes, 116 F.3d 957, 959 (1st Cir. 1997).

An issue of fact is "genuine" if it "may reasonably be resolved in favor of either party," id. at 960, and an issue of fact is "material" "only when it possesses the capacity, if determined as the nonmovant wishes, to alter the outcome of the lawsuit under the applicable legal tenets." Roche v. John Hancock Mut. Life Ins. Co., 81 F.3d 249, 253 (1st Cir. 1996).

Summary judgment involves shifting burdens between the moving and the nonmoving parties. Initially, the burden requires the moving party to show "an absence of evidence to support the nonmoving party's case." Garside v. Osco Drug, Inc., 895 F.2d 46, 48 (1st Cir. 1990) (quoting Celotex Corp. v. Catrett, 477 U.S. 317, 325 (1986)). Having established this, the burden then falls upon the nonmoving party, who must oppose the motion by presenting facts that demonstrate a genuine trialworthy issue remains. Cadle, 116 F.3d at 960. This burden can be satisfied by presenting "enough competent evidence to enable a finding favorable to the nonmoving party." Goldman v. First Nat'l Bank of Boston, 985 F.2d 1113, 1116 (1st Cir. 1993).

## IV. Analysis

Plaintiffs, in their Complaint, plead a total of six counts alleging violations of the Fourth Amendment (Count I), § 6 of the

Rhode Island Constitution (Count II), the federal wiretapping statute, 18 U.S.C. § 2511 et seq. (Count III), and various state laws (Counts IV-VI). Defendants move for summary judgment, on various grounds, for all claims.[10] The Court will address each of these arguments seriatim.

A. § 1983 Claim - Fourth Amendment[11]

Plaintiffs' first claim is that the Defendants violated their Fourth Amendment right to be free from unreasonable searches and seizures, in violation of 42 U.S.C. § 1983. This claim requires Plaintiffs to first establish that the Defendants acted under color of state law; and second, that their conduct worked a denial of rights secured by the Constitution or by federal law. Rodriguez-

[10] The parties' initial briefs and oral argument were somewhat confusing and unclear, prompting the Court to order additional briefing on certain issues. (For example, at oral argument, in response to the Court's query as to whether Plaintiffs were asserting a Monell claim, Plaintiffs' counsel espoused unfamiliarity with the case. Conversely, Defendants' counsel, just as unsure, did not originally move to dismiss or for summary judgment on this claim.) Despite this Court's plea for more helpful briefs, many arguments have been left undeveloped. The most egregious examples, discussed below, where an argument has been left entirely undeveloped, have resulted in waiver. See United States v. Zannino, 895 F.2d 1, 17 (1st Cir. 1990).

[11] For the purposes of this case, because art. I, § 6 of the Rhode Island Constitution is congruent with the Fourth Amendment in both its requirements and protections, the analysis in section IV.A applies with equal force to Plaintiffs' second Count. See State v. Bennett, 430 A.2d 424, 426 (R.I. 1981). Consequently, because the Court finds that there remains a dispute of fact as to whether Defendants violated Plaintiffs' Fourth Amendment rights, it is also the case that a dispute of fact remains as to whether Defendants also violated Plaintiffs' state constitutional corollary, art. I, § 6.

Cirilo v. Garcia, 115 F.3d 50, 52 (1st Cir. 1997). Proving the second element requires not only a deprivation of federal right, but a "show[ing] that the defendants' conduct was the cause in fact of the alleged deprivation." Id.; Soto v. Flores, 103 F.3d 1056, 1062 (1st Cir. 1997). In addition, "[t]he issue of causation of damages . . . is based on basic notions of tort causation." Rodriguez-Cirilo, 115 F.3d at 52. Under § 1983, a defendant may violate a plaintiff's constitutional rights through conduct directly causing the constitutional deprivation, see Rodriguez-Cirilo, 115 F.3d at 52, by acting in a supervisory capacity that triggers liability, see Camilo-Robles v. Hoyos, 151 F.3d 1, 6 (1st Cir. 1998), by creating a policy or custom under which unconstitutional practices occurred, see Monell v. Dep't of Soc. Servs., 436 U.S. 658 (1978), or by allowing such a policy or custom to continue, see City of Canton v. Harris, 489 U.S. 378, 388 (1989); Santiago v. Fenton, 891 F.2d 373, 382 (1st Cir. 1989).

The initial requirement, that the Plaintiffs first must show official conduct - an act or omission undertaken under color of state law - is easily established. All Defendants concede that they were acting under color of Rhode Island law and the Attorney General so found. See Rogan v. City of Boston, 267 F.3d 24, 27 (1st Cir. 2001). However, the second requirement - that the Plaintiffs establish that the Defendants' acts or omissions caused a constitutional injury - requires more discussion.

Before reaching the question of whether each of the Defendant's actions were the cause in fact of the alleged injuries, it is first necessary to frame the precise constitutional violation in this case. See id. A "constitutional injury" requires the plaintiff to "make a showing of a deprivation of a federally-secured right." Id. Where the alleged deprivation hinges (as it does here) on a violation of a Fourth Amendment right, the plaintiffs must establish that they possessed a justifiable, reasonable, or legitimate expectation of privacy in the thing alleged to have been invaded by government action. See Smith v. Maryland, 442 U.S. 735, 740 (1979). There can be little doubt that the Fourth Amendment inscribes a fundamental right to privacy in wire communications. See Katz v. United States, 389 U.S. 347 (1967). But in order to establish a violation of this fundamental right, plaintiffs must demonstrate two things: "first, that [the plaintiff] exhibited an actual (subjective) expectation of privacy and, second, that the expectation be one that society is prepared to recognize as 'reasonable.'" Id. at 361 (Harlan J., concurring). The second prong of this inquiry - whether the expectation is reasonable - requires a balancing of the need for the search (or seizure) against the level of intrusion of personal rights; consequently, a court is charged with the responsibility of weighing "the scope of the particular intrusion, the manner in which it is conducted, the justification for initiating it, and the

place in which it is conducted." Bell v. Wolfish, 441 U.S. 520, 559 (1979).

Here, there is no question that Plaintiffs contend that they possessed a subjective expectation of privacy (and no Defendants contest this). Even though Major Simoneau sent an e-mail to approximately 500 employees alerting them to the possibility that the lines would be recorded, there is no allegation here (let alone any evidence whatsoever) that Plaintiffs received this e-mail, that they actually consented to the recording of their telephone calls or that they knew that their calls were being recorded, and Plaintiffs assert that they believed their conversations at the PPSC were, in fact, private. See Vega-Rodriguez v. Puerto Rico Tel. Co., 110 F.3d 174, 178 (1st Cir. 1997) ("[d]etermining the subjective component of the test requires only a straightforward inquiry into the complainant's state of mind"). Indeed, the fact that the Defendants have themselves at times denied knowing that all the phone lines were being recorded seems to support the credibility of Plaintiffs' subjective expectation of privacy. See In re State Police Litig., 888 F. Supp. 1235, 1256 (D. Conn. 1995).

Whether Plaintiffs possessed a legitimate, objective expectation of privacy is a closer call. In State Police Litig., the court analyzed a similar (class action) claim that a set of defendants violated plaintiffs' Fourth Amendment rights by recording calls into and out of a police station. The court found

that "[t]he surreptitious recording of unprivileged but private calls, if proven, involves an invasion of privacy that far outweighs defendants' proffered justifications." Id. Defendants had sought to argue that special security concerns in police departments necessitated the implementation of a call recording system, but the court rejected this proffer, noting that in the cases where this justification was successful, at least one of the participants had given consent. See id.; United States v. Miller, 720 F.2d 227, 228 (1st Cir. 1983) ("[L]istening in to a telephone conversation on an extension, with the consent of one party, does not violate the rights of another party under the Fourth amendment."); see also Vega-Rodriguez, 110 F.3d at 180 n.4 (observing that notice "bears heavily on both the subjective and objective reasonableness of an employee's expectation of privacy"). Consent is often an important factor because it significantly reduces the effect and scope of the intrusion. See Miller, 720 F.2d at 228.

As noted above, there is no indication that Plaintiffs were put on notice that their calls were being monitored or recorded. Because any inquiry into the objective reasonableness of an asserted expectation of privacy is case specific and fact intensive, Vega-Rodriguez, 110 F.3d at 178, and because here there is no clear factor (like notice) weighing against such an expectation, it cannot be said, as a matter of law, that

Plaintiffs' expectation of privacy was unreasonable. See, e.g., Zaffuto v. City of Hammond, 308 F.3d 485, 488-89 (5th Cir. 2002). Plaintiffs have, therefore, established that a genuine issue of material fact exists as to whether a deprivation of their Fourth Amendment rights occurred with the procurement, installation and operation of the Total Recall system.

It remains, however, to determine the precise roles each Defendant played in connection with the Total Recall system in order to decide whether their individual actions trigger liability for the alleged Fourth Amendment violations.

1. Defendant Vieira

Vieira first argues that there is no evidence he "use[d] or access[ed] the Total Recall system or that he knew the phone lines for inbound and outgoing calls, except for emergency or central desk lines, were being recorded." He thus contends that there is no genuine issue of material fact as to his lack of knowledge about and connection with the recording of the telephone lines and, therefore, that his conduct could not have denied Plaintiffs any rights secured by the Fourth Amendment.

Stated this way, Vieira's argument is that he is not personally liable for any possible Fourth Amendment violations in connection with the Total Recall system. See DiMarco-Zappa v. Cabanillas, 238 F.3d 25, 33 (1st Cir. 2001). The Court, however, can easily reject this argument based on even a cursory review of

the record, which clearly establishes a genuine issue of material fact as to whether Vieira was involved in the procurement and installation of the Total Recall system and whether he knew that the Total Recall system was recording all inbound and outbound phone calls. For example, Plaintiffs' proffer of the statements of Andrew Rosenzweig, then Assistant Chief of Police, who, after interviewing Vieira stated that he was "comfortable" that Vieira "was aware of what the [Total Recall] system was all about" suggests that Vieira knew about the Total Recall system, and not merely in a limited way. In addition, Anthony Desmarais, a radio engineer employed by the Communications Department, stated that Vieira directed him to prepare the Request For Proposal for the recording system and that "Vieira wanted everything recorded on the system," directly calling into question Vieira's abnegation of his role in the procurement of the system and of its capabilities. Desmarais also testified that he was certain that Vieira told him that all stations should be recorded and that, shortly after the system was implemented, Vieira told him to remove certain stations from the recording system. Even if this were not enough, the State Police investigation summary strongly corroborates this account. The summary states that "memos and statements that were reviewed indicated that Manuel Vieira was directly responsible for the

purchase and installation of the recording device."[12] This evidence suggests, rather clearly, that, at a minimum, a genuine issue of material fact exists about Vieira's knowledge and role in procuring the Total Recall system.

Vieira also argues that Plaintiffs are unable to demonstrate a causal connection between his involvement and the deprivation of their Fourth Amendment rights. He claims that he had no knowledge of the "extent of the recording of calls" and that he only approved the system (if at all) for the recording of "900" or sex line calls and that any additional or increased use of the system to record all the phone lines was undertaken by subordinates. In essence, Vieira seeks to cast himself as a supervisor, unaware (but not recklessly so) of his subordinates' decision to increase the scope of recording. Vieira thus seeks to raise the bar on Plaintiffs' burden for establishing causation, see Rodriguez-Cirilo, 115 F.3d at 52, by forcing them to prove supervisory liability. See Camilo-Robles, 151 F.3d at 6-7; Carmona v. Toledo, 215 F.3d 124, 132 (1st Cir. 2000) ("[S]upervisors are not automatically liable for the misconduct of those under their command. A plaintiff must show an 'affirmative link' between the subordinate officer and the supervisor, 'whether through direct participation or through

---

[12] For the reasons discussed in footnote 15, infra, the Court is unpersuaded that this report should not be considered for purposes of summary judgment as the Defendants urge. Nevertheless, even were this report to be put aside, there is still ample evidence suggesting a material factual dispute about Vieira's role.

conduct that amounts to condonation or tacit authorization.'") (quoting Camilo-Robles, 151 F.3d at 43-44).

Vieira's gambit fails because Plaintiffs have established at least a factual question as to whether Vieira's own actions, irrespective of any supervisory role he may have played, directly caused the deprivation of their Fourth Amendment rights. A causal connection "can be established not only by some kind of direct personal participation in the deprivation, but also by setting in motion a series of acts by others which the actor knows or reasonably should know would cause others to inflict the constitutional injury." Gutierrez-Rodriguez v. Cartagena, 882 F.2d 553, 561 (1st Cir. 1989) (quoting Springer v Seaman, 821 F.2d 871, 879 (1st Cir. 1987)). Thus, as discussed earlier, there is sufficient evidence to create a genuine issue of material fact that Vieira's procurement of the Total Recall system was done with the knowledge that it would record all incoming and outgoing conversations. If proven, this would establish beyond doubt that Vieira's direct actions, and not those of any subordinate, caused the constitutional deprivation.[13]

---

[13] Vieira's claim that there is no affirmative link between his conduct and Plaintiffs' damages is relevant only where the theory of liability rests on supervisory liability. See Camilo-Robles, 151 F.3d at 7. Consequently, because he is not entitled to summary judgment for his direct conduct (i.e., a jury may find him directly liable), the Court need not address his arguments concerning supervisory liability or damages. This argument may resurface as a later point, depending on how the jury finds on the issue of his direct liability.

2. Defendant Prignano

Prignano disavows any connection whatsoever with the Total Recall system, explaining that he "retired nearly one year prior to the process that set in motion the procurement of the 'Total Recall System' and never even heard of it until the precipitous press release of February 2003 - more than two years after his retirement." In reply, Plaintiffs rely heavily on the deposition testimony of Assistant Chief Rosenzweig, discussed above, in which Rosenzweig stated that Vieira reported to him that Prignano requested a recording system that would record almost all incoming and outgoing calls, a system "with all the bells and whistles." Rosenzweig also reported that Vieira relayed a conversation with Prignano in which Prignano asked, "Are we going to have a recording system? Make sure we have it. What are you doing about the phone system?"

Prignano argues that these statements - the only evidence that he played a role in procuring the system - are inadmissible hearsay, see Fed. R. Evid. 801(c)), and therefore not relevant for a summary judgment determination. See Vazquez v. Lopez-Rosario, 134 F.3d 28, 33 (1st Cir. 1998) ("Evidence that is inadmissible at trial, such as inadmissible hearsay, may not be considered on summary judgment."). Plaintiffs submit that the statements are admissible because they are not hearsay, either because they are an admission by a party-opponent, see Fed. R. Evid. 801(d)(2)(A), or

fit within the exception to the rule for a statement of a co-conspirator of a party made during the course and in furtherance of a conspiracy. See Fed. R. Evid. 801(d)(2)(E).[14]

Here, it is not difficult to see why Prignano's alleged statements are admissible as an admission under Rule 801(d)(2)(A). See Vazquez, 134 F.3d at 34 ("For a statement to be an admission under Rule 801(d)(2), the statement must be made by a party . . . [and] [e]ach link in the chain must be admissible, either because it is an admission and thus not hearsay or under some other hearsay exception."). Clearly, Prignano's initial statements to Vieira are not hearsay because they are a "party's own statement, in either an individual or a representative capacity" and are clearly offered as an admission against Prignano. Fed. R. Evid. 801(d)(2)(A). Similarly, Vieira's statements to Rosenzweig are sufficient to be considered an admission made by a party under Rule 801(d)(2)(A). Consequently, because each of the statements are, in fact, not hearsay, they may be used in a determination of summary judgment.[15]

---

[14] Alternatively, Plaintiffs suggest that the statement could be admitted under Rule 805, as a prior inconsistent statement, if either Vieira or Prignano were to rely on their deposition testimony, which contain statements denying any knowledge or involvement in the procurement of the Total Recall system.

[15] Were it necessary, the Court additionally notes that "technical rulings on the admissibility of evidence have no place in a summary judgment procedure," and "that any doubts regarding the admissibility of any evidence should be resolved in favor of admissibility." 27A. Fed. Proc. § 62:708; see Gaston v. Home Depot USA, Inc., 129 F. Supp. 2d 1355, 1361 (S.D. Fla. 2001) ("To the

On the substantive question of whether, assuming Prignano was in part responsible for procuring and installing the Total Recall system, such conduct triggers liability under Plaintiffs' § 1983 claim, this Court is left only to guess at Prignano's legal arguments underlying his motion for summary judgment. A scan of both his motion for summary judgment and his reply brief reveals a complete lack of legal authority for any of the claims he makes. For instance, in his motion for summary judgment Prignano repeatedly asserts that he had retired before the Total Recall system had been installed, and even before the PPSC was constructed, but he fails to offer developed argument about the legal significance of this fact beyond merely asserting that "[i]t is beyond dispute that Col. Prignano could not have been involved in the procurement, installation, maintenance or even the use of 'The Total Recall System.'"[16] As this "fact" has been clearly

---

extent any affidavit or deposition testimony is hearsay, it [] may not be considered for summary judgment purposes unless it would be admissible at trial for some purpose, e.g., the statement might fall within an exception to the hearsay rule, might not actually constitute hearsay at all . . . or it might be used solely for impeachment purposes.").

[16] In his reply brief, Prignano appears to add the additional argument that "[e]ven if the 'conversations' [between Prignano and Vieira] were deemed to be an initial part of the procurement process eventually leading to the purchase of the 'Total Recall System[,]' there is no evidence that Col. Prignano intended that the capabilities of the system be used in an unlawful manner." But even were this argument appropriately raised, which it is not, see LR Cv 7(b)(2) ("A reply memorandum shall consist only of a response to an objection and shall not present additional grounds for

called into dispute by the above discussion, the same rationale compelling a denial of Vieira's motion for summary judgment exists here. See Gutierrez-Rodriguez, 882 F.2d at 561.[17]

3. Defendant Lennon

Similar to Prignano, Lennon contends that Plaintiffs have failed to present any evidence indicating that she participated in any way in the procurement or installation of the Total Recall system. She concedes that she was aware of the system, but that there is no evidence that she knew the system was recording private telephone conversations. Apparently operating on the incorrect supposition that she may only be liable under a theory of supervisory liability, Lennon contends that no evidence exists to suggest that she approved or even knew of the recording of private telephone conversations. However, like Vieira, Lennon may be liable not only as a supervisor, but also for her conduct that

---

granting the motion, or reargue or expand upon the arguments made in support of the motion."), Prignano cites neither legal authority nor evidentiary support for the asserted proposition that unlawful conduct, so long as it was not intended to be unlawful, does not trigger liability under § 1983. This argument is therefore rejected.

[17] It remains a disputed fact what type of system Prignano and/or Vieira sought to procure, and although this is sufficient to deny summary judgment, if at trial Prignano is able to prove that he played no specific role in procuring the precise system ultimately installed, he may be able to avoid § 1983 liability. As a consequence, because Prignano's presence in the case requires the Municipal Defendants' Motion for Summary Judgment to be denied, see IV.A.4 infra, a directed verdict (or similar outcome) for Prignano may allow the Municipal Defendants to likewise avoid liability.

directly deprived Plaintiffs of their constitutional rights. See, e.g., Cepero-Rivera v. Fagundo, 414 F.3d 124, 129 (1st Cir. 2005). Here, Plaintiffs' proffered evidence includes the fact that Lennon ordered that additional lines be added to the Total Recall system. The State Police investigation supports this assertion, and taking all inferences in favor of the Plaintiffs, this fact could arguably compel a factfinder to conclude that Lennon engaged directly in a practice that led to a civil rights violation. See State Police Litig., 888 F. Supp. at 1255-56; cf. Velez-Rivera v. Agosto-Alicea, 437 F.3d 145, 156 (1st Cir. 2006). This is especially so where, as alleged here, Lennon knew that lines were being recorded and personally requested that a conversation be retrieved from the system.

4. Municipal Defendants[18]

The Municipal Defendants offer the most thoroughly developed arguments for why summary judgment should be granted to them on the § 1983 Fourth Amendment claims, and their first argument hinges on the predicate that no final policymaker for the City of Providence made "a conscious choice among alternatives to tape all calls going into and out of the public safety complex." Of course, it is well-

[18] These Defendants include Colonel Dean Esserman, Mayor David Cicilline and the City of Providence. In addition, to the extent that the individual Defendants join, in their official capacities, see Will v. Michigan Dep't. of State Police, 491 U.S. 58, 71 (1989), the arguments of the Municipal Defendants, the Court's conclusions apply to them with equal force. See Monell, 436 U.S. at 658.

settled that § 1983 liability may not be premised on a theory of respondeat superior. Monell, 436 U.S. at 691; Wilson v. City of Boston, 421 F.3d 45, 59 (1st Cir. 2005). Thus, where a claim premised on Monell fails to establish that a person with final policymaking authority played a role in formulating an official policy or custom, no municipal liability can exist. See Pembaur v. City of Cincinnati, 475 U.S. 469, 479-81 (1986); Jett v. Dallas Indep. Sch. Dist., 491 U.S. 701, 737 (1989); Young v. City of Providence, 404 F.3d 4, 25 (1st Cir. 2005).

Here, however, although the Municipal Defendants adequately established that the current police chief Dean Esserman shut down the recording system as soon as he discovered it was operational, thereby absolving him from liability as final policymaker, genuine disputes of fact exist as to Prignano's role in procuring the Total Recall system. Consequently, for the reasons discussed above, the Municipal Defendant's claim that "there is no evidence that Prignano had anything to do with the Total Recall system" must be rejected, and because the Municipal Defendants concede that Prignano was the Chief of Police and a final policymaker, their motion for summary judgment on this ground must be denied. See Young, 404 F.3d at 29-30.[19]

---

[19] This Court has previously ruled in another context that the Chief of Police, not the Mayor, is a final policymaker. See Young v. City of Providence, 396 F. Supp. 2d 125, 137-38 (D.R.I. 2005).

The Municipal Defendants next argue that the Plaintiffs have failed to adequately plead that an official municipal policy or widespread custom or practice caused their constitutional injuries and, therefore, they have failed to properly assert a Monell claim. It is of course undisputed that, to make out a Monell claim, a municipal policy or custom must be involved in to order to make the municipality liable. See Young, 404 F.3d at 30 n.21. But here, according to the Municipal Defendants, the Plaintiffs have failed to point with sufficient specificity or clarity, what official policy or custom was formulated that resulted in a deprivation of Plaintiffs' rights. In response, Plaintiffs contend that their claim that Defendants "install[ed] and maintain[ed] the 'Total Recall' system" is sufficient for the purposes of asserting an official policy or custom in a Monell claim.[20]

While it may be true, based on Plaintiffs' counsel's response to the Court's question at oral argument, that Plaintiffs did not fully understand the law in this area at the time they filed their

---

[20] Plaintiffs' § 1983 claim stated, in its entirety:

> 115. The actions of the Defendants as alleged, including, but not limited to, using, installing and maintaining the "Total Recall" system violated Plaintiffs' constitutionally protected Fourth Amendment rights; specifically, the Fourth Amendment right to be secure in their persons, houses, paper, and effect, against unreasonable searches and seizures.
>
> 116. As a direct result of the violation of Plaintiffs' Fourth Amendment rights, they sustained personal injuries and other damages.

Complaint, and perhaps were unsure of the full scope of their claim, the Court has little trouble concluding that Plaintiffs' Complaint adequately pleads a Monell claim, and additionally, that a jury could find that the installation and operation of the Total Recall system constituted a policy of the City of recording calls. The Court does not understand Defendants' argument on this point to be that the decision to install and maintain the Total Recall system is, itself, insufficient to establish an official policy or custom. Indeed, were this the case, it could be flatly rejected. See Pembaur, 475 U.S. at 480-81; Elliott v. Cheshire County, N.H., 940 F.2d 7, 12 (1st Cir. 1991) ("[A] plaintiff must show that the municipality made a deliberate choice to follow a course of action . . . made from among various alternatives by the official or officials responsible for establishing final policy with respect to the subject matter in question.") (internal quotation marks and citation omitted); Young, 404 F.3d at 30 n.21; Casey v. Newport Sch. Comm., 13 F. Supp. 2d 242, 245 (D.R.I. 1998). Instead, Defendants' argument is, at base, that Plaintiffs failed to use the words "policy," "custom," or "practice" in their pleadings, and that this renders their claim defective. But courts have never required complaints to contain a fully articulated and defined exegesis of the legal theory necessary to sustain a claim, nor are plaintiffs required to meet a heightened pleading requirement for § 1983 claims. See Leatherman v. Tarrant County Narcotics

Intelligence Coordination Unit, 507 U.S. 163, 168-69 (1993). The idea that a claim could rise or fall based on the presence or absence of a single word is anathema to one of the most basic teachings that a statement need only "give the defendant fair notice of what the plaintiff's claim is and the grounds upon which it rests." Swierkiewicz v. Sorema, N.A., 534 U.S. 506, 512 (2002) (internal quotation marks and citation omitted). Simply put, the adequacy of a pleading does not hinge on the use of technical words or phrases, but rather must contain the necessary operative facts to give the defendants a complete understanding of the claims made against them. Here, Plaintiffs have met that burden and the fact that the Complaint leaves out the above words is not, without more, grounds for dismissal.

The Municipal Defendants also appear to argue that the installation and use of the Total Recall system could not have violated Plaintiffs' Fourth Amendment rights, presumably because they believe it does not violate 18 U.S.C. § 2511 (and therefore was not illegal). Of course, § 2511 and the Fourth Amendment are not coextensive in their protections, and claims premised on one are not necessarily congruent with claims premised on the other. See Anderson v. City of Columbus, Georgia, 374 F. Supp. 2d 1240, 1253 n.13 (M. D. Ga. 2005). Put another way, they require separate inquiries. See Miller, 720 F.2d at 228-29. It may certainly be the case that, in some situations, the fact that a policy or act

does not violate Title III is also evidence that it does not violate the Fourth Amendment, but this is useful only insofar as it relates to the Fourth Amendment inquiry into the objective expectation of privacy. Cf. Williams v. Poulos, 11 F.3d 271, 287 (1st Cir. 1993).

This confusion also in part explains the Municipal Defendants' contention that Plaintiffs are prohibited from simultaneously pursuing claims under § 1983, on one hand, and the federal and state wiretapping statutes on the other. Defendants base their argument on language from Adams v. City of Battle Creek, 250 F.3d 980 (6th Cir. 2001), in which the Court of Appeals for the Sixth Circuit declined to reach the constitutional question of whether the monitoring of a pager through use of a clone pager constituted an illegal search and seizure in violation of the Fourth Amendment. The court justified its decision on the basis that the federal wiretapping statute was a comprehensive statute "designed to protect specific constitutional values" and therefore was "the exclusive remed[y] in the field." Id. at 986. It concluded that "[w]here a statutory or nonconstitutional basis exists for reaching a decision, as it does here, it is not necessary to reach the constitutional issue." Id. at 986.

The Municipal Defendants embrace this language in arguing that, here, this Court should only allow Plaintiffs' statutory-based claims to go forward (if any claims are to move forward at

all) in order to avoid unnecessary constitutional adjudication. But this Court does not read Adams and the cases it relies upon to stand for the broad proposition that § 1983 claims based on alleged Fourth Amendment violations are somehow preempted by Title III. Indeed, such a bright-line rule, as the Municipal Defendants would have it, is clearly belied by the litany of cases allowing such dual claims to be maintained. See, e.g., Mitchell v. Forsyth, 472 U.S. 511 (1985); Frierson v. Goetz, 99 Fed. Appx. 649 (6th Cir. 2004); First v. Stark County Bd. of Comm'rs, 234 F.3d 1268 (6th Cir. 2000); Blake v. Wright, 179 F.3d 1003 (6th Cir. 1999); Anderson, 374 F. Supp. 2d at 1253-54.

In any case, Defendants' reading of Adams is inapt. The court did not dismiss plaintiffs' Fourth Amendment claims because they were precluded by Title III, and no case has ever so held. A more tethered reading of Adams comports with the well-hewn maxim that courts should not "decide questions of a constitutional nature unless absolutely necessary to a decision of the case." Burton v. United States, 196 U.S. 283, 295 (1905). Thus, where a court, especially an appellate court, need not reach a constitutional claim in order to render a decision, policy considerations compel that court to avoid deciding the constitutional issue. This presumption is prudential in nature and is different, for obvious reasons, than a rule that prevents, as a matter of law, a plaintiff from alleging violations of his Fourth Amendment rights and

violations of similar federal and state statutory schemes. See PBA Local No. 38 v. Woodbridge Police Dept., 832 F. Supp. 808, 825 (D.N.J. 1993) (rejecting any claim that "§ 1983 liability should be precluded because the federal and state wiretap statutes provide comprehensive remedies for the alleged illegal surveillance" in part because the § 1983 claims "relate to rights which exist under the Constitution itself"). The Motion for Summary Judgment as to the Municipal Defendants is therefore denied.

B. Title III claims

Plaintiffs also assert a claim under Title III of the Omnibus Crime Control and Safe Streets Act of 1968, 18 U.S.C. §§ 2510 et seq. Pursuant to § 2520, which provides a private right of action for "any person whose wire, oral, or electronic communication is intercepted, disclosed, or intentionally used in violation of this chapter," Plaintiffs contend that the same conduct that allegedly violated § 1983, also violated § 2511 the federal wiretapping statute. To show a violation of § 2511, Plaintiffs must prove that Defendants "intentionally intercept[ed], endeavor[ed] to intercept, or procure[ed] any other person to intercept or endeavor to intercept, any wire, oral or electronic communication." 18 U.S.C. § 2511(1)(a). In order to survive summary judgment, however, Plaintiffs must only establish that Title III is applicable to the Defendants and that a question of material fact exists as to whether (1) Defendants intercepted,

sought to intercept, or procured another person to intercept their communications through the use of any electronic, mechanical, or other device; (2) Plaintiffs had an expectation that their oral communications were not subject to interception; and (3) if Plaintiffs had such an expectation, the expectation was justified under the circumstances. See Anderson, 374 F. Supp. 2d at 1244.

Title III does, however, carve two relevant exceptions. First, an exception exists for any communications received through a telephone component used "by an investigative or law enforcement officer in the ordinary course of his duties." 18 U.S.C. § 2510(5)(a)(ii); see Amati v. City of Woodstock, 176 F.3d 952, 954 (7th Cir. 1999) (discussing the "ordinary course of law enforcement" exception). Second, a party may avoid liability under what is known as the "consent exception." Under § 2511(2)(c)), a person is permitted to intercept communications "where such person is a party to the communication or one of the parties to the communication has given prior consent to such interception." Although this consent can be implied, it must still be "consent in fact." United States v. Lanoue, 71 F.3d 966, 981 (1st Cir. 1995) abrogated on other grounds by United States v. Watts, 519 U.S. 148 (1997). Further, "[d]eficient notice will almost always defeat a claim of implied consent." Id. Although "consent might be implied in spite of deficient notice," "[t]he surrounding circumstances must convincingly show that the party knew about and consented to

the interception in spite of the lack of formal notice or deficient formal notice." Id. Thus, irrespective of whether the elements of § 2511(1)(a) are met, if Defendants can demonstrate that the recording falls within either of these exceptions, they will successfully defeat Plaintiffs' claims under Title III.

1. Defendants Vieira, Prignano and Lennon

Because Defendants Vieira, Prignano and Lennon's arguments for summary judgment on Plaintiffs' Title III claims are coextensive, the Court will analyze their contentions together.

a. Intent

All three Defendants argue, with varying levels of development, that there is no evidence that they intended to record Plaintiffs' conversation. See § 2511. At base, this argument is, for all three, merely a rehash of their now common refrain that they had nothing to do with the implementation or use of the Total Recall system. As the Court found earlier, there are genuine issues of material fact as to whether these Defendants played a role in procuring, installing, and using the recording system, therefore any claim to the contrary, and any derivative argument flowing therefrom, must be rejected on summary judgment. If Defendants did install, implement, or procure the Total Recall system, whether they did so intentionally is apodictic; and the inference that they intended the system to record all calls going into and coming out of the PPSC is supported by the record.

Consequently, there exists a genuine issue of material fact as to whether these Defendants intended to intercept Plaintiffs' conversations, and their claim to the contrary is rejected.

b. Intercept

The argument that Defendants did not "intercept" any calls through the Total Recall system because there is no evidence that they ever listened to the calls is likewise rejected. Under § 2510, "intercept" is defined as "the aural or other acquisition of the contents of any wire, electronic or oral communication through the use of any electronic, mechanical, or other device." 18 U.S.C. § 2510(4). Although there is anecdotal support for Defendants' position that telephone calls automatically recorded, but not listened to, are not "aurally acquired" within the meaning of § 2510, see Arias v. Mut. Cent. Alarm Serv., Inc., 202 F.3d 553, 558 (2d Cir. 2000) and Greenfield v. Kootenai County, 752 F.2d 1387, 1389 (9th Cir. 1985), the Court of Appeals for the First Circuit has rejected this argument. See United States v. Lewis, 406 F.3d 11, 17 n.5 (1st Cir. 2005) (rejecting the argument that the "'acquisition of the contents' of the call did not occur" until the recordings were listened to); see also Ali v. Douglas Cable Commc'ns, 929 F. Supp. 1362, 1381 (D. Kan. 1996); In re State Police Litig., 888 F. Supp at 1262. Consequently, summary judgment cannot be granted on this ground.

c. Ordinary Course

Defendants[21] next rely on the exception to liability under Title III for the interception or recording of communications on any equipment "being used by a provider of wire or electronic communication service in the ordinary course of its business, or by an investigative or law enforcement officer in the ordinary course of his duties. See § 2510(5)(a)(ii). Commonly known as the "ordinary course of law enforcement" exception, see Amati, 176 F.3d at 954, Title III recognizes an exception for recordings that fall outside the purpose of the statute, "to regulate the use of wiretapping and other electronic surveillance for investigatory purposes." Id. at 955. Thus, recording which is "ordinary," or, as some courts have explained, "routine" and "noninvestigative," may fall within the § 2510(5)(a)(ii) exception. Id.; see also Arias, 202 F.3d at 558.

In Amati, the Court of Appeals for the Seventh Circuit applied this exception to a police department's recording of all calls taking place on all lines in the department. The department implemented a policy in which it initially recorded all ingoing and outgoing conversations on all lines except one unlisted line that could be used for personal calls. Notice was given that all of the

---

[21] Although the Municipal Defendants do not join the individual Defendants' arguments in IV.B.1.a-b, supra, they do join the individual Defendants' argument on the ordinary course exception. This section's discussion, therefore, applies equally to the Municipal Defendants.

tapped lines were being recorded, both via written memorandum and a "beep" that alerted callers that the line was tapped. Almost nine years after the policy was implemented, the police department added the originally un-tapped line to the system but did not tell its employees. The plaintiffs challenged the "surreptitious" recording of this last line as violative of Title III, but the Seventh Circuit disagreed, finding that such recording is routine police practice because "[s]uch calls may constitute vital evidence or leads to evidence, and monitoring them is also necessary for evaluating the speed and adequacy of the response of the police to tips, complaints, and calls for emergency assistance." Amati, 176 F.3d at 954. The court additionally concluded that such recording was ordinary even absent overt notice because "what is ordinary is apt to be known" and where a police station records its own lines, notice is implicit. See id. at 955; see also Jandak v. Village of Brookfield, 520 F. Supp. 815, 821-25 (N.D. Ill. 1981).

Recording all incoming and outgoing calls in a police station may, therefore, fall within the ordinary course of law enforcement exception under Title III if it can be shown that the recording is routine and noninvestigative. But to extrapolate from this a per se rule that all recording of police lines falls within the exception is unsupportable. Indeed, Amati recognizes that some recording schemes will fall clearly outside the reach of the exception, 176 F.3d at 956, and whether a recording scheme falls

within or outside the exception will inevitably be based on the specific facts developed at trial. Cf. AccuSoft Corp. v. Palo, 237 F.3d 31, 46 (1st Cir. 2001). Here, the Defendants suggest that the recording was "utilized for call cost accounting in order to eliminate, or at least minimize, any misuse of the lines for private purposes, long distance, or '900' calls and to preserve and accurately recall messages relating to emergencies or official police business." But this proffered justification, intended as it is to explain the recording of all lines in the PPSC, does not square with a number of the Defendants' statements. For instance, Defendant Vieira stated in deposition testimony that "[y]ou just don't record lines unless they're emergency lines" and that recording all lines would "be in violation of the city's policies and procedures," and, finally, that "if the system had been installed and was recording all these lines, it would not be put in and used in the ordinary course of business of the communications department of the City of Providence." Clearly, these statements call into question the purpose of the Total Recall system and whether it can be considered routine and noninvestigative. Accordingly, the Total Recall system does not unequivocally fall within the ordinary course of law enforcement exception, and summary judgment on the Title III claim cannot be granted on this ground.

d. Consent

Finally, although Defendants argue that the "consent exception" also compels granting their motion for summary judgment, the record suggests otherwise. The defendants' disquisition on the contours of the law governing the consent exception notwithstanding, there is simply no evidence suggesting that the Plaintiffs were aware that their conversations were being recorded. In fact, to believe the Defendants' repeated protestations that they had no idea the calls were being recorded would appear to convincingly foreclose any serious argument that the Plaintiffs had actual notice of the recording practice. It is true that there was a public bidding process to implement the system and that its use and capabilities may have been "openly discussed," but Defendants can point to nothing in the record establishing that these Plaintiffs, specifically, were on notice of the recording of all the telephone lines in the PPSC. In any event, at minimum, this is a factual question for the jury.

Barring actual notice, Defendants are left to argue that the circumstances surrounding the use of the Total Recall system establish implied consent. But it is the "rare case where the court can conclude with assurance from surrounding circumstances . . . that the [party] knowingly agreed to the surveillance," Lanoue, 71 F.3d at 981 (internal quotation marks and citation omitted) (emphasis in original), and here, the surrounding circumstances do

not even come close. It is true that an e-mail was circulated to at least a number of PPSC employees, but there is no indication that this e-mail was sent to the Plaintiffs. Additionally, there was no "beep" or similar warning emitted from the telephone lines, no official memorandum circulated advising the employees at the PPSC that the lines were being recorded, no effort to seek consent from the employees and deposition testimony that suggests that at least to Defendant Lennon's knowledge, and no employees knew about the recording system. Combined with the Defendants' own repeated and explicit abnegation that they knew the phone lines were being recorded, it is clear that at this stage of the proceedings, the recording cannot be said to fall within the consent exception.

2. Municipal Defendants

a. Preemption

The Municipal Defendants contend that "plaintiffs cannot simultaneously pursue relief under the federal and state wiretapping statutes." Citing Whitaker v. Garcetti, 291 F. Supp. 2d 1132 (C.D. Cal. 2003), *rev'd*, 486 F.3d 572 (9th Cir. 2007), they argue that where the Defendants are local officials and where the two wiretapping statutes (state and federal) regulate the same sphere of conduct, unless the federal statute preempts the state statute, Plaintiffs may only proceed under the state scheme. This odd notion of "reverse preemption" flies in the face of traditional rules governing the interplay between federal and state statutory

schemes. Simply put, there is no authority for this argument whatsoever; Whitaker, which was an outlier, has now been reversed and the Court declines to follow its logic. There is no legal or doctrinal basis for Defendants' argument, and it is rejected out of hand.

b. Municipal Liability

The Municipal Defendants, however, have one remaining arrow in their quiver of arguments against allowing the Title III claim to proceed. They argue that under Title III municipalities are immune from suit and, therefore, Plaintiffs' Title III claim against them must be dismissed. This argument poses a difficult hurdle for Plaintiffs to surmount, and requires some discussion.

In Abbott v. Village of Winthrop Harbor, 205 F.3d 976 (7th Cir. 2000), the Seventh Circuit faced a suit, similar to this one, in which a set of plaintiffs sued a municipality, the Village of Winthrop Harbor, for alleged violations of the Federal Wiretapping Act. As noted earlier, the precise language under § 2511(1)(a), which sets forth the private right of action for violations of Title III, states that "any person who-(a) intentionally intercepts, endeavors to intercept, or procures any other person to intercept or endeavor to intercept, any wire, oral, or electronic communication" shall be found in violation of the statute and subject to penalties. 18 U.S.C. § 2511(1)(a). The Seventh Circuit was asked to construe the word "person" in this provision to

include municipalities even though the definition extended only to "any employee, or agent of the United States or any State or political subdivision thereof, and any individual, partnership, association, joint stock company, trust, or corporation." § 2510(6). The plaintiffs observed that even though § 2510(6) defined "person" without reference to municipalities, the Act's specific provision for recovery of civil damages, § 2520, authorized recovery against any "person or entity," and they argued that this language ("or entity" was added by Congress in 1986) draws municipalities into the coverage and scope of who may be liable under the statute.

The court disagreed, noting that the legislative history was silent as to the reason behind the addition of the term "entity," and it refused to infer from that term a meaning that was not plain on its face or explicit in the legislative history. In fact, the court went so far as to quote with approval a district court's opinion that "[i]t is unreasonable to conclude that Congress intended to subject an entire class of defendants to potential liability without any expression of that intent in the legislative commentary." Abbott, 205 F.3d at 980 (quoting Amati v. City of Woodstock, 829 F. Supp. 998, 1003 (N.D. Ill. 1993)). The court also found persuasive the fact that "Congress has never amended the definition of 'person' in § 2510(6)." Id. This holding has been

followed by at least one other court. See Anderson, 374 F. Supp. 2d at 1244-46.

But there is middle ground between unreasonably expanding the meaning and scope of a term absent any indication of Congressional intent (something which the Abbott court sought to prevent) and refusing to give any meaning to a term whatsoever (something which the Abbott court did). To reject the claim that "entity" as it is used in § 2520 includes government entities requires that some other explanation be offered for Congress's decision to add the term. This is so because courts "must read statutes, whenever possible, to give effect to every word and phrase," Narragansett Indian Tribe v. Rhode Island, 449 F.3d 16, 26 (1st Cir. 2006) (en banc), and "[w]hen engaged in statutory interpretation, courts may 'assume that Congress used two terms because it intended each term to have a particular, nonsuperfluous meaning.'" Valerio v. Putnam Assocs. Inc., 173 F.3d 35, 42 (1st Cir. 1999) (quoting Bailey v. United States, 516 U.S. 137, 146 (1995)).

In Abbott, the court offered no alternative explanation for Congress's addition of the term, except to say that nothing in the legislative history supported an interpretation that "entity" was meant to include government entities. But this is no answer for what the term does mean, and it leaves Congress's addition nugatory. See Solid Waste Agency of N. Cook County v. U.S. Army Corps of Eng'rs, 531 U.S. 159, 172 (2001) ("[I]t is one thing to

give a word limited effect and quite another to give it no effect whatever."). It is possible that Congress added the term to ensure that business entities were covered under the Act, but as a number of courts have pointed out, § 2510(6)'s definition of "person" already includes business entities, see Conner v. Tate, 130 F. Supp. 2d 1370, 1374 (N.D. Ga. 2001); Dorris v. Absher, 959 F. Supp. 813 (M.D. Tenn. 1997) rev'd on other grounds 179 F.3d 420 (6th Cir. 1999); Bodunde v. Parizek, 1993 WL 189941 (N.D. Ill. May 28, 1993), so such an explanation would be redundant. One court has also suggested that Congress added the term to "maintain consistency with the alternative language contained in section 2511(3)(a)," which was also added in 1986 and which included the phrase "person or entity." See Amati, 829 F. Supp. at 1002. But this merely shifts the burden, from § 2520 to § 2511(3)(a), to explain the meaning of the added term and the district court could not offer any adequate explanation as to why Congress added the term "entity" in § 2511(3)(a). See id. at 1002 n.5. In short, no court has suggested a reasonable alternative explanation for Congress's addition, and those that have rejected construing the meaning of "entity" to include governmental entities have done so solely on the basis that there is no evidence to support such an inference.

All this heuristic interpretation aside, this Court believes that the most reasonable and nonsuperfluous understanding of the term "entity" is that Congress did intend to include governmental

entities within the scope of liability for violations of Title III. Indeed, support for this can be found in a parallel provision within the Act, § 2707(a), which Congress amended at the same time. There, the Senate Committee Report summarizing the provision (which establishes liability for intercepting stored communications) "specifically states that the word 'entity' includes governmental entities." Adams v. City of Battle Creek, 250 F.3d 980, 985 (6th Cir. 2001) (citing S. Rep. No. 541, 99th Cong., 2d Sess. 43 (1986), reprinted in 1986 U.S.C.C.A.N. 3555, 3597). It is true that no similarly clear report exists for § 2520, but this silence is not dispositive, especially because "[s]tatutory construction is a holistic endeavor" requiring courts to recognize that "[a] provision that may seem ambiguous in isolation is often clarified by the remainder of the statutory scheme-because the same terminology is used elsewhere in a context that makes its meaning clear, or because only one of the permissible meanings produces a substantive effect that is compatible with the rest of the law." Koons Buick Pontiac GMC, Inc. v. Nigh, 543 U.S. 50, 60 (2004) (internal quotations and citations omitted). The bottom line is that the word "entity" in § 2520 is not qualified so as to exclude governmental entities. The pointers that do exist indicate that Congress meant for the word to be broadly construed; and this construction is practical and consistent with the remainder of the statutory scheme. See King v. St. Vincent's Hosp., 502 U.S. 215,

221 (1991). Consequently, summary judgment for the Municipal Defendants on Plaintiffs' Title III claim will be denied.

C. Qualified Immunity

All three individual Defendants, Vieira, Prignano and Lennon next assert that they are entitled to qualified immunity on some or all of Plaintiffs' claims. Qualified immunity shields certain government officials from liability for civil damages "insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." Harlow v. Fitzgerald, 457 U.S. 800, 818 (1982). The First Circuit has instructed that qualified immunity claims are evaluated under a three-part test:

> First, we ask whether, [t]aken in the light most favorable to the party asserting the injury, . . . the facts . . . show the [defendant's] conduct violated a constitutional right. If so, the second question is whether that constitutional right was clearly established at the time of the . . . violation. The third question is whether a reasonable [defendant], similarly situated, would understand that the challenged conduct violated the clearly established right at issue.

Borges Colon v. Roman-Abreu, 438 F.3d 1, 18-19 (1st Cir. 2006) (internal citations and quotations omitted); see Savard v. Rhode Island, 338 F.3d 23, 27 (1st Cir. 2003); see also Saucier v. Katz, 533 U.S. 194, 201 (2001).

With respect to the second clearly established question, the First Circuit has asked "whether the right was clearly established at the time of the alleged violation such that a reasonable officer would be on notice that [his] conduct [was] unlawful." Riverdale

Mills Corp. v. Pimpare, 392 F.3d 55, 61 (1st Cir. 2004) (quoting Suboh v. Dist. Attorney's Office, 298 F.3d 81, 90 (1st Cir. 2002)). Further, qualified immunity will protect the official who mistakenly violates a clearly established law if his "mistake as to what the law requires is reasonable." Saucier, 533 U.S. at 205.

Although seemingly straightforward in its application, recent cases in this circuit have clarified the Supreme Court's statement in Saucier that the first prong of the qualified immunity analysis is satisfied where a constitutional right "would have been violated were the allegations established." 533 U.S. at 201. In both Riverdale Mills and Buchanan v. Maine, 469 F.3d 158, 168 (1st Cir. 2006), the First Circuit has suggested that Saucier's formulation may not be completely appropriate for cases that have reached the summary judgment stage. Noting that "[t]he issue of how specific the first prong is meant to be is an issue that has troubled courts for some time," the First Circuit has instructed that "[t]he level of specificity depends on the stage of the proceedings at which a qualified immunity defense is brought." Riverdale Mills, 392 F.2d at 61. Thus, where the inquiry occurs on a motion to dismiss pursuant to Fed. R. Civ. P. 12(b)(6), the Saucier rule applies, requiring courts to resolve the question taking the facts in a light most favorable to the plaintiffs and basing the determination only on the facts stated in the complaint itself. Id. With such an inquiry, the potential violation of a constitutional right is

likely to be nonspecific and the right possibly violated broad. Alternative Sys. Concepts, Inc. v. Synopsys, Inc., 374 F.3d 23, 29 (1st Cir. 2004).

Where, however, a qualified immunity defense is raised at the summary judgment stage, the First Circuit has construed Saucier and its progeny to require a more searching inquiry into both the facts alleged and the parties' submissions, including "all the uncontested facts and any contested facts looked at in the plaintiff's favor." See Riverdale Mills, 392 F.2d at 62 (noting that the point of the first prong is to "aid in law elaboration" and that, at least at the summary judgment stage, any "very generalized proposition such as whether it is a constitutional violation for enforcement officers to perform an unreasonable search . . does nothing to further elaborate the law"). Courts are therefore left to address the first prong with the appropriate level of specificity based on the posture of the proceedings. See Int'l Action Center v. United States, 365 F.3d 20, 25 (D.C. Cir. 2004) ("The validity of the qualified immunity analysis 'depends substantially upon the level of generality at which the relevant "legal rule" is to be identified.'") (quoting Anderson v. Creighton, 483 U.S. 635, 639 (1987)).[22]

[22] At least one Defendant, Vieira, also argues that he is entitled to qualified immunity on Plaintiffs' Title III claim. But, the sum total of his argument for this contention is the following: "Although the foregoing analysis deals with the application of qualified and supervisory immunity in actions under

1. First Prong

Here, although the Defendants imply familiarity with the burden the initial stage of the qualified immunity inquiry requires (for instance, Vieira states "[i]n order to satisfy the first prong of the qualified immunity analysis, plaintiffs must demonstrate that the facts alleged show Vieira's conduct violated a constitutional right") they utterly fail to support the argument that no constitutional rights were violated beyond the hollow statement that: "plaintiffs have not established that [defendants] either personally or in [their] official capacity violated their rights." Of course this deficiency might be because the Defendants did not argue, on the issue of § 1983 liability, that Plaintiffs were not deprived of any constitutional rights, see DiMarco-Zappa, 238 F.3d at 36 (waiver of the argument that there was no constitutional violation for liability purposes is equally effective for qualified immunity purposes), or it might be due to the absence of any clear case law supporting such a claim.

But even applying the modified summary judgment standard for determining whether a constitutional right was violated, Plaintiffs

---

§ 1983, those defenses are equally applicable to the Plaintiffs' Title III claims which are addressed later in this memorandum." Qualified immunity for statutory claims premised on Title III is not always straightforward and requires its own analysis. Compare Blake v. Wright, 179 F.3d 1003 with Berry v. Funk, 146 F.3d 1003 (D.C. Cir. 1998). Vieira fails to even remotely develop his argument and cites no case law in support of his claim. This Court is not in the business of conjuring a party's arguments and, accordingly, this argument is waived.

successfully meet the first prong. The constitutional right Plaintiffs allege was violated is not a Fourth Amendment right in the abstract, see, e.g., Int'l Action Center, 365 F.3d at 25; rather, it is the Fourth Amendment protection of the right to privacy in wire communications - telephone calls - and that the surreptitious recording of those calls (which, it goes without saying was carried out without Plaintiffs' knowledge or consent) violated the Fourth Amendment right to privacy. This right has been consistently recognized. See Blake v. Wright, 179 F.3d at 1008 (recognizing that "[f]ederal case law has specifically delineated a fundamental right to privacy in wire communications based on the Fourth Amendment" and applying this to the recording of telephone conversations); State Police Litig., 888 F. Supp. at 1260 (noting that "the capture of private telephone conversations is a search for Fourth Amendment purposes . . . [s]ince the Supreme Court's decision in Katz v. United States, 389 U.S. 347 (1967)). And Plaintiffs have alleged sufficient facts to survive summary judgment on the question of whether they had a reasonable expectation of privacy in their calls. Therefore, under this analysis, Defendants' argument that no constitutional right was alleged to have been violated must be rejected.[23]

---

[23] Thus, any claim by Defendants that they were acting only in a supervisory capacity, and are therefore entitled to qualified immunity under a theory of supervisory immunity is premature. Supervisory immunity will only protect an official from suit where it can be shown that the official did not participate in the

2. Second Prong

Turning next to the question of whether the Plaintiffs' Fourth Amendment rights were clearly established, Defendants, again without any support, baldly assert that "[t]he law regarding the monitoring of phone lines was sufficiently unclear at the time of the alleged violations that a 'reasonable' person in defendants' position would not have known he was violating 'clearly established' rights." Without any further development, the Court would be left to guess why this might be the case were it not for the fact that "[o]ne tried and true way of determining whether [a] right was clearly established . . . is to ask whether existing case law gave the defendants fair warning that their conduct violated the plaintiff's constitutional rights." Suboh v. Dist. Attorney's Office of Suffolk Dist., 298 F.3d 81, 93 (1st Cir. 2002). This inquiry extends not just to Supreme Court case law, but to all available cases. Id.

Here, at the time Defendants acted to procure, install and direct the Total Recall system, ample case law supports Plaintiffs' position that this conduct directly violated Plaintiffs' constitutional right to their reasonable expectation of privacy in

---

challenged conduct himself. See Bisbal-Ramos v. City of Mayaguez, 467 F.3d 16, 25 (1st Cir. 2006). Here, the § 1983 claims go forward on the basis of the Defendants' alleged direct participation in unconstitutional conduct. See DiMarco-Zappa, 238 F.3d at 35 (finding that where personal liability is established, "the issue of supervisory liability is superfluous").

their phone calls into and out of the PPSC.[24] See Amati v. City of Woodstock, 1997 WL 587493, *2 (N.D. Ill. Aug. 7, 1997) ("[A]lleged conduct of surreptitiously recording telephone of conversations without listening is a violation of . . . the Fourth Amendment."); State Police Litig., 888 F. Supp. at 1260-61.

3. Third Prong

Defendants make no argument that they acted in an objectively reasonable manner in procuring and installing the Total Recall system except to assert that they did not act with deliberate indifference. This argument again misunderstands the nature of Plaintiffs' claims, which are not unequivocally tied to the theory of supervisory liability, but are, rather, premised on a theory of direct liability for Defendants' alleged direct participation in unconstitutional conduct. Nevertheless, assuming the facts in the record and as alleged by Plaintiffs, including, especially, the evidence that no notice that the system was in use was ever given, the Court concludes that no reasonable official could have concluded that the alleged conduct of tapping and recording all

---

[24] Any attempt to claim that the law was not clearly established because of Title III's exceptions to liability is unpersuasive because it relies on a specific interpretation of the facts concerning notice and intent. As noted earlier, there is a dispute over whether Defendants sought to record all lines in the ordinary course of business and whether Plaintiffs consented to the recording or were on notice. Under Plaintiffs' version of the facts, Defendants' conduct violated Title III, therefore for purposes of the clearly established prong of qualified immunity, the Court must assume that the Title III exceptions are inapplicable. See Anderson, 374 F. Supp. 2d at 1252.

lines into and out of the PPSC was permissible and not in violation of the Fourth Amendment. See State Police Litig., 888 F. Supp. at 1261. Consequently, Defendants' claim that they are entitled to qualified immunity on the § 1983 claim must be rejected.

D. State Laws[25]

1. Right to Privacy

Under R.I. Gen. Laws § 9-1-28.1, in order to establish a violation of a right to privacy, plaintiffs must show that the defendants engaged in "an invasion of something that is entitled to be private or would be expected to be private," and the invasion must have been "offensive or objectionable to a reasonable man." This requires both a subjective and objectively reasonable expectation of privacy. See Pontbriand v. Sundlun, 699 A.2d 856 (R.I. 1997). Defendants argue that Plaintiffs did not have a subjective or objectively reasonable expectation of privacy in their telephone calls into and out of the PPSC. Here, for the same reasons as discussed above in V.A infra, summary judgment on this claim will be denied.

---

[25] The analysis of these state law claims applies with equal force to the Municipal Defendants, who have failed to offer any evidence why, as a matter of law, Vieira, Prignano and Lennon were acting outside their scope of employment, thereby negativing liability for the municipality. See Cruz v. Town of N. Providence, 833 A.2d 1237, 1240 (R.I. 2003).

2. R.I. Gen. Laws § 11-35-21

R.I. Gen. Laws § 11-35-21 makes it punishable for any person to "wilfully intercept[], attempt[] to intercept, or procure[] any other person to intercept or attempt to intercept, any wire, electronic, or oral communication." Defendants argue that there is no evidence that they "willfully," meaning deliberately or intentionally, intercepted the Plaintiffs' telephone calls. For the same reasons discussed in V.A.1-3 infra, this argument can be rejected.

Defendants also contend that this statute is a criminal statute and therefore does not create a cause of action to support Plaintiffs' claims. Although true, Plaintiffs correctly point out that R.I. Gen. Laws § 9-1-2 is the "enabling act giving a person injured as a result of a crime or offense a right of action where none existed at common law." Lyons v. Town of Scituate, 554 A.2d 1034, 1036 (R.I. 1989). This statute has been found to allow a plaintiff to "bring a cause of action even if no criminal complaint for the crime or offense has been filed." Mello v. DaLomba, 798 A.2d 405, 411 (R.I. 2002). Here, based on the analysis contained in V.A.1-3 infra, disputes of fact exist as to whether the Defendants violated § 11-35-21 and because § 9-1-2 allows for a cause of action premised on an allegation that this criminal statute was violated summary judgment on this claim will be denied.

3. R.I. Gen. Laws § 12-5.1-1

The Rhode Island wiretap statute is in large part parallel to the federal wiretap statute. See Pulawski v. Blais, 506 A.2d 76, 77 (R.I. 1986). The statute provides that "[a]ny person whose wire, electronic, or oral communication is intercepted, disclosed, or used in violation of this chapter shall have a civil cause of action against any person who intercepts, discloses, or uses the communications." R.I. Gen. Laws § 12-5.1-13. Thus, where an interception is made in nonconformance with § 12-5.1-1 et seq., a cause of action may lie. Defendants argue that the only conceivable violation of this statute would be if they had disclosed the intercepted communications, in violation of § 12-5.1-10, something which has not been alleged here. However, the use of the disjunctive in the statute suggests that, in fact, a violation can occur where a person's "wire, electronic, or oral communication is intercepted," not just disclosed, "in violation of this chapter." § 12-5.1-13. It should be noted that this reading comports with federal wiretap statute in the sense that under Title III a violation exists not just for disclosure of communications but also for the interception of communications. See 18 U.S.C. § 2511(1)(b). For the reasons discussed above, disputes of fact exist about the role Defendants played in the interception of

Plaintiffs' communications and, therefore, summary judgment on this claim will be denied.[26]

## VI. Conclusion

For the foregoing reasons, Defendants' Motions for Summary Judgment are DENIED. Defendant Lennon's Motion for Sanctions is DENIED.

It is so ordered.

WESmith

William E. Smith
United States District Judge
Date: 7/6/07

[26] The Court does not reach the question of whether the state wiretap statue applies to municipalities because here the municipality has not developed any argument as to why it should not be liable for the conduct of its employees. The question whether or not the statute allows for suits against municipalities directly is therefore superfluous.